UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

99 FEB -9 PM 3: 33

FRANCISCO FUSTER-ESCALONA)
)
    Petitioner, )
)     Case No. 97-1369-CIV-LENARD
-vs- )     MAGISTRATE JUDGE SORRENTINO
)
HARRY K. SINGLETARY, )
)
    Respondent. )
)
_____ )

## MOTION FOR AN EVIDENTIARY HEARING AND FOR LIMITED DISCOVERY

COMES NOW PETITIONER, FRANCISCO FUSTER-ESCALONA, and

requests an evidentiary hearing and limited discovery. This Motion addresses the need for

an evidentiary hearing to submit evidence to support a number of federal constitutional

claims that stem from the improper introduction at trial of unreliable evidence –

specifically, the results of an unreliable gonorrhea test;[1] the testimony of a key witness,

Iliana Fuster, whose memory was hypnotically altered;[2] and the reports of children who

had been subjected to unduly suggestive questioning.[3] Mr. Fuster also addresses herein

the reasons that he is entitled to such an evidentiary hearing in light of the inadequacy of

state court factfinding procedures available to him during postconviction proceedings.

Finally, Mr. Fuster makes one limited discovery request. That is, he wishes to obtain

---

[1] In violation of Mr. Fuster's rights of due process, of Brady v. Maryland, and of effective assistance of counsel, or as constituting newly discovered evidence.

[2] In violation of Mr. Fuster's rights of due process, of Brady v. Maryland, of confrontation, and of effective assistance of counsel, or as constituting newly discovered evidence.

[3] In violation of Mr. Fuster's due process and confrontation rights, and as constituting newly discovered evidence.

1



evidence from the Behavior Changers - the psychologists who met with Iliana Fuster in

prison for eight weeks leading up to her appearance at trial - describing the processes

they used to induce Ms. Fuster to change her long-standing claim of her own and Mr.

Fuster's innocence to a guilty plea and to testify against Mr. Fuster.[4]

In support of this Motion and the limited discovery request, Mr. Fuster relies upon

the certifications attached hereto of:

- Amy Gershenfeld Donnella, the undersigned counsel;

- W.L.H. Whittington, an expert in sexually transmitted diseases;

- Maggie Bruck, Ph.D., an expert in the effects of suggestive questioning on

    children; and,

---

[4]  Mr. Fuster is aware that this Court is concerned that the factual
underpinning for this claim consists only of newspaper articles and
other evidence from years after trial. However, Mr. Fuster has now
obtained billing records from August and September, 1985, submitted by
the Behavior Changers to Iliana Fuster's defense counsel, which show
that these psychologists met with Ms. Fuster almost daily for this
eight week period, and that they met frequently with her attorney and,
on several occasions, with lawyers from the state attorney's office.
Please see Ofshe, Exhibit 6.  Ofshe, Exhibits 7 and 8, attached hereto,
further support the contention that Ms. Fuster's defense counsel was
willing to employ improper means to obtain a guilty plea from Ms.
Fuster. Both documents predate the trial.  Hopefully this will allay
some of the Court's concerns regarding the potential of this claim.

However, and more importantly, Mr. Fuster's ability to obtain
information contemporaneous to trial with which to prove his claim
rests in his ability to obtain from the Behavior Changers records
describing their sessions with Ms. Fuster to corroborate her 1994
testimony, and to substantiate this claim. And it may be necessary,
depending on what is contained in these records to take the depositions
of these two psychologists, who played such an instrumental role in
overcoming Ms. Fuster's eleven month long insistence upon her and Mr.
Fuster's innocence.  Thus, denying Mr. Fuster the opportunity for this
limited discovery would put him in a Catch-22 situation - without
discovery, he cannot support his claim with further facts that would
support his request for discovery.  Again, Mr. Fuster hopes that the
combination of the affidavit he attaches hereto along with the exhibits
to that affidavit, and Mr. Fuster's arguments herein regarding the
inadequacy of the state court factfindings, will convince this Court to
grant him the very limited discovery he now seeks.

- Richard Ofshe, Ph.D., an expert in the misuse of influence procedures and the creation of pseudo-memories by psycho-therapists;

and upon the following:

**The Need for an Evidentiary Hearing and For Limited Discovery**

1. Mr. Fuster asks this Court to grant him an evidentiary hearing at which he can put on the live testimony of three expert witnesses, whose certifications he attaches to this Motion. Each of these experts provides an opinion in his or her certification (and would amplify the bases for his or her opinions at an evidentiary hearing) necessary for Mr. Fuster to prove: 1) that his constitutional rights were violated at trial; and/or 2) that newly discovered evidence now proves that evidence admitted at trial was so highly unreliable as to violate Mr. Fuster's rights to due process.

*Certification of W.L.H. Whittington*

2. The first certification attached hereto has been provided by W.L.H. Whittington, an expert in the testing procedures used to identify and diagnose sexually transmitted diseases. Whittington is a research scientist who currently serves as the Director of Epidemiology and Prevention Activities of the STD Control Programs for the Seattle-King County Department of Public Health and as the Director of the Neisseria Reference Laboratory for the Harborview Medical Center of the University of Washington in Seattle. Until recently, Whittington worked in similar capacities at the Centers for Disease Control Division of Sexually Transmitted Diseases. His positions included Chief of Epidemiology, VD Control Division at CDC.

3. In his affidavit, Whittington explains for the Court why the type of testing that was performed on Noel Fuster (NG) in 1984 to reach the diagnosis that Noel had

3

gonorrhea of the throat was unreliable.  Whittington also explains that the testimony given at trial by the prosecution's expert witness (and state employee)[5], and at deposition by a state-employed laboratory technician -- that the testing performed on Noel was incapable of producing a false positive result -- was false.

4. Whittington concludes to a reasonable degree of scientific certainty, based on his review of materials provided to him, the following:

- The trial testimony given by the prosecution's witness was inaccurate and highly misleading;

- The testing performed to determine that Noel Fuster had gonorrhea of the throat was unreliable and would not meet contemporary standards of accuracy; and

- The destruction by the laboratory after three days of the isolate taken from Noel's throat does not comport with standards employed by laboratories then or now where the diagnosis of gonorrhea is intended for use as evidence in a criminal prosecution for child sexual abuse.[6]

_____

[5]  Jackson Memorial Hospital is a county hospital. Moreover, the Rape Treatment Center, which is part of that hospital, is run in close affiliation with state law enforcement.

[6]  This Court may recall that one of Mr. Fuster's initial discovery requests was for information about the testing procedures used to determine that Noel had gonorrhea of the throat and to learn what had happened to the specimen taken from Noel's throat.  As undersigned counsel's certification details, Mr. Fuster has tried repeatedly since the filing of his original discovery motion to determine answers to those questions.

The consequence of these efforts, however, is that Mr. Fuster has now located an internal memorandum dated February 19, 1985 from assistant state attorney Dan Casey to assistant state attorney Dan Shiffrin, noting serious chain of evidence concerns **and the destruction after three days in the laboratory of Noel's throat specimen**.  This memorandum is attached hereto as Whittington, Exh. 2. At 2.

4

5.  Mr. Fuster hereby proffers Whittington's sworn statement along with the supporting documents and asks this Court to accept this evidence in support of his claim or to grant him an evidentiary hearing at which to put this evidence before the Court.

### Certification of Richard Ofshe, Ph.D.

6.  The second certification attached hereto is that of Richard Ofshe, Ph.D. Ofshe is a professor of sociology at the University of California at Berkeley and co-author, *inter alia,* with Ethan Watters of *Making Monsters: False Memories, Psychotherapy and Sexual Hysteria,* Scribner's, 1994 (reissued by the University of California Press in 1996.) The central focus of Ofshe's research and writing in recent years has been in the area of the misuse of influence procedures and the creation of pseudo-memories by psychotherapists.

7.  Ofshe was provided with a number of documents, listed in his attached certification,[7] and asked to assume, for purposes of rendering his expert opinion, that the

---

Mr. Fuster has also located the depositions of two laboratory technicians who prepared and tested the specimen. These depositions provide the answer to the other questions Mr. Fuster had sought discovery on with regard to this claim - *i.e.,* what type of testing was conducted to reach the diagnose testified to at trial. These depositions are attached hereto as Whittington, Exhs. 4 and 5. These depositions, it should be noted, confirm Mr. Fuster' original claim, disputed by Respondent, that the specimen had been tested using a test known as RapID NH System.

[7] Since Mr. Fuster submitted his original discovery request, he has also located several documents that bear upon this claim. First, he has found three letters, written by mental health professionals, evaluating Iliana Fuster's competence to stand trial. These were each written during the summer of 1985, prior to the time the Behavior Changers began meeting with Ms. Fuster. Please see Ofshe, Exhs. 3-5.

As noted supra, Mr. Fuster has also obtained the billing letters sent by the Behavior Changers to Ms. Fuster's attorney. Ofshe, Exh. 6. These note the ongoing meetings they had with Iliana at the prison, consultations with Iliana's attorney, and consultations with Janet Reno and John Hogan, from the state attorney's office. They also note a period of 7 ½ hours they spent reviewing videotapes. (No indication is given of what videotapes they were reviewing. The two possibilities

statement under oath given by Ileana Fuster in Honduras in 1994 was both truthful and historically accurate.  Using this as the hypothetical basis for his opinion, Ofshe was asked whether he considered the testimony given by Ileana Fuster at trial in 1985 to be reliable – that is, an accurate reflection of historical events as opposed to a report of pseudo-memories induced by prior hypnosis.

8. Ofshe provides his expert opinion, to a reasonable degree of scientific certainty, that Ileana's trial testimony was not reliable but was the product of hypnotically-induced fantasies occasioned by the psychotherapy she received in prison.

9. Ofshe further explains that, in order for him to be able to render an opinion that was not hypothetical, he would need information from a source other than Ileana regarding the nature of the therapy sessions she had with the Behavior Changers.  Ofshe suggests that the best evidence of this would be the notes of the therapists who conducted these sessions with Ileana, any recordings they may have made of these sessions and deposition testimony from them. Such information would either corroborate or

---

that leap to mind are that they were viewing videotapes of the children's interviews with the Bragas or that they made their own videotapes of their sessions with Iliana Fuster.)

Mr. Fuster has also attached, as Ofshe, Exh. 7, an affidavit filed on July 29, 1985, by assistant public defender Herb Smith, noting that Ms. Fuster's lawyer, Michael von Zamft, had announced to him and Jeffrey Samek at lunch that he (von Zamft) would prosecute Iliana "even more severely than the state of Florida would." Ofshe, Exh. 8, is a memo to the file from Assistant State attorney Dan Casey, dated August 5, 1985, noting that Michael von Zamft had told Casey that he intended to argue a duress defense for Iliana but that he anticipated the state would object to this defense "because of the inability of Iliana to admit the underlying charges. Michael questioned our ability to do so if he proffered that Iliana had told him in confidence that she would be able to admit the facts. **Michael then went on and stated that he would so proffer, regardless of the truthfulness of that proffer. When questioned as to his desire to so proffer untruthfully, regardless of the truthfulness, Michael stated that if it got Iliana off he would do it.**" Please see Ofshe, Exh. 8.

disconfirm his hypothetical opinion that Ileana was repeatedly hypnotized, instructed to hypnotize herself repeatedly, and fed information while in a dissociative state that resulted in the creation of pseudo-memories.

10.  Thus, Mr. Fuster asks that he be granted this limited discovery.

11.  Mr. Fuster also asks that, should he obtain this discovery, he be given the opportunity to present to this Court the opinion of Dr. Ofshe, revised in accordance with what the evidence discovered may reveal.  Mr. Fuster asks that he be permitted to do this either by affidavit or by providing live testimony at an evidentiary hearing before this Court.

### *Certification of Maggie Bruck, Ph.D.*

12. The third certification is that of Maggie Bruck, an expert in the field of children's memory and the influences that can affect it.  Bruck, a professor in the Department of Child and Adolescent Psychology at Johns Hopkins University, is co-author with Stephen Ceci, Ph.D. of *Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony,* American Psychological Association: Washington, D.C., 1995.  Bruck has written extensively in the field of suggestive interviewing techniques and has designed and conducted numerous studies that demonstrate the effects of suggestive questioning on children's responses and memories.

13.  In her affidavit, Bruck addresses several issues.  First, she explains that at the time of Mr. Fuster's trial in 1985, there was no research to support the testimony of Mr. Fuster's expert witness, Dr. Lee Coleman, regarding the influence of suggestive questioning on the Country Walk children.  Likewise, there was at the time no research to discredit the testimony of the state's expert witnesses.  By contrast, there now exists an

entire body of uncontroverted research that demonstrates not only that suggestive questioning can affect the reports and memories of children but also demonstrates the often catastrophic effects the suggestive questioning can have.

14. In her affidavit, Bruck explains the new research in detail and relates that research to the interviewing techniques used by police investigators (including Joseph and Laurie Braga), state employees at the Rape Treatment Center, private therapists, and others, when questioning these very young children.

15. Bruck concludes, to a reasonable degree of scientific certainty, that:

- The methods used to obtain allegations of abuse from the children in this case render their resulting accusations as unreliable evidence;

- In 1985, however, there were no scientific studies upon which to base such a conclusion;

- The testimony given by the experts for the prosecution has little if any scientific support;

- The studies that discredit the opinions given by the state's experts at trial did not exist in 1985.

16. Mr. Fuster asks this Court to accept into evidence the certification submitted by Dr. Bruck in support of his claim that newly discovered evidence shows that the reports by the children in this case were highly unreliable. Mr. Fuster also asks that this certification be considered in support of his claim that the hearsay repetitions of these children's claims were improperly admitted at trial, again because of their unreliability.

17. Mr. Fuster further asks that he be permitted to put on Dr. Bruck's live testimony at an evidentiary hearing before this Court. Dr. Bruck's live testimony would

be particularly useful in this case because she would be able to show the Court, through the use of videotaped experiments with children, the consequences of using suggestive interviewing techniques even in a controlled laboratory setting.

**Mr. Fuster's Entitlement to Limited Discovery and to an Evidentiary Hearing.**

18. In <u>Bracy v. Gramley</u>, 117 S.Ct. 1793, 1799 (1997), the Supreme Court said that <u>Harris v. Nelson</u>, 394 U.S. 286 (1969):

> stated that "where specific allegations before the court show reason to believe that the petition may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.

The Court then upheld the <u>Harris</u> standard by finding that the district court had improperly exercised its discretion with its blanket denial of the petitioner's discovery requests.

19. In the instant case, Mr. Fuster has now withdrawn all of his discovery requests save his request to find out from the Behavior Changers what form of therapy they provided to Iliana Fuster.  The certification of Mr. Fuster's expert, Dr. Richard Ofshe, explains why that piece of information is critical to proving Mr. Fuster's claim that Iliana's testimony was hypnotically induced.

20. Thus, Mr. Fuster believes it would be appropriate at this juncture for the Court to grant discovery on this issue if the state factfinding procedures were inadequate.

21. The inadequacy of state court factfindings is also the predicate for determining whether Mr. Fuster has the right to an evidentiary hearing in federal habeas

court, assuming his claims, if proven, would demonstrate a constitutional violation. Townsend v. Sain, 372 U.S. 293 (1963).[8]

22.  Mr. Fuster was denied adequate factfinding proceedings in state postconviction court. Although he was indigent and counsel was proceeding *pro bono*, Mr. Fuster was not given funds with which to hire experts or to conduct discovery.

23.  Nor was Mr. Fuster granted an evidentiary hearing to put on the evidence he was able to muster without funds.

24.  This Court will note, too, at the outset, that the state court did not make any findings of historical fact to which a presumption of correctness would otherwise attach. All of the state court findings were legal conclusions or mixed issues of fact and law to which Mr. Fuster is entitled to a *de novo* hearing in this Court.

25.  By far the most serious obstacle to Mr. Fuster's ability to prove his case in state court were the state court's erred legal determinations.

26.  Probably the gravest of these was the state court's fundamental error in finding Mr. Fuster's claims time-barred unless they constituted newly discovered evidence. The court not only time-barred Mr. Fuster's ineffective assistance of counsel claim in its written opinion but had much earlier announced in open court that it considered Mr. Fuster's petition time-barred except for newly discovered evidence claims.  This was simply wrong under Florida rules of procedure.

---

[8]    Note that 28 U.S.C. §2254(e)(1) provides another mechanism for obtaining a federal evidentiary hearing, even where the state court has provided adequate factfinding procedures.  That is, where a factual predicate could not have been previously discovered by the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

27.  At the time Mr. Fuster filed his Rule 3.850 petition in state court in Florida, he was still within the two-year statute of limitations period for filing a petition for post-conviction relief – whether or not his claims involved newly discovered evidence.  His claim, for example, of ineffective assistance of counsel was properly and timely filed.

28.  Nevertheless, the state postconviction court dismissed Mr. Fuster's claim of ineffective assistance of counsel, stating that it was time-barred by virtue of his failure to assert it within two years of the dismissal of his direct appeal on July 25, 1986 and *the return of jurisdiction* to the state court.  Resp. App. 332.  However, Florida rules of procedure permit the filing of a motion under Rule 3.850 within two years of the date that the mandate has been filed, following a direct appeal.  See Fla. Rules of Criminal Procedure, Rule 3.850(b), which states, "No other motion [other than a motion to vacate a sentence that exceeds the limits provided by law] shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence become final in a noncapital case . . ." See also, Green v. State, 676 So. 2d 32 (Fla 2d DCA, 1996) Finality of judgment is measured in Florida by the date on which the mandate issues, following completion of the direct appeal.  It is this date that determines the timeliness of a motion for postconviction relief.  See, e.g., Spaziano v. State, 570 So.2d 303 (Fla. 4th DCA, 1991); Cook v. State, 596 So. 2d 483 (Fla 1st DCA, 1992); Gallo v. State, 571 So. 2d 76 (Fla. 4th DCA, 1990); Miller v. State, 601 So. 2d 604 (Fla. 4th DCA, 1992); Jones v. State, 602 So. 2d 606 (Fla. 1st DCA, 1992).  The mandate in Mr. Fuster's case issued on December 2, 1991.  He filed his Rule 3.850 Motion in November, 1993, before the two year period had run.

29.  Thus, Mr. Fuster was clearly entitled to be heard on his claim of ineffective assistance of counsel.  Had the state court permitted him to pursue this claim, as it should have, Mr. Fuster would have also argued that counsel's ineffectiveness extended to his failure to challenge the gonorrhea testing and his failure to question the methods used to produce Iliana's guilty plea and testimony against Mr. Fuster as alternative grounds for relief.[9]

30.  Mr. Fuster was also entitled to prove that the state violated his rights to due process and committed <u>Brady</u> violations in connection with his gonorrhea claim.  After all, as argued in Mr. Fuster's Amended Petition, if defense counsel had enough reason at the time of trial to alert him to the possible unreliability of the gonorrhea testing performed on Noel Fuster, then the state must be held to have had that same knowledge. The fact that two of its employees testified under oath, one in deposition and one at trial, that the testing procedures used were infallible if they produced a positive result, means that the state allowed its witnesses to lie or to testify in gross disregard of the truth.

---

[9] The state has argued previously that any claims regarding ineffective assistance of counsel have to be barred on a theory of laches because trial counsel died after trial and cannot be questioned regarding his strategy decisions. Even assuming this were fair, which it is not, there is no conceivable strategy that would have militated in favor of not challenging the reliability of Noel's gonorrhea test.  A state expert testified that this test was absolutely accurate and that the only way a child could have gonorrhea of the throat was if someone ejaculated into the child's mouth.  With that as a predicate, no reasonable defense attorney would have failed to challenge whether the diagnosis of gonorrhea was itself reliable.

This evidence, of course, should also have been considered in conjunction with all the other evidence of defense counsel's ineffectiveness.

31.  If the state knew (or had reason to know) of the unreliability of these testing procedures and failed to so notify Mr. Fuster, this also constituted a violation of <u>Brady v. Maryland</u>.  Such information would have been highly exculpatory.

32.  Finally, it is clear from the internal memo from the state attorney's office that the state did know that the chain of evidence for this throat specimen was highly problematic.  The state also knew that the throat specimen had been destroyed after three days.  Again, the destruction of forensic evidence by a state laboratory – where the evidence is intended to be used as a primary piece of evidence against the defendant and where the testing procedures are not virtually perfect – is a clear due process violation.

33.  Mr. Fuster was provided no factfinding procedures to prove these violations in state court.  Instead, he was pre-empted by the state court's initial and wrong determination that he was only entitled to raise claims that constituted newly discovered evidence.

34.  With regard to the claim that Ileana Fuster had been hypnotized, the state postconviction court would again only consider this claim under a newly discovered evidence standard.  The court said, however, *inter alia,* that the facts underlying this claim were ascertainable at the time of trial.

35.  If the state court had not made its initial erred ruling on the timing of the petition, Mr. Fuster could have pursued this issue on alternative bases, as a claim of newly discovered evidence or as an issue of ineffective assistance of counsel.  There is, after all, no plausible strategic reason that defense counsel would not have fought to keep Iliana from testifying at trial if he knew that she had been hypnotized.  Florida does not permit a person to testify who has been hypnotized.  No defense attorney acting

13

reasonably could have imagined that Iliana's testimony would benefit Mr. Fuster in any way.[10]

34.  The state court also noted in ruling on this claim that Florida law does not permit an expert witness to comment on the truthfulness or credibility of a witness's statement in general.  Resp. App. 333.  Again, had the state postconviction court permitted, as requested, an evidentiary hearing on this matter or funds to obtain expert affidavits, Mr. Fuster could have demonstrated that he did not seek to have an expert testify as to Ileana's truthfulness or credibility.  Rather, Mr. Fuster sought then (as he does now) to have an expert testify as to the hypnotic procedures that were used on Ileana that rendered her trial testimony unreliable and inadmissible.  See, e.g., Ofshe Affidavit at ¶¶13 and 16.  The state postconviction court put the horse, so to speak, before the cart, cutting off factfinding proceedings on bases that would have answered that court's procedural concerns.  This, too, was procedural error on the state court's part that rendered the factfinding procedures in state court inadequate.

35. Finally, with regard to the issue of the suggestive questioning of children, this claim was unquestionably a matter of newly discovered evidence.  Unfortunately, the state postconviction court misunderstood the argument Mr. Fuster made in this regard.  The state court found that issues involving the interviewing techniques had been litigated at trial.  Further, the state court believed that the basis for Mr. Fuster's newly discovered evidence claim lay in evolving law from another jurisdiction.  That was a complete

---

[10]  Because the state appears to have also been aware of the procedures being employed with Ileana, this claim would also have been developed and presented under the legal theory that the state violated Mr. Fuster's Brady rights by failing to notify him Ileana had been hypnotized.

misapprehension by the state court of Mr. Fuster's claim – a misapprehension the court would not have labored under had it allowed Mr. Fuster to put on evidence on this point.

36. Mr. Fuster sought in his state postconviction proceedings to demonstrate that the testimony given by Dr. Lee Coleman, his expert at trial, while prescient in the sense that Dr. Coleman intuitively anticipated what research would later prove, was wholly unsupported by scientific research at the time of trial.[11] Indeed, Dr. Coleman was entirely discredited on cross-examination as he was forced to admit that there were no scientific studies that supported his beliefs and that there were no experts in the field who would agree with his positions. Moreover, the defense was unable at trial to debunk the unsupported assertions of prosecution expert witnesses who claimed to be able to judge when children were making true reports of sexual abuse – again, because the research had not yet been done that would prove their assertions false.

37. As Dr. Maggie Bruck's certification makes plain, the research simply did not exist in 1985. There now exists, however, a large and uncontroverted body of scientific studies that would have supported every one of Dr. Coleman's assertions. More than that, the new research demonstrates the far-reaching impact of suggestive questioning in ways that could have been graphically shown to the jury through videotapes of children participating in these research studies. The new research also shows quite strikingly how the false reports given by these children defy all previous expectations of child experts that a child who is lying will appear rigidly consistent, will fail to exhibit appropriate

---

[11]   Consider the fact that many scientific discoveries are preceded by someone's unproven hypothesis. Ancient Greek philosophers believed in the concept of the atom long before scientists were able to prove the atom's existence.

15

affect or will talk in generalities rather than providing highly detailed accounts.  See Bruck Affidavit.

38.  The state court permitted no factfinding on this claim.  Had the court granted an evidentiary hearing as requested, Mr. Fuster could have demonstrated that this issue fit precisely within the definition of newly discovered evidence.  Again, the failure of the state postconviction court to consider evidence on this issue foreclosed Mr. Fuster from being able to prove that this was indeed newly discovered evidence.

39.  Thus, because of errors in the legal determinations made by the state postconviction court, the state court failed to provide Mr. Fuster with adequate factfinding procedures.

40.  Finally, it must also be emphasized that Mr. Fuster was convicted on the basis of evidence, every piece of which was highly unreliable, as the attached certifications make clear.  This Court is always empowered to grant relief, and by extension, discovery and an evidentiary hearing, to prevent a fundamental miscarriage of justice.  No reasonable factfinder could have found Mr. Fuster guilty beyond a reasonable doubt if these central pillars of evidence had been excluded from evidence as they should have been or if legitimate and substantial challenges to the state's evidence had been made at trial.

Accordingly, Mr. Fuster requests that this Court:

1)  Grant him an evidentiary hearing at which he can put the testimony of his experts before this Court;

2)  Grant him the necessary funds to hire these experts for that purpose and to pay for their travel expenses to testify;

     3) Grant counsel the necessary funds to travel to Florida for an evidentiary

hearing;

     4) Grant him the right to obtain records from the Behavior Changers and to take

their depositions; and

     5) Grant him the funds with which to take these depositions.

Respectfully submitted this 5th day of February, 1999.

Amy Gershenfeld Donnella,
Attorney for Francisco Fuster-
Escalona

310 Chamounix Road
St. Davids, PA 19087
610-341-9566

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRANCISCO FUSTER-ESCALONA)

    Petitioner,

-vs-

HARRY K. SINGLETARY,

    Respondent.

_____

Case No. 97-1369-CIV-LENARD
MAGISTRATE JUDGE SORRENTINO

# EXHIBITS TO MOTION FOR AN EVIDENTIARY HEARING

Volume I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRANCISCO FUSTER-ESCALONA)
                      )
      Petitioner,      )
                      )    Case No. 97-1369-CIV-LENARD
-vs-              )   MAGISTRATE JUDGE SORRENTINO
                      )
HARRY K. SINGLETARY, )
                      )
      Respondent.     )
                      )
_____)

## CERTIFICATION OF AMY GERSHENFELD DONNELLA, COUNSEL FOR FRANCISCO FUSTER-ESCALONA

Amy Gershenfeld Donnella, being of full age, hereby deposes and states the following:

1. My name is Amy Gershenfeld Donnella. I am an attorney at law and am currently representing Petitioner, Francisco Fuster-Escalona in this habeas corpus action. I began representing Mr. Fuster in mid-October, 1997, shortly before the time he was given to file an Amended Petition with this Court.

2. I am a sole practitioner and I am representing Mr. Fuster on a *pro bono* basis. I have no staff of any sort, secretarial or investigative.

3. Mr. Fuster is indigent and is proceeding *in forma pauperis*. While Mr. Fuster's family has been able to secure occasional funds with which to pursue his case, the amount of these funds has been barely adequate to cover the expenses involved in even the most basic needs of the case such as copying costs and phone bills. Recently, however, they were promised a small donation with which to pay for the initial opinions

of the experts whose affidavits are appended hereto.  (As of this writing, those funds have not yet been received.)

4.  Several months ago, I filed a Public Records Act request with the Office of the State Attorney for Dade County.  I did so in the hopes of locating documents that would eliminate my need for the extensive discovery I had initially requested from this Court.

5.  In response to my request, I received a letter, dated December 10, 1998, from Senior Trial Counsel, Assistant State Attorney, Abraham Laeser.  (Mr. Laeser was one of the prosecutors at Mr. Fuster's trial in 1985.)  Mr. Laeser stated in response to my requests that:

> Most of the items which you request (27 file boxes) are legally available for copying.  As we have previously notified your client when he made a similar request, *the cost of such copying is prohibitive*, but could be undertaken upon proper payment for those expenses.

Please see Letter from Abraham Laeser attached hereto.  Mr. Laeser did not indicate what the actual cost of copying these files would be.

6.  Moreover, Mr. Laeser said in his letter that some of the items requested were excluded from disclosure by statute, by prior order of the Court in the underlying case, or privileged by general case law. Mr. Laeser then stated, "Quite obviously, we would resist disclosure of those items."  Mr. Laeser did not identify which items the state attorney's office regarded as being excluded from disclosure.  We do not have the resources, however, to fight a legal battle over disclosure of the state attorney's files.

7.  During the course of the 15 months I have represented Mr. Fuster, he has been transferred on 11 separate occasions to different correctional institutions.  These have taken him further and further away from his family, making meetings with them nearly impossible and inhibiting my ability to communicate with him.

8. When I began representing Mr. Fuster, he was being held in Baker Correctional Facility. He was then moved to North Florida Reception Center, then to Gulf, back to the Main Unit at N.F.R.C., then to the West Unit (which is a mile or so away from the Main Unit), then to Columbia, then back to N.F.R.C., then to Apalachee East, then to Apalachee West, then to N.F.R.C. (Main), back to N.F.R.C. (West) and most recently, on January 28, 1999, to Santa Rosa Correctional Facility, near the Alabama border.

9. Moreover, Mr. Fuster is unable to maintain access to his own files. He has been required to store his case files in the property or mail rooms of the prisons to which he has been transferred and only has limited access to them. Typically, he has been permitted only an hour twice a week to use his files. Thus, it has been difficult at best for him to help guide me through the massive documentation for his case.

10. In an effort to pursue any avenue possible to obtain records, operating under the funding constraints we have had, I asked Mr. Fuster's current wife to see if she could gain access to files maintained in conjunction with the civil lawsuit brought against Mr. Fuster and the Arvida Corporation, developers of the Country Walk Housing Development in which the Fusters lived while operating the babysitter service. Mr. Fuster was represented in this lawsuit by the lawfirm of Spencer and Taylor, which firm is no longer in existence.

11. Mrs. Fuster was eventually able to track down a storage unit in which a number of boxes of files from the Arvida litigation were being kept. Because Mrs. Fuster works full-time as a nurse, she spent her evenings for a period of several weeks, searching for documents she thought might be of use to this case.

*Official Records*
*Inc.*

(305) 541-8900

2917 N. W. 7th Street — Miami Florida 33125

DATE: ___JUN 27 1995___
RE: ___Fuster, Mael___
HOSP. #: ___1763530___

Jackson Memorial Hospital has recently received a written Authorization, or a Subpoena, for certain Medical Records of the above named patient.

As is true with most large organizations today, Jackson Memorial Hospital has had an ever increasing load of paper work. Our company, their service vendor, is assisting them in coping with the problem by furnishing you with the attached copies of the records you requested or Subpoenaed.

Our Invoice reflects a charge of $5.00 for the first seven pages of Xeroxing and/or microfiche printing. Additional Xeroxing is .50¢ per page and additional microfiche printing is .50¢ per page. Our minimum charge is $5.00 and your prompt payment directly to us is appreciated.

In the interest of patient confidentiality, the attached records shall not be used for other than the stated purpose and shall not be disclosed by recipient to any other party(ies). Recipients are requested to destroy these copies after the stated need has been fulfilled.

If you have any questions, please feel free to call.

Sincerely,

OFFICIAL RECORDS, INC.



*The Authorized Procurement and Duplication of Original Records*

WHITTINGTON Exhibit # 6

IN THE CIRCUIT COURT IN AND FOR DADE COUNTY, FLORIDA

JEFFREY I. MARKS and KAREN )
MARKS, et al., )
    Plaintiffs, )
             )
vs. )
             )
FRANCISCO FUSTER ESCALONA, et al.,)
             )
    Defendants. )

TODD LEININGER, et al., )
             )
    Plaintiffs, )
             )
vs. )
             )
FRANCISCO FUSTER ESCALONA, et al.,)
             )
    Defendants. )

CASE NO. 84-42560

CASE NO. 86-19449

SUBPOENA DUCES TECUM
WITHOUT DEPOSITION

THE STATE OF FLORIDA:

TO: Jackson Memorial Hospital, Attn: Medical Records Custodian,
1611 N.W. 12th Avenue, Miami, Florida 33136

YOU ARE COMMANDED to appear at **see below** in Miami , Florida, on
Thursday, June 26 , 19 86 at 9:00 A.M., and to have with you at that time
and place the following:

Any and all medical records, including medical test
results, pertaining to the examination and/or treatment
of Noel Fuster, during the years of 1983, 1984, 1985,
and 1986.

These items will be inspected and may be copied at that time. You will not be required to
surrender the original items. You may comply with this subpoena by providing legible copies of the
items to be produced to the attorney whose name appears on this subpoena on or before the sched-
uled date of production. You may condition the preparation of the copies upon the payment in ad-
vance of the reasonable cost of preparation. You may mail or deliver the copies to the attorney
whose name appears on this subpoena and thereby eliminate your appearance at the time and place
specified above. You have the right to object to the production pursuant to this subpoena at any
time before production by giving written notice to the attorney whose name appears on this sub-
poena.

If you fail to:

AS PER THE ATTACHED AUTHORIZATIONS OR SUBPOENA, WE COPIED
___ ENTIRE RECORD - (ALL ADMISSIONS AND ACCOMPANYING TREATMENT) appear as specified, or
___ ENTIRE RECORD - (CURRENT ADMISSION ONLY) obey this subpoena, or
___ ENTIRE RECORD - (ADMISSIONS ONLY) be in contempt of court. You are subpoenaed by the attorneys whose names appear on this
ADMISSION FACE SHEET and unless excused from this subpoena by the attorneys or the Court, you shall respond to
___ PHYSICAL ___ LAB AND DIAGNOSTIC REPORTS
___ HISTORY this subpoena as directed. ___ ANESTHESIA RECORD
___ EMERGENCY ROOM REC. ___ NURSING NOTES
___ DISCHARGE SUMMARY DATED on ___ CONSENTS JUN 19 1986 , 19
___ CONSULTATION ___ OPERATIVE REPORT
___ PROGRESS NOTES ___ PHOTOGRAPHY REPORTS
___ PATHOLOGY REPORT ___ OTHER
___ OUTPATIENT RECORDS

RICHARD P. BRINKER
Clerk of the Court

ARTHUR H. TAYLOR, ESQ.
             GINETTE AUDAIN

Attorney for Defendant, Francisco
        Fuster Escalona
1107 Biscayne Boulevard
Address, 19 West Flagler Street
    Miami, Florida 33130

BY ___
        Deputy Clerk

12057

076745

Neisseria
gonorrhea

t throat    GC Culture

MD Plate received

PEDI WALK IN
EXT 7400 R3

**JACKSON MEMORIAL HOSPITAL**

01-0116-0

C-310    **LABORATORY REPORTS**



JACKSON MEMORIAL HOSPITAL

**C-310**     **LABORATORY REPORTS**

12060



Ms plate Received only

GC culture

unitain?

**JACKSON MEMORIAL HOSPITAL**

01-0119-6

| C-310 | | **LABORATORY REPORTS** |

**JACKSON MEMORIAL HOSPITAL**
UNIVERSITY OF MIAMI SCHOOL OF MEDICINE
MIAMI, FLORIDA

| Hospital Record No. | Julian Date | Brought in By | | S W A O | Record Called | | Area |
|---|---|---|---|---|---|---|---|
| 176 J 530 | | | | | | | PWT |

Patient's Name · Date of Birth: 10-19-77 · Age: 6 yr

Social Security No. · Patient Telephone: 633-852

DISCHARGE CONDITION

DIAGNOSIS
Dx: Sexual Abuse

PATIENT INSTRUCTIONS

MEDICATION—MEDICINA

ACTIVITY—ACTIVIDAD
☐ Bed Rest (Duration) __
☐ Return to Work

DISPOSITION — ORDEN AL PACIENTE

I certify that the above care was needed and that the above patient instructions are correct.

8/13/84   5:30 P

C-210   EMERGENCY DEPARTMENT MEDICAL RECORD

176 3530 0 10/19/
FOSTER, NOEL
14810 SW 144 TERR N1A 53
4225   NZP   P   08/13/84

Complaint: Medical Clearance ~ PD

| Nurse | B/P | Pulse | Resp. | Allergies | | Onset Time | Age | Doctor |
|---|---|---|---|---|---|---|---|---|
| | | | | | | am/pm | | |

Time Ordered ~ 5 ~

Tests and Medications

WT. 59½# ~ 5 mg 6-7 yo old-ish hispanic male brought in by HRS for med. clearance
Calm/hyperactive ~ verbal, pleasant.

PE:

HEENT - NCAT - PERRL EOMi M's clear
T-clear    neck -supple, ↓ nodes

VDRL ~
Throat ~ } GC  chest: clear to A+P
urethral } culture  ABD - benign ↓ masses tend HSM
rectal

GU - nml circ penis - testes ↓↓ anus - nml appearance - ext - 8 c/c/e

Skin - superficial abrasion on (L) upper arm + abdomen ~2° to swimming accid told

(L) upper mass - post - 1 inch superific - based buttocks - 2 superific abrasions appulis in creases

man (L) one in (R)
(R) 2nd toe plantar surface ~½ cm pin size

Imp - no physical evidence of sex or physical abuse / neglect

DISCHARGE CONDITION

DIAGNOSIS
(?) o Sexual Abuse

| Admit To | Time | Physician |
|---|---|---|

PATIENT INSTRUCTIONS

ACTIVITY-ACTIVIDAD
☐ Bed Rest (Duration) / Descanso en Cama (Duración)
☐ Return to Work / Regrese al Trabajo
☐ Other (Specify) / Otro (Especifique)
(Date-Fecha)

MEDICATION-MEDICINA

DISPOSITION - ORDEN AL PACIENTE
☐ No follow-up required / No necesita continuar con atención médica
☐ Clinic Appt. (Name) / Cita en la Clínica (Nombre)
☐ Return to Private Physician / Regrese a su Médico Privado
☐ Nursing Home (Name) / Hogar de Ancianos (Nombre)
☐ Ambulance Transportation Needed / Es necesaria Ambulancia para transportarlo
☐ Instruction Form / Hoja de Instrucciones
☐ Other Instructions - Otras Instrucciones -

I certify that the above care was needed and that the above patient instructions are correct.

| Date Discharged | Time Discharged | Patient Signature |
|---|---|---|
| 8/13/84 | 5:3P | |

C - 210   EMERGENCY DEPARTMENT MEDICAL RECORD

1-06-9590-0-06/19/77
FOSTER, NOEL - DOB
14810 SW 144 TERR MIA 33119
4225  HZP  P  06/13/84 HZP

FROT WATK TN



DAILY UPDATE REPORT  13 AUG 84  12:2    PAGE 1

RPR    RPR G  -- FTA ABS - VDRL CSF

13 AUG 19:06

FUSTER, NOEL  6U  1763530  PWI
UNIVERSITY OF MIAMI — JACKSON MEMORIAL MEDICAL CENTER

C-310E

01-0068-8

OUTPATIENT LABORATORY REPORT

*Reagent Quality Control* The RapID NH Reagent is quality tested in situ using cultures of known reactivity on a previously quality tested lot of RapID NH Panels. The following organism is suitable for reagent quality control

| ORGANISM | RapID NH TEST | EXPECTED RESULTS |
|---|---|---|
| | PRO | + |
| | GGT | - |

## SHELF LIFE AND STORAGE

The expiration date and storage conditions of the RapID NH System components are stated on the outer containers. All components of the RapID NH System will retain activity when stored as directed for the period on the outer box.

IDS RapID NH Panels - Store at 2-8°C
IDS RapID NH Reagent - Store at 2-8°C

## LIMITATIONS

Interpretation of results and use of the RapID NH System requires a competent laboratorian who should judiciously make use of experience, knowledge, specimen information, and other pertinent procedures before reporting the identification of test organisms. Characteristics such as Gram stain reaction, oxidase, growth on selective and nutrient agars, growth requirements and morphology should be considered using the IDS System.

Expected values summarized in IDS DIFFERENTIAL CHARTS may differ from published information for conventional test methods. The IDS System is designed to address only those organisms listed in the IDS DIFFERENTIAL CHART. The use of organisms not listed may lead to aberrant results.

The accuracy of the IDS System is based upon the statistical use of the multiplicity of tests in the database. The use of any single test in the IDS System to delineate an identification is subject to the error inherent in that test alone.

## REFERENCES

1. Barnes, E H and J F Morris 1957 A quantitative study of the phosphatase activity of *Micrococcus pyogenes*. J Bacteriol 73:100-104
2. Blazevic, D J and G M Ederer 1975 Principles of biochemical tests in diagnostic microbiology. John Wiley & Sons, New York, N Y
3. Enriquez, L A and N E Hodinka 1983 Development of a Test System for the Rapid Differentiation of *Neisseria* and *Haemophilus* spp. J Clin Microbiol 18:1032-1039
4. Guilbert, G G 1970 Determination of enzymes in Enzymatic methods of analysis pp 43-51 Pergamon Press, New York, N Y
5. Kellogg, D S Jr, K K Holmes, and G A Hill 1976 Laboratory diagnosis of gonorrhoea. CUMITECH 4 (S Marcus and J C Sherris, Coord eds) Amer Society for Microbiol, Washington, D. C.
6. Kellogg, D S and E M Turner 1973 Rapid fermentation confirmation of *Neisseria gonorrhoeae*. App Microbiol 25:50-52
7. Kilian, M 1980 Haemophilus. In Manual of Clinical Microbiology, third edition (E H Lennette, A Balows, W J Hausler, Jr and J P Truant, eds) Amer Society Microbiol, Washington, D C
8. Morello, J A and M Bohnhoff 1980 *Neisseria* and *Branhamella*. In Manual of Clinical Microbiology, third edition (E H Lennette, A Balows, W J Hausler Jr, and J P Truant, eds) Amer Society Microbiol Washington D C
9. Nagatsu, T, M Hino, H Fuyamada, T Hayakawa, S Sakakibara, Y Nakagawa, and T Takemoto 1976 New chromogenic substrates for X-prolyl dipeptidyl-aminopeptidase. Anal Biochem 74:466-476
10. Rosalki, S B 1975 Gamma glutamyl transpeptidase. In Advances in Clinical Chemistry: 17 (O Bodansky and A L Latner eds) Academic Press, New York, N Y
11. Thornsberry, C, T L Gavan and E H Gerlach 1977 New developments in antimicrobial agent susceptibility testing. CUMITECH 6 (J C Sherris, Coord ed) Amer Society Microbiol Washington, D C

IDS ™ INC

Innovative Diagnostic Systems, Inc.
3404 Oakcliff Road, Suite C-1
Atlanta, Ga 30340

FOR IN VITRO DIAGNOSTIC USE

Insert #58003

# RapID ™ NH System

## FOR THE BIOCHEMICAL IDENTIFICATION OF NEISSERIA and HAEMOPHILUS

## INTENDED USE

The IDS RapID NH System is a qualitative micromethod employing conventional and single substrate chromogenic tests for the identification of *Neisseria gonorrhoeae*, *N meningitidis*, and *N lactamica*. The RapID NH System is designed to differentiate these organisms from other *Neisseria* spp, *Moraxella* spp, *Branhamella catarrhalis*, CDC M-groups and species of *Kingella*. The RapID NH System will also aid in the identification of *Haemophilus* spp as well as biochemically type *H influenzae* and *H parainfluenzae*.

## SUMMARY AND EXPLANATION OF THE SYSTEM

The IDS RapID NH System is comprised of (i) RapID NH Panels, (ii) RapID INOCULATION FLUID, and (iii) RapID NH REAGENT. Each RapID NH Panel has a series of ten individual test cavities containing dehydrated reactants. The test cavities are molded into the periphery of the plastic disposable panel allowing simultaneous inoculation of test cavities with a measured amount of inoculum. A suspension of test organism in RapID Inoculation Fluid is used as inoculum which rehydrates test ingredients and initiates reactions. After incubation of the panel, each test cavity is examined for reactivity and visually scored by noting the presence or absence of a specific color change. In some cases, reagents must be added to the test cavities to detect the reaction. The resulting pattern of positive and negative scores is used as the basis of identification of the unknown test isolate by comparison to reactivity patterns stored in a database.

## PRINCIPLES AND COMPONENTS OF THE SYSTEM

The tests used in the RapID NH System are based upon the microbial degradation of specific substrates detected by various indicator systems or by the addition of reagents. The reactions involved in the RapID NH System as well as reactive ingredients are listed in TABLE 1.

## REAGENTS

The IDS RapID NH System requires the following reagents:

1. RapID NH Reagent: One (1) dropper tube containing reagent sufficient for at least 20 tests

| | |
|---|---|
| Sodium dodecyl sulfate | 18.8 grams |
| 3-phenyl-4-dimethylaminoacrolein | 0.15 grams |
| Ethylene glycolmonomethyl ether | 880 ml |
| Hydrochloric acid (conc.) | 220 ml |
| Distilled water | 110 ml |
| Acetic Acid | 10 ml |
| Surfactant | 10 ml |

STORE AT 2-8°C IN ORIGINAL CONTAINER
NOTE • Do not allow reagent to contact skin, eyes or clothing
NOTE • Reagent is for in vitro diagnostic use and must be used in conjunction with IDS RapID NH Panels

*Not supplied with the RapID NH System but available from IDS*

1. RapID Inoculation Fluid: Fifty (50) screw-capped tubes containing 1 ml each

| | |
|---|---|
| KCl | 7.5 grams |
| $CaCl_2$ | 0.5 grams |
| Distilled water | to 1000 ml |
| | pH 7.5 - 9.0 |

STORE AT 15 TO 30°C IN ORIGINAL CONTAINER
NOTE • RapID Inoculation Fluid is especially designed to inoculate RapID NH Panels

2. IDS BETA DISCS: One (1) vial containing discs sufficient for at least 20 tests
See IDS BETA DISCS Package Insert for complete description of ingredients.
STORE FROZEN. A WORKING SUPPLY MAY BE STORED AT 2-8°C FOR UP TO 3 WEEKS

3. IDS INNOVA NITRATE Reagents: In dropper tubes
*Nitrate Reagent A*: sulfanilic acid (0.8%)
*Nitrate Reagent B*: N'N-dimethyl-alpha-naphthylamine (0.5%)
STORE AT 2-8°C IN THE ORIGINAL CONTAINER

4. IDS INNOVA SPOT INDOLE Reagent: In a dropper tube
p-Dimethylaminocinnamaldehyde (1%) in 10% hydrochloric acid
STORE AT 2-8°C IN THE ORIGINAL CONTAINER



## SPECIMEN COLLECTION AND PROCESSING

The dependence of judicious specimen collection and processing upon the recovery of those organisms pertinent to the RapID NH System cannot be overemphasized. The subject of determination collection and processing of judicious specimen and microaerophilic systems is described in detail in the appropriate sections of the *Manual of Clinical Microbiology* (18, and Chapters 4-13).

### RECOMMENDED PROCEDURE

PROVIDED - The following materials are provided with the RapID NH System. 20 RapID NH Panels, 1 dropper vial of RapID NH Reagent, 20 Reagent Panels, 1 Package Insert, and users note in the RapID NH Code Compendium.

NOT PROVIDED - Also needed but not provided with the RapID NH System.

Available from IDS
- RapID Inoculation Fluid
- RapID NITRATE Reagent
- RapID SPOT INDOLE Reagent
- IDS-RR-2 McIDS

Not available from IDS

| | |
|---|---|
| carbon dioxide (anaerobic) | incubator (35-37 C) |
| inoculating loop/tip | bunsen burner |
| inoculating needle | test tube rack |
| Pasteur pipets | McFarland #3 standard |
| applicator sticks | |

### 1 Preparation of RapID NH Panels

A) Remove the panel from storage. One panel of each should be touched up on a surface if the lot is compromised. The panels must be used the same day they are removed from storage.

### 2 Preparation of the inoculum

A) Test organisms may be recovered from chocolate agar, modified Thayer-Martin agar, Martin-Lewis agar, modified New York City medium, or Trypticase soy agar containing 5% sheep blood.

NOTE • Panels should be at room temperature, usually 15-30 mins old.

NOTE • Test organism should be screened by Gram stain, oxidase test (where appropriate) and colonial morphology prior to use with the RapID NH System.

B) Using an inoculating loop or applicator stick, remove sufficient growth from the surface of an agar plate to achieve a heavy "milky" (absolutely equivalent to a McFarland #3 turbidity standard) suspension of the test organism in RapID NH Inoculation Fluid.

NOTE • Some organisms may autoagglutinate in the Inoculation fluid. This will not normally affect testing if a homogeneous suspension is made.

NOTE • Suspensions more turbid than #3 McFarland standard will enhance test performance. Suspensions less turbid than #3 McFarland standard will compromise test performance.

### 3 Inoculation of RapID NH Panels

A) Using a Pasteur pipet, withdraw the entire contents of the RapID Inoculation Fluid tube into the pipet.

B) After peeling back the protective tab labeled "Peel to inoculate", attach the pipet into the upper right hand corner of the RapID NH panel and record the entire contents of the Inoculation Fluid.

NOTE • It is important that the entire panel recover.

NOTE • Inoculation Fluid tubes and panels should be autoclaved, incinerated or immersed in a germicidal prior to disposal.

C) After inoculation and while keeping the test panel on a level surface tilt the panel back to approximately 45° angle.



While tilted rock the panel by tilting the right or left side to evenly distribute the inoculum during the rear bottles.

VERY SLOWLY tilt the low end forward pushing back or table top to achieve the horizontal surfaces, until the inoculum is at the rear of all the bottles wetting the lower reaction surfaces. This should evacuate the entire inoculum from the rear bottles.

NOTE • If the panel is tilted too quickly, air may be trapped in the cavity junctions restricting fluid movement during inoculation.

Return the panel to a level position. If necessary, gently tap the panel top to remove any air bubbles formed during inoculation.

D) Examine the test panel reaction cavities. Cavities should appear uniformly filled. Discard any panel that contains air in the reaction cavities.

NOTE • Some entrapment in the front of the air acceptable and will not affect the test performance. When properly filled, each cavity of the test panel will contain approximately 0.1 ml of inoculum.

### 4 Incubation of NH panels

A) After inoculation, return the inoculated test panel to the carrier tray. Place the panels in the carrier (the insert portion of the RapID NH Panel box) and incubate for 4 hours at 35-37 C in a non-CO2 incubator.

### 5 Scoring NH Panels

RapID NH Panels contain 10 reaction cavities that provide test results. 11 test results and 5 auto-bottom-test. Test cavities 2 and 6 contain ENFUNCTIONAL tests (i.e., form tests in the same reaction cavity). Before test result interpretation is complete, each cavity reagent addition allowing the second test result. Separately, the tests cavity is scored the first test before the fourth test and the second test before the first.

**EXAMPLE**

| | First | Second |
|---|---|---|
| | (without/reagent test) | (with/reagent test) |
| CMPG | First effort/none test | |

A) Peel off the protective cover over the specimen cavities by placing the tab out and to the left side firmly holding the panel. Discard the cover (cavities reactions are evaluated by adding the tests result only to the half-side cavity).

B) Without the addition of any reagents read and score cavities 1, 2 and 6 among the bottom test code for biochemical tests. Record members in the appropriate box on the report sheet.

C) Add 2 drops of Nitrate Reagent & followed by 2 drops of Nitrate Reagent B to cavity #2 (NIT/ONPG).

D) Add 2 drops of RapID NH Reagent to cavity #3 (PRO) and cavity #6 (OGT).

NOTE • Care must be taken not to introduce RapID NH Reagent into the NIT/ONPG cavity since it will produce a pink color.

E) Add 2-3 drops of IDS Spot Indole Reagent to cavity #8 (INDORE).

NOTE • IDS Spot Indole Reagent must be read, Proc. I, or Theta I+ Reagent will produce anomalous reactions.

TABLE 1. PRINCIPLES AND COMPONENTS OF THE IDS RapiD ANI SYSTEM

| Comp No | Test Code | Reactive Ingredient | Quantity | Principle | Ref |
|---|---|---|---|---|---|
| 1 | PO4 | Phenyl phosphonate | 0.1% | Hydrolysis of the colorless substrate releases yellow p-nitrophenol | 3 |
| 2 | NIT | KNO3 | 0.9% | Reduction of nitrate to nitrite is detected by the nitrite catalyzed diazotization of sulfanilic acid and coupling to a substituted naphthylamine to form a red dye. The addition of Zn++ to a negative nitrite test can be used to confirm the reduction of nitrate | 2 |
| 2 | ONPG | o-Nitrophenyl beta-D-galactoside | 0.25% | Hydrolysis of the colorless galactoside releases yellow o-nitrophenol | 2 |
| 3 | PRO | Propyl p-nitroanilide | 0.1% | Hydrolysis of the amide substrate releases p-nitroanilide which reacts with Rapid ANI Reagent to form a colored shift | 3, 9 |
| 4 | GGT | Propyl gamma-Glutamyl-p-nitroanilide | 0.17% | base | 3, 10 |
| 5 | RES | Resazurin | 0.1% | Reduction of resazurin to resorufin results in a color change | 3 |
| 6 | GLU | Glucose | ?% | Utilization of the sugar substrate produces acidic products which lower the pH and change the cresol red indicator | 8 |
| 7 | SUC | Sucrose | ?% | | |
| 8 | IND | Tryptophane | 0.18% | Utilization of tryptophane produces indole which is detected by the color formed with spot indole reagent | 2 |
| 8 | URE | Urea | 0.38% | Hydrolysis of urea produces basic products which raise the pH and change the cresol red indicator | 2 |
| 9 | ORN | Ornithine | 0.8% | Utilization of ornithine results in the formation of basic products which cause an indicator change | 2 |
| 10 | BLA | Penicillin | 1.2 mg/disc | Hydrolysis of penicillin results in the formation of penicilloic acid which changes the indicator color | 11 |

Note: Some cavities contain more than one test (e.g. cavity 2 contains NIT and ONPG; cavity 6 contains IND and URE)

TABLE 2. INTERPRETATION OF THE RapID NH SYSTEM TESTS

| Cavity No. | Test Code | Reagent | REACTION | | COMMENTS |
|---|---|---|---|---|---|
| | | | Positive | Negative | |
| 1 | PO4 | None | Yellow | Clear, tan, or very pale yellow | Only significant color development should be considered positive. |
| 2 | NIT | Nitrate A Nitrate B | Pink, red or violet | Clear or tan | Any pink color development should be scored positive[1] |
| 2 | ONPG | None | Yellow | Clear or tan | Any yellow color development should be scored positive |
| 3 | PRO | RapID NH Reagent | Blue, blue green or dark purple | Light to medium violet | Only significant color development should be scored positive. Any shade of violet is negative. The color may form as a layer and mixing may be helpful. Color development must occur within 3 min. to be positive |
| 4 | GGT | RapID NH Reagent | | | |
| 5 | RES | None | Pink | Blue or purple | Only distinct pink tests should be scored positive |
| 6 | GLU | None | Yellow or orange | Red, red/orange | Any significant change from red is considered positive. |
| 7 | SUC | None | Yellow, light yellow orange | Red, red/orange, orange | Only yellow orange or yellow is considered a positive result |
| 8 | IND | Spot Indole | Brown/Black | Orange | Any darkening of the orange color after reagent addition should be scored positive |
| 8 | URE | None | Red/Violet or very dark orange red | Yellow or light orange | Only the development of a distinct red color is positive. Light orange color development is negative |
| 9 | ORN | None | | | |
| 10 | BLA | Beta Disca | Yellow green/yellow brown/yellow | Purple | Any change from a deep purple should be considered positive |

1. Care should be taken not to mix RapID NH Reagent in the ONPG/NIT cavity since it will produce a pink color

TABLE 3.  IDS RapID NH SYSTEM DIFFERENTIAL CHART

| ORGANISM | PO₄ | HIT | OMPG | PRO | OGT | RES | GLU | SUC | IND | URE | ORN |
|---|---|---|---|---|---|---|---|---|---|---|---|

F) Allow no less than 30 seconds but no more than 3 minutes for color development of reagent requiring tests

G) Read and score reagent requiring tests #2, #3, #4, and #5 using the top test code for bifunctional tests. Record reactions in the appropriate boxes on the report sheet.

H) After all reactions have been scored and an identification of H. gonorrhoeae or H. influenzae has been made, drop 1 BETA DISC into the BLA test (cavity #10) being sure to seat the disc firmly on the cavity bottom (an applicator stick works well for this purpose).

NOTE = Although many organisms addressed by the RapID NH System can produce beta-lactamase, the BLA test is recommended only for H. gonorrhoeae and H. influenzae.

I) Panels should be autoclaved, incinerated, or immersed in a germicide prior to disposal.

6  Interpretation of results.
An interpretation guide for each test in the IDS RapID NH System is presented in TABLE 2.

## RESULTS

Identifications are made using each individual test score in conjunction with laboratory information to produce a pattern which is unique for the organisms addressed by the RapID System. Test results are compiled and demonstrations assigned with the aid of the DIFFERENTIAL CHART presented in TABLE 3 or the IDS CODE COMPENDIUM. Test organisms which demonstrate a pattern of results in accord with those listed in TABLE 3 are identified as a member of that taxon. The DIFFERENTIAL CHART summarizes a database which statistically supports the use of each reaction in the IDS RapID NH System as well as establishes the basis for numerical coding.

## RANGE OF EXPECTED VALUES

Consult the IDS DIFFERENTIAL CHART (TABLE 3) for the range of expected values for each test in the IDS System.

### HAEMOPHILUS BIOTYPE CHART

| ORGANISM | IND | URE | ORN |
|---|---|---|---|
| *Haemophilus influenzae* | | | |
| BIOTYPE I | + | + | + |
| BIOTYPE II | + | + | − |
| BIOTYPE III | − | + | − |
| BIOTYPE IV | − | + | + |
| BIOTYPE V | + | − | + |
| BIOTYPE VI | + | − | − |
| *Haemophilus parainfluenzae* | | | |
| BIOTYPE I | − | − | + |
| BIOTYPE II | − | + | + |
| BIOTYPE III | − | + | − |

NOTE = Some strains of H. influenzae and H. parainfluenzae may not react with biotyping tests and may therefore represent untypeable strains of H. aegne.

## QUALITY CONTROL

Each component of the IDS RapID NH System is subjected to quality control by IDS. For laboratory quality control testing each lot of IDS RapID NH Panels using known reference strains is recommended. TABLE 4 lists expected results for a battery of selected organisms.

### TABLE 4. EXPECTED QUALITY CONTROL RESULTS FOR THE IDS RapID NH SYSTEM

| Organism | PO4 | NIT | ONPG | PRO | GGT | RES | GLU | SUC | IND | URE | ORN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H. influenzae Biotype I | + | + | − | − | − | +(−) | +(−) | − | + | + | + |
| N. sicca | − | − | + | − | + | + | + | − | − | − | − |
| N. lactamica | − | − | + | + | − | − | +(−) | − | − | − | − |
| M. urethalis | − | − | − | −(+) | + | + | − | − | − | − | − |



HTLV — III ANTIBODY
HRS FORM 1575, MAY 85

Affix Numbered, dated
sticker in this area
on every Lab Slip

[DO NOT WRITE HERE]
Provider No. 302905

Q 3
DO NOT WRITE
ID NO. IN LAB
ID SLOT.

TEST RESULTS

☒ NEGATIVE FOR ANTIBODY TO HTLV III
☐
☐
☐ Unsatisfactory

Date Reported 1-16-86

OPTIONAL INFORMATION

SYMPTOMS

INSTRUCTIONS ON BACK

CLIENT COPY

12. As a result of Mrs. Fuster's efforts, we have located documents that have answered certain questions about the gonorrhea testing that was performed on Mr. Fuster's son, Noel. These documents are attached as exhibits 2, 3 and 4 to the affidavit of W.L.H. Whittington, an expert in sexually transmitted diseases. Also as a result of these efforts, we have located a full set of the police report filed by Detective Meznarich, which is attached as Exhibit 2 to Maggie Bruck's affidavit, and several depositions that Bruck has reviewed.

13. We have now exhausted nearly all the funds at Mr. Fuster's and his family's disposal. Unless we are able to locate a private donor or receive funds from this Court, we will be unable to pay the expenses necessary to put on an evidentiary hearing, should this Court grant one. Nor do we have funds to enable us to do any further investigation or for counsel to travel to Florida to search for missing records or to take depositions.

Affiant says nothing further.

I hereby certify that the statements made above are true and accurate to the best of my knowledge, information and belief. I am aware that, should any statement I have made be knowingly false, I am subject to the pains and penalties of perjury.

Amy Gershenfeld Donnella

## STATE ATTORNEY

ELEVENTH JUDICIAL CIRCUIT OF FLORIDA
E. R. GRAHAM BUILDING
1350 N.W. 12TH AVENUE
MIAMI, FLORIDA 33136-2111

KATHERINE FERNANDEZ RUNDLE
STATE ATTORNEY

TELEPHONE (305) 547-0100
TELEFAX 547-0313

December 10th , 1998

Amy G. Donnella, Esq.
310 Chamounix Road
St. Davids, Pennsylvania  19087

Re: Francisco E. Fuster, case # 84-19728

Dear Ms. Donnella,

The State Attorney, Ms. Rundle, has forwarded your December 1st letter to me.  I have reviewed it.  Rather than respond to each of the items which you request, I can summarize our position.

Most of the items which you request (27 file boxes) are legally available for copying.  As we have previously notified your client when he made a similar request, the cost of such copying is prohibitive, but could be undertaken upon proper payment for those expenses.

Some of the items you have requested are excluded from disclosure by statute (F.S. 119), by prior order of the Court in the underlying case, or privileged by general case law. Quite obviously, we would resist disclosure of those items.  Finally, some items are not within our control, and you must apply to the other proper agencies for those items.

Please feel free to contact me if you should have any questions.  Thank you.

Sincerely,

KATHERINE FERNANDEZ RUNDLE
State Attorney

by: Abraham Laeser
    Senior Trial Counsel
    Assistant State Attorney

DONNELLA, Exhibit 1

STATE OF WASHINGTON

COUNTY OF KING

### CERTIFICATION OF W.L.H. WHITTINGTON

W.L.H. Whittington, being of full age, does hereby depose and state the following:

1.  My name is Wil Whittington.  I am a research scientist at the Center for AIDS and STD, Department of Medicine, University of Washington. In addition, since 1996, I have served as Director of Epidemiology and Prevention Activities of the STD (Sexually Transmitted Disease) Control Program for the Seattle-King County Department of Public Health in Seattle, Washington.  From 1991 through the present, I have also served as Director of the Neisseria Reference Laboratory for the Harborview Medical Center of the University of Washington in Seattle.

2.  For the past 26 years, I have been involved in the study and detection of sexually transmitted diseases.  From 1972 to 1975, I served as the Director of the STD Control Program for the Pennsylvania Department of Health.

3.  Beginning in 1975, I held a variety of positions with the Centers for Disease Control (CDC) in Atlanta, Georgia.  From 1975 to 1980, I served as the Assistant to the Chief in the Field Operation Section of the Venereal Disease (VD) Control Division at CDC.  From 1981 until

1

1986, I served as the Chief of Epidemiology, and Program Studies Section, VD Control Division at CDC.  During part of that time (1981-1983), I was also the Acting Chief of the Operational Research Branch and Acting Chief of the Clinical Studies Section for the Division of Sexually Transmitted Diseases of the CDC's Centers for Prevention Services.  From 1986 until 1996, I worked in the capacity of Biomedical Research Investigator with the Clinical Research Branch of the CDC's Division of STD/HIV Prevention.

4.   Additionally, from 1990 to 1992, I served on the faculty of the Emory University School of Medicine in Atlanta, Georgia, as an adjunct instructor in the Division of Infectious Disease and Immunology, Department of Pediatrics.

5.   As my attached biographical sketch will attest, I have spent most of my professional career as a research scientist, studying, teaching and writing about sexually transmitted diseases.  I have spent a significant amount of time researching matters concerning the proper identification of sexually transmitted disease organisms – in particular, methods to identify *Neisseria gonorrhoeae*, the organism that causes gonorrhea. See Whittington, Exhibit 1, attached hereto.

6.  I was recently contacted by Amy Gershenfeld Donnella, counsel for Francisco Fuster-Escalona and asked to provide my expert opinion regarding the reliability of the gonorrhea testing performed on Noel Fuster in connection with Mr. Fuster's conviction for child sexual abuse in 1985.

7.  Counsel has provided me with the following documents: trial testimony of Dr. Judith Lederhandler; memo from Dan Casey to Richard Shiffrin on State Attorney letterhead dated February 19, 1985, entitled "Admissibility of Test Results;" deposition of Joseph Kyle, dated July 24, 1985; deposition of Freda Burstyn, dated July 24, 1985;  a packet of documents sent by Jackson Memorial Hospital on June 27, 1986 to attorney Arthur H. Taylor, in response to a Subpoena Duces Tecum Without Deposition, requesting "any and all medical records, including medical test results, pertaining to the examination and/or treatment of Noel Fuster, during the years of 1983, 1984, 1985 and 1986;" Examination under Oath of Martha Goodman;  Laboratory sheets prepared by Jackson Memorial Hospital for gonorrhea testing of TL, JC, BT, SM, and DL.

8.  Counsel has asked me to review the above-listed documents and to answer the following questions if I can: 1)  Was the testimony of the state's witness, Dr. Judith

3

Lederhandler – that the gonorrhea testing performed on Noel Fuster was incapable of producing a false positive – accurate? If not, why? 2) How reliable were the test procedures used on Noel? 3) Would the testing procedures used meet contemporary standards for diagnosis of gonorrhea in a forensic setting? 4) Would it be possible now to determine whether Noel Fuster actually had gonorrhea of the throat at the time he was diagnosed in 1984?

9. In summary, my opinion, to a reasonable degree of scientific certainty, is that the testimony offered at trial by Dr. Judith Lederhandler seriously misrepresented the likely accuracy of the testing performed on Noel Fuster's throat sample. Contrary to Dr. Lederhandler's assertions, the testing procedures that were performed on that specimen had a documented and important degree of unreliability, even if all steps in the testing procedure were performed perfectly. Also contrary to her assertions, the testing procedures employed once Noel's culture plate reached the laboratory involved the exercise of skill and discretion at every step. Therefore, the test was highly susceptible to human error. Moreover, the documentation I have seen regarding the testing gives me several reasons for concern about the care that may have been taken in performing the necessary procedures and about the skill

level of the laboratory technicians.  Thus, based upon all the documents I have reviewed, I have substantial doubt as to the reliability of results reported in this case of supposed gonorrhea of the throat.

10.  It is also my opinion, to a reasonable degree of scientific certainty, that the testing procedures used with the specimen taken from Noel's throat do not meet contemporary standards for the diagnosis of gonorrhea in a child and certainly not in a child in a forensic setting.

11.  Moreover, it would ordinarily be relatively simple to confirm at this point whether Noel had gonorrhea at the time he was initially tested in 1984.  It is recommended practice that an isolate taken for testing in a medico-legal context such as Mr. Fuster's case presented be preserved by means of freezing the bacterial isolate. Preservation of the specimen is recommended by both the American Academy of Pediatrics and the Centers for Disease Control.  A frozen sample can be retested even decades after it has been taken.  However, the documentation I have reviewed indicates that the sample taken from Noel Fuster was destroyed after three days.  I also understand that, when Mr. Fuster arranged to have Noel's biological mother take Noel for retesting, the test was performed under the auspices of the state and the culture was lost on the way

5

to the laboratory. I also understand that, nevertheless, Noel was immediately treated with antibiotics which would have killed the gonorrhea, had he been harboring any. Thus, confirming the original test has been rendered impossible.

12. Further, the American Academy of Pediatrics and the Centers for Disease Control recommend that the identity of bacterial isolates from such cases of potential abuse be confirmed by testing at a reference laboratory. Clearly, the original isolate in this case was not forwarded to a reference laboratory for confirmation.

13. In the sections that follow, I explain my conclusions.

**A *General Overview of the Problems Associated with Testing for Gonorrhea***

14. Gonorrhea is a disease caused by an organism classified scientifically as *Neisseria gonorrhoeae*. *Neisseria* is the name of the genus to which the organism belongs; *gonorrhoeae* is the species.

15. There are a number of problems associated with the identification of *Neisseria gonorrhoeae*, particularly when a diagnosis is to be used in a medico-legal context. These problems stem in large part from the fact that a number of the members of the <u>Neisseria</u> genus look alike, react

6

similarly, and/or grow on gonococcal-selective media. These include: Neisseria meningitidis, Neisseria lactamica, Neisseria cinerea, Neisseria sicca, Neisseria subflava biovar perflava, Neisseria mucosa, Neisseria flavescens, and Neisseria polysaccharea. There are also two organisms, not part of the Neisseria family that share similar traits with Neisseria gonorrhea. These are: Branhamelia catarrhalis and Kingelia dentrificans.

16.   The problem of identification is compounded in children, particularly with specimens taken from the mouth or throat.   The reason for this is that several of the bacterial strains listed above are common inhabitants of children's oropharynx.

17.   For example, Branhamella catarrhalis has been isolated from the throats of healthy children and has been implicated as an etiologic agent in conjunctivitis, otitis media (ear infections), and respiratory tract infections. Likewise, in a study conducted in Connecticut, it has been reported that the oropharynx of 59% of healthy children had been colonized by Neisseria lactamica at least once by age 4.

18. A prime example of the difficulties in identifying Neisseria gonorrhoeae can be seen by reviewing a study in which I participated in 1983 and 1984 while serving as the

Chief of the Epidemiology and Program Studies Section of the Venereal Disease Control Division at CDC. Laboratories throughout the United States sent us 40 isolates that they had identified as *Neisseria gonorrhoeae.* These isolates were sent to us to confirm the identity of the organism. Each of these strains had been collected from a child, some of whom were tested because of suspicions that they had been sexually abused.

19. Of these 40 isolates that had been tested previously by these other laboratories, 14 of them turned out not to be *N. gonorrhoeae.* None of these non-gonoccocal organisms was the cause of a sexually transmitted disease. Three of these isolates were confirmed at CDC to be *Branhamella catarrhalis.* (These samples had been taken from the children's throats and eye.) Another three were confirmed by CDC to be *Neisseria lactamica.* (These samples too had been taken from children's throats and eye.) Additionally, four samples misidentified as *N. gonorrhoeae* were in fact *Neisseria cinerea,* two others were *Neisseria meningitidis,* one was *Kingella dentrificans,* and one was an unidentified other *Neisseria* species.

20. Of these 14 isolates that turned out not be *N. gonorrhoeae,* 10 of the children from whom they had been collected had not previously been suspected of being the

victims of sexual abuse.  Nevertheless, the incorrect
identification of these 10 organisms as gonorrhea resulted
in the initiation of investigations of child abuse in 8
cases.  It is probably safe to assume that in the four
cases in which sexual abuse was already suspected, these
misidentifications of gonococcal bacteria were used as
proof that the abuse had occurred.

21.  As a result of these findings and a review of
procedures employed at various laboratories around the
United States, the CDC and the American Academy of
Pediatrics published guidelines, describing the
difficulties involved in identifying gonorrhea, explaining
the methods that needed to be used in order to prevent
misidentification, and urging laboratories to adopt these
procedures, particularly when the result of the testing
procedures are to be used in any forensic setting.

### The Trial Testimony of Dr. Judith Lederhandler

22.  Dr. Lederhandler's testimony(transcript cite
9/4/85, 185 et seq.), is attached hereto as Whittington,
Exh. 3.

23.  Dr. Lederhandler testified at Mr. Fuster's trial
as a prosecution witness.  Dr. Lederhandler testified that
she took swab specimens from Noel Fuster's anus, penis and
throat.  She also testified that she applied each specimen

to a separate culture plate which she identified as being
selective for the growth of *N. gonorrhoeae*.  She said that
she then sent these cultures to the microbiology lab at the
hospital and received word sometime thereafter that Noel's
throat specimen had tested positive for gonorrhea. Exh. 3
at 190, 194.

24.   Dr. Lederhandler was then asked what the
implications were of the culture coming back positive.  She
replied that the culture process that had been used was
incapable of producing a false positive. She testified that
the culture had grown and that the growth of the culture
meant two things:  first, that the sample was properly
taken, and second, that the sample had to be gonorrhea.
Thus, she concluded that it was absolutely certain that
Noel had gonorrhea of the throat at the time he was tested.
Exh. 3, 195-196.

25.   Dr. Lederhandler's testimony was wrong on at
least two major points. First, there is no known growth
medium that is perfectly selective only for gonorrhea. A
selective medium suppresses the growth of other organisms;
however, other organisms including those that ca be
confused with *N. gonorrhoeae*, can and do "break through."
Thus, the growth of an organism on the culture plate that

10

she described is not in any way conclusive of a diagnosis of gonorrhea.

26.  Second, Dr. Lederhandler's testimony that "there is no such thing as a false positive" gonorrhea test is at variance with the facts.  False positives do occur and throat specimens from children are linked to a higher probability of such false positives.

**The Testing Procedures Actually Performed**

27.  According to the documents I have reviewed, including the depositions of Joseph Kyle and Freda Burstyn, lab technicians who prepared and tested Noel Fuster's throat culture, the microbiology laboratory performed a series of procedures on the culture.

28.  The lab received petri dishes which contained a medium identified as Martin-Lewis agar.  Deposition of Joseph Kyle, attached hereto as Whittington, Exhibit 4, at 5.  Next, according to Kyle, standard procedure would be to incubate the Martin-Lewis medium in a carbon dioxide environment at 37 degrees centigrade for 18 to 24 hours. Kyle did not know how long Noel's isolate had been incubated but thought it was probably for 18 hours.  Id., 14.  Kyle did not perform any actual tests on the culture. Id.

11

29.  Freda Burstyn stated in her deposition that she
conducted tests on the culture when she received it.  She
indicated that she saw visible clusters of organisms
growing on the petri dish so she performed tests that "we
routinely do" to "make sure," presumably that this was
gonorrhea.  Freda Burstyn deposition, attached hereto as
Whittington, Exhibit 5, at 4-5.  Burstyn explained that she
first did a gram stain to differentiate between organisms,
some of which are gram positive and others which are gram
negative, id., 6, and the specimen was then examined to
determine if it contained gram-negative diplococci.  Id, 8.
The specimen was also tested to see if it was oxidase
positive.  Id.

30.  Burstyn stated further that the specimen was then
subjected to a biochemical test, which she referred to as
an NH test.  Documents I have reviewed from Jackson
Memorial Hospital include the testing protocol that
accompanied the test then in use at the laboratory, which
is called the RapID/NH test.  See Whittington, Exh. 6,
attached hereto.  Burstyn explained that this test was
performed by "inoculat[ing] a broth and then inoculating a
series of wells, each of which contained a reagent, on a
small plate.  Whittington, Exh. 5, 13-14. The plate would
then be incubated for four hours, after which the

"reactions are read." Burstyn stated that the reactions are "very specific, based on whether or not there is a reaction and what the reaction is, we identify the organism." Id., 14.

31. Burstyn said that it was her belief that this test was 100% accurate. Id., 18.

**Performance of the RapID/NH Test.**

32. Even if everything went perfectly and there was no operator error in the use of this test, the RapID/NH test as constituted in 1984 was incapable of being 100% accurate. This was documented in at least one report published in the Journal of Clinical Microbiology in 1983 which reported misidentifications of isolates of *Neisseria* species. (See, Robinson MJ, Oberhofer TR. Identification of pathogenic *Neisseria* species with the RapID NH system. J Clin Microbiol. 1983;17:400-4.) The Journal of Clinical Microbiology is a standard peer-reviewed journal relied upon by clinical laboratories in the United States.

33. In 1985, the Journal published two additional articles. The first of these noted that the RapID/NH test had been found to not always differentiate *Neisseria cinerea* from *Neisseria gonorrhoeae*. (Boyce JM, Mitchell EB. Difficulties in differentiating Neisseria cinerea from Neisseria gonorrhoeae in rapid systems used for identifying

pathogenic Neisseria species.  J Clin Microbiol 1985;
22:731-4.  As noted earlier, in tests at the CDC, Neisseria
cinerea was misidentified as Neisseria gonorrhoeae in four
of fourteen misidentified isolates sent for confirmation.

34.  In yet another study, the RapID/NH test was found
to correctly identify only 80% of strains of Neisseria
gonorrhoeae, Neisseria meningitidis, Neisseria lactamica,
and Branhamella catarrhalis.  (Philip A, Garton GC.
Comparative evaluation of five commercial systems for the
rapid identification of pathogenic Neisseria species.  J
Clin Microbiol.  1985; 22:101-104.)

35.  The limitations of this test as described in the
biomedical literature strongly suggest that the ability of
this test to identify N. gonorrhoeae correctly from a
throat specimen from a child is likely no better than three
in four - assuming it must be stressed that the test was
performed under ideal conditions by laboratory personnel
who had the necessary finesse to conduct the test and
interpret the test results.

36.  This level of inaccuracy does not comport with
contemporary standards that must be met before a diagnosis
of gonorrhea is considered confirmed for forensic purposes.

**Subjective Factors in Interpreting Test Results**

37.  Based on my review of the documents,  I have little confidence that the testing of this sample was conducted with the necessary technical skill required of the testing procedures.

38.  The RapID/NH test involves a substantial amount of subjective interpretive potential.  This test is not comparable, for example, to a glucose dip-stick test or a home pregnancy test in which a color or a symbol appears, indicating a positive or negative result.  Rather, this test requires a technician to read and interpret rather subtle color changes in a series of reaction test wells.

39.  The testing process also requires a more basic understanding of Neisseria organisms and their reactions than Lederhandler, Kyle or Bustyn seem to have possessed. Dr. Lederhandler's errors have already been noted.  I note some examples from the depositions in which the laboratory technicians either misspoke or made important errors.

40.  Kyle indicated, for instance, that Martin-Lewis agar is "selective for pathogenic Neisseria gonorrhea and particularly Neisseria gonorrhea."  Whittington, Exh. 4, 5. This phrase has little meaning.  Additionally, a number of other organisms (other than *Neisseria* species) grow on this particular selective medium.

15

41.   Kyle also acknowledged that samples were incubated for 18 to 24 hours.  When asked why, he stated that that was what the manufacturers recommended.  He did not appear to know the significance of the incubation period.  In fact, that period is extremely important. Moreover, when asked, he indicated simply that Noel Fuster's culture had "probably" been incubated for 18 hours.  The lack of documentation is, in itself, troubling. An 18 hour period of incubation, however, is close to the minimum required by the manufacturers of the RapID NH test. See Whittington, Exh. 6, package insert.  (Burstyn was likewise unable to say how long the culture had been incubated initially.)

42.   In Burstyn's deposition, she uses language in a disturbingly loose fashion which tends to make me think she did not understand the distinction between members of the Neisseria genus and gonorrhea as a specific species within that genus.  For example, she says, "Neisseria gonorrhea species, which gonorrhea being one of them."  Whittington, Exh. 5, 2.  Likewise, when referring to the results of the NH test, she says that "it comes up Neisseria," apparently not understanding that something that is Neisseria is not necessarily gonorrhea.  Id., 11.

16

43.  Additionally, Burstyn states that oxidase
positive organisms other than *Neisseria gonorrhoeae* do not
grow on Thayer-Martin agar.  (Thayer-Martin is a medium
similar to Martin-Lewis.) Id., 11. This is nonsense and is
contradicted by the scientific literature.  See, for
example, Waldman CR, Gaydos JM, Synder FF.  Office
Laboratory identification of Neisseria gonorrhoeae.  J Fam
Pract. 1982; 14:35-37.)

44.  When Burstyn describes the procedures used in the
NH test, her description is consistent with what one would
expect if a technician were simply reading from the product
brochure.  This does not give me great confidence that she
had the capability to make critical judgments about test
performance in general.  I would have even less confidence
that this technician had the necessary skills to interpret
atypical results if such results were noted.

45.  Of some importance, I note the failure of a
laboratory to record times and dates accurately and
consistently.  Such failure may speak to a degree of
carelessness one would hope not to see in any laboratory,
let alone a forensic lab.  It also indicates that the
personnel may not adequately have understood the
significance of time (or other testing) factors that affect
the outcomes of these tests. Information as to who

transmitted the specimen to the lab, how long it sat before being delivered to the lab, who handled the specimen in the lab, what tests were performed, what results were found at each stage of the testing process, and importantly, how long the specimen was incubated, also seem to be curiously missing from the documentation.

46.   Finally, I note that the laboratory report on Noel Fuster's throat culture indicates that the sample was tested for antimicrobial susceptibilities.   No indication is given as to how this testing was done so I cannot comment on the accuracy of these results.   However, it is of interest to note that, at this time in southern Florida, *Neisseria gonorrhoeae* were typically resistant to many of the antibiotics to which this test was reported as susceptible.   (Zenilman Whittington et al.   Sex Transmit Dis.)   Such susceptibilities may be more suggestive of other Neisseria species than gonorrhea.

**The Destruction of the Sample**

47.   It has been well-understood in the medical community for many years that isolates which are collected for the purposes of criminal investigations and prosecutions should be preserved.   The process for preserving a suspected gonococcal isolate is straight forward – it requires that the isolate be frozen at minus

seventy degrees Centigrade or at minus twenty degrees Centigrade and then transferred to a minus seventy freezer. Most general laboratories and virtually all forensic laboratories would have had the equipment to preserve a gonococcal isolate in 1984. Once frozen properly, these isolates will last for many years in a condition that additional confirmatory tests can still be performed on them. Further, forwarding of such specimens to a reference laboratory is a recommended procedure.

48.  The memo I have reviewed from assistant state attorney Dan Casey to assistant state attorney Richard Schiffrin indicates that the isolate taken from Noel Fuster's throat was destroyed after three days. (I cannot tell from this whether it was destroyed three days after testing was completed or three days after it was collected.) The memo further notes that this destruction of the sample was done per standard operating procedures of the laboratory. Whittington, Exh. 2 at 2.

49.  This must be regarded as inappropriate practice. The American Academy of Pediatrics and the Centers of Disease Control specifically recommend that a sample taken from a child suspected of having a sexually transmitted disease must be preserved. This is, and has long been,

standard laboratory protocol when a sample has been collected for potential use in a criminal investigation.

50.   To summarize my conclusions then, it is my opinion to a reasonable degree of scientific certainty that: The trial testimony given by Dr. Judith Lederhandler was inaccurate and highly misleading.  The testing performed to determine that Noel Fuster had gonorrhea of the throat was unreliable and would not meet contemporary standards of accuracy.  The destruction of isolate taken from Noel's throat after three days does not comport with standards employed by laboratories either then or now where a diagnosis of gonorrhea dependent on that isolate is intended for use as proof in a criminal prosecution for child sexual abuse.

I would be happy to provide this Court with any further information that would be useful, either by additional affidavit or by testifying at an evidentiary hearing.

I hereby certify that the information I have provided above is true and accurate to the best of my knowledge, information and belief.  I am aware that if I have purposely made any misrepresentations, I am subject to the penalties of perjury.

Affiant says nothing further.

20

This 2nd day of January, 1999.

_____
W.L.H. Whittington

FF                               Principal Investigator/Program Director *(Last, first, middle)*: _____.

## BIOGRAPHICAL SKETCH

| NAME | POSITION TITLE |
|------|----------------|
| W. L. H. Whittington | Research Scientist |

EDUCATION

| INSTITUTION AND LOCATION | DEGREE | YEAR CONFERRED | FIELD OF STUDY |
|--------------------------|--------|----------------|----------------|
| University of the South, Sewanee, Tennessee University of Scranton, Scranton, Pennsylvania | A.B. - | 1967 | Physics English Literature and Philosophy |
| Department of Epidemiology, School of Public Health, University of Washington (on leave presently) | | | Epidemiology |

*PROFESSIONAL EXPERIENCE*

| | |
|--|--|
| 1996–present | Director, Epidemiology and Prevention Activities STD Control Program, Seattle-King County Department of Public Health, Seattle, WA. |
| 1991–present | Research Scientist and Director, Neisseria Reference Laboratory, Harborview Medical Center, University of Washington, Seattle, WA. |
| 1990–92 | Adjunct Instructor, Division of Infectious Disease and Immunology, Department of Pediatrics, Emory University School of Medicine, Atlanta, Georgia. |
| 1986–96 | Biomedical Research Investigator, Clinical Research Branch, Division of STD/HIV Prevention, Center for Prevention Services, Centers for Disease Control, Atlanta, Georgia. |
| 1981–83 | Acting Chief, Operational Research Branch and Acting Chief, Clinical Studies Section, Division of Sexually Transmitted Diseases, Centers for Prevention Services, Centers for Disease Control, Atlanta, Georgia. |
| 1981–86 | Chief, Epidemiology and Program Studies Section, VD Control Division, Center for Prevention Services, Centers for Disease Control, Atlanta, Georgia. |
| 1975–80 | Assistant to the Chief, Field Operation Section, VD Control Division, Centers for Disease Control, Atlanta, Georgia. |
| 1972–75 | Director, STD Control Program, Pennsylvania Department of Health, Harrisburg, Pennsylvania. |

*Publications (Selected examples)*
*Manuscripts and Chapters*

1. Whittington WL, Cates W. Acyclovir therapy for genital herpes: enthusiasm and caution in equal doses (editorial). JAMA 1984;251:2116-7.
2. Whittington WL, Vernon A, Biddle JW, DeWitt W, Zaidi A, Starcher T, Perkins G, Rice R, Anderson B, Johnson S, Albritton WL. Serological classification of Neisseria gonorrhoeae: uses at the community level. In: Schoolnick GS, Brooks GF, Falkow SL, Knapp JS, McCutchan JA, Morse SA eds. The Pathogenic Neisseriae. Am Soc Microbio, Washington, D.C. 1985;20-5.
3. Rice RE, Schalla WO, Whittington WL et al. Phenotypic characterization of Neisseria gonorrhoeae isolated from three cases of meningitis. J Infect Dis 1986;153:362-5.
4. Whittington WL, Kraus SJ, Lee F, Nahmias AJ. The prevalence of HTLV-III/LAV antibodies in heterosexuals. JAMA 1986;255:1702-3.
5. Whittington WL, Rice RJ, Biddle JW, Knapp JS. Incorrect identification of Neisseria gonorrhoeae from infants and children. Pediatr Infect Dis 1988;7:3-10.
6. Whittington WL, Knapp, JS. Trends in resistance in Neisseria gonorrhoeae to antimicrobial agents in the United States. Sex Transmit Dis 1988;15:202-10.
7. Schwarcz SK, Whittington WL. Sexual assault and sexually transmitted diseases: detection and management in adults and children. Reviews Infect Dis 1990;12:S682-90.
8. Larsen SA, Kraus SJ, Whittington WL. Clinical spectrum of syphilis. In: *Manual of Serologic Tests for Syphilis*. 1990 Am Pub Health Association, Chicago, IL.
9. Stone KM, Whittington WL. Treatment of genital herpes. *Rev Infect Dis* 1990;12 (Suppl):S610-9.
10. Sanchez-Martinez D, Schmid DS, Whittington WL, Brown P, Reeves WC, Chatterjee S, Whitley RJ, Pellett PE. Evaluation of a test based on baculovirus-expressed glycoprotein G for detection of herpes simplex virus type-specific antibodies. J Infect Dis 1991;164:1196-9. ◄▬▬▬▬▬▬▬

11. Winterscheid KK, Whittington WL, Roberts MC, Schwebke JR, Holmes KK. Decreased susceptibility to penicillin G and Tet M plasmids in genital and anorectal isolates of Neisseria meningitidis. Antimicrob Agents Chemo. 1994;38:1661-3.

12. Xia M, Whittington WL, Holmes KK, Plummer FA, Roberts MC. Pulsed-field gel electrophoresis for genomic analysis of Neisseria gonorrhoeae. J Infect Dis 1995;171:455-8.

13. Knapp JS, Hale J, Neal SW, Winterscheid K, Rice RJ, Whittington WL. Disk diffusion susceptibilities to ciprofloxacin, ofloxacin, enoxacin, lomefloxacin and norfloxacin, of strains of Neisseria gonorrhoeae exhibiting decreased susceptibilities to ciprofloxacin. Antimicrob Agents Chemo 1995;39:2442-5.

14. Whittington WL, Roberts MC, Hale J, Holmes KK. Susceptibilities of Neisseria gonorrhoeae to the glycylcyclines. Antimicrob Agents Chemother 1995;39:1864-85.

15. Knapp JS, Hale JA, Neal SW, Winterscheid K, Rice RJ, Whittington WL, Proposed criteria for interpretation of susceptibilities of strains of Neisseria gonorrhoeae to ciprofloxacin, ofloxacin, enoxacin, lomefloxacin, and norfloxacin. Antimicrob Agents Chemother 1995;39:2442-45.

16. Whittington WL, Ison C, Thompson SE. Gonorrhea. In: Atlas of Sexually Transmitted Disease and AIDS. Morse S, Moreland A, Holmes KK (eds). Mosby-Wolfe, London, UK. 1996 pp 99-117.

17. Garnett, G. Hughes JP, Anderson RM, Stoner BP, Aral SO, Whittington WL, Handsfield HH, Holmes KK. Sexual mixing patterns of patients attending STD clinics. Sex Transmit Dis 1996;23:248-57. Handsfield HH, Whittington WL. Antibiotic-resistant Neisseria gonorrhoeae: the calm before another storm? (editorial) *Ann Intern Med* 1996;125:507-9.

18. Knapp JS, Fox KK, Trees DL, Whittington WL. Fluoroquinolone resistance in Neisseria gonorrhoeae. Emer Infect Dis 1997;3:33-9.

19. Fox KK, Knapp JS, Holmes KK, Hook EW, Judson FN, Thompson SE, Washington JA, Whittington WL. Antimicrobial resistance in Neisseria gonorrhoeae in the United States 1988-1994: The emergence of decreased susceptibility to the fluoroquinolones. J Infect Dis 1997; 175:1396-1403.

20. Xia M, Whittington WL, Holmes KK, Roberts MR. Genomic homogeneity of the AHU/IA-1,2 phenotype of Neisseria gonorrhoeae during its disappearance from an urban population. *Sex Transmit Dis* 1997;24:561-6.

21. Kilmarx PH, Knapp JS, Xia M, St. Louis ME, Neal SW, Sayers D, Doyle LJ, Roberts MC, Whittington WL. Spread of gonococci with decreased susceptibility to fluoroquinolones: a unique focus in the United States. J. Infect Dis 1998;177:677-82.

22. Ryan CA, Vathiny OV, Gorbach PM, Leng HB, Berlioz O, Arthaud A, Whittington WL, Holmes KK: Explosive spread of HIV-1 and sexually transmitted diseases in Cambodia. Lancet 1998;351:1175.

23. Fox KK, Whittington WL, Levine WC, Moran JS, Zaidi AA, Nakashima AK: Gonorrhea in the United States, 1981-1996. Sex Transm Dis 1998;25:386-393.

24. Trees DL, Sandul AL, Whittington WL, Knapp JS. Identification of novel mutation patterns in the parC gene of ciprofloxacin-resistant isolates of Neisseria gonorrhoeae. *Antimicrob Agents Chemother*. 1998 Aug;42:2103-5.

25. Wi T, Mesola V, Manalastas R, Tuazon C, Perine P, Ghee A, Holmes KK, Whittington WL. Syndromic approach to management of gonococcal and chlamydial infections among female sex workers in two Philippine cities. *Sex Transm Inf* 1998;72(Suppl):

OFFICE OF THE STATE ATTORNEY                    JANET RENO · STATE ATTORNEY

INTER-OFFICE MEMORANDUM

201.01-22C

| | | | |
|---|---|---|---|
| **TO:** | RICHARD SHIFFRIN | **DATE:** | FEBRUARY 19, 1985 |
| | | **FILE NO.** | |
| | | **POLICE NO.** | ADMISSIBILITY OF |
| **FROM:** | DAN CASEY | **SUBJECT:** | TEST RESULTS |

Issue:

How. to introduce into evidence the gonorrhea test Results on Noel Fuster:

Facts -

1. On 8/13/84 Noel Fuster, W/M, 7 years old, was remanded to the custody of Marty Berger, H.R.S., by Juvenile Judge Ferguson.

2. While in the custody of Mr. Berger, and after the consent of his natural mother, Martha Fuster, Noel was taken to J.M.H. Pediatics walk in for testing.

3. At the Pedi Walk-In samples from Noel were taken by Dr. J. Liedenhandler at approximately 4:40 p.m.

4. These samples were given to a nurse, who placed them in a plate/tray for pickup, as is the ordinary procedure for that department at J.M.H.

5. The name of the Pedi Walk-In nurse is unknown.

6. The test samples were appropriately marked, but they and their containers have been destroyed, as is the ordinary procedure at J.M.H.

7. At 5:16 p.m. the samples were picked up by a messenger, and taken to the main lab computer room.

8. The name of the messenger is unknown.

9. At 6:35 p.m. the samples were picked up by a messenger and were taken to the Micro-Biology Lab.

10. The name of that messenger is unknown.

11. At the Micro-Biology Lab the specimens were logged into their ~~and~~ records and the sample was checked to assure that it corresponded with the accompanying voucher.

*Ricards*

WHITTINGTON Exhibit #2

Page Two

12. At the Micro-Biology Lab, Medical Technician Joseph Kyle placed the specimens into a $CO_2$ jar, placed it into the incubator.

13. On 8/14/84 Medical Technician Freda Burstyn retrieved the specimens from the incubator and performed several tests for sensitivity. The results of these tests by Ms. Burstyn proved positive for neisseria gonorrhea in one organism.

14. The specimens taken from Noel were retained by the Micro-Biology Lab for three days. After three days the specimens were discarded, in compliance with the S.O.P. of J.M.H.

15. The original vouchers that accompanied the specimens throught the rigors of the J.M.H. Laboratory bureaucracy have been retained.

9/4/85

1          (Whereupon, a recess was taken.)

2          THE COURT: State ready?  Bring in the jury.

3          Both sides concede the presence of the jury?

4          MR. SAMEK: Yes, sir.

5          MR. HOGAN: Yes. State's ready to proceed.

6          MR. CASEY: State calls as it's next witness Dr.

7    Judith Lederhandler.

8          (Whereupon, the following proceedings were had:)

9                    DR. JUDITH LEDERHANDLER

10          having been first duly sworn, was examined

11          and testified as follows:

12    EXAMINATION BY MR. CASEY:

13          Q.   Good afternoon, Doctor.  Doctor, unfortunately we

14    moved into a courtroom that has some of the poorest acoustics

15    in the building.  Every time someone moves back in a chair we

16    can hear it.

17          MR. SAMEK:  A building known for poor acoustics.

18          Q.   (BY MR. CASEY) I'm going to ask you to keep your

19    voice up.

20          A.   Sure.

21          Q.   The microphone will aid us in that. Could you tell

22    us your full name, please?

23          A.   My name is Dr. Judith Wise Lederhandler.

24          Q.   Doctor, what is your chosen profession?

25          A.   I'm a pediatrician.

1    Q.    What is your current place of employment?

2    A.    I've employed by the University of Miami within the

3    Mailman Center for Child Development.

4    Q.    Is there a particular team at the Mailman Center

5    with which you work?

6    A.    Yes, I work with the child protection team.  I'm the

7    medical director.

8    Q.    Excuse me.  You think the microphone could be

9    somewhat adjusted?

10    THE COURT: Try that.

11    A.    How is that?

12    MR. SAMEK: Much better.

13    Q.    (BY MR. CASEY) Could you explain for the ladies and

14    gentlemen of the jury what' the child protection team is?

15    A.    Certainly. The child protection team is a state

16    agency that the whole purpose of it is two examine, medically

17    examine and do psychological testing and counseling on

18    children that are suspected of be abused or neglected.

19    Q.    You are the medical director?

20    A.    Yes, I am.

21    Q.    How long have you been with the child protection

22    team.

23    A.    I've been with the child protection team for over a

24    year.

25    Q.    How long have you served as its medical director?

1         A.    Since July 1, 1984.

2         Q.    Could you explain to the ladies and gentlemen of the

3    jury a little bit about your educational background and your

4    background and experience allows you to practice medicine in

5    the State of Florida?

6         A.    I finished college in 1977 and went to medical

7    school and immediately after that I did my first two years at

8    the University of Michigan.  Then I moved to Chicago and

9    completed my medical degree at the University of Chicago in

10   1981. Then I moved to Cleveland where I did 3 years of

11   pediatric residency training at Case Western Reserve

12   University and then came on to the University of Miami

13   faculty.

14        Q.    You are a faculty member on the University of Miami

15   faculty?

16        A.    Yes, I'm a full time faculty member.

17        Q.    Doctor, are you licensed to practice medicine in the

18   State of Florida?

19        A.    Yes, I am.

20        Q.    State at that time would proffer Dr. Lederhandler as

21   expert in the area of medicine?

22             THE COURT: Any questions?

23             MR. SAMEK: Yes, Judge.  I don't object to the

24   doctor's expertise in pediatrics but I do object to being

25   proffered as an expert in medicine.  I have voir dire if the

1   government wishes-- unless the government wishes to rephrase

2   its proffer.

3            MR. CASEY: No, Judge I believe the doctor has also

4   shown herself to be well qualified in the area of medicine, a

5   licensed medical doctor.

6            THE COURT: Care to inquire?

7            MR. SAMEK: Judge, no, I'm not going to inquire.  I

8   think she should be excluded as an expert in medicine and

9   qualified as an expert in pediatrics.

10           THE COURT: Qualify her as an expert.  Go ahead.

11           MR. SAMEK:  In what.

12           THE COURT: In medicine.

13      Q.   (BY MR. CASEY) Doctor, directing your attention the

14   date of August 13, 1984 did you have occasion on that day to

15   see a young boy by the name of Noel Fuster?

16      A.   Yes, I did.

17      Q.   How old was Noel Fuster?

18      A.   Approximately 6 years old.

19      Q.   Doctor, when you saw him did you know of his

20   relationship to a case that was then in the media known as the

21   Country Walk case?

22      A.   Yes, I did.

23      Q.   Did you know of his relationship to a person by the

24   name of Frank Fuster?

25      A.   Yes, I did.

1    Q.   What relationship the Noel Fuster that you know and

2    you saw on August 13, what relationship was he to Frank

3    Fuster?

4    A.   A son.

5    Q.   Where did you see Noel Fuster?

6    A.   I saw him on the fifth floor of the ambulatory

7    section of Jackson Memorial Hospital which was then the

8    pediatric emergency room called pediatric walk in.

9    Q.   Who brought Noel to the pediatric walk in?

10   A.   I don't know who brought him there but the person

11   who accompanied him was his natural mother.

12   Q.   Why was it that you were seeing Noel Fuster at the

13   pediatric walk in of Jackson Memorial Hospital?

14   A.   I was seeing him as the medical director of the

15   child protection team to do a physical examination as part of

16   the investigation for sexual abuse.

17   Q.   What tests did you run on Noel Fuster?

18   A.   I ran the routine tests that we run on children that

19   are suspected of being abused.  We run blood tests for

20   syphilis and we run swabs what we call Q-tip swabs, specimens

21   of the throat, rectum, and penile and urethra for gonorrhea.

22   Those are the tests we ran on him.  We did a complete physical

23   examination.

24   Q.   The complete physical examination that you performed

25   on Noel Fuster did it disclose any area of overt trauma or

1    obvious abuse?

2         A.   No, it did not.

3         Q.   Could you tell the ladies and gentlemen of the jury

4    how you went about testing Noel Fuster for gonorrhea taking

5    the swabs from the 3 different areas of his body?

6         A.   Those were the last things that we did as part of

7    the physical exam and we took a Q-tip and swabbed the throat

8    and then it is plated on a little dish called a petri dish and

9    you take the swab and you just draw a line on it with whatever

10   you take out of the throat, just like any throat culture but

11   the disk is special for gonorrhea.  We did the same thing from

12   the rectum.  We inserted a Q-tip the size of a thermometer

13   even less and inserted it into the rectum, twirled it around

14   and then plated that on this plate and did the same thing in

15   the penis, very skinny little Q-tip rubbed around and plated

16   on this plate again.

17        Q.   Why did you take cultures from those 3 areas of the

18   body?

19        A.   Because those are the 3 areas where gonorrhea is

20   transmitted and can be gotten from.

21        Q.   What did you do with the petri dishes the actual

22   innoculated petri dishes after you had taken the cultures from

23   the different parts of the body the samples and put them on

24   the petri dishes?

25        A.   A little tablet is dropped on them.  That is part of

1    the procedure of keeping the right atmosphere inside this

2    plate.  The cover is placed on it and then his name was

3    written on the plates and then these plates are then labeled

4    with the Jackson label, has his name and his number on it and

5    a form is filled out for each plate, wrapped around it put in

6    a bag and then sent down to the laboratory.

7         Q.   Are the 3 different petri dishes that contained the

8    samples from the throat, from the rectum and from the penis,

9    are they kept separate and labeled separately?

10        A.   Yes, I forgot to mention that the first thing done

11   before I even do the taking of the specimen is to label this

12   one being the throat, to write on there throat, next one

13   rectum and next one urethra to keep them separate.

14        Q.   The culture is taken from the throat put in the

15   throat petri dish, rectum and the penis.  Doctor, you

16   mentioned throat.  What part of the-- all kinds of different

17   things go back down past your teeth.  Could you explain for

18   the ladies and gentlemen of the jury where you took what you

19   term the throat culture of Noel Fuster?

20        A.   The proper way to do a throat culture is way down on

21   Novel take this Q-tip and rub the tonsil on each sidess and

22   then the very back of the throat between the tonsils as far

23   back as you can go.

24        Q.   One's these were all labeled are these dishes

25   themselves also labeled with the patient's names?

1    A.   Yes.

2    Q.   In this case labeled with Noel Fuster's name?

3    A.   Yes.

4    Q.   Each one of the individuals cultures is self

5  contained within its dish has a name and the sticker has also

6  what other things about Noel Fuster on it?

7    A.   Name, some identification number that Jackson gives

8  him and other numbers.  I'm not certain of their significance.

9    Q.   Labeled all that identification material from

10  Jackson including his name?

11    A.   Yes.

12    Q.   Labeled with where the culture is taken.  There's

13  also an invoice filled out?

14    A.   Yes.

15    Q.   That is wrapped around the culture with a rubber

16  bands?

17    A.   Correct.  Then that's usually inserted into a bag

18  and sealed.

19    Q.   Also all sent down to the lab?

20    A.   Yes.

21    Q.   Did you use all of the established procedures within

22  the area of medicine and within the practice of Jackson

23  Memorial Hospital in taking these cultures and preparing in

24  order to be sent to the lab?

25    A.   Yes, I did.

1             MR. SAMEK: Objection.  That's not the standard.

2             THE COURT: Overruled.  Go ahead.

3        Q.   (BY MR. CASEY) Did you send the samples to the lab

4   in the ordinary procedure for sending samples of this type to

5   the lab?

6             MR. SAMEK:  Objection.

7             THE COURT: Overruled.  Answer the question if you

8   can?

9        A.    Yes, I did.  Once I took the specimens and they were

10  labeled properly they were placed in a box in the pediatric

11  area where a transporter then picks them up and takes them

12  into the laboratory and that is standard procedure.

13       Q.   What laboratory do samples of this nature go to?

14       A.   They go to a laboratory called microbiology lab

15  which handles bacteria.

16       Q.   In this case what laboratory did Noel Fuster's

17  samples go to?

18       A.   Went to the microbiology laboratory.

19       Q.   To the best of your knowledge, Doctor, either in the

20  taking of samples or transporting of samples or processing and

21  examining of the samples at Jackson Memorial Hospital were

22  these samples in any way tampered with by anybody?

23             MR. SAMEK: Objection.  She testified she put them in

24  a box.

25             THE COURT: If she knows.

1    A.   I would have no reason to think that they or any

2    other specimens would be, no.

3            MR. SAMEK: Objection.  Nonresponsive.  Move to

4    strike.

5            THE COURT: Sustain the objection.  Answer the

6    question.

7            MR. SAMEK:  Move to strike.  Request curative

8    instruction.

9    Q.   (BY MR. CASEY) The question was to the best of her

10   knowledge were any samples tampered with in any way any place

11   in Jackson Memorial Hospital?

12           THE COURT:  Answer that question?

13   A.   To the best of my knowledge, no.

14   Q.   Doctor, did there come a time when you got the

15   results of the gonorrhea tests that you had taken from Noel

16   Fuster back from the microbiology lab?

17   A.   Yes, I did get them back from the microbiology lab.

18   I received a phone call telling me they were positive by

19   another member of my team and I then called the microbiology

20   lab myself and verified that throat culture was positive.

21   That was the only one that was positive.

22   Q.   So we're absolutely clear when you say the throat

23   culture was positive what does that mean Noel Fuster was

24   suffering from?

25   A.   That means he had gonorrhea of the throat.

1    Q.   Doctor, are you familiar with the occurrence of

2  false positives or false negatives in the testing for

3  gonorrhea of this type?

4    A.   I am familiar with that to the extent that there is

5  no such thing as false positives.  In other words, you cannot

6  have the culture grow unless there is gonorrhea because

7  gonorrhea is very hard to grow.  More commonly you have false

8  negatives that the person has gonorrhea but the culture

9  doesn't grow.

10   Q.   So in other words if the test comes back negative

11  it's either because you don't have gonorrhea or because the

12  culture didn't grow, right?

13   A.   Which usually happens because it's not collected

14  properly.  Gonorrhea is very hard to grow in the laboratory.

15  It has to be in the special dish as I mentioned.  That tablet

16  had to be there to insure the right atmosphere and it has to

17  be plated immediately.  In other words, I have to take the

18  swab and as soon after I take it I have to plate it.  I can't

19  wait an hour so when it's not done direct correctly in those

20  manners it may not grow. You have a false negative.

21   Q.   The other side of that, Doctor, if the test comes

22  back positive though it definitely means two things, one is

23  that  the tests were done correctly?

24   A.   Correct.

25   Q.   And, two, that the person really does absolutely

1  have gonorrhea of the contaminated area?

2      A.   Correct.  There's no way to get it on that plate

3  unless you got it on that swab from that place.

4      Q.   I don't have any further questions of the doctor at

5  this time.  Thank you, Doctor?

6          THE COURT: Mr. Samek.

7          EXAMINATION BY MR. SAMEK:

8      Q.   Good afternoon, Doctor. How does one get gonorrhea

9  of the throat?

10     A.   One gets gonorrhea of the throat by coming in

11 contact with gonorrhea.

12     Q.   How does one get contact with gonorrhea?

13     A.   By coming in contact with someone's body part that

14 has gonorrhea on it.

15     Q.   Can you have gonorrhea of the fingers?

16     A.   No.

17     Q.   Can you have gonorrhea germ particles?  Would it be

18 called gonorrhea germs?

19     A.   No.

20     Q.   Gonorrhea what?

21     A.   Gonorrhea is only transmitted sexually.

22     Q.   So that if I were to reach down into my throat if I

23 were to touch someone who had gonorrhea and reach some in my

24 throat I couldn't give it to myself, right?

25     A.   No, it isn't transmitted outside of the body.  In

1   other words, it can't live on fingers.  It can't live on

2   toilet seats.  It can't live on towels.  It has to be

3   transmitted from the place in the body where it came from to

4   another person's body.  It can only live in the human body.

5       Q.   Where in the human body can it live?

6       A.   Almost anywhere inside the body.  In order for it to

7   be transmitted it has to come from a penis that has gonorrhea

8   coming out of its urethra.

9       Q.   That's the only way it can be transmitted?

10      A.   It can be gotten.  That's the way it can be gotten.

11      Q.   That's it.  No other way?  The ejaculate of a penis

12  that has gonorrhea?

13      A.   Correct.

14      Q.   What are the objective signs of gonorrhea of the

15  throat?

16      A.   Usually it is asymptomatic.  There are no symptoms.

17  There are no signs.  Less commonly it may be a red throat or a

18  sore throat like any other the person comes in says I have a

19  sore throat.  By looking at it you can't tell it's gonorrhea,

20  only by culturing it.

21      Q.   If left untreated are there objective signs?

22      A.   If left untreated it can go on to become a more

23  whole body illness of gonorrhea and not just confined to the

24  throat.

25      Q.   The infection spreads?

1    A.   Yes, within the body.

2    Q.   When the infection spreads what other symptoms do

3 you develop besides a sore throat?

4    A.   One could develop any symptom or any sign in any

5 organs of the body where the gonorrhea lodges.  If it lodges

6 in the abdomen you can have an infection of the abdomen.  If

7 it lodges in the woman's pelvic organs you can have pelvic

8 inflammatory disease.  Wherever the gonorrhea lives is where

9 you'll have the symptoms.

10    Q.   What are the objective signs of gonorrhea of the

11 penis?

12    A.   Maybe asymptomatic again.  No symptoms.  Maybe a

13 discharge from the penis.  Maybe itching of the penis, maybe

14 burning on urination and no symptoms.

15    Q.   Can you be any more medically precise than maybe?

16    A.   What?  Percentages you mean?

17    Q.   If there are percentages?

18    A.   I would have to look that up.  There are studies

19 that show what percentage are asymptomatic.

20    Q.   You don't know what the percentage is?

21    A.   I don't keep that figure in my head, no.

22    Q.   You use the word ambulatory. I wonder if you would

23 explain to the jury what ambulatory means?

24    A.   What ambulatory means in the context I said it in?

25    Q.   Yes, please?

1     A.    I said ambulatory building because it's called

2     ambulatory care center.

3     Q.    Doesn't mean Noel was rushed in an ambulance and

4     taken on a stretcher up to the pediatric clinic?

5     A.    No, it does not.

6     Q.    What is the ambulatory building?

7     A.    That is a building where the out patient clinics of

8     Jackson are held and where at the time the pediatric emergency

9     room was located.

10    Q.    In fact ambulatory you're able to move it yourself?

11    A.    That's what that means.  It in fact may not be true

12    because people in wheelchairs are brought as well.

13    Q.    In Noel Fuster's case he wasn't other than what you

14    subsequently found as a result of the culture, I mean he was

15    not injured in any way you were able to observe.  He walked by

16    himself?  He came he, sat, he chatted?

17    A.    Correct.

18    Q.    Is there any way you can test to determine who

19    someone got gonorrhea from?

20    A.    No.

21    Q.    Is there one gonorrhea the same as any other

22    gonorrhea?

23    A.    The organism is the same.  However, let me qualify

24    that. There are different types of gonorrhea in which types

25    will respond to which medicine, penicillin works on some but

1     not all so they're not all the same in that way.

2         Q.   If you have 5 people on the one hand who have

3     gonorrhea and one person who also has gonorrhea you can't tell

4     from whom the one person got it from?

5         A.   No, that is correct.

6         Q.   You can't get it from somebody who doesn't have it,

7     can you?

8         A.   Someone has to have it to give it to some one else,

9     correct.

10        Q.   You can't get it from someone who doesn't have it?

11        A.   Correct. May I make a comment here?

12        Q.   Yes.

13        A.   You can't get it from someone that doesn't have it

14    but as we have said the person who gives it to you may be

15    asymptomatic so they don't know they have it or may have even

16    been cultured but the culture isn't done appropriately so they

17    do have it but it doesn't show up on that culture cause it

18    wasn't done properly.

19        Q.   How long can you be asymptomatic?

20        A.   How long can you be asymptomatic? I don't know that

21    answer is known.

22        Q.   Are there any--

23        A.   In other words, if you're asymptomatic you may not

24    go to the doctor ever and you may always have the gonorrhea of

25    the throat.  It my just not spread any further but no one ever

1    knows. I don't think that question is able to be answered.

2       Q.   But if you had gonorrhea of the throat you couldn't

3    give it to somebody through the penis?

4       A.   If you had gonorrhea of the throat?

5       Q.   You couldn't given it to somebody through your

6    penis?

7       A.   Not unless you had it in your penis.

8       Q.   How long can you be asymptomatic with gonorrhea of

9    the penis?

10      A.   As I said I don't believe that those answers could

11   be known.

12      Q.   Thank you. I have no further questions.

13           THE COURT: Anything further of the doctor?

14           EXAMINATION BY MR. CASEY:

15      Q.   Yes, just one other question. Doctor, what kinds--

16   you mentioned different kinds of gonorrhea. What kind of

17   gonorrhea did Noel Fuster have in his throat?

18      A.   He had the kind that is sensitive to penicillin.

19      Q.   What's the name of it, neisseria gonorrhea?

20      A.   They're all called neisseria gonorrhea. They are

21   either penicillin sensitive which means they could be treated

22   with it or penicillin resistant meaning it is not sensitive to

23   penicillin, needs another drug.

24      Q.   The kind of gonorrhea Noel Fuster had can be cured

25   by injection of penicillin?

1    A.   Correct.

2    Q.   Thank you.  I don't have any further questions of

3  the doctor.

4         EXAMINATION BY MR. SAMEK:

5    Q.   One further question.  Doctor-- actually two

6  questions.  Are you able to tell how long someone has

7  gonorrhea from the tests?

8    A.   No.

9    Q.   And if you're asymptomatic but for one or reason

10  another tested you won't show up as being negative?

11   A.   Could you repeat the question, please?

12   Q.   If you are asymptomatic, whether or not someone is a

13  symptomatic will not affect the test results; is that correct?

14   A.   You can be asymptomatic.  No, that will not affect

15  the test results.  It's up to the tester to do the test

16  properly for everything to go properly for it to grow.  You

17  may be asymptomatic and it may be negative because it wasn't

18  done properly.

19         MR. SAMEK: Thank you.

20         MR. CASEY: Nothing further.  Thank you very much,

21  Doctor.

22             (Whereupon, the following proceedings were

23  had:)

24             DR. SIMON MIRANDA

25         having been first duly sworn, was examined

JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

CASE NO. 84-19728

THE STATE OF FLORIDA,

      Plaintiff,

  vs.

FRANCISCO FUSTER ESCALONA,

      Defendant.

_____/

                       1351 Northwest 12th Street
                       Miami, Florida
                       Wednesday, July 24, 1985
                       1:35 p.m. - 2:00 p.m.

## DEPOSITION OF JOSEPH KYLE

Taken before MARK J. SILVERMAN,

Shorthand Reporter and Notary Public in and for the

State of Florida at Large, pursuant to a Notice of

Taking Deposition, filed in the above-styled cause.

- - - - -

BRICKELL REPORTING SERVICE, INC.
COURT AND DEPOSITION REPORTERS
444 BRICKELL AVENUE, SUITE 650
MIAMI, FLORIDA 33131
(305) 756-2322

WHITTINGTON Exhibit # 4

```
 1        APPEARANCES:

 2            DANIEL CASEY,
              Assistant State Attorney,
 3            On behalf of the Plaintiff.

 4            SAMEK & BESSER,
              BY:   JEFFREY SAMEK, ESQ.,
 5            On behalf of the Defendant.

 6

 7

 8

 9

10

11

12

13

14                         - - - -

15                      I N D E X

16
```

```
17       Witness                           Direct

18       Joseph Kyle                          3
```

```
19

20

21

22

23

24

25
```

**Thereupon--**

JOSEPH KYLE,

was called as a witness by the Defendant and, having

been first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. SAMEK:

Q    State your name and your occupation,

please?

A    My name is Joseph Kyle.  I'm a Medical

Technologist at Jackson Memorial Hospital.

Q    What do you do as a Medical Technologist?

A    I work in the Microbiology Lab and I

perform tests on specimens from patients.

Q    What is your educational background?

A    I have a Bachelor's Degree, in biology

sciences and I have a Master's Degree, in micro-

biology.

Q    Where did you get your Master's Degree?

A    University of Miami.

I graduated in 1977.

Q    Were you called upon to perform any tests,

make any analyses of any fluids or any substances

which you believe were taken from any of the alleged

victims, witnesses, or the defendants in what's

1    commonly referred to as the Country Walk case?

2        MR. CASEY:  Your question is "Which" at

3    the time?

4        That question has so much in it.

5        Are you asking him:  Did he do some tests?

6        MR. SAMEK:  Do you understand my question?

7        THE WITNESS:  I understand the question.

8        I'm not sure.

9    BY MR. SAMEK:

10       Q    Do your best to answer.

11       A    How to answer it?

12       Well, I received some specimens on a

13   patient and I later found out that that particular

14   patient was involved in this case.

15       Q    Yes?

16       A    At the time I received them, I didn't--I

17   didn't know anything about the patient.

18       Q    What did you receive?

19       A    We--I was working second shift, on the

20   particular evening that these came in.

21       Q    When was that?

22       A    August 13, 1984.

23       Q    Yes?

24       A    My preliminary job, that evening, was to

25   receive the specimens, log them in and then to set

them up to be cultured.

Q       What did you receive?

A       What we received was three petri dishes, with medium known as Martin Lewis Agar, in them.

Q       What is "Martin Lewis Agar"?

A       It's a selective--it's a medium, which is selective for pathogenic Neisseria gonorrhea, and particularly Neisseria gonorrhea.

Q       In laymen's terms, would it be accurate to say that Martin Lewis Agar is the substance that you mix with the particular fluids taken from a body to grow a culture, to reflect the presence of gonorrhea in the person from whom the sample was taken?

A       It's part of the process.

It does not necessarily--that is not the whole process in determining the presence of gonorrhea.

Q       Okay.

What else is there?

A       There are certain characteristics, of the bacterium, which causes it; morphology, under the microscope and the reaction to a Gram's stain.

Q       How do you spell that?

A       G-r-a-m stain.

Then there are other biochemical tests that are performed to verify the identity of the

1    bacteria.

2        Q.    What are the tests?

3        A.    The first thing that we do, if we suspected

4    that it could be Neisseria gonorrhea, is to do what

5    is called an oxidase test, and Neisseria gonorrhea

6    is positive for the oxidase reaction.

7              If it's oxidase positive, and it has the

8    correct Gram's stain reaction, in morphology, then

9    in our laboratory, we proceed to do a test which we--

10   it's a biochemical profile that's used for a number

11   of organisms, but we could innoculate that, incubate

12   it and on the basis of the profile, we would generate

13   a number, compare that to a list, which would give us

14   the identity of the bacteria.

15       Q.    So, those are the four things that you do

16   after the culture has grown?

17       A.    Yeah, what I just explained to you.

18       Q.    You have to wait for the culture to grow?

19       A.    Yeah.  It usually takes at least 24

20   hours.

21       Q.    For the culture to grow?

22       A.    Yes.

23       Q.    Is Martin Lewis Agar used as a medium for

24   anything else?

25       A.    In our lab, as a primary isolation medium,

we use it for isolating Neisseria gonorrhea.

1

Q       Anything else?

2

A       We can--we use it also to verify the

3

pathogenicity of Neisseria, like--

4

Q       What is Neisseria?

5

A       Neisseria is a group of bacteria and there

6

are several different types of Neisseria, but the

7

one we would use the Martin Lewis Agar for is

8

Neisseria meningitidis.

9

Q       That is the meningitis?

10

A       Right.

11

Q       What about other labs that you're aware of?

12

A       I don't know specifically about other

13

labs.  I know this is--you're asking me about the

14

Martin Lewis Agar specifically?

15

Q       Yes.

16

A       I don't know what other labs would use that

17

for, other than what I've just told you.

18

Q       Are you aware of any other microbiologically

19

accepted use for the Martin Lewis Agar?

20

A       Not offhand, no.

21

Q       When did you know who the sample was taken

22

from?

23

A       Well, I knew the patient's name.

24

I knew the patient's name.

25

Q       Immediately upon your receipt?

1    A.    Immediately upon receiving it.

2    Q.    What's the patient's name?

3    A.    Noel Fuster.

4    Q.    When did you find out more information

5    about who Noel Fuster was?

6    A.    I think 48 hours after I received the

7    culture.

8    Q.    Who told you?

9    A.    I really figured it out.

10         I heard the "Fuster" name on the TV and

11   put two and two together.

12   Q.    Are there any other tests, other than the

13   four that you told us about, that are used to detect

14   the presence of the gonorrhea bacteria?

15   A.    There are other ways to detect gonorrhea.

16   We use another method, an additional method now,

17   which we were not using then.  It's a commercially

18   available method.

19   Q.    What is it?

20   A.    It's called Gonocheck (phonetic).

21         But it's another way--there is an older way.

22   Q.    What does the Gonocheck do?

23   A.    It tests for the presence or absence of

24   different enzymes.  And each of, I think three or

25   four different enzymes is unique to each of three or

1    four species of Neisseria.  So, each one was a unique

2    enzyme for that.  And based on the presence, or

3    absence, of that, you can determine which of those

4    are present.

5         Q.   How does it work?

6         A.   We have a tube, a commercial test comes in

7    a tube.  We prepare, from the culture, a suspension,

8    which we put into the tube.  We incubate it at

9    body temperature, 37 degree centigrade, for approxi-

10   mately thirty minutes.

11            After that, based on the color reaction

12   that we see--

13        Q.   It reacts with a different color for

14   different enzymes?

15        A.   Right.

16            And so therefore, based on the color, it

17   will give you the identity of the organism.

18        Q.   Are you aware of what the recommended

19   method of drawing a sample is out of a lab, if some-

20   body buys it commercially and just wants to use it at

21   home?

22        A.   Are you asking about obtaining the

23   specimen?

24        Q.   Yes.

25        A.   No.  No.

We don't do that part of--

Q    I know you don't.  I'm asking you if you're aware of how this commercially acceptable one suggests people, on the street, take their own samples?

A    No, I'm not.

Q    Is there a medically accepted sample that must be drawn?

MR. CASEY:  For what?

MR. SAMEK:  For the testing of the gonorrhea bacteria.

MR. CASEY:  Under which of the tests?

MR. SAMEK:  Under any of them.

If, Mr. Casey, if you object to the form, object to the form--

MR. CASEY:  I just want to make sure the questions are clear.

MR. SAMEK:  We're not dealing with an illiterate.

MR. CASEY:  Right.

MR. SAMEK:  The man is certainly capable to tell me if he understands the question.

MR. CASEY:  As long as the questions are put right.

MR. SAMEK:  If he doesn't understand it, I'm sure he'll tell us.

1    He's probably better educated than either

2    one of us.

3        MR. CASEY:  I imagine.

4        THE WITNESS:  As far as obtaining

5    specimens, we do not routinely do that.

6    BY MR. SAMEK:

7        Q    Do you know what's done?

8            I'm not asking for your professional

9    opinion, I'm just asking you if you know how the

10   sample is done?

11       A    In general, I know how that's done.

12           I don't know specifically how they would

13   do it at the hospital.

14       Q    Generally, what's done?

15       A    In a case like this, in this particular

16   case, we got three specimens.  One was from the

17   throat.  One from the urethra and one from the

18   rectum.  And I believe that in a case such as that,

19   they would, with a sterile cotton swab, would swab

20   the area or obtain an exudate.

21       Q    What's an exudate?

22       A    An exudate, being fluid, pus, something

23   such as that.

24       Q    Saliva?

25       A    I don't believe that you'd want to obtain

it.   You'd be taking it from the throat, so.

Q    Not from the mouth?

A    No.

     I don't--

Q    As far as you're aware of--I understand that is not your expertise--

A    It--well--

Q    On the evening of the 13th, you set the samples up for a culture?

A    They actually had already been set up when they came into the lab.

Q    Do you know who did that?

A    No, I do not.

Q    They came from--the petri dishes didn't have any indication on them--

A    No.

Q    --of who would set them up?

A    No.

Q    Where did they come from?

A    They came from the P.D. Walk-in Clinic at--the pediatric clinic--

Q    At Jackson?

A    From Jackson.

Q    From whom did they come?

A    From what person?

1  Q    Yes?

2  A    That I do not know.

3  Q    After you set them up for culture, what's

4  the next thing you did with them?

5  A    Incubate them--

6  Q    By "incubate them"--

7  A    Well, they're received, the information

8  on both the specimen and request form, patient

9  information are matched; in other words, that has to

10 agree before we do anything else.

11 Q    You want to make sure you got the right

12 sample?

13 A    Right.

14      In other words, if they don't match, our

15 policy is not to accept it.

16      So, after that is verified, they're logged

17 in our in-lab log book and then, at that point, they

18 are numbered, both the ticket and the specimen

19 are numbered with a culture number.

20 Q    They're given the same number; right?

21 A    It's the same number, right.

22      At that point the petri dishes are

23 incubated appropriately.

24 Q    What is the appropriate way of incubating

25 these petri dishes?

A.    The Martin Lewis medium, when you're trying to culture Neisseria gonorrhea, you need to be incubated in $CO_2$, or carbon dioxide environment, at 37 degree centigrade.

Q.    What is the incubation period?

A.    They're incubated for 18 to 24 hours before they are checked.

Q.    Who determines whether it will be 18 or 24?

A.    That's just the standard recommended incubation time.

Q.    How long were these incubated?

A.    These were probably--when they were first checked, they were probably incubated about 18 hours.

Q.    How long an incubation did they get before any tests were done on them?

A.    Specifically, I don't know.

My involvement, with these specimens, stopped at the point of the incubation.

Q.    You didn't perform any tests on them?

A.    No.

Q.    Do you know who did?

A.    Yes, I do.

Q.    Who?

A.    Her name is Freda Burstyn.

Q       Did you observe her doing the test?

A       Not when she was doing it, no.

Q       Did you discuss the results of the tests with her, or she with you?

A       Yes.  After the culture had already been signed out.

Q       What was your discussion?

A       She commented that she had a patient with Nisseria gonorrhea from the throat.  And in the same --and it was even after that, that I had put a connection between our work on these cultures and the Fuster case.

Q       Are you aware of any way to test who or how someone--who they have gotten gonorrhea from, or how they got it from the person?

A       I'm not sure what you're asking.

Q       Are you aware of any test, that can be made upon someone who has gonorrhea, that will indicate who they got it from?

A       No.

Q       Are you aware of any test that can be done to determine how someone got it, within the range of accepted methods of getting gonorrhea?

A       No, I'm not.

Q       Did you do any other tests on any other

samples?

1

     A.    On this particular patient?

2

     Q.    Any patient with regard to Country Walk?

3

     A.    I'm not aware of any other patients.

4

     MR. SAMEK:  Thanks so much for coming in.

5

     THE WITNESS:  Thank you.

6

     MR. CASEY:  That's it.

7

     (Thereupon, the taking of the deposition

8

was concluded.)

9

     (Reading and signing waived.)

10

     - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

STATE OF FLORIDA )
                           : SS.
COUNTY  OF  DADE )

I, MARK J. SILVERMAN, a Notary Public in and for the State of Florida at Large, hereby certify that I reported in shorthand the deposition of JOSEPH KYNE, a witness herein; that the deponent was first duly sworn by me; that reading and signing of the deposition were waived by the deponent and counsel; that the foregoing pages, numbered 1 to 16, inclusive, constitute a true record thereof.

I further certify that I am not of counsel, I am not related to nor employed by any attorney to this suit, not interested in the outcome thereof.

The foregoing certification does not apply to any reproduction of this transcript by any means unless under the direct control and/or direction of the certifying shorthand reporter.

Dated at Miami, Dade County, Florida, this _____ day of July 1985.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

CASE NO. 84-19728


THE STATE OF FLORIDA,

       Plaintiff,

   vs.

FRANCISCO FUSTER ESCALONA,

       Defendant.

_____/




                1351 Northwest 12th Street
                Miami, Florida
                Wednesday, July 24, 1985
                2:00 p.m. - 2:25 p.m.

### DEPOSITION OF FREDA BURSTYN

       Taken before MARK J. SILVERMAN, Shorthand
Reporter and Notary Public in and for the State of
Florida at Large, pursuant to a Notice of Taking
Deposition, filed in the above-styled cause.


- - - - -


BRICKELL REPORTING SERVICE, INC.
COURT AND DEPOSITION REPORTERS
444 BRICKELL AVENUE, SUITE 650
MIAMI, FLORIDA 33131
(305) 756-2322

WHITTINGTON Exhibit # 5

APPEARANCES:

    DANIEL CASEY,
    Assistant State Attorney,
    On behalf of the Plaintiff.

    SAMEK & BESSER,
    BY:  JEFFREY SAMEK, ESQ.,
    On behalf of the Defendant.

- - - - -

**I N D E X**

| **Witness** | **Direct** |
|-------------|:----------:|
| Freda Burstyn | 3 |

1    Thereupon--

2                         FREDA BURSTYN,

3    was called as a witness by the Defendant and, having

4    been first duly sworn, was examined and testified as

5    follows:

6                      DIRECT EXAMINATION

7    BY MR. SAMEK:

8         Q    State your name and your occupation, please?

9         A    Freda Burstyn, Medical Technologist.

10        Q    By whom are you employed?

11        A    Jackson Memorial Hospital, Public Health

12   Trust.

13        Q    What is your professional education?

14        A    I have a B.S. in Medical Technology,

15   from the University of Miami.  I interned at Jackson

16   Memorial, in Medical Technology.

17        Q    Did you have occasion to conduct tests

18   on incubated Martin Lewis Agar, that you subsequently

19   became aware of was connected with the Country Walk

20   case?

21        A    One more time?

22        Q    I phrased that so well.

23             Mark, could you please read that back.

24             (Whereupon, the question as above recorded

25   was read back by the court reporter.)

A.      When I worked on the culture, I was not aware that it was connected  with the Country Walk case.

Q       That is why I said "subsequently."

A.      Yes, I subsequently became aware of it.

Q       What did you do?

First, when did you conduct the tests?

A.      When I conducted it?

When I received it.

Q       Do you know when that was?

A.      I believe it was in August, I believe that's when they pulled the cultures out, the lab report out; I think it was in August.

Q       What did you do?

A.      What we routinely do any time we receive--

Q       Don't let my first question fool you.  I have no idea what I was talking about.  It's just that we took Mr. Kyle's deposition and--

A.      I had a Martin Lewis--which is a specialized growth, which is specifically for Neisseria gonorrhea species, which--gonorrhea being one of them.

Q       What is special about it?

A.      It has nutrients or inhibitory ingredients-- for lack of a better word--that enhances the growth of Neisseria gonorrhea.

5

1        Gonorrhea is a Neisseria.

2    Q    Yes?

3    A    It's on a plate and--

4    Q    When you say "a plate"; what is it?

5    A    It's a little petri dish, and it has agar

6  in it--it's called a Thera-Martin (phonetic) media,

7  which is specialized for Neisseria gonorrhea,

8  particularly.

9    Q    What do you do with that plate?

10    A    I saw something growing on it.

11         Of course, I want to make sure, so we

12  routinely do what I did, I made a Gram stain, which

13  is Gram-negative dipolcocci.

14    Q    You're jumping way ahead of me anyway.

15         You found these incubated petri dishes?

16    A    One.

17         There were three cultures on this patient.

18    Q    What did you do with the petri dishes after--

19    A    I looked at them.  I said, "Oh, little

20  colonies, there is something growing on it."

21    Q    By colonies, you're not saying somebody

22  built a housing development, are you?

23    A    No, colonies is visible clusters of

24  organisms.

25    Q    So, you can look at the plate and--

1      A.     I can look at the plate and see it.

2      Q.     Anybody with eyesight could look and see

3   something?

4      A.     On that plate.

5             Whether or not they know what it is, or

6   what to do with it--well, that's another story.

7      Q.     But it was easily visible?

8      A.     Easily visible.

9      Q.     To an average-sighted human being?

10     A.     Yes.  Even me with my glasses (indicating).

11            We made a Gram stain.

12     Q.     What is that?

13     A.     A Gram stain will differentiate between

14  organisms.

15            There is Gram-positive organisms and Gram-

16  negative organisms.  There are cocci and there are

17  rods.

18            What we look for in Thera-Martin are Gram-

19  negative dipolcocci, which are Neisseria, particularly

20  Neisseria gonorrhea.

21            This--

22     Q.     Gram-negative dipolcocci is the name for a

23  particular kind of--

24     A.     It's the name for a group of organisms

25  that fit into that particular--

1    Q    They have particular visual characteristics?

2    A    Under the microscope, yes.

3         This is microscopic.

4         What we do is a colony morphology, which is

5    the way it looks.  Then we do a microscopic morphology,

6    which is the Gram stain.  Then we do a biochemical

7    test, to confirm, or not confirm, that this is, in fact,

8    the organisms present.

9         So we did the colony; right?  We looked at

10   the plate and we saw that there--

11   Q    --was something?

12   A    --was something.

13   Q    If you hadn't seen anything, you would have

14   either left it or--

15   A    If I hadn't seen anything, which on two of

16   the cultures there was nothing growing within 48

17   hours, which is significant enough to sign it out as

18   "no growth in 48 hours.  Then this is a negative

19   report."

20        But the third one, on the throat, yes,

21   there was something growing.

22   Q    That's the morphology, just looking at it is

23   the morphology?

24   A    Not just that.  It's a transluscent colony,

25   which is wher you work with them enough, usually you

8

1   can look at it and recognize it.  You can even smell

2   it if you're prone that way.

3           I can smell it.

4           There are lots of ways you do it.  But you

5   make the Gram stain.  Microscopically it has to be

6   Gram-negative dipolcocci.  They were.

7           It doesn't matter, if I explain to you,

8   exactly what a Gram-negative dipolcocci looks like?

9       Q    It does.

10      A    It does?

11           Okay.

12           They're little round circles, cocci--

13      Q    As opposed to triangulars--

14      A    As opposed to rods, which is rectangular.

15   They're dipolcocci, because there are two and it's--

16      Q    Like a figure eight?

17      A    No.  It's kidney-bean shaped.

18           If you give me a piece of paper and pen

19   I'll make you a picture of what it looks like.  And

20   this definitely had those in the Gram stain.

21           Not only that, another significant thing

22   for Neisseria is that it would be oxidase positive,

23   which it was.

24           MR. CASEY:  If you care to voluntarily draw

25

1    a picture, that's up to you.

2         MR. SAMEK:  She just asked--

3         MR. CASEY:  I'm just advising her of something.

4         MR. SAMEK:  You don't represent her.

5         MR. CASEY:  If I could just make a record.

6         For the record, he has called you here for

7    oral deposition.  He can ask you questions and you

8    can give him oral responses.  I'm not going to go

9    into the full explanation, since you brought it

10   up.  I'm not your lawyer and I cannot tell you what

11   to do and what not to do.

12        But, you don't have to draw any pictures, or

13   do anything else like that, if you don't care to.

14        If you care to, you can.

15        He can ask you questions, you don't have to

16   draw--

17        THE WITNESS:  It's all right.

18        MR. SAMEK:  You offered, and I would appre-

19   ciate it if you would.

20        You can keep the drawing when you're finished.

21        THE WITNESS:  I'll do it.

22        Do you have a red pen?

23        Excuse me, I'm not an artist.

24        (Whereupon, the witness made a drawing.)

25        THE WITNESS:  There are two circles, stuck

1         together, red, in a Gram stain.

2                 MR. SAMEK:  Thank you.

3                 THE WITNESS:  That's very typical.

4    BY MR. SAMEK:

5         Q    Is there any other reaction to a Gram stain

6    that results from the Gram stain, in what you refer to

7    as a Gram stain?

8         A    Gram stain--there is another genesis of

9    organisms, however, they have to be anaerobic, which

10   means they grow only in the absence of oxygen.  And

11   these plates were incubated in the presence of oxygen.

12        Q    How do you know that?

13        A    That's what we routinely do.  That's what

14   the procedure is for these plates.

15        Q    How do you know these particular plates

16   were not grown in anaerobic--

17        A    They were not put in an anaerobic jar.

18        Q    You saw that?

19        A    To be incubated anaerobically--obviously,

20   there is air all around us, and they're plates.

21   They were never done that way.  If they did, I would

22   have to write a report and say "lab error, please

23   submit new specimen."  That was not done.

24        Q    Is it possible that it was incubating

25   anaerobically a few minutes before you came to look at

1   it and somebody changed it?

2       A.    If it was incubated anaerobically, nothing
would have grown, because the organisms I'm talking

3   about would not grow. This is the only thing it could

4   be. There was no lab error. It was incubated in

5   $CO_2$, air Martin media is specific for Neisseria.

6   This was Neisseria species. I did the Gram stain.

7   That's what it looks like.

8           We do something which is an NH Test.

9       Q.    What is that?

10      A.    Biochemical test, to confirm it. It's a

11  series of reactions. We inoculate these little wells,

12  that are little agents, in this we incubate for four

13  hours. We get a profile number, which is characteristic

14  for specific organisms. It came up Neisseria. It came

15  up Neisseria, no question, nothing else it could have

16  been. Based on that, I signed my report.

17      Q.    What is the oxidase test?

18      A.    Oxidase is another identifying test that we

19  use for organisms, and again, Neisseria gonorrhea is

20  very specifically oxidase positive.

21          Not that many organisms are, and certainly

22  none that grow on Thera-Martin.

23      Q.    How do you know it was growing on Thera-

24  Martin?

25

1      A.    Because it was growing, that was the only

2    plate that was submitted.  It's a Thera-Martin plate.

3      Q.    How do you know that, it says that on it?

4      A.    It said "Thera-Martin," or Martin Lewis,

     it's the same media.  It says it on it.

5

6      Q.    How do you know it wasn't mislabeled?

7      A.    That would have to be done by BBL, the

     company that manufactures it, has it on it.

8

9      Q.    So, you're relying on their representation?

10     A.    No, I'm relying on the fact that if it was

     a Thera-Martin plate, because it says so right on there,

11   "ML plate received," and he wouldn't have written

12   that if it wasn't on the ticket.

13         If you look on the ticket, it says, "ML

14   Plate received."

15

16     Q.    How would he know that--

17     A.    Because he received it and he looked at it.

18     Q.    What is it that you can see when you look

     at it?

19

20     A.    It either--I don't know, this particular

21   plate that they received, I don't know--because I

22   don't remember.  But, it either would have said,

23   "Thera-Martin," or Martin Lewis plate, but it has

24   to be labeled that way because media has to be

25   labeled.

Q.    If it was mislabeled, is there any way that you could visually tell?

A.    There is only one other plate that it looks like and Neisseria gonorrhea will also grow on that; and that is a chocolate plate.  But other things are grown on it.

Q.    Why is it called a "chocolate plate"?

A.    Because it's very enriched and it's cooked blood as opposed to a blood agar plate.  Practically anything will grow on that.  And it will grow well. But then again, I would have made a microscopic examination.  I would have my biochemical profile. There are three checks in this, to make sure this is the organisms.

Q.    The biochemical test, what does that do?

A.    That is the NH Test.

Q.    What is done, what is the actual test?

A.    Okay.  It's a little plate, with little wells in it.  And each well has a different reagent? And we take some of those colonies, that I told you that were growing on that plate, and we inoculate a broth for this test.  And then we inoculate all these wells.

Q.    When you say "inoculate--"

A.    Inoculate means, I take the broth, pour it

1    into the wells so that the organisms act with the

2    reagent that is present in each well, okay.  It's

3    incubated for four hours.

4         And at that time that the reactions are

5    read, and they're very specific, based on whether or

6    not there is a reaction and what the reaction is,

7    we identify the organism.

8         Q.   What is the organism results from the

9    inoculation of--

10        A.   What was the profile number?

11        Q.   Yes.

12        A.   On that particular one, it was 0220.

13        Q.   How would you describe the microscopic

14   visual features of 0220?

15        A.   Well, they're not microscopic.  They're to

16   the eye.

17        Q.   Plainly viewed?

18        A.   I brought a little pamphlet from the NH kit.

19        Q.   With you?

20        A.   It's in my lab coat.

21        Q.   Can we see it?

22        A.   Sure.

23        (Whereupon, the witness left the room and

24   returned with the pamphlet.)

25

BY MR. SAMEK:

Q     The No. 0220 is--

A.    The profile number.

Q     Profile number that is drawn from a chart of some kind?

A.    Yeah.  There is a chart that has a list of a whole bunch of numbers, and different organisms.

Q     And zero, at the beginning of 0220 indicates negative results for various, appearance of various what?

A.    For those reactions.

Q     What are the two two's stand for?

A.    One of them was glucose--you don't want me to say what it is.

      You want to have it right, you're going to have to look at the spelling.

Q     What is the first zero mean was not present?

A.    It was negative for phosphate, phenyl-phosphanite, it's all indicated up here.  Principally-- these I can do each one for you, but that's totally up to you.

Q     Does the "zero" signify anything significant?

A.    It means it was negative for that reaction.

Q     What does the first 2 indicate?

A.    It means that it's positive for the

prolyl-P-nitroanilide, p-r-o-l-y-l-P-

n-i-t-r-o-a-n-i-l-i-d-e.

     Q.    What does that mean?

         Can it mean that it was positive for anything

else?

     A.    No.

         That's the only thing it could be positive

for, in this reaction, and it's positive for glucose.

     Q.    And negative--

     A.    For sucrose o-n-p-g, negative for o-n-p-e

sucrose--

     Q.    Yes?

     A.    Ornithine, I don't know what "GGT"--

we always just say "GGT," gama-glutamyl-P,

g-l-u-t-a-m-y-l-P--nitroanilide.  Nitroanilide.

     Q.    Does it mean that it was negative for all

or any one?

     A.    It means it's negative for that reaction.

         It's also negative for resazurim,

r-e-s-a-z-u-r-i-m.

     THE WITNESS:  I'm so glad I brought that.

BY MR. SAMEK:

     Q.    You checked 0220 with the chart for comparing

the numbers to what they represent and that tells you

that it represented what?

A.      Neisseria gonorrhea.

Q.      Are there any other tests that can be performed that are medically accepted--

A.      Yes.

Q.      --whether done in your lab or not--

A.      Yes.

Q.      --that could have been done?

A.      Yes.

Q.      What are they?

A.      The three sugars, which is what we used to do before we had all these, this neat little kit.   CTA sugars for glucose, sucrose, maltose, lactose.

Q.      Why don't you use that test anymore?

A.      It's not as efficient.   It takes 24 hours. This test only takes four hours.

Q.      Any other test?

A.      There is another little test, that we just started to do, I've only done it once.   I don't know too much about it; it's called the Gonocheck, which is half an hour test.

Q.      Let's go back to the three sugar test first.

A.      Yes.

Q.      Are the results more accurate?

A.      They are--they confirm the absence or presence of Neisseria gonorrhea just as well as this test will.

In other words, if you get the correct reaction, there is no other organisms that these could be, except Neisseria.

Q     It's your belief that these tests are 100 percent accurate?

A     Yes, it's my belief.

Q     What do you know about Gonocheck?

A     As I said, I only did it once.  It's a different kind of test.  It takes half an hour and it seemed to work pretty well.  But, we don't--I don't know if we were using it routinely in the lab yet. I've only done it once.

This is one I'm more familiar with.

Q     Is there any way for me examining the original incubation or any of the results from any of the other tests that you did, or the tests that you didn't do, to determine the age of the bacteria?

A     Of the bacteria?

Q     Of the gonorrhea?

A     No.

Q     You can only test the presence or lack thereof?

A     Yes.

Q     From the test, from the observation of the incubated dishes, from observation from any of the test results, there is no way that you can determine

1    how long the gonorrhea has been in the person from

2    whom the sample was drawn?

3         A.    No.

4              MR. SAMEK:   Thank you.

5              THE WITNESS:   Thank you.

6              (Thereupon, the taking of the deposition was

7    concluded.)

8              (Reading and signing waived.)

9                   - - - - -

<u>CERTIFICATE</u>

STATE OF FLORIDA )
                     : SS.
COUNTY  OF  DADE )

    I, MARK J. SILVERMAN, a Notary Public in and for the State of Florida at Large, hereby certify that I reported in shorthand the deposition of FREDA BURSTYN, a witness herein; that the deponent was first duly sworn by me; that reading and signing of the deposition were waived by the deponent and counsel; that the foregoing pages, numbered 1 to 19, inclusive, constitute a true record thereof.

    I further certify that I am not of counsel, I am not related to nor employed by an attorney to this suit, not interested in the outcome thereof.

    The foregoing certification does not apply to any reproduction of this transcript by any means unless under the direct control and/or direction of the certifying shorthand reporter.

    Dated at Miami, Dade County, Florida, this _26_ day of July 1985.

*a journal for clinicians*

# The Pediatric Infectious Disease Journal®

GOOD SAMARITAN HOSPITAL
BEINECKE MEDICAL LIBRARY
WEST PALM BEACH, FLA.

## Volume 7
## Numbers 1–12, 1988

COPYRIGHT © 1988 BY WILLIAMS & WILKINS
BALTIMORE, MARYLAND

WHITTINGTON Exhibit # 7

# The Pediatric Infectious Disease Journal®

## Chief Editors

JOHN D. NELSON, M.D.      GEORGE H. McCRACKEN, JR., M.D.

## Editorial Office

PEDIATRIC INFECTIOUS DISEASE
University of Texas Southwestern Medical Center at Dallas
5323 Harry Hines Blvd.
Dallas, TX 75235

## Editors

KENNETH J. BART, M.D.    HEINZ F. EICHENWALD, M.D.    HARRY R. HILL, M.D.    JEROME O. KLEIN, M.D.
*Washington, DC*              *Dallas, TX*                *Salt Lake City, UT*      *Boston, MA*
WALTER ORENSTEIN, M.D.            GEORGES PETER, M.D.              JAMES K. TODD, M.D.
*Atlanta, GA*                        *Providence, RI*                    *Denver, CO*

## Editor for Statistical Review

JOAN REISCH, Ph.D.
*Dallas, TX*

## International Editors

BAROUKH M. ASSAEL, M.D.          RYOCHI FUJII, M.D.          LARS Å. HANSON, M.D.
*Milan, Italy*                      *Tokyo, Japan*              *Göteborg, Sweden*
P. HELENA MÄKELÄ, M.D.    CARL MIETENS, M.D.    E. RICHARD MOXON, M.D.    URS B. SCHAAD, M.D.
*Helsinki, Finland*          *Bochum, Germany*        *Oxford, England*        *Bern, Switzerland*

## Editorial Board

JAMES W. BASS, M.D.              SAMUEL P. GOTOFF, M.D.              PEARAY OGRA, M.D.
*Honolulu, HI*                      *Chicago, IL*                      *Buffalo, NY*
JOHN E. BENNETT, M.D.            MOSES GROSSMAN, M.D.            MICHAEL T. OSTERHOLM, Ph.D.
*Bethesda, MD*                    *San Francisco, CA*                *Minneapolis, MN*
ADNAN DAJANI, M.D.              CAROLINE B. HALL, M.D.            LARRY K. PICKERING, M.D.
*Detroit, MI*                      *Rochester, NY*                    *Houston, TX*
FLOYD W. DENNY, M.D.      MARGARET R. HAMMERSCHLAG, M.D.      PHILLIP A. PIZZO, M.D.
*Chapel Hill, NC*                    *Brooklyn, NY*                  *Bethesda, MD*
LEIGH G. DONOWITZ, M.D.          WALTER T. HUGHES, M.D.          DAVID W. SCHEIFELE, M.D.
*Charlottesville, VA*                *Memphis, TN*                *Vancouver, BC, Canada*
LISA M. DUNKLE, M.D.            SHELDON L. KAPLAN, M.D.          STANFORD T. SHULMAN, M.D.
*St. Louis, MO*                      *Houston, TX*                      *Chicago, IL*
ANNE A. GERSHON, M.D.            MICHAEL KATZ, M.D.            RUSSELL W. STEELE, M.D.
*New York, NY*                      *New York, NY*                  *Little Rock, AR*
JANET R. GILSDORF, M.D.          S. MICHAEL MARCY, M.D.        CATHERINE M. WILFERT, M.D.
*Ann Arbor, MI*                    *Panorama City, CA*                *Durham, NC*

1988

anti-
ct Dis

·l
·
e test.

sion of
wborn:
Lancet

tive re-
: in the
t Infect

nosis of
inofluo-

· results
J Clin

Pediatr Infect Dis J, 7:3–10, 1988
0891-3668/88/$02.00/0
Copyright © 1988 by Williams & Wilkins

Vol. 7, No. 1
Printed in U.S.A.

CENTERS FOR DISEASE CONTROL: CURRENT ISSUES IN PEDIATRICS.
EDITED BY WALTER ORENSTEIN, M.D.

# Incorrect identification of *Neisseria gonorrhoeae* from infants and children

W. L. WHITTINGTON, BA, R. J. RICE, MD,* J. W. BIDDLE, MS AND J. S. KNAPP, PHD

Sexual abuse of children is receiving increasing attention. The isolation of a sexually transmissible pathogen from a child, when infection *in utero* or during delivery can be excluded, is presumed to be evidence of sexual abuse.[1] Such circumstantial evidence of sexual abuse is often the catalyst for the referral of children and their families to social welfare agencies. Because of the seriousness of sexual abuse allegations for the child, the family, health care professionals, clinical laboratories and suspected assailants, the diagnosis of an infection caused by a sexually transmitted disease (STD) agent in a pediatric patient should be carefully substantiated.

The frequency of sexual child abuse is unknown, but many believe the problem to be enormous in scope.[2] Numerous genitourinary tract pathogens and STD agents may be transmitted during abuse and the identification of each agent requires specific technical competence. Further compounding the problem of identification and diagnosis is the great variety of normal microbiologic flora that may be isolated from children. Many of these organisms are phenotypically similar to STD agents. Further, particularly in very young children, autoinoculation of oropharyngeal flora to the genital tract, where the same organism may be a marker of sexual activity or sexual abuse, is an important consideration.

A number of infections in children caused by STD agents transmitted from adults have been documented. Although the focus of this report is on difficulties in the identification of *Neisseria gonorrhoeae*, a variety of STD pathogens can be transmitted during

sexual abuse of children. These include *Treponema pallidum, Chlamydia trachomatis*, herpes simplex virus (HSV) and human papilloma virus.[3–6] Vaginosis has been diagnosed in sexually abused young females,[7] but its etiology may be complex. Examination of a Gram-stained smear and wet mount may be used to guide the management of a symptomatic child; the presence of *Trichomonas vaginalis* may be determined by examination of a wet mount, but culture has been shown to be more sensitive.[8] Although the isolation of genital mycoplasmas from adults has been shown to be a marker of sexual activity,[9] several studies have failed to detect such an association in sexually abused female children.[10,11] Additionally a recent report[12] described recurrent urethritis caused by *Ureaplasma urealyticum* in a sexually inactive, prepubertal male.

Recommended laboratory tests to document the presence of specific sexually transmissible pathogens are summarized in Table 1. A serologic test for syphilis is recommended when sexual abuse of a child is suspected.[1,2] A reactive nontreponemal test for syphilis, e.g. rapid plasma reagin card circle test or Venereal Disease Research Laboratory test should be confirmed by a treponemal test. For the child with clinical lesions a darkfield examination is indicated.

When a genital infection with HSV is suspected because of the presence of vesicles or ulcers, a specimen should be obtained from the lesions and cultured for the virus. In adults cytopathic effect in an appropriate cell culture system is almost always specific for HSV.[13] However, because varicella zoster can produce a cytopathic effect that is virtually indistinguishable from HSV, it is advisable to confirm the identity of virus isolates by accepted methods in specimens obtained from children. Because there has not been enough experience with antigen detection systems among patients of this age group, culture remains the standard for the identification of HSV. Although the specific serotypes of HSV have been associated with oral (type 1) and genital (type 2) infections, the iso-

From the Division of Sexually Transmitted Diseases, Center for Prevention Services (WLW, RJR), and Sexually Transmitted Disease Laboratory Program, Center for Infectious Diseases (JWB, JSK), Centers for Disease Control, Atlanta, GA.
*Current address: Department of Medicine, Harborview Medical Center, University of Washington, Seattle, WA.
Address for reprints: Technical Information Services, Attention: W. L. Whittington, Center for Prevention Services, Centers for Disease Control, 1600 Clifton Road, N.E., Atlanta, GA 30333.

**TABLE 1.** Recommended tests for the identification of STD agents in the pediatric patient

| Disease or Syndrome | Tests Suggested |
|---|---|
| Gonorrhea | Culture; identity of isolate confirmed by two independent methods |
| Syphilis | Nontreponemal test results confirmed by treponemal test; darkfield examination of material from lesions (if present) |
| Herpes | Culture with confirmation encouraged |
| Genital warts | None available |
| *Chlamydia* | Culture |
| Vaginitis | Gram's stain and wet mount of discharge* |

*To guide approach to therapy; tests are unable to affirm the identity of a specific organism. However, when infection with *Trichomonas vaginalis* is considered, wet mount findings are specific, although culture is more sensitive.

lation of HSV type 2 is not in and of itself proof of sexual abuse because either serotype may be isolated from either anatomic site.[14,15]

At the present time diagnostic tests for genital warts (human papilloma virus infection) are not available for the clinical laboratory setting. The diagnosis must be based on clinical findings. Autoinoculation from other infected body sites should also be considered.

Infection with *C. trachomatis* may be confirmed only by isolation and identification of the organism in cell culture.[16] Antigen detection systems have considerable value in screening adult populations[17,18] and appear useful in the evaluation of children with conjunctivitis.[19,20] However, their value as tests on specimens from other anatomic sites in children is unproven and their use should be discouraged.[21] Additionally infec-ı acquired from the mother has been shown to ᵖersist in the rectum of children for as long as 2 years postpartum;[22] thus the isolation of *C. trachomatis* from the very young child should be evaluated carefully before a presumption of sexual abuse. However, in older children, e.g. ≥2 years of age, case-control[23,24] studies strongly suggest that isolation of *C. trachomatis* from any body site should be a catalyst for further evaluation of the child for sexual abuse.

Gonococcal infection in children appears to be the best understood of all STDs in children.[2] Nonetheless laboratories still have problems associated with the identification of *N. gonorrhoeae* in specimens from children.

### BACKGROUND

During 1983 and 1984, 14 isolates initially identified as *N. gonorrhoeae* by clinical laboratories were confirmed to be species other than *N. gonorrhoeae*. These isolates represented approximately one-third of isolates from children that were received at the Centers for Disease Control. This rate of incorrect identification may not be representative of the experience of all clinical laboratories because the distribution of specimens received at our laboratory may not be repre-sᵉⁿ*ative of all organisms isolated from specimens ᵗted from children.

The diagnosis of gonorrhea in sexually active individuals may be based on a presumptive identification of *N. gonorrhoeae*, i.e. the detection of Gram-negative, intracellular diplococci in Gram-stained smears of urethral or cervical secretions or the growth of Gram-negative, oxidase-positive diplococci on selective media from urogenital specimens.[25] Specimens from sexually active individuals are inoculated on selective media containing antibiotics such as colistin, vancomycin and nystatin that inhibit the growth of most colistin-sensitive commensal *Neisseria* spp.[25] Thus in sexually active patients the presumptive identification of *N. gonorrhoeae* has a high predictive value when specimens are collected from anatomic sites other than the oropharynx.[26]

However, in any low prevalence group such as children the identification of *N. gonorrhoeae* based on presumptive criteria may have an unacceptably low predictive value. Routine bacteriologic specimens from children are often inoculated on nonselective medium unless a gonococcal infection is initially suspected. Because all nongonococcal *Neisseria* spp. isolated from man are part of the normal flora in the oropharynx of children and adults, throat specimens inoculated on nonselective media may yield many different *Neisseria* ssp. Even when throat specimens from children are inoculated on selective media used for *N. gonorrhoeae*, strains of *Neisseria lactamica* may be commonly isolated because this species is colistin-resistant.[25]

Confirmation of an organism presumptively identified as *N. gonorrhoeae* may be undertaken by the use of one or more of three available methods. Carbohydrate degradation tests distinguish between species of the *Neisseriaceae* by determining the ability of an isolate to produce acid from glucose, maltose, fructose, sucrose and/or lactose. Enzyme-substrate tests assist in the differentiation of *Neisseriaceae* by the detection of the specific enzymes 1-hydroxyprolylaminopeptidase, gamma-glutamylaminotransferase and beta-galactosidase.[25] Serologic (immunologic) tests for *N. gonorrhoeae* are designed to permit identification of *N. gonorrhoeae* in primary culture or directly in specimens.

Our experience as a reference laboratory is that strains with cultural characteristics and cell morphology similar to gonococci may often be misidentified as *N. gonorrhoeae* if not characterized adequately (Table 2). Additionally the use of a single confirmatory test has not always proved adequate to ensure the correct identification of *N. gonorrhoeae*.

### SUMMARY OF CASES

During 1983 and 1984 approximately 40 bacterial isolates from children younger than 15 years of age that had been identified as *N. gonorrhoeae* were sub-

TABLE 2. Characteristics that differentiate between strains of Neisseria spp., Branhamella catarrhalis and Kingella denitrificans that normally grow on gonococcal selective media or resemble Neisseria gonorrhoeae in cultural and biochemical characteristics

| Species | Pigment[a] | Catalase[b] | Acid from | | | | | Polysaccharide[c] from 5% sucrose | Reduction | | DNase | Extra CO2 | Growth | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Glucose | Maltose | Fructose | Sucrose | Lactose (ONPG) | | NO3 | NO2[e] | | | MTM, ML or NYC medium | Chocolate, blood agar at 22°C | Nutrient agar at 35°C |
| Neisseria gonorrhoeae | - | + | + | - | - | - | - | - | - | - | - | VI | + | - | - |
| Neisseria meningitidis | - | + | + | + | - | - | - | - | - | - | - | I | + | - | - |
| Neisseria lactamica | - | + | + | + | - | - | + | - | - | d | - | d | + | - | + |
| Neisseria cinerea | - | + | -[f] | - | - | - | - | - | d | d | - | d | + | + | + |
| Neisseria sicca | - | + | + | + | + | + | - | + | + | + | - | No | - | + | + |
| Neisseria subflava biovar perflava[h] | + | + | + | + | + | - | - | + | + | d | - | No | - | + | + |
| Neisseria mucosa | - | + | + | + | + | + | - | + | + | + | - | No | - | + | + |
| Neisseria flavescens | + | + | - | - | - | - | - | + | - | - | - | No | - | + | + |
| Neisseria polysaccharea | - | + | + | + | - | - | - | + | d | d | - | d | - | d | + |
| Branhamella catarrhalis | - | + | - | - | - | - | - | - | + | + | + | No | - | d | + |
| Kingella denitrificans | NG | - | + | - | - | - | - | - | + | + | - | I | + | - | - |

a Pigment observed on nutrient agar.
b Catalase test using 3% H2O2; Neisseria gonorrhoeae reactions stronger using 30% H2O2 (superoxol).
c Some strains can be inhibited by 5% sucrose (1% sucrose may be used).
d Some strains of Neisseria cinerea can reduce 0.01% (w/v) nitrite.
e Nitrate in 0.1% (w/v) nitrite; Neisseria gonorrhoeae can reduce 0.01% (w/v) nitrite.
f Some strains of Neisseria cinerea may give a weak acid reaction in glucose in some rapid tests for the detection of acid production from carbohydrates.
g Some strains of Neisseria cinerea have been isolated on gonococcal selective medium but are colistin-sensitive and will not grow when subcultured on gonococcal selective media.
h Strains of Neisseria subflava biovar perflava give consistent patterns of acid production when tested in appropriate media.
ONPG, o-nitrophenyl-beta-D-pyranoside; DNase, deoxyribonuclease; MTM, modified Thayer-Martin medium; ML, Martin-Lewis medium; NYC, New York City medium; NG, no growth; +, most strains (≥90%) positive; -, most strains (≤90%) negative; d, some strains positive, some strains negative; VI, very important for growth; I, important for growth; No, not needed for growth.

mitted to the Sexually Transmitted Disease Laboratory Program at the Centers for Disease Control for confirmation of their identify. Of these isolates 14 proved not to be N. gonorrhoeae. Sexual abuse was not suspected in the first group of 10 children until the isolation of N. gonorrhoeae was reported (Table 3). The 4 children in the second group were evaluated because of initial allegations of sexual abuse (Table 4). In each instance a diagnosis of gonococcal infection was based on the identification of Gram-negative, oxidase-positive diplococci as N. gonorrhoeae. The methods for identification of isolates by the submitting laboratories ranged from the growth of Gram-negative oxidase-positive diplococci on selective media to identification using serologic or biochemical tests.

Specimens collected from the 10 children evaluated for reasons other than suspected sexual abuse included 4 specimens each from the throat and the eye. One child was tested because of suspected meningitis and one because of a perirectal abscess. The incorrect identification of these 10 organisms as N. gonorrhoeae resulted in initiation of investigations of child abuse in 8 cases. As part of these investigations 14 classmates, siblings and other relatives were examined and/or treated (Table 3). Among children examined because of evidence of sexual abuse, 3 specimens were collected from genital sites and 1 specimen was obtained from the oropharynx (Table 4).

## BACTERIOLOGIC STUDIES

At the Centers for Disease Control isolates were characterized by their colonial morphology, oxidase reaction and morphology in a Gram-stained smear (Table 2). Organisms were identified on the basis of several of the following reference biochemical tests: acid production from glucose, maltose, fructose, sucrose and lactose;[27] production of beta-galactosidase (o-nitrophenyl-beta-D-pyranoside);[27] reduction of nitrate;[27] production of polysaccharide from sucrose;[28] colistin susceptibility;[29] and the superoxol test.[30] Miningococcal grouping was performed when appropriate. Beta-lactamase was detected using the chromogenic cephalosporin test.[31]

## PROBLEMS ASSOCIATED WITH THE LABORATORY IDENTIFICATION OF N. GONORRHOEAE FROM CHILDREN

Fourteen Gram-negative, oxidase-positive diplococcal isolates from children that were misidentified as N. gonorrhoeae by clinical laboratories were confirmed to belong to five different species belonging to the family Neisseriaceae. Regardless of the anatomic site from which a specimen is collected from the child, the identification of N. gonorrhoeae presents special problems. The use of presumptive criteria may be used to guide the choice of therapy but should be followed by the confirmed identification of the isolate.

*NEISSERIA GONORRHOEAE* January, 1988 Vol. 7, 1

**TABLE 3.** Summary of clinical, epidemiologic and laboratory data from 10 pediatric patients with no supporting evidence of sexual child abuse and a culture initially identified as *Neisseria gonorrhoeae*

| Case | Age/Sex | Reason for Testing | Site Cultured | Basis for Identification as *Neisseria gonorrhoeae* | Confirmed Identification | Suspicion of Child Abuse[a] | Other Persons Evaluated[b] |
|------|---------|--------------------|----------------|------------------------------------------------------|---------------------------|-----------------------------|-----------------------------|
| 1. | 3 months/male | Conjunctivitis | Eye | Growth on nonselective medium, oxidase-positive, beta-lactamase positive | *Branhamella catarrhalis* | Yes | 4 |
| 2. | 2 years/male | Routine | Throat | Gram-negative, oxidase-positive, beta-lactamase positive | *Branhamella catarrhalis* | Yes | 1 |
| 3. | 2 years/male | Respiratory tract infection | Throat | Growth on selective medium and Gram stain morphology | *Neisseria lactamica* | Yes | 4 |
| 4. | 8 years/female | Meningitis | CSF | CIE | *Neisseria meningitidis* | Yes | 0 |
| 5. | 12 years/female | Routine | Throat | Oxidase-positive, Gram stain morphology | *Kingella dentrificans* | Yes | 5 |
| 6. | 3 years/female | Sore throat | Throat | Oxidase positive, Gram stain morphology, Phadebact®; no ONPG | *Neisseria lactamica* | Yes | 0 |
| 7. | 6 months/male | Conjunctivitis | Eye | Oxidase-positive, Gram stain morphology Phadebact®; no ONPG | *Neisseria lactamica* | Yes | 0 |
| 8. | 8 years/male | Perirectal abscess | Rectum | Biochemical tests (3) | *Neisseria cinerea* | Yes | 0 |
| 9. | 5 days/female | Conjunctivitis | Eye | N/A | *Neisseria cinerea* | No | |
| 10. | 3 months/female | Conjunctivitis | Eye | N/A | *Neisseria cinerea* | No | |

[a] After initial identification of *Neisseria gonorrhoeae*.
[b] Number of associates tested and/or treated.
CIE, counterimmunoelectrophoresis; ONPG, o-nitrophenyl-beta-D-pyranoside; NA, not available; CSF, cerebrospinal fluid.

**TABLE 4.** Summary of laboratory data from four pediatric patients examined because of suspicion of sexual abuse

| Case | Age/Sex | Site Cultured | Basis for Identification as *Neisseria gonorrhoeae* | Confirmed Identification |
|------|---------|---------------|------------------------------------------------------|---------------------------|
| 1 | 10/female | Vagina | Oxidase-positive, GND | *Neisseria cinerea* |
| 2 | 8/female | Throat | N/A | *Branhamella catarrhalis* |
| 3 | 2/female | Vagina | Oxidase-positive GND | Unidentified *Neisseria* species |
| 4 | 4/male | Urethra | Oxidase-positive GND | *Neisseria meningitidis* |

GND, gram-negative diplococci; NA, not available.

**Neisseriaceae isolated on gonococcal selective media.** Strains of *N. lactamica, Neisseria meningitidis, Neisseria polysaccharea* and *Kingella denitrificans,* which may resemble *N. gonorrhoeae* in their cultural characteristics, grow on gonococcal selective medium.[25,32-34] In addition some strains of *Branhamella catarrhalis*[35,36] and *Neisseria sicca* or *Neisseria subflava* biovar *perflava*[37] are colistin-resistant and will grow on gonococcal selective media. Although strains of *N. cinerea* are colistin-susceptible, some strains have been isolated on gonococcal selective media.[29,38]

In the first group of children (Table 3) two of the four organisms isolated from the throat were ultimately identified as *N. lactamica.* Gold et al.[39] reported that the oropharynx of 59% of healthy children in Connecticut had been colonized with *N. lactamica* at least once by age 4. One of the *N. lactamica* isolates had been incorrectly identified as *N. gonorrhoeae* because of the clinical laboratory's failure to confirm the result of a positive polyvalent serologic test (Phadebact® *Gonococcus* Test) with an o-nitrophenyl-beta-

pyranoside test as was recommended in the manufacturer's directions for use of the test.

Strains of *N. meningitidis* may be confused with *N. gonorrhoeae.* Identification of the cerebrospinal fluid isolate as *N. gonorrhoeae* was based on a negative result in the counterimmunoelectrophoresis test for *N. meningitidis*[40] without additional biochemical or serologic tests. *N. meningitidis* strains may be identified by detection of acid production from maltose but not lactose or sucrose[25] or by the production of gamma-glutamylaminotransferase.[41] Maltose-negative strains of *N. meningitidis* have also been described[42,43] and may also be differentiated from *N. gonorrhoeae* by their ability to produce gamma-glutamylaminotransferase.[41]

Although *K. denitrificans* is a Gram-negative, oxidase-positive coccobacillus, strains of this species resemble *N. gonorrhoeae* in their cultural characteristics, and many appear to be Gram-negative diplococci in Gram-stained smears.[34] Strains of *K. denitrificans* produce acid from glucose.[25] Given the high carriage

rates of *K. denitrificans* in the oropharynx of children,[34] it is not surprising that this species was misidentified as *N. gonorrhoeae* in one case. This organism may be differentiated from *N. gonorrhoeae* by the superoxol test,[31] by the reduction of nitrate to nitrate[25] or by the demonstration of cell elongation when exposed to a penicillin disk on growth medium.[25]

Strains of *B. catarrhalis* have been isolated from the throat of healthy children and have been implicated as etiologic agents in conjunctivitis, otitis media and respiratory tract infections.[44-47] As many as 20% of strains produce beta-lactamase.[48] This characteristic may confuse the distinction between *B. catarrhalis* and beta-lactamase-producing strains of *N. gonorrhoeae* unless the organism is identified. Presumptive criteria coupled with a positive beta-lactamase test resulted in misidentification of organisms from 2 patients.

Some strains of *N. sicca* or *N. subflava* biovar *perflava* have been isolated on gonococcal selective media[39] and are colistin-resistant. Because of pigment production and colony opacity these strains may be differentiated presumptively from *N. gonorrhoeae* in the primary culture and can be differentiated biochemically by the detection of acid production from maltose and sucrose.[25] However, confirmatory testing with the use of only enzyme-substrate tests is not advised because these strains will be identified as either *N. meningitidis* or *N. gonorrhoeae* because they produce gamma-glutamyl-aminotransferase and/or prolylaminopeptidase.[37,49]

Among colistin-susceptible *Neisseria* spp. that rarely grow on gonococcal selective media, *Neisseria cinerea* is similar to the gonococcus in both cultural and biochemical characteristics and may easily be misidentified as *N. gonorrhoeae*. *N. cinerea* was misidentified as *N. gonorrhoeae* in four cases. Some tests currently used for the identification of *N. gonorrhoeae* may not give positive acid reactions from glucose,[50] further adding to the difficulties in species differentiation. Some strains of *N. cinerea* and *N. gonorrhoeae* may not be differentiated by other tests including the Minitek®,[38,51] BACTEC®,[38,44] Gonochek II®[51] and Rapid NH®[51] tests.

Although, the Phadebact® *Gonococcus* Test has now been replaced by the Phadebact® OMNI Test, this test has also given cross-reactions with strains of *N. cinerea* and other *Neisseria* spp. (unpublished data). Only careful use of a variety of techniques will permit the differentiation of some strains of *N. cinerea* from many strains of *N. gonorrhoeae* (Table 2). For example *N. gonorrhoeae* and *N. cinerea* differ in reduction of nitrite and growth on nutrient agar.

***Neisseriaceae* isolated on nonselective medium.** *Neisseria* and related species will grow on nonselective medium. Many of these species are distinctly pigmented and opaque and can be easily differentiated

from *N. gonorrhoeae* in primary culture. In addition, with one exception all of the pigmented species produce acid from maltose and will not be misidentified as *N. gonorrhoeae* in rapid tests to detect acid production. However, if these species are not recognized as colistin-susceptible and tested in enzyme substrate tests they will be identified either as *N. meningitidis* or *N. gonorrhoeae* because they produce gamma-glutamylaminotransferase or 1-hydroxyprolylaminopeptidase.[49]

**Limitations of confirmatory tests.** Rapid tests have been developed in recent years to permit confirmed identifications of Gram-negative, oxidase-positive diplococci in primary cultures or pure subcultures. Care must be taken when choosing the tests to be performed and interpreting the results of such tests for the identification of *Neisseria* spp. Additional care must be taken when identifying Gram-negative, oxidase-positive isolates from nonselective medium because all commensal species can grow and will outnumber pathogenic species.

Rapid carbohydrate tests permit the identification of many species, or groups of *Neisseria* species, by their patterns of acid production. Only five species are normally maltose-negative. These are *N. gonorrhoeae*, *N. cinerea*, *Neisseria flavenscens*, *B. catarrhalis*, and *K. denitrificans*. As discussed above maltose-negative strains of *N. meningitidis* have been isolated.[42,43] The problems in identifying these strains will not be overcome by the use of reference tests for detection of acid. However, enzyme-substrate tests may be used to identify strains of *B. catarrhalis* and maltose-negative *N. meningitidis*. It is unlikely that strains of *N. flavescens* will be encountered. Strains of this species were isolated from a single outbreak of meningitis in Chicago in 1930.[52] Although the isolation of this species has been reported by other investigators,[53,54] the strains were not adequately characterized, and it is probable that these strains were *N. cinerea*.[29,54] Supplementary tests are included or suggested for the identification of other species.

Enzyme-substrate tests permit the identification of *Neisseria* and related species by the detection of specific enzymes, 1-hydroxyprolylaminopeptidase, gamma-glutamylaminotransferase and beta-galactosidase.[41] Some manufacturers do not limit the use of their product to the identification of isolates from gonococcal selective media but use additional tests to differentiate between *N. gonorrhoeae* and other species with similar biochemical characteristics. Some manufacturers have not included *N. cinerea* or *K. denitrificans*, or note the existence of colistin-resistant strains of *N. subflava* biovar *perflava*, in the data bases for their product with the result that strains of these species that are also 1-hydroxyprolylaminopeptidase-positive may be misidentified as *N. gonorrhoeae*.

Rapid serologic tests for *N. gonorrhoeae* are de-

signed to permit identification of *N. gonorrhoeae* in primary culture[25,55-58] or directly in specimens.[25,59] Tests using either polyvalent or monoclonal antibody reagents are commercially available.

Tests that use polyvalent antibodies are currently available to detect gonococcal antigens directly in specimens by an enzyme-linked immunosorbent assay test[36] or from primary cultures using a fluorescent antibody test.[25] The antibody reagents in these tests may cross-react with other *Neisseria* spp.[25,60]

Tests using monoclonal antibody reagents in coagglutination[55-57] and direct fluorescent antibody[58] tests are also available for culture confirmation. These tests also have some limitations. Some monoclonal reagents may not detect all strains of *N. gonorrhoeae*[61] and may give equivocal reactions including weak reactions with some known gonococcal isolates and weak, apparent cross-reactions with some strains of nongonococcal species[62] (unpublished data). In addition some nonspecific Fc binding of the reagent to staphylococcal cells has been noted and it is important that tests be limited to colonies of confirmed Gram-negative, oxidase-positive organisms (S Braemer, personal communication).

Although these tests may be used with some degree of confidence to identify gonococcal infections in high prevalence patient populations, the results of these tests for the confirmed identification of *N. gonorrhoeae* in specimens from low prevalence populations must be interpreted with caution. The identification of *N. gonorrhoeae* in low risk patients should be made using an isolate that can be stored and the identify of which can be reconfirmed if necessary.

The use of a colistin susceptibility test has been recommended to aid in the identification of *Neisseria* spp. With the exceptions noted above, strains of the commensal species are colistin-susceptible.

It is impossible to list all of the problems associated with the use of rapid tests for the identification of *N. gonorrhoeae*. In addition to those listed above there are occasional, perhaps rare, isolates that have aberrant properties that may result in their misidentification as *N. gonorrhoeae*. Given the limitations of any single test to confirm the identify of *N. gonorrhoeae* and serious consequences associated with accusations of sexual child abuse, it is important that the identification of *N. gonorrhoeae* be made by testing isolated organisms rather than by direct identification of organisms in patient specimens. In addition it is advisable that the identification of *N. gonorrhoeae* be confirmed by several different procedures that permit both the identification of *N. gonorrhoeae* and the exclusion of other species belonging to the family *Neisseriaceae*. Tests should include at least two procedures that use different principles, e.g. biochemical and enzyme-substrate or serologic. It is also important that both clinical microbiologists and clinicians understand the limitations of the tests used for the identification of isolates and interpret the laboratory results accordingly.

## IMPLICATIONS OF THE IDENTIFICATION OF *N. GONORRHOEAE* IN CHILDREN

Sexual abuse of children is a sensitive and important issue for pediatric health care professionals, social service workers and laboratory personnel. When children are examined for reasons other than suspected sexual abuse, the incorrect identification of a bacterial isolate as *N. gonorrhoeae* produces unwarranted allegations and investigations of sexual abuse that are destructive to the physical and psychological well-being of the child and the well-being of the family structure. Among children examined because of other evidence of sexual abuse, the incorrect identification of organisms may result in difficulties for the investigation and prosecution of alleged assailants.

Because the laws relating to evidence for the prosecution of sexual child abuse may vary among states, it is important that clinical microbiologists and clinicians be familiar with the local regulations regarding the storage of isolates as evidence. Isolates should be frozen at $-70°C$ because strains of many species will not survive storage at $-20°C$. Confirmation of the identification of the organism by a reference laboratory might be considered if isolates are of medicolegal importance.

The laws relating to investigations of suspected child abuse also vary among states. The use of a presumptive identification as *N. gonorrhoeae* in a Gram-stained smear should be used only to guide therapy for the symptomatic child. Unless there is other evidence of sexual abuse, initiation of formal child abuse investigations should await the confirmed identification of the isolate.

## ACKNOWLEDGMENTS

We wish to thank those concerned clinicians and laboratory workers for making this report possible. In addition, we thank Stephen Morse, Ph.D., for his useful suggestions.

## REFERENCES

1. Centers for Disease Control: STD treatment guidelines. *MMWR* 34:1-35, 1985
2. Baker CJ: Child abuse and sexually transmitted diseases. *Sexually Transmitted Diseases*. Edited by: KK Holmes, PA Mardh, PF Sparling, et al. New York, McGraw-Hill, 1984, pp 116-119
3. Sgroi S: Sexual molestation of children: The last frontier of child abuse. *Child Today* 4:18-22, 1975
4. Rettig PJ, Nelson JD: Genital tract infection with *Chlamydia trachomatis* in prepubertal children. *J Pediatr* 99:206-210, 1981
5. Nahmias AJ, Dowdle WR, Naib ZM, et al: Genital infection with *Herpesvirus hominis* type 1 and 2 in children. *Pediatrics* 42:659-666, 1968
6. Seidel J, Zonana J, Totten E: Condylomata acuminata as a sign of sexual abuse in children. *J Pediatr* 95:553-557, 1979
7. Hammerschlag MR, Cumming M, Doraiksawamy B, et al: Nonspecific vaginitis following sexual abuse in children. *Pediatrics*

75:1028–1031, 1985

8. Fouts AC, Kraus SJ: *Trichomonas vaginitis*: Reevaluation of its clinical presentation and laboratory diagnosis. *J Infect Dis* 141:137–143, 1980

9. McCormack WM, Almeida PC, Parlay PE, et al: Sexual activity and vaginal colonization with genital mycoplasmas. *JAMA* 221:1375–1377, 1982

10. Hammerschlag MR, Doraiswamy B, Cox P, et al: Colonization of sexually abused child with genital mycoplasmas. *Sex Transm Dis* 14:23–25, 1987

11. Hammerschlag MR, Alpert S, Rosner I, et al: Microbiology of the vagina in children: Normal and potentially pathogenic organisms. *Pediatrics* 62:57–62, 1978

12. Shawn DH, Quinn PA, Prober C, et al: Recurrent *Ureaplasma* urethritis in a prepubertal boy. *Pediatr Infect Dis J* 6:687–689, 1987

13. Drew WL, Rawls, WE: Herpes simplex virus. *Manual of Clinical Microbiology.* Fourth Edition. Edited by EH Lennette, A Balows, AJ Hausler Jr, et al. Washington DC, American Society of Microbiology, 1985, pp 705–710

14. Nahmias AJ, Josey WE: Herpes simplex viruses 1 and 2. *Viral Infections of Humans: Epidemiology and Control.* Edited by AS Evans. New York, Plenum 1982, pp 351–372

15. Taieb A, et al: Clinical epidemiology of symptomatic primary herpetic infections in children: A study of 50 cases. *Acta Paediatr Scand* 76:128–132, 1987

16. Schachter J: Chlamydiae (psittacosis-lymphogranuloma verereum-trachoma group). *Manual of Clinical Microbiology.* Edited by EH Lennette, A Balows, AJ Hausler Jr, et al: Fourth Edition. Washington DC, American Society for Microbiology. 1985, pp 856–862

17. Chernesky MA, Mahony JB, Castriciano S, et al: Detection of *Chalmydia trachomatis* antigens by enzyme immunoassay and immunofluorescence in genital specimens from symptomatic and asymptomatic men and women. *J Infect Dis* 154:141–148, 1986

18. Taylor-Robinson D, Thomas BJ, Osborn MF: Evaluation of enzyme immunoassay (Chlamydiazyme) for detecting *Chlamydia trachomatis* in genital tract specimens. *J Clin Pathol* 40:194–199, 1987

19. Rapoza PA, Quinn TC, Kiessling LA, et al: Assessment of neonatal conjunctivitis with a direct immunofluorescent monoclonal antibody stain for *Chlamydia. JAMA* 255:3369–3373, 1986

20. Iveland H, Skaug K, Dahl M, et al: *Chlamydia trachomatis*: Direkte pavisning med immunofluorescence teknikk. *Tidsskr Nor Laegeforen* 106:1689–1690, 1986

21. Schachter J: Rapid diagnosis of sexually transmitted diseases: Speed has a price. *Diagn Microbiol Infect Dis* 4:185–189, 1986

22. Bell TA, Stamm WE, Kuo CC, et al: Chronic *Chlamydia trachomatis* infections in infants. *Chlamydial Infections.* Edited by D Oriel, G Ridgway, J Schachter, et al. Cambridge, UK, Cambridge University Press, 1986, pp 305–308

23. Ingram DL, White ST, Occhiuti AR, et al: Childhood vaginal infections: Association of *Chlamydia trachomatis* with sexual contact. *Pediatr Infect Dis* 5:226–229, 1986

24. Hammerschlag MR, Doraiswamy B, Alexander ER, et al: Are rectogenital chlamydial infections a marker of sexual abuse in children: *Pediatr Infect Dis* 3:100–104, 1984

25. Morello JA, Janda WM, Bohnhoff, M: *Neisseria* and *Branhamella. Manual of Clinical Microbiology.* Fourth Edition. Edited by EH Lenette, A Balows, AJ Hausler Jr, et al. Washington DC, American Society for Microbiology, 1985, pp 176–192

26. Smeltzer MP, Curran JW, Brown ST, et al: Accuracy of presumptive criteria for culture diagnosis of *Neisseria gonorrhoeae* in low prevalence populations of women. *J Clin Microbiol* 11:485–487, 1980

27. Hendrickson DA: Reagents and stains. *Manual of Clinical Microbiology.* Fourth Edition. Edited by EH Lennette, A Balows, AJ Hausler Jr, et al. Washington DC, American Society for Microbiology, 1985, pp 1093–1107

28. Knapp JS, Holmes KK: A modified oxidation-fermentation medium for detection of acid production from carbohydrates by *Neisseria* spp. and *Branhamella catarrhalis. J Clin Microbiol* 18:56–62, 1983

29. Knapp JS, Totten PA, Mulks MH, et al: Characterization of

*Neisseria cinerea*, a nonpathogenic species isolated on Martin-Lewis medium selective for pathogenic *Neisseria* spp. *J Clin Microbiol* 19:63–67, 1984

30. Arko RJ, Odugbemi TO: Superoxol and amylase inhibition tests for distinguishing gonococcal and nongonococcal cultures growing on selective media. *J Clin Microbiol* 20:1–4, 1984

31. O'Callaghan CH, Morris A, Kirby SM, et al: Novel method for detection of beta-lactamases by using a chromogenic cephalosporin substrate. *Antimicrob Agents Chemother* 1:283–288, 1972

32. Riou JY, Guibourdenche M, Popoff MY: A new taxon on the genus *Neisseria. Ann Microbiol (Paris)* 124B:257–267, 1983

33. Guibourdenche M, Pophoff MY, Riou JY: Deoxyribonucleic acid relatedness among *Neisseria gonorrhoeae, N. meningitidis, N. lactamica, N. cinerea,* and *"Neisseria polysaccharea." Ann Microbiol (Paris)* 137(B):177–185, 1986

34. Hollis DG, Wiggens GL, Weaver RE: An unclassified Gram-negative rod isolated from the pharynx on Thayer-Martin medium. *Appl Microbiol* 17:71–77, 1972

35. Doern GV, Morse SA: *Branhamella (Neisseria) catarrhalis*: Criteria for laboratory identification. *J Clin Microbiol* 11:193–195, 1980

36. Doern GV, Siebers KG, Hallick LM, et al: Antibiotic susceptibility of beta-lactamase-producing strains of *Branhamella (Neisseria) catarrhalis. Antimicrob Agents Chemother* 17:24–29, 1980

37. Janda WM, Ulanday MG, Bohnhoff M, et al: Evaluation of the RIM-N, Gonochek II, and Phadebact systems for the identification of pathogenic *Neisseria* spp. and *Branhamella catarrhalis. J Clin Microbiol* 21:734–737, 1985

38. Dossett JH, Applebaum PC, Knapp JS, et al: Proctitis in a child associated with *Neisseria cinerea* misidentified as *Neisseria gonorrhoeae. J Clin Microbiol* 21:575–577, 1985

39. Gold R, Goldschneider I, Lepow ML, et al: Carriage of *Neisseria meningitidis* and *Neisseria lactamica* in infants and young children. *J Infect Dis* 137:112–121, 1978

40. Anhalt JP, Kenny GE, Rytel MW: *Cumitech 8: Detection of Microbial Antigens by Counter-immunoelectrophoresis.* Coordinating ed., TL Gaven. American Society for Microbiology, Washington DC, 1978

41. D'Amato RF, Eriquez LA, Tomfohrde KM, et al: Rapid identification of *Neisseria gonorrhoeae* and *Neisseria meningitidis* by using enzymatic profiles. *J Clin Microbiol* 7:77–81, 1978

42. Saez-Nieto JA, Fenoll A, Vazquez J, et al: Prevalence of maltose-negative *Neisseria meningitidis* variants during an epidemic period in Spain. *J Clin Microbiol* 15:78–81, 1982

43. Granato PA, Howard R, Wilkerson B, et al: Meningitidis caused by maltose-negative variant of *Neisseria meningitidis. J Clin Microbiol* 11:270–273, 1980

44. Leinonem M, Luotonen J, Herva E, et al: Preliminary serologic evidence for a pathogenic role of *Branhamella catarrhalis. J Infect Dis* 144:570–574, 1981

45. Chapman AJ Jr, Muscher DM, Jonsson S, et al: Development of bactericidal antibody during *Branhamella catarrhalis* infection. *J Infect Dis* 151:878–882, 1985

46. Shurin PA, Marchand CD, Kim CH, et al: Emergence of beta-lactamase-producing strain of *Branhamella catarrhalis* as important agents of acute otitis media. *Pediatr Infect Dis* 2:34–38, 1983

47. Wald ER: Acute sinusitis in children. *Pediatr Infect Dis* 2:61–68, 1983

48. Brorson JE, Martinell J, Wilske H: *Branhamella cartarrhalis*: Antibiotic susceptibility and beta-lactamase production. *J Antimicrob Chemother* 7:208–209, 1981

49. Schalla WD, Lewis JS, Knapp, et al: Comparison of two rapid diagnostic tests for the identification of pathogenic *Neisseria* species. Abstract C267. Annual Meetings, American Society for Microbiology, 1983

50. Morello JA, Lerner SA, Bohnhoff M: Characterization of atypical *Neisseria gonorrhoeae* from disseminated and localized infections. *Infect Immun* 13:1530–1516, 1976

51. Boyce JM, Mitchell EB Jr: Difficulties in differentiating *Neisseria cinerea* from *Neisseria gonorrhoeae* in rapid systems used for identifying pathogenic *Neisseria* species. *J Clin Microbiol* 22:731–734, 1985

52. Branham SE: A new meningococcus-like organism (*Neisseria flavescens* n. spp.) from epidemic meningitidis. *Public Health*

*Rep* 45:845–849, 1930

53. Prentice AW: *Neisseria flavescens* as a cause of meningitidis. *Lancet* 1:613–614, 1957
54. Berger U: Die anspruchlosen *Neisseria*. *Ergeb Mikrobiol Immunitaetsforsch* 36:97–167, 1963
55. Lawton WD, Battaglioli GJ: GonoGen coagglutination test for confirmation of *Neisseria gonorrhoeae*. *J Clin Microbiol* 18:1264–1265, 1983
56. Carlson BL, Goodman RE, Siebel MB, et al: Evaluation of the Phadebact Monoclonal GC OMNI test for the identification of *Neisseria gonorrhoeae*. Abstract 525. Presented at the Interscience Conference Antimicrobial Agents and Chemotherapy, Minneapolis, September, 1985, p 193
57. Frankel JW, Alvarez D, Geier J, et al: A monoclonal coagglutination (COA) test for rapid identification of *Neisseria gonorrhoeae*. Abstract 526. Presented at the Interscience Conference Antimicrobial Agents and Chemotherapy, New Orleans, LA September, 1986, p 193

58. Laughon BE, Ehret JM, Handsfield HH, et al: Fluorescent monoclonal antibody for confirmation of *Neisseria gonorrhoeae*. Abstract C272, Annual Meeting of the American Society for Microbiology, Atlanta, GA March, 1987, p 368
59. Stamm WE, Cole B, Fennell C, et al: Antigen detection for the diagnosis of gonorrhea. *J Clin Microbiol* 19:399–403, 1984
60. Hofmann H, Petzoldt D: Detection of the gonococcal antigen with an enzyme Immunoassay (Gonozyme): Results of the original and modified test procedure *Hautarzt* 36:675–681, 1985
61. Minshew BH, Beardsley JL, Knapp JS: Evaluation of GonoGen coagglutination test for serodiagnosis of *Neisseria gonorrhoeae*: Identification of problem isolates by auxotyping, and with a fluorescent antibody reagent. *Diagn Microbiol Infect Dis* 3:41–46, 1985
62. Barth SS, Tatsch PC, Gibson SJ: Evaluation of Phadebact OMNI test for identification of *Neisseria gonorrhoeae*. Abstract C270, Annual Meeting of the American Society for Microbiology, 1987, p 368

# Announcements

**NINTH ANNUAL ADVANCES IN INFECTIOUS DISEASES: CURRENT THERAPY.** April 13 to 15, 1988, Sheraton-Palace Hotel, San Francisco, CA.

This meeting is sponsored by the Division of Infectious Diseases, Department of Medicine, University of California, San Francisco. Fees: $365/physicians; $250/allied health professionals. Credit: Approximately 16.0 Category 1 AMA credit. For further information contact Postgraduate Programs, Department of Medicine, 505 Parnassus, M979, University of California, San Francisco, CA 94143-0120. Telephone (415) 476-5208.

**SYMPOSIUM ON RESPIRATORY INFECTIONS IN CHILDREN AND EIGHTH ANNUAL NATIONAL PEDIATRIC INFECTIOUS DISEASE SEMINAR.** April 6–9, 1988, Hyatt Regency Hotel, New Orleans, LA. Organized by John D. Nelson and George H. McCracken, Jr., University of Texas Southwestern Medical Center at Dallas.

Faculty: Robert S. Daum, Heinz F. Eichenwald, George H. McCracken, Jr., John D. Nelson, Georges Peter, Jane D. Siegel, Russell W. Steele, Ellen R. Wald, Richard L. Wasserman. 25 hours CME credits (7 for Symposium; 18 for Seminar). Tuition $315 ($235 for Residents, Fellows and Physician's Assistants). Contact Marian Troup, Seminar Coordinator, Department of Pediatrics, University of Texas Southwestern Medical Center at Dallas, 5323 Harry Hines Blvd., Dallas, TX 75235-9063. Tel: 214/688-3439.

Pediatr Infect Dis J, 7:1-2, 1988
0891-3668/88/$02.00/0
Copyright © 1988 by Williams & Wilkins

Printed in U.S.A.

# Misidentification of sexually transmitted organisms in children: medicolegal implications

E. RUSSELL ALEXANDER, M.D.

There are two reasons why laboratory tests on children in whom sexual abuse is suspected should be selected, collected and interpreted with particular care. One is that such children deserve optimal care with minimal disturbance, and because sexually transmitted diseases are not frequent enough to warrant treatment without specific diagnosis,[1] such tests should be definitive. The second reason is that there are legal issues to consider. The results of the tests may be important determinants in assessing whether sexual abuse occurred, and sometimes with whom. Beck-Sague and I[2] attempted to summarize and modify the Centers for Disease Control (CDC) Sexually Transmitted Diseases treatment guidelines recommendations in such children in a recent review of sexually transmitted diseases in children and adolescents.[3]

In this issue two articles give very pertinent examples of the pitfalls that await us if we are not careful in choosing and interpreting tests. The first article, by Whittington et al.,[4] deals with the subject of gonorrhea. Fourteen of 40 isolates of *Neisseria gonorrhoeae* from children sent to the CDC for confirmatory testing turned out to be false-positives. They were all related organisms but failed the necessary confirmatory tests by more than one method, as described in this article. Such confirmatory testing should be an automatic response in laboratories when *Neisseria* species are recovered in children from any site or are recovered in anyone from sites other than the urethra or cervix. These points have been made repeatedly in CDC Sexually Transmitted Disease treatment guidelines,[2] in the American Academy of Pediatrics Redbook[5] and in many other references.

In eight instances reported in the current article, such false identification initiated sexual abuse inquiries which were unjustified. Such reports could put either laboratory or physician at risk for legal action.

It should be noted that these instances represent the tip of a large iceberg. There is no active surveillance system for such cultures at CDC and these cultures are but a few that were questioned by someone in another laboratory. Many probably go unnoticed.

Whittington et al. also make the point that any isolates of sexually transmitted organisms should be stored in the correct manner because they may be of medicolegal importance. This is particularly true if isolates are also available from the suspected abuser or from other possible contacts. In many instances there are typing schemes or markers that can be used to show similarity of isolates. In the case of *N. gonorrhoeae* there is the combination of auxotype and immunologically determined serovar to characterize isolates.[6] In the case of *Chlamydia trachomatis* only broad serovars may be used,[7] but they may be of some value. On the other hand, in the case of genital herpes isolates may be characterized rather exactly on the basis of restriction endonuclease mapping.[8]

In the second article Hammerschlag et al.[9] cite a series of cases where antigen detection methods for *C. trachomatis* were used in sexual abuse cases and gave false-positive results. The point to be made here is that antigen detection tests are not reliable enough to be used in any group of patients where prevalence is not expected to be high. Sexually abused children represent such a low prevalence group in most settings.

Furthermore antigen detection methods for *C. trachomatis* are not valid for sites other than the urethra or cervix and in the particular instance of neonatal conjunctivitis. This is not simply a matter of trials not having been done. There are sound biologic reasons why one should anticipate cross-reacting bacteria which may give confusing results when either oral or rectal sites are sampled, whether by direct fluorescent antibody smear[10] or enzyme immunoassay.[11]

Finally the use of antigen detection tests prohibits recovery and storage of isolates that might be necessary for legal evidence or be used for markers of identity.

The evaluation of children suspected of sexual abuse is clearly difficult. Potential pitfalls are many. This is

From the Division of Sexually Transmitted Diseases, Center for Prevention Services, Centers for Disease Control, Atlanta, GA.
Address for reprints: Technical Information Services, Attention: E. R. Alexander, M.D., Center for Prevention Services, Centers for Disease Control, 1600 Clifton Road, N.E., Mailstop E02, Atlanta, GA 30333.

not to say that such evaluation should be avoided but only that it should be approached carefully, methodically and with well-designed protocols.

## REFERENCES

1. White ST, Loda FA, Ingram DL, et al: Sexually transmitted diseases in sexually abused children. *Pediatrics* 72:16–21, 1983
2. Centers for Disease Control: STD treatment guidelines. *MMWR* 34:1–35, 1985
3. Beck-Sague C, Alexander ER: Sexually transmitted diseases in children and adolescents. *Infect Dis Clin North Am* 1:277–303, 1987
4. Whittington WL, Rice RJ, Biddle JW, et al: The incorrect identification of *Neisseria gonorrhoeae* from infants and children. *Pediatr Infect Dis J* 7:3–10, 1988
5. American Academy of Pediatrics: *Report of the Committee on Infectious Diseases*. 20th Edition. Edited by G Peter, GS Giebink, CB Hall, et al. Chicago, American Academy of Pediatrics, 1986
6. Knapp JS, Tam MR, Nowinski RC, et al: Serological classification of *Neisseria gonorrhoeae* with use of monoclonal antibodies to gonococcal outer membrane protein 1. *J Infect Dis* 150:44–48, 1984
7. Wang SP, Grayston JT: Immunologic relationship between genital TRIC, lymphogranuloma venereum and related organisms in a new microtiter indirect immunofluorescence test. *Am J Ophthalmol* 70:367–374, 1970
8. Linnemann CC, Buchman TG, Light IJ, et al: Transmission of herpes simplex virus type 1 in a nursery for the newborn: Identification of viral isolates by DNA fingerprinting. *Lancet* 1:964–966, 1978
9. Hammerschlag MR, Rettig PJ, Shields ME: False-positive results with the use of *Chlamydia* antigen detection tests in the evaluation of suspected sexual abuse in children. *Pediat Infect Dis J* 7:11–14, 1988
10. Rompalo AM, Suchland RJ, Price CB, et al: Rapid diagnosis of *Chlamydia trachomatis* rectal infection by direct immunofluorescence staining. *J Infect Dis* 155:1075–1076, 1987
11. Riordan T, Ellis DA, Matthews PI, et al: False positive results with an ELISA for detection of *Chlamydia* antigen. *J Clin Pathol* 39:1276–1277, 1986



**Shrine: Nara, Japan**

*Jaroslav Cermak, M.D.*
*West Germany*

## CERTIFICATION OF RICHARD OFSHE, PH.D.

Richard Ofshe, being of full age, hereby deposes and states the following:

1. My name is Richard Ofshe. I am a professor in the Department of Sociology at the University of California at Berkeley. I received my Ph.D. in 1968 from Stanford University. I began teaching at U.C. Berkeley in 1967.

2. I have received several honors during my professional career including sharing in the award of a Pulitzer Prize for Public Service in 1979 to the Point Reyes Light Newspaper, and the Roy Dorcus Award, given by the Society for Clinical and Experimental Hypnosis, for the Best Paper on Clinical Hypnosis of 1994. This paper was entitled, "Recovered Memory Therapy and Robust Repression: Influence and Pseudomemories."

3. I have served as consultant to a number of law enforcement agencies including, *inter alia,* the Office of the Attorney General for the States of California and Arizona; the U.S. Attorney's Offices in Los Angeles and West Virginia; the U.S. Department of Justice; the Internal Revenue Service; the Office of the Governor of Missouri; and the Commissioner's Office of the Department of Social and Rehabilitation Services for the State of Vermont.

4. As my attached curriculum vita indicates, I have published numerous articles over the course of my professional career. (Please see Ofshe, Exhibit 1.)

### *The Areas of My Expertise Relevant to Mr. Fuster's Case*

5. A central focus of my research and writing in recent years has been in the area of the misuse of influence procedures and the creation of pseudo-memories by psycho-therapists. In 1994, Ethan Watters and I published a book entitled, *Making Monsters:*

1

*False Memories, Psychotherapy and Sexual Hysteria*, Scribners, 1994 (reissued by the University of California Press in 1996).

6.   Among other things, *Making Monsters* addresses issues surrounding the creation of false memories, particularly where those memories are generated during the course of therapy or interrogation where the person "recalling" the information has been placed in a dissociative state.  Such a dissociative state may result from the person having been formally hypnotized, from the person inadvertently having been hypnotized, from self-inducing trance, from the use of drugs, or other techniques.

7.  *Making Monsters*, and much of my other writing in recent years, also describes and documents the widespread reliance by psychotherapists, particularly during the 1980's through the mid-1990's, on a theory known of traumatic repression. This theory posits the belief that people subjected to sexual abuse during their childhoods or adolescence will frequently: 1) automatically repress memories of the trauma because their conscious minds cannot deal with the trauma;  2)  have full amnesia of the traumatic experience(s); but  3) nevertheless, retain the memory of their abuse in their unconscious minds, fully intact;  and 4)  these memories can be recovered (or will emerge) from the unconscious in full detail with no distortion.  I and others have demonstrated  that these theories are wholly unsubstantiated. This, too, is addressed in *Making Monsters* and other publications of mine.

8.   I discuss in the book and elsewhere the very dangerous consequences of repressed memory theory, that psychotherapists – if they are possessed with a predisposition to uncover memories of abuse – can unintentionally spark and then build false beliefs in a patient's mind.  The techniques of influence employed in this context are

2

not generally intended simply to force the patient to agree with the therapist's conclusions, as would be the case with interrogators threatening and berating a suspect in an attempt to force a confession. Rather, the techniques are persuasive ones which result in the patient internalizing the belief that abuse occurred. If used improperly, hypnosis, to choose a prominent example, whether employed purposefully or inadvertently, can effectively induce a patient vividly to imagine the events of abuse that the therapist presumes to have happened.

9. Through the therapy process, patients come to believe essentially, that they have two sets of memories of the time period in question – one maintained in normal memory, and another, recorded in their subconscious minds, during which they were involved in repeated and horrific acts of sexual abuse. Patients arrive at this belief because their therapists demand such belief and accuse them of being in denial if they fail to adopt it. For some patients, the gap between pretherapy memories and posttherapy memories is not a difficult one to leap. The newly uncovered "memories" may augment pretherapy memories of a time period that was indeed dismal and contained other abusive elements. For other patients, the beliefs created in therapy may darkly contrast with pretherapy memories of a warm and cherished period of their lives.

10. Faced with choosing between their memories before and after the influence of therapy, therapists often encourage patients to redefine their histories based on the new pseudomemories. They must first admit that their normal memories were essentially fantasies – a trick their minds employed to shield them from the awful truth. In this way, the therapy not only builds new memories but discredits the pretherapy recollections.

3

11.  Perhaps most disturbingly, recovered memory therapists often train their patients to "re-experience" the emotional pain of rape, sexual abuse and other horrors that they "discover" in therapy.  Believing it therapeutic, therapists encourage abreactions – where the patient, often in hypnotic trance, "relives" the imagined abuses.  Patients are persuaded to literally feel the pain of rape and torture and humiliation of unspeakable degradation.  The power of the therapists' suggestions is so great that some patients can develop observable physiological reactions such as welts or rashes.  Certainly, "reliving" the imagined abuses, complete with attaching to these scenes physical and emotional sensations the patient imagines he or she would be feeling, helps to concretize the experience and make the patient more likely to believe in its historical validity.

12.  Because of my expertise in false memories and repressed memory theory, I was contacted by counsel for Francisco Fuster-Escalona (hereafter "Mr. Fuster) and asked to provide my expert opinion as to the validity of Mr. Fuster's claim that the trial testimony given by his former wife and co-defendant, Ileana Fuster (hereafter "Ileana"), was unreliable because of the way her accounts of events emerged during counseling instituted by her attorney in the weeks just before their joint trial was about to begin.

13.  I understand that a concern raised by the state court in an earlier proceeding in this case is that my expert testimony would have involved me offering opinions regarding Ileana's credibility.  This reflects a very basic misunderstanding of the testimony I would give.  My testimony would involve the effects of the influence procedures brought to bear on Ileana by the therapists who were sent in to see her. That testimony would, in turn, be based upon our scientific understanding of such procedures.  Thus, my testimony would be directed to the likelihood that the reports Ileana provided w ere hypnotically generated

4

fantasies versus actual memories of events she experienced. I would not be speaking to Ileana's credibility if for no other reason than I have no reason to doubt she accurately reported at trial the visualizations she experienced. Rather, I would be offering testimony related to explaining whether it was more likely that those visualizations were caused by suggestion under hypnosis or, instead, were more likely based on having actually experienced the events described - the visualizations being based on actual memories. In other words, I would not be commenting on Ileana's credibility; I would be commenting only on the reliability of her testimony.

*Summary of My Conclusions and the Documents Upon which I Base Them*

14. Counsel has provided me with a number of documents associated with Mr. Fuster's case, including: April 26, 1985 letter to Jeffrey Samek and Michael Von Zamft from the Office of the State Attorney; July 10, 1985 memo from John Hogan to Janet Reno re: an examination of Ileana Fuster by Dr. Charles Mutter; Affidavit of Herb Smith, filed July 29, 1985; July 30, 1985 letter from Norman Reichenberg, Ph.D. to Judge Robert H. Newman; July 31, 1985 letter from Sanford Jacobson, M.D. to Judge Robert H. Newman; July 31, 1985 deposition of Norman Reichenberg, Ph.D.; August 1, 1985 deposition of Shirley Jean Blando; August 3, 1985 letter from Psychological Associates of Miami to Judge Robert H. Newman; August 5, 1985 memo from Dan Casey (state prosecutor) to file; August 21, 1985 Letter to John Hogan re: results of polygraph examination administered to Ileana Fuster; August 22, 1985 letter to file from Dan Casey; August 23, 1985 Text of Ileana Fuster's guilty plea; September 11, 1985, Ileana Fuster's deposition in Case No. 84-19728A; September 12, 1985, continuation of same; September 18, 1985, continuation of same; September 30, 1985 transcript of Ileana Fuster's trial

testimony in Case No. 84-19728A; April 12, 1988 deposition transcript of Ileana Fuster in

Leninger et al. v. Fuster, Case no. 86-35443 (31); July 25, 1988 deposition of Ileana

Fuster taken in Uss v. Fuster, Case no. 87-43248 CA 17; July 25, 1988 deposition of

Ileana Fuster taken in Popham v. Fuster, Case No. 87-43247 CA 21; January 13, 1989

deposition of Ileana Fuster taken in Popham v. Fuster, Case no. 86-43247 CA 21: October

15, 1994 Sworn Statement of Ileana Flores taken in Florida v. Fuster, 84-19728; March

18, 1995 Letter from Ileana Flores, witnessed by Tommy Watson;   May 9, 1995

deposition of Reverend Tommy Watson, taken in Florida v. Fuster, 84-19728A; and the

billing records dated August 26 and September 24, 1985 of the Behavior Changers, signed

by Drs. Michael E. Rappaport and Merry Sue Haber.

 15.  Counsel has also explained to me in general terms that Francisco and Ileana

Fuster were married, that Ileana operated an in-home day care center, that they were both

accused of having committed a number of acts of sexual abuse against the children under

Ileana's care, that both steadfastly maintained their own and each other's innocence in the

year's time leading from their arrest to their trials, and that, on the eve of trial, Ileana

Fuster suddenly pled guilty and subsequently testified against Mr. Fuster, claiming that she

had seen him commit multiple acts of sexual abuse and that he had forced her to

participate in these events.

 16.  I have no independent basis for endorsing the accuracy or truthfulness of any

of the documents I have reviewed.  I, therefore, address the question put to me by counsel

as a hypothetical, to provide my opinion based on the assumption that the documents are

both authentic, accurate and not purposeful attempts by anyone involved to misrepresent

historical truth.  (I recognize that the historical accuracy of Ileana Fuster's Sworn

Statement to Arthur Cohen, provided in October, 1994, must present the source of greatest concern to any court addressing these matters. I, therefore, devote time towards the end of this affidavit to a discussion of materials I have seen that corroborate Ileana's statement and materials I would want to see – namely, recordings of sessions with the Behavior Changers, notes taken by the Behavior Changers contemporaneous with their providing therapy to Ileana, or depositions taken now in which they describe their course of therapy with Ileana – before I would be able to render an opinion that I did not consider to be hypothetical.)

17. With this caveat and based upon all the materials I have reviewed, it is my opinion to a reasonable degree of scientific certainty, that Ileana Fuster was hypnotized repeatedly prior to trial; that Ileana has personality characteristics – as adjudged by mental health professionals who evaluated her in 1985 – that indicate a high level of suggestibility coupled with a great desire to please; that the testimony she eventually gave against her husband is likely to have included a great many elements that were suggested to her by therapists in the weeks leading up to trial; and that, as a result, her trial testimony cannot be considered reliable, factual or as historical truth.

18. In order to explain the bases for my opinion, I first recount the essence of Ileana Fuster's sworn statement, given in Tegucigalpa, Honduras on October 15, 1994, in which she describes the psychotherapy treatment she received during the eight weeks leading up to her trial testimony. See Ofshe, Exhibit 2. (Let me note at the outset that I am aware she retracted this statement some five months later and address this factor herein, as well.) After recounting Ileana's 1994 statement, I explain how her description of events relates to our knowledge of memory and the creation of pseudo-memory. I also

7

explain the ways in which her therapists, in referring to Ileana having blacked out certain memories, engaged in the same fallacies as other repressed memory therapists I have studied.

***Ileana's October 15, 1984 Honduran Statement.***

19.  According to her statement, Ileana was arrested on August 24, 1984 and from then until the time of trial remained mostly in solitary confinement in a small room by herself with only a bed, a sink, a toilet and a door. (10-15-94, 5-8). She notes that she remembers very little of that time period at least in part because she was being given medication to help her sleep. (Id., 8-9).

20.  Ileana notes that her lawyer, Michael Von Zamft, would often ask her what had happened, referring to the crimes with which she was charged, and that she would tell him that she was innocent. His response to her was that she "needed to remember something" or "must have something to say." He then expressed the opinion that she had problems and should be seen by a psychologist. (Id., 10-11).

21.  Towards the end of the summer, two psychologists began meeting with Ileana. They, too, told Ileana that she was having problems and diagnosed her as having a "blackout" of events. (Id., 11) Ileana said that the psychologists started coming almost every day and then started seeing her at night. She recalled being awakened at times and taken out of her cell because the psychologists were there. (Id., 11-12)

22.  At first, the psychologists talked to Ileana about her memories of her childhood, her school and her friends. Gradually, they led into discussions about Mr. Fuster, which involved bad experiences for Ileana, though none involving any of the children in Ileana's care. (Id., 12)

23.  At some point, the psychologists began asking Ileana about "Country Walk" (as I understand it, the name this case was called in the popular press), and Ileana told them she had nothing to say.  Ileana testified, "[T]hey told me that there must be something because the kids were saying this story and that story and that story and, you know.  And I kept denying it to them because I had no memory.  I couldn't recall none of those stories.  And I couldn't recall nothing like that happening." (Id., 14).  Ileana said that she continued to tell them that she was innocent but that they wouldn't listen.  "And they said that I was suffering from a blackout, and that those things had happened because the kids said it, and the kids don't lie.  And they said it happened, so it must have happened." (Id.)

24.  These psychologists, according to Ileana, told her not just that the children had made accusations against her and Mr. Fuster but told her the details of these accusations as well.  They would repeat the same things over and over to her.  (Id., 15, 31-32)  Ileana believed that the psychologists were getting the information about what the children were saying from either the state or her attorney, Mr. Von Zamft.  (Id., 33)  Eventually, Ileana began having bad dreams which the psychologists made her repeat to them in detail.  They would then tell her that she was remembering.  She would tell them it could not be that she was remembering because she still had no memory, just bad dreams.  The psychologists insisted, however, that this *was* Ileana's way of remembering.  (Id., 32).

25.  When embarking upon these sessions, the psychologists would tell Ileana that she had to "feel clear, I had to clear my mind about anything else that was happening.  I had to forget I was in jail, and I had to think that I was back in the house . . . they would tell me just, you know, close your eyes and think you are walking into the room.  And I

had to give them details of the room first, where the bed was, where the lamps were, whatever I could remember. And then I have to visualize the events, what the kids were saying, and visualize my dreams. And I had to tell them, you know, if it was something in the kitchen, I had to think about the kitchen, how the kitchen was. And I have to picture myself in there." (Id., 33-34) They would repeat the same procedure with each of the rooms in the house. The psychologists would also stress to Ileana that she had to help the children and that the only way to help them was by remembering and "backing their word up." (Id., 34-35)

26. On those occasions when Ileana would come to a session and say that she had no memories, Dr. Rappaport would express anger at her, standing above her, gesturing with his hands, asking if she wanted to spend the rest of her life in jail and if she wanted this to happen to other children. Sometimes Rappaport would laugh at her and tell her what would happen to her if she did not remember. (Id., 56-57) The psychologists would then read to her notes from what the children were telling police investigators and tell her that it was then time for her to go and rest. They'd again instruct her to think very hard and try to remember before going to bed, to clear her head and then rest. Ileana was told to close her eyes and think of standing in front of the house at Country Walk. She was then supposed to walk towards the house, towards the front door, open the front door and see what was happening. Ileana apparently followed these instructions. (Id., 35, 57-58). In response to her ongoing questions as to why she still had no waking memories of these events happening, the psychologists continued to tell her that her mind was defending her from the memories by blacking these memories out. (Id, 36)

27.  According to Ileana, these sessions with Drs. Rappaport and Haber did not end when she pled guilty.  They continued to meet with her to prepare her before and during her deposition, which occurred on three different days, and after her deposition, to prepare her for her trial testimony. (Id. 51-52)  Ileana said that the doctors continued during that time period to talk about her nightmares and the things the children had said because Ileana "needed to match everything the kids said" (Id., 47)  and because the trial was getting near and she had not given the state enough information.  (Id.).  In the final sessions with the Behavior Changers before she testified against Mr. Fuster,  the doctors repeated the same things to Ileana, according to her statement, because, as they told her, they did not want her to make any mistakes.  (Id. 59)

28.  When given the opportunity to provide her thoughts at the end of this October, 1994 statement, Ileana says, ". . . I want to know the truth.  But the truth of it is that none of these things happened because there's no way that I cannot remember.  How come I remember what I was six years old and how come I remember my school?  I even remember the bad times I had with Frank.  [She had earlier recalled that she was very frightened of him because he yelled at her and beat her.]  And I don't remember anything with the kids. . . .  And the only things I remember is what I briefly told you, you know, is the time in jail.  That's what's been traumatic to me.   The times in jail were awful.  . . .I have no peace at all.  I remembered that -- the lights, the coldness, the people banging on the doors, you know.  And then the doctors, they were there day and night.  They were there on the weekend.  And I didn't rest until I said whatever I had to say, you know, whatever would help the kids in court, because otherwise he was going to get out and he was going to get me." (Id., 60)

*The Processes Used to Elicit Ileana's Memories.*

29. Ileana describes techniques that were used on her during her sessions with Drs. Rappaport and Haber which amounted to hypnotic induction, even if the formal term, hypnosis, was never used with her. Relaxation techniques and formal hypnotic induction are virtually interchangeable. Thus, therapists can unwittingly induce hypnotic states in their clients with little or no awareness that they have done so.

30. In order to understand this, it is first necessary to address what hypnosis is. While those who study the topic do not fully agree that hypnosis exists as a definable and separate state of consciousness, hypnosis can best be described as a state of focused attention on a specific set of mental images and thoughts with an accompanying restricted awareness of one's surroundings. Trance can be compared to the sensation of being so fully absorbed in the images from reading a novel that one loses track of time, tunes out surrounding sounds, and concentrates exclusively on the scene being created in one's imagination. The difference in a trance is that the images and sensations imagined are not taken from a book but from one's own mind and the suggestions of the hypnotist. Most researchers note that hypnosis allows the patient to set aside critical judgment, become more willing to accept suggestion and engage unselfconsciously in fantasy and role playing.

31. Ileana talks in her 1994 statement of being led through, and taught, techniques designed to create just such a trance state. She describes being told: to close her eyes; to clear her mind of all other thoughts; to focus her attention on the image of her house in Country Walk; to imagine herself walking in through the door and picturing specific events (described to her by her therapists) taking place in the house. Ileana did this not

only in the presence and under the direction of the therapists but was also instructed to do this as she was going to sleep, back in her own cell.  (In addition to be told to relax while she was doing this, documents indicate that Ileana was also being medicated regularly with Elavil, 25 mg.  Elavil is an anti-depressant and mood-enhancer, often prescribed for use at bedtime to help patients relax to sleep.)  This would certainly have had the ability to put Ileana into a trance state.

32.  As for how hypnosis interacts with memory, much experimental work has been done.  The primary problem of judging the accuracy of historical accounts in therapy, for which neither the therapist nor the patient has undisputed knowledge in a clinical setting, is a hurdle that can easily be overcome by experimental researchers.  By showing test subjects movies, pictures, or lists of words, and later testing them with and without use of hypnosis, researchers can quite accurately determine the effects of hypnosis on normal recall.

33.  Experimenters have indeed found that hypnotized subjects are more likely to give more correct *and* incorrect responses to memory tests than waking subjects given the same test.  It has been further demonstrated, however, that the fact that more correct responses are given is not a sign that hypnosis has some special access to the memory.  When nonhypnotized subjects are required to concentrate longer or to guess, their number of right answers rises to the levels of the hypnotized subjects.

34.  It is also important to note that studies have shown that a hypnotized subject's confidence increases for both correct and incorrect answers.  That is, while there is usually a positive relationship between confidence in one's memory and the accuracy of that memory at least in the short term, hypnosis lessens that relationship.  Summarizing the

13

relevant studies on the topic, the Council on Scientific Affairs of the American Medical Association published the following warning in the Journal of the American Medical Association in 1985: "Contrary to what is generally believed by the public, recollections obtained during hypnosis not only fail to be more accurate but actually appear to be generally less reliable than recall. . . . [I]n no study to date has there been an increase in accuracy associated with an appropriate increase in confidence in the veracity of recollections. Consequently, hypnosis may increase the appearance of certitude without a concurrent increase of veracity."

35.    Of particular concern in the case of Ileana Fuster's treatment is the fact that research shows that, under hypnosis, subjects often become highly willing to internalize suggestions from the hypnotist or the hypnotic setting. In a classic experiment, modeled after one done by world-renowned hypnosis expert, Dr. Martin Orne of the University of Pennsylvania Medical School, researchers hypnotically "age-regressed" 27 subjects to a night the previous week and instructed them to relive their activities. The subjects were then asked if they had heard a loud noise which had awakened them. Responding to the suggestion implicit in the question, 17 of the subjects imagined hearing such a noise. After hypnosis, 13 of the total group told researchers their belief that the suggested memory had actually taken place. One subject, for instance, said, "I'm pretty sure it happened because I can remember being startled. It's the physical thing I remembered." This subject had actually reconstructed her memory to include the physical sensation of having been startled.

14

36. In this experiment and others like it, researchers did not directly suggest a memory by instructing the hypnotized subjects to imagine it. Rather, the experimenters merely asked a question as to whether the subject had experienced the event.

37. Contrast this with the approach described by Ileana Fuster used by her therapists, who provided her directly  with descriptions of scenes of sexual abuse, purportedly reported by children in Ileana's care, and told her to imagine these scenes of abuse as she engaged in relaxation and visualization exercises, both in the presence of her therapists and as she was going to sleep. This would have had a far more powerful influence on the creation of pseudomemories than the casual question put to the subjects in the study described above.

38. Dr. Martin Orne coined the term "demand characteristics" to describe the hypnotic subject's understanding of what behavior is appropriate or expected in a certain situation. Hypnotic subjects tend to respond to, or meet, the demand characteristics put in place by their hypnotists. Research shows that one such demand characteristic for hypnotic sessions is the underlying expectation that the subjects will glean information from the hypnotist's questions or comments and include that information into the scene they are imagining. When the experimenter asks a question that suggests the presence of an additional element consistent with the scene already imagined, the subject may not simply add that detail but often supplies additional details that incorporate that suggestion seamlessly into the story.

39. Whether the patient classifies what is envisioned during hypnosis as a memory or imagination also depends greatly on the demand characteristics of a given hypnotic session. If an experimenter tells a subject that what he will experience under hypnosis is

15

memory, the subject is significantly more likely to identify what comes out of hypnosis as memory than subjects told otherwise. What happens to a person's belief in his memory under hypnosis in the end seems less a result of properties specific to hypnosis than several factors that surround the procedure. Hypnotists and therapists often lead their patients to believe, for instance, that under hypnosis they can activate parts of their minds that they cannot normally engage, such as subconscious realms to which memories of trauma have been relegated in order to protect the conscious mind. Recovered memory therapists, for example, are notorious for telling patients this.

40. The therapists meeting with Ileana Fuster foisted just such beliefs upon her, according to the 1994 statement. Ileana describes the insistence with which her therapists assured her that she and her husband had abused the children in Ileana's care but that she had "blacked out" these memories because they were too painful for her conscious mind to bear. According to Ileana's statement, the psychologists claimed to have "diagnosed" her as having such blacked out memories. They further imposed the belief on Ileana that the nightmares she began having during therapy were the result and first sign of these repressed memories emerging from her subconscious, and that the nightmares represented historically accurate events. With this demand characteristic in place, it is not surprising that Ileana eventually came to accept these nightmares, repeated while in trance, as historical truth.

41. The dangers of relying upon such hypnotically produced memories in legal proceedings is well-known and well-researched. Hypnosis results in confabulation, the hardening of memories, an increased confidence by the witness in the veracity of the memories and the production of false memories. Because hypnosis can drastically alter a

witness's memory, yet do so without a diminution of, and, more likely, an increase in, confidence of the accuracy of the memory, many jurisdictions will not permit a witness who has been hypnotized to testify in a criminal proceeding. Doing so would impinge upon a defendant's rights to confrontation and to be convicted by reliable evidence. Other jurisdictions require strict safeguards to be employed, none of which appear to have been present in Ileana's case.

42. First, where information is sought through hypnosis for use in a criminal trial, great care must be taken by the hypnotist not to suggest to the witness any information that might become incorporated in that witness's account of events. In the instant case, however, the doctors who met with Ileana told her that she was supposed to remember particular events, chastised her if she did not have these memories, and rehearsed her "memories" with her to make sure she did not make any mistakes at trial. These were hardly free recall sessions.

43. Second, the hypnotist is supposed to be a neutral, to have no stake in the outcome, no ongoing contact with the witness and no bias borne of pre-existing knowledge about the case. Here, the psychologists who induced Ileana's hypnosis appear to have been fully versed in the allegations in the case, had notes supplied to them by Ileana's lawyer and the state, and told Ileana the outcome they sought.

44. Third, the hypnotist is supposed to conduct a pre-induction interview with the subject to make clear what information was known to the witness before the hypnosis and what new information emerged during or after the hypnosis. This may have been done by the Behavior Changers but, if so, I have not been provided with any evidence of it.

17

45. Fourth, hypnotic sessions must be electronically (preferably, video-) recorded so that the exact structure of the interview can be reviewed to see what suggestive forces may have been introduced into the session. I am not aware that this was done.

46. It may be suggested that these safeguards were not employed because the Behavior Changers did not purposely hypnotize Ileana or purposely train her to self-induce hypnosis. The intent of the therapists, unfortunately, does nothing to lessen the degree to which these safeguards are necessary to insure the reliability of the subsequent testimony given by a witness in a criminal proceeding. The subject is still placed in a greatly heightened state of suggestibility, whether the hypnosis was inadvertent or purposeful. And the fact that the hypnotic induction may have been inadvertent actually increases the likelihood of memory contamination. No ethical hypnotist working within a forensic setting would purposely try to induce recollections of specific memories in a hypnotized subject. Certainly, if Ileana's description of events is accurate, the Behavior Changers were acting in ways directly contrary to these safeguards, specifically attempting to alter Ileana's memory.

47. One demand characteristic placed by the Behavior Changers upon Ileana deserves special mention. That is, the Behavior Changers told Ileana repeatedly (according to her 1994 statement) that she had "blacked out" memories of the abuse she and Mr. Fuster had committed because the memories were too horrific for her conscious mind to deal with. Thus, Ileana was instructed to "recover" these "memories," to "relive" these acts of horror, and to accept her nightmares both as historical truth and as evidence of her traumatic memories resurfacing.

48. While the Behavior Changers may have believed Ileana was blacking out images stored in tact in her subconscious mind (as did countless repressed memory therapists in the 1980's and early 1990's), there is no scientific support for such a belief.

49. First, there is no instance in the scientific literature, recent or historical, recounting any instance in which a person has had a fully amnesiac episode of traumatic childhood events, sexual or otherwise, which the person has later spontaneously remembered and for which reliable corroborating evidence exists. [put in cite to study] (Taking even the most conservative estimates of the rate at which child sexual abuse occurs, the fact that no such case has ever been documented is surprising, at the very least, if a robust repression mechanism actually exists that causes people to repress memories and recall them only years later.) To the contrary, there is a substantial body of evidence that demonstrates that, wherever such claims have been made that a person has suddenly recovered theretofore fully "repressed" memories of childhood sexual abuse, the "recovery" of these memories has come as the result of therapists implanting such ideas in their patients' minds and then "drawing out" these false memories by use of psychologically coercive means, including hypnosis.

50. Second, no mental health expert or other scientist has ever proposed a plausible explanation of how such a memory repression mechanism might operate. The most obvious questions about such a mechanism are routinely glossed over by so-called repressed memory experts or answered in ways that are self-contradictory. For example, if a child has been the victim of repeated acts of childhood sexual abuse, does the child repress each separate traumatic event immediately after it happens so that the child then does not remember the events that have occurred previously? Or, does the child repress

19

the cumulative experience when it reaches a certain level of trauma or only after it comes to an end?  If the child represses these memories after a series of acts of abuse have been committed against her, what is the trigger that causes this amnesia to finally occur?  If this particular trigger had not occurred, would the child have remembered the repeated acts of abuse committed against her?  Recovered memory theorists have no answers to these questions.

51.  Another issue recovered memory proponents pose no plausible answer for is why this complete repression mechanism only operates when the traumatic event experienced by the child involves sexual abuse.  For instance, children confined in concentration camps during World War II have not totally repressed these memories. Studies of adults who as children witnessed their parents being murdered likewise show no evidence of that the children have repressed such memories in the sense of having total amnesia of the occurrence of these events.  (Many people who experience trauma work consciously to avoid thinking of the traumatic event but this is very different from repressed memory theory which posits an automatic and total repression of events.)

52.  Repressed memory theory also runs directly counter to the very substantial body of research that exists on memory.   Contrary to the implicit assertions of repressed memory therapists and experts, memories are not retained in tact over periods of years like videotape recordings that one can later replay.  Rather, memories have a tendency to decay over time.  Portions of memories that are not rehearsed with some regularity are lost altogether over time and remaining parts of memories often become intermingled with inaccurate memories through a process known as confabulation.  Studies show this to be true not just of everyday events but of traumatic events as well.

53. Thus, the demand characteristic of Ileana's sessions with the Behavior Changers – i.e., that she believe that the images she was seeing in trance and/or in nightmares were historically true events – was premised on unsupportable pseudo-science.

54. Finally, I would note in this regard that letters written to the Court in late July and early August, 1985, by mental health experts sent in to determine Ileana's competence to stand trial, state that Ileana seemed to be emotionally retarded, two of them opining that Ileana was functioning with the emotional wherewithal of a six-year-old child. See Ofshe, Exhibits 3-5. The doctors performing these evaluations note that Ileana was especially prone, due to her upbringing and cultural associations, to accede to the authority of any dominant adult, particularly a male. These factors increase the probability that Ileana would succumb to the demands placed upon her by Drs. Rappaport and Haber and incorporate them into her hypnotic responses.

55. Under the circumstances, I can state with a reasonable degree of scientific certainty that any testimony Ileana gave subsequent to meeting with these psychologists has to be considered highly unreliable. Again, this is all subject to the caveat that the records I have reviewed are relatively accurate and contain historically accurate information.

### *Taking This Opinion From the Hypothetical to the Actual*

56. The question will invariably arise as to why anyone should believe Ileana's sworn statement, given the fact that she retracted it some five months after she gave it. To aid in that effort, it is important to look for corroboration and context.

57. There are a number of independent sources that corroborate portions of Ileana's Honduran statement. Ileana states that she was being medicated to help her sleep.

21

In his July 31, 1985 report to the trial court, Dr. S. Jacobson notes that Ileana was receiving the drug, Elavil, 25 mg., once or twice a day as necessary on a regular basis because of symptoms of anxiety and depression. Ofshe, Exh. 5 As noted above, Elavil is a drug used as an anti-depressant and mood elevator, often prescribed to help a person sleep less fitfully.

58.  Ileana states in her Honduran statement that Drs. Rappaport and Haber met with her for long sessions, nearly every day, beginning before she gave her depositions, but continuing during the period of those depositions and up until the time of trial. The Behavior Changers' billing records, dated August 26, and September 24, 1985, indicate that they visited Ileana at the prison on August 1, 5, 6, 7, 8, 9, 11,13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 30, and September 3, 5, 6, 9, 10, 12, 13, 17, 18, 20, and 22.  (Ileana pled guilty on August 23, 1985 and was deposed on September 11, 12 and 18.)  Many of these visits lasted two hours; at least one lasted 3.50 hours and another lasted 4 hours.  Thus, Ileana's statement is again accurate.  Please see Ofshe, Exhibit 6.

59.  Ileana notes in her sworn statement that the doctors came to these visits armed with notes about allegations the children had made.  Ileana expresses the opinion that the doctors were being supplied with this information by her lawyer and/or the state attorney's office.  Indeed, the doctors' billing records indicate 10 separate conferences and consultations during the month of August with Ileana's attorney;  at least one consultation with her attorney, Janet Reno and Mr. Hogan, who I understand were then state attorneys; and a third conference with Janet Reno by herself.  The billing records also indicate that the doctors spent 7.5 hours in August reviewing videotapes.  Ofshe, Exh. 6. There is no indication of what these videotapes are but I understand that the state had made

videotapes of children being interviewed by state investigators.  Thus, Ileana's assumption may be correct.  It is certainly not ill-founded in any case.

60.  Ileana talks in her Honduran statement about the fact that she was confused as to why she would have clear memories of Mr. Fuster's cruelty towards her, beating her and dominating her, but no memories of either her or Mr. Fuster doing anything harmful to any of the children in their care.  In a deposition taken on August 1, 1985, of Shirley Blando, chaplain at the jail in which Ileana was incarcerated for eleven months prior to trial, Ms.Blando talks about the many sessions she had with Ileana to that date.  She describes Ileana's frame of mind and talks of Ileana's terrible fear of Mr. Fuster because he had beaten her on occasion and dominated her in such a way that she felt wholly under his control.  Ms. Blando emphasizes, however, that despite Ileana's fear and the openness with which had revealed sordid details of their life together, Ms. Blando had no doubt that Ileana believed herself and Mr. Fuster to be innocent of any wrongdoing against the children in their care.

61.  Ileana's statement to the trial court, when rendering her guilty plea, is likewise consistent with her Honduran statement.  On August 23, 1985, when entering her plea, she tells the court that she is pleading guilty not because she feels guilty or because she has done anything wrong, but only for the sake of the children and for the sake of getting this all over with.

62.  During Ileana's depositions, taken during the course of Mr. Fuster's trial, Dr. Rappaport is present.  At times, Ileana is asked a question about the events involving a particular child and Ileana responds that she does not remember.  Dr. Rappaport then prompts her, telling her it's not that she doesn't remember but rather that she doesn't want

to remember.   This corroborates Ileana's statements that the doctors had told her that she had these memories but was blocking them out of her conscious mind.

63.   According to the Behavior Changer's billing records, the doctors attended Ileana's polygraph session and her deposition.   Ileana's Honduran statement is also correct on these points.   Ofshe, Exh. 6.

64.   There is also independent evidence to corroborate Ileana's statements about the attitude her lawyer, Mr. Von Zamft, had expressed to her that she "needed to remember something."   Herb Smith, a Florida attorney and then Assistant Public Defender in Miami, Florida, submitted an affidavit to the trial court on July 29, 1985 in which he noted that, on July 18, 1985, Michael Von Zamft had stated to him and Jeffrey Samek (Mr. Fuster's attorney) that his defense would allege: that atrocities had been perpetrated not only upon the children but also upon Ileana;  that he would prosecute Ileana even more severely than the State of Florida would;  and that he would portray Mr. Fuster as a sex fiend. Ofshe, Exh. 7 In a memo written to the file by assistant state attorney John Hogan, Mr. Hogan notes that Mr. Von Zamft seemed prepared to plead his client guilty or defend her on a theory of duress and that Von Zamft would represent to the state attorney's office, if need be, that Ileana had made such representations to him, even though she had not yet done so.   Ofshe, Exh. 8.  Shirley Blando testified in her deposition that Ileana had told her that she did not trust her lawyer, that she was afraid of her lawyer and that her lawyer wanted her to say things that were not true. Blando Deposition at 52. In other words, it appears that Mr. Von Zamft did indeed "need" Ileana to remember something and was prepared to get those memories from her one way or another.

24

65. Thus, there is substantial corroboration for many of the statements made by Ileana in her Honduran deposition. It was not invented of wholecloth.

66. Ileana's retraction is interesting because of what it says and what it doesn't say. Ileana claims that she was tricked and pressured into giving her statement to Mr. Fuster's attorney. She claims in the retraction that she did not know her words were being taken down by a court reporter or that she was being tape recorded, and that she believed she was providing her statement to clear her own name but was unaware that the statement would be used in any way to help her former husband. However, I see no evidence of trickery in place. Arthur Cohen, the attorney who questioned Ileana, explains to her at the beginning of the session that he is an attorney, that he has a court reporter present and that he is tape recording the session. In fact, he stops the session several times to turn the tape over or to change it, and explains on the record each time he does so. He also asks Ileana if she understands what she is doing and that she is under oath. Ileana says that she understands. Mr. Cohen specifically asks Ileana if anyone has threatened her in any way or promised her anything in regard to her meeting with him. She answers no. She also states that she is present of her own free will. Ofshe , Exh. 2 (10-15-94, 2-3) At the end of the statement, which lasts a total of 1.5 hours, Mr. Cohen gives Ileana the opportunity to add to her statement anything else that he has not inquired about. Ileana uses that opportunity to emphasize the points she had made earlier in the statement: that she knew the truth was that she and Mr. Fuster had not committed these acts; that she fully remembered the brutality Mr. Fuster had demonstrated towards her, the trauma of being in prison and things that had happened to her as a child;  and that she did not believe she had blacked out memories of their abusing children. (Id., 59-60)

67. Thus, the retraction of this statement on the grounds that she was pressured to provide it or that she did not understand she was testifying under oath is unconvincing.

68. What is more convincing is Ileana's concern in the retraction that she did not realize that the statement she had given Mr. Cohen could be used to help vindicate Mr. Fuster. It is clear from the letters provided in summer, 1985 to the trial court by the mental health professionals evaluating Ileana's competence to stand trial, that Ileana had at one time feared Mr. Fuster and had been worried that he would harm her if he got out of prison. It appears that Ileana may have learned that her statement to Mr. Cohen could be used to free Mr. Fuster and that she wanted to ensure that such an event did not occur.

69. There is evidence that Ileana was worried about Mr. Fuster leaving prison because he so dominated her and because she feared him physically.   Psychiatrist Sanford Jacobson noted in his report to the court dated July 31, 1985 that Ileana had told him Mr. Fuster beat her and abused her physically, both before and during their marriage. Jacobson also notes that Ileana said that she was afraid of Mr. Fuster and that he would possibly harm her. "She wondered if indeed he could still hurt her today." Ofshe, Exh. 5 (July 31, 1985 report at 4).   Again, Ileana's statement to Arthur Cohen reinforces this impression. Near the conclusion of the statement, when she is asked to add whatever she chooses to the statement, she says, "And then the doctors, they were there day and night. They were there on the weekend. And I didn't rest until I said *whatever I had to say,* you know, whatever would help the kids in court, *because otherwise he was going to get out and he was going to get me."* Ofshe, Exh. 2 (10-15-94, 60) (emphasis added.)

70. On the other hand, it is important to note that Ileana did not claim in her February, 1995 "retraction" that she had misrepresented the conduct of the Behavior

26

Changers towards her. Thus, taken alone, Ileana's retraction does not convince me that her account of the treatment she received at the hands of Drs. Rappaport and Haber was false or inaccurate.

71.   Of course, the best way to confirm the accuracy of Ileana's 1994 Honduran statement to Arthur Cohen would be to review any recordings the Behavior Changers made of their sessions with Ileana, and any notes they made contemporaneous with providing therapy to her.  If one or the other of those items do not exist, or if the notes are scant, the next best thing would be to question the doctors now (under oath) about what they did back in 1985.  As a scientist and researcher who believes in the value of historical truth, I can think of no better way to learn the historical truth than by tapping the notes and recollections of the Behavior Changers themselves.

72.  The questions to look at, beyond getting a detailed description of what took place during their sessions with Ileana, would ideally include the following:

a)  What, if any, instructions were they given by Ileana's defense attorney as to their purpose in meeting with her?

b)  Did they have particular goals in mind when they began meeting with her or at any other point? If so, who established these goals?

c)  At whose behest did they attend Ileana's polygraph examination and deposition?  Why?

d)  What videotapes did they review, as reflected in their August 26, 1985 billing, and for what purpose?

e)  Did they at any point diagnose Ileana as suffering from repressed memory syndrome or a black out of memories?

f) If so, on what basis did they make this diagnosis?  How long did it take them to reach this diagnosis?  Did they discuss this diagnosis with Ileana?

g) If they believed that Ileana was suffering from repressed memories of sexual abuse committed on children, what plan, if any, did they employ to recover these memories?

h) Had they at that time been trained in the use of hypnosis?

i) Were they aware that Ileana was taking Elavil during the time of their therapy with her and, if so, were they cognizant of any effects the medication was having on her?

j) Were they aware, at any point during their therapy with Ileana, that three mental health experts had rendered opinions that she was emotionally immature and that she obeyed authority figures, particularly when they were men?

k) If they were aware of this, what actions, if any, did they take to ensure that Ileana would not succumb to their will as authority figures?

l) Whom did they regard as their client in this case?

m) Did they consider themselves to have any ethical obligations to anyone in providing therapy to Ileana and, if so, to whom did these obligations run?  What were these obligations?

n) Did they ever attempt to induce in Ileana a dissociative state?

o) Did they feel any ethical responsibility to elicit memories of abuse from Ileana for the sake of the child complainants in this case?

p) Did they believe at any point during the therapy they provided to Ileana that the accusations that had been made against her or Mr. Fuster were true?  If so, what was their basis for this belief and at what point did they arrive at this belief?

28

There are, of course, follow-up questions that answers to some of these questions might prompt.

73.  If I were called upon to do so, I would be happy to testify at an evidentiary hearing and explain more fully the bases for the expert opinions I have rendered herein.  I would also welcome the chance to respond to any questions the court or the Respondent might have concerning these opinions.  I would, of course, greatly prefer to do so after I had had the opportunity to learn more from the Behavior Changers themselves or after reviewing the notes or recordings they made of their sessions with Ileana Fuster.

I hereby certify that the statements I have made herein are true and accurate to the best of my knowledge, information and belief.  I am aware that if I have made any statement, knowing or believing it to be false, I am subject to the penalties of perjury.

Affiant says nothing further.

Richard J. Ofshe, Ph.D.

29

September 1998

## RICHARD J. OFSHE, Ph.D.

### Curriculum Vitae

**RESIDENCE:**                                          **UNIVERSITY:**

    7112 Marlborough Terrace                 Department of Sociology
    Berkeley, California 94705                University of California
    510/845-4911                              Berkeley, CA  94720
                                              510/642-4289 or
                                              510/642-4766


**PERSONAL:**

    Birthdate: February 27, 1941


**EDUCATION:**

    Stanford University                 Ph.D. -- 1968, Sociology
    Queens College, C.U.N.Y.            M.A.  -- 1964, Sociology
    Queens College, C.U.N.Y.            B.A.  -- 1963, Psychology

    Doctoral Dissertation. "A Theory of Behavior Under Conditions of
        Reference Conflict." Stanford University, 1968.

    M.A. Thesis. "Effects of Interaction in Interpersonal Communication."
        Queens College, C.U.N.Y., 1964.


**POSITIONS:**

    Professor, Department of Sociology, University of California.
        Berkeley, California, 1982-present.
    Associate Professor, Department of Sociology, University of
        California. Berkeley, California, 1971-82.
    Assistant Professor, Department of Sociology, University
        California. Berkeley, California, 1967-71.
    Visiting Associate Professor, Department of Sociology, Stanford
        University. Stanford, California, Summer 1971.


**HONORS:**

    John Simon Guggenheim Memorial Foundation Fellow, 1973-74.
    Pulitzer Prize -- For Public Service, 1979.
        Member of the three-person reporting and research group
        whose work won the award in the name of the Point
        Reyes Light newspaper.

OFSHE Exhibit # 1

**HONORS:** (continued)

California Newspaper Association Awards, 1980. Awarded to the <u>Point Reyes Light</u> based in part on my work.

Community Service Award -- for editorials and news stories about state government's failure to regulate Synanon.
Best Editorial Series -- for editorials about state government's failure to regulate Synanon.
Best News Series -- for news coverage of Synanon and state government.

Visiting Scholar. University Center of Georgia, Atlanta, 1982.

Recipient of Roy Dorcus Award for the Best Paper on Clinical Hypnosis of 1994. Awarded by the Society for Clinical and Experimental Hypnosis for "Recovered Memory Therapy and Robust Repression: Influence and Pseudomemories."

**PROFESSIONAL MEMBERSHIPS:**

American Sociological Association
American Psychological Association
American Psychological Society
Sociological Practice Association
Pacific Sociological Association

**PROFESSIONAL ACTIVITIES:**

Editorial Board of <u>Administrative Science Quarterly</u>, 1970-71.
Editorial Board of <u>Sociometry</u>, 1970-73.
Editorial Board of <u>The American Journal of Sociology</u>, 1972-74.
Committee on the Certification of Social Psychologists of the American Sociological Association, 1968-72.
Chairman, Publications Committee, Social Psychology Section, American Sociological Association, 1975-76.
Faculty Council of the Center for Research in Management Science, University of California, Berkeley, 1975-83.
Chairman, Cooley-Mead Award Selection Committee, American Sociological Association, 1984-85
Member, Editorial Board of <u>Journal of Cultic Studies</u>, 1984-1993.
Director, American Family Foundation, 1989-1993.
Executive Board of the California Chapter of the Sociological Practice Association, 1991-93.
Advisory Board, False Memory Syndrome Foundation, 1992-

**CONSULTANT TO:**

Marin County Sheriff's Department, 1979-80.
Office of Attorney General, State of California, 1980-81.
U.S. Attorney's Office, Los Angeles, 1982.
U.S. Attorney's Office, Los Angeles, 1982 (re:DeLorean)
Office of Attorney General, State of Arizona, 1982-84.
U.S. Department of Justice:
    Tax Division, 1982-84.
    Criminal Division, 1984-90.
Prosecuting Attorney, Jefferson County, West Virginia, 1984.
Los Angeles District Attorney's Office, 1984-85.

**CONSULTANT TO:** (continued)

> Commissioner's Office of the Department of Social and
>     Rehabilitation Services, State of Vermont, 1984.
> Internal Revenue Service, 1986-88.
> U.S. Attorney's Office, West Virginia, 1987-91.
> Thurston County Prosecutor's Office, Washington, 1990.
> State's Attorney's Office, Fort Lauderdale, Florida 1992-94.
> Office of the Governor of Missouri, 1995 (re: the pardon of Johnny
>     Wilson)
> Office of the District Attorney, Los Angeles, 1995 (Menendez).

(

**PUBLICATIONS:**

<u>Books and Monographs:</u>

Ofshe, Richard, with Lynne Ofshe. 1970. <u>Utility and Choice in Social Interaction</u>. Englewood Cliffs, New Jersey: Prentice-Hall.  Reprinted by Irvington Publishers, New York.

_____, (ed.). 1970.  <u>The Sociology of the Possible</u>. Englewood Cliffs, New Jersey: Prentice-Hall.

_____, (ed.). 1977.  <u>The Sociology of the Possible</u>, 2nd Edition. Englewood Cliffs New Jersey: Prentice-Hall.

_____, (ed.). 1973. <u>Interpersonal Behavior in Small</u> Groups. Englewood Cliffs, New Jersey: Prentice-Hall.

_____, with David Mitchell and Cathy Mitchell. 1980. <u>The Light on Synanon</u>. New York: Seaview Press.

_____, with Ethan Watters. 1994. <u>Making Monsters: False Memories, Psychotherapy and Sexual Hysteria</u>, New York: Charles Scribner's.

_____. 1995. <u>Making Monsters; False Memories, Psychotherapy and Sexual Hysteria</u>, London: Andre Deutsch (with a new introduction to the British Edition)

_____. 1996. <u>Making Monsters: False Memories, Psychotherapy and Sexual Hysteria</u>, Munich: DTV (German language translation)

_____. 1996.  <u>Making Monsters:  False Memories, Psychotherapy and Sexual Hysteria</u>, Berkeley, University of California Press.

_____, with Ethan Watters. In Press. <u>Therapy's Delusions</u>, New York: Charles Scribner's.

<u>Articles:</u>

Ofshe, Richard, with Ronald Anderson. 1968. "Testing a Measurement Model." Chapter 9 in <u>Sociological Methodology: 1969</u>, E. Borgatta (ed.), San Francisco: Jossey-Bass.

_____, with Norman Goodman. 1968. "Empathy, Communication Efficiency, and Marital Status." <u>Journal of Marriage and Family</u>, Vol. 30, No. 4, November.
Reprinted in <u>Social Psychology and Everyday Life</u>. B. Franklin and F. Kohout (eds.), New York: David McKay, 1973.

_____, with Arthur Stinchcombe. 1969. "On Journal Editing as a Probabilistic Process." <u>American Sociologist</u>, Vol. 4, No. 2, May.

Articles: (continued)

_____, with Lynne Ofshe. 1969. "Social Choice and Utility in Coalition Formation." Sociometry, Vol. 32, No. 3, September.

_____. 1970. "Cognitive Consistency and Language Behavior." Human Relations, Vol. 23, No. 2, April. Reprinted in Interpersonal Behavior in Small Groups, R. Ofshe (ed.), Englewood Cliffs, New Jersey: Prentice-Hall, 1973.

_____, with Lynne Ofshe. 1970. "Choice Behavior in Coalition Games." Behavioral Science, Vol. 15, No. 4, July, 1970. Reprinted in Bobbs-Merrill Reprint Series in Sociology, Indianapolis: Bobbs-Merrill, 1973. Reprinted in Interpersonal Behavior in Small Groups, R. Ofshe (ed.), Englewood Cliffs, New Jersey: Prentice-Hall, 1973.

_____, with Hamit Fisek. 1970. "The Process of Status Evolution," Sociometry, Vol. 33, No. 3, September. Reprinted in Interpersonal Behavior in Small Groups, R. Ofshe (ed.), Englewood Cliffs, New Jersey: Prentice-Hall, 1973.

_____, with Lynne Ofshe. 1970. "A Comparative Study of Two Scaling Models: Paired Comparisons and Scalogram Analysis." Sociometry, Vol. 33, No. 4, December.

_____. 1971. "The Effectiveness of Pacifist Strategies: A Theoretical Approach." Journal of Conflict Resolution, Vol. 15, No. 2, June. Reprinted in Interpersonal Behavior in Small Groups, R. Ofshe (ed.), Englewood Cliffs, New Jersey: Prentice-Hall, 1973.

_____, with Lynne Ofshe. 1971. "A Utility Theory for the Behavior of Three Person Interaction Systems." in Social Choice, B. Lieberman (ed.), New York: Gordon and Breach.

_____. 1972. "Reference and Conflict and Behavior," Sociological Theories in Progress, Vol. II, J. Berger, M. Zelditch and B. Anderson (eds.), Boston: Houghton Mifflin.

_____, with Lynne Roberts. 1972. "A Utility Based Theory of Decision Making." Contributions to Experimental Economics, Vol. III, H. Sauermann (ed.), Tubingen, West Germany: J.C.B. Mohr.

_____, et al. 1974. "Social Structure and Social Control in Synanon." Journal of Voluntary Action Research. Vol. 3, No. 3.

_____, with Claude Fischer and Mark Baldassare. 1975. "Crowding Studies and Urban Life: A Critical Review." Journal of the American Institute of Planners, Vol. 41, No. 6, November.

_____. "Synanon: The People Business." C. Glock and R. Bellah (eds.), The New Religious Consciousness, University of California Press.

Articles: (continued)

_____, with David V. and Cathy Mitchell. 1978/1979. As Editorial Consultant and Researcher with the Point Reyes Light newspaper, I contributed to the production of over 120 stories and editorials on the Synanon Foundation, Inc.

_____. 1980. "The Social Development of the Synanon Cult: The Managerial Strategy of Organizational Transformation." Sociological Analysis, Vol. 41, 2.

_____, with Margaret Lee. 1981. "The Impact of Behavioral Style and Status Characteristics on Influence:  A Test of Two Competing Models." Social Psychology Quarterly, Vol. 44, No. 2, June.

_____, with Margaret Lee. 1981. "Reply to Greenstein." Social Psychology Quarterly, Vol. 44, No. 4, December.

Ofshe, Richard, with Margaret Lee. 1983. "What Are We to Make of All This?" Social Psychology Quarterly, Vol. 46, No. 1, March.

_____, with Kenneth Christman. 1986. "A Two-Process Theory of Social Behavior." Rationality and Collective Belief, A. Harris (ed.), New York: Ablex.

_____, with Margaret Singer. 1986. "Attacks on Peripheral versus Central Elements of Self and the Impact of Thought Reforming Techniques: Review and Theoretical Analysis." Cultic Studies Journal, Vol. 3, No. 1.
Reprinted in Tort and Religion, Chicago: American Bar Association, 1989.

_____. 1989. "The Rabbi and the Sex Cult." Cultic Studies Journal, Vol 3, No. 2.

_____. 1989. "Coerced Confessions: The Logic of Seemingly Irrational Action." Cultic Studies Journal, Vol 6, No. 1.

_____, with Margaret Singer. 1990. "Thought Reform Programs and the Production of Psychiatric Casualties." Psychiatric Annals, Vol 20, No. 4, April.

_____. 1992. "Coercive Persuasion and Attitude Change." The Encyclopedia of Sociology, edited by E. Borgatta and M. Borgatta. New York: Macmillan.

_____. 1992. "Inadvertent Hypnosis During Interrogation: False Confession Due to Dissociative State; Mis-Identified Multiple Personality and the Satanic Cult Hypothesis." International Journal of Clinical and Experimental Hypnosis, Vol. 40, No. 3, July.


Articles: (continued)

_____, with Ethan Watters. 1993. "Making Monsters." Society, Vol 30, 3, March/April.

_____, with Ethan Watters. 1993. "More on Making Monsters, Authors Reply." Society, Vol 31, No. 1, November/December.

_____, with Suzanne Johnson. 1994. "Religious Cults." Academic American Encyclopedia, Danbury, Connecticut: Grollier.

_____. 1994. "Making Grossly Damaging but Avoidable Errors: The Pitfalls of the Olio/Cornell Thesis." Journal of Child Sexual Abuse, 3, 3.

_____, with Margaret Singer. 1994. "Recovered Memory Therapy and Robust Repression: Influence and Pseudomemories." International Journal of Clinical and Experimental Hypnosis, 62, 4, October.

_____, 1995. "Ian Hacking's Leaning Tower: Foundations for the Architecture of Analysis," Metascience, June.

_____, with Ethan Watters. 1995. "Beware Americans Bearing Gifts: Introduction to the British Edition of Making Monsters." In Richard Ofshe and Ethan Watters, Making Monsters, False Memories, Psychotherapy and Sexual Hysteria, London: Andre Deutsch, October.

_____, 1995. "I'm Guilty If You Say So," in Donald Connery (ed.) Convicting the Innocent, Cambridge, Brookline Press.

_____, with Richard Leo. 1997. "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." Studies in Law, Politics and Society, 16, pp. 189-251.

_____, with Richard Leo. 1997. "The Decision to Confess Falsely: Rational Choice and Irrational Action." Denver University Law Review. "Symposium: An Interdisciplinary Examination of Coercion, Exploitation and the Law. 74, 4, pp. 979-1122.

_____, with Richard Leo. 1997. "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem." University of Denver Law Review. "Symposium: An Interdisciplinary Examination of Coercion, Exploitation and the Law. 74, 4, pp. 1135-1144.

_____, with Richard Leo. 1998. "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." Journal of Criminal Law and Criminology, Northwestern University, School of Law. 88, 2, pp. 429-496.

8

Articles: (continued)

_____, with Richard Leo.  1998.  "Using the Innocent to
Scapegoat Miranda: Another Reply to Paul Cassell." Journal of
Criminology and Criminal Law. Northwestern University, School of
Law. 88, 2, pp. 557-578.

(

## Presented at Meetings of Scientific Associations:

Ofshe, Richard. 1964. "Effect of Interaction in Interpersonal Communication." American Sociological Association, Montreal, Canada, September.

_____, with Norman Goodman. 1965. "Cognitive Consistency and the A-B-X Model." Pacific Sociological Association, Salt lake City, April.

_____. 1965. "On the Strategy of Laboratory Simulation." The West Coast Small Groups Conference, Salt lake City, April.

_____. 1968. "A Laboratory Method for the Measurement of Identification." American Sociological Association, Boston, September.

_____, with Lynne Ofshe. 1969. "A Utility Based Theory of Decision Making." American Sociological Association, Chicago, September.

_____, with Lynne Ofshe, 1970. "A Comparative Study of Two Scaling Models: Paired Comparisons and Scalogram Analysis." American Sociological Association, San Francisco, September.

_____, with M. Hamit Fisek. 1970. "The Process of Status Evolution." American Sociological Association, San Francisco, September.

_____, with Lynne Roberts. 1971. "A Utility Based Theory of Decision Making." Schonberg International Conference on Experimental Economics, Frankfort, West Germany, September.

_____. 1971. "The Effectiveness of Pacifist Strategies: A Theoretical Approach." American Sociological Association, New York, September.

_____, et al. 1972. "A Model for the Structure of Cognitions of Racial Differences and Evaluations to Planned Social Change." Russell Sage Foundation Conference on Social Indicator Models, New York, July.

_____, et al. 1974 "Social Indicators of Racial Perspectives." American Sociological Association, Chicago, September.

_____. 1979. "The Evolution of the Synanon Cult." Religion and Political Movements section of the Association for the Study of Religion meetings, Washington, August.

_____. 1979. "Some Problems of Doing Controversial Research." American Sociological Association, Washington, D.C., August.

<u>Presented at Meetings of Scientific Associations</u>: (continued)

_____. 1980. "Shifts in Opportunities and Accountability and the Regulation of Religious Organizations." Association for the Study of Religion, New York, August.

_____. 1980. "Status Characteristics and Expectation States - A Critical Review." Thematic Session on Expectation States Research, American Sociological Association, New York, September.

_____. 1981. "Theories of Coercive Social Control." Conference on Conversion, Coercion and Commitment in New Religious Movements, Center for the Study of New Religions, Berkeley, June.

_____, with Kenneth Christman and Robert Saltz. 1981. "Obedience to Authority: Re-analysis and Explanation." American Sociological Association meetings, Toronto, Canada, August.

_____. 1981. "The Construction of Behavior Through Out-of-Awareness Influence: An Alternative to Brainwashing Theories." American Psychological Association, Los Angeles, August.

_____. 1981. "Thought Reform and the Appearance of Mental Illness." American Psychological Association, Los Angeles, September.

_____. 1982. "Group Pressure Tactics in Conversion to Terrorism," American Psychiatric Association, Toronto, Canada, May.

_____. 1984. "Problems of Doing Research on Controversial Subjects," American Sociological Association, San Antonio, August.

_____. 1985. "The Rabbi and The Sex Cult," American Sociological Association, Washington, D.C., August.

_____. 1987. "Regulation of Cult Organizations and Prosecution of Cult-generated Crimes," presented at the First International Congress on Sects and Society, Barcelona, Spain, November.

_____. 1988. "Coerced Confessions: Case Studies in The Tactics of Persuasion." American Sociological Association, Atlanta, August.

_____. 1988. "Thought Reforming Interrogations in America," The Society for the Study of Social Influence, Los Angeles, November.

_____. 1989. "Police Brainwashing in America," Pacific Sociological Association, Las Vegas, April.

Presented at Meetings of Scientific Associations: (continued)

_____, 1991. "The Dynamics of Violence Generating Cults," The Society for Cross Cultural Research, San Juan, Puerto Rico, February.

_____, 1991. "Thought Reform - Lurid Fantasy versus Interesting Reality," Western Psychological Association, San Francisco, April.

_____, with Richard Leo. 1991. "The Social Psychology of Coerced Internalized False Confessions," American Sociological Association, Cincinnati, August.

_____. 1993. "Making Monsters - Recovered Memories: Who is Victimizing Who," STAR, San Juan, Puerto Rico, March.

_____. 1993. "Making Monsters: The New Dr. Frankenstein," TREAT IV Conference, Santa Fe, April.

_____. 1993. "Making Monsters: An American Tragedy." Conference on Memory and Reality: An Emerging Crisis, False Memory Syndrome Foundation, Philadelphia, April.

_____. 1993. "Analyzing The Social Structure of Cults and Crisis Decision Making." American Psychiatric Association, San Francisco, May.

_____. 1993. "Making Monsters: The Coming Crisis in Psychiatry." American Psychiatric Association, San Francisco, May.

_____. 1993. "Making Monsters: The Recovered Memory Therapy Crisis," International Academy of Sex Research, Pacific Grove, California, June.

_____. 1994. "The Creation of Illusory Belief," Claremont Conference on Applied Cognitive Psychology: Suggestibility and the Veracity of Memory, Claremont, March.

_____. 1994. "Psychology's Phlogiston -- Robust Repression and Misused Influence:  The Recovered Memory Crisis." Invited keynote address, Wisconsin State Psychological Association, Milwaukee, April.

_____. 1994. "The Social Psychology of the Substitution of Belief for Memory, 1994 CSICOP Conference, The Psychology of Belief, Seattle, June.

_____. 1994.  "The Social Psychology of the Creation of Pseudomemories."  Conference on "Psychological Issues in Child Sexual Abuse Investigations," Tromso University, Tromso, Norway, August.

_____. 1994.  "Influence in Psychotherapy: The Big Picture." Johns Hopkins Medical Institution conference on Memory and Reality: Reconciliation. Scientific and Legal Issues of False Memory Syndrome. Baltimore, Maryland. December.

_____. 1997. "Investigating and Analyzing Cult Cases," presentation to the Third Annual National Legal Seminar on Cult Litigation, Pittsburgh, September.

12

Presented at Meetings of Scientific Associations: (continued)

*with Richard Leo*

_____ 1997.  "The consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation," Law and Society Association, St. Louis, Missouri, May.

**Presented at Other Associations and Groups:**

_____. 1987. "Cultic Organizations: An Overview," First International Congress on Sects and Society, Barcelona, Spain, November.

_____. 1988. "Synanon: An Example of America's Struggle to Control Cult Violence," keynote address, Cult Awareness Network Annual Conference, Portland, September.

_____. 1988. "Cults, Psychics and Other Psychological Nominators," California Trial Lawyers Association, Los Angeles, November.

_____. 1989. "Tort Liability for Brainwashing - a Debate," American Bar Association, National Institute - Tort and Religion, San Francisco, May.

_____. 1989. "Beyond Civil Liberties: The Real Issues," Interfaith Coalition of Concern about Cults, New York, May.

_____. 1991. "Coercive Persuasion of the Mind in Police in Police Obtained Confessions," Second Annual Conference - Criminal Defense Litigation Along the Rim and the River. Public Defender's Office, Coconino County, Flagstaff, June.

_____. 1991. "Professional Workshop. Sociologists as Expert Witnesses." American Sociological Association, Cincinnati, August.

_____. 1991. "The Use of Psychological, Social and Medical Evidence in Clarifying Cult Issues in Court." Grand Rounds, Walnut Creek Hospital, Walnut Creek, November.

_____. 1993. "Pseudomemories and Real Malpractice." Association for Behavioral and Cognitive Therapy. San Francisco, September.

_____. 1993. "Recovered Memories -- Issues in Criminal and Civil Litigation." State Judicial Conference. Breckenridge, Colorado, September.

_____. 1993. "Coerced False Confessions: The Social Psychology of Extreme Influence." Alameda County Criminal Defense Bar, Oakland, October.

_____. 1993. "Police Interrogation and the Coercion of False Confessions." Top Gun II, Criminal Defense Seminar, St. Petersburg, Florida, October.

_____. 1993. "Memories are Made of This." Conference on Human Memory and Sex Abuse Cases: The Misuse and Abuse of Science. Criminal Lawyers Association, Toronto, Canada, November.

_____. 1993. "Influence and the Creation of Believed False Memories." San Francisco Academy of Hypnosis, San Francisco, December.

<u>Presented at Other Associations and Groups:</u> (continued)

_____. 1994. "Coerced False Confessions." Advanced Criminal Law Seminars, Aspen, Colorado, January.

_____. 1994. "False Memories and True Malpractice." Grand Rounds, Walnut Creek Hospital, Walnut Creek, March.

_____. 1994. Town Meeting on "False Memory or Recovered Memory." At the San Francisco Press sponsored by Media Alliance, March.

_____. 1994. "Valid Memories or Pseudomemories." Florida State Supreme Court, Judicial Conference, mini-course for trial and appellate judges, Tampa, Florida, May.

_____. 1994. "False Confessions." Florida State Supreme Court, Judicial Conference, mini-course for trial and appellate judges, Tampa, Florida, May.

_____. 1994. "Police Interrogation and False Confession." Death Penalty Resource Center National Training Conference, Charleston, South Carolina, June.

_____. 1994. "The Social Psychology of False Confession." Alaska Academy of Trial Lawyers, Anchorage, Alaska, September.

_____. 1994. "The Psychology of Interrogation: Unearthing False Confessions." The North Carolina Academy of Trial Lawyers. Greensboro, North Carolina, September.

_____. 1994. "Beware American's Bearing Gifts: The Spreading Satanic Cult Hysteria." First Annual Fair Lecture, Fair, London England, October.

_____. 1994. "The American Origins of the Recovered Memory Quackery." Public Lecture for the British False Memory Syndrome Foundation, London, England, October.

_____. 1994. "The Recovered Memory Epidemic: Needless Mal-Practice." 1994 Western Regional Symposium on Child Abuse and Sexual Assault. Eugene, Oregon, November.

_____. 1994. "Recovered Memories: Monstrous Misuse of Influence." Grand Rounds, Alta Bates Hospital, Berkeley, California, October.

_____. 1994. "Influence and Creation of Pseudomemories." Current Topics in the law and Mental Health. Seattle, Washington, November.

_____. 1994. "Making Monsters: Dangerous Influences on Psychotherapy." Continuing Medical Education Conference on Recovered Memories, Trauma and Clinician's Liability: The Impact on Psychotherapy." San Diego, California. December.

Presented at Other Associations and Groups: (continued)

_____. 1995. "The Recovered Memory Error: Social Worker Mal-Practice." National Association of Social Workers - Northern California Division, Oakland, California, January.

_____. 1995. "Recovered Memories: The Coming Mal-Practice Crisis for Psychiatrists and Psychotherapists." Grand Rounds, California Pacific Medical Center, San Francisco, California. February.

_____. 1995. "Police Interrogation and Confession." Capital Case Defense Seminar, California Attorneys for Criminal Justice and California Public Defenders Association, Monterey, California, February.

_____. 1995. "False Confession: Decision and Analysis." Florida Association of Criminal Defense Lawyers, 8th Annual Meeting. St. Petersberg, Florida, June.

_____. 1995. "Abdication of Professional Responsibility and Sexual Abuse Hysteria," Child Protectors and Clients: First International Forum, The Netherlands, June.

_____. 1995. "Analysis of Coerced and False Confessions," National Association of Criminal Defense Lawyers, Annual Meeting, Snowmass, Colorado, August.

_____. 1995. "The Case for Recordation of Interrogation." Principal speaker at a day-long Forum on Convicting the Innocent, Hartford, Connecticut, September.

_____. 1995. "Police Interrogation and False Confession." International Conference on Allegations of Child Abuse: The Law, The Science, The Myths, The Reality, Chicago, October.

_____. 1996. "False Confessions by Criminal Syspects." Seattle Forensic Institute of Washington. February.

_____. 1996. "Analyzing Coerced Statements and False Confessions." Capital Case Defense Seminar, California Attorneys for Criminal Justice and California Public Defenders Association, Monterey, California, February.

_____. 1996. "Coerced Confessions," 15th Annual Juvenile Delinquency Training Seminar, The Los Angeles County Public Defender's Office, Los Angeles, California, April.

_____. 1996. "Analyzing Coerced Confessions and Witness Statements," Oregon Criminal Defense Lawyers Association, Sun River, Oregon, May.

_____. 1996. "Recording Interrogations and Miscarriages of Justice," American Bar Association, Presidential Special Session -- "Miranda at 30: Still Good After All These Years?" Orlando, Florida, August.

<u>Presented at Other Associations and Groups</u>: (continued)

_____. 1996. "Interrogation and Confessions - **True and False**," New York State Defenders Association, Annual Conference, Lake Placid, N.Y., August.

_____. 1996. "Police Interrogation and False Confessions," International Conference on Allegations of Child Abuse, Las Vegas, Nevada, September.

_____. 1996. "Social Change and The False Memory Epidemic," False Memory Syndrome Foundation Conference, Chicago, Illinois, September.

_____. 1996. "Analyzing Coerced and False Confessions," Chicago, Seminar for the Office of the Public Defender, Chicago, Illinois, September.

_____. 1996. "The Scope of the Recovered Memory Public Health Problem," Council on Licensure, Enforcement and Regulation, 16th Annual Conference, Anchorage, Alaska, October.

_____. 1997. "The Decision to Confess," Denver University College of Law Symposium on Coercion, Denver, Colorado, March.

_____. 1997. "Analyzing Interrogations and Explaining False Confessions," Conference of the New Hampshire State Public Defender Organization, Manchester, May.

_____. 1997. "The Dangers of False Confessions," The Texas State Police Officer Association, Amarillo, Texas, June.

_____. 1997. "Workshop on Detecting and Avoiding Taking and Relying on False Confessions," The Texas State Police Officer Association, Amarillo, Texas, June.

_____. 1997. "Police Interrogation and False Confessions," International Conference on Allegations of Child Abuse, Las Vegas, Nevada, September.

_____. 1997. "Why it is Economically and Morally Dangerous to Practice Recovered Memory Therapy," University Center, University of Northern Colorado, Greeley, Colorado, October.

_____. 1997. "Why it is Economically and Morally Dangerous to Practice Recovered Memory Therapy," Mountain Crest Hospital, Fort Collins, Colorado, October.

_____. 1997. "False Confessions: Exploring the Last Frontier," Ohio Association of Criminal Defense Lawyers, "Annual Superstar Seminar," Columbus, October.

_____. 1997. "Police Interrogation and False Confession," Missouri State Public Defender System, December.

_____. 1998. "Interrogation and Confession," University of Alabama Law School, February.

## Presented at Other Associations and Groups: (continued)

_____. 1998. "False Confessions," Alaska Academy of Trial Lawyers, May.

_____. 1998. "Police Interrogation Techniques," "Consequences of False Confession" and "Preparing the Confession Case," Hamilton county Public Defender's Office (Cincinnati), May.

_____. 1998. "Winning False Confession Cases," Arizona Attorneys for Criminal Justice, Tucson, September.

_____. 1998. "Analyzing False Confessions," International Conference on Allegations of Child Abuse, Las Vegas, October.

_____. 1998. "Teaching Juries How to Analyze Interrogations and False Confessions, "National Conference on Wrongful Convictions and the Death Penalty, Northwestern University Law School, Chicago, November.

```
 . 1                    IN THE CIRCUIT COURT OF THE
                        11TH JUDICIAL CIRCUIT, IN AND
   2                    FOR DADE COUNTY, FLORIDA

   3                    CASE NO. 84-19728

   4
        IN RE:  STATE OF FLORIDA
   5
   6                    VS

   7              FRANCISCO FUSTER

   8                                        COPY

   9

  10                    SWORN STATEMENT

  11                         OF

  12                    ILEANA FLORES

  13

  14

  15

  16                    Tegucigalpa, Honduras
                        Centro Comercial
  17                    Plaza Miraflores, #362
                        October 15, 1994
  18                    12:20 o'clock P.M.

  19

  20

  21

  22     PRESENT:

  23              ARTHUR COHEN, ESQUIRE

  24              GERMAN E. LEITZELAR VIDAURRETA,
                  Notary Public
  25              — OFSHE Exhibit #2      —
```

THEREUPON:

ILEANA FLORES

being of lawful age, and being first duly sworn by

German E. Leitzelar Vidaurreta to tell the truth, the

whole truth and nothing but the truth, in her answers

to the questions to be to her propounded, testified on

her oath as follows:

EXAMINATION

BY MR. COHEN:

    Q.    Okay.  My name is Arthur Cohen, and I'm an

attorney from Fort Lauderdale, Florida.  We're here in

the Tegucigalpa, Honduras.  Today is October 15th,

1994, and the time is approximately 12:25 P.M.,

Honduras time.  I'm here with a young woman by the

name of Ileana Flores.

        Ileana, do you understand that I'm here to

take a statement under oath from you today?

    A.    Yes.

    Q.    And do you understand that it's being taken

down by a court reporter that I've brought with me

from the United States?

    A.    Yes.

    Q.    And do you understand that I've also got a

cassette tape recorder on the table here that is

presently in the on position?  And --

1      A.    Yes.

2      Q.    Okay.  Now, has anyone forced you to be here

3  today?

4      A.    No.

5      Q.    Has anyone threatened you in any way or

6  promised you anything in regards to meeting with me

7  here today?

8      A.    No.  Nobody has.

9      Q.    Okay.  And are you here on your own free

10  will?

11      A.    Yes, I am.

12      Q.    Okay.  All right.  For the record, please,

13  please state your name and where you live.  And spell

14  your last name, please.

15      A.    My name is Ileana Flores, F-L-O-R-E-S.  And

16  I live here in Tegucigalpa.

17      Q.    How long have you resided here?

18      A.    For the last five years.

19      Q.    Okay.  And are you presently employed?

20      A.    No, I'm not.

21      Q.    Okay.  What do you do?

22      A.    I go to school.

23      Q.    And where do you go to school?

24      A.    To the National University.

25      Q.    And what are you studying there?

```
 1        A.    Business administration.

 2        Q.    Now, are you the same individual who was

 3   charged in Dade County, Florida in Case Number

 4   84-19728 under the name of Ileana Fuster?

 5        A.    Yes.

 6        Q.    And with reference to that case who was your

 7   attorney?

 8        A.    Michael Von Zamft.

 9        Q.    And did he represent you throughout the

10   entire proceedings?

11        A.    Yes, he did.

12        Q.    Did you hire him yourself?

13        A.    No.

14        Q.    Who hired him?

15        A.    The court appointed him.

16        Q.    Okay.  Now, with reference to that case did

17   there come a point in time that you entered a plea to

18   the charges?

19        A.    Yes.

20        Q.    And do you recall what you pled to?

21        A.    Yes.  Guilty.

22        Q.    Do you recall what charges you pled to?

23              Okay.  Do you recall -- let's -- let me ask

24   you this:  Do you recall being sentenced on the case?

25        A.    Yes.
```

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

```
 1          Q.    Okay.  And what was your sentence?

 2          A.    Ten years and a ten year probation.

 3          Q.    All right.  And when -- do you recall the

 4  date of your sentencing?

 5          A.    Not the date exactly, but 1986.

 6          Q.    And when, if you recall, were you arrested

 7  on the charges?

 8          A.    On August 24th of '84.

 9          Q.    And when you were taken into custody where

10  were you taken?

11          A.    Into the Women's Detention Center in Miami.

12          Q.    Dade County, Florida?

13          A.    Dade County, Florida.

14          Q.    You have something you want to ask me?

15          A.    No, no.  I just --

16          Q.    Okay.

17          A.    Just -- just off the record.  Not since --

18                (Thereupon, a discussion was held off the

19  record and German E. Leitzelar Vidaurreta left the

20  room, after which the following proceedings were had:)

21                MR. COHEN:  Okay.  We're back on the

22        record.

23  BY MR. COHEN:

24      Q.    Ileana, we were discussing your arrest, and

25  you told me you were arrested in -- August 24th of
```

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

1 1984.  Do you recall where exactly you were when you

2 were arrested?

3   A. No.  I turned myself in.

4   Q. Okay.  How old were you at the time?

5   A. 17.

6   Q. And were you told of the charges that you

7 were being accused of when you were arrested?

8   A. Yes.

9   Q. Okay.  Do you recall what those charges

10 were?

11   A. Not all of them.

12   Q. To the best of your recollection.

13   A. Child abuse.

14   Q. And you were then appointed an attorney,

15 Mr. Von Zamft, at some point in time.  Correct?

16   A. Right.

17   Q. All right.  What I want to do, Ileana, is I

18 want to try and avoid asking you a lot of specific

19 questions.  I just want to have you tell what

20 happened, you know, once you were incarcerated in the

21 Dade County jail system.

22   And where I'd like to start is, when you

23 were first incarcerated would anyone come to see you?

24 Let's -- let's start there.  Did anyone come to see

25 you?

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

```
 1        A.    The first days?
 2        Q.    Yeah.   The first days, weeks.
 3        A.    Yes.   Von Zamft came to see me.  I remember
 4   an investigator coming to see me.
 5        Q.    Do you remember his name?
 6        A.    Yeah.   Just Mr. Dinerstein.
 7        Q.    And do you know who Mr. Dinerstein worked
 8   for?
 9        A.    For Mr. Von Zamft.
10        Q.    Do you recall any discussions with
11   Mr. Dinerstein?
12        A.    Yeah.   He came to see me a couple of
13   times --
14        Q.    And what --
15        A.    -- in the beginning.
16        Q.    What did you talk about?
17        A.    I really don't remember exactly what I told
18   him.
19        Q.    How long were you incarcerated in Dade
20   County jail?
21        A.    Approximately almost two years.
22        Q.    And were you in the -- what would be called
23   open population?
24        A.    No.   I was in solitary confinement at all
25   times.
```

1    Q.   From the day you were arrested until the day

2  you were sentenced to prison?

3    A.   Yes.

4    Q.   And when you say solitary confinement,

5  explain that a little bit to me.

6    A.   Just being in a room by myself.

7    Q.   Do you recall -- well, let's talk about what

8  were your conditions when you were in the room by

9  yourself, that you can recall?

10    A.   Well, I -- just the bed, the toilet and sink

11  and the door.  It was very small.

12    Q.   What about clothing?  Did you wear street

13  clothes?

14    A.   No, I had my clothes on, but people that

15  were in those cells, some of them have no clothes on

16  because they were suicidals or they had problems.

17    THE COURT REPORTER:  Because they were

18    what?

19    THE WITNESS:  Suicidals.  I mean --

20    yeah.

21  BY MR. COHEN:

22    Q.   When was the, if you recall -- well, let me

23  ask you this:  What happened for the next following

24  months that you can remember while you were

25  incarcerated?

```
 1        A.    Well, I think -- I can hardly remember
 2   anything.  I remember half of the time I was there.
 3             I know that they gave me medications.
 4        Q.    Okay.  When you say they, who's they?
 5        A.    The nurse.
 6        Q.    All right.  Do you know what kind of
 7   medications they gave you?
 8        A.    No.  I have no idea, but they would help me
 9   rest, they said, because I wasn't eating properly and
10   I needed to sleep and I -- I wasn't sleeping properly.
11        Q.    And this medication helped you to sleep?
12        A.    Yes.
13        Q.    How long did you take that medication for,
14   do you remember?
15        A.    No, I don't remember.
16        Q.    Would it have been --
17        A.    But most of the time I was there.
18        Q.    Okay.  So for a good portion of your
19   incarceration --
20        A.    Yes.
21        Q.    -- in the Dade County jail you were under
22   medication?
23        A.    Under medication, yeah.
24        Q.    Okay.  When was the first time that you can
25   recall that anyone visited you from the State
```

1   Attorney's Office, or a representative of the State

2   Attorney's Office?

3       A.   I have no idea when the time was, but I have

4   investigators coming in from the -- from the state.

5       Q.   Would this have been closer to the time when

6   you entered your plea or way before it?  Do you recall

7   that?

8       A.   No.  At the beginning there was a long

9   period of time that nobody visit me but Von Zamft and

10  sometimes -- you know, not all the time.  I didn't

11  know what was really going on with the case.  But

12  he'll come or he'll ask me if I have something to say

13  or if I remember anything.  And I --

14      Q.   Did you?

15      A.   No.  You know, I always say that I have

16  nothing to say, that I was innocent.  And I had

17  nothing to say about the charges that I -- that I was

18  charged with.

19           And then I remember that it came a time

20  where the trial date was nearby, and Von Zamft told me

21  that the trial date was coming, and I still have

22  nothing to say.

23      Q.   That would have been approximately September

24  of 1985?

25      A.   Yes.

1    Q.    All right.  Continue.

2    A.    And he said that I needed to remember

3    something or that I must have something to say.

4         And I kept telling him no.  And then he

5    thought that I had problems and that I should be seen

6    by a psychologist.

7         And then two psychologists started seeing

8    me.

9    Q.    What were their names?

10   A.    Michael Rappaport and Merry Haber.  So they

11   came in, I met them, and they were very nice.  And so

12   they asked me the same questions that my attorney had

13   asked me all that time.

14        And I kept telling him no, you know, that I

15   have nothing to say.  I had told him no, too.

16        Then they explained to me that I was -- I

17   was having problems and that they were there to help

18   me.  So they started therapy or treatment with me.

19   Q.    What did they tell you they were going to be

20   doing with you?

21   A.    Well, they told me that after talking to me

22   they -- they diagnos -- diagnosticated (sic) or --

23   that I was having a blackout of events.

24   Q.    Did they come to visit you often?

25   A.    Oh, yes.  Hm-hmm.  They started coming

1    almost every day.  And then I started seeing them at

2    nights.

3         Q.   This is what I want to talk about.  And I

4    want to see if you can get in as much detail as

5    possible.

6              Tell me what would happen when they came to

7    visit you on a session.

8         A.   Well, we will meet usually in these little

9    booths that they were downstairs.  And we will start

10   talking about the beginning, you know, about -- I used

11   to talk a lot about my childhood with them, and -- but

12   since, you know, those were good memories, I have good

13   memories about my childhood, I always have a nice

14   life, you know.  And I talked a lot about my school

15   and my friends.  And that's where we started.

16             And then we got to the point about Frank

17   which, you know, that was a bad experience I had.  And

18   so I was able to talk about that.

19        Q.   Now when they would talk to you do you

20   recall what time of day it would be?

21        A.   No.  I can -- you know, I just remember

22   being awakened and taken out because my psychologists

23   were there.

24        Q.   You said awakened?

25        A.   Awakened.

1      Q.    Awakened from sleep?

2      A.    From sleep, yeah.  And --

3      Q.    Who -- who would be present at these

4   sessions other than --

5      A.    Nobody.  Just them two.

6      Q.    Just Drs. Rappaport and Haber?

7      A.    And Haber, yeah.

8      Q.    Was -- do you recall if anyone had a tape

9   recorder during these sessions?

10      A.    I remember tape recorders, but I don't know

11   if it was in those sessions or with the lawyers or

12   with DA's office.  I don't know.  But maybe they had

13   one.  More than likely probably they had one.

14      Q.    Now, when they had these sessions with you,

15   you said you went to a little booth?

16      A.    Yeah.  I remember going sometimes to those

17   little booths.

18      Q.    What about other times, where would you be?

19      A.    I don't remember.

20      Q.    All right.

21      A.    Because you have to understand that, you

22   know, this was approximately ten years ago.  And I

23   hardly remember those times because I was -- I don't

24   know.  I was very confused and I was very tired.

25              And so after we started talking about my --

 1   you know, my past and how -- I guess I talked a lot

 2   about that so they get to know me, what type of person

 3   I was.  But then we started talking about the time

 4   being in the house in Country Walk, you know, how was

 5   it.

 6         And I told them I had nothing to say because

 7   I had -- you know, and they told me that there must be

 8   because the kids were saying this story and that story

 9   and that story and, you know.  And I kept denying it

10   to them because I had no memory.  I couldn't recall

11   none of those stories.  And I couldn't recall nothing

12   like that happening.

13         Q.   Now at that time did you believe -- did you

14   believe at that time that the truth was that nothing

15   happened at the house?

16         A.   Yes.  Yes.  Hm-hmm.  I -- you know, I --

17   because I kept saying that I was innocent, but nobody

18   would listen to me.

19         And they said that I was suffering from a

20   blackout, and that those things had happened because

21   the kids said it, and the kids don't lie.  And they

22   said that it happened, so it must have happened.

23   So --

24         Q.   And you were --

25         A.   They told me -- then after they be telling

1    me these stories that the kids were saying about games

2    and stuff happening in the house, I remember going

3    back to my cell, and then I would have nightmares

4    about the same things they would tell me, you know.

5              And I would listen to the same things two

6    days, three days, and nights, anytime during the day,

7    on weekends, you know.  Some of the times I did not

8    even know if it was nighttime or daytime.

9         Q.   And they would come back and talk to you

10   about these things?

11        A.   Right.  And, you know, before I know it I

12   was having nightmares.  And that's when the treatment

13   started they said.  Because, you know, I was so

14   afraid, the next day I went down and talked to them

15   and tell them that the same things we talked about

16   that they said the kids said, that I was having

17   nightmares about them.

18             And they said that that was a way of my

19   system remembering what had -- what had actually

20   happened.

21             And then, you know, I argued that a little

22   bit, but I got to a point that I was believing that --

23   that probably those things happened and I just didn't

24   remember because they were so shocking that I -- my

25   sane mind protect -- you know, as a protection I

1   was -- I was forgetting about them or putting them in

2   the back of my head.  And --

3         Q.   Were there at any times ever any threats

4   like if -- that were made to you by the doctors?

5         A.   No.  They would just tell me constantly that

6   I would spend the rest of my life in jail, that I

7   would grow old as an old lady in jail.  And I was only

8   17.  And they would remind me how it was to be a high

9   school student and to be in jail or what my friends

10  would be doing.

11        Q.   The doctors talked to you about this?

12        A.   Yes.  And that I had to remember.

13        Q.   Can you recall approximately how long these

14  sessions went on for?

15        A.   No.

16        Q.   Days?  Weeks?  A couple of weeks?

17        A.   Oh, they went on for days.  I remember that

18  they were long.  And -- you know, and I thought they

19  were helping me.

20        Q.   After you would be done with a session what

21  would -- where would you go then?

22        A.   Back to my cell.  And some days, you know, I

23  also remember they would take me out of my cell.

24        Q.   Who's they?

25        A.   Investigators would take me out of the cell

1   at night and we'd go to restaurants.  I recall twice.

2        Q.    Where were the investigators from, do you

3   know?

4        A.    From the state.

5        Q.    How do you know that?

6        A.    Because I saw them in court a couple of

7   times, and because they told me they worked with

8   Mr. Hogan.

9        Q.    Can you -- I know it's ten years later but

10   can you recall what one or either of them may have

11   looked like?

12        A.    No.  I don't remember their names.  I --

13   maybe if I look at a picture, yeah, I would remember

14   their faces, who they were.

15        Q.    Do you recall -- well, how many times that

16   you can remember did they take out of your jail cell

17   into a restaurant?

18        A.    I remember at least twice.

19        Q.    Do you recall the restaurant you went to?

20        A.    No, no, because it was at night.  I just

21   remember being taken out and going to nice restaurants

22   and eat Spanish food.  I remember that.

23        Q.    It was just you and the investigators?

24        A.    Right.  And they would just tell me, you

25   know, isn't the restaurant nice, I mean don't you miss

1    being out here in a restaurant, stuff like that.

2              And -- but I be quiet all the time.  I was

3    very quiet.

4         Q.   So that's about all they talked to you

5    about?

6         A.   Yeah.  They never talked about anything

7    else.

8         Q.   Then what would happen after dinner?

9         A.   They would take me back to the cell.

10        Q.   And you recall that --

11        A.   Yeah.

12        Q.   -- about two times?

13        A.   Right.  And so I thought they were being

14   nice to me.

15        Q.   Now, during the course of your incarceration

16   you had some contact with Frank.  Is that correct?

17        A.   Yes.

18        Q.   And how did you do that?

19        A.   Oh, in the beginning, that was in the very

20   beginning.  I don't remember how, but there was a

21   process with the jails that two persons that were

22   married could see each other and talk to each other

23   for a certain amount of time.

24        Q.   And you took advantage of that?

25        A.   Yes.  Hm-hmm.  We communicated in the

1    beginning.

2        Q.    Do you recall how long you continued to

3    communicate on -- with each other?

4        A.    No.  Just the beginning.

5        Q.    Do you recall when it ended?

6        A.    When I started seeing the psychologists.

7        Q.    Why was that?  Why did it stop then?

8        A.    I don't know.  I was being afraid of Frank,

9    so -- in the beginning he -- you know, he's the one

10   that wanted to be in touch with me.  And I feel he

11   wanted to have control of the situation.  Or maybe he

12   knew back then I was so young, you know, and he -- you

13   know, he just wanted to be in touch, you know, kept in

14   touch.

15            And I didn't mind.  But then I -- the time I

16   was seeing the psychologist, you know, I started

17   talking about how my life was really with Frank and

18   why I was in that situation.  So I started feeling

19   remorse, you know, because it was his fault that I was

20   in that situation.

21       Q.    Did they talk to you, the psychologists talk

22   to you about Frank?

23       A.    Yeah.

24       Q.    Now what I want to do is -- it might be a

25   little easier for you this way.  I'm going to go --

```
 1    I'm going to give you a name of an individual and then
 2    I'm going to want you to tell me what you can recall
 3    about this particular individual as it relates to this
 4    case.  And whatever you want to say.
 5              Your attorney, Michael Von Zamft.  What can
 6    you tell me about Michael?
 7         A.   He -- I mean he was nice.  He came to see
 8    me.  He said he was working very hard on the case.
 9    And then he said that the cases should be separated.
10    I mean the --
11         Q.   Severed, is that the word?
12         A.   What?
13         Q.   Severed.
14         A.   I mean the two persons --
15         Q.   Severed.  Yeah.
16         A.   Yeah, they should be separate, because there
17    was too much evidence against us.  And there were a
18    lot of evidence against Frank.  And all those evidence
19    were going to hit me because it was only one case.
20              And so I got very afraid.  He told me that
21    the state was going to win the case, and that it was
22    necessary for me to remember everything and say it.
23    But I have nothing to remember at the time.  So he
24    said he was going to get me psychologists to help me
25    remember.  And, you know, I kept telling him that
```

```
 1   there -- that there was nothing I could remember.
 2       Q.   And when you talked did you tell him there
 3   was nothing you could remember because that's what you
 4   believed the truth to be?
 5       A.   Right.  Hm-hmm.  Right.  And but then he
 6   said that it was my decision, you know, but that to
 7   take in consideration I was going to spend the rest of
 8   my life in jail.  And, you know, I was very afraid.  I
 9   was very scared at the time.
10       Q.   What about when you entered your plea, what
11   type -- did you have any discussions with Mr. Von
12   Zamft about that?
13       A.   Yes.  He told me about the plea and told me,
14   you know, what to do.
15       Q.   What did he tell you the plea was?
16       A.   Because I was innocent.  No, he said -- he
17   didn't say that there was a plea, they were going to
18   give me so many years or nothing like that.
19       Q.   I see.
20       A.   He said that they didn't promise anything,
21   but to be lenient.  But still, I -- you know, I felt
22   very -- I felt hesitant because I told him that I was
23   innocent and I couldn't plead guilty to charges I
24   didn't felt guilty about.
25            And he said that no, that those things
```

1  happened, you know, and that Frank was guilty and I

2  was guilty.

3       And I said no, I'm not.  And then he will

4  get mad and I won't hear from him for two days, three

5  days.  So I would get afraid because I feel like --

6  like I felt very lonely then, you know, alone -- not

7  lonely, that's not the word, but alone.  You know,

8  alone at night.  I didn't know what was going to

9  happen.

10       So I felt the doctors were helping.  I felt

11  the doctors were helping when they started seeing me

12  because I started remembering things.

13       Q.   You felt that they were helping you?

14       A.   Yeah, because I was starting to remember all

15  those things that the kids were saying.  I was having

16  bad dreams about them.

17       Q.   Anything else about Michael Von Zamft?

18       A.   I mean I hardly seen him.  I saw him -- I

19  didn't see him much.

20       Q.   What about after your conviction and after

21  you went to prison, did you ever have any further

22  contact with Mr. Von Zamft?

23       A.   No.

24       Q.   Any letters, any telephone calls?

25       A.   I don't remember.

```
 1        Q.    What about recently?

 2        A.    Recently?

 3        Q.    In the last few years.

 4        A.    Yes, about a year ago.

 5        Q.    Okay.  What was that about?

 6        A.    I talked to him over the phone.  About a

 7   year ago, you know, I found out through my mother that

 8   there was this group of people that has been

 9   investigating the case, and those people wanted to

10   talk to me.

11            So I talked to one person, and I was -- I

12   was -- you know, I was told about all this new

13   evidence and all these things that really had happened

14   ten years ago.  And, you know, all these things were

15   answering actually a lot of the questions that I have

16   had all these years.

17            And so I was very confused and I called

18   Mr. Von Zamft and, you know, I was -- you know, I was

19   telling him that is it true that this happened, you

20   know, is it true that you did this or you did that,

21   you know, or the doctors, is it true that they -- they

22   were playing with my mind.

23            So I was confused because all these years,

24   you know, as the years go by, I have -- I still have

25   no memory of what I testified then -- I mean about.
```

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

1    Eight years ago, I have no -- no memories of it.  And

2    the nightmares are fading to a point that even today I

3    don't have nightmares about that.

4        Q.   When you had this conversation with Mr. Von

5    Zamft did he say anything else to you?

6        A.   No.  He just said that I should not listen

7    to anybody, and that he forbid me to talk to anybody

8    about this case at all, and that he was my attorney.

9        Q.   Is Mr. Von Zamft your attorney?

10       A.   No, he's not.  I didn't want to -- I didn't

11   want to keep talking about the same thing over the

12   phone then because I felt that I had no case with him.

13   You know, if he felt like that I thought I'm going to

14   forget about this and I'm going to keep leading my

15   life.  So -- but then I thought that, you know, he was

16   wrong, he's not my attorney anymore, and I just didn't

17   know what to do.

18       MR. COHEN:  All right.  I'm going to

19          stop the tape because it's getting towards

20          the end and I'm going to flip it over.

21          (Thereupon, the tape was flipped over, no

22   conversations were had off the record, and the

23   following proceedings were had:)

24   BY MR. COHEN:

25       Q.   Okay.  We're back on the record.  All right.

1    The next person is Shirley Blando.  What do you recall

2    about Shirley Blando?

3        A.    She was a chaplain at the jail.  I recall

4    she was very nice to me, and she helped me through the

5    time I was there.  That's all I have to say about her.

6    She's -- she's been -- she's been nice to me all this

7    time.

8        Q.    What about Jeffrey Samek, Frank's attorney,

9    did you ever meet him?

10       A.    Yes.  I met him at the beginning of the

11   case.  And he was Frank's attorney.  At the beginning

12   I think he represented both of us, something like

13   that.  But then I never saw him again.

14       Q.    Okay.  Do you recall the deposition that he

15   took from you?

16       A.    Yes.

17       Q.    All right.  Let's talk about that deposition

18   a little bit.  The deposition I believe was over a

19   couple day period.  It was back in September of 1985,

20   more specifically September 12th and then September

21   18th, I believe.

22            Do you recall anything today about your

23   deposition?

24       A.    No.

25       Q.    All right.  Do you recall who was present at

1    your deposition?

2         A.   No.   I don't remember.

3         Q.   Do you recall where your deposition was

4    taken?

5         A.   I remember -- I think it was in the court

6    building, somewhere in there, because I was taken out

7    of the jail.

8         Q.   Do you recall who was in the room when your

9    deposition was given?

10        A.   No.   I just -- I can't remember.   I don't

11   want to say that a person was there.   I don't

12   remember.

13        Q.   Okay.

14        A.   I think my lawyer was there.

15        Q.   Right.   Was Mr. Samek there?

16        A.   Yeah, Mr. Samek was there.

17        Q.   Anyone from the prosecutor's office?

18        A.   I don't remember.   I think somebody was

19   there from the prosecutor's office.   I don't know if

20   it was Mr. Hogan or -- I have no -- I mean I don't

21   remember.

22        Q.   All right.   So other than -- other than your

23   attorney and --

24        A.   And Mr. Samek.

25        Q.   -- Mr. Samek you don't remember who else was

27

```
 1   in the room?
 2        A.   No, I don't remember.
 3        Q.   Do you remember -- so other than that you
 4   don't remember anything else about the deposition?
 5        A.   No.  But I know they were long and they made
 6   all kinds of questions.  I was prepared for them.
 7        Q.   Who prepared you?
 8        A.   My lawyer.
 9        Q.   Anyone else or just your lawyer?
10        A.   My lawyer, and I think I talked to the --
11   someone from the state --
12        Q.   Do you recall who?
13        A.   -- about it.
14             I don't remember if it was Mr. Hogan.  And I
15   remember Janet Reno coming in a couple of times, too,
16   to see me.
17        Q.   Let's talk about that for a little bit.
18   When you say Janet Reno came to visit you a couple
19   times, where did she visit you?
20        A.   At the jail.
21        Q.   And do you recall when in point of time that
22   would have been?
23        A.   No.
24        Q.   Closer to trial?  Further away from trial?
25        A.   Close to the trial.
```

```
 1          Q.   Okay.

 2          A.   Close to the trial she visit me.

 3          Q.   And you said she came to visit you twice.

 4   Is that what you recall?

 5          A.   No.  It was more than two times.  I don't

 6   exactly know how many times but -- you know, but it

 7   was more.  She'd come in, and all I remember is

 8   that -- even now I have the feeling that she's a very

 9   intelligent lady.  And she was very nice to me and she

10   told me she wanted to help me, and that something real

11   bad had happened to me and it was her duty to make

12   sure that justice was done and --

13          Q.   Is this what her conversation would consist

14   of --

15          A.   Right.

16          Q.   -- when she came to see you?

17          A.   Yeah.  And she told me that those things had

18   happened, that that's what the psychologists said, and

19   that I had to accept it.

20          Q.   And you recall that conversation?

21          A.   Yeah.

22          Q.   Okay.  As far as -- do you recall when you

23   gave your deposition a question was asked of you

24   regarding how many times Janet Reno came to visit you?

25          A.   Yes.
```

OFFICIAL REPORTING SERVICE, INC.   (305) 467-8204

Q.   Do you recall being asked that question?

A.   Yes.

Q.   And do you recall what your response was?

A.   I said that she came to see me.  And then I talked to the state again and my lawyer, and they told me I should have not said that she came to see me, but now I have to say it because I had said it before.

Q.   When did they tell you this?

A.   I don't remember, but it was in between the -- in the deposition.

Q.   So you took a break, is that -- or something happened like that, or you don't recall?

A.   I don't remember the procedures or -- sometimes I did not know if I was in record or not because -- you know, it's not like right now I know exactly what's going on.  And back then everybody told me what to do or when to talk, when not to talk.  And I was afraid.

Q.   So someone from -- during your deposition, what you just stated is that --

A.   Yeah, they stopped.

Q.   -- someone -- they stopped, and then someone told you, you know, to go back in there and say something else?

A.   Yeah.  I had to fix that.

```
 1        Q.    You had to fix it.  Okay.  So that would

 2   be --

 3        A.    So they told me --

 4        Q.    Because I've read your deposition, and in

 5   your deposition it reflects that you came back in and

 6   said that you wanted to correct a statement that you

 7   had made regarding how many times Janet Reno visited

 8   you.

 9        A.    Right.

10        Q.    So is that what you're talking about?

11        A.    Yes.

12        Q.    Okay.

13        A.    That's when it happened.

14        Q.    What about -- again, I've read the

15   deposition, and it seems according to the record in

16   the deposition that Dr. Rappaport was there also.  Do

17   you recall that?

18        A.    But they were with me at all times, so he

19   must have been there during the depos and in court.

20   He must have been there, but --

21        Q.    Did they ever tell you why he was going to

22   be there with you?

23        A.    Oh, because he said he had to give me

24   strength, or that I -- this I remember, that the

25   reason why was so that I could pretend I was talking
```

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

1  to him.

2        Q.    Okay.

3        A.    Because I was afraid of the attorneys and

4  the courts.

5        Q.    Before we were talking about Janet Reno.  Is

6  there, other than what you've told me, anything else

7  that you can recall about your relationship with her,

8  anything else that happened?

9        A.    No.  That's all I remember, that she visit

10  me and --

11        Q.    When she visited you, would -- do you recall

12  if she was alone or with someone else?

13        A.    I don't remember.  I just remember her

14  visiting me and we'd talk.  And -- but most of the

15  time I was quiet.  She would do all the talking.

16        Q.    All right.  Now I want to get back again to

17  these -- the sessions that you had, because the next

18  names on my list here are Dr. Rappaport and Dr. Haber.

19            Do you recall if -- when they would start

20  these sessions what would they say to you?  Do you

21  recall what they would say?

22        A.    No.  I can hardly remember.  This has been

23  so long.  You know, I remember just that I will calm

24  down, and I just wanted to get it over with because,

25  you know, they told me this happened, this happened,

OFFICIAL REPORTING SERVICE, INC.  (305) 467-8204

1  this happened.

2        And I will break down and say no, no, no, it

3  didn't happen.

4        And then they would tell me that yes, I have

5  to accept it, I have to confront it.  So they were

6  long sessions and tiring.  I just remember that that

7  was the procedure.

8        And I would go to bed, and I don't know why,

9  but I would dream about the same things the kids were

10  saying and the same things they were telling me.

11        So I came back, and the first question was

12  so what did you dream about last night, did you have

13  any bad dreams or did you not.  If I had bad dreams I

14  had to tell them about my bad dreams in detail.  And

15  they did tell me, you see, you remembering.

16        And then I say no, it cannot be because I

17  have -- I still have no memory, I just have bad

18  dreams.

19        And they say that that was the way of me

20  remembering.  So it was shocking, you know, and -- up

21  to today, you know, I've been confused, you know, did

22  that really happen or not, because I have no memories

23  of it.

24     Q.   Did they -- do you recall them teaching you

25  in any way how to remember things?  Did they give you

```
 1    any instructions on what to do?

 2         A.   No.  Just that during the sessions they

 3    would repeat the -- they said that -- they would tell

 4    me that -- I think the state or Von Zamft, I don't

 5    know who, would give them the information about what

 6    the kids were saying, and they would tell me what the

 7    kids were saying and they would ask me about it.

 8              And I'd go back to bed.  And then I remember

 9    having bad dreams about it.  They told me that that

10    was a technique of remembering bad things.

11         Q.   Did they ever tell you to relax?

12         A.   Yeah.  When I -- when I went to the sessions

13    and I had -- they told me I had to feel clear, I had

14    to clear my mind about anything else that was

15    happening.  I had to forget that I was in jail, and I

16    had to think that I was back in the house.  And then

17    I --

18         Q.   Were you able to see those thoughts once

19    they start to --

20         A.   Yeah.  I can actually be in the house.  I

21    mean I could go to any room.  I can -- they would tell

22    me just, you know, close your eyes and think you are

23    walking into the room.

24              And I had to give them details of the room

25    first, where the bed was, where the lamps were,
```

```
 1    whatever I could remember.  And then I have to

 2    visualize the events, what the kids were saying, and

 3    visualize my dreams.

 4             And I had to tell them, you know, if it was

 5    something in the kitchen, I had to think about the

 6    kitchen, how the kitchen was.  And I have to picture

 7    myself in there.  And then I have to tell them about

 8    my nightmare that I had in the kitchen.

 9             And then I had nightmares about the living

10    room, I had nightmares about the main room, and I had

11    to do the same thing.

12        Q.   Now when that would happen and you like woke

13    up from these nightmares, if you can recall them, did

14    you believe it was true?

15        A.   Yes, because I was in there.  You know, the

16    same things I was dreaming, I was in there.  I could

17    actually feel I was in there.  I remember the walls,

18    and then I'd remember Frank, too.

19        Q.   Do you recall if during these sessions that

20    anyone took any notes?

21        A.   Yeah, they took notes.

22        Q.   Drs. Haber and Rappaport took notes?

23        A.   Yeah, they took notes.  And they said that I

24    was remembering, and then after remembering I was

25    going to feel better.  And that I needed to help the
```

1   children, and the only way to help them is remembering

2   and backing their word up.   I have to back up their

3   word.

4        Q.   Do you want to take a break, Ileana?

5        A.   No.

6        Q.   Do you want a tissue?

7        A.   That's all right.

8        Q.   Okay.   Now, do you recall how -- I know you

9   indicated before that there were a lot of sessions.

10  Can you recall how long a session would last

11  approximately?

12       A.   No.   I just remember they were long, or

13  until I remember.

14            And when I came back with nightmares that I

15  have had the night before, we had to go through the

16  nightmare again.   I had to tell it and I had to

17  transport myself into the house again.   And once that

18  was over, then we'd take a break into the next day.

19            And then the next day I had nothing to say.

20  And then they'd tell me something else that the kids

21  said, and I have no memories, and I tell them I don't

22  remember, I don't remember.   So they said that then it

23  was time for me to go and rest.   And I had to think at

24  night before going to bed, I had to think and try to

25  remember real hard.   And I just had to clear my head

1   again and then rest, and that everything was going to

2   come up, because it was a defense that I had.  My own

3   mind was defending me from the memories.  So that's

4   what I used to do for that whole period.

5        Q.   Did there -- did there come a time during

6   these sessions that you believed or came to believe

7   that you, you know, and/or Frank had sexually abused

8   any of the children?

9        A.   I -- after -- how can I explain you?  After

10  talking to the psychologists and after having the bad

11  dreams, I came to a point that those things really had

12  happened because they convinced me that I was

13  remembering everything through my dreams, and I came

14  to realize that maybe those things happened.

15        But one thing that I always argued with them

16  is how come I didn't have memory of it.  I mean -- and

17  they told me that with time I will know it.

18        But, you know, it's like when you know you

19  did something, you broke something, but you know you

20  did it, you know, even if you -- if you tell your mom,

21  no, I didn't do it, but you know you did it.

22        And I didn't have that feeling.  You know,

23  it was just -- it was just something that had happened

24  that it was true, but I didn't know about it because

25  of this blackout that they said I had.

1    Q.   Let me ask you this question, see if you can

2  answer this.  If you now believe that your prior

3  belief is untrue, what you just told me about, why

4  have you changed your mind now?

5    A.   Well, I came back to Honduras, and like I

6  say my nightmares are fading, and I still don't

7  remember none of those things happening.  But I

8  decided to -- I mean what can I do about it?  You

9  know.  And those things probably happened, and that's

10  what I've been believing all those years, those things

11  probably happened, but I still don't remember, you

12  know.

13         And -- but ten years have gone by, and I

14  still don't remember.  And so I decided just to keep

15  living my life, you know, and try to forget that that

16  ever happened to me and better myself.

17         Until about a year ago, like I said, I

18  didn't know that someone was researching and worrying

19  about, even listening -- listening to me.  And I

20  thought they had forgot about me or anything.  And

21  then you guys came up with this proofs with these

22  things that might have happened, and to a lot of

23  answers to my questions.  So now I'm back into that

24  stage, you know.

25    Q.   You feel that some of your questions are

1    beginning to be answered now?

2        A.    Right.   You know, that never happened.   But

3    I have nightmares about it, but that never happened

4    because I never did anything.

5        Q.    When you say you never did anything, you

6    never did anything regarding what you were accused of

7    or convicted of?

8        A.    Yeah, right.   And I never saw anything

9    happening, either.

10            So those bad dreams, you know, that's one

11   question now I hope that somebody can answer to me.

12            But when you -- but when we talked about a

13   year ago and you told me about how I was feeling and

14   probably this had happened, or you told me about this

15   doctor that believes that this and that and, you know,

16   about -- described me, described me practically just

17   from reading my deposition and reading about me, and

18   it was incredible.   I felt like this person knew me.

19   And I have never talked to anybody about this case.

20       Q.    Making reference to Dr. Ofshe?

21       A.    Yes.   Hm-hmm.   I never talked to anybody

22   about this case, not even my own family, you know.

23   The only person that I talked to about it was Dr.

24   Rappaport and Dr. Haber and the court, you know, when

25   I testified.   And after that, I never talked to

```
1    anybody about it or testifying because I don't like to
2    talk about it.
3         Q.   Let me ask you this, if you can recall:
4    When Drs. Rappaport and Haber would come to do these
5    sessions with you were you sitting at the time?  Would
6    you sit in a chair?
7         A.   Yeah.  I sit in a chair.
8         Q.   What about Drs. Rappaport and Drs. Haber --
9    Dr. Haber?
10        A.   They'd be standing up.
11        Q.   They would stand up?
12        A.   Yeah.
13        Q.   Both of them?
14        A.   I don't recall.  Whoever was talking to me.
15   Dr. Rappaport was always standing up.
16        Q.   How did that make you feel?
17        A.   Back then I was very afraid.  I didn't want
18   to say the wrong thing.
19        Q.   For fear of what?
20        A.   For fear of what?  Because, you know, I will
21   be in that solitary for the rest of my life.
22        Q.   That's what they told you would happen?
23        A.   Yes.  And that people would dislike me and
24   that people hated me.
25             MR. COHEN:  All right.  We're going to
```

```
 1          take a short break because I'm a little warm

 2          and I want to get something to drink, and

 3          your -- the tears are coming down your eyes.

 4          Okay.

 5               (Thereupon, a recess was taken at 1:19 P.M.,

 6     after which the following proceedings were had at 1:22

 7     P.M.:)

 8     BY MR. COHEN:

 9          Q.   We're back on the record at approximately

10     1:20 P.M.

11               Ileana, I want to stay on this course that

12     we were on here with your sessions with the doctors

13     and just talk about this a little bit more.

14               When you'd have these sessions, do you

15     recall anyone else being present other than Dr.

16     Rappaport and Dr. Haber?

17          A.   No, I don't recall anyone else.

18          Q.   And you said that sometimes you'd be in the

19     jail cell, in your jail cell?

20          A.   Yes.

21          Q.   Other times you'd be in a little booth?

22          A.   Yeah.  In a little booth.  And then I don't

23     remember.  I just remember their faces and -- because

24     I'd get so involved.

25          Q.   Describe -- can you recall what Dr. Haber
```

1    and Dr. Rappaport look like?  Can you give me a

2    description?

3         A.    Yes.   Dr. Rappaport was very tall and had --

4    I think he was losing his hair a little bit.   Had a

5    little.   I don't know if it was long or not.   And had

6    a beard.

7         Q.    What about Dr. Haber?

8         A.    Dr. Haber, she was -- she wasn't as tall as

9    Dr. Rappaport.   And she was very sweet.   And

10   she had -- maybe her hair was to her shoulders,

11   something like that.   But I remember her.

12        Q.    All right.   Now when they asked you

13   questions, would they ask you to just like freely

14   recall what happened like I'm asking you or would

15   they --

16        A.    No.

17        Q.    -- do something else?

18        A.    No.   The sessions were, you know, we'll

19   start talking about anything.   Anything.   About

20   how was my day, what I did or who did I call over the

21   phone or if my mother visited me.

22              And then they said well, we're going to

23   start talking about your dreams, did you have any bad

24   dreams or not.

25              And then when I had nightmares, you know,

```
 1    they would tell me, you know, you have to clear your
 2    head, you have to forget that you're here.
 3         Q.   So they would like try and get you to relax,
 4    is that what they were doing?
 5         A.   Yes.  I have to get relaxed.
 6         Q.   What else would they say?  Were there any
 7    other words other than the word "relax"?
 8         A.   I'm trying to think.  I'm trying to think
 9    because -- I mean those are the days that I -- all
10    these years I've been trying to forget, you know.
11         Q.   Take your time.  See if you can remember any
12    other words or phrases that they used other than
13    "relax".
14         A.   No.  They just tell me to clear my head, and
15    I have to close my eyes and I have to transport myself
16    to the house, you know, and -- oh, I think one day
17    they showed me a picture of Frank.  And since I was
18    very afraid of him, you know, I was actually living
19    the times -- they would tell me to think about all the
20    horrible times that he -- when he hit me and how he
21    yell at me.
22         Q.   Do you recall Frank ever hitting you?
23         A.   Yes.
24         Q.   All right.
25         A.   I remember that.  He was very violent.  And
```

```
 1    so they tell me that I have to think about that.

 2              And then I had to think about my nightmares.

 3    And just by detailing it, just by being in the

 4    house -- I have to transport myself into the house,

 5    and don't be afraid to walk in the house.  And I will

 6    actually -- you know, I close my eyes and I would be

 7    actually walking into the house and I would be

 8    detailing everything to them.

 9        Q.    Your eyes would continue to be closed while

10    you did this?

11        A.    Yeah.  That was the only way to picture the

12    house.  And then I will retell my nightmares, part by

13    part.  And some of the things that I dreamt were so

14    awful that I didn't want to -- I didn't wanted to

15    repeat the nightmares.

16        Q.    Right.

17        A.    But they said I had to because that was the

18    only way to liberate my mind from it.  So --

19        Q.    Do you recall what those dreams were?

20        A.    Some of them I do.

21        Q.    Can you talk about it?

22        A.    You know, they were like games.  And I will

23    see all the kids in there and I will see Frank in

24    there doing weird stuff.

25              And that was what happened, you know, that
```

1   was what my mind -- my mind couldn't take that, so

2   that's why they were in the back of my memory.  But I

3   had to back up the kids if I wanted to help them.  And

4   that's why it was so hard to dream that.

5        Q.   But these were --

6        A.   Some of the stuff they told me I couldn't

7   dream about it.  And they would get mad, but I

8   couldn't dream about it, so --

9        Q.   So just so I have this straight, they

10   would --

11        A.   They told me that in the future I was going

12   to remember, actually I was going to dream again.

13        Q.   Just so I have this straight, they would --

14   during the sessions they would tell you certain things

15   about the children, and the children said this or the

16   children said that?

17        A.   Yeah.

18        Q.   And then they would tell you that you have

19   to visualize yourself in --

20        A.   In the house.

21        Q.   -- in the house, and visualize what they

22   told you the children said, and put it all into

23   perspective?

24        A.   Yeah.  Only if I dream about it.  Because

25   other times they told me well, this really happened.

```
1            And I said no, because that wasn't in my
2   dream.
3            They said well, you will dream it.  And it
4   was true.
5       Q.   So they would tell --
6       A.   That's why I believed it, because it was
7   true.  You know, every time they tell me I would dream
8   about it, even if it took two, three days later, it
9   was true, I would dream exactly the same things.  And
10  I started to believe it that they really happened.
11      Q.   So you would start to dream the things that
12  they talked to you about?
13      A.   Yeah.  Every time I would dream the same
14  things.  Maybe they were a couple of things that were
15  not in my dreams.  They told me that after this was
16  over and after I was away that they would come up
17  again and I was to call them and tell them.
18      Q.   During the period between when you gave your
19  deposition and when you testified at trial do you
20  recall speaking with anyone then during that time
21  period?
22      A.   During the trial?
23      Q.   Well, it would have been between when you
24  gave your -- the time period between your deposition,
25  which was, you know, September 12th, September 18th,
```

1    1985, and the time that you testified at trial, which

2    would have been I believe sometime in October --

3         A.    Yeah.

4         Q.    -- okay, do you recall talking to anyone

5    about your deposition or your trial testimony?

6         A.    Just Von Zamft and the doctors.  They

7    also -- Von Zamft told me to take a lie detector test.

8    I remember they took me to the DA's office and I took

9    a lie detector test.  I took two or three.  And I

10   passed two of them I think, but -- I know I passed one

11   or two of them, but -- I am not sure how many there

12   were, but I failed one.  I think it was the last one.

13        And -- but I kept having the sessions during

14   that time with the doctor.  So I was -- in my mind I

15   was confused when they will ask me the same things the

16   doctor said that really had happened.

17        I don't know why I failed the last one.  I

18   was supposed -- and they say that they didn't know how

19   I passed those two, that I needed to say the truth.

20        Q.    Do you recall anything else that you said

21   during that interim between deposition and trial

22   testimony that -- you spoke with your attorney, you

23   spoke with the doctors.  Do you recall what you spoke

24   about?

25        A.    During the lie -- during --

1          Q.   Well, during the time period between your

2     deposition and prior to your trial testimony, do you

3     recall what you spoke about?

4          A.   Well, we talk about my nightmares, we talk

5     about the things that the kids said, because I needed

6     to match everything the kids said.

7          Q.   Who told you that?

8          A.   The doctors.

9          Q.   They told you that you had to match

10    everything --

11         A.   The kids said.

12         Q.   -- the kids said to what you were going to

13    say?

14         A.   Right.

15         Q.   So that's what you talked about during the

16    time period between the deposition --

17         A.   Right.

18         Q.   -- and the trial?

19         A.   Because -- but I didn't remember it, so I --

20    that's why they said they had to see me so much,

21    because the trial was getting there and I didn't have

22    enough -- had not given the state enough information.

23         Q.   Do you recall as it got close to the trial

24    was Janet Reno still visiting you then?  Trying to get

25    a time period.

1     A.    She stopped by that time.  I think she

2     stopped.  That's when somebody said in court that she

3     went to see me.  I don't know.  Then she said she

4     couldn't come back to see me no more.

5     Q.    You don't recall when?

6     A.    After that -- back then I really did not

7     care who came or not.  I came to a point that I really

8     didn't know -- I just wanted to get it over.

9     Q.    Do you recall if -- prior to you giving your

10    deposition had Janet Reno seen you on any occasion?

11    Your deposition was in September.

12    A.    Oh, yeah.  I don't want to say -- I remember

13    seeing her and her coming to see me, and it was near

14    the trial, the depos, but I don't remember when

15    exactly.

16    Q.    Okay.  What about during the trial?  I know

17    that Ms. Reno sat in the first row while you

18    testified.  Do you recall her being in the courtroom?

19    A.    Yeah, she was there.

20    Q.    Do you remember --

21    A.    Everybody was there.

22    Q.    Who is everybody?

23    A.    Mr. Hogan, Mr. Von Zamft, Janet Reno was

24    there, Frank was there.

25    Q.    Did you know that Janet Reno was going to be

1   in the courtroom prior to you testifying?

2        A.    Yeah.

3        Q.    How did you know that?

4        A.    Somebody told me.  I think Dr. Rappaport.

5        Q.    He told you that Janet Reno would be in the

6   courtroom?

7        A.    Right.

8        Q.    What about Dr. Rappaport, was he in the

9   courtroom?

10       A.    Yeah, he was there.

11       Q.    Do you recall where he was sitting?

12       A.    No.  Because again, when I was going to

13  testify they told me I was supposed to look at the

14  jury or at the judge, and --

15       Q.    Who told you that?

16       A.    I don't know.  I think it was Mr. Von Zamft

17  and the doctors, but one of them two.

18            Because I was supposed to -- I was supposed

19  to do the same thing, like when -- like I had to

20  pretend I was --

21            MR. COHEN:  Stop.  I wasn't paying

22       attention.

23            (Thereupon, a discussion was held off the

24  record and the tape replaced, after which the

25  following proceedings were had:)

BY MR. COHEN:

    Q.    Okay.    We're back on the record.    It's approximately 20 minutes of two, and what happened was the tape machine was at the end of the tape.    And I have a new tape in now.

    Are you ready to proceed, Ileana?

    A.    Yes.

    Q.    All right.    We had talked about before, the portion that didn't get on the tape because it had stopped -- and just to condense it, we were talking about a time period between your deposition and your trial testimony, and that you had met with Dr. Rappaport and your attorney, and you spoke about your upcoming testimony.    Is that correct?    Is that what you said before?

    A.    Yes.

    Q.    Okay.    Now I'm curious, when you stated before that you were told that your testimony had to match what the kids were saying, who said that to you again?    Was that Dr. Rappaport?

    A.    Yeah.    The doctors.    Because that was the only way to help the kids.

    Q.    And they told you that?

    A.    Yes.

    Q.    At that time what you were saying, what you

```
 1    were not saying, was it matching up to what the kids

 2    had said?  Do you recall?

 3         A.   No, it's just I have nothing to say.

 4         Q.   So at that point in time, this is between

 5    deposition and trial time, you still had nothing to

 6    say?

 7         A.   No.  Before deposition they were already

 8    seeing me.

 9         Q.   All right.  Okay.  Because when you gave

10    your deposition you made the allegations or you

11    started giving the statements that things did happen.

12    Do you recall that?

13         A.   Right.

14         Q.   All right.  So I just don't want to get

15    confused here.  Because you said before between

16    deposition and trial that's when they worked with

17    you --

18         A.   Right.

19         Q.   -- to match up what you were going to say

20    with the children.

21         A.   No.  They were -- they were seeing me before

22    the depositions.

23         Q.   All right.

24         A.   I had to get ready for the depositions --

25         Q.   Okay.  I got you.
```

```
 1        A.    -- and then the trial.

 2        Q.    I got you.  Okay.  So it even started before

 3   your deposition?

 4        A.    Yes.  Way back.  We had to work long hours,

 5   and every day, even weekends.  I was tired, very

 6   tired.

 7        Q.    Do you recall what month that might have

 8   been?

 9        A.    I have no idea.

10        Q.    Do you recall about how far in advance of

11   your deposition it was?

12        A.    No.  I have no idea about the time or

13   anything else.  Back then -- I can hardly remember the

14   events of back then, less the time.

15        Q.    All right.  Now you said before that at some

16   point in time you were shown a picture of Frank.

17        A.    Yes.

18        Q.    Is that correct?

19        A.    Hm-hmm.

20        Q.    And I think you also indicated that doctors

21   told you that -- that he was bad.  What did they say

22   about Frank?

23        A.    No, they just told me if I recognize him.

24   And because I was so afraid of him I would break down.

25   You know, even today I --
```

53

1     Q.   So when they would show you a picture of him

2   you started to cry?

3     A.   Yeah.  Because I'm -- you know, I'm afraid

4   of him -- well, today I'm -- I guess I'm not as afraid

5   as I was ten years ago, but yes, back then I remember

6   break down and crying.  And I thought he was going to

7   get me.  And I used to have nightmares he was going to

8   get me.

9     Q.   Did they -- other than that -- how many

10   times did they show you his picture?  Just once?

11     A.   No.  A couple of times.  When I was --

12   because sometimes I refused to talk or I didn't want

13   to talk about anything else, and I told them I have no

14   dreams or nightmares, even though I was having them,

15   because I was so tired.

16          And so when they would show me the picture

17   I will get mad and, you know, I will get angry and

18   I will get afraid, and then I will start talking about

19   the nightmares or about him.

20     Q.   Just give me one moment here.

21          All right.  Now do you want to say

22   something?

23     A.   No, no.  I was -- you know, I think I told

24   you this before.  I just -- you know, I like somebody

25   to explain me what happened, what happened to me.

54

```
 1        Q.   Let me ask you this, Ileana:  When you gave

 2   your deposition and when you gave your testimony at

 3   trial, were you still taking medication, if you

 4   recall?

 5        A.   Yes.  The nurse always came in.  I needed to

 6   rest.  I remember the rooms were very cold, too.  The

 7   room was very cold.

 8        Q.   The jail cell?

 9        A.   Yes.  And that would -- that would help me

10   sleep.

11        Q.   Well, my question was when you went to give

12   your deposition in September and when you testified at

13   trial do you recall if you were taking medication then

14   or not?

15        A.   Yeah, I was -- I mean the nurse kept giving

16   it to me.  There must be records of it.  I don't know.

17        Q.   Okay.

18        A.   But the only time I felt totally clean was

19   when I was in Lowell when I was sent to the youth

20   offender program, because over there I didn't get

21   medications or anything.

22        Q.   All right.  Now I just want to -- I know

23   it's going to be real difficult for you, but I just

24   want to talk briefly again about -- about Frank.

25             You indicated that you were afraid of him
```

1  back then, and that you told the doctors about this.

2  Is that correct?

3      A.   Yes.

4      Q.   Why were you so afraid of him?

5      A.   Because when -- when I used to live with him

6  he was -- he used to treat me really bad and he used

7  to hit me.  And I was never myself.  But he told me

8  what to do, what not to do, what to wear and what not

9  to wear.  And before I knew it I was in this problem

10 and I was arrested.  And I didn't know a lot of things

11 about him.  So I came to realize who I was with for

12 those months.

13     Q.   And --

14     A.   But, you know, but I didn't have no memories

15 of the charges of abusing kids.

16     Q.   But you had memories of Frank treating you

17 bad?

18     A.   Yeah.  And that I have --

19     Q.   That was part of your life?

20     A.   Right.  And that -- that happened to me.

21     Q.   Versus what happened to the children?

22     A.   Exactly.  I have no memories of that because

23 nothing really happened.  I mean nothing.  I just

24 remember them being there and the parents coming and

25 pick them up.

1      I don't know.  You know, I have no

2  experience with kids and, you know, that's -- you

3  know, that's the truth.  You know, I have no

4  experience if -- if a kid was to wait for too long,

5  that type of thing maybe happened, but I have no

6  memories about anything happening at all in the house

7  with the kids.

8      Q.   Why do you think that is?

9      A.   Why what?

10     Q.   Why do you think you have no memories of it?

11     A.   Because those things never happened.  They

12  only -- the big questions that I have had this year is

13  how come I only remember to my nightmares back then,

14  and how come those nightmares are fading, you know, to

15  the point that this day I don't have no memory -- I

16  mean no nightmares?

17     Q.   Let me ask you this:  When talking about

18  remembering, when you would have your sessions with

19  Drs. Rappaport and Haber, what would happen if you

20  told them that you didn't remember something?

21     A.   Right.  What would happen?

22     Q.   Yeah.  What would they say if anything?

23     A.   Well, they would get -- Dr. Rappaport would

24  get angry.  Sometimes he would laugh and would tell me

25  what would happen to me.

1    Q.   Well, when you said he would get angry, what

2  would he do to exhibit anger that you recall?

3    A.   He would stand and he would go like that

4  with his hands, and say why, you know, why you don't

5  remember, you know, do you want to spend the rest of

6  your life here, you know.  And do you want this to

7  happen again to other kids, and what type of person

8  you are.

9         But I didn't remember.  You know, I -- and

10  then they said that to help me remember they will tell

11  me what the kids were saying and would read me notes

12  from what the kids were telling the Bragas.

13    Q.   They had these notes in the session room

14  with them?

15    A.   Yes.

16    Q.   Now you just indicated that they would say

17  to you that they would help you to remember.  Correct?

18    A.   Yeah.

19    Q.   Would they -- would they tell you any

20  exercise or anything that you could do to help

21  yourself remember?

22    A.   Just that I -- before going to bed, like I

23  said before, I was supposed to close my eyes and I was

24  supposed to think of the house.  And I was supposed to

25  be standing in front of the house, and I was supposed

1   to walk towards the house, towards the front door.

2   And that I was afraid to open it, and I was supposed

3   to open the door, and I was supposed to see what was

4   happening.

5           And before I knew it I would fall asleep and

6   that's what would happen.  And I -- plus I was

7   sleeping all the time, so --

8       Q.   Did you feel tired?

9       A.   Yeah.  All the time tired.

10      Q.   Did you know what time of day it would be or

11  day of the week?

12      A.   No.

13      Q.   Were you able to keep track of time?

14      A.   No.  There were sometimes I remember.  But I

15  don't remember, but my mother said that, you know, she

16  went to see me and that I didn't recognize her.  But I

17  don't remember doing that.

18      Q.   Do you recall as we sit here today -- do you

19  recall what your -- what the bulk of your testimony

20  was at trial?

21      A.   What the what?

22      Q.   What -- do you recall what your testimony

23  was about at trial?  Do you recall what you testified

24  to?

25      A.   It was the same things that I was telling

```
 1    the doctors of the nightmares.  And even before that I

 2    gave my testimony, they repeated the same things to me

 3    on the last sessions because they didn't want me to

 4    make no mistakes, they said.

 5          Q.   Did they say that to you?

 6          A.   Yes.

 7          Q.   We don't want you to make any mistakes?

 8          A.   Hm-hmm.

 9          Q.   And that was Dr. Rappaport and Dr. Haber?

10          A.   Yeah.

11          Q.   Anybody else tell you that?

12          A.   Yes, but they really believed that those

13    were my memories.  You know, I think they really

14    believed it then.

15          Q.   I think I've just about covered everything

16    that I wanted to cover here with you today, Ileana.

17               Anything else that you can think of that,

18    you know, we've spoken about here today that you've

19    told me that you might want to add to, or anything

20    else that you can think of that I may not have

21    inquired about that you would like to make part of

22    your statement here today?

23          A.   No, just that -- that I'm still trying to

24    clear up what happened, you know, after knowing that

25    there could be a possibility that these things never
```

1  happened.  You know, I just -- I want to know the

2  truth.  But the truth of it is that none of these

3  things happened because there's no way that I cannot

4  remember.  How come I remember what I was six years

5  old and how come I remember my school?  I even

6  remember the bad times I had with Frank.  And I don't

7  remember anything with the kids.  And I always had

8  the -- you know, after getting out of the prison, you

9  know, I told myself that maybe the kids would grow up

10  and they will remember, too, that nothing happened to

11  them.  And that maybe if that happened then I'll know

12  what really happened to me.

13          And the only things I remember is what I

14  briefly told you, you know, is the times in jail.

15  That's what's been traumatic to me.  The times in jail

16  were awful.  I mean I had -- I have no peace at all.

17  I remembered that -- the lights, the coldness, the

18  people banging on the doors, you know.

19          And then the doctors, they were there day

20  and night.  They were there on the weekend.  And I

21  didn't rest until I said whatever I had to say, you

22  know, whatever would help the kids in court, because

23  otherwise he was going to get out and he was going to

24  get me.

25          Q.   I'm just going to -- couple of quick

1    questions.

2            How much time did you serve in prison?

3        A.   I served five years, a little bit over five

4    years.

5        Q.   That included your jail time?

6        A.   Yeah, including my jail time.

7        Q.   What happened when you were released from

8    the Florida State prison system?

9        A.   I was deported.

10       Q.   Where?

11       A.   To Honduras.

12       Q.   And how much -- how much further do you have

13   to go in education until you get your degree?

14       A.   I should get -- by the middle of next year I

15   should get my degree.  And then I want to continue and

16   get my Master's degree.

17            MR. COHEN:  All right.  I don't have

18       anything further.

19            I'm going to conclude this statement at

20       approximately 1:55 P.M.

21            (Thereupon, the statement was concluded at

22   1:55 P.M.)

23

24

25

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA
     COUNTY OF BROWARD
 3
              I, the undersigned authority, certify that
 4   ILEANA FLORES personally appeared before me and was
     duly sworn by German E. Leitzelar Vidaurreta, an
 5   Attorney and Notary Public in Tegucigalpa, Honduras.

 6            WITNESS my hand and official seal this 17th
     day of October, 1994.
 7

 8              Barbara J. Rendina
                Barbara J. Rendina
 9              Notary Public - State of Florida

10                          OFFICIAL SEAL
                            BARBARA J. RENDINA
11                          My Commission Expires
                              March 1, 1996
                            Comm. No. CC 178208
12       REPORTER'S STATEMENT CERTIFICATE WITH ACKNOWLEDGMENT

13   STATE OF FLORIDA
     COUNTY OF BROWARD
14
              I, BARBARA J. RENDINA, a Certified Shorthand
15   Reporter, certify that I was authorized to and did
     stenographically report the foregoing statement; and
16   that the transcript is a true record of the testimony
     given by the witness.
17
              I further certify that I am not a relative,
18   employee, attorney or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
19   attorney or counsel connected with the action, nor am
     I financially interested in the action.
20
              Dated this 17th day of October, 1994.
21
                Barbara J. Rendina
22              Barbara J. Rendina
                Certified Shorthand Reporter
23

24

25
```

1

2   STATE OF FLORIDA
    COUNTY OF BROWARD

3

        The foregoing certificate was acknowledged
4   before me this 17th day of October, 1994 by Barbara J.
    Rendina who is personally known to me.

5

6                           *Dawn M. Whitmarsh*

7                           Notary Public - State of Florida
                            My Commission No.
8                           Expires:

9                           NOTARY PUBLIC, STATE OF FLORIDA.
                            MY COMMISSION EXPIRES: July 31, 1996.
10                          BONDED THRU NOTARY PUBLIC UNDERWRITERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NORMAN REICHENBERG, Ph.D.

DADELAND WEST BUILDING

SUITE 109

10621 NORTH KENDALL DRIVE

MIAMI, FLORIDA 33176

PHONE (305) 274-9112

July 30, 1985

Judge Robert H. Newman
Metropolitan Justice Building
1351 NW 12th Street
Miami, Florida 33125

Case No. 84-19728 B

Psychological Evaluation of Ileana Fuster

This 18-year, 9-month-old, married girl was referred
for psychological evaluation and was seen at the
Women's Detention Center on 7/29/85.    She was
initially tense and anxious, but became more at ease
as the examination progressed.  She functioned in an
organized and integrated fashion with no suggestions
of manipulative behavior during the psychological
examinations.

She indicated that she has lived in Miami for 3½ years,
coming from Honduras, and that she  was married at
age 16 in September of 1983.    There is a step-son
from the husband's previous marriage but she has no
children of her own.  Both of her parents are living
but were divorced when the defendant was approximately
6.  She was raised by her father.  She and a younger
sister came to the United States in 1983.  She gave
her occupation as "housewife."

She completed the Information Sheet, Bender Designs,
HTP Drawings, a Sentence Completion Form, and the
Rorschach.  All of the psychological response pat-
terns indicated the gross emotional immaturity in
this individual and indicated, strongly, that she is
a submissive and subservient individual, particularly
where males are involved.

Bender Designs, HTP Drawings and the Sentence Com-
pletion Form were remarkable in indicating the in-
tense emotional immaturity; her drawing of a house
was similar to those obtained from young children.

—OFSHE Exhibit #3

Ileana Fuster _____ Page 2

The Bender Designs and the Drawings indicate that
she is an affect-starved individual who would be
easily manipulated by adult males.

Sentence Completion items included:  I DREAM about
my school and friends; MY MIND is sometimes tired of
thinking;  MOST BOSSES are very bossy persons; I HAVE
A FEELING that I will see my father again; and AS A
CHILD I used to play all day with my toys.

There were several completions regarding school and
her regret that she had stopped school, and when
asked why she didn't finish school, she stated: "My
husband didn't let me.  He said, "It's not a wife's
place."  The examiner feels that, in view of the
gross emotional immaturity, the submissiveness indi-
cated is genuine.

She handled the Rorschach effectively and appropriate-
ly, but the turmoil involving the father figure symbols
emphasized the submissiveness, particularly in her
response to Card 4, where the figure appeared to be
"King Kong, looking down" and then elaborated her
response in terms of, "You don't ask questions."
That is, the figure was excessively dominant and it
must be remembered that she is dealing with symbols,
and the response was not obtained in terms of concrete
questions regarding the father figure.  In addition,
the patterns were seen repeatedly in terms of gross
emotional immaturity, and the Rorschach confirmed the
earlier findings that she functions, almost completely,
in terms of child-like obedience to authority.

In the opinion of the examiner, this defendant is an
organized and integrated individual and no psychotic
processes appeared.  While intellectually she would
have no difficulty functioning in the bright normal/
superior ranges, the enormous difference between her
intellectual ability and the almost child-like func-
tioning in affective situations suggested that she
would be vulnerable to pressure, particularly from
adult males.  Her need to be accepted by them is in-
tense and of long-standing.

Psychological Associates of Miami

326 N.E. 26th Street
Miami, Florida  33137
(305) 573-7373

Psychological Report
Privileged and Confidential

August 03, 1985

Hon. Robert H. Newman
Judge, Circuit Court
Eleventh Judicial Circuit of Florida
Metropolitan Justice Building
1351 N.W. 12th Street
Miami, Florida  33125

Re: Ileana Fuster
CC: 84-197266

**REFERRAL DATA:**

Ileana Fuster was examined at the Women's Detention Center on August 01, 1985, pursuant to a Court Order issued by Circuit Court Judge Robert H. Newman. The examination was conducted in order to evaluate the issues of competency, sanity, and involuntary hospitalization in regard to the criminal charges brought against Ileana Fuster (Sexual Battery).

**TESTS ADMINISTERED:**

Psychological Interview
Mental Status Examination


OFSHE Exhibit # 4

Re: Ileana Fuster
CC: 84-19768A

PRS. HISTORY:

Ileana Fuster was examined by Dr. Leonard Haber on 08/01/85 at the Women's Detention Center pursuant to a Court Order issued by the honorable Circuit Court Judge Robert M. Newman. Mrs. Fuster entered the examining room hesitantly but willingly and was cooperative although cautious and seemingly frightened. The subject correctly identified the date of examination as 08/01/85, her location as the Women's Detention Center of the Dade County Jail, the examiner as Dr. Haber, her date of birth as 11/28/66, her age as 18 and her birthplace as Honduras.

The subject explained that she came to Miami for the first time at the age of 15, in December of 1981. She came from Honduras with her 13 year old sister. She had been living in Honduras with her father all of her life. She reported that her mother left the family when she was 6 years old and came to Miami. The subject had no idea that her mother had remarried. At the age of 15, she and her sister desired to live with their mother and came to Miami. They had been apart from her for 9 years. When the subject arrived here with her sister, she found her mother living with another man. She stated, "I did not have a good relationship with him — we were jealous". They thought their mother was living alone and were disappointed to find her living with another man. They were upset that their father never told them of the divorce and remarriage.

The subject attended school in Miami at Curley Notre Dame High School, a private Catholic school. She finished the 10th grade. She did not know English when she first entered the school but, "I did not flunk anything — I had B's and C's". After the summer of her 10th grade she met her husband to be, Frank Fuster and, "did not go back to school because I had to marry Frank". She explained that the reason she had to marry Frank was because, "the way I was raised when you had sex with a man you had to marry him". She explained the encounter with her husband's son, the meeting with him and then explained the circumstances that led up to her sexual contact with him, his intimidation of her and her belief that she had to marry him.

The subject has no work history except that she engaged in, "taking care of friends' children in my house where we were living". She was married for the first time on 09/23/83 at the age of 16 to her current husband who has a prior marriage and a five and a half year old son, Noel. Her husband was 34 years old at the time. The subject reports no history of treatment or hospitalization for mental or nervous disorder. She reports no use of psychotropic medications. She reports no difficulty with the community, the law and no prior arrests. The subject denies any abuse of beer, alcohol, marijuana.

- 3 -

or any illegal drugs. She does not smoke. Her only use of marijuana occurred at the "demand" of her husband who insisted that she had to have sex with him and to make it possible for her to comply with that request. The subject is aware that she is represented by counsel. She identified her attorney as Michael Von Zamft.


TEST RESULTS

The subject presented as neat, clean and well groomed. Her comprehension and speech were good even though she learned to speak English only a few years ago. The subject presented as cooperative but cautious and fearful. She was emotional, tearful, yet coherent, alert, intelligent, pleasant and soft spoken. She was "embarrassed" about her situation which includes the "humiliation" she feels will result from people knowing about her relationship with her husband and the way in which he treated her. She was very sensitive and concerned about media exposure about her life so that "all will know". For her distress, she occasionally takes Elavil and some "pain pills" for problems with backache.

The subject's eye contact was good. She was well oriented for time, place and person, her memory for recent and remote events appeared adequate and her thought processes were productive and goal oriented without evidence of tangential or circumstantial reasoning. The subject demonstrated no loosening of associations and no ideas of reference. Her fund of information was adequate. She denied any paranoid, suicidal or homicidal ideation as well as any hallucinations, delusions or depressive symptomatology. At this time her judgment appeared to be adequate although she claims to maintain ideas of an "old world" type.

The subject presented as a depressed, potentially hysterical, immature, and easily led individual who is simple in her orientation, lacking in worldly knowledge or sophistication, and possibly with a bent toward superstition. She appeared to have an acceptable appreciation of the charges placed against her, as well as their seriousness, an appreciation of the range and nature of possible penalties, an acceptable appreciation and understanding of the adversary nature of the legal process, a capacity to disclose to her attorney pertinent facts surrounding the alleged offense, to relate to her attorney, assist her attorney in planning her defense, realistically challenge prosecution witnesses, manifest appropriate Court Room behavior, testify relevantly in her own behalf and appeared motivated to help herself in the legal process.

Based upon the youthfulness, inexperience, temperament, ease of being manipulated, existing feelings of intimidation and fear of her husband, feelings of shame and embarrassment regarding the intimate details of her life, the subject may become adversely impacted by two factors in regard to her competency to stand trial. Those two factors are the media coverage of the intimate details of her life and the presence of her husband at the trial which is a source of

- 4 -

distraction and serious concern to her. Although these factors appear to be important, they do not overshadow the subject's overall competency to stand trial at this time.

Competency to stand trial:

Based upon test results and available information, the subject appears competent to stand trial at this time. However, it should be noted that she will be more sensitive than most for reasons already mentioned to the issue of media coverage of the intimate details of her life and to the issue of possible intimidation by her husband.

Thank you for the opportunity to examine this interesting person, and to be of service to the Court. If there is any other way in which I can be of assistance, please do not hesitate to call on me.

Leonard Haber, Ph.D.
Licensed Psychologist

SANFORD JACOBSON, M. D.
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY
CERTIFIED, AMERICAN BOARD OF FORENSIC PSYCHIATRY

PROFESSIONAL ARTS CENTER
SUITE 305
1150 N. W. 14TH STREET
MIAMI, FLORIDA 33136

TELEPHONE 324-4212

July 31, 1985

The Honorable Robert H. Newman
Circuit Court
Eleventh Judicial Circuit of Florida
Metro Justice Building
1351 N.W. 12 Street
Miami, Florida 33125

Re:  Fuster, Ileana
Case No. 84-19728B

Dear Judge Newman:

Ileana Fuster is an 18-year old Honduran-born Caucasian
female seen for psychiatric evaluation at the Dade County
Jail's Womens Annex on July 30, 1985 in connection with a
number of counts of sexual battery and a number of counts of
lewd, lascivious or indecent assault upon a child.  There is
also a charge of aggravated assault.  These alleged offenses
apparently occurred between January and August of 1984.  The
defendant was seen primarily to determine her present com-
petency for legal proceedings.  I did not discuss with her
events surrounding the alleged offenses.  The charges are so
complex that I could not really begin to discuss these with
her in the limited time allotted and there also was a wish
on her part not to discuss these with me.  I did receive some
material from the State Attorneys Office through Mr. Hogan,
which consisted of police reports as well as statements in
the form of notes made by a number of parents of the victims
of the alleged offense.  I received from the defendant's
counsel, Mr. Von Zamft, other material including copies of
memoranda, copies of letters from Mrs. Fuster's husband and
copies of several letters to Dr. Mutter who has apparently
seen the defendant on a number of occasions for purposes of
evaluation.  Mr. Von Zamft suggested that I contact an

— OFSHE Exhibit # 5   —

Fuster, Ileana
Page Two

Assistant Chaplain at the women's annex, but as of the time
of this dictation, that had not been done.  That information
can be considered at a later time.

HISTORY AND EXAMINATION.   It would appear that counsel
for the defendant is claiming that the defendant is not
competent for legal proceedings because of her level of
immaturity and her subjugation to the co-defendant, her
husband, Frank Fuster.  Her counsel feels that the defendant
does not understand the nature of the proceedings and will
not be able to aid and assist counsel because of her domina-
tion by her husband and, for that reason, cannot assist and/or
testify in her own behalf if instructed not to do so because
of the control of her husband, the co-defendant, Frank Fuster.

The interview with the defendant, which lasted one
hour and fifteen minutes, was limited in scope.  I reviewed
her jail medical record and noted that she was receiving
Elavil, 25 mg. once or twice daily as necessary.  It seems
that she took the medication on a fairly regular basis.  It
was apparently prescribed because of some symptoms of anxiety
and depression.  She was also receiving Motrin for menstrual
cramps or pain.

The defendant entered the interview situation in a
willing and polite fashion.  I initially explained that
communication with me was not privileged or confidential,
and that if there was anything she wished not to discuss with
me, to advise me of that and I would not try to go against
her wishes.

She explained to me that she was born in Honduras in
the city of Progresso which is on the coast.  Her father
apparently still lives there while her mother is here.  She
noted that she has one younger sister some 2½ years her
junior and a number of half-brothers and sisters.  Most of
them are from a previous marriage of her father and one
half-brother from a previous marriage of her mother.  She
had apparently lived with her father in Honduras after her
parents separated when she was about 5 or 6 years of age.
She did not tell me that her parents may never have been
married but some information supplied by Mr. Von Zamft
seemed to indicate that that might be the case.  She came
to the United States in 1981 when she was about 15 years
of age, to live with her mother.  She was not aware at that
time that her mother had remarried and I am not sure if her

Fuster, Ileana
Page Three

mother had actually remarried or met someone after the
defendant arrived here in the United States.  The defendant
told me that she had always hoped that her parents would
eventually reconcile and that it was a disappointment to
her to find out that that would not happen.  Apparently there
were some adjustment problems at home with her mother and
stepfather.  She seemed to resent her mother being married
or involved with someone else and felt some jealousy and
disappointment.  Perhaps she had always had an idealized
view of her mother, who had been away from her for some
nine years, and could not deal with the reality of her
mother's new relationship.  Because of this, she really did
not want to continue living at home.  It was not long
thereafter that she met her husband, Frank Fuster.  Actually,
she met him through his son.  She described her initial
contact with the son and how she then met her husband-to-be.
She describes feeling sorry for his son, Noel, and how this
led to her enjoying some conversations with Frank Fuster.
She was reluctant to talk about how she came to marry her
husband.  She noted that her family tried to dissuade her
from doing this but she went ahead with it anyway.  She asked
if she had to talk about this and, while I did not force her
to do so, she hesitated.  It did not seem to relate to the
charges against her so I urged her to tell me and she told
me a little bit, indicating that her husband had forced her
to submit to sexual intercourse which was without her consent.
I asked her if he had raped her and she told me that she
did not like the word "rape".  I did not get a clear under-
standing of the nature of the claimed sexual assault on the
part of her husband, but Mr. Von Zamft apparently described
her description of it in some of the material provided.

    The defendant indicated that because of her religious
beliefs and her guilt that she, at that point, felt that she
had to marry her husband.  She also felt that because of her
no longer being a virgin that her family would reject her.
She describes a fairly strong religious background in Honduras,
but acknowledged that she very infrequently went to church
here in the United States.

    After her initial sexual contact, she claims that her
husband would beat her and abuse her physically.  She
describes this as occurring both before and after the
marriage.  She describes being afraid of him.  While she did
not describe or discuss the details surrounding the many

Fuster, Ileana
Page Four


alleged offenses, she indicated that she was frequently
beaten by her husband during the course of their marriage
and that she was afraid to argue with him.  For this
reason, she claimed that she was afraid to go to trial
because she felt that he will become upset with her again
and, in some way, possibly harm her.  I asked her how she
thought this could come about, particularly if he was
convicted, but she provided no explanation.  She noted, with
some ambivalence, that she had always believed that her
husband would do whatever he said and that he had a bad
temper and, because of this, that she was often unable to
deal with him and had to do whatever he said or else he
would continue to hit her.  Going for help was not some-
thing that occurred to her because of her great fear of him.
She wondered if indeed he could still hurt her today.  The
defendant went on to explain that she just did not want to
be in front of him, that she feared that he would hurt her
in some way, and that it was clear that I did not under-
stand the problems that she had in dealing with him and
facing him in court.  I asked what she would do if she was
tried separately and if her husband testified at her trial
and if she would be able to tolerate this.  She indicated to
me that she did not know how she would handle this.  I tried
to explore her feelings about going to court and she noted
that she had never been in a trial before and had never
even been in the custody of police.  Going to court was a
new experience and she was frightened and her fears were
magnified by the previously-noted concerns about her husband.

     The interview with the defendant and the mental status
examination disclosed a small, slim Caucasian female appearing
about her stated age.  She was generally comfortable during
the interview and her anxiety level was within acceptable
limits.  She provided information in an organized and goal-
directed manner.  Associations were not fragmented or loosened.
There seemed to be some hesitation on her part in discussing
the claimed sexual assault by her husband and she avoided
being very direct about that.  Other than that, and her
reluctance to discuss any of the details about the alleged
offense, she was quite goal-directed and to the point.  Verbal
abilities were quite acceptable considering the fact that
English was her second language.  There were no hallucinations
and I saw nothing to suggest delusional thinking.  She
described the previously-noted fears of her husband but these
could not be considered phobias. To her they were realistic

Fuster, Ileana
Page Five

fears and I do not know how to evaluate the validity of
her claims.  I found her relatively convincing in the way
in which she expressed her views.  Mood was not overtly
depressed and only on one occasion did I note her to be
tearful and that was when she was talking about her fear
of her husband.  She denied any morbid or suicidal ideation.
Her affect was at all times appropriate to her thought
content and behavior.  There was nothing to suggest grandio-
sity or other types of paranoid ideation.  Her manner was
that of a soft-spoken, polite woman who was not overtly
aggressive or demanding.  She would be seen as somewhat
compliant but any view of her as having the maturity of a
6-year old would be simplistic.

Testing of special faculties showed her to be
oriented in all three spheres.  She had a good fund of
general information and commented on recent news items.  She
was able to handle calculations in a manner consistent with
her educational level.  She abstracted well.

SUMMARY AND CONCLUSIONS.  With respect to the psy-
chiatric-legal issues, it is my opinion that the defendant
is presently competent for legal proceedings and has sufficient
present ability to communicate with counsel with a reasonable
degree of rational understanding.  She possesses both a
rational and factual understanding of the charges.  An
assessment of the various factors considered indicates that:

A.  The defendant's appreciation of the
    charges is very acceptable.  She is
    well aware of the charges and noted
    that her attorney explained these to
    her and that she understood them.

B.  The defendant's appreciation of the
    range and nature of possible penalties
    is again quite acceptable or could
    become as acceptable as necessary
    with additional explanations.

C.  The defendant's understanding of the
    adversary nature of legal process is
    acceptable.

Fuster, Ileana
Page Six

D.  The defendant's capacity to disclose
    to attorney pertinent facts surrounding
    the alleged offense is acceptable.
    While the defendant has indicated that
    she did not want to discuss her
    recollections with respect to the many
    alleged offenses, she indicated that she
    had no problem with her memory and that
    she could and has discussed these with
    her counsel.

E.  The defendant's ability to relate to
    attorney is good since she appears to
    relate well with me.

F.  The defendant's ability to assist her
    attorney in planning defense is acceptable
    based on what would appear to be good
    intelligence, good verbal abilities, and
    the absence of any mental disorder which
    would interfere with her thought processes.
    Certainly there is a possibility that she
    might be very anxious at the trial and this
    could affect her concentration, but I do not
    think that that is anything peculiar or
    specific to this defendant.

G.  The defendant's capacity to realis-
    tically challenge prosecution witnesses
    is acceptable although I do not know enough
    about her version of the alleged offense
    to determine possible contradictions in
    testimony that she might have to challenge.

H.  The defendant's ability to manifest
    appropriate courtroom behavior is acceptable
    although indeed she might be anxious and
    possibly distraught at certain points in the
    trial.  This, however, is not something rare
    or unusual and defendants are certainly known
    to have outbursts without being incompetent.

I.  The defendant's capacity to testify relevantly
    is acceptable.

Fuster, Ileana
Page Seven

    J.  The defendant's motivation to help
        herself in the legal process is
        acceptable.

    K.  The defendant's capacity to cope with
        the stress of incarceration prior to
        trial is acceptable.


    The defendant's claim of incompetence because of her
fear of the defendant's husband and her domination by him
is an unusual claim.  It may well be that she is fearful
of him, has been dominated and abused by him in the past,
and is afraid of what he might do to her in the future.
However, the defendant makes it clear that she is likewise
fearful of the trial itself and her fears of her husband
are difficult to distinguish qualitatively from any fear
that a defendant might have of the legal process and how
they will behave or function at a trial.  I would not be
able to conclude that the defendant is incompetent because
of these kinds of fears.  In addressing all of the various
issues considered, she performs very well and there is
little or no reason to consider her incompetent on the basis
of any mental disorder or her ability to function in the
previously-noted areas.

    At this time the defendant would not meet the criteria
for involuntary psychiatric hospitalization.

    I see nothing to suggest that the defendant was
insane at the time of the alleged offense.  The defendant
may have been involved in the alleged offense for a number
of reasons, but her involvement was not explored sufficiently
so that I might offer an explanation.

                        Respectfully,

                        Sanford Jacobson, M.D.
                        Psychiatrist

SJ/ms
cc:  John Hogan,
     Assistant State Attorney

     Michael L. Von Zamft, Esq.

Behavior Changers, Inc.
4770 Biscayne Boulevard
Suite 1020
Miami, Florida 33137
(305) 576-6410

Date: August 26, 1985

: Michael Von Zamft, Esq.
7600 West 20th Avenue
Suite 223
Hialeah, FL  33016

: Ileana Fuster

| :e | Description of Services | Time | Amount |
|----|-------------------------|------|--------|
| )1-85 | Jail Visit w/ Ileana Fuster | 1.50 hrs. | $187.50 |
| )5-85 | Jail Visit & Conf. w/ Von Zamft | 2.00 | $250.00 |
| )6-85 | "      "      "      " | 2.00 | $250.00 |
| )7-85 | "      "      "      " | 2.00 | $250.00 |
| )8-85 | "      "      "      " | 1.50 | $187.50 |
| )9-85 | "      "      "      " | 2.00 | $250.00 |
| " | Conference w/ Mr. Von Zamft | 2.50 | $312.50 |
| .1-85 | Jail Visit w/ Ileana Fuster | 4.00 | $500.00 |
| .2-85 | Telephone Conf. w/ Mr. Von Zamft | .50 | $ 62.50 |
| .3-85 | Jail Visit w/ Ileana Fuster | 2.00 | $250.00 |
| .4-85 | "      "      "      " | 1.50 | $187.50 |
| .5-85 | "      "      "      " | 2.00 | $250.00 |
| .6-85 | "      "      "      " | 1.50 | $187.50 |
| .9-85 | Jail Visit & Consultation w/ Mr. Von Zamft/Janet Reno & Mr. Hogan | 3.00 | $375.00 |
| ·0-85 | Jail Visit & Consultation with Mr. Von Zamft | 2.00 | $250.00 |
| 2-85 | Jail Visit w/ Ileana Fuster | 1.50 | $187.50 |
| " | Polygraph & Consultation w/ Mr. Von Zamft, et al | 7.50 | $937.50 |

— OFSHE Exhibit # 6 —

Behavior Changers, Inc.
4770 Biscayne Boulevard
Suite 1020
Miami, Florida 33137
(305) 576-6410


Date: September 24, 1985

: Metro Justice Building
  1351 N.W. 12th Street
  STATE ATTORNEY'S OFFICE
  Miami, FL  33125

  Attn: John Hogan


: Ileane Fuster

| Date | Description of Service | Time | Amount |
|------|------------------------|------|--------|
| 26-85 | Jail Visit to Ileana Fuster | 2.00 | $ 250.00 |
| 8-30-85 | " " | 2.00 | $ 250.00 |
| 9-02-85 | Telephone call with Ileana | 0.50 | $  62.50 |
| 9-03-85 | Jail Visit to Ileana | 2.00 | $ 250.00 |
| 9-05-85 | " " " | 3.50 | $ 437.50 |
| 9-06-85 | " " " | 2.50 | $ 312.50 |
| 9-08-85 | Telephone call with Ileana | 0.50 | $  62.50 |
| 9-09-85 | Jail Visit to Ileana | 2.50 | $ 312.50 |
| 9-10-85 | " " " | 2.00 | $ 250.00 |
| 9-11-85 | Deposition of Ileana Fuster | 8.00 | $1000.00 |
| 9-12-85 | Jail Visit to Ileana | 1.00 | $ 125.00 |
| 9-13-85 | " " " | 1.50 | $ 137.50 |
| 9-17-85 | " " " | 2.00 | $ 250.00 |
| 9-18-85 | " " " | 1.00 | $ 125.00 |
| 9-20-85 | " " " | 1.00 | $ 125.00 |
| 9-22-85 | " " " | 2.00 | $ 250.00 |


TAL AMOUNT DUE: $4,250.00


ank you,

[signature]

ry Sue Haber, Ph.D.
chael E. Rappaport, Ph.D

| :e | Description of Services | Time | Amount |
|----|-------------------------|------|--------|
| :2-85 | Visit w/ Ileana Fuster, Mr. Von Zamft, et al | 3.50 | $437.50 |
| :3-85 | Jail Visit w/ Ileana Fuster and Conf. w/ Janet Reno | 3.00 | $375.00 |
| | Review of Videotapes | 7.50 | $937.50 |

al Amount Due: $6,625.00

nk you,

ry Sue Haber, Ph.D.
h/    E. Rappaport, Ph.D

STATE OF FLORIDA,

       Plaintiff,

vs.

FRANCISCO FUSTER ESCALONA,

       Defendant.

_____/

JUL 29 1985

RICHARD P. BRINKER
CLERK

AFFIDAVIT IN SUPPORT OF
MOTION FOR SEVERANCE

BEFORE ME the undersigned authority appeared HERB SMITH, who, after first being duly sworn states:

1.  My name is Herb Smith.

2.  I am an attorney licensed by the Florida Bar and practicing as an Assistant Public Defender in Miami, Dade County, Florida.

3.  I am acquainted with Jeffrey Samek and Michael Von Zamft.

4.  On Thursday, July 18th, 1985 while having lunch with Mr.'s Samek and Von Zamft Mr. Von Zamft advised Mr. Samek and I that he believed his defense of Ileana Fuster in the case herein and Mr. Samek's defense of Francisco Fuster Escalona in the case herein would be absolutely antagonistic.  Mr. Von Zamft stated that in the course of his representation he would prosecute Ileana even more severely than the State of Florida would.  He advised Mr. Samek and I that his defense would allege that atrocities had been perpetrated not only upon the children as alleged in this case but also to his client.  Mr. Von Zamft further indicated he would not allow his client to testify at a joint trial and that he would portray Mr. Fuster as a sex fiend.

5.  Additionally, Mr. Von Zamft stated that he would point his finger at Mr. Fuster and allege that he was solely culpable throughout his opening argument in this case if Mr. Fuster and Ileana Fuster were tried in a joint trial.

FURTHER AFFIANT SAYETH NAUGHT.

— DFSHE Exhibit # 7 —

HERB SMITH

1

STATE OF MARYLAND
COUNTY OF BALTIMORE

———————————

FRANCISCO FUSTER-ESCALONA

v.

HARRY  K.  SINGLETARY

CASE NO. 97-1369-Civ-LENARD

MAGISTRATE JUDGE SORRENTINO

———————————

1.  Maggie Bruck, being duly sworn according to law, hereby says and deposes as follows:

I hold a doctorate in experimental psychology and am a Professor in the Department of Psychology at McGill University in Montreal, Canada (on leave) and as associate professor of Psychiatry at Johns Hopkins Medical Institution in Baltimore, Maryland.  I specialize in research in the field of developmental psychology.  My particular research interests focus on children's language and memory development.

I received my undergraduate degree in Psychology from Wheaton College in Norton, Massachusetts in 1967. In 1969, I received my Master's degree in Experimental Psychology from McGill University. I earned my Ph.D. in Experimental Psychology from McGill University in 1972.

My academic/research history includes experience as a Research Associate in the McGill University Department of Psychology (1972) and at the McGill-Montreal Children's Hospital Learning Center (1972-1975). I served as a Senior Staff Member of the Center for Applied Linguistics in Arlington Virginia in 1975 and 1976. From 1976 through 1993 I was the Research Director at the McGill-Montreal Children's Hospital Learning Center. From 1976 through 1992, I was an Associate Member of the Department of Psychology at McGill University. Since 1991 I have been an Associate Professor in the Department of Psychology and Department of Pediatrics at McGill University.  I was appointed to full Professor in Psychology in 1998.  At present, on leave from McGill, I am an associate professor in the Department of Psychiatry at Johns Hopkins School of Medicine.

Since 1971 I have taught the following subjects: Educational Psychology (McGill); Tests and Measurement (McGill); Language Development (Sir George Williams University); Research Methods in Psycholinguistics (McGill); Childhood Psychopathology (McGill & Concordia

2

Universities); Graduate Clinical Seminar (McGill); Psychology of Language (McGill); Graduate Cognitive Seminar (McGill); Experimental Problems (McGill); and Reading Ability and Reading Disability (McGill); Children in the Courtroom (McGill). I have also served as a Senior Lecturer in the Senior Resident Ambulatory Rotation in the McGill University Department of Pediatrics.

My administrative experience includes tenure as the: Research Director at the McGill University Children's Hospital Learning Center; Acting Director McGill-Montreal Children's Hospital Learning Center; and Assistant Director of the Learning Center of Quebec.

I have served on several University committees including the Cyclical Review Committee for the Department of Otolaryngology; Graduate Faculty Social Science Research Grants Committee, Graduate Faculty Social Science Research Grants Committee (Chair), Graduate Faculty Council, Graduate Fellowship Committee, and Committee on Non-medical Research involving Humans.

I have also reviewed numerous research grants for organizations including: the Social Science and Humanities Research Council; the Natural Sciences and Engineering Research Council of Canada; the McGill-Montreal Children's Hospital Research Institute; Les Fonds de la Recherche en Sante du Quebec; B.C. Health Care Research Foundation; the National Institute of Health; and the Ontario Mental Health Foundation. I have reviewed articles for the Canadian Journal of Behavioral Science; Reading Research Quarterly; Canadian Journal of Psychology; Developmental Psychology; Memory & Cognition; International Journal of Behavioral Development; Journal of Experimental Psychology; British Journal of Psychology; Law & Human Behavior; and Applied Cognitive Psychology.

I have served as a member of the following Review Committees: National Health and Welfare Canada Development Program; American Psychological Association (Division 7); Society for Research in Child Development; and the Advisory Committee Massachusetts General Hospital Institute of Health Professionals. I also serve or have served on the Editorial Boards of the following scientific peer review journals: Applied Psycholinguistics; Journal of Experimental Child Psychology; Psychology, Public Policy and Law; Child Development; and Journal of Experimental Psychology: Applied.

I am a member of the American Psychological Society, the Society for Research in Child Development, and The Psychonomics Society.

I have received nearly two dozen research grants during the last 20 years.  I have published some 60 articles in peer reviewed publications, 16 book chapters and co-authored with Stephen Ceci, Ph.D. *Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony*, American Psychological Association: Washington, D.C. (1995). Dr. Ceci and I won the Robert Chin Memorial Award for the most outstanding article on child abuse in 1994 for our article The Suggestibility of Child Witnesses: An Historical Review, *Psychological Bulletin*, 113 403-439

3

(1993). I have also presented more than 40 peer reviewed papers at professional conferences and presented more than 50 invited addresses.

2. I have testified as an expert trial witness in *North Carolina v. Robert Fulton Kelly*; and in *R. v. Linda Sterling* (Saskatchewan) and at evidentiary hearings in *Commonwealth of Massachusetts v. Cheryl Amirault LeFave*; and *California v. Scott Kniffen, Brenda Kniffen, Alvin McCuan, and Debora McCuan*. I have participated as amicus curiae in *New Jersey v. Margaret Kelly Michaels* (New Jersey Supreme Court) and *Snowden v. Singletary* (United States Court of Appeals for the 11th Circuit). Facts and issues in these cases were similar to those present in this case.

3. For the past 9 years, I have conducted research in the area of the reliability and credibility of children's testimony. With my colleague, Dr. Stephen Ceci, I have conducted a number of experimental studies on the factors that influence children's suggestibility; these have been published in peer-review journals. I have reviewed the materials of a number of actual legal cases of alleged sexual abuse of children, either in the capacity of an expert witness or consultant. To a large extent, many of these materials have motivated my research studies.

4. I have been asked by defense counsel for Francisco Fuster-Escalona to review a number of documents, which are set out below. This affidavit contains a review of the scientific research literature on (I) the disclosure patterns of sexually abused children and (II) the effects of various interviewing techniques on the recall of young children. The affidavit also contains my expert opinion on the uses of various suggestive interviewing techniques as well as a scientific appraisement of the testimony of the expert witnesses who testified in *Fuster*.

5. Counsel has sent for my review the following documents:

1.   Police Investigative Files
2.   Medical Reports from the Jackson Memorial Rape Treatment Center.
3.   Trial testimony of Dr. Roland Summit
4.   Trial testimony of Dr. Jerome Poliacoff
5.   Trial testimony of Dr. Simon Miranda
6.   Trial testimony of Dr. Barbara Goldman
7.   Trial testimony of Laurie Braga
8.   Trial testimony of Joseph Braga
9.   Trial testimony of Doris Stiles
10.  Trial testimony of Dr. Lee Coleman
11.  NG Transcripts of Braga interviews on 8/13/84, 8/14/84, 8/15/84 and 11/26/84; and interview with Dr. Simon Miranda on 11/27/84
12.  JC Transcripts of Braga interviews on 8/9/84 (2 vols., part w/ brother), 8/13/84 (part with BT), 8/20/84 and 8/28/84
13.  TL (a girl) Transcripts of Braga interviews on 8/9/84, 9/10/84, and 1/28/85
14.  JL Transcripts of Braga interviews on 9/19/84 and 1/17/85

4

15.   RL's trial testimony (JL's mother)
16.   SM transcripts of Braga interview on 8/17/84 and 1/25/85
17.   AP transcripts of Braga interviews on 8/16/84 (along with younger brother) and 1/14/85
18.   BT transcripts of Braga interviews on 8/10/84, 8/12/84, and 8/30/84
19.   Trial testimony of Linda Cooper, social worker for Child Protective Team
20.   Deposition of Ellen St. Laurent
21.   Deposition of Phylis Wilker.
22.   Deposition of Steven Paul Allen
23.   Deposition of Mary Lerow

I.      **General Overview of a) Criminal Cases Involving Suggestibility; b) Recent
Research Literature; c) Expert Opinion of the Record in *Fuster* According
to the Relevant Scientific Research Literature and d) Organization of
Affidavit**

A.      The Cases

6. During the 1980s and early 1990s, there were a number of cases similar to *Fuster* in
which young children claimed that their parents or other adults had sexually abused them. The
claims were often fantastic, involving reports of ritualistic abuse, pornography,  multiple
perpetrators and multiple victims (e.g., *California v. Scott Kniffen and Brenda Kniffen*, Cal. Ct.
of App. 5th Dist. # F004423 (1995);*California v. Alvin McCuan and Deborah McCuan*, Kern
County Superior Court # 24208; *California v. Raymond Buckey et al.*, Los Angeles County Sup.
Ct. #A750900; *New Jersey v. Michaels*, 625 A.2d 579 *aff'd* 642 A.2d 1372 (1994); *North
Carolina v. Robert Fulton Kelly Jr.*, 456 S.E.2d 861 (1995). As in Mr. Fuster's case, children's
often fantastic claims were believed by mental health professionals, by police officers, by
prosecutors, and by parents. In the ensuing legal proceedings, the major issue before the jury was
whether or not to believe the children. Prosecutors argued that children do not lie about sexual
abuse, that the child witness' reports were authentic, and that their bizarre and chilling accounts of
events, which were well beyond the realm of most preschoolers' knowledge and experience
substantiated the fact that the children had actually participated in them. The defense in each of
these cases tried to argue that the children's reports were the product of repeated suggestive
interviews by parents, law enforcement officials, and therapists. However, in the absence of any
direct scientific evidence to support the defense's arguments -- and in light of the common belief
of that time that children do not lie about sexual abuse -- many of these cases eventuated in
convictions.

B.      The Scientific Research Literature Developed in the Years Since the Fuster  Trial.

7. Now, 13 years later, social scientists have developed a sociological and  psychological
understanding of the possible factors that might influence children's testimonies in cases such as
*Fuster*. Specifically, in the decade of the 1990s there has been an exponential increase in research

5

on the accuracy of young children's memories.  Although some early studies document strengths of young children's memories under certain circumstances, increasing numbers of studies highlight their weaknesses, demonstrating how children's memories and reports can be molded by suggestions implanted by adult interviewers.  The new research also shows that even professionals accustomed to dealing with children on a regular basis are unable to tell with any accuracy whether a child is providing a false or a true report when that child has been suggestively interviewed.  Under such circumstances, the child's affect and the detail with which the child reports the event and its surrounding circumstances are often indistinguishable from what one would expect from a child who is reporting the actual truth.

      C.        Summary of Issues and Conclusions

    8.  I have been asked by defense counsel for Francisco Fuster-Escalona to review a number of documents, which are set out below, and to answer, if I can, the following questions:

      (i)        Were the interviews conducted in this case so suggestive as to be capable of rendering the children's reports of abuse unreliable?

      (ii)        If so, could the defense's expert witness, Dr. Lee Coleman, support his clinical intuitions about the interviews with scientific evidence when he testified in 1985?

      (iii)        Based on the most current scientific knowledge, what is the quality of the testimony of the prosecution's experts who stated at trial that (a) that young children do not lie about sexual abuse,  (b) that mental health professionals can detect children's true and false reports, and (c) that sexually abused children exhibit specific disclosure patterns and behaviors that consistent and diagnostic of the abuse ?

    9.  The short answer to these questions is that the interviews in this case were indeed so suggestive as to render the children's reports of abuse unreliable.  In 1985, however, there were no studies upon which to base such a conclusion.  While a psychiatrist such as defense expert, Dr. Lee Coleman, had the intellectual tools – i.e., intuition – to detect certain suggestive questioning tactics that could shape the child's responses, no one in 1985 could provide scientific data  about the actual *impact* on the young child's testimony of suggestive questioning techniques used in *Fuster*.  The state of knowledge has changed dramatically since 1985 in the wake of a surge of interest in the study of child suggestibility.  This new research focuses on the types of interviewing practices that can alter the accuracy of a child's reports about central important events; and it also demonstrates the far-reaching impact of such questioning on young children who frequently generate detailed, emotionally laden accounts of events that have never actually transpired.  The new research also shows that under some circumstances, children come to believe these false

6

accounts of events that never occurred.

10. Moreover, the testimony given by the experts for the prosecution on each of the three topics outlined above has little if any scientific support. Of particular importance is the finding that when children produce false reports as a result of suggestive interviewing procedures, even experts in child development cannot detect the falsity of these children's reports. Again, however, the studies that discredit the opinions given by these experts did not exist in 1985. Thus, there would have been no way to prove in 1985 that the opinions provided by the prosecution witnesses were invalid.

11. Finally, in reviewing the record, I noted the absence of electronic recordings of initial interviews with key child witnesses. I present scientific evidence to suggest that the absence of such material makes it impossible to determine the accuracy of some of the actual reports initially made in this case.

D.   Organization of Affidavit

12. Section II of this affidavit contains a discussion of young children's disclosure patterns of sexual abuse. The disclosure pattern of the children in the Fuster case is presented and interpretations of the disclosure patterns are discussed. The beliefs about disclosure patterns expressed by the state experts who participated in the investigation and trial of this case are then presented through citations to excerpts from the record in this case. Following that, it is explained that the beliefs of the investigators and experts in this case are unsupported and controverted by the relevant scientific research literature.

13. In Section III of my affidavit, I provide an overview of the change of focus that occurred in the late 1980s in the type of research conducted on issues pertaining to the reliability and credibility of children's reports. Throughout, I also provide several examples of the egregious errors made by the *Fuster* interviewers to illustrate points not already made in Mr. Fuster's Amended Petition. Because of time constraints, and because the interviews are saturated with these interviewing errors, Mr. Fuster has asked that I not attempt to catalogue these errors. Instead, I have attached as Exhibit 3 to my affidavit those pages of Mr. Fuster's petition which provide examples of the interviewing techniques I describe. I have reviewed these examples and affirm that they are valid. In addition, I attach to this affidavit transcripts of the first several days of recorded interviews conducted by state investigators, Laurie and Joseph Braga, and suggest that the Court open these transcripts randomly to get a sense of the frequency with which suggestive interviewing is used with these children. The Court will note that, once armed with an understanding – from reading the scientific data I provide herein – of the robust effects that certain types of suggestive questioning and interviewing ploys can have, the educated layperson can review most interviews and on the basis of the current scientific literature discern whether they have the potential to distort a child's memory. Certainly the Braga interviews have abundant

7

examples that are not subtle. In Section III, when relevant, I return to evaluate the testimony of the state's experts. I argue that their opinions are not supported by current scientific evidence.

14. In Section IV, I turn to the examine the testimony of defense expert, Dr. Lee Coleman, and explain why his testimony, although intuitively correct, had no scientific support at the time he testified, as demonstrated dramatically by the prosecution's ability to discredit Dr. Coleman on cross-examination. By referring to Section II of this document, I will show that there now exists a large body of consistent research that supports his earlier intuitions.

15. In Section V, I turn to a subject of research that was not directly addressed in Mr. Fuster's Corrected Petition – *i.e.*, the problem of unrecorded interviews such as those conducted by parents, police investigators (other than the Bragas), and personnel at the Jackson Memorial Hospital Rape Treatment Center (RTC). Describing relevant experiments conducted since 1985, this section explains that without electronic recording of all interviews, it is impossible to determine the accuracy of adults' reports of the content as well as the structure of the interview. Electronic recordings are crucial not only for determining how children's disclosures of abuse were made but also the accuracy of adults' notes and memories of what the children actually said. The police reports and depositions I have reviewed provide some clear examples of the problems occasioned by the lack of verbatim reports.

16. In Section VI, I return to the testimony of the prosecution's experts, including Drs. Joseph and Laurie Braga, Dr. Roland Summit, Dr. Doris Stiles, Dr. Simon Miranda, Dr. Jerome Poliacoff and Dr. Barbara Goldman who testified about the behaviors that are consistent with and diagnostic of childhood sexual abuse. I will discuss the status of this testimony in light of current scientific evidence. This research discounts the strong assertions made by these experts.

17. Finally, I note that I have confined my affidavit to the above-listed topics at counsel's request because of time and funding limitations. If the Court were to deem it necessary or useful, however, I will appear at an evidentiary hearing or provide a supplementary affidavit in which I would trace the development of each child's allegations of abuse in detail. I would then explain what leads me to the specific conclusion that each of these children's reports has been rendered unreliable by the nature of the interviews to which he or she was subjected.

## II. Patterns of Disclosure of Child Sexual Abuse

### A.     The Disclosure Pattern that has Raised the Most Concerns About Reliability of Accusations of Abuse is the One Found in This Case

18. When evaluating a child's allegations of sexual abuse, it is of primary importance to understand the evolution of the child's reports. The following pattern has raised the most concerns regarding allegations of abuse. The child is initially silent—He does not make any unsolicited or spontaneous statements about abusive acts. Rather, the allegations emerge once an

8

adult suspects that something has occurred and starts to question the child.  At first, the child denies the event happened, but with repeated questioning, interviewing, or therapy, the child may eventually come to make a disclosure.  Sometimes after the disclosure is made, the child may recant, only to later re-state the original allegation after further questioning.  This pattern of disclosure characterizes the child witnesses in *Fuster*.

19.  None of the child witnesses in *Fuster* spontaneously reported to their parents that Frank Fuster had abused him or her.  Even when their parents and police investigators first directly asked them about abusive acts at Country Walk Babysitting Service all the children but one denied that anything had happened.  Some children disclosed abusive acts within the first month of questioning by parents, police officers, social workers, and therapists; other children did not disclose until many more months of questioning.  Some children recanted earlier allegations in subsequent interviews or sometimes within the same interview. The one child (JC) who disclosed abusive acts by the Fusters during the first police interview (this interview was not recorded and there are only police notes), changed his answers in the interview upon having questions repeated; provided highly inconsistent answers; alternately claimed to have seen the abuse and then to have been in a different part of the house when it was happening; and repeatedly changed his report as to who the participants in the abusive events were.  This same child later required his mother to prompt him to remind him of acts of abuse he had earlier recounted.  JC also told state attorney investigators, Laurie and Joseph Braga, about a game he had often played with his cousin in which success was measured by who managed to touch another child's vagina.  (As I will later discuss, there are serious problems associated with the fact that we have no verbatim record of the initial interviews with this child.)

B.  Interpretation of Patterns of Disclosures Offered by the Experts in This Case

20.  There are two different interpretations of the evolution of the allegations of sexual abuse made by the child witnesses in *Fuster*.

21.  The first interpretation is that the progression from silence to denial to disclosure to recantation to re-statement is common and perhaps even diagnostic of sexual abuse.  As repeatedly proffered by the states' experts, sexually abused children deny and recant either because they are afraid (due to threats), ashamed, or even believe themselves to be culpable. Experts at Mr. Fuster's trial also testified that a child who was threatened with harm if he or she disclosed would be very reluctant to disclose, even if asked directly about abuse.

22.  For example, this explanation of disclosure patterns was described at Mr. Fuster's trial by the state's expert witness, Dr. Roland Summit.  One of the earliest proponents of the so-called Child Sexual Abuse Accommodation Syndrome (CSAAS), Dr. Summit testified that it was usual for young children to disclose slowly, to deny and to retract, only to disclose again.  He stated that "most children never tell" and "it's normal on a statistical basis not to tell and not to

9

tell as a child. Some of the reasons some children give for not telling are that they are afraid they won't be believed. They are afraid they will be punished. They are afraid that their parents can't tolerate it or they are afraid of the results that have been threatened to them, that they will get into trouble, that they will be hurt by the perpetrator or their parents will be hurt by the perpetrator." (9/10/85, 206) Summit continued by saying that later retracting allegations of abuse was "also a part of a more or less predictable pattern." (9/10/85, 207) Dr. Joseph Braga, who interviewed a number of the children for the prosecution and was also qualified as an expert, provided similar trial testimony. (9/6/85, 192-194) When asked whether children who have been sexually abused immediately tell someone, Braga answered, "No. In fact, it's an exception rather than the rule." (Id. 192) Joseph Braga continued by explaining that factors that caused the child not to tell included fear, helplessness, threats, secrecy, a sense of guilt, shame or embarrassment. (Id. 192-194) Dr. Laurie Braga, who also interviewed a number of children for the state and was qualified as an expert, testified, "First of all, there are certain inconsistencies that children will make that are very predictable of children who have been abused. They will come in, they'll say nothing happened . ..." (9/27/85, 61.)  Similar testimony was provided by other prosecution witnesses. In fact, in some cases the experts made a diagnosis of sexual abuse based upon the presence of a specific disclosure pattern. Thus if a child denied abuse, this strengthened the conviction that the child was abused (Miranda, 9/4/85, 255-256).

23.  These beliefs about the disclosure process sometimes are translated into the following practices:  Abused children must be relentlessly pursued or they will never disclose their abuse; one should not readily accept children's denials or recantations because these responses are typical among sexually abused children.   Sometimes, interviewers assure themselves of the safety of actively pursuing children until they assent to abuse by stating that children cannot be influenced to "lie" about sexual abuse. (Faller, 1984; Sgroi, 1982) These descriptions seem to characterize the prevailing beliefs and procedures in *Fuster*.. ( Summit, 9/10/85, 208; L,. Braga, 9/10/85, 169, 176).

        C.    The Beliefs Expressed by the State Experts in This Case are Unsupported and
               Have Been Contradicted by the Relevant Scientific Research Literature

24.  There are serious problems associated with this view that sexually abused children often deny, disclose and recant allegations. There is little adequate scientific evidence to support the view that most children may not readily or consistently disclose sexual abuse when directly asked about it. Although it is true that there are some studies that can be found in the literature to support the claim that sexually abused children do not readily disclose and often recant, these studies suffer a number of methodological flaws that make the results difficult if not impossible to interpret (see Ceci & Bruck, 1995).  The primary problem with such studies are the criteria used to select children with diagnoses of sexual abuse.  In most of these studies, the criteria are not

10

clearly described or else are highly questionable and thus it is not known if the children in sexually abused group were actually sexually abused.

25. The better (although not perfect studies) use more objective criteria for classifying children as sexually abused. In the most recent study, Bradley and Wood (1996) found that among 234 validated cases of child sexual abuse, only 5% of the children denied the abuse when questioned by CPS workers and only 3% recanted their earlier reports of abuse. Jones and McGraw (1987) found a recantation rate of 8% among 309 validated sexual abuse cases seen at a child protection agency.

26. One factor that appears to predict nondisclosure of sexual abuse is the supportiveness of the caretaker and the relationship of the child to the perpetrator.. Lawson and Chaffin (1992) identified 28 children with STD who had made no prior disclosures of sexual abuse. Each of the children was interviewed by a social worker. Their parents were interviewed to determine whether they accepted the possibility that their child had been abused. These researchers found that 43% of the children disclosed abuse in the first interview. Children whose parents accepted the possibility of abuse (the parents were labeled supportive) were more likely to disclose (63% of this group disclosed) compared to children whose parents were not supportive and did not believe their child had been abused (only 17% of these children disclosed). Furthermore, most of the disclosures (67%) involved extra-familial perpetrators. In terms of the present case, these figures are important because the parents in *Fuster* were very supportive and wanted their children to disclose. In addition, except for one child (NG), the alleged perpetrators were extra-familial. Given these patterns, one might expect very high rates of disclosure in the first interview with the *Fuster* child witnesses.

27. The available evidence also does not consistently support the common assumption that sexually abused children do not disclose because of explicit threats made by the perpetrators. In a large study of child victims of sexual abuse, Gray (1993) reported that although 33% of the children in her study were threatened by the perpetrator not to tell, two/thirds of these children still disclosed.

28. To summarize, given the parameters of the present case (supportive parents, extra-familial perpetrators) and the results of the large scale CPS studies, it appears that a small percentage of youngsters disclose their abuse reluctantly, with an equally small percentage subsequently recanting their disclosures. However, the majority of sexually abused children appear to maintain their claims, never denying them to <u>officials</u> once they are asked. Thus although some validated cases of abuse fit the disclosure pattern of denial-disclosure-recantation, these represent a distinct minority of sexually abused children. Furthermore, although threats are sometimes used to silence sexually abused children, these are not predictably effective. In Fuster, none of the child witnesses when first questioned accused Frank Fuster of sexual abuse. Even

11

when urged by parents and other police to tell, many of the children denied for long periods of time. JC, the child who made the earliest and most fantastic claims, and who testified as a central prosecution witness, repeatedly made and then recanted his claims. TL, who told the Bragas in her first interview that they had played ring-around-the-rosy with their clothes off, told Laurie Braga in her second interview that this was just a story. (9/20/85, 222). (Of course, TL's first disclosure may reflect the fact that TL had been induced to play with anatomically correct dolls that had no clothes on. Thus, the original accusation must be taken with a large grain of salt in any case.)

29. Because the patterns of disclosure of the children in Fuster are so discrepant from those reported in the scientific literature, explanations other than sexual abuse must be considered to explain the evolution of these children's allegations that began with silence, then progressed to denial, and eventuated in disclosure and often in recantation. The hypothesis that is considered in my expert analysis is that the children's disclosures were the product of suggestive influences that can sometimes eventuate in false allegations of sexual abuse.

In order to discuss this hypothesis, I first focus on the concept of "suggestive interviewing techniques."

### III  Suggestive Interviewing Techniques

A.     Experiments Prior to the Early 1990s Were Not Designed to Study the Effects of Suggestive Interviews -- Like Those in This Case -- on Children's Ability to Provide Accurate Reports

30. Until the beginning of the 1990s, the concept and the scientific study of "suggestibility" involved asking a misleading question about some experienced or observed event. For example, children might be asked about the hair color of a male visitor who was bald. If children reported that the man's hair was black, this was an indication of their suggestibility. In other studies, children were provided with misinformation about an event they had experienced. For example, children may have been told a story about a girl with a stomachache. Later, they were falsely reminded that the girl had a headache. Still later, the children would be asked whether the girl had a stomach ache or a headache. If children answered the girl had a headache, this was an indication of their suggestibility. Regardless of the measure of suggestibility, a consistent finding was that younger children were more suggestible than older children (see Ceci & Bruck, 1993, for a review).

31. For several reasons this literature was and is of little practical value in assessing the reliability or suggestibility of children who make allegations of sexual abuse or other potentially distressing events in such cases as Fuster. First, before 1990, there were only a few studies that included preschool children, the age of the children in Fuster. This void left open the question of

12

the suggestibility of preschool children.

32. Second, the pre-1990 studies showed that children could be led to make inaccurate reports about neutral events that had little personal salience (for example the color of a stranger's hair). It was not known if children would come to make similar inaccurate reports if they were asked misleading questions or given misinformation about more central events, especially those that involved their participation in an event and that involved bodily touching.

33. Third, the questioning of the children in these early scientific studies seemed to bear little if any similarity to the conditions under which children were questioned in actual cases. For example, in *Fuster*, the children were not simply asked several leading questions in one interview. They were repeatedly questioned over a period of days, weeks, and months, sometimes by more than one interviewer. Also, the interviews were characterized by more than just the use of leading questions. Children were told that their friends had talked about things at the day care, children were asked to demonstrate sexual acts on anatomically correct dolls, children were bribed or rewarded for their responses in some interviews. And all of this interviewing took place in an atmosphere where the prevailing belief among the interviewers was that abuse had taken place at the day care. Thus the suggestibility research that was carried out until the late 1980s and early 1990s did not address the issue of whether certain conditions, such as those found in *Fuster*, would eventuate in children making false claims of touching or of sexual abuse.

   B.    Recent Experiments Are Designed to Study the Effects of Suggestive Interviews --
         Like Those in This Case -- on Children's Ability to Provide Accurate Reports

34. Because of the limitations of the early studies and as a result of the issues raised by such cases as *Fuster*, there has been a change of focus and a broadening in the research on children's suggestibility that continues as this affidavit is written. There have been three important changes in the direction of this research. First, preschool children have been included in many studies. Second, researchers have begun to examine children's suggestibility about events that are personally salient, that involve bodily touching, and/or that involve insinuations of sexual abuse. Third, the concept of "suggestive" techniques has been expanded from the traditional view of asking a misleading question or planting a piece of misinformation to using a larger range of interviewing devices that include repeated questioning within interviews, repeated interviews, selective reinforcement of responses, appeal to authority of the interviewer, and the use of props.[1]

---

[1]Although social scientists are increasingly creative in the paradigms that they devise to study components of suggestive interview techniques, they will never carry out studies that perfectly map all of the factors operating in any one case. This is because researchers and their institutional review boards would consider the examination of many of the interviewing procedures used in cases such as *Fuster* too unethical. In a word, scientists cannot suggest the horrors of child abuse to children about whom abuse has not been confirmed -- like the investigators in these cases often

13

35.  The broadening of this research was also accompanied by the broadening of the conceptualization of suggestibility.  Traditionally, suggestibility has been defined as "the extent to which individuals come to accept and subsequently incorporate post-event information into their memory recollections" (Gudjonsson, 1986. p. 195; see also Powers, Andriks, & Loftus, 1979). This traditional definition contains several important implications: : a) suggestibility is an unconscious process (i.e., information is unwittingly incorporated into memory), b) suggestibility results from information that was supplied after an event as opposed to before it (hence, the term "post-event"), and c) suggestibility is a memory-based, as opposed to a social, phenomenon.  This final point means that suggestions are thought to influence reports via incorporation into the memory system, not through some social pressure to fabricate or otherwise conform to expectations.  Early studies of children's suggestibility adhered to this definition.

36.  This traditional conceptualization and demonstration of suggestibility, however, is too restrictive to aid our understanding of the many cases involving young child witnesses, such as *Fuster*.  Therefore, the definition of suggestibility has been broadened in the past decade to encompass what is usually connoted by its lay usage.  Hence, according to the newer definition suggestibility refers to the degree to which the encoding, storage, retrieval and reporting of events can be influenced by a range of internal and external factors.   This broader view implies that it is possible to accept information and yet be fully conscious of its divergence from the originally perceived event, as in the case of acquiescence to social demands, lying, or efforts to please loved ones.  This broadened definition of suggestibility does not necessarily involve the alteration of the underlying memory; a child may still remember what actually occurred but choose not to report it for motivational reasons.  This broader definition also implies that suggestibility can result from the provision of information either before or after an event.  Finally, the broader definition implies that suggestibility can result from social as well as cognitive factors.  Thus, this broader conceptualization of suggestibility accords with both the legal and everyday uses of the term, to connote how easily one is influenced by subtle suggestions, expectations, stereotypes, and leading questions that can unconsciously alter memories, as well as by explicit bribes, threats, and other forms of social inducement that can lead to the conscious alteration of reports without affecting

do. Since we cannot duplicate the conduct of investigative interviewers like those in this case, we must base our inferences on the most scientifically rigorous evidence that is available. Thus, even though there is not a single study that reflects all the variables that were operative in the *Fuster* interviews, there is scientifically adequate knowledge about many of these.  It is this knowledge, in conjunction with my analyses of the *Fuster* interviews, that form my expert opinion that the constellation of factors operating in *Fuster* would constitute an extraordinarily powerful suggestive atmosphere, one that is far stronger than those that have given rise to false reports in the research studies described in this report.

14

the underlying memory.

37.    In my recent work with Stephen Ceci at Cornell University, we have described the architecture and process of suggestive interviewing techniques (Ceci & Bruck, 1995)  In this characterization, interview bias is the defining feature of many suggestive interviews.  Interviewer bias characterizes those interviewers who hold *a priori* beliefs about the occurrence or non-occurrence of certain events and, as a result, mold the interview to elicit statements from the interviewee that are consistent with these prior beliefs.

38.    Interviewer bias influences the entire architecture of interviews and it is revealed through a number of different component features that are potentially suggestive.  For example, in order to obtain confirmation of their beliefs, biased interviewers may not ask children "open-ended" questions such as "What happened?" but quickly resort to a barrage of very specific questions, many of which are repeated, and many of which are "leading." When interviewers do not obtain information that is consistent with their suspicions, they may repeatedly interview children about the same set of suspected events until they do obtain such information, sometimes reinforcing responses consistent with their beliefs and ignoring information that is inconsistent with their beliefs.  In order to obtain full compliance from the child, interviewers often try to engage the child by co-opting his cooperation, by telling him that he is a helper in an important legal investigation and sometimes by telling the child that his friends have helped or already told, and that he should also tell.  Interview bias is also reflected in the use of some techniques that are specific to interviews between professionals and children.  One of these involves the use of anatomically detailed dolls and line drawings in investigations of sexual abuse.  When interviewers suspect abuse, before the children have made any allegations, they sometimes ask children to show on the dolls how they have been sexually abused. As will be described in this report, these are a few of the techniques and some of the characteristics that were used to question the children in *Fuster*.

39.    The current research in the field of children's suggestibility examines the degree to which these and other interviewing techniques, when used in isolation or in combination, result in tainted and unreliable reports from children of the same age as those of the *Fuster* child complainants.  As will be described in this affidavit, the use of these suggestive techniques can bring young children to make claims about events that they have never experienced.  The false claims made by children in some of the scientific studies involve potentially serious actions; sometimes the false claims involve actions to their own bodies and sometimes the false claims have a sexual interpretation. The results of these newer studies suggest that children 6 years and younger are especially prone to suggestive influences.

40.    In the next sections, I will review the scientific literature that focuses on particular "suggestive" interviewing procedures and then provide examples of how these techniques were

15

used in *Fuster*. In providing examples, I am limited by the fact that the only electronically recorded interviews (that provide verbatim information as well as visual information of what the children were doing when questioned) were those conducted by Joseph and Laurie Braga. Although there are also police reports, reports from the RTC, parents' depositions and sometimes therapy reports for the children, these do not substitute for electronic recordings or transcriptions of these recordings. As will be argued in Section V, written statements sometimes are inaccurate because they omit information, or because the information is incorrectly recorded. Of greatest concern is that the written reports do not contain every question asked by the interviewer or every answer given by the child. This information is crucial in order to evaluate the degree to which different suggestive techniques were used in each interview. Even with this limitation, there are sometimes substantial hints in the early police and RTC reports and parent depositions that provide a flavor of how the children were interviewed, how the children reacted and what the children said. This information provides a rough characterization of the early interviewing of the children in *Fuster*.

> ### C.    Interviewer Bias is the Single-Minded Attempt to Gather Only Information That is Consistent With the Interviewer's Prior Beliefs

41. As noted above, "interviewer bias" is a term used to characterize those interviewers who hold a priori beliefs about the occurrence of certain events and, as a result, mold the interview to elicit statements from the interviewee that are consistent with these prior beliefs. One of the hallmarks of "interviewer bias" is the single-minded attempt to gather or accept only confirmatory evidence and to avoid all avenues that may produce negative or inconsistent evidence. Thus, while gathering evidence to support his hypothesis, an interviewer may fail to gather any evidence that could potentially disconfirm that hypothesis. The biased interviewer does not ask questions that might provide alternate explanations for the allegations (e.g., A biased interviewer would not ask, "Did your mommy and daddy tell you that this happened or did you see it happen?"). Nor does the biased interviewer ask the child about events that are inconsistent with his hypothesis (e.g., A biased interviewer would not ask, "Who else besides your teacher touched your private parts? Did your mommy touch them, too?"). And the biased interviewer does not challenge the authenticity of the child's report when it is consistent with his hypothesis (e.g., The biased interviewer would not say, "It's important to tell me only what you saw, not what someone may have told you." or, "Did that really happen?", or "It's OK to say you don't remember or you don't know."). When provided with inconsistent or bizarre evidence, biased interviewers either ignore it or else interpret it within the framework of their initial hypothesis. It is important to note that within this context, a biased interviewer may be a police officer, a therapist, and even a parent. It takes no special skills to be a biased interviewer.

42. Research has documented how interviewer bias can result in the generation of false

16

reports from children. Two studies are described below.

43. Thompson, Clarke-Stewart & Lepore (1997) conducted a study in which 5- and 6-year-olds viewed a staged event that could be construed as either abusive or innocent. Some children interacted with a confederate named "Chester" as he cleaned some dolls and other toys in a playroom. Other children interacted with Chester as he handled the dolls roughly and in a mildly abusive manner. The children were then questioned about this event. The interviewer was either 1) "accusatory" (suggesting that the janitor had been inappropriately playing with the toys instead of working), 2) "exculpatory" (suggesting that the janitor was just cleaning the toys and not playing), or 3) "neutral" and non-suggestive . In the first two types of interviews, the questions changed from mildly to strongly suggestive as the interview progressed. Following the first interview, all children were asked to tell in their own words what they had witnessed and then they were asked questions about the event. Immediately after the interview and two weeks later, the children were asked by their parents to recount what the janitor had done.

When questioned by a neutral interviewer, or by an interviewer whose interpretation was consistent with the activity viewed by the child, children's accounts were both factually correct and consistent with the janitor's script. However, when the interviewer was biased in a direction that contradicted the activity viewed by the child, those children's stories quickly conformed to the suggestions or beliefs of the interviewer. Also children's answers to interpretive questions (e.g., "Was he doing his job or just being bad?") were in agreement with the interviewer's point of view, as opposed to what actually happened. When asked neutral questions by their parents, the children's answers remained consistent with the interviewers' biases.

44. A second study (Bruck, Ceci & Melnyk, 1999) shows how interviewer bias can occur in a more natural situation, how it can quickly develop, and how it can not only taint the responses of child interviewees but also the reports of the adult interviewers. The subjects in this study were 120 preschool children and 30 interviewers. These interviewers were primarily recruited from university graduate degree programs in social work or counseling. All had training and experience in interviewing children.   Approximately two weeks before they were to be interviewed, the children participated in a staged event. Some children attended a surprise birthday party. With the help of research assistant A, the children surprised research assistant B, played games, ate food, and watched magic tricks. Other children did not attend the birthday party but simply colored a picture with research assistants A and B. These children were told that it was one of the assistant's birthday. They also saw one magic trick. Two weeks later, the children were individually interviewed by one of the 30 interviewers. Each interviewer was told to find out about a special event that happened with special visitors. Each interviewer interviewed 4 children consecutively. The first three children attended the "birthday party" and the fourth child attended the "coloring event".   Immediately after the interview with the fourth child, the

17

interviewers were asked to describe the special event that the children had attended. Several weeks later the interviewers were again questioned about what they had learned from the children.

The accuracy of the children's reports were examined. Of particular interest was whether the fourth child who did not attend the birthday party would make false claims consistent with attending the party. Indeed, Child #4 produced twice as many errors as the first three children; 60% of the fourth children made false claims that involved a birthday party. This pattern reflected the fact that the interviewers had built up a bias that all the children had attended a birthday party. By the time they interviewed child 4, the interview was structured in such a way as to elicit claims consistent with their primary hypothesis. Even when child #4 denied attending a birthday party, 84 % of their interviewers later reported that all the children they interviewed had participated in a surprise birthday party. Thus if interviewers have the belief that all the children they are interviewing have experienced a certain event, then it is probable that many of the children will come to make such claims even though they were non-participants (or non-victims). The data also suggest that regardless of what children actually say, biased interviewers later inaccurately report the child's claims, making them consistent with their own hypotheses.

45. These studies and others reviewed by Ceci & Bruck (1995) provide important evidence that interviewers' beliefs about an event can influence the accuracy of children's answers. The data highlight the dangers of having only one hypothesis about an event, particularly an event involving an ambiguous act such as touching.

46. Examples of interviewer bias abound in the Braga interviews. These examples show how the Bragas evidenced their bias by ignoring statements made by children or interpreting them only in light of their belief that the children were sexually abused by Mr. or Mrs. Fuster.

*Interviewer Bias: A special case in the interviewing of Noel Fuster(NG).*

47. Of course, the clearest evidence of bias relates to the interviews by the Bragas and Dr. Simon Miranda of NG, the 6-year old son of Mr. Fuster. Laurie Braga testified at trial that prosecutors came to her and her husband with the information that NG had tested positive for gonorrhea and told them to be as leading as necessary to get NG to acknowledge that Mr. Fuster had abused him (9/27/85, 71). Thus with this seemingly scientific evidence on hand to confirm all previous suspicions about sexual abuse by Mr. Fuster, the Bragas believed that NG's previous denials of sexual abuse were false and that he was lying. As a result, they applied highly coercive techniques to get him to disclose. The following example illustrates the potential impact of suggestive interviewing techniques when the interviewer appears very confident about the accuracy of his hypothesis.

J. Braga: Did they tell you not to tell anybody you had gonorrhea?
NG: Gonorrhea?...I didn't know that

18

J. Braga:  But you now know?

NG: (inaudible)

L. Braga: But if they had known, they would have said don't talk about it, don't tell anybody else.

NG: No, never said it.  They didn't know

J. Braga:  Let's go back to talking, I said to you earlier that I know you are not telling me the truth because you said that no one put their penis in your mouth but yet you had the test, the test said you had gonorrhea,  If you have gonorrhea, someone put their penis-

NG:  I don't remember, maybe they did.  I don't remember.  Maybe it happened when I six.  I don't remember when I was six...

J. Braga:  You said you don't remember anybody putting their penis in your mouth?  Do you think it was your father?

NG:  I don't know who did it....

L. Braga:  Let's suppose that it did, okay?  Because the doctor said it did, even though you don't remember who did, you think might it have done that to you.  Do you have any idea, even if you don't remember?

NG:  I think  maybe my dad and maybe somebody else...

J. Braga:  Do you remember the first time your dad did it, did you ask him to stop?

Child:  No...I don't remember anything about that.  I don't want to.

J. Braga:  Do you think if your dad had done it, if you told him to stop, he would have stopped?

NG:  I don't remember anything about it.  I don't know if I told him to stop.  I don't know if I told him., you know like that.  I don't remember nothing about it.

L. Braga:  If you did remember about it, would it be hard for you to talk about

NG:: No

Joe Braga:  Would you tell us?

NG::  Yes

48.  After pages and pages of this type of intensive questioning and denial, NG, finally admitted to many acts that were committed by his father and by Ileana.  But in subsequent sworn statements, NG repeatedly and pointedly denied that he had ever been abused and explained that he had previously made such claims only because the Bragas had refused to end the interview until the he had made them.

49.  There are several important aspects of the Braga interviews with NG.  First, one might argue that this was the perfect example of a sexually abused child first denying abuse, then disclosing, and then recanting.  Following this line of reasoning, one could justify the Bragas' interviewing techniques; they were obtaining confirmation, not of a hypothesis, but of a scientific fact (the gonorrhea test).  It is situations such as this that provided the best rationale for the prosecutors in this case to not only invoke the so-called classic model of denial-disclosure-

19

recantation in the sexually abused child, but also to condone the suggestive techniques that must be used to unearth the disclosures from these children (see J. Braga, 9/6/85, 225; L. Braga, 9/10/85, 168, 169; 9/27/85, 47). Thus the NG interviews could provide evidence that when interviewers biases/primary hypotheses are correct, they will eventually obtain correct disclosures from children

50.  There is, however, another side to the argument.  These interviews with NG show the strength of the interviewers' biases:  When NG denied abuse consistently, the interviewers only hypothesis was that he was in denial.  It did not seem to have occurred to them that perhaps the child was telling the truth and that there might be some other explanation besides denial for the discrepancy between the medical tests and the child's word.   More neutral interviewers might have considered the hypothesis that the medical evidence  could be wrong.  In light of the child's strong persistent denials, more neutral interviewers might have asked for a second medical test.  Of course, this did not occur in the present case because Joseph Braga and others had the prominent belief that denial, no matter how strong, was consistent with abuse.

51.  Finally, even if NG had been abused, the Bragas clearly overstepped their roles as protectors of children and blatantly became engines of the prosecution.  When a child so vehemently denies, one must listen to these denials and respect them--not bully the child into providing statements that are demanded by the prosecution and that are also consistent with one's pet hypothesis.

52.  In my opinion, one of the determining factors of the degree of bias in this case—that all the children had been sexually abused—was the model of disclosure that the experts proposed. If the child denied abuse, it meant that the child had been abused.  In reviewing their testimony, some experts do acknowledge that denial could mean that the child was not abused.  However, their subsequent testimony does not focus on how to test the hypothesis that the child was not abused.  The bulk of the testimony focuses on the hypothesis that the children were abused and that their silence mirrored their fright, guilt, and embarrassment.  For example, L. Braga provides pages of testimony on the symptoms of children who are abused and silent and how to provide them with a context to tell of their abuse.  When she does focus on the hypothesis that perhaps the child is not abused, it is dealt with in one sentence, "You talk to the child and see he has not been abused" (9/10/85, 166).  There is no discussion or elaboration of this sentence on how you talk to a child and see he has not been abused, perhaps because these investigators simply did not know how to test this alternative hypothesis.

53.  It should be noted that police reports indicate that, as soon as NG's positive gonorrhea test was reported, the state attorney instructed investigators to notify all parents to bring their children in for testing. Bruck, Exh. 2 at 51. The police report does not indicate whether parents were specifically told about the positive test result.  If they were, this information

20

would have the ability to implant bias in the minds of parents.

*Interviewer Bias: The Rest of the Children*

54.  While NG's interviews present a "special" case, interviewer bias is an ever-present component in all of the Braga interviews.  I have seen no instance in which an interview with any child began in a neutral manner with the Bragas asking a series of questions that did not assume the occurrence of abuse.  Instead, the typical Braga interview begins with one or both of the Bragas playing with toys with the child for a period of time.  The Bragas then typically introduce a set of anatomically detailed dolls, undress the dolls, name them Frank and Iliana, and ask the child what was "done" to them while at the Fusters.

55.  It is interesting to note that it never seems to occur to the interviewers that pre-school children who have spent hours or entire days with their babysitters are likely to have been touched in the genital area, or undressed, as a result of normal toileting practices.  The interviewers likewise seem convinced that a child who correctly answers that Iliana has "boobies" must have seen Iliana naked, rather than considering the possibility that a pre-school child understands a woman with a protruding chest has breasts under her clothes and that several of these children went to the beach with Iliana and undoubtedly saw her in a bathing suit.  These again are clear indications of interviewer bias.

        E.    Interview Strategies Proven to Compromise the Reliability of Children's Reports
              and Examples of the Use of Those Strategies in This Case

        1.    **Use of Specific Questions**

56.  In order to obtain confirmation of their suspicions, biased interviewers might not ask children "open-ended" questions such as "What happened?", but instead may quickly resort to a barrage of very specific questions, many of which are repeated, and many of which are "leading" in the sense that the question stem presupposes the desired answer ("When Bobbie did this to you was he alone or with someone?").

57.  The problem with this strategy is that young children's answers to direct or specific questions can be quite inaccurate, as demonstrated by a number of recent studies.  For example, Peterson and Bell (1996) interviewed children (ages 2 to 5 years) after they had been treated in an emergency room for a traumatic injury. They were first asked free-recall questions ("Tell me what happened").  Then in order to obtain additional information, the children were asked more specific wh-questions (e.g., "Where did you hurt yourself?") or yes-no questions (e.g.,  "Did you hurt your knee?") . Peterson and Bell found that children were most likely to accurately provide important details in free recall.  Across all age groups, errors increased when children were asked more specific questions; the percentage of errors elicited by free recall, wh-questions, and yes-no

21

questions was 9%, 49%, and 41% respectively.

58. Forced choice questions (e.g., "Was it the man or the woman?") also compromise the reliability of children's reports. This is because children will select a response set (they will frequently select the second rather than the first option) and because children commonly do not provide "I don't know" responses (e.g., see Walker, Lunning, & Eilts, 1996) even when the question is nonsensical. (Hughes & Grieve, 1980)   One of the reasons that children so willingly provide answers to specific yes/no or to forced choice questions even though they may not know the answer is that young children are cooperative: they perceive their adult interviewer as truthful, and not deceptive. In order to comply with a respected adult, children sometimes attempt to make their answers consistent with what they see as the intent of the questioner rather than consistent with their knowledge of the event. (see Ceci & Bruck (1993) for a review) Because of this compliant-cooperative characteristic, and because of young children's poor performance on specific questions, it is particularly important in interviews to tell children that they have the option of saying "I don't know" or "I don't remember".

59. As noted above, there are virtually no instances in which the Bragas begin an interview with a series of neutral, open-ended questions about what it was like at the babysitter's. One can search the interviews in vain for a real sequence of questions such as, "Tell me about how you spent your time at your babysitter's." "What kinds of things did you do there?" "Were there things you did there that you liked?" "Were there things you did there that you didn't like?" The far more common approach taken by the Bragas is demonstrated in the first interview with TL (a boy). Laurie Braga begins the interview as follows:

> L. Braga: Dolls, here, do you like dolls?
> TL: Yes.
> Braga: Let's play a game with these dolls. Let's pretend this one is T., okay?
> TL: (nodding in the affirmative)
> Braga: That is T. This is a little girl. Let's pretend – do you know a little girl named B? [naming another child that attended the babysitting service.]
> TL: (nodding in the affirmative.)
> Braga: Can we pretend this is B.?
> TL: Yes. He's got –
> Braga: He's got a mouth. You can put your finger in, huh? And this, this is Iliana. Let's pretend this is Iliana, okay? This doll we are going to pretend is Frank. Okay? You can play with the dolls and you show me what Iliana and T. do, okay? Just show me.
> TL: (Pause.)
> Braga: Mommie is there. Would you show me? Show me what Iliana does, okay? Show me what Iliana does to T. Would you show me?
> TL: (Nodding in the affirmative.)
> Braga: Huh?

22

TL: (Demonstrating).

Braga: Likes to put your finger in there, huh? I will tell you what. Let's see. Let's pretend, can everybody play a game together?

TL: (Nodding in the affirmative.)

Braga: Shall we all play together? Okay? So we have got Frank and Iliana, okay and B. and T., okay. Everybody play a game together, what game shall we play? You tell me what game shall we play? Show me what game? Will you show me? Okay, have you ever played a game called the pee-pee game?

(9/12/85, 70-72).

60. Because of the results of studies such as those just reviewed, it is recommended that in interviews with children that the interviewer begin with very open-ended questions (e.g., tell me what you did at Frank and Illeana's). If children provided minimal information, then a general recommendation is that they be prompted ("Tell me more" . "What else happened) or be asked other open-ended questions (What did you do that was fun? What did you do that was not fun?). If children are not forthcoming, then it is recommended in my guidelines that the questions become a little more direct (Can you tell me about any games that you played?). Finally, if the child provides no information despite many prompts, some guidelines allow for the use of more specific questions (e.g., Did you play a game with a mask?) (See Poole & Lamb, 1998 for a current review of interviewing techniques and guidelines).

61. This pattern was almost totally lacking in the Braga interviews. Not only was there a lack of open-ended questions, but the children were quickly immersed into play and pretend where they were asked to pretend with dolls or toys about what happened at the day care. Direct and specific questions were directed at the play and some of these questions were highly direct and suggestive. In general the children were not simply asked to talk about what happened at Frank and Illeana's and their free recalls were not systematically followed up with more specific questions. In the following two examples, I have provided the major content questions that were asked at the beginning of two different initial interviews. This part of the interviewing usually took place after a long free-play period with each child.

In the first interview with TL (a girl), L. Braga does begin the initial questioning with an open-ended question:

L Braga: "What kinds of things did you do there"

TL: Nothing

But then, the questions become specific. As shown, there is no attempt to situate the daycare, what the children did, what was fun, what was not fun. The interview is a stream of seemingly unrelated questions reflecting part of the interviewers' beliefs of what happened

L Braga: Did you ever play any games?

23

> TL: Nope
> ....
> LB: Who else went to that place with you?
> TL: B.
>
> LB: When you were at Iliana and Frank's place did they ever take pictures of you playing?
> ...
> TL: No,
>
> LB Did Iliana and Frank --did they tell you not to tell anybody?
> TL: -NO
> LB: Did they tell you to keep it a secret?
> TL: -INAUDIBLE
> LB: Did they say it was all right for you to tell?
> TL: YES

The following is a description of the first interview with BT on August 10th. This interview is punctuated by questions by the two Bragas while they are playing with dolls and pretending with the child. After playing with the dolls and naming them for a while, the following appropriate open-ended question is asked:

> L. Braga; When you would go to school at Frank and Ileana's house what are some of the games you would play?
> BT: It's not a school

After more play with the dolls

> Braga: Did Frank and Iliana have a TV camera like that to make movies?
> BT: (SHAKES HEAD NO)

After more play with dolls,

> Joe Braga : Let's play with the games that we want to play, that we don't tell anybody about. So Ileana, I want you to help us to play a game but we don't tell anybody about it. So let's play these secret games Can you show us what the secret game is?
>
> BT: (No response)
>
> Braga: D o you remember though, do you remember the babysitter sometimes would play games without clothes on? Would she take her clothes off and play some of the games we play without clothes?

62. These two examples provide a flavor of how the children were questioned. They

24

were rarely if ever asked to tell in their own words what happened—a strategy that usually results in high accuracy. Rather, they were almost immediately asked specific and leading questions—forms that result in high rates of inaccurate responses, especially as will be shown below when these are repeated within and across interviews.

## 2.    Repeating Questions Within Interviews

63. As just discussed, asking children specific questions often compromises the accuracy of their reports. These problems seem to increase when such questions are repeated.

64. Biased interviewers sometimes repeatedly ask the same question until the child provides a response that is consistent with their hypothesis. A number of studies have shown that asking children the same question within an interview, especially a yes/no question, often results in the child changing his original answer. Children often do this, reasoning that the question was asked a second time either because the first answer was wrong or because the interviewer must not have like the first answer, regardless of its accuracy (e.g., Siegal, Waters, & Dinwiddy, 1988).

65. Poole and White (1991) examined the effects of repeated questioning within and across sessions. Four, six, and eight-year-olds witnessed an ambiguous event. Half of the subjects were interviewed immediately after the event as well as one week later. The remaining subjects were interviewed only once -- one week after the event. Within each session, all questions were asked three times. Repeated open-ended questions (e.g., "What did the man look like?"), both within and across sessions had little effect, positive or negative, on children's responses. However on repeated yes/no questions (e.g., "Did the man hurt Melanie?"), the younger children were most likely to change their responses, both within and across sessions. Also, when children were asked a specific question about a detail for which they had no information (i.e. "What did the man do for a living?"), many answered with sheer speculations. Furthermore, with repeated questions, they used fewer qualifiers omitting phrases such as "it might have been," and consequently they sounded increasingly confident about their statements. In other words, children will often cooperate by guessing, but after several repetitions, their uncertainty is no longer apparent.

## 3.    Repeated Interviews

66. Sometimes, when children do not provide the desired information within a single interview, they are interviewed again until their reports are consistent with the interviewers' biases. Results from a number of studies show that when misleading questions or inaccurate information are repeated across multiple interviews, children's final reports become highly tainted, as illustrated by the following study.

67. In this study (Bruck, Ceci, Francoeur & Barr, 1995) five-year-old children visited their pediatrician. During that visit, a male pediatrician gave each child a physical examination, an oral polio vaccine, and an inoculation. During that same visit, a female research assistant talked

25

to the child about a poster on the wall, read the child a story and gave the child some treats. Approximately one year later, the children were interviewed on three different occasions about the inoculation visit.  During these interviews some children were given false information:  they were told that the female research assistant gave them the inoculation and the oral vaccine.  A number of the children who received these false suggestions later reported that the research assistant had indeed performed a number of medical procedures on them during the initial visit.

68.  Other studies (described in greater detail below e.g., Bruck, Ceci & Hembrooke, 1997; Ceci, Loftus, Leichtman & Bruck, 1994a) show that when children are repeatedly and suggestively interviewed about false events, assent rates rise for each interview and stay high even when children are interviewed by a new interviewer.  For example, children are more likely to assent to a false event in a third interview than in a second interview and they will persist in their false allegation when interviewed again by a new interviewer.

69.  In *Fuster*, the child witnesses were repeatedly interviewed by their parents, by the police, by their therapists, and by members of the prosecutor's office.  During these interviews, the children were asked specific and leading questions about masks, secret games played in the nude, and about caca and pee pee games.  With repeated interviews their denials ended and their disclosures began.

70.  Some experts in *Fuster* interviewed or treated children after the Braga interviews. However, these experts seemed ignorant of the potential effects that these earlier interviews could have on the children's statements.  For example, BT's therapist, Dr, Stiles, was unaware of any of the previous interviews with BT—ones that had the high risk of tainting her testimony. Nonetheless, even after learning of the interviews and the potentially damaging content of these interactions, Dr. Stiles concluded that these previous interviews did not influence the accuracy of the statements that BT told her therapist (9/10/85, 78).  The current scientific evidence suggests that the suggestive Braga interviews with BT could not only render her reports unreliable in those interviews but also could render them unreliable with other interviewers.

71.  When children provide new information when they are re-interviewed under suggestive conditions, it raises the issue of whether the new reports are accurate memories that the children did not remember in previous interviews or whether the new reports are false and the result of previous suggestive interviews.  The scientific evidence provides support for the second hypothesis, especially when there is a delay between some alleged event and the interviews.  This is because children's memory of the original event (e.g., what happened at the day care) fades after a period of time, allowing the suggestion (e.g., The teacher did bad things to kids) to become more easily planted. For example, in the pediatrician study just described, the children were given suggestions immediately after they had received their inoculation about how much the inoculation had hurt (e.g., some children were told that it did not hurt very much when in fact it

26

did). This suggestive interview did not have any effect on children's reports taken one week after the inoculation, presumably because the episode was still fresh in their mind. However, one year later, when the same children were given similar suggestions (e.g., "You were so brave that day. It seemed like the shot hardly hurt you"), these misinformed children now routinely underestimated their level of pain and crying as a result of erroneous suggestions about how brave and courageous they had been.

72. Another set of recent studies provide important new evidence to dispute the common claim that children need to be re-interviewed because it helps them to remember new and important details. These studies show that reports that emerge in a child's first interview with a neutral interviewer are the most accurate. When children are later interviewed about the same event and report new details not mentioned in the first interview, these have a high probability of being inaccurate (Bruck, Ceci, & Hembrooke, 1998; Salmon & Pipe, in press ).

73. The child witnesses in *Fuster* were suggestively interviewed about their day care experiences, which for some children had occurred months previously. When first questioned most children denied any wrongdoing. But with the passage of time and the increased intensity of questioning, they began to assent to abuse allegations; the number and descriptions of the abusive acts became more detailed. It is possible that the children's accounts of abuse emerged because they were no longer afraid to tell their stories of horror. However, a more scientific explanation is that the children came to make false reports of abuse because their memories of the benign events at the day care had begun to fade and these memories were replaced by their interviewers' suggestions of wrong-doing at the day care.

### 4.    Emotional Tone of the Interview

74. Interviewers can use verbal and nonverbal cues to communicate their bias. These cues can set the emotional tone of the interview. Children are quick to pick up on the emotional tones in an interview and to act accordingly. For example, in some studies when an accusatory tone is set by the examiner, (e.g. "It isn't good to let people kiss you in the bathtub", or "Don't be afraid to tell"), children are likely to fabricate reports of past events even in cases when they have no memory of any event occurring. In some cases, these fabrications are sexual in nature.

75. In one such study, children played with an unfamiliar research assistant for five minutes while seated across a table from him. Four years later, researchers asked these same children to recall the original experience (Goodman, Wilson, Hazan & Reed, 1989). The researchers created "an atmosphere of accusation," telling the children that they were to be questioned about an important event and saying things like, "Are you afraid to tell? You'll feel better once you've told." Although few children had any memory of the original event from four years earlier, five out of the fifteen children incorrectly agreed with the interviewer's suggestive question that they had been hugged or kissed by the confederate, two of the fifteen agreed that

27

they had their picture taken in the bathroom, and one child agreed that she or he had been given a bath. In other words, children may give inaccurate responses to misleading questions about events for which they have no memory when the interviewer creates an emotional tone of accusation.

76. In *Fuster*, there are glimpses from various sources such as the parent depositions and reports from the Rape Treatment Center that provide clues as to ways parents and others tried to create an atmosphere of accusation and fear in the children in order to promote the accusations of abuse. The most salient examples, however, are provided by the Braga interviews, where both Bragas interjected the concepts of fright, threats, and the need to protect children. These strategies may reflect their bias that the abusers' threats were so severe that the children would not disclose their abuse. However, the major consequence of introducing these concepts could be that in order to comply with the interviewers' encouragements, the children came to falsely report that they had been threatened and scared.

77. For example, in Laurie Braga's first interview with TL (a girl), Braga says:

Braga: I think that Iliana and Frank did some things that some of the children didn't like and if somebody, a grown-up person tries to do something and touch you in a way that you don't like –
TL: Yes.
Braga: -- then it's okay for you to say, no, don't do that, see but nobody knew they were going to do it, so nobody told you to say no. So we need to know what they did so we can make sure they don't do it anymore . . .

(9/12/85, 177)

Braga: Do you think you could tell me some more stuff about what happened at Frank and Iliana's?
TL: No.
Braga: No? You don't want to?
TL: No.
Braga: Does it make you sad to talk about it?
TL: I don't know.
Braga: Does it scare you?
TL: I don't know.
Braga: You don't know? Did somebody tell you not to tell?
TL: Some, I don't know.
Braga: Did they maybe tell you that you might get in trouble if you told?
TL: I don't want to ask – I don't want to talk.
Braga: Yes I know it's kind of hard but I will tell you what, I will talk, okay? You don't have to talk. I just want to tell you no matter what anybody said, you are not going to get into trouble for telling, okay? You did real good (inaudible) nobody is going to do anything to you. You are not going to get into any trouble. Nobody is going to hurt you.

28

You didn't do anything bad.

(Id., 187-188.)

In Laurie Braga's first interview with BT, she tells the child:

> Braga: You know what? The other children came in and just like you, they didn't want to tell at first because they were afraid. They thought maybe they had done something bad because Frank and Iliana made them feel like if they told, they would get into trouble and their Mommy and Daddy would be mad at them but Mommy and Daddy won't be mad at you. It's okay if you tell. . . . It's scarey. I know it's scarey because you like Frank and Iliana but some of the things they did, you didn't know whether you should be doing it and they told you not to tell. . . .

(9/13/85, 73) And then,

> Braga: Sometimes little boys and girls have yucky secrets and they don't want to tell anybody because they are scared but if you tell a yucky secret, if you don't tell, it just stays inside and hurts but if you do tell, it's all gone and you feel better and this never -- and you never have to tell it again.

(Id., 74). See also the examples in Bruck, Exh. 3 at 38-40.

### 5.  Rewards and Punishments

78.  There are many studies in the social science literature to show that reinforcing (rewarding) children for certain behaviors, regardless of the quality of the behaviors, increases the frequency of these types of behaviors (e.g., Ettinger, Crooks, & Stein, 1994; Zigler & Kanzer, 1962). Similarly, punishing children decreases the probability of a response. The expression of rewards and punishments in interviews can be explicit or implicit. Explicit forms of reward include telling children that they are being helpful and that their answers are good. Sometimes interviewers' use of reinforcement becomes so intense that statements intended to be rewarding seem more like bribes and statements intended to be mildly discouraging seem more like threats. Implicit rewards include verbal and nonverbal cues that provide attention and support for the child's statements. These cues are not always conducive to producing accurate reports. For example, if interviewers are overly supportive (attentive) of children, the children tend to produce many inaccurate as well as many accurate details (e.g., Geiselman, Saywitz & Bornstein, 1990). Rewards and threats can be very tangible such as offering the child treats or bribes if he tells what happened.

79.  The use of rewards and punishments in interviews with children can have beneficial as well as negative consequences. The use of these may motivate children to come to tell the truth. On the other hand, children may learn that if they produce stories that are consistent with the

interviewers' beliefs, they will be rewarded by their interviewers and parents.   In some cases, the attention provided by these interviewers may be sufficiently rewarding for children to fabricate reports.  As the following study illustrates, the use of rewards and punishments in an interview can quickly shape the child's behavior and have long lasting consequences

80.  Children between the ages of 5 to 7 attended a special story time led by a visitor called Paco.  During this 20 minute visit, Paco read the children a story, handed out treats, and placed a sticker on the child's back.  One week after the visit, the children were asked mundane questions ("Did Paco break a toy?) and fantastic questions ("Did Paco take you somewhere in an airplane?) about the visit.   Children in the neutral-no reinforcement condition were simply asked a list of 16 questions and provided with no feedback after each question.  Other children, in the reinforcement condition were provided with feedback after every question, as illustrated by the following examples:

Interviewer:  Did Paco take you somewhere on a helicopter?

Child:          No (*Note.  This is an accurate denial*)

Interviewer:   You're not doing good.  Did Paco take you to a farm?

Child:          Yes (*Note this is an incorrect  assent*)

Interviewer:   Great.  You're doing excellent now.  (*The next question  is asked*)

The reinforcement had large negative effects on the accuracy of children's responses.  Children in the reinforcement condition provided inaccurate assents to misleading mundane questions 35% of the time and to misleading fantastic questions 52% of the time.  The comparable rates for the non-reinforcement group were 13% and 15%.   In a second interview, a week later, all children were simply asked the same questions, without any reinforcement.  The same high error rates continued for the reinforcement children.  When children were challenged and asked in the second interview, "Did you see that or just hear about that?", children in the reinforcement group stated that they had personally observed 25% of the misleading mundane events and 30% of the misleading fantastic events.  Children in the non-reinforcement group only made these claims 4% of the time.

81.  These findings show how quickly children can be shaped to provide inaccurate responses no matter how bizarre the question.  Furthermore, the inaccurate responses persist upon a second questioning with a number of children claiming that they actually observed the suggested but false event.

82.  In terms of the Fuster interviews, rewards and punishments are sometimes interchangeable with emotional tone.  In both cases, the interviewers signaled to the children the types of responses  that would be considered  acceptable and worthy of praise by themselves and their parents.  At the same time, they also signaled to the child the types of responses that were not considered appropriate and that should be ignored.  The following are a few examples of the use of rewards and threats in the interviews with the children in *Fuster*.

83. At the end of JC's interview on August 10, 1984, the Bragas gave JC a bag of toys and told him there were a whole bunch of games in the bag. (9/12/85, 198-199). JC returned to the Bragas three days later, having done a lot more talking in the meantime. (9/13/85, 182.)

84. At TL's (girl) second interview with Laurie Braga, TL begins urging her mother to let her leave after the interview has gone on for quite some time. TL does not want to talk any more but her mother is not satisfied that the child has told Braga what she needs to. Accordingly, TL's mother promises the child she will take TL to work with her, take her to McDonald's, take her to get candy, and eventually, promises to give the child a necklace, if only TL will tell Braga about her eyes and her vagina. (9/20/85, 230-231.) (TL's mother, it should be noted, has also just finished telling TL that BT and JC had been in to talk to Braga that morning and that they had told her about the bad things that had happened at the Fusters. Id., 226-227.)

85. The Bragas gave frequent verbal rewards, telling children that they or the child's parents, will be so proud when they disclose. One example of the many to be found in the Braga interviews is the following:

> Braga: Okay. Well if sometime maybe you remembered something or if maybe some of the children told you something, then you could tell your mom and dad, okay? Because they wouldn't get mad.
> JL: They would get mad at Frank and Iliana.
> Braga: Yes, they would because they think that Frank and Iliana shouldn't do that to children but they wouldn't get mad at you. [*note: the child has not made any disclosures of abuse to this point so Braga's reference to things Frank and Iliana shouldn't do is an indication and use of stereotype induction. Please see below.*]
> JL: Yes because I told.
> Braga: Yes. They would be very proud.
> JL: Yes.
> Braga: And all the parents, all the moms and dads are real proud of their children if they don't keep a secret because they want their children to be safe. They don't want their children to be hurt.

(9/19/85, 64-65.)

### 6.      Interviews with Adults of High Status

86. Young children are sensitive to the status and power of their interviewers and as a result they are especially likely to comply with the implicit and explicit agenda of such interviewers. If their account is questioned for example, children may defer to the challenges of the more senior interviewer. To some extent, the child's recognition of this power differential may be one of the most important causes of their increased suggestibility. Children are more likely to believe adults than other children, they are more willing to go along with the wishes of

adults, and to incorporate adults' beliefs into their reports. This fact has been recognized by researchers since the turn of the century and has been demonstrated in many studies (Ceci & Bruck, 1993 for review).

87. Children may also be sensitive to status and power differentials among adults. This is a particularly important issue for the testimony of child witnesses who are interviewed by police officers, judges, and medical personnel.

88. A study by Tobey and Goodman (1992) suggests that under certain conditions, interviews by high status adults may have negative effects on the accuracy of children's reports. In their study, preschoolers played a game with a research assistant who was called a "baby-sitter." Eleven days later, the children returned to the laboratory. Half of the children met a police officer who said

> I am very concerned that something bad might have happened the last time that you were here. I think that the babysitter you saw here last time might have done some bad things and I am trying to find out what happened the last time you were here when you played with the babysitter. We need your help. My partner is going to come in now and ask you some questions about what happened.

A research assistant dressed-up as a police officer then questioned these children. The other children never met the police officer; they were only questioned by a neutral interviewer about what happened with the baby-sitter. When the children were asked to tell everything they could remember, the children in the police condition gave fewer accurate statements and more inaccurate statements than children in the neutral condition. Two of the 13 children in the police condition seemed to be decisively misled by the suggestion that the baby sitter had done something bad. One girl said to her mother, "I think the baby-sitter had a gun and was going to kill me." Later, in her free recall, the same child said, "That man he might try to do something bad to me....really bad, yes siree." The second child inaccurately reported his ideas of what something bad might be, by saying "I fell down, I got lost, I got hurt on my legs, and I cut my ears."

89. Goodman (1993) summarizes these findings as follows:

> One should be concerned not only with the actual questions but also with the context of the interview. An accusatory or intimidating context leads to increased errors in children's reports. (p. 15)

90. Most of the child witnesses in *Fuster* were interviewed by the police. We know from Detective Meznarich's report, for example, that she interviewed the following children prior to their being interviewed by the Bragas: JL (Bruck, Exh. 2 at 19); DL (id., 20); BT (id., 21); TL (girl) (id.; 22); SL (id., 28); JC (id., 29).

91. Another feature of some of the interviews in this case was that there was often more

than one adult questioner present. For example:

- The first official police interview we know of with JC was conducted with both Detective Meznarich and Assistant State Attorney Christopher Rundle present (Id., 29).
- Both Laurie and Joseph Braga interviewed JC together during his first several interviews;
- BT was interviewed at the RTC in the presence of counselor Cathleen McGinnis, Detective Meznarich, Assistant State Attorney Rundle and BT's father;
- DL was interviewed at the RTC by McGinnis with his mother present;
- The Bragas not only acted in tandem when interviewing children but often had the children's parents participate in the interviews as well.

92. One might argue that the presence of more than one interviewer may be a safeguard to ensure that the child told the truth. However, it also seems that additional adults merely multiply the number of questions and suggestive interview strategies to which the children are subjected. In *Fuster*, when one investigator or interviewer could not extract information from a child, sometimes another one took over. These increased questions may increase children's willingness to defer to the adults' agenda rather than to their own memories of whether an event actually occurred.

93. Note, for example, the interview conducted with BT (9/13/85, 14 et seq.), in which her father and mother both participated along with the Bragas, trying to induce BT to disclose. By page 61 of the interview, BT has not made any disclosures of a sexual nature despite the Bragas' asking her to describe secret games (BT says they played grocery store) and the Bragas asking her what games were played with no clothes on (BT says they all had clothes on.) Mr. and Mrs. T. then get involved in the interview: Now, in addition to L. Braga's suggestive techniques, BT also is exposed to those of her parents.

> MR. T.: Hey B., now it's time. Now we've been playing around, I want you to show me the games that you play. It's okay now. We all want to know. You won't get in any trouble.
> L. BRAGA: You know, I think some of the other children told us they got kind of scared because Frank and Ileana told them not to tell anybody but the other children talked to us and they felt much better after they talked to us. We thought you would feel better, too, if you told us what happened.
> BT: I'm going to put my things on like this and pretend I am a little girl (inaudible).
> MR. T.: B., what I want you to do is come down here for a second, okay?
> MRS. T.: Mommy will hold that.

> MR. T.: Hey, B., come over here. I know –
>
> B.: I'm playing.
>
> MR. T.: I know but I want to play with these dolls. I want you to show me what exactly happened in the secret game. You remember you were not supposed to keep secrets from Mommy and Daddy. You know that? . . . Come down, sit here for a few minutes and I want you to tell me about the secret games.
>
> BT: I don't want you to know.
>
> MR. T.: Come on.
>
> L.BRAGA: You won't get into any trouble. Nobody. What anybody told you, you won't get into trouble.
>
> MR. T.: No, not the grocery store game. Let's try the other game. . . .Aren't there other games that you play over there?
>
> J.BRAGA: Pee pee game.
>
> …
>
> MR. T.: You know what I want to hear. B., I want to tell you a secret. Come here. Come here. I want you to tell me about the pee pee game.
>
> BT: No.
>
> MR. T.: Why not?
>
> BT: There's no pee pee game.
>
> MR. T.: No pee pee game? What do you call it?
>
> BT: I call it (inaudible) game.
>
> MR. T.: Okay, tell me a little bit about it or show me. I want to see.
>
> BT: One, two, three. They stand on their head. It's hard for them.
>
> (Id., 61-64)

The interview continues like this for pages, with BT's father suggesting to BT that games were played with no clothes on and again alternately pleading and demanding that she tell him about the "secret" game. BT insists, "There's no secret game." Mr. T. responds, "There's no?" BT answers, "They did not tell me a secret game." BT then tells Mr. T. about a ghost game she has played at the Fusters in which the children sing, "Frank Fusters" to the tune of "Ghost Busters." (Id., at 66)

**7.    Stereotype Induction**

94. Stereotype induction refers to a process by which interviewers suggest to a subject that someone has certain personality characteristics or that the person has acted in a certain way. For example, in a 1994 study, children ranging in age from 4 to 6 years played some games with a man called "Dale." Dale also asked each child to help him take off his sweater. Later, an interviewer asked what had happened in the room with Dale. With half of the children, the interviewer reacted in a neutral way when the children reported an action. For the other half, the interviewer reinterpreted the child's responses in an incriminating way by saying, "He wasn't

supposed to do that. That was bad. What else did he do?" At the conclusion of these incriminating procedures, the children were asked three highly suggestive and misleading questions. 1) Didn't he take off some of your clothes, too?" 2) Other kids have told me that he kissed them, didn't he do that to you, too?" 3) He touched and he wasn't supposed to do that, was he?"

Following this, all the children were asked direct questions, requiring yes/no answers. Children in the incriminating condition gave many more inaccurate responses to these direct questions that did children in the neutral condition, mainly because they made errors on questions having to do with "bad" actions that had been suggested to them by the questioner. A full third of the children in the incriminating condition embellished their incorrect responses and the embellishments were always in the direction of making Dale seem worse. For example, some children not only reported (incorrectly) that Dale had touched them, but also reported other children Dale had touched, where he touched them (e.g. on the legs), how he touched them (e.g. he kissed some on their lips), and how he took off their clothes ("Yes, my shoes and my socks and my pants. But not my shirt.") These inaccuracies were not corrected by the children when they were interviewed again the following week; in fact, the embellishment continued. Moreover, the children in the incriminating condition made spontaneous negative reports about Dale and were more likely to agree that Dale intended to be mean, to fool around, to be bad, and not to do his job. Lepore, S.J. and Sesco, B. (1994).

95. Thus, stereotype induction can cause children to view a person in a negative light and can induce memories of bad acts that never occurred.

96. This technique was used repeatedly in the Braga interviews with every child. It is also clear that parents had identified for the children the fact that the Fusters were bad people. JL, for instance, comes into her first interview with Laurie Braga and tells her that the Fusters are strangers and that they went to jail. (9/19/85, 29) Examples of this can be found throughout the transcripts of interviews.

### 8.       Fantasy Techniques:  Thinking, Imagining and Hearing

97. In order to get children to report or to remember an event, interviewers sometimes ask children to first try to remember or pretend if a certain event occurred and then to create a mental picture of the event and think about its details. Sometimes children are encouraged to think about events by "pretend" play with props or with toys. Although there are problems with using these techniques with people of all ages (see Ceci & Bruck, 1995; Lindsay & Read, 1994), there are particularly serious deleterious effects for young children whose boundaries between reality and fantasy are fragile. Young children sometimes have difficulty distinguishing between memories of actual events and memories of imagined events (e.g., Parker, 1995; Welch-Ross, 1995). Thus, when young children are asked to pretend or try to think about certain events, they

35

may later come to believe that these imagined activities actually did happen. This is illustrated by the results of the following studies.

98.  Harris, Brown, Marriott, Whittall, and Harmer (1991) questioned preschool children about imagined ghosts, monsters, and witches. At first, the preschool children showed a firm grasp of the distinction between fantasy and reality, with most correctly stating that imagined ghosts, monsters, and witches were not real.  However, when the children were told to imagine that a pretend character was sitting in a box, many of them began to act as though the pretend character was real.  In one experiment, half of the children were told that the pretend character in the box was a rabbit and the other half were told that it was a monster.  After being told this, all the children agreed that it was only a pretend character and that the box was, in actuality, empty. When the experimenter attempted to leave the room for a few minutes, 33% of the 4-year-olds who had been told that there was a pretend monster in the box would not let her leave the room. None of the 6-year-old children acted this way.  Upon the experimenter's return, almost half of the children in both age groups said they wondered if perhaps there was an imaginary creature in the box after all.  These data illustrate the fragility of children's fantasy-reality distinctions.  When situations and questioning become more intense, a sizeable portion of children appear to give up distinctions between what is real and what is only imagined.  In this study, despite the fact that the children were repeatedly assured that the creatures were unreal, it seems that the experimental procedure that encouraged them to imagine that there were creatures in the box was mildly suggestive, thus breaking down their shaky differentiations within a short period of time.

99.  These results suggest that when young children with fragile fantasy-reality boundaries are asked to "pretend" about some events, even ones that seem bizarre, they may eventually become confused about what is real and what is pretend, especially when the interviewer fails to bring the child back to reality.

100.  Ceci and his colleagues (1994a) examined the effects of repeatedly asking young children to think about some event, creating mental images each time they did so.  In 11 consecutive interviews, preschool children were asked to think about fictitious events that according to their parents, they never experienced (e.g., falling off a bike and getting stitches) and real events (e.g., going to a birthday party). An interviewer told the children that they would hear about something that had happened to them when they were little and that they should try to make a picture of it in their head.  With each session, children increasingly assented to false events.  In another study with similar procedures, Ceci and colleagues(1994b) found that when asked to think about false events (e.g., the child's finger caught in a mousetrap) a significant number of children falsely assented to these events in the first interview.  Thus, when asked to think about a non-event, false assents can occur during one interview.

101.  Sometimes suggestions can be very subtly introduced to children who subsequently

36

incorporate these into their reports.  In a series of studies, Poole and Lindsay (1995, 1996) have shown how parents can subtly suggest false events to their children.  In their initial study (Poole & Lindsay, 1995), preschoolers played with "Mr. Science" for 16 minutes in a university laboratory. During this time, the child participated in four demonstrations (e.g., lifting cans with pulleys). Three months later, the children's parents were mailed a story book that was specially constructed for each child.  It contained a biographical description of their child's visit to Mr. Science. However, not all of the information was accurate; although the story described two of the experiments that the child had seen, it also described two that the child had not seen. Furthermore, each story finished with the following fabricated account of what had happened when it was time to leave the laboratory:

> Mr. Science wiped (child's name) hands and face with a wet-wipe.  The cloth got close to (child's name) mouth and tasted really yuckie.

The parents read the story to their children three times.  When later interviewed by the experimenters, the children reported that they had participated in demonstrations that, in actuality, had only been mentioned in the stories read to them by their parents.  When asked whether Mr. Science put anything "yuckie" in their mouths, more than half of the children inaccurately replied "yes", and many of these children elaborated their "yes" answers.  Moreover, inaccurate reports of having something "yuckie" put in their mouths increased on repeated questioning.  When asked, "Did Mr. Science put something yuckie in your mouth or did your Mom just read you this in a story?", 71% of the children said that it really happened.  The children made these claims even though they had been previously warned that some of the things in the story had not happened and they had been trained to say "no" to non-experienced events.

102.  This study demonstrates how subtle suggestions can influence children's inaccurate reporting of non-events that, if pursued in follow-up questioning by an interviewer who suspected something sexual had occurred, could lead to a sexual interpretation.  The study, along with several others, also illustrates preschoolers' susceptibility to "source monitoring" confusions. That is preschoolers have particular difficulty in identifying the source of a suggestion; children in this study confused their parent reading them the suggestion with their experience of the suggestion.  Thus, children  incorrectly answered questions such as:  "Did that really happen?" and "Did your mom tell you about it?"

103.  Poole and Lindsay (1996) recently replicated these findings with children from a wider age range (3 to 8 year olds).  The findings were similar across ages with one exception:  the source monitoring procedures enabled the older but not the younger children to reduce the rate at which they reported having experienced the suggested events.  That is, when asked, "Did Mr.

37

Science really put something yuckie in your mouth or did your Mom just read you this in a story?", the older children recanted their previous claims and said that their Mom had told them.

104.  The results of the Poole and Lindsay studies suggest that it is possible for children to incorporate suggestions that are delivered by their parents.  These suggestions need not be very salient but could be buried in a mass of other details, some of which are actually true.  The results also demonstrate that once children incorporate these suggestions into their reports, they may not remember that someone told them about the false event but rather come to believe that the false event really happened to them.

105.  A salient feature of the Braga interviews in *Fuster* was that the children were given anatomically detailed dolls and asked to pretend ("imagine") that these were the defendants or themselves. This request is similar in nature to having children "think" about false events (as described in the Ceci et al. studies). The interviews then became a stage for the child (sometimes with the Bragas) to play, pretend, and fantasize about what happened at the day care.

106.  There is no indication that interviewers tried to determine from the children whether or not they were showing events that actually happened or whether the actions were merely a reflection of the request to the children to play.  For example, when children were asked to enact the alleged abuse with the dolls, it is never clear whether the children were playing a game (that may eventually become real to them) or whether they were demonstrating abuse that actually took place.  An example of this confusion is demonstrated in the Braga interview with BT, recorded at 9/13/85, 14 et seq.

107.  During this first interview with the Bragas, Laurie Braga brings out anatomically detailed dolls and says, "Do you want to do a make-believe game with them and pretend?  Do you?" (9/13/85, 26)  Braga then suggests naming the other dolls after children at the babysitter's and after Frank.  BT introduces an entire squad of other toys into the game including Donald Duck, Minnie Mouse, Pinnochio, the Cat in the Hat, and Mr. Tiger. Interspersed with suggesting that they play some more with the dolls, the Bragas ask BT what games she played at the Fuster's house.  (Id., 44)  BT plays more with the doll but does not respond directly to that question.  Joe Braga suggests several more times that they "start playing again."  See, e.g., id, 50.  Joe Braga then pretends (using a doll) to be Frank speaking.  Eventually, the Bragas play a game with BT and the dolls in which they go to the grocery store and buy various kinds of food and bring them back home.  Joe Braga asks BT repeatedly to tell him what the "secret game" is that the Fusters taught BT.  BT does not seem to have any answer.  Then, Joe Braga suddenly says, "Do you remember though, do you remember the babysitter sometimes would play games without any clothes on?  Would she take her clothes off and play some of the games we play without clothes?" (id, 55)  BT responds that she is going to take the dolls' clothes off.  BT then proceeds to take the clothes off each of the dolls.  As she does, Joe Braga asks questions such as, "Does Iliana take her

38

clothes off?" (Id., 56.) BT answers, "Yes. She has all her clothes off." (Id., 56-57.) BT is talking about the doll at this point. It is unclear whether Joe is referring to the doll or to the real Iliana. Within another page of transcript, J. Braga says, "Okay, we want to play the games just like we play at the babysitters." (Id., 58.) Moments later, BT announces that all the dolls now have their clothes off and J. Braga suggests that they play the game "we play now. . . .We've all got out clothes off." (Id., 59) BT responds, "What about me? I'm not naked." (Id.) J. Braga tells BT, "You can pretend." (Id.) Braga continues to urge BT to demonstrate what Iliana and Frank will do, now that they are naked. (Id., 60) BT tells him they kiss. (Id.) (One can only get a true feeling for the level of confusion between reality and fantasy this interview would have engendered by reading it from start to finish. Bruck, Exh. 6, 9/13/85, 14 et seq.)

108. Of course, as the literature suggests, it may become impossible for children to make differentiations between reality and fantasy when they are suggestively interviewed.

109. The prosecution experts in Fuster however had their own non-scientific interpretation. They testified that children's action in such play situations were indicative of what was going on in their own lives (L.Braga, 9/27/85, 34) and that asking children about the reality of their fantastic statements might be deleterious to the disclosure process because the challenge would convey the interviewer's disbelief to the child (Id., 39)

## 9.    The Use of Props and Cues

110. Anatomically detailed dolls are frequently used by professionals when interviewing children about suspected sexual abuse. The major rationale for the use of anatomical dolls is that they allow children to manipulate objects reminiscent of a critical event, thereby cueing recall and overcoming language and memory problems. It is also argued that the dolls are used to overcome motivational problems of embarrassment and shyness. Despite the lack of any empirical evidence about the risks or benefits of using dolls and other similar materials (the use of line drawings and puppets), several state experts provided endorsements for the use of such techniques.

111. Moreover, the prosecution ridiculed Dr. Coleman, the defense expert, for his unsupported statements that anatomically detailed dolls created problems of false reporting when used with children. (9/24/85, 186-190, 210)

112. Contrary to the testimony of the state experts and the sarcastic rebukes of the prosecutor when cross-examining Dr. Coleman, the use of anatomically detailed dolls has raised grave concerns among clinicians and researchers for at least two reasons. First, the dolls are themselves suggestive (especially when used by a biased interviewer) and encourage the child to engage in sexual play even if the child has not been sexually abused (e.g., Terr, 1988). A child, for instance, may insert a finger into a doll's genitalia simply because of its novelty. Second, it is impossible to make firm judgments about children's abuse status on the basis of their doll play because, until recently, there were no normative data on non-abused children's doll play. Over the

39

past several years, researchers have conducted a number of studies to address these concerns.

113. There are several important findings of this research. First, there is no consistent evidence to suggest that there are characteristic patterns of doll-play for "abused" children. Many studies show that the play patterns thought to be characteristic of abused children, such as playing with the dolls in a suggestive or explicit sexual manner, or showing reticence or avoidance when presented with the dolls, also occur in samples of non-abused children. For example, Goranson (1986) conducted doll-centered interviews with 14 preschool non-abused children. The interviewer asked each child if anyone had touched their genitalia. The interviewer then followed up with more specific questions. None of the children used the dolls to demonstrate sexual intercourse. However, 50% of the children did insert their finger in the opening for the vagina or anus, and most stroked or tugged the penis or used it as a handle to swing the dolls. See, for example, the description in the police reports of DL's use of the dolls. At the RTC, he is given anatomically detailed dolls and questioned about games he played with his babysitters.

> Miss McGinnis asked him if they played special games, and he replied, "Yes."
> During the conversation, DL undressed all of the dolls and laid them down on the floor.
> When asked about the games, D. pulled on the front of his pants; and when asked "who",
> he said, "Frank." D. then took the penis of the small boy doll and pulled on the penis.

(Bruck, Exh. 2 at 26)

114. Second, more recent studies indicate that use of the dolls does not improve accuracy of reporting by young children. In some cases, children are more inaccurate with the dolls, especially when asked to show with the dolls certain events that never happened. For instance, three-year old children visited their pediatrician for their annual check-up (Bruck, Ceci, Francoeur & Renick, 1995). Half the children received a genital examination where the pediatrician gently touched their buttocks and genitals. The other children were not touched in these areas. Immediately after the examination, an experimenter pointed to the genitalia or buttocks of an anatomically detailed doll and asked the child, "Did the Doctor touch you here?" Only 45% of the children who received the genital exam correctly answered yes; and only 50% of the children who did not receive a genital exam correctly answered "No" (i.e. 50% of these children falsely reported touching). When the children were simply asked to "Show on the doll" how the doctor had touched their buttocks or genitalia, accuracy did not improve. Now only 25% of the children who had received genital examinations correctly showed how the pediatrician had touched their genitals and buttocks. Accuracy decreased in part because a significant number of female subjects inserted their fingers into the anal or genital cavities of the dolls; the pediatrician never did this. 55% of the children who did not receive genital examinations falsely showed either genital or anal touching when given the dolls. Researchers have obtained similar results in a study of 4-year old

40

children (Bruck, Ceci & Francoeur, 1995).

115.   The interview procedures used in the Bruck, Ceci & Francoeur doll studies also elicited a number of other behaviors that adults might misinterpret as sexual. When the children were given a stethoscope and a spoon and asked to show what the doctor did or might do with these instruments, some children incorrectly showed that he used the stethoscope to examine their genitals and some children inserted the spoon into the genital or anal openings or hit the doll's genitals. A number of other children showed aggressive behaviors with the dolls, hitting them with some of the props provided.

116.   Some data suggest that repeated exposure to the dolls may lead young children to fabricate highly elaborate accounts of sexual abuse. For example, after a third exposure in a period of a week to an anatomically correct doll, a non-abused 3-year child, reported to her father how her pediatrician had strangled her with a rope, inserted a stick into her vagina and hammered an earscope into her anus (see Bruck et al, 1995).

117.   Research reveals similar concerns about the use of anatomically detailed dolls with children as old as 6 years of age.  Steward and Steward (1996) interviewed children (ages 3-6 years) three times after a pediatric clinic visit.  With each interview, children's false reports of anal touching increased; by the final interview, which took place 6 months after the initial visit, more than one-third of the children falsely reported anal touching.

118.   The "sexualized" behaviors that the children demonstrated in the above studies do not necessarily reflect young children's initial sexual knowledge or experiences, but two other factors. First, the types of questions and props used in an interview (asking children to name body parts, including genitals, showing children anatomically detailed dolls and asking children to manipulate these dolls) make children think that it is not only permissible, but expected, that they respond to the interviewers' questions using these same terms. Second, these props are interesting to young children, and they may insert fingers into cavities or show sexual acts because these are creative ways of playing with the dolls, especially if they are encouraged to do so by their adult interviewers.  Of course, the suggestive use of the dolls in interviews may result in children's increased knowledge about anatomy and sexual activities that they did not have before being introduced to the dolls or similar props.

119.   In *Fuster*, the dolls may have been among the most important techniques used.  They were used immediately with the children at the Rape Treatment Center and were used thereafter in virtually ever interview conducted by the Bragas.  All of the interviewers appear to have assumed that any sexualized doll play was an accurate reflection of what took place at the Fusters and made no attempt to test alternative hypotheses.  (For instance, no one tried giving the dolls names of neutral adults or parents, undressing the dolls, and seeing how the children then played with them.)

41

120.  Notes from police investigators who observed or talked to counselors at the Rape Treatment Center, though scant, are revealing about the methods employed by the counselors and the children's responses.  Note, for example, the descriptions of the use of dolls at the RTC with BT and with TL (a girl):

> Miss McGinnis then spoke to BT with this investigator, Mr. Rundle and her father in the conference room of the Rape Treatment Center.  Miss McGinnis introduced BT to the dolls with their clothes on, then explained that they were like real girls and boys, and then she removed the clothing.  While doing so, BT watched.  Miss McGinnis asked if she had a babysitter, and BT stated, "I do", then identified her as Ileana.  She also said Ileana had a friend named Frank, but that only Ileana watched her.  While there, she, Ileana and the other children played games.

> After undressing the four dolls, Miss McGinnis encouraged her to play with them, and BT laid them side-by-side, covered them with a cloth and announced they were sleeping.  During the session, Miss McGinnis pointed to the large doll's penis and asked if she had ever seen one before.  BT replied, "My daddy's.", then was asked if she had ever seen Frank's.  When she answered "yes", she was asked which was larger and she replied "Frank's."  BT began to play with her dolls, which she had brought and continued efforts to interest her in the anatomically correct dolls failed.  The session ended soon after, and BT left the Rape Treatment Center with her parents.

Bruck, Exh. 2 at 26-27.

> Mrs. McGinnis [a nurse/counselor] advised she had had a session with TL that morning; and during the session, she had showed the anatomically correct female doll to TL and she had asked what "nipples" were called.  After advising TL "nipples", TL lifted up the skirt, and Miss McGinnis says she asked her if she had ever showed anyone else, and TL stated, "Two people in school."  When asked what about Frank and Ileana, TL had said, "Yes."  Miss McGinnis advised she asked TL what she did at Frank's, and she indicated he touched her on the "boob" and "climbed" on top of her and kissed her.  At that time, TL indicated Ileana was also in the room.  According to Miss McGinnis, TL laid the doll, she identified as herself, down and placed the large male doll, she identified as Frank, on top of her and rubbed the boy doll's penis on the girl doll's vaginal area.  At the time TL did this, both dolls were completely naked.

Bruck, Exh. 2 at 26.

121.  It is important to note that the interview described here with BT was actually attended by the detective who wrote this narrative while the interview with TL was reported to the detective by nurse McGinnis.  As I discuss and caution further on, there is no way to judge the accuracy of reporting interviews when electronic recordings are not used.  One can readily see here, at least, that it was McGinnis who undressed the dolls for BT and continued trying to interest the child in them when the child wanted to play with her own, non-sexualized, dolls.

42

According to the report of the interview with TL, the child pulled up the doll's dress and the interviewer immediately assumed that the child was demonstrating something that the child had done to herself in real life. The interviewer, according to her report at least, then plunged into a series of highly directed and leading questions. (Note that, when BT plays with the dolls in a non-sexual way, covering them with a cloth and putting them to sleep, it does not appear that anyone assumes her actions are a reflection of reality.)

122.   The use of anatomically detailed dolls served as the centerpiece of many of the Braga interviews.  The children were not only asked to pretend with these dolls but were told what names to assign to the dolls – *i.e.*, Frank and Iliana and, typically, the child being interviewed and perhaps other children, as well. Two year old Scotty Marks was shown two female dolls and asked which of them looked more like Iliana than the other.  When one reviews the tape of this interview, one can readily see that Laurie Braga was not showing Scotty the dolls' faces.  In fact, Braga had the dolls' faces covered by their dresses and is showing Scotty only the dolls' genitalia.

123.   In addition, the Bragas used leading questions (these included yes/no questions and forced choice questions) that contained explicit sexual information and asked children to show them, using the dolls, how various games in the nude were played *or would have been played* if they had happened.  For example, in Laurie Braga's first interview with JL, she asks the child what types of games were played at the Fusters. JL responds, "We just played with their toys." (9/19/85, 30) Braga then introduces JL to a set of anatomically correct dolls and tells the child that these are the dolls that she has used with JL's younger brother and with some of the other children, naming the dolls Frank, Iliana and assigning some of the children's names to the child dolls. (Id., 35) When JL specifically denies having played Ring-around-the-Rosy and Simon Says, two games JC had earlier told the Bragas were played in the nude at the Fusters, Braga suggests that perhaps they played "duck, duck, goose." JL says they did not play this either but agrees to engage in a game of it with Braga and the dolls. (Id., 36-37)  During the course of the interview, this game continues while Braga and JL discuss the fact that Frank is in jail and how that makes JL feel.  When JL asks if Frank did something bad, Braga responds that she does not know for sure but that other children have told that he did and that one child took the dolls and removed all their clothes. (Id., 47-49).  The interview continues:

> JL:  Do you know what he did?
> Braga:  Well, I'm not sure because I am not like a policeman or something like that.  So I am not sure but would you like me to tell you what D. said?  Okay, David said – he took the dolls and he kind of talked a little and he showed me and one of the things is that he took all the clothes off the dolls.
> JL:  Why?

43

> Braga:  Well, he said that the children played a game like – one of the games he said they would play was ring around the rosy.
> JL:  With no clothes on?
> Braga:  No clothes on.
> JL:  That's one of the games that's bad.
> Braga:  Yes.  Do you think- do you think D. was telling the truth?
> JL:  (Shakes her head no.)
> Braga:  You don't?  Does D. tell stories?
> JL:  (Nods yes.)

(Id., 47-49)  Braga and JL start playing with the dolls, Braga telling JL that the dolls are just pretend, not real.  JL asks Braga to take the dolls' clothes off and Braga does, responding, "Maybe you can show me if they are just pretend what they might do."  (Id., 49)  For the next 18 pages of transcript, Braga tells this child that other children, including older children, have accused Frank of touching them and playing games in the nude and also tells JL that Frank is in jail because he may have touched other children's "private parts."  (Id., 49-66)  Finally, Braga asks JL if she has any questions.  The following dialogue then takes place:

> JL:  No but I wonder if they played ring around the rosy with no clothes on?
> Braga:  Do you think they did? …Do you think maybe so?
> JL:  (nods yes.)
> Braga:  You know ring around the rosy and they go all fall down?  Do you know what they would do then?
> JL:  They would just fall down.
> Braga:  And anything else?
> JL:  I wonder if they played or (inaudible) no clothes on.
> Braga:  I don't know.  I wonder.  …I wonder if they did play duck, duck, goose with no clothes on.
> …
> Braga:  I wonder if they did, if they would like touch each other in their private parts.  Do you think?
> JL:  (Shakes her head no.)
> Braga:  No?  You don't think so?  If they did, you think that they probably played it with their clothes off?
> JL:  Off?
> Braga:  Off.  What do you think they would do with their clothes off?
> JL:  Play games.
> Braga:  Like what?
> JL:  They would touch somebody bad with no clothes on.
> Braga:  They would touch (inaudible) with no clothes on?
> JL:  Yes, bad, bad parts.
> Braga:  What, can you show me?
> JL:  Like coming (inaudible) your hair and touching like (inaudible).

44

Braga:  Something like that?  Could you pretend and show me with one of the dolls?

(Id., 66-68)  Note the combination of suggestive interviewing techniques employed in this one excerpt:  evident bias, leading questions, peer pressure, stereotype induction, confusion of fantasy play with reality, and all tied together with the use of anatomical dolls.  One can see the evolution of this child's reports here as this four-year-old child, who only attended the babysitting service once for an afternoon, begins only by saying that she played with toys there and that she knows from her mother that the Fusters are strangers, to discussing games (she earlier denied having played at all) and acceding to the suggestion that these games were played in the nude.

124.  This is a potentially dangerous combination of techniques because it can result in children providing false reports of touching.  It is highly possible, therefore, given the scientific evidence, that the children in *Fuster* came to make a variety of sexual allegations as a result of their play and exposure to dolls.  It was these materials along with interviewers' explicit sexual questions that could explain these children's seemingly precocious sexual knowledge that unfolded throughout the investigatory process.  (Studies on the effects of using a combination of suggestive interviewing techniques are reviewed in the next section.)

125.  When children in *Fuster* were interviewed in 1984 and 1985, there were no scientific data to guide the interviewers' decisions to routinely use dolls and drawings in conjunction with leading questions when questioning young children about sexual abuse. Indeed, when Dr. Coleman testified in 1985, there were no scientific data upon which he could rely to support his position that the dolls should not be used to interview young children.  Instead, he was forced to acknowledge on cross-examination that these dolls were indeed widely used, that he knew of no experts in the field who shared his concern about the use of the dolls and was aware of no scientific studies that supported his views.  Thirteen years later, however, there are now sufficient data to show that the interviewing techniques used with these children were faulty and have a high risk of producing false allegations.

**10.     Use of Peer Pressure  (Your Friends Said....)**

126.  The effects of letting children know that their friends have "already told" is a much less investigated area in the field of children's testimonial research.  Certainly, the common wisdom is that a child will go along with a peer group; but will a child provide an inaccurate response just so he or she can be one of the crowd?  The results of two studies suggest that the answer is "yes."

127.  First, Binet (1900) found that children will change their answers to be consistent with those of their peer group even when it is clear that the answer is inaccurate.  Second, Pynoos and Nader (1989) studied people's recollections of a sniper attack.  On February 24,

45

1984, from a second story window across the street, a sniper shot repeated rounds of ammunition at children on an elementary school playground. Scores of children were pinned under gunfire, many were injured, and one child and a passerby were killed. Roughly 10% of the student body, 113 children, were interviewed 6 to 16 weeks later. Each child was asked to freely recall the experience and then to respond to specific questions. Some of those children who were interviewed were not at the school during the shooting, including those already on the way home or on vacation. Yet, even the non-witnesses had "memories":

> "One girl initially said that she was at the school gate nearest the sniper when the shooting began. In truth she was not only out of the line of fire, she was half a block away. A boy who had been away on vacation said that he had been on his way to the school, had seen someone lying on the ground, had heard the shots, and then turned back. In actuality, a police barricade prevented anyone from approaching the block around the school." (p. 238).

One assumes that children heard about the event from their peers who were present during the sniper attack and they incorporated these reports into their own memories.

128. The Braga interviews contain some clear examples of peer pressure being used on children. The following exchange between Laurie Braga and JL shows what a threat to accuracy the use of peer pressure can be in an interview:

> Braga: Some of the children don't understand. They are afraid. Some children said that they were acting like monsters and they wore these masks and scared them.
> JL: Is that true?
> Braga: I am not sure but some of the children said so and I believe the children because I don't think children make up stories like that. Do you?
> JL: Which children?
> Braga: Well, D. and some of the other children.
> JL: They were bigger than me.
> Braga: Well, most, some of them were bigger than you and some of them were littler than you.
> JL: But some of them are bigger than me and did they tell that they were naked or anything like that?
> Braga: Yes.
> JL: What did they say?
> Braga: They said that they played games with Frank and Iliana and some of the littler children and everybody took off their clothes and they played games and people touched each other's private parts.
> JL: That's true.
> Braga: Is it true?
> JL: Yes but D. (inaudible) the other children said it, so D. might be right.
> Braga: You think D. might be right?

  JL: Right. Right because the bigger children said that.

  Braga: You thought maybe if D. said it, maybe it wasn't right?

  JL: But now I found out that it was true because other children said it.

(9/19/85, 63-64)

  129. It is also clear from depositions and police reports that parents told other parents what their children had said and in some cases this led to further concern and thus questioning of their own children. See Bruck, Exh. 2 at 8 and 10-11. See also, Bruck, Exh. 5 at 15-16 and 27-31, in which Mary Lerow, a friend of TL's (a girl) family and a police officer who was not assigned to this case, describes how, parents of the Country Walk children began having meetings with each other from an early point in the investigation and that she herself, who was convinced the children had been sexually abused, talked to the parents of AP, JC, JL, SM, and BT.

  130. The next section reviews two recently completed studies that demonstrate the power of telling children what other children have said when this technique is combined with other suggestive techniques.

### 11. Combinations of Suggestive Interviewing Techniques

  131. The studies discussed above have predominantly examined the effect of using a single suggestive technique on the accuracy of children's reports. However, when a number of techniques are combined in one interview, as was the case with the child witnesses in *Fuster*, these procedures have detrimental effects much larger than might be expected. Two recent studies support this conclusion.

  132. The first study (Bruck, Ceci, & Hembrooke, 1998) examined the impact of repeatedly interviewing children with a combination of suggestive procedures. Preschool children were asked to tell about two true events (a recent punishment and helping a visitor at their school who had hurt her ankle) and about two false events (helping a lady find her monkey in the park and witnessing a thief steal food from the day care).

  133. Children were interviewed on five different occasions about the four events. In the first interview, the children were asked if the event had happened and if so to provide as many details as possible about its occurrence. The next three interviews included a combination of suggestive interviewing techniques that have been shown to increase children's assents to false events. These techniques included: the use of peer pressure ("Megan and Shonda were there and they told me you were there, too."), visualization/pretend techniques (try to think about what might have happened), repeating (mis)information, and providing selective reinforcement ("It's so wonderful that there are such nice kids like yourself to help people out when they need it. You know it's really important to help people out."). The same interviewer questioned the children for

47

the first four interviews.  In the fifth interview, a new interviewer questioned each child about each event in a non-suggestive manner.

134.  Across the five interviews, all of the children consistently assented to the true-helping event.  However, children were at first reluctant to talk about the true-punishment event; many of the children denied that the punishment had occurred.  With repeated suggestive interviews, the children agreed that the punishment had occurred.  Similar patterns of disclosure occurred for the false events; that is, children initially denied the false events but with repeated suggestive interviews they began to assent to these events.  By the third interview, most children had assented to all true and false events, which included witnessing a thief take food from the day care.  This pattern continued to the end of the experiment.  Thus the combination of suggestive techniques (that were also used in *Fuster*) produced high assent rates for true and false events, one of which was a criminal act.

135.  This study illustrates both the beneficial as well as baleful consequences of using suggestive techniques to elicit reports from young children.  For children who may not want to talk about unpleasant but true events (the punishment), the use of repeated interviews with suggestive components did prompt them to correctly assent to previously denied events.  However, the use of these very same techniques prompted children to assent to events that never occurred.

136.  A study by Garven, Wood, Shaw, & Malpass (1997) shows how a combination of suggestive interviewing techniques that were used in the McMartin case (People v Buckey) can compromise the accuracy of children's reports in one short 10 minute interview.  In this study, a stranger visited children at their day care and read them a story.  One week later, children (between the ages of 3 and 6 years) were interviewed about the visit.  Half the children were asked leading questions (e.g., "Did Manny break a toy?").  The other children were also asked leading questions but in addition other suggestive techniques were used including peer pressure ("The other kids said that…"),  positive consequences (giving the child praise for certain answers and telling him that he is a good helper), negative consequences (telling the child that this was not the appropriate answer, and repeating the question), enjoinders to think about it (children were asked to think hard about questions they said "no" to) and enjoinders to speculate (asking children to pretend or to tell what might have happened).  Children in the combined technique condition accurately answered approximately 42% of the questions compared to an accuracy rate of 83% of children who were just asked leading questions.  The children in the combined suggestion group claimed that Manny said a bad word , that he threw a crayon, that he broke a toy, that he stole a pen, that he tore a book and that he bumped the teacher.  Another important result of this study is that children in the combined suggestion condition came to make more false claims as the interview progressed: that is within a short 5 to 10 minute interview, children made more false

48

claims in the second half than in the first half of the interview. Thus, the children had learned what types of answers the interviewer wanted to hear.

137. Taken together these studies suggest that when suggestive interviewing techniques are used in combination, young children can quickly come to make false reports that involve harm and wrong doing. Please see the interview described above with JL and Laurie Braga under the heading of anatomically correct dolls as an example of this occurring in Mr. Fuster's case..

## 12.    Credibility of Children's Reports Produced by Suggestive Interviewing Techniques

138. The prosecution introduced testimony of a host of therapists who described themselves as child care professionals. These included: Dr. Barbara Goldman, Jennifer Litwin's therapist; Dr. Doris Stiles, Brooke Toby's therapist; Dr. Jerome Poliacoff, Scotty Marks' therapist; and Dr. Simon Miranda, who was directed by Child Protective Services to evaluate Noel Fuster. Towards the conclusion of each of these therapist's testimony, the prosecutor asked him or her the following question:

Is [child's name]'s behavior absolutely consistent with a child who is disclosing to you actual sexual abuse and is not telling you something he's either made up or has been forced to say or has been programmed or influenced to say?

139. In each case, the state expert answered that, indeed, the child's behavior was consistent with a child who was disclosing actual sexual abuse. (9/4/85, 152); (9/4/85, 254-55); (9/5/85, 165-66); (9/10/85, 54).

140. Each of these experts then proceeded to explain what factors he or she considered in determining whether the child under his or her observation was telling the truth versus lying or seeming programmed.[2] The experts noted the emotive quality of the children's reports, the detail of these reports, the lack of rigid consistency in the telling, and the sexual knowledge that a child that age would not ordinarily have. Other state experts, most notably Drs. Joseph and Laurie Braga, expressed the opinion that children are incapable of lying..

141. It has often been stated that it is easy to detect false reports that are the result of suggestion, because it was thought that children were merely "parroting" the words of their interrogators. However, evidence from the past decade, provides no support for this assertion. First, we have found that when children are suggestively interviewed, their subsequent narratives include false reports that were not suggested to them, but that are consistent with the suggestions

---

[2] In this affidavit, I avoid the term "lie" because it denotes the child's conscious attempt to dupe or deceive their interviewer. When children provide false reports as a consequence of suggestive interviewing procedures, their statements are not considered lies because the child's intent is not to deceive but rather in some cases to please or comply with their interviewer and sometimes the false statements represent the child's belief (a false memory) of what actually happened.

49

(e.g., Bruck, Ceci, Francouer & Barr, 1995; Bruck, Ceci & Hembrooke, 1997).

142. Second, subjective ratings of children's reports after suggestive interviewing reveals that these children appear highly credible to trained professionals in the fields of child development, mental health, and forensics (e.g., Leichtman & Ceci, 1995, Ceci et al. 1994); these professionals cannot reliably discriminate between children whose reports are accurate from those whose reports are inaccurate as the result of suggestive interviewing techniques. The children who provided the false reports spoke sincerely and provided accounts laden with emotion and perceptual details.

143. Third, results of a recent study revealed that linguistic markers do not consistently differentiate true from false narratives that emerge as a result of repeated suggestive interviews. In the Bruck et al., study (1997) where children were repeatedly and suggestively interviewed about true and false events (described above), the children's narratives of the false events actually contained more embellishments (including descriptions and emotional terms) and details than their narratives of the true events. Also the false narratives had more spontaneous statements than the true narratives. Thus on these dimensions, the experts in *Fuster* were totally wrong in terms of their criteria for determining truth.

144. Of relevance to the present case, two measures differentiated the true and false stories. First, children were more likely to repeat the same details across interviews for true than for false narratives. Thus, the true narratives were more "consistent" than the false narratives. One reason for this difference was the fact that with each retelling, children included more new details in their false than in their true narratives. The experts in *Fuster* told the court that false stories are characterized by rigid consistency—exactly the opposite pattern to what is found in the new scientific literature (Dr. Miranda, 9/4/85, 253).

145. A second factor that differentiated true from false stories was the number of aggressive, exaggerated, and fantastical details in false compared to true narratives. In *Fuster* after several suggestive interviews, most children began to make fantastic and bizarre claims. JL, for example, has a second interview with the Bragas after having had 17 sessions with a private therapist. In this second Braga interview, JL now tells the Bragas about a game she played at the Fusters (with their clothes off) called "Cut your head off." With some prompting, JL describes a game in which Frank would ask the children if they wanted a cupcake. If they said yes, he would cut their heads off. She then says Frank held a knife to their throats and revises this and says Frank used a saw. (9/21/85, 224-226). JC's reports also become increasingly fantastic. By his fifth interview with the Bragas, JC reports that Iliana wore something around her neck that gave her energy like "Black Beard" and that the pee pee devil and the ka ka devil and dragons would come out of the toilet to get you. JC also says the Fusters put ka ka in his drink. (9/19/85, 409-410). Bruck et al.'s data suggest that perhaps these claims were merely a product of the

50

interviewing process and did not reflect the children's past experiences.

146. Taken together these studies suggest that when suggestive interviewing techniques are used in combination, young children can quickly come to make false reports that involve harm and wrong doing. With repeated interviewing, not only do false assents rise, but most importantly the children's false narratives take on many of the characteristics of what is thought to define true narratives. The children's words and demeanor are often deceptively authentic even to the well-seasoned professional.

      F.      **Summary of the Research Findings of Disclosures that Emerge from Suggestive Interviews**

147. The present state of scientific knowledge about the reliability and credibility of the testimony of child witnesses indicates the following:

      a.      There are reliable age effects in children's suggestibility, with preschoolers being more vulnerable than older children to a host of factors that contribute to unreliable reports.

      b.      Although young children can be accurate reporters, they do make errors – sometimes elaborate ones -- particularly when they undergo suggestive interviews. These errors involve not only peripheral details, but also central events that involve their own bodies. At times children's false reports can be tinged with sexual connotations. In research studies, young children have made false claims about "silly events" that involved body contact (e.g., Did the nurse lick your knee? Did she blow in your ear?), and these false claims persisted in repeated interviewing over a three-month period. (Ornstein, Gordon, & Larus, 1992) Young children falsely reported that a man put something yuckie in their mouth. (Poole & Lindsay, 1995, 1996) Preschoolers falsely alleged that their pediatrician had inserted a finger or a stick into their genitals (Bruck et al, 1995) or that some man touched their friends, kissed their friends on the lips, and removed some of the children's clothes. (Lepore & Sesco, 1994). A significant number of preschoolers assented to suggestions that a doctor had cut out some bone in the center of the child's nose to stop the child from bleeding (Quas et al, in press). A significant number of preschool children falsely reported that someone touched their private parts, kissed them, and hugged them. (Goodman et al., 1990; Goodman, Bottoms, Schwartz, Kenney & Rudy, 1991; Rawls, 1996; Melnyk, Bruck & Ceci, 1997) When suggestively interviewed, children will make false allegations about nonsexual events that have serious legal consequences were they to occur. For example, preschoolers claimed to have seen a thief in their day care. (Bruck et al., 1997)

      c.      Suggestive interviewing affects the credibility of children's statements. As a result, even professionals cannot tell when suggestively interviewed children are providing a true or false report. The major reason for this lack of accurate discrimination is that children's reports, that are the result of suggestive techniques, come to take on a life of their own, in certain respects. Their

51

reports are not simple reflections or monosyllabic responses to leading questions. Under some conditions, their reports become spontaneous and elaborate, going beyond the suggestions provided by their interviewers. For example, in the recent Bruck, et al., study (1997), children's false reports contained the prior suggestion that they had seen a thief take food from their day care; but these reports also contained nonsuggested details that included chasing the thief, hitting the thief, and shooting the thief.

     <u>d.</u>      Measures can be taken to lessen the risk of suggestibility effects. To date, the factors that we know most about concern the nature of the interview itself -- its frequency, degree of suggestiveness, and demand characteristics.

     -- A child's report is less likely to be distorted, for example, after one interview than after several interviews (the term "interviews" here includes informal conversations between parents and child about the target events).

     -- Interviewers who ask non-leading questions, who do not have a confirmatory bias (i.e., an attachment to a single hypothesis), and who do not repeat close-ended yes/no questions within or across interviews, are more likely to obtain accurate reports from children.

     -- Interviewers who are patient, non-judgmental, and who do not attempt to create demand characteristics (e.g., by providing subtle and explicit rewards for certain responses) are more likely to elicit better quality reports from young children.

     148. Thus, if during the initial interview, the child is asked neutral non-leading questions about suspected abuse, and if the child provides an account in their own words of abuse, then one might have some confidence that the child had observed or participated in these events. On the other hand, if during the first interview, the child initially denies any knowledge of abuse, and only makes allegations as the result of suggestive interviewing practices in the first and subsequent interviews, then there is a high risk that the child's reports have been tainted.

     149. In *Fuster*, the most consistent pattern of disclosure was that when the children were first questioned by their parents, they all consistently denied that they had been abused. As the investigation continued, as parents gathered more knowledge about the allegations, and as children were repeatedly interviewed by biased interviewers, charges of sexual abuse emerged and expanded.

     e      Finally, it is also important that the court appreciate the complexity of the interrelationships of the factors affecting children's suggestibility. Even though suggestibility effects may be robust, the effects are not universal. Thus, even in studies with pronounced suggestibility effects, there are always some children who are highly resistant to suggestion. This pattern also occurred in *Fuster* interviews: in some cases, no matter how much the interviewers tried to suggest that an event occurred, some children consistently resisted and did not incorporate the interviewer's suggestion or point of view. On the other side, although

52

suggestibility effects tend to be most dramatic after prolonged and repeated interviewing, some children incorporate suggestions quickly, even after one short interview (e.g.Clarke-Stewart, et al., 1989; Garven et al., 1997).

### IV    The Testimony of Dr. Lee Coleman, Defense Expert

150.  Dr. Lee Coleman testified on September 24, 1985 as the defense's only expert witness.  Dr. Coleman provided insightful testimony on the factors that could influence a child to make a false report of sexual.  For example, Dr. Coleman noted that a variety of factors used in the interviews could, in his view, contaminate a child's report.  These included: use of anatomically detailed dolls (9-24-85, 47); encouraging a child to fantasize about abusive conduct, with or without anatomically detailed dolls as a prop (id., 48); interviewers ignoring obvious comments by children that showed them to have been influenced by outside contacts (id. 49); reinforcement by interviewers of children's answers that were consistent with abuse with comments like "I'm so proud of you for telling.  You're so brave." (id., 50-51); use of leading and manipulative questions (id., 52); asking children multiple choice questions (id., 52-53); repeated questions(id., 53); interviewers ignoring children's comments that were unquestionably fantasy while automatically accepting statements from the same child that were consistent with the interviewer's theory that abuse had occurred (id., 53); use of peer pressure, distortion of previous remarks made by the child, use of one child's statements against another (id., 54, 56-57); the length of the sessions and the number of adults present (id., 55-56); and the recruitment by the Bragas of the parents to adopt the same biases that they had (id., 57-58).

151.  Dr. Coleman then analyzed each child's interviews with Drs. Joseph and Laurie Braga and pointed out where the Bragas had used each of the techniques he (Coleman) had earlier criticized.  (Id., 72-163)

152.  Dr. Coleman's testimony was on the mark in terms of many of the factors that influence children's reports of abuse.  Unfortunately, Dr. Coleman's credibility as an expert in the subject was dismantled on cross-examination because he could not provide a single study to support his intuitions.  He was also unable to cite the name of any other expert who would support the theories he had put forward. (This was not because Dr. Coleman was unprepared; it was because, at the time, there were none.)  For example, the prosecutor asked Dr. Coleman if he knew of any "statistically verified studies" that called into question the reliability of anatomically detailed dolls.  Dr. Coleman answered, "No." (Id., 181-182)  Dr. Coleman was forced to admit that there are no studies that would prove how likely it was that a child could be manipulated by the interviewing techniques he had earlier described to the jury. (id., 182).

153.  Dr. Coleman was then asked by the prosecutor to name three or four leading experts who have done research in the area of child fantasy.  Dr. Coleman could only provide the names

53

of people who had conducted research (at that time) that showed the strength of children's memories (id., 184-185), a point the prosecutor then highlighted.

154.   The prosecutor eventually drove home the point to the jury, through his questions to Dr. Coleman, that no experts agree with Coleman and that even the experts Coleman himself has named as being the "leaders" in the field have documented the strength of children's memories, not the weaknesses. (id., 186-190)  In fact, the prosecutor returned to this theme with Dr. Coleman after first moving into other areas. (id., 210)

155.   As documented in the prior sections, there were no studies conducted at the time of or prior to the trial to provide direct support for Coleman's opinions. This is not to say that studies actually contradicted his conclusions.  Rather, the experiments being performed were simply not relevant to the types of challenges to which children's memories were being put when they were interviewed in sessions like those conducted by the Bragas.  However, as also reviewed in the previous sections, Coleman's opinions preceded the scientific data which in the decade of the 1990s matched and supported his clinical intuitions .

## V.       Electronic Recording of Interviews is Necessary to Support Any Claim That Interviews Were Not Suggestive or that Children's Resulting Reports are Accurate or Reliable

156.   As is demonstrated in the previous section, the exact wording of each question asked of children during investigative interviews -- as well as the number of times questions are repeated and the tone of questioning -- is necessary to determine whether strategies recognized as capable of affecting the reliability and accuracy of children's reports were applied -- consciously or unconsciously -- by interviewers. Without electronic recordings of interviews this information cannot be preserved.  Thus, claims by investigators that their unrecorded interviews were not suggestive or that children spontaneously reported abuse cannot be supported. Because suggestive interviews can have lasting effects on the accuracy of children's memory and reports, the failure to record all interviews makes it impossible to support any claims that children's reports are accurate or reliable and free of suggestive influences.

157.   The failure to have audio- or video-taped records of any of the initial police or RTC interviews with the Fuster witnesses makes it impossible to support a claim that the children's initial allegations are accurate.  Summaries of interviews (such as those provided by the Police Department, Rape Treatment Center and parents) do not substitute for missing original interviews because written summaries are subject to a number of distortions that can include omission of important details, inclusion of inaccurate details, and most importantly the absence of a verbatim record of each utterance produced in the interview.

158.   It is a well documented fact in the psycholinguistic literature that when asked to

54

recall conversations, most adults may recall the gist (the major ideas, the content), but they cannot recall the exact words used, nor the sequences of interactions between speakers. This linguistic information rapidly fades from memory, minutes after the interactions have occurred. (see Rayner & Pollatsek, 1989, for a review) In a recently completed experiment in our laboratory (Bruck, Ceci & Francoeur, 1999), we videotaped interviews where mothers asked their four-year old children about a play activity that had taken place in the laboratory. Three days later, we asked mothers for a report about this conversation. The mothers could not remember much of the actual content of the interview, omitting many details that had been discussed, but much of what they did recall was accurate. Most importantly, the mothers were particularly inaccurate about several aspects of their conversation: they could not remember who said what (e.g., They could not remember if they had suggested that an activity had occurred or if the child had spontaneously mentioned the activity). They could not remember the types of questions they had asked their children (e.g., They could not remember if they had used an open-ended question or a series of leading questions to obtain a piece of information). For example, although some mothers in this study remembered that they learned that a strange man came into the room when the child was playing, they could not remember if the child spontaneously gave them this information, or if they obtained it through a sequence of repeated leading questions that the child assented to with monosyllabic utterances. To summarize, although parents could accurately remember parts of the general content of the conversation, they could not remember how or if they questioned their child.

159. A similar study with mental health trainees has just been completed. This study (the birthday party study) was described above in the section on interview bias (Bruck, Ceci & Melnyk, 1999) The trainees interviewed four children about an event. Later, their memories for two of the conversations were tested. The mental health trainees showed the same pattern as the parents. They had difficulty remembering who first mentioned certain pieces of information; also, they could not remember if the child's statements were spontaneous or the result of leading questions. In addition, these trainees mixed-up which of the four children said what. That is, they often attributed the actual report of Child A to Child B. Warren & Woodall,(in press) obtained similar results with experienced investigators who provided summaries immediately after the interview with a child. In this study, when asked what types of questions they had used to elicit information from the children, most of the interviewers answered that they had asked primarily open-ended questions, while few stated that they had asked specific questions, and only one reported asking any leading questions. Their estimates were highly inaccurate, as most (over 80%) of the questions asked by these interviewers were specific or leading. Returning to the Bruck, Ceci & Melnyk study, as reported at the beginning of this affidavit, the interviewers also made factual errors about what the children had said, errors that reflected accumulating biases.

55

That is the interviewers reported that the fourth child had attended a birthday party, when it was clear in a number of cases that the child had made no such statement.

160.  These data provide an empirical basis for the importance of obtaining electronic copies of interviews with children.  They suggest that summaries of interviews based on interviewers' notes and memories may be inaccurate for a number of reasons.  Usually notes only contain pieces of information that the investigator thinks are important at the moment.  If the investigator has a bias that the child was sexually abused, this could color his interpretations of what the child said or did; and it is this interpretation that appears in the summary rather than a factual account of what transpired.  Finally, if a number of children are interviewed and the reports are not immediately written, the investigator may confuse which child said what.

161.  It is fortunate in *Fuster* that the Bragas did videotape most of their interviews, including the initial ones with the children.  This record allows an objective retrospective view of the emergence  of the children's allegations.  Unfortunately, there is one large gap in this record.  There is no record of the first two interviews with the first child (JC) to disclose.  The following information is available.  On August 7, Detective Meznarich and Assistant State Attorney Rundle conducted an interview with JC in his bedroom.  The following is part of the police report:

> JC was asked if he liked to the Fuster's and he stated he did not.  When asked, "why", he stated because of what "they did".  When asked "what happened", JC did not answer.  This investigator asked if any of the children had their clothes off and JC stated "yes".  When asked "who", he stated "My brother".  JC was asked to describe what happened to his brother and he replied that [his brother] would be wearing a shirt and not diaper and be sitting on the floor when Ileana would put her mouth on [his brother's] penis, then grab it.  This investigator asked JC if Frank Fuster was there when this happened and he said, "No"., he also related that one time when Ileana put her mouth on [his brother's] penis, she called "Frank, come here and look".  When he saw what she was doing, JC says they argued about it and Mr. Fuster stated, "That's real dumb and the kids know it.  It's embarrassing"....(Interviewer continues and includes other allegations).

Bruck, Exh. 2 at 29-30.  See also, Police reports quoted above regarding interviews at the RTC with TL, BT and DM.

162.  Although the report may seem informative, it is crucial to know how and how long it took to get these critical details.  For example, did the answer about fellatio come out spontaneously or was it the result of repeated leading questions:  "Did Illeana put her mouth on his penis?"  It does seem from the rest of the notes that JC was repeatedly asked the same questions, changing his answer to become consistent with the view that the Fusters abused many children.  What did Mr. Rundle ask, if anything, during this interview?  Based on the notes, the

56

most one can conclude from this interview is that JC denied that he had been a victim, that he was asked questions repeatedly, that his answers were highly inconsistent, and there was much bizarre content in his statements.

163. The second interview with JC, his first with the Bragas, was videotaped. Unfortunately, due to technical difficulties, there is no sound. So by the time of the first recorded interview (but the third interview not including any conducted with parents or others) it is not possible to evaluate the degree to which JC's statements (which continued to be inconsistent and bizarre) are the product of previous suggestive interviews. This turn of events makes the reliability of his statements unknown and unknowable.

164. Similar concerns are raised by the written reports of the initial interviews with the other children by the police and by the interviewers at the RTC. None of these reports specify the degree to which the children's answers were spontaneous or prompted. The reports of the children's behaviors with the dolls at the RTC is uninterpretable without a video record of how the children were questioned (e.g., Did the interviewers suggest to the children how to manipulate dolls by asking leading questions). As the studies cited above indicate, if investigators were later asked to provide this information (e.g., "Did the child tell you about the incident or did you have to ask him many leading questions to obtain the information?"), they would be unable to do so.

165. The concerns about the accuracy of some of the initial police-RTC reports and of the parents' reports raise fundamental questions about what exactly if anything the children in *Fuster* initially said about abuse. Without transcripts of actual interviews with police and RTC workers, it will be impossible to ever tell.

## VI.        There Are No Reliable Behavioral Symptoms That Are Diagnostic Of Sexual Abuse

166. Through out this affidavit, I have directly addressed the scientific validity of some of the opinions of the experts who testified for the prosecution. I have concluded in different sections that these experts' opinions do not hold up to the scrutiny of current scientific data. Specifically, contrary to what many of them stated at trial (a) professionals cannot determine whether a child's statements are true or false, especially if that child has undergone suggestive interviews and (b) that sexually abused children do not uniformly fail to disclose abuse when first interviewed by professionals; nor do they often recant once they have made a disclosure.

167. In this section, I focus on another issue—whether sexually abused children exhibit a constellation of specific behavioral problems that are consistent and diagnostic of abuse.

168. Many of the states experts testified that the child witnesses in Fuster displayed a constellation of behavioral problems that were consistent and diagnostic of sexual abuse.

169. Dr. Goldman described the following symptoms: depression, withdrawn, suicidal,

57

increased somatic complaints, eneuresis, regressive toileting , precocious sexual play, excessive masturbation, poor self-image, unkempt appearance, anxiety, sleep problems and aggression (9/4/85, 154)

170.  Dr.Miranda mentioned the following symptoms that are observed in sexually abused children:  lack of motivation, evidence of guilty, obsessive-compulsive behaviors, low self-esteem, anger, lack of trust, unexplained attachment (9/4/85,278)

171.  Dr. Stiles' list included the following problems:  masturbation, nightmares, bedwetting, approaching strangers in an unnaturally trusting manner, abnormal fears and separation anxiety (9/10/85, 42–48).

172.  Joseph Braga's list included the following symptoms:  extreme modesty, sudden eating disorder, swallowing problems, secretive behavior, excessive bathing, pseudo-mature behavior, over-compliance (9/6/85, 187-192).

173.  Some experts testified about the presence of specific symptoms in the child witnesses in Fuster. And parents testified about behavioral changes that they later came to understand as their children's reactions to abuse.

174.  Despite the ubiquity of this syndrome testimony, it does not hold up under the scientific microscope.  First, the idea that there is a list of behaviors that can be used to  diagnose child sexual abuse has been shown to have no scientific underpinning.  In fact, the laundry lists of "symptoms" experts have associated with sexual abuse include a panalopy of behaviors displayed by maladjusted as well as adjusted children (see Kendall-Tackett, Willliams & Finkelhor, 1993).

175.  Second, it  is also important to distinguish behaviors that occurred before disclosure from those that occurred after disclosure.  In some cases, children may develop behavioral problems as a consequence of adults treating them like victims, or because of the interviews themselves.  Adults may misplace the correct timing of the symptoms and come to remember symptoms that actually emerged after disclosure as occurring pre-disclosure. For example, JC's mother, when first interviewed by the police about JC, stated that he had nightmares "but she did not become alarmed." Bruck, Exh. 2 at 29  By trial, her testimony included the following list:  aggressive, belligerent behavior (9/10/85, 134);  sarcasm and mockery (id.);  frequently using the word "kill"  (id.);  sexual awareness (id., 135);  masturbation (id.);  use of language like "fucking" and "sexy"  (id.);  fear over the prospect of his parents' absence (id. , 138);  an obsession with death (id., 141).  Moreover,  JC's mother now described having grave concerns because of the horrific nightmares JC had experienced.  (Id., 137-140)

176.  In some cases,  the inconsistencies and inaccuracies of the parents' reports reflect the normal processes of memory.  Our current memories are not a faithful reproduction of past events; rather they are constructive in nature.  Changes in memories occur for a variety of factors that include the passage of time, confusions or blending of target events with other past or even

58

imagined events, beliefs and motivations to view the world in a certain way. (e.g., Ross, 1989) As our comprehension of a situation changes, our past recollections of the situation also change to conform with current belief systems.

177. The claim is not that the children did not show any behavior problems. Many of the problems cited by the parents (anxiety, enuresis, fears, night terrors and even sexual behaviors) are common in children of this age or else they can be associated with other types of childhood behavioral disorders (e.g., see Kendall-Tackett, Williams, & Finkelhor, 1993). As explained in previous sections, these behaviors may in fact have emerged as a result of the coercive and suggestive interviews which the children in *Fuster* endured. In addition, there are a number of suggestions in the record that there were factors in most of the children's lives to elicit these symptoms. (These include: being left with a babysitter for the first time; watching scary movies; loss of an in-home babysitter; a mother beginning full-time work; a father being arrested for firearms violations; parents getting divorced.) Thus in some cases, the parents' reports may reflect a change in their beliefs about the causes and the time periods of their children's symptoms and behaviors which may actually have occurred.

178. To conclude, although the children in *Fuster* may have displayed a variety of symptoms, contrary to the testimony of the states' experts, these are not diagnostic of sexual abuse. The appearance of these symptoms in the *Fuster* witnesses could be readily explained by a host of other primary life stresses.

### VII. Conclusions

179. In sum, it is my expert opinion to a reasonable degree of scientific certainty, based on the relevant research literature and the facts in this case, that the methods used to obtain allegations of abuse from the children in this case render their resulting accusations as unreliable evidence. Contrary to the opinions of the state experts in *Fuster*, there is no scientific evidence to support the view that most sexually abused children deny abuse, disclose abuse, and then recant their previous reports. The research reviewed in this affidavit provides a scientifically based explanation for why children in *Fuster* denied, disclosed, and recanted. Specifically, suggestive interviewing techniques resulted in the children providing reports that have a high risk of being unreliable. I have discussed a number of these techniques that, when present in interviews or interactions with young children, may greatly compromise the accuracy of their reports. These factors include: biased beliefs of the interviewer, the use of repeated questions, the repetition of misleading information, and the use of rewards and bribes. Other important factors that contribute to children's unreliable reports include the use of peer pressure, the use of anatomically detailed dolls, and the creation of an atmosphere of fear and accusation. These factors have their greatest impact when used in combination with preschool witnesses. This was the case in *Fuster*.

59

180.   Unless investigators and others are very careful in the interviewing procedures that are used with children suspected of having been abused, one can never make an accurate determination of whether or not abuse occurred. There are a number of interviewing procedures that have the potential to make non-abused children look like abused children. These are the same procedures that were used in the interviews with the *Fuster* children. Using these procedures, children may not only come to falsely report acts of sexual abuse, but they may come to believe that they experienced the events they reported. These children's memories may be permanently tainted by the sexualized suggestions of their interviewers. These children can appear highly credible both to subsequent interviewers, to family, and to jurors. There are no valid scientific tests to determine which of the children's reports were accurate, once the children have been subjected to suggestive interview methods. Because the children in *Fuster* underwent extremely suggestive interviews, a determination of reliability and accuracy of any of the allegations of abuse is impossible.

60

Signed and sworn under the pains and penalties of perjury this __ day of February, 1999.


_____

Maggie Bruck, Ph.D

61

# References

Binet, A. (1900). La Suggestibilité. Paris: Schleicher Freres.

Bradley, A., & Wood, J. (1996). How do children tell? The disclosure process in child sexual abuse. Child Abuse & Neglect, 20, 881-891.

Bruck, M., Ceci, S.J., Francoeur, E., & Barr. R.J. (1995). "I hardly cried when I got my shot!": Influencing children's reports about a visit to their pediatrician. Child Development, 66, 193-208

Bruck, M., Ceci, S. J., Francoeur, E., & Renick, A. (1995). Anatomically detailed dolls do not facilitate preschoolers' reports of a pediatric examination involving genital touch. Journal of Experimental Psychology: Applied, 1, 95-109.

Bruck, M., Ceci,S.J., & Francoeur, E. (1995) Anatomically Detailed Dolls Do Not Facilitate Preschoolers' Reports of Touching. Paper presented at Society for Research on Child Development, Indianapolis, Indiana, March.

Bruck, M., Ceci, S., Francoeur, E. (In press) The accuracy of mothers' memories of conversations with their preschool children. *Journal of Experimental Psychology: Applied*

Bruck, M. Ceci, S.J.& Hembrooke, H. (1997). Children's reports of pleasant and unpleasant events. In D. Read and S. Lindsay (eds.). Recollections of trauma: Scientific research and clinical practice. New York: Plenum press.

Bruck, M., Ceci, S.J., & Melnyk, L. (1999). The effect of interviewer bias on the accuracy of children's reports and interviewer's reports. Paper presented at the Biennial Meeting of the Society for Child Development. Albequerque, NM. .

Ceci, S. J., & Bruck, M. (1993). The suggestibility of the child witness: A historical review and synthesis. Psychological Bulletin, 113, 403-439.

Ceci, S. J. & Bruck, M. (1995). Jeopardy in the courtroom: A scientific analysis of of children's testimony. Washington, DC: American Psychological Association.

Ceci, S.J., Crotteau-Huffman, M., Smith, E., & Loftus, E.W. (1994a). Repeatedly thinking about non-events. Consciousness & Cognition, 3, 388-407.

Ceci, S.J., Loftus, E.W., Leichtman, M. & Bruck, M. (1994b). The role of source misattributions in the creation of false beliefs among preschoolers. International Journal of Clinical and Experimental Hypnosis, 62, 304-320..

Ettinger, R.H., Crooks, R.L., & Stein, J. (1994). Psychology: Science, Behavior, and Life. Fort Worth: Harcourt Brace.

62

Faller, K.C. (1984). Is the child victim of sexual abuse telling the truth? Child Abuse & Neglect, 8, 473-481.

Garven, S., Wood, J.M., Shaw, J.S., & Malpass, R., (1997). More than suggestion: Consequences of the interviewing techniques from the McMartin preschool case.

Geiselman, R., Saywitz, K., & Bornstein, G. (1990) Effects of cognitive interviewing, practice, and interview style on children's recall performance. Unpublished Manuscript.

Goodman, G.S., Bottoms, B.L. Schwartz-Kenney, B., & Rudy, L. (1991). Children's testimony about a stressful event: Improving children's reports. Journal of Narrative and Life History, 1, 69-99.

Goodman, G. S., & Clarke-Stewart, A. (1991). Suggestibility in children's testimony: Implications for child sexual abuse investigations. In J. L. Doris (Eds.), The Suggestibility of Children's Recollections (pp. 92-105). Washington, D.C.: American Psychological Association.

Goodman, G. S., Rudy, L., Bottoms, B., & Aman, C. (1990). Children's concerns and memory: Issues of ecological validity in the study of children's eyewitness testimony. In R. Fivush & J. Hudson (Eds.), Knowing and Remembering in Young Children (pages 249-284). NY: Cambridge University Press.

Goodman, G. S., Wilson, M. E., Hazan, C., & Reed, R. S. (1989). Children's testimony nearly four years after an event. Paper presented at Annual Meeting of the Eastern Psychological Association, Boston, MA.

Goranson, S. (1986) Young child interview responses to anatomically detailed dolls: Implications for practice and research in child sexual abuse. Unpublished Master's Thesis, University of British Columbia.

Gray, E. (1993). Unequal justice: The prosecution of child sexual abuse. New York: MacMillan.

Gudjonsson, G. (1986). The relationship between interrogative suggestibility and acquiescence: Empirical findings and theoretical implications. Personality and Individual Differences, 7, 195-199.

Harris, P., Brown, E., Marriott, C., Whittall, S., & Harmer, S. (1991). Monsters, ghosts and witches: Testing the limits of the fantasy-reality distinction in young children. British Journal of Developmental Psychology, 9, 105-123.

Hughes, M., & Grieve, R. (1980). On asking children bizarre questions. First Language, 1, 149-160.

63

Jones, D., & McGraw, J. M. (1987). Reliable and fictitious accounts of sexual abuse in children. Journal of Interpersonal Violence, 2, 27-45.

Kendall-Tackett, K. A., Williams, L. M., & Finkelhor, D. (1993). Impact of sexual abuse on children:  A review and synthesis of recent empirical studies. Psychological Bulletin, 113, 164-180.

Lawson, L., & Chaffin, M. (1992). False negatives in sexual abuse disclosure interviews: Incidence and influence of caretaker's belief in abuse in cases of accidental abuse discovery by diagnosis of STD. Journal of Interpersonal Violence, 7, 532-542.

Leichtman, M. D., & Ceci, S. J. (1995). The effects of stereotypes and suggestions on preschoolers' reports.  Developmental Psychology, 31, :568-578 .

Lepore, S.J., & Sesco, B. (1994).  Distorting children's reports and interpretations of events through suggestion.  Applied Psychology, 79, 108-120.

Lindsay, D.S., & Read, J. D ( 1994).  Psychotherapy and memories of childhood sexual abuse: A cognitive perspective.  Applied Cognitive Psychology, 8, 281-338.

Melnyk, L., Bruck, M., & Ceci, S.J. (1997, July). Win, Lose, or Draw: The effect of drawing on children's suggestibility and source monitoring ability. Paper presented at the meeting of the Society for Applied Research in Memory and Cognition, Toronto, Canada.

Ornstein, P., Gordon, B. N., & Larus, D. (1992). Children's memory for a personally experienced event: Implications for testimony. , Applied Cognitive Psychology, 6, 49-60.

Parker, J. (1995). Age differences in source monitoring of performed and imagined actions on immediate and delayed tests.  Journal of Experimental Child Psychology, 60, 84-101.

People v. Scott Kniffen, Brenda Kniffen, Alvin McCuan and Deborah McCuan, Kern County (Calif) Superior Court No. 24208.

People v. Raymond Buckey et al. Los Angeles Sup. Ct. No. A7509000.

Peterson, C., & Bell, M. (1996).  Children's memory for traumatic injury.  Child Development, 67, 3045-3070.

Poole, D.A., & Lindsay, D.S. (1995). Interviewing preschoolers: Effects of nonsuggestive techniques, parental coaching and leading questions on reports of nonexperienced events. Journal of Experimental Child Psychology., 60, 129-154.

Poole, D.A., & Lindsay, D.S. (1996). Effects of parent's suggestions, interviewing techniques, and age on young children's event reports. In D. Read and S. Lindsay (eds.). Recollections of trauma: Scientific research and clinical practice. New York: Plenum Press.

64

Poole, D., & White, L. (1991). Effects of question repetition on the eyewitness testimony of children and adults. Developmental Psychology, 27, 975-986.

Powers, P., Andriks, J. L., & Loftus, E. F. (1979). Eyewitness accounts of females and males. *Journal of Applied Psychology, 64*, 339-347.

Pynoos, R.S., & Nader K.(1989). Children's memory and proximity to violence. Journal of the American Academy of Child and Adolescent Psychiatry, 28, 236-241.

Quas, J.A., Goodman, G.S., Bidrose, S., Pipe, M.E., Craw, S., & Abline, D.S. (in press). Emotion and memory: Children's long-term remembering, forgetting, and suggestibility. *Journal of Experimental Child Psychology*

Rawls, J. (1996). How question form and body-parts diagrams can affect the content of young children's disclosures. In D. Read and S. Lindsay (eds.). Recollections of trauma: Scientific research and clinical practice. New York: Plenum press.

Rayner, K., & Pollatsek, A. (1989). The Psychology of Reading. Prentice-Hall, Inc. Division of Simon & Schuster. Englewood Cliffs: NJ.

Ross, M. (1989). Relation of implicit theories to the construction of personal histories. Psychological Review, 96, 341-357.

Salmon, K., & Pipe, M-E. (in press). Providing props to facilitate young children's event recall: The impact of a one year delay. Journal of Experimental Child Psychology.

Sgroi, S. M. (1982). Handbook of clinical intervention in child sexual abuse. Lexington, MA: Lexington Books.

Siegal, M., Waters, L., & Dinwiddy, L. (1988). Misleading children: Causal attributions for inconsistency under repeated questioning. Journal of Experimental Child Psychology, 45, 438-456.

State v. Michaels, Superior Court, Essex County New Jersey (1988)

State v. Robert Fulton Kelley Jr. Superior Criminal Court, Pitt County, North Carolina, #91-CRS-4250-4363 [1991-1992].

Steward, M.S., & Steward, D.S. (with Farquahar, L., Myers, J.E.B., Reinart, M., Welker, J., Joye, N., Driskll, J., & Morgan, J.). (1996). Interviewing young children about body touch and handling. Monographs of the Society for Research in Child Development, 61, (4-5 Serial No. 248).

Summit, R. (1983). The child sexual abuse accommodation syndrome. Child Abuse and

65

Neglect, 7, 177-193.

Terr, L. (1988). Anatomically correct dolls:  Should they be used as a basis for expert testimony? Journal of the American Academy of Child and Adolescent Psychiatry, 27, 254-257.

Thompson, W.C.,  Clarke-Stewart, K.A., &  Lepore, S (1997). What did the janitor do? Suggestive interviewing and the accuracy of children's accounts. Law & Human Behavior, 21(4), 405-426.

Tobey, A., & Goodman, G. S. (1992). Children's eyewitness memory:  Effects of participation and forensic context. Child Abuse & Neglect, 16, 779-796.

Walker, N., Lunning, S., & Eilts, J. (1996). Do children respond accurately to force choice questions? Paper presented to the NATO Advanced Study Institute: Recollections of Trauma: Scientific Research and Clinical Practice. Talmont Saint Hilaire, France, June.

Warren, A., & Woodall,  (In press). The reliability of hearsay testimony: How well do interviewers recall their interviews with children? Psychology, Public Policy, and Law

Welch-Ross, M. (1995).  Developmental changes in preschoolers' ability to distinguish memories of performed, pretended, and imagined actions.  Cognitive Development, 10, 421-441.

Zigler, E.  & Kanzer, P. (1962). The effectiveness of two classes of verbal reinforcers on the performance of middle- and lower-class children. Journal of Personality, 30, 157-163.

Signed and sworn under the pains and penalties of perjury this 2nd day of ~~January~~, 1999.

*February*

Maggie Bruck, Ph.D

# Curriculum Vitae

### Maggie Bruck

| | |
|---|---|
| Date of Birth: | June 24, 1946 |
| Citizenship: | Canadian, American |
| Social Insurance (US) | 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 |

| | |
|---|---|
| Office Address: | Department of Psychology |
| | McGill University |
| | 1205 Dr. Penfield |
| | Montreal Quebec H3A 1B1 |
| Telephone: | (514)398-1255 |
| Fax: | (514)398-4698 |
| e-mail | Bruck@hebb.psych.mcgill.ca |

| | |
|---|---|
| Home Address: | 657 Belmont Ave |
| | Montreal, Quebec |
| | H3Y2W3 |
| Telephone: | (514) 481-2921 |

## Education

| | |
|---|---|
| 1963-1967 | B.A. Wheaton College, Norton, Massachussets |
| 1967-1968 | Applied School Psychology, McGill University |
| 1968-1969 | M.A. Experimental Psychology, McGill University |
| 1969-1972 | Ph.D Experimental Psychology, McGill University |

## Academic-Research Experience

| | |
|---|---|
| 1972 | Research Associate. Drs. Lambert and Tucker, Psychology, McGill University. |
| 1972-1975 | Research Associate. McGill-Montreal Children's Hospital Learning Center. |
| 1975-76 | Senior Staff Member. Center for Applied Linguistics. Arlington, Virginia |
| 1976-93 | Research Director. McGill-Montreal Children's Hospital Learning Center |
| 1976-92 | Associate Member Department of Psychology, McGill University. |
| 1982-1992 | National Health Welfare Scholar |
| 1991- | Associate Professor, Department of Pediatrics, McGill University |
| 1992- | Associate Professor, Department of Psychology, McGill University |
| 1998- | Full Professor, Department of Psychology, McGill University |
| 1999- | Associate Professor of Psychiatry, Johns Hopkins University Medical School |

Bruck, Exhibit 1

### Summary of Research Contributions

I have two major areas of research interest. The first is language acquisition. Over most of my career, I have examined aspects of oral and written language development in normal learners and dyslexics. My studies have included monolingual as well as bilingual children and adults. I consider the following to be the most important contributions of this line of work.

First, Mark Seidenberg, Gloria Waters, and I were among the first researchers to adapt and refine information processing paradigms to examine the acquisition of component word recognition and spelling skills in young children. This work contributed to current models that highlight the importance of phonological skills in normal literacy development. Second, our research of normal literacy development provided a basis for the systematic examination of the reading and spelling profiles of children with developmental dyslexia. We have consistently found that there are no atypical patterns that characterize the reading and spelling skills of dyslexic children. Rather, dyslexic children show normal but delayed patterns of skills; that is, they resemble normal but younger readers and spellers. Third, once we began to understand the fundamental component reading and spelling skills, I examined their precursors or cognitive underpinnings, particularly in the area of developmental dyslexia where there has been a recurrent controversy about the relative importance of visual vs. linguistic skills. Recent work conducted with Patrick Cavanagh and Steven Hayduk failed to support the most recent form of the visual deficit hypothesis that dyslexics have selective low level visual impairments in the transient system. Rather, my work has contributed to the theory that phonological processing difficulties best account for the reading and spelling deficits of developmental dyslexics of all ages. Consistent with these findings, I have found that pre-readers' performance on phonological tasks is the best single predictor of later reading success or failure. Fourth, I have conducted a number of studies where I have followed the progress of dyslexic children into adulthood. Although many become educationally successful, the phonological deficits that characterize dyslexic children persist into young adulthood. Fifth, my cross-linguistic studies of literacy acquisition (in collaboration with Fred Genesee and Marketa Caravolas) show that the major models of reading acquisition that have been developed from data on English-speaking subjects generalize to other languages in which children learn alphabetic orthographies. Thus many of the component skills, processes, and precursors of literacy in alphabetic languages are universal rather than language-specific.

My second research interest is children's memory. I entered this new field in collaboration with Stephen Ceci at the beginning of the 1990s. The long-term goal of this research program is to develop a model that specifies the role of cognitive, social, and biological factors in the development of children's accurate memories and reports. To date, motivated by theories of interpersonal expectancy and memory processing, we have focused on children's suggestibility and autobiographical memories as a means to understanding children's representation of events and the constructive nature of memory. We have carried out a number of studies to examine how accurately children remember actual events and the conditions under which false reports or false beliefs can be implanted in young children. Recently, the scope of our studies has expanded to the following related areas some of which have psycholinguistic roots: the

Bruck        Page 3

linguistic markers that differentiate children's true and false narratives; adults' memories of conversations with children; the conversational mechanisms that mediate interpersonal expectancies; the cognitive and psycho-social mechanisms of suggestibility.   Our studies have contributed to the understanding of the strengths and weaknesses of children's and adults' memories.  These studies have also made contributions to other areas of developmental psychology that include the development of source monitoring ability, the development of symbolic representations, and children's long-term memory for autobiographical as well as suggested events.  Finally, we have written several extensive reviews and syntheses of the existing literature.  Some of these reviews are written for an academic audience; these provide a theoretical basis and explanation for the research findings.  Other reviews are written for a more applied audience (mental health and legal communities); here, we have tried to draw parallels (when they exist) between the research and actual forensic cases.

Bruck        Page 4

# Publications

***Articles in Peer-Reviewed Publications***

Remillard, L., Tucker, G.R., & Bruck, M. (1973). The role of phonology, lexicon and syntax in eliciting reactions to dialect variation. *Anthropological Linguistics*, 383-397.

Bruck, M., & Tucker, G.R. (1974). Social class differences in the acquisition of school language. *Merrill-Palmer Quarterly*, 20, 205-220.

Bruck, M., Lambert, W.E., Tucker, G.R., & Bowen, D. (1975). The 1968 NDEA Institute follow-up evaluation. *Foreign Language Annals*, 311-341.

Bruck, M., Jakimik, J., & Tucker, G.R. (1975). Are French immersion programs suitable for working class children? A follow-up investigation. *Word*, 311-341.

Bruck, M., Lambert, W.E., & Tucker, G.R. (1975). Cognitive consequences of bilingual schooling: The St. Lambert project through Grade 7. *Language Learning, 24,* 183-204.

Bruck, M., Rabinovitch, M.S., & Oates, M. (1975). The consequence of bilingual schooling on children with language learning disabilities. *Working Papers in Bilingualism, 5,* 47-87.

McDougall, A., & Bruck, M. (1975). English reading within the French immersion program: A comparison of the effects of the instruction of English reading at different levels. *Language Learning*, 37-43.

Bruck, M., Lambert, W.E., & Tucker, G.R. (1976). Cognitive and attitudinal consequences of bilingual schooling: The St. Lambert project through Grade 6. *The International Journal of Psycholinguistic Research*, 14-33.

Bruck, M., Lambert, W.E., & Tucker, G.R. (1976). Alternative forms of immersion for second language teaching. *Working Papers in Bilingualism*, 1-51.

Bruck, M., & Schultz, J. (1977). An ethnographic analysis of the language use patterns of bilingually schooled children. *Working Papers in Bilingualism*, 59-91.

Bruck, M. (1978). The suitability of early French immersion programs for the language disabled child. *Canadian Journal of Education*, 51-72.

Bruck, M. (1978). The suitability of early French immersion programs for the language disabled child. *Canadian Modern Language Review*, 884-888

Bruck, M. (1979). Switching out of French immersion. *Interchange*, 86-94.

Bruck, M. & Ruckenstein, S. (1982). Teachers' talk to language delayed children. *First Language*, 201-223.

Bruck, M. (1982). Language disabled children's performance in an additive bilingual education program. *Applied Psycholinguistics*, 45-60.

Bruck, M., & Hebert, M. (1982). Correlates of learning disabled children's peer interaction patterns. *Learning Disability Quarterly*, 353-362.

Waters, G., Seidenberg, M., & Bruck, M. (1984). Children's and adults' use of spelling-sound information in three reading tasks. *Memory and Cognition*, 293-305.

Backman, J., Bruck, M., Seidenberg., M., & Hebert, M (1984). Acquisition and use of spelling-sound correspondences in reading. *Journal of Experimental Child Psychology, 38*, 114-133.

Bruck, M. (1985). The adult functioning of children with specific learning disabilities. In I. Sigel (Ed.), *Advances in applied developmental psychology*, vol. 1.

Bruck, M. (1985) Predictors of transfer out of French immersion programs. *Applied Psycholinguistics, 6*, 39-61.

Bruck, M. (1985). Consequences of transfer out of French immersion programs. *Applied Psycholinguistics, 6*, 101-119.

Waters, G., Bruck, M., & Seidenberg, M. (1985). Cognitive processes in reading and spelling. *Journal of Experimental Child Psychology, 39*, 511-530.

Seidenberg, M., Bruck, M., Fornorolo, G., & Backman, J. (1985). Word recognition skills of poor and disabled readers: Do they differ? *Applied Psycholinguistics, 6*, 161-180.

Seidenberg, M., Bruck, M., & Backman, J. (1986). Who's dyslexic? A reply to Wolf. *Applied Psycholinguistics, 7*, 77-83.

Bruck, M. (1986). The primary characteristics of dyslexic children. *Canadian Journal of Public Health, 77*, 59-64.

Bruck, M. (1987). The long-term prognosis of children with learning disabilities. *Annals of Dyslexia, 37*, 252-263.

Bruck, M. (1988). The processes dyslexic children use to read and spell words: A longitudinal study. *Reading Research Quarterly, 23,* 1-26

Bruck, M., & Waters, G. (1988). Analysis of the spelling errors of children with discrepancies between their reading and spelling skills. *Applied Psycholinguistics, 9,* 77-92.

Waters, G., Bruck, M., & Malus, M. (1988). The role of linguistic and visual processes in spelling: A developmental study. *Journal of Experimental Child Psychology, 45,* 400-421.

Bruck, M., (1990). Word recognition skills of adults with childhood diagnoses of dyslexia. *Developmental Psychology. 26,* 439-454.

Bruck, M. & Treiman, R.(1990). Phonological awareness and spelling in normal children and dyslexics: The case of initial consonant clusters. *Journal of Experimental Child Psychology, 50,* 156-178.

Treiman, R., Goswami, U., & Bruck, M. (1990). Not all nonwords are alike: Implications for reading development and theory. *Memory and Cognition,18,* 559-567

Bruck, M., & Waters, G. (1990). An analysis of the component spelling skills of good readers-poor spellers. *Applied Psycholinguistics, 11,* 425-437.

Bruck, M., Cavanagh, P., & Ceci, S. (1991). Fortysomething: Recognizing faces at one's 25th reunion. *Memory and Cognition, 19,* 221-228

Schacter, D., Pless, B.& Bruck, M. (1991) Prevalence and correlates of behavior problems in learning disabled children. *Canadian Journal of Psychiatry, 36,* 323-331

Schacter, D., Pless, B.& Bruck, M. (1992) Self reports of family histories of learning difficulties: Artifactual or genuine?" *Canadian Journal of Psychiatry, 37,* 29-36.

Bruck, M., & Treiman, R. (1992). Learning to read: The limitations of analogies. *Reading Research Quarterly, 27,* 375-388.

Bruck, M. (1992) Persistence of dyslexics' phonological awareness deficits  *Developmental Psychology, 28,* 874-886. (abstracted in *Science News*)

Ceci, S.J., & Bruck, M. (1993) The Suggestibility of the Child Witness: An Historical Review and Synthesis. *Psychological Bulletin, 113,* 403-439.
Reprinted in Hertzig, M. E. & Farber, E. A. (1995). *Annual progress in child psychiatry and child development - 1994: A selection of the year's outstanding contributions.* NY: Brunner Mazel, pp. 195-277.

Caravolas, M., & Bruck, M. (1993). The effect of oral and written language input on children's phonological awareness: A cross-linguistic study. *Journal of Experimental Child Psychology, 55,* 1-30.

Bruck, M. (1993). Component spelling skills of college students with childhood diagnoses of dyslexia. *Learning Disability Quarterly, 16,* 171-184.

Bruck, M. (1993). Word recognition and component phonological processing skills of adults with childhood diagnoses of dyslexia. *Developmental Review, 13,* 258-268.

Adams, M. J., & Bruck, M. (1993). Word recognition: The interface of educational policies and scientific research. *Reading and Writing: An Interdisciplinary Journal, 5,* 113-139.
In 1995, edited and reprinted as: Resolving the great debate. *American Educator, 19.*

Ceci, S.J., & Bruck, M. (1993.). Children's recollections: Translating research into policy. *SRCD Social Policy Reports.* November.

Hayduk, S., Bruck, M., & Cavanagh, P. (1993). Do adult dyslexics show low level visual processing deficits? *Annals of the New York Academy of Sciences, 682,* 351-353.

Ceci, S.J., Loftus, E.W., Leichtman, M. & Bruck, M. (1994). The role of source misattributions in the creation of false beliefs among preschoolers. *International Journal of Clinical and Experimental Hypnosis, 62,* 304-320.

Ceci, S.J., & Bruck, M. (1994). How reliable are children's statements? *Family Relations, 43,* 255-257.

Bruck, M., Ceci, S.J., Francoeur, E., & Barr. R.J. (1995). "I hardly cried when I got my shot!": Influencing children's reports about a visit to their pediatrician. *Child Development, 66,* 193-208.

Bruck, M. Ceci, S.J., Francoeur, E., & Renick, A. (1995). Anatomically detailed dolls do not facilitate preschoolers' reports of a pediatric examination involving genital touching. *Journal of Experimental Psychology: Applied, 1,* 95-109.

Bruck, M., & Genesee, F. (1995). Phonological awareness in young second language learners. *Journal of Child Language, 22,* 307-324.

Bruck, M., Treiman, R., & Caravolas, M. (1995). The syllable's role in the processing of spoken English: Evidence from a nonword comparison task. *Journal of Experimental Psychology: Human Perception and Performance, 21,* 469-479.

Bruck, M.& Ceci, S.J. (1995). Brief on behalf of amicus developmental, social, and psychological researchers, social scientists, and scholars. State of New Jersey vs. Margaret Kelly Michaels. *Psychology, Public Policy and the Law, 1,* 1-51.

Ceci, S.J., Bruck, M., & Rosenthal, R. (1995).Children's allegations of sexual abuse: Scientific and Forensic Issues. *Psychology, Public Policy and the Law, 1,* 494-520.

Hayduk, S., Bruck, M., & Cavanagh, P. (1996).Low level visual processing skills of adults and children with dyslexia. *Cognitive Neuropsychology, 13,* 975-1015.

Bruck. M. & Ceci, S.J. (1996). Issues in the scientific validation of interviews with young children: Commentary on Steward, Steward Farquhar, Myers & Reinhart "Interviewing Young Children about Body Touch and Handling". *Monographs of the Society for Research on Child Development. (No. 248)*

Bruck, M. & Ceci, S. (1997). Developmental factors in the creation of false memories. *Current Directions in Psychological Science, 6,* 75-79.

Bruck, M., Melnyk, L., & Ceci, S. (1997). External and internal sources of variation in the creation of false reports in children. *Learning and Individual Differences, 9,* :289-316

Ceci, S.J. & Bruck, M.(1998). Children's testimony: Applied and Basic Issues. In I.E. Sigel and K. A. Renninger (Vol. Eds.) *Child psychology in practice,* Volume 4. In W. Damon (Gen. Ed.), *Handbook of child psychology,* 5th edition.(pp 713-774). New York: Wiley.

Bruck, M., Ceci, S., & Hembrooke, H.(1998) Reliability and credibility of young children's reports: From research to policy and practice, *American Psychologist 53,* 136-151.

Ceci, S.J., Bruck, M., & Loftus, E. (1998). On the ethics of memory implantation research. *Applied Cognitive Psychology, 12,* 230-240.

Bruck, M., Treiman, R., Caravolas, M., Genesee, F., & Cassar, M. (1998) Spelling skills of children in whole language and phonics classrooms. *Applied Psycholinguistics, 19,* 669-684.

Ceci, S. J. & Bruck, M. (in press). The Ontogeny and durability of true and false memories: A Fuzzy Trace account. *Journal of Experimental Child Psychology.*

Bruck, M., & Ceci, S.J (1999). The suggestibility of children's memory. *Annual Review of Psychology, 50,* 419-439.

Bruck, M., Ceci, S., Francoeur, E. The accuracy of mothers' memories of conversations with their preschool children. *Journal of Experimental Psychology: Applied*

Bruck, M. A Summary of an Affidavit prepared for *Commonwealth of Massachusetts v Cheryl Amirault LeFave. Applied Developmental Science.*

**Books**

Ceci, S., & Bruck, M. ( 1995). *Jeopardy in the Courtroom: A scientific analysis of children's testimony.* American Psychological Association.


**Book Chapters**

Bruck, M. (1979). Problems in early French immersion programs. In B. Mlacak & E. Isabelle (Eds.) *So you want your child to learn French.* Ottawa: Mutual Press.

Bruck, M. (1984). Feasibility of an additive bilingual program for the language impaired child. In Y. Lebrun & M. Paradis (Eds.), *Early bilingualism and child development.* Amsterdam: Swets and Zeitlinger.

Bruck, M. (1984). A communicative approach to language proficiency assessment in a minority setting. In C. Rivera (Ed.), *Communicative competence approaches to language proficiency assessment: Research and application.* Clevedon, England: Multilingual Matters.

Bruck, M. (1985). The long-term prognosis of childhood learning disabilities: A Canadian perspective. In P. Gerber & K. Garnett (Eds.), *Life transitions of learning disabled adults: Perspectives from several countries.* World Rehabilitation Fund, 1985.

Bruck, M. (1986). Social and emotional aspects of learning disabilities: A review of the issues. In S. J. Ceci (Ed.), *Handbook of the cognitive, social, and physiological characteristics of learning disabilities.* Erlbaum.

Bruck, M. (1989). Prevalence and etiology of adjustment problems of children with learning disabilities. In J.J. Dumont, H. Nakken & H.. *Learning disabilities: Cognitive, social and remedial aspects* ( pp.73-86). Amsterdam: Swets & Zeitlinger.

Bruck, M., & Waters, G. (1990). A component skills analysis of the reading and spelling skills of children who show significant discrepancies in their reading and spelling abilities. In T. Carr & B.A. Levy (Eds.) *Reading and its development: Component*

*Skills Approaches* (pp 161-206). Academic Press.

Ceci, S.J., & Bruck, M. (1995). The bio-ecological theory of intelligence: A developmental-contextual perspective. In D. Detterman (Ed.). Current Topics in Human Intelligence (Vol 4) *Theories of Intelligence* (pp 65-84). Norwood, NJ: Ablex.

Ceci, S. J., Leichtman, M. D., & Bruck, M. (1995). The suggestibility of children's eyewitness reports: Methodological issues. In F. Weinert & W. Schneider (Eds.), *Memory performance and competencies: Issues in growth and development* (pp. 323-348). Englewood Cliffs, NJ: Erlbaum.

Ceci, S.J., Bruck, M.(1996). Memories of childhood trauma: Therapeutic considerations for assessment and treatment. In S. Kaplan (Ed.). *Family violence: A clinical and legal guide*. (pp. 241-276). American Psychiatric Association: Washington, D.C.

Bruck.,M., & Ceci, S.J. (1996). The description of children's suggestibility. In N Stein, P.A. Ornstein, C.J Brainerd & B. Tversky (Eds.), *Memory for everyday and emotional events*. Hillsdale, NJ: Erlbaum.

Schwartz, S., & Bruck, M. (1997). The relationship of central auditory processing disorder and learning problems. In C.K Leong & M. Joshi (eds). *Cross-language studies of learning to read and spell: Phonological and orthographic processing*.(pp. 89-102). The Netherlands: Kluwer.

Bruck, M., Genesee, F., & Caravolas, M. (1997). A cross-linguistic study of early literacy acquisition. In B. Blachman (Ed.) *Dyslexia and its Treatment* (pp. 45-62). Mahwah, NJ: Erlbaum.

Bruck, M. Ceci, S.J.& Hembrooke, H. (1997). Children's reports of pleasant and unpleasant events. In D. Read and S. Lindsay (eds.). *Recollections of trauma: Scientific research and clinical practice* (pp. 199-219) New York: Plenum press.

Bruck, M. (1998). Outcomes of Childhood Dyslexia.. In R.M. Joshi & C. Hulme (Eds.) *Reading and spelling: Development and disorder*.(pp. 179-200) Mahwah, NJ: Erlbaum.

Bruck, M. (1998). The trials and tribulations of a novice expert witness. In S. Ceci and H. Hembrooke (Eds) *What Can (and Should) an Expert Tell the Court?* (pp. 85-104) American Psychological Association: Washington D.C.

Ceci, S. J. & Bruck, M. (in press). In the Aftermath of the Sterns: Old wine in new bottles? In J. Lamiell. (ed.) *C. Stern and W. Stern.*. Washington, DC: APA Books.

## *Other*

Bruck, M. (1974). A review of *The Psychology of Second Language Learning*, P. Pimsleur and T. Quinn (Eds.). *Linguistics*, April, 121-125.

Bruck, M. (1975). A review of *Out of the Mouth of Babes*, D. Olmstead. *Linguistics*, March, 88-91.

Swain, M., & Bruck, M. (1976). Proceedings of the Research Conference of Immersion Education for the Majority Child. *Canadian Modern Language Review*, 490-610.

Cohen, A., Bruck, M., & Brown, F. (1977). *Bilingual education: Evaluating evaluation*. Center for Applied Linguistics.

Bruck, M. (1977). A naturalistic study of the directive control strategy in two kindergarten classrooms. In P. Griffin and R. Shuy (Eds.), *Language and education in the early years,* Final Report submitted to the Carnegie Corporation.

Bruck, M. (1984). A review of *The bilingual child,* D.R. Omark and J.G Ericksen (Eds.). *Applied Psycholinguistics, 5,* 81-84.

Bruck, M. (1985). A review of *Bilingualism and language disability: Assessment and remediation.* N. Miller (Ed.). *Applied Psycholinguistics, 6,* 453-454.

*Submitted*

Bruck, M., Ceci, S.J., & Francouer, E.    A comparison of three and four year old children's use of anatomically detailed dolls to report genital touching in a medical examination

Bruck, M., Melnyk, L., & Ceci, S.J.  The effects of repeated drawing on the accuracy of children's reports and source monitoring attributions.

Caravolas, M., & Bruck, M. "Vowel Categorization Skill and its Relationship to Early Literacy Skills Among First Grade, Quebec-French Children"

*In Preparation*

Bruck, M., Hembrooke, H., & Ceci, S.J.  Linguistic characteristics of true and false narratives.

Bruck, M., Ceci, S., Melnyk, L., & Finkleberg, D.  The effects of interviewer bias on children's recall and on interviewers' recall.

Bruck      Page 11
**Papers Presented at Conferences (Peer Reviewed)**

Bruck, M. (1972). Social Class differences in the acquisition of school language.  Canadian Psychological Association, Montreal.

Bruck, M. (1974). The effects of French immersion programs on children with language disabilities.  TESOL, Denver.

Bruck, M., Lambert, W., & Tucker, G.R. (1975). The assessment of functional bilingualism within a bilingual program.  TESOL, Los Angeles.

Bruck, M., Brown, F., & Shultz (1976). A microethnographic study of code switching in a bilingual classroom.  American Educational Research Association, San Francisco.

Bruck, M., & Shultz, J. (1976). The effect of teacher's language proficiency on language use patterns of the bilingually schooled child.  NWAVE Conference, Washington, D.C.

Bruck, M. (1978). Teachers' speech to language disabled children.  Boston Conference on Child Language.

Bruck, M.(1979). Long term follow-up of learning disabled children into adulthood.  Canadian Psychological Association.

Backman, J., & Bruck, M. (1982). Reading and listening comprehension processes in disabled and average adolescent readers.  Canadian Psychological Association.

Bruck, M. (1983). Predictors of switching out of French immersion programs.  TESOL, Toronto.

Backman, J., Bruck, M., & Seidenberg, M. (1983). The development of word recognition strategies in good beginning readers, American Educational Research Association, Montreal.

Bruck, M., Backman, J., & Seidenberg, M. (1983). Word recognition skills of poor and disabled readers.  Society for Research on Child Development, Detroit.

Waters, G., Bruck, M., & Seidenberg, M. (1983). Use of spelling-sound correspondences in reading and spelling by good readers-poor spellers.  Second International Congress on Dyslexia, Greece.

Waters, G., Bruck, M., & Seidenberg, M. (1984).Individual differences in the cognitive processes children use to read and spell words.  American Psychological Association, Toronto.

Bruck, M., & Waters, G. (1985). Spelling disabilities:  A psychometric study.  International Neuropsychological Society, San Diego.

Waters, G., Bruck, M., & Seidenberg, M. (1985). Cognitive processes in reading and spelling.   Society for Research on Child Development, Toronto.

Bruck, M. (1985). The primary characteristics of dyslexic children.  Canadian Public Health Association, Ottawa.

Bruck, M., & Waters, G. (1986). How to explain developmental spelling disabilities?  Canadian Psychological Association, Toronto.

Bruck, M. (1987). Reading deficits of adults with childhood diagnoses of dyslexia.  International Neuropsychological Society, Washington.

Bruck, M. (1987).Persistence of Dyslexic children's word recognition deficits.  Society for Research on Child Development, Baltimore.

Waters, G., & Bruck, M. (1987). Children's use of linguistic and visual information for spelling:  A developmental study.  Society for Research on Child Development, Baltimore, .

Bruck        Page 12

Waters, G., & Bruck, M. (1987). An analysis of the reading and spelling skills of children who show significant discrepancies in their reading and spelling abilities. Third World Congress on Dyslexia. Crete Greece.

Bruck, M. (1988). Dyslexics' phonological awareness skills: Changes across the life span. International Neuropsychological Society, New Orleans.

Bruck, M. (1989) The persistence of dyslexic children's phonological awareness deficits. Society for Research on Child Development, Kansas City.

Bruck, M. (1989). Dyslexia is a valid diagnostic category. American Educational Research Association, San Francisco, 1989.

Schacter, D., Bruck, M., & Pless, B. (1989). Behavior Problems in Learning Disabled Children. American Academy of Child and Adolescent Psychiatry. New York, October.

Genesee, F. & Bruck, M. (1990). Predicting reading achievement for bilingual children. TESOL, San Francisco.

Treiman, B., Bruck, M., & Goswami, U. (1990). Phonological and orthographic units in the pronunciation of nonwords. American Educational Research Association, Boston.

Seidenberg, M., & Bruck, M. (1990). Generation of past tense verbs. Psychonomic Society, New Orleans.

Genesee, F. & Bruck, M. (1991). Predicting reading achievement from kindergarten language abilities of bilingual children. TESOL, New York.

Bruck, M. & Treiman, R. (1991). Learning to read the limitations of analogies. Society for Research on Child Development, Seattle, WA.

Bruck, M. (1992). Component Spelling Skills of College Students with Childhood Diagnoses of Dyslexia. American Educational Research Association, San Francisco

Hayduk, S., Bruck, M., & Cavanagh, P. (1992). Do adult dyslexics show low level visual processing deficits? Paper presented at New York Academy of Sciences, September.

Bruck, M., Hayduk, S., & Cavanagh, P. (1993). The role of low level visual processing in developmental dyslexia. Society for Research on Child Development, New Orleans, Louisiana

Bruck, M., (1993). Discussant of symposium on "Social competence of children with learning disabilities: A developmental perspective". Society for Research on Child Development, New Orleans, Louisiana.

Hayduk, S., & Bruck, M. (1993). The role of low level visual deficits in dyslexia. Paper presented at Canadian Psychological Association, Montreal, May.

Caravolas, M., & Bruck, M. (1993). Cross-linguistic studies of literacy skills. Paper presented at Canadian Psychological Association, Montreal, May.

Bruck, M., Genesee, F.,Caravolas, M. (1993). Cross-linguistic studies of literacy acquisition. Canadian Society for Brain, Behavior, and Cognitive Sciences. Annual Meeting. Toronto, July.

Bruck, M., Ceci,S.J., & Francoeur, E. (1995) Anatomically Detailed Dolls Do Not Facilitate Preschoolers' Reports of Touching. Paper presented at Society for Research on Child Development, Indianapolis, Indiana, March.

Bruck, M. (1995). Effects of interviewing procedures on children's narratives for true and false events. Society for Research on Child Development, Indianapolis, Indiana.

Bruck,M. (1997)..Factors influencing the interface between science and policy. Symposium on Reading Instruction: Science and Policy. AAAS Annual Meeting. Seattle, February.

Bruck        Page 13

Bruck, M., & Genesee, F. (1997). Preliteracy and early word identification skills in the emerging bilingual child. Society for Research on Child Development. Washington, D.C. April.

Bruck, M. & Ceci, S. (1997). Memories of a conversation. Society for Research on Child Development. Washington, D.C. April.

Bruck, M. (1997). Linguistic markers of true and false reports. American Psychological Association. Chicago, August.

### Invited Addresses

A Microethnographic study of code switching in a bilingual classroom. Illinois Conference on Bilingual Evaluation, Chicago, 1976.

Process Evaluation: Why and How. Plattsburgh State University Evaluation Conference on French Immersion, 1977.

Functional language competence. Societe Provinciale de l'Enseignement de l' Anglais au Quebec, Quebec City, 1977.

Evaluation of auditory comprehension and speaking skills. Council of Ministers of Education of Canada, Cap-Rouges, 1977.

Learning Disabilities and French immersion programs. Canadian Association of Immersion Teachers, Ottawa, 1977.

An ethnography of the teaching of math in the French immersion classroom. Ontario Institute for Studies in Education, 1978.

Switching out of French immersion programs. Conference on French Language Instruction, Toronto, 1978.

The feasibility of French immersion programs for the child with specific learning disabilities. Canadian parents for French. Montreal, November, 1979.

French immersion programs and the language disordered child. Protestant School Board of Hull, Hull, June, 1979.

Should children with learning disabilities attend French immersion programs? Canadian Association of Second Language Teachers, Moncton, 1979.

Adult functioning of children diagnosed as learning disabled. Research Frontiers in Education. The Concordia International Conference. Montreal, February, 1980.

A long-term follow-up of learning disabled children. Quebec Association for Children with Learning Disabilities. Montreal, March, 1980.

Learning disabled children can learn a second language. Department of Education, Fredricton, New Brunswick, June, 1980.

Cognitive development in bilingual environments. International Symposium of Standard Language/Vernacular Relations and Bilingual Education. Racine, Wisconsin. Nov, 1980.

The persistence and long-term consequences of childhood learning disabilities. Concordia University, February, 1981.

Second language learning for children experiencing learning disabilities. Ottawa Roman Catholic School Board, March, 1981.

Second language learning for children experiencing learning disabilities. Ottawa-Carlton French as a Second Language Committee, March, 1981.

Bruck        Page 14

The feasibility of French immersion programs for the poor achieving student.  Saskatchewan Association of Language Teachers and Parents for French, Regina, October, 1981.

The feasibility of French immersion programs for the poor achieving student.  Canadian Parents for French, Vancouver, October, 1981.

The feasibility of French immersion programs for the poor achieving student. Department of Language Education, University of British Columbia, Vancouver, October, 1981.

The adult functioning of children with severe learning disabilities.  Ontario Association for Children with learning disabilities. Toronto, April, 1983.

The consequences of switching out of French immersion programs:  A prospective study.  Modern Language Center, Ontario Institute for Studies in Education, Toronto, April, 1983.

Literacy skills of learning disabled adults.  Canadian Council of Teachers of English, Montreal, May, 1983.

Learning difficulties in French immersion.  Toronto Board of Education, Toronto, Dec, 1983.

Transfer out of early immersion programs.  Canadian Association of Immersion Teachers, Montreal, November, 1984.

The relationship between poor academic achievement and participation in a bilingual program.  The Ottawa Roman Catholic Separate School Board, April, 1985.

The long term effects of childhood learning disabilities.  Department of Pediatrics, University of California at San Diego, August, 1985.

Long-term consequences of transfer out of French Immersion programs.  Canadian Parents for French.  Whitehorse, September, 1985.

Reading disabled children become reading disabled adults.  Department of Psychiatry, Kingston General Hospital, November, 1985.

The primary characteristics of dyslexic children.  Canadian Public Health Association, Ottawa, December, 1985.

Word recognition skills of adult dyslexics.  Psychology Department, Queen's University, Kingston, November, 1986.

Word recognition skills of dyslexics:  A developmental perspective.  Neurolinguistics Laboratory, Massachussets General Hospital, Boston, March, 1987.

Personality and social correlates of learning disabilities.  International Conference on Learning Disabilities, Amsterdam, September, 1987.

Literacy skills of adult dyslexics.  Psychology Department, McGill University.  October, 1987.

Basic linguistic deficits underlying reading disabilities.  New Directions in Special Education. Montreal, April 1989.

French Immersion--The Canadian experience.  Potsdam College Collaborative Project, Potsdam College of SUNY.  August, 1989.

The suggestibility of children.  Department of Educational Psychology, McGill, October, 1991

An expert witness gives testimony on children's suggestibility.  Faculty of Nursing, McGill, January, 1992.

Research on reading and spelling abilities and disabilities.  Child Guidance Clinic, Winnipeg, June, 1992.

Children's memory and suggestibility:  Can we trust what they tell us?  The Institute for the Prevention of Child Abuse, Annual Convention.  Toronto, Ontario, October 25, 1993.

Bruck        Page 15

Assessing the reliability of children's reports.  Grand Rounds.  Department of Pediatrics (Montreal Children's Hospital), McGill University.  January, 1994.

Assessing the reliability of children's reports.  Grand Rounds.  Department of Psychiatry (Montreal General  Hospital) January, 1994.

Human Memory and Sexual Abuse Cases.  Canadian Appellate Court Seminar.  April, 1994.

Cross Linguistic Studies in Literacy Acquisition.  Centre d"Hospitalier Cote des Neiges.  May, 1994.

Children's Recollections and Suggestibility:  Translating Research into Policy.  Society for the Study of Social Problems.  Los Angeles, August 1994

Outcomes of Childhood Dyslexia..  Invited Lecturer at NATO meeting on Cognitive and Linguistic Bases of Reading. Writing, and Spelling,October, 1994.

Assessing the reliability of children's reports.  Colloquium McMaster University, December 1994

Testimonial Competence and credibility of children  Canadian Appellate Court Seminar.  Quebec City, April, 1995..

The child witness:  Suggestibility and Credibility.  Manitoba Educational Seminar.  Winnipeg, April, 1995.

A cross Linguistic study of early literacy acquisition.  National Foundation for Dyslexia.  Kawaii, Hawaii, May, 1995.

The child witness in the courtroom. Summit on child protection.  State of Michigan Governor's task force on children's justice and The State of Michigan Department of Social Services, September, 1995.

Child Witnesses in sexual abuse cases:  Empirical research findings, and implications for the justice system.  Annual meeting of The Wisconsin Judicial Conference.  October 26, 1995

Detection of Deception:  Myths and Realities. Criminal Lawyers Association.  Toronto October 27, 1995.

Children and the Law.  Psychology Department. University of Arizona, February, 1996.

Children's Suggestibility.  Child Psychiatry, Jewish General Hospital, April 1996

Invited Feature presenter (one of sixteen) NATO Advanced Study Institute "Recollections of Trauma:  Scientific Research and Clinical Practice." Port de Borgeny, France, June 1996.


Invited Addresses on Child Witnesses:1997
Department of Psychology, University of Toronto, March
Judicial Council of California, March,
American Bar Association and American Psychological Association, April.
North Shore University Hospital-New York University School of Medicine, October.


Invited Addresses on Child Witnesses:1998
Department of Psychology, Johns Hopkins University, February
Department of Psychology, Temple University, March
Department of Psychology, Washington University, November
St. Louis Psychoanalytic Institute, November


Invited Addresses on Child Witnesses 1999
Department of Psychology, SUNY Binghamton, January

Bruck        Page 16
**Awards and Research Grants**

1. Language Program's Branch of the Secretary of State. The effect of French immersion programs on children with language learning disabilities, 1976-1979.
2. McGill-Montreal Children's Hospital Research Institute. Status of young adults who were diagnosed in childhood as learning disabled, 1977.
3. Health and Welfare Canada. The adult functioning of the learning disabled child, 1978-1980.
4. Quebec Ministry of Education. Children with learning disabilities in French immersion programs, 1979-1980.
5. Quebec Ministry of Education. Educational alternatives for the poor achieving French immersion student, 1980-1982.
6. Social Science and Humanities Research Council. Precursors and consequences of switching out of French immersion , 1981-1983.
7. Le Programme de Formation de Chercheurs et d'Action Concertee (FCAC). Good, poor and disabled readers' acquisition of word recognition skills, 1982-1983.
8. Le Programme de Formation de Chercheurs et d'Action Concertee (FCAC). Good, poor and disabled readers' acquisition of word recognition skills, 1983-1985.
9. McGill-Montreal Children's Hospital Research Institute. Equipment grant, 1982.
10. National Health and Welfare Canada. National Health Research Scholar Award, 1982-1987.
11. Fonds Pour la Formation de Chercheurs et L'Aide a la Recherche (FCAR). Acquisition and retardation of literacy skills, 1985-1988.
12. McGill-Montreal Children's Hospital Research Institute. Literacy skills of adult dyslexics, 1986.
13. Social Science and Humanities Research Council. Literacy skills of adult dyslexics, 1986-1988.
 . Natural Sciences and Engineering Research Council of Canada. Acquisition and use of morphological knowledge for reading and spelling. 1986-1989.
15. National Health and Welfare Canada. National Health Research Scholar Award, 1987-1992.

Bruck        Page 17

16. Fonds Pour la Formation de Chercheurs et L'Aide a la Recherche (FCAR).  Computational and behavioral studies of word recognition, 1988-1991.

17. Natural Sciences and Engineering Research Council of Canada.  Relationship of phonological awareness to the acquisition of literacy skills.  1989-1992.

18. National Literacy Secretariat.  Reading assistant programs for children and adults.  1989.

19. Natural Sciences and Engineering Research Council of Canada.  The role of phonological and visual skills in reading acquisition. 1992-1995.

20. Natural Sciences and Engineering Research Council of Canada.  Equipment grant, 1992.

21. Fonds Pour la Formation de Chercheurs et L'Aide a la Recherche (FCAR).  Bilingualism:  From infancy to adulthood. 1993-1996.

22.  Natural Sciences and Engineering Research Council of Canada.  Developmental and cross-linguistic studies of speech perception and literacy acquisition (1995-1999).

Bruck        Page 18
**Teaching Interests**

My teaching experience has been varied. As a member of the Department of Psychology at McGill, I have taught graduate and undergraduate courses in the areas of cognition, developmental psychology, and experimental design. The specific courses include: Cognitive Psychology, Experimental Design, Psychology of Language, Psychology of Reading Ability and Disability, Children and the Law, and Childhood Psychopathology. As a member of the Department of Pediatrics, I have also taught selected topics in cognitive and developmental psychology to interns, residents, and research fellows at the Montreal Children's Hospital. I have supervised research and thesis projects of both undergraduate and graduate students in the Department of Psychology both before and since taking a full-time appointment in that department.

I find teaching rewarding and would like to continue teaching core courses in developmental psychology and specialized courses in experimental design, the psychology of reading, and children and the law.

*Undergraduate and Graduate Courses Taught*

| | |
|---|---|
| 1971-1973 | Educational psychology. Faculty of Education, McGill University |
| 1972 | Tests and measurement (summer session). Faculty of Education, McGill University |
| 1973 | Language development (summer and winter sessions). Sir George Williams University |
| 1978-79 | Research methods in psycholinguistics. Psychology Department, McGill University |
| 1980 | Childhood psychopathology. Psychology Department, McGill University |
| 1981 | Childhood psychopathology. Psychology Department, Concordia University |
| 1985- | Selected topics in child development. Child Development Program. Community, Developmental, and Epidemiology Program, Department of Pediatrics, McGill University |
| 1986, 1987 | Graduate clinical seminar. Psychology Department, McGill University |
| 1990 | Psychology of language. Psychology Department, McGill University |
| 1992-93 | Graduate Cognitive Seminar. Psychology Department, McGill University |
| 1992- | Experimental problems. Psychology Department, McGill University |
| 1993- | Reading Ability and Reading Disability. Psychology Department, McGill University |
| 1996 | Graduate Developmental Seminar. Psychology Department, McGill University |
| 1996- | Children in the Courtroom. Psychology Department, McGill University |

Bruck        Page 19

*Supervision of Research Projects*
<u>Undergraduate Students' Theses</u>

McDougall, A. (1975). The native language reading skills of children taught in a second
  language.

Michel , M. (1978). Communication skills of children educated in a second language.

Ruckenstein, S. (1979). Teachers' talk to language delayed children.

Kastner, E. (1979). Language delayed children's interactions with normally developing peers.

Hebert, M. (1981). Correlates of learning disabled children's peer interaction patterns.

Fornorolo, G. (1981). Word recognition skills of reading disabled children.

Fornorolo, G. (1982). Reading comprehension and listening comprehension skills of reading
  disabled children.

Hebert, M . (1981). The role of spelling-sound correspondences in reading acquisition.

Cohen, S. (1983). Word recognition skills of good readers-poor spellers.

Ectovitch, J. (1983). Word recognition skills of good readers and poor readers as measured by
  pronunciation and lexical decision tasks.

MacEwen, K. (1983). The development of reading strategies in grade six good and poor
  readers.

de Souza, C. (1983). Reading and spelling strategies of good readers/poor spellers.

Malus, M. (1985). Spelling proficiency and sensitivity to linguistic structure in elementary
  school-aged students.

Schibbler, S. (1985). The role of context in the use of spelling-sound information for word
  recognition.

Schibbler, S. (1986). The spelling skills of adult dyslexics.

Smith, M. (1986). The use of context for word recognition by adult dyslexics.

Heick, C. (1986). Recognition of multi-syllabic and morphologically complex words.

Higham, D. (1987). Phonological awareness skills of adult dyslexics.

Gauze, C. (1988). Phonemic segmentation analysis at the intra-syllabic level and its relation to
  reading and spelling deficiencies in dyslexics.

Capreol, K.(1988). A comparison of children's phonological awareness and reading and spelling
  skills at the level of the onset unit.

Kohn, D. (1990). Speech segmentation routines of French-English bilingual speakers.

Romano, E. (1991). Speech segmentation routines of French-English bilingual speakers.

Lily, C. (1992). Visual deficits and developmental dyslexia.

Norris, S. (1992). The interaction of phonological and orthographic codes in dyslexic children.

Rabat, C. (1993). Do dyslexics show transient system deficits?

Wolfe,L. (1994). French-English Bilinguals' perception of stop consonants.

Hebra, M.(1995) The association of between second language proficiency and speech
  perception.

Herscovitch, L. (1995). The structure of mother-child conversations.

Ritchie, K.(1995). Mothers' memories of their conversations with their children.

Finkelberg, D. (1996). The effect of repeated drawing on children's recall.

Fisher, A. (1997). The structure of biased interviewers' conversations with children.

Levine, J. (1997). Interviewers' memories of their conversations with children.

Rooney, K.(1997) Expectancy effects in interviews with young children.

Bruck        Page 20

<u>Graduate Students' Theses</u>

Schacter, D.  The prevalence and correlates of behavior problems in learning disabled children
(Awarded MSc, 1988).

Caravolas, M.  The effect of input on children's phonological awareness:  A cross-linguistic study
(Awarded M.A, 1991).

Hayduk, S. The association of low level visual deficits and dyslexia in adults (Awarded MA ,
1993).

Dumarty, J.L.  Speech perception in bilinguals. (Thesis project carried out in the Department of
Psychology, McGill University, 1994.  Franco-Quebec exchange program).

Caravolas, M.  Six-year-olds' phonological and orthographic representations of vowels:  A study
of 1st grade Quebec-French children (Awarded Ph.d, 1996).

Hayduk, S.  The effect of strategic influences on orienting visual attention to spatial locations: A
developmental perspective (Awarded Ph.d 1997).

Melnyk. L.  Individual differences in children's suggestibility (Ph.d expected, 1999).

(

Bruck        Page 21
**Administrative Experience**

<u>Learning Center of Quebec</u> (formerly McGill-Montreal Children's Hospital Learning Center)
| | |
|---|---|
| 1976-93 | Research Director. McGill-Montreal Children's Hospital Learning Center |
| 1984 | Search Committee: Director for McGill-Montreal Children's Hospital Learning Center |
| 1984 | Acting Director McGill-Montreal Children's Hospital Learning Center |
| 1988 | Search Committee: Director for McGill-Montreal Children's Hospital Learning Center |
| 1990-1993 | Assistant Director Learning Center of Quebec |

<u>McGill University Committees</u>
| | |
|---|---|
| 1984 | Cyclical Review Committee for Department of Otolaryngolgy, McGill University. |
| 1989-1993 | Graduate Faculty Social Sciences Research Grants Subcommittee, McGill University |
| 1993-1996 | Chair: Graduate Faculty Social Sciences Research Grants Subcommittee, McGill University |
| 1993-1996 | Graduate Faculty Council |
| 1994-97 | Student Standing Committee |
| 1994: | Senate Advisory Committee for Appointment of Dean of Dentistry |
| 1996-97 | Graduate Fellowships (Montreal Children's Hospital Research Institute) |
| 1997-98 | Committee on Non-medical research involving human subjects |

<u>McGill Psychology Department</u>
 Committees
1991-93 Ethics Committee (School of Human Communication Disorders)
1992-96 Graduate Committee
1993-97 Hebb Lecture Committee
1993-96 Honors Committee
1994 Chair: Honors Committee
1996-97 Ethics Committee

Bruck      Page 22
**Professional Activities**

Grant and Journal Resource Reviewer

-Social Science and Humanities Research Council; Natural Sciences and Engineering Research Council of Canada; McGill-Montreal Children's Hospital Research Institute; Fonds de la Recherche en Sante du Quebec; B.C. Health Care Research Foundation; National Institute of Health; Ontario Mental Health Foundation

*Canadian Journal of Behavioral Science; Reading Research Quarterly; Canadian Journal of Psychology; Developmental Psychology; Memory & Cognition; International Journal of Behavioral Development; Journal of Experimental Psychology: General; British Journal of Psychology; Law & Human Behavior; Applied Cognitive Psychology; Reading & Writing: Scientific Studies of Reading*

Grant Review and Editorial Review Boards  Advisory Committees

| | |
|---|---|
| 1984-1988 | National Health and Welfare Canada Development Program |
| 1988 | National Health and Welfare Canada Development Program. Special Competition Drug and Alcohol Abuse. |
| 1988 | American Psychological Association (Division 7), 1989 Annual Meeting (Review Committee) |
| 1990- | Editorial Board *Applied Psycholinguistics* |
| 1990 | Society for Research in Child Development, 1991 Meeting (Review Committee) |
| 1992 | Society for Research in Child Development, 1993 Meeting (Review Committee) |
| 1993- | Advisory Committee Massachussets General Hospital Institute of Health Professionals |
| 1994-95 | Review Committee for Post-doctoral Fellowships. FCAR |
| 1994 | Review Committee Psychology Department, Memorial University |
| 1995- | Editorial Board *Journal of Experimental Child Psychology* |
| 1995- | Editorial Board. *Psychology, Public Policy and the Law* |
| 1995-1997 | Editorial Board *Child Development* |
| 1995 | Review Committee National Institute of Child Health and Child Development (Learning Disability Center Grants) |
| 1997- | Editorial Board *Journal of Experimental Psychology: Applied* |

Members in Professional Societies
American Psychological Society (Fellow)
Society for Research in Child Development
Psychonomics Society
Society for Scientific Study of Reading

Awards
1994 Robert Chin Memorial Award to S. Ceci and M. Bruck

Bruck        Page 23

**Forensic Work**

<u>Expert Testimony</u>
1992: State vs. Robert Fulton Kelly (Little Rascals Case in Edenton North Carolina)
1994: R. v. Linda Sterling (Martensville Case, Saskatchewan)
1996: Evidentiary hearing for People v. Scott Kniffen, Brenda Kniffen, Alvin McCuan and
    Deborah McCuan, Kern County California
1998 Evidentiary hearing for Commonwealth of Massachussets vs. Cheryl Amirault LeFave

<u>Amicus Brief/Affadavit</u>
1993 Brief on behalf of amicus developmental, social, and psychological researchers, social
    scientists, and scholars.  State of New Jersey vs. Margaret Kelly Michaels.
1997.  State of Florida vs, Harold Snowden
1997   Commonwealth of Massachussets vs. Cheryl Amirault LeFave

OFFENSE – INCIDENT REPORT

FLORIDA

| | | Unit No. | Date of Report | Dispatch | | In Service | Address of Dispatch |
|---|---|---|---|---|---|---|---|
| | | 746 | 09-07-84 | 3:00 PM | 3:00 PM | 7:30 PM | 15043 S.W. 147 Avenue |

Date – Day – Time of Occurence: 7-31-84, TUES., 10:00AM-3:30 PM

Battery

Offense (Incl. Name of Business or Type of Premises)
310 S.W. 144 Terrace

☐ Missing Person ☐ Runaway
LAURENT, Jared — Age 19M — Race W — Sex M — Res. Phone 251-4024 — Bus. Phone

☐ Discover
LAURENT, Ellen — Age — Race W — Sex F — Res. Phone 251-4024 — Bus. Phone

043 S.W. 147 Avenue

☒ Suspect ☐ Juvenile ☐
USTER, Frank — Age 35 — Race W — Sex M — Res. Phone 235-8831 — Bus. Phone
Occupation: Salesman
D.O.B. 12-10-48

4810 S.W. 144 Terrace
e County Jail

Person/Unit Notified: None — Time: --

☐ Missing Person Info.
Relatives/Friends — N/A
Address — N/A — Phone
Last Seen By — N/A — Phone
Location Last Seen — N/A
Previous Case No.

Prop./ID Carried — N/A
Alias/Maiden/Nickname

☐ Property Taken (Type) — N/A
Value — N/A   Recov. Value — N/A   Property Receipt ☐ Yes ☐ No
Property Recovered (Type) — N/A

☐ Modus Operandi
Sexual Assault At Day Care Center

Tool/Weapon: Unknown   How Used: Unknown
How Offenders – App./Fled. — No. Offenders: TWO

What did Offenders Say: See Remarks
Exact Location of Victim/Prop.: In Residence

Mental/Physical Condition — N/A
Reporter's Signature — N/A
Photo ☐ Yes ☐ No   D.O.R. — N/A   Acct. No

☐ Bank – Credit Card
Payable To — N/A   Document No.

☐ Vehicle: ☐ Subject ☐ Victim ☐ Stolen
N/A Make   Model – Color N/A   Condition --
N/A Yr.   N/A No.
Value N/A   Recov. Value N/A   Door Locked ☐ Yes ☐ No   Keys in Ign. ☐ Yes ☐ No
Teletype N/A
Articles in Van: N/A

Amt. of Chkg   Amt. Loss — N/A   Date of Doc. N/A   Can Subj. Or ID'd ☐ Yes ☐ No
Signature on Face — Printed Name — N/A
Reason Not Honored — ID Used — N/A

☐ Hospital — None
Physician — None
Nature of Injury – Location On Body: None Visible
Condition — Next of Kin Notified ☐ Yes ☐ No   By Whom

(SEE CONTINUATION)

Assigned To
Referred To
Supervisor

☐ Ex. Cl.   ☐ Unf.

| Badge No. | District |
|---|---|
| 1630 | 05 |

Badge No. Grid

ET. D. MEZNARICH/km

Reporting Officer's Name (Print)

☐ Domestic
☐ Neighbor Dispute
☐ Tenant – Landlord
☐ FaNy/Bate Alarm

☐ Civil Matter – Advised
☐ NPA
☐ Scene Secured
☐ N/A

DEFENDANT'S EXHIBIT
2A

Bruck Exhibit # 2

Defendant's #L
5/16/96

DADE POLICE DEPT.
D. DE:CC.   Y. FLORIDA

Type of Report Continued   Offense — Incident   CONTINUATION

☒ Victim  ☐ Missing Person  ☐ Runaway
Name: ST. LAURENT, Jared

Case No. 287537-E

2— | OFFENSE—INCIDENT | SEXUAL BATTERY

Continued:

**DATE:** On Tuesday, 31 July 1984, between 10:00 a.m. and 3:30 p.m.

**LOCATION:** 14810 S.W. 144 Terrace -- (Residence).

**VICTIM:** ST. LAURENT, Jared – 19 months, W/M – d.o.b.: 31 January 1983; resides at 15043 S.W. 147 Avenue, phone: 251-4824, with his parents, LOUIS and ELLEN ST. LAURENT.
The victim does not attend school.
The victim has no MDPD past.

**SUBJECT #1:** FUSTER, Frank – AKA: FRANCISCO FUSTER, FRANCISCO FUSTER ESCALONA – 35 years, W/M – d.o.b.: 10 December 1948; resides at 14810 S.W. 144 Terrace, phone: 235-8831.
The subject is self-employed with the Mobile showroom, Inc.
The subject has a MDPD ID #281103, with a past in New York for First Degree Manslaughter, and Lewd and Lascivious Assault on Minor Child.

**SUBJECT #2:** FUSTER, Ileana – 21 years, W/F – d.o.b.: 28 November 1962 or 28 November 1966; resides at 14810 S.W. 144 Terrace, phone: 251-4334.
The subject has no employment.
The subject has a MDPD ID # 339698.

**WITNESSES:** Unknown.

**WEAPON:** None.

**INJURY:** None Visible.

**VEHICLE USED:** None.

**PROPERTY TAKEN:** None.

**M.O.:** The victim is taken to the subjects to be babysat. He is picked

(SEE CONTINUATION)

Officer's Name (Print)   Badge No.   District   Grid
DET. D. MEZNARICH/vm   1520   or   0058

2

METRO-DADE POLICE DEPT.
DADE CO. DADE CY. FLORIDA

CONTINUATION

| Type of Report Continued | Offense – Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287537-E |

Continued:

up five-and-one-half hours later and appears to be drugged
or dazed.

NARRATIVE:      On Friday, 03 August 1984, at 1:00 p.m., this investigator
was assigned, by Sexual Battery LIEUTENANT L. BLUE, the investigation into the
possible sexual assaults occurring at the Country Walk Babysitting Service,
located at 14810 S.W. 144 Terrace.

LIEUTENANT BLUE advised she had been contacted by Assistant State Attorney C. RUNDLE,
who advised he had had a conversation with a JAN HOLLINGSWORTH. MRS. HOLLINGSWORTH
related she had been contacted by a friend, ELLEN ST. LAURENT, who had taken her
19-month-old son to the Country Walk Babysitting Service several days prior. When
she picked the victim up, she noted that his eyes appeared "glassy", and he was
"dopey".

After speaking with several other mothers, MRS. ST. LAURENT had been told of some
rumors that the children might be being sexually assaulted. MRS. ST. LAURENT had
then contacted JAN HOLLINGSWORTH, who had called CHRISTOPHER RUNDLE. Additionally,
LIEUTENANT BLUE advised this investigator that JOANNE MENOHER, at the Country Walk
Country Center, could provide the names of additional families using the service.

This investigator attempted to contact MRS. ST. LAURENT but met with negative
results.

This investigator then contacted JOANNE MENOHER and was advised she would be at
the center until late evening.  An appointment was made for an interview.

At 4:00 p.m., on 03 August 1984, this investigator responded to 14601 S.W. 144
Street and spoke with JOANNE MENOHER.  MISS MENOHER advised she works in coordinating
the recreational activities at the Country Walk Country Center and, therefore, was
acquainted with alot of the residents of Country Walk.

MISS MENOHER stated sometime prior to 22 June 1984, BARBARA LEININGER, a Country Walk
resident, had told her, in confidence, that she had taken her child, TODD, out of the
babysitting service at FRANK and ILEANA FUSTER'S due to a conversation she had had with

(SEE CONTINUATION)

| | Badge No. | District | Grid |
|---|---|---|---|

3

METRO-DADE POLICE DEPT.
DADE COUN.   FLORIDA

CONTINUATION

| Type of Report Continued | Offense – Incident | ☐ Victim Name: | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ☒ Victim Name: ST. LAURENT, Jared | | 287537-E |

another Country Walk resident, VICKI MESEROLL. VICKI MESEROLL had told MRS. LEININGER that one day her son, DAVID MESEROLL, had come out of the shower naked and stated, "Mommy, kiss my body." As DAVID MESEROLL refers to his penis as his "body", his mother asked him who had kissed his "body", and he replied, "Ileana".

MISS MENOHER advised she had become concerned about the situation; and shortly after the conversation with MRS. LEININGER, had made an anonymous report to H.R.S. MISS MENOHER could not recall the date that she made the report but advised she thought it was the first week of June, 1984. The H.R.S. workers had, in fact, responded to the Country Walk Babysitting Service because MISS MENOHER says two black females, who identified themselves as H.R.S. investigators, stopped at the Country Center and asked her for directions to the FUSTER'S residence. When the FUSTER'S continued to operate the babysitting service, a letter, dated 17 July 1984 and signed by the Director of Property Management, DAVID B. MESEROLL JR., was sent to "MR. and MRS. FOSTER". The letter stated the FUSTER'S "may be running a formal babysitting service under the apparent business name of 'Country Walk Babysitting Service" and "may have distributed business cards imprinted with the name 'Country Walk Babysitting Service" and may have represented" (i) that you have received Arvida's approval to use 'Country Walk' in your name; (ii) that you are zoned as a commercial enterprise; and (iii) that you have licensing from the Department of Health and Rehabilitative Services to care for a maximum of 15 children in your home."

The letter goes on to say that "Country Walk" is a service mark and trade name registered in both the State of Florida and Dade County, and Arvida never gave permission to any homeowners allowing them to use "the 'Country Walk' trade mark or name".

Additionally, they were advised that the "Homeowner's Association documents for Country Walk prohibit operation of a commercial establishment in a residential unit." Reference was made to the fact that neither the Building and Zoning Department nor the Department of Health and Rehabilitative Services can confirm that you are zoned for a commercial enterprise or licensed as a child care facility."

The letter advised the FUSTER'S to "refrain from either operating a babysitting service out of your home or using the 'Country Walk' name". See a copy of the letter, which has been made a part of this case file, for further information.

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

4

METRO-DADE POLICE DEPT.

DADE COUNTY   FLORIDA

| Type of Report Continued | Offense — Incident | | | | Case No. |
|---|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ☒ Victim | ☐ Missing Person | ☐ Runaway | 287537-E |
| | | Name: ST. LAURENT, Jared | | | |

Continued:

MISS MENOHER advised an advertisement for the Country Walk Babysitting Service had been placed in the May, 1984 issue of the Country Times. The Country Times is a newsletter that she puts out each month to the residents of Country Walk, which contains news and some advertisements. After talking with MRS. LEININGER, MISS MENOHER says she did not allow the advertisement for the Country Walk Babysitting Service to appear in the Country Times again.

Regarding FRANK and ILEANA FUSTER, MISS MENOHER stated FRANK FUSTER had resided in the patio homes for a period of time; then, after he married ILEANA FUSTER in September of 1983, he had moved to the estate home at 14810 S.W. 144 Terrace. He had operated the Kendall Decorators Warehouse, at 14145 S.W. 142 Avenue, but had closed that business and opened the Mobile Showroom at his residence.

MISS MENOHER went on to say MR. FUSTER had had his wedding reception at the Country Walk Center on 24 September 1983. When using the center, MR. FUSTER had given MISS MENOHER the name "ESCARLONA" and stated he used that name also. MISS MENOHER advised she thought FRANK FUSTER was approximately 48-49 years old and ILEANA FUSTER was approximately 21-years-old. She went on to say during one conversation with MR. FUSTER, he told her he had known and dated ILEANA for only three weeks prior to their marriage. MR. FUSTER had a seven-year-old son, NOEL FUSTER, from a prior marriage.

MISS MENOHER advised that she knew of approximately eight families that used the FUSTER'S babysitting service but thought that perhaps as many as 20 families used it. The families that she knew are:

(1) Barbara Leininger, of 14922 S.W. 149 Street, phone: 232-0715.

(2) Ellen St. Laurent, of 15043 S.W. 147 Avenue, phone: 251-4824.

(3) Cathy and Brian Pariser, of 14760 S.W. 147 Court, phone: 252-0620.

(4) Diane and Edward Toby, of 15045 S.W. 142 Place, phone: 251-9459.

(5) Kelly Allens, phone: 251-0452.

(SEE CONTINUATION)

| | Badge No. | District | Grid |
|---|---|---|---|
| Officer's Name (Print) DET: D. MEZNARICH/km | 1610 | 05 | 2052 |

METRO-DADE POLICE DEPT.
DATE CCI.   FLORIDA

| Type of Report Continued | Offense - Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

ontinued:

(6) Valerie Popham, of 14825 S.W. 149 Court, phone: 252-1005.

(7) Reggie Litwin, of 14833 S.W. 148 Street Circle, phone: 255-4739.

(8) David and Vicki Meseroll, of 15006 S.W. 148 Street, phone: 238-7367.

According to MISS MENOHER, the MESEROLL family was currently out-of-town on vacation and would not return until 14 August 1984.

While at the Country Center, this investigator contacted MRS. LEININGER and was advised she would not be available until late evening. An appointment was made for an inter-view on the following day, Saturday, 04 August 1984.

This investigator then responded to 15043 S.W. 147 Avenue and spoke with LOUIS and ELLEN ST. LAURENT. The ST. LAURENT'S are the parents of JARED ST. LAURENT. MRS. ST. LAURENT stated she had not, in the past, left her son with a babysitting service but had had the babysitters come to her home. She had spoken with DIANE TOBY about the Country Walk Babysitting Service and advised they were "very good" and that her daughter, BROOKE, "loved to go there".

Due to the fact that the service was close and, therefore, convenient, she decided to see how it would work out. On Monday, 30 July 1984, she telephoned ILEANA FUSTER and spoke with her about keeping JARED for a few hours. After speaking with MRS. FUSTER, she made arrangements for her to babysit her son for a few hours the following day.

At approximately 10:00 a.m., on Tuesday, 31 July 1984, MRS. ST. LAURENT advised she took JARED to the Country Walk Babysitting Service. When she left him, MRS. ST. LAURENT says that ILEANA FUSTER was there, along with BROOKE TOBY and NOEL FUSTER. MRS. ST. LAURENT advised she thought that MR. FUSTER was also home.

At approximately 12:00 noon, she attempted to contact MRS. FUSTER by telephone but got no answer. At approximately 12:30 p.m., she called again; and, this time, ILEANA FUSTER answered and advised her JARED had had lunch with the other children and was doing fine. At 2:55 p.m., MRS. ST. LAURENT says she again telephoned MRS. FUSTER and told her she would

(SEE CONTINUATION)

| | District | Grid | |
|---|---|---|---|

Officer's Name (Print)

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim Name: | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ST. LAURENT, Jared | | 287537-E |

CONTINUATION

Continued: be about 20 minutes late in picking up her son.

At 3:20 p.m., MRS. ST. LAURENT advised she arrived at 14810 S.W. 144 Terrace. ILEANA FUSTER answered the door, and when she went inside, she observed FRANK FUSTER standing in the kitchen. JARED ST. LAURENT was sitting quietly in a chair at a table in the kitchen area. When her son heard her voice, MRS. ST. LAURENT says he said, "Mommy". ILEANA FUSTER advised her that her son had "just woke up". MRS. ST. LAURENT says she asked how long he had slept and was told by ILEANA, "Forty or forty-five minutes." After paying MRS. FUSTER, she was told, "Oh, he has a rash." MRS. ST. LAURENT says she told her, "Oh, a heat rash", and MRS. FUSTER replied, "No, a diaper rash. I put some cream on it." MRS. ST. LAURENT discussed JARED being babysat at the FUSTERS on Tuesdays, on a regular basis, then she told MRS. FUSTER she would call her later. MRS. ST. LAURENT then left the FUSTER residence and placed JARED in his car seat in her car.

At the time she picked her son up, MRS. ST. LAURENT advised she was accompanied by a friend, GAIL APPELROUTE. In the few minutes it took to drive from the FUSTER residence to her residence, MRS. ST. LAURENT says she noticed her son didn't "look right" and commented on this to MISS APPELROUTE. She says her friend told her, "He just woke up." MRS. ST. LAURENT says she mentioned the fact that he "didn't look right" two-to-three times on the way home. According to her, he looked "glassy-eyed" and "dazed" as if he had been "drugged" or "doped".

Upon arriving at her residence, MRS. ST. LAURENT says she immediately checked him and observed a red rash over his entire buttocks area. She says she thought it was strange he could get such an extensive rash so fast. After putting some Desitex on him, she put him down and observed him walk up to the vacuum cleaner her maid was using, grab the hose and begin to play with it. This, according to MRS. ST. LAURENT, would be typical behavior for her son. After ten-to-fifteen minutes, however, JARED went into the family room, sat down and began to hit himself in the head with a large block. MRS. ST. LAURENT advised she took the block away and tried to interest him in some other toys. JARED, however, went to a corner of the room, sat down and leaned against the sliding glass door. Further efforts to interest him in toys failed, and MRS. ST. LAURENT says she became alarmed at his behavior.

At approximately 6:00 p.m., on Tuesday, 31 July 1984, MRS. ST. LAURENT called her pediatrician, DR. ALVIN FREUND, of 10621 North Kendall Drive, phone: 274-2007. When he returned her call at

(SEE CONTINUATION)

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | | Case No. |
|---|---|---|---|
| 8— OFFENSE-INCIDENT<br>(Continued) | SEXUAL BATTERY | | 287537-F. |

Name: ☒ Victim ☐ Missing Person ☐ Runaway   ST. LAURENT, Jared

6:30 p.m., MRS. ST. LAURENT says JARED was acting fine by then, and she was told it was too late for a blood test.

MRS. ST. LAURENT advised she also attempted to contact DIANE TOBY but was unable to do so. MRS. ST. LAURENT then called CATHY PARISER and told her that JARED had been at the FUSTER'S and had been "acting funny". MRS. PARISER told her about the "rumor" of ILEANA kissing the boy's penis.

MR. ST. LAURENT stated that about two hours after he arrived home, JARED was "back to normal", and the rash on his buttocks cleared up within 24 hours.

On Thursday, 02 August 1984, she contacted DIANE TOBY and told her about the rumor she had heard. MRS. ST. LAURENT says she asked MRS. TOBY if anything strange had ever happened to BROOKE while at the FUSTER'S. She advised MRS. TOBY told her one time BROOKE said NOEL had showed her his penis and that FRANK was a monster because he had smacked NOEL across the mouth, MRS. TOBY advised her one time when she had gone there, ILEANA had been wearing sunglasses.

On Friday, 03 August 1984, MRS. ST. LAURENT mentioned the incident to JAN HOLLINGSWORTH, who then contacted CHRISTOPHER RUNDLE.

At 1:00 p.m., Saturday, 04 August 1984, this investigator responded to 14922 S.W. 149 Street and spoke with BARBARA LEININGER. MRS. LEININGER stated she began taking her 2 year old son, TODD MICHAEL, to the Country Walk Babysitting Service around the end of December, 1983, after she read their ad in the newsletter. According to MRS. LEININGER, her son was one of the first children to go there. The last time TODD was there was 05 May 1984. At the time she stopped, MRS. FUSTER was watching three-to-four babies and two-to-three toddlers, approximately eight-to-nine children at one time.

MRS. LEININGER advised she stopped taking TODD to the FUSTER'S after a friend, VICKI MESEROLL, related to her that MRS. MESEROLL'S son, DAVID, had said, "Ileana's kissing babies on their bodies". MRS. MESEROLL questioned DAVID and had been told, "yes, she kissed", but had not been sure of how much he understood. MRS. MESEROLL had then stopped taking DAVID to the babysitting service; and due to the fact that TODD LEININGER was going there and she and BARBARA were good friends, MRS. LEININGER says she told her

(SEE CONTINUATION)

METRO-DADE POLICE DEPT.
DADE COUN. Y, FLORIDA

CONTINUATION

| Type of Report Continued | Offense – Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE–INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

Continued:

about DAVID MESEROLL'S statements. MRS. MESEROLL had told her, in confidence, so when the mothers of other children questioned her as to why she took TODD out, she told them she was unhappy with the large number of children there and the fact that they only watched television.

During the last part of May, 1984, MRS. LEININGER advised she told JOANNE MENOHER about DAVID MESEROLL'S statements. MRS. LEININGER says she told MISS MENOHER, in confidence, however, she is aware of the fact that MISS MENOHER notified the Department of Health and Rehabilitative Services.

MRS. LEININGER stated she first met ILEANA FUSTER when she began taking TODD to her residence. She recalled that MRS. FUSTER was from Colombia or Venezuela, and she appeared to be 21 or 22 years old. FRANK FUSTER, whom she met at the same time, appeared to be about 37-years-old. Their son, NOEL, attends the same school as her older children, STACY, seven-years-old, and SCOTT, ten-years-old. She recalled that sometime around Christmas, 198, she went to the children's school to help at a party. While there, she saw NOEL FUSTER and noticed he had marks on his face that looked like someone had hit him. MRS. LEININGER says she asked him if someone had hit him and was told, "Yes." She then asked if his mother or father had hit him, but received no answer.

During the 1983-1984 school year, MRS. LEININGER says her daughter, TRACY, had a problem with NOEL at school. NOEL would chase STACY and try to kiss her. This behavior stopped towards the end of the school year. One night at dinner, her son, SCOTT, suddenly stated, "Noel said something to me about Stacy today." Noel said Stacy had a nice pussy." MRS. LEININGER advised she was shocked at her son's statement but thought it would be better not·to comment on it, so she did not.

According to MRS. LEININGER, her son went to the FUSTER'S from 8:00 a.m.-to-4:30 p.m., Monday through Friday. Her daughter, STACY, went there three times during the day, when she had no school. Her daughter told her she would help watch the children while she was there. When she first started taking TODD to the FUSTER'S, she says he would cry before being dropped off. This she attributed to the fact that ILEANA FUSTER was his first babysitter. MRS. FUSTER told her that TODD settled down and stopped crying after she left. When he first started going there, MRS. LEININGER advised TODD got a diaper rash, and she asked MRS. FUSTER what she was giving him to drink. She does not

(SEE CONTINUATION)

| Officer's Name (Print) | | Badge No. | District | Grid |
|---|---|---|---|---|

METRO-DADE POLICE DEPT.

DADE CO. , FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

Continued:

recall what MRS. FUSTER told her but advised her if it was apple juice, not to give him anymore.

According to MRS. LEININGER, when she dropped her son off in the mornings, FRANK FUSTER would be there and also when she picked him up in the afternoons, he would be there. On one occasion, she says she went to the front door, and looking through the open blind, observed an approximately three-year-old white female, whose name she later learned was BROOKE, laying on a couch watching television, with only a shirt on. After MRS. FUSTER had let her in, she quickly grabbed a towel and wrapped it around the girl. MRS. FUSTER told her that the girl's mother had not brought any diapers for her. MRS. LEININGER stated she later learned this girl does not wear diapers.

Numerous times in both the morning and the afternoon, she says it would take MRS. FUSTER three-to-five minutes to answer the door. One time, after taking a long time to answer the door, MRS. FUSTER stated she had been changing TODD'S diaper. On another occasion, her older children, STACY and SCOTT, had gone inside to get TODD while she remained in the car. After several minutes had passed, she went inside and found MRS. FUSTER changing TODD'S diaper.

Approximately three-to-four months prior, MRS. LEININGER advised she went to the FUSTER residence one morning and observed MRS. FUSTER wearing sunglasses inside the residence. When she inquired as to what was wrong, MRS. FUSTER said she had an eye infection. Later in the day, however, MRS. LEININGER saw her without the glasses and noted her eyes appeared to be swollen below and did not appear to be like an eye infection.

This investigator asked MRS. LEININGER if she knew of any other people who had children that had been cared for by the FUSTER'S. She advised of the following and added that she had spoken with them concerning her uncertainty as to what had been occurring at the Country Walk Babysitting Service.

(1) Cathy Pariser -- MRS. LEININGER had been told by MRS. PARISER that one time when she was at the FUSTER'S, TODD had been in the bedroom and ILEANA would not let him come out. When MRS. PARISER asked her why she stopped sending TODD there, MRS. LEININGER advised she told her, and MRS. PARISER said she was going to quit, too.

(SEE CONTINUATION)

| | | | |
|---|---|---|---|
| Officer's Name (Print) | Badge No. | District | Grid |

10

METRO-DADE POLICE DEPT.

DADE COUN.    FLORIDA

| Type of Report Continued | Offense - Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

(2) Kelly Allens -- MRS. LEININGER advised MRS. ALLENS telephoned her and asked why she was no longer sending TODD to the FUSTER'S. During the conversation, MRS. ALLENS told MRS. LEININGER she used the FUSTER'S babysitting service often and would sometimes leave her son there overnight. A few times, her son returned home "groggy" and "glassy-eyed". MRS. ALLENS also advised she once saw ILEANA FUSTER with a black eye.

(3) Ellen St. Laurent -- MRS. LEININGER advised she spoke with MRS. ST. LAURENT, who advised the first time she sent her child to the FUSTER'S, he returned home with a "glassy look".

(4) Phyllis Wilker, phone: 233-0291 -- MRS. WILKER had contacted her and asked why she was no longer sending TODD to the FUSTER'S. MRS. LEININGER says she told her she was not happy with the way the children spent their time there and was uncomfortable about the situation.

This investigator then responded to 14825 S.W. 149 Court and contacted VALERIE POPHAM. MRS. POPHAM advised she had begun to take her 15-month-old daughter, LAUREN JEANNE POPHAM, sometime in March, 1984, after seeing the advertisement in the Country Times. According to MRS. POPHAM, her daughter went to the FUSTER'S two or three times per week until 04 August 1984 when she spoke with MRS. LEININGER. During time time she was going, her daughter never fussed either before or after. The FUSTER'S made a "big deal" over LAUREN, saying she was so cute and pretty. MRS. FUSTER, on several occasions, told MRS. POPHAM they had taken photographs of LAUREN and even showed her some. The photographs, MRS. POPHAM advised, showed her daughter wearing a big hat and sunglasses. In all of the photographs, her daughter was clothed, and she thought nothing of it other than it seemed strange to waste money taking photographs of someone else's child. MRS. POPHAM went on to say that MRS. FUSTER had mentioned to her one time about not being able to have any children. This, she thought, might be the reason MRS. FUSTER seemed to make such a fuss over her daughter, always saying she was so "cute" and "sweet".

When asked if anything unusual had ever occurred while she was at the FUSTER'S, MRS. POPHAM advised that one time when she went to pick her daughter up, she was told that ILEANA and FRANK had been in bed and LAUREN had been there also. MRS. POPHAM stated she

(SEE CONTINUATION)

| | Bade No. | District | Grid |
|---|---|---|---|

Officer's Name (Print)

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-1 |

-12-

(IS Continued)

could not recall the exact conversation but thought she was told they were playing in the bed with her. The only other thing MRS. POPHAM thought strange was the fact that ILEANA would sometimes take a long time to answer the door. When asked how long she was referring to, she replied, "Four-to-five minutes." MRS. POPHAM could advise no further information.

This investigator then called KELLY ALLENS and advised her that the parents of children who went to the Country Walk Babysitting Service were being interviewed. MRS. ALLENS was asked if this investigator could interview her and was told that would not be possible without her first asking her husband, and he was not presently home. This investigator advised she would be recontacted at a later date.

This investigator then responded to 14760 S.W. 147 Court and spoke with CATHY and BRIAN PARISER. MRS. PARISER stated she began taking her two-year-old son, MICHAEL BENJAMIN, to the Country Walk Babysitting Service at the beginning of March, 1984, and stopped the third week of June after talking with BARBARA LEININGER. MR. PARISER advised the first couple of times he picked MICHAEL up from the FUSTER'S, he appeared to be "dazed" and was extremely quiet, then later, a few times, noticed that he was "glassy-eyed" and "staring".

MRS. PARISER advised that several times when she went to the FUSTER residence, she would ring the doorbell and knock for approximately five minutes before anyone answered it. On two occasions when she turned the doorknob, she discovered the door was unlocked; so she went inside. The first time, ILEANA came out of the master bedroom and stated, "Stay in there; I'll be right in" and immediately shut the door. As MRS. PARISER was speaking with MRS. FUSTER, she advised the door was opened by a blonde boy, who was totally naked. The second time was approximately three weeks after the first. On this occasion, MRS. PARISER was again bringing her son to the FUSTER residence and found the door unlocked. After entering, ILEANA again came from the master bedroom and closed the door behind her. A few minutes later, the door was opened by the same boy, who was again wearing no clothes. At that time, MRS. FUSTER stated, "Todd, go back in", and the child did so. According to MRS. PARISER, the other children were at the other end of the residence, in the room off the kitchen. MRS. FUSTER told MRS. PARISER, "Frank must have left the door unlocked." MRS. PARISER advised that at neither time did she see MR. FUSTER there.

(SEE CONTINUATION)

| Reporting Officer's Name (Print) | | Badge No. | District | Grid |
|---|---|---|---|---|
| | | | | |

METRODADE POLICE DEPT.

DADE CO.    FLORIDA

**CONTINUATION**

| | Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| 3- | OFFENSE-INCIDENT | SEXUAL BATTERY | Name ST. LAURENT, Jared | 287537-E |

(continued)

MR. PARISER stated that one time he was speaking with MR. FUSTER and was told that approximately three years prior, he had been shot in the face during a Robbery. A few times when he picked his son up, MR. PARISER advised he observed him sitting at his desk in one of the bedrooms they had made into an office. MR. and MRS. PARISER could advise no further information.

This investigator attempted to contact PHYLLIS WILKER·at 233-0291, but met with negative results.

This investigator responded to 15045 S.W. 142 Place and attempted to contact DIANE and EDWARD TOBY, but met with negative results.

This investigator responded to 14810 S.W. 144 Terrace and noted the license plate number of a brown van parked in the FUSTER'S driveway. It was 1984 Florida 727-ARF. Another vehicle, an older model station wagon, did not have a license tag. A check with MPDD Records revealed the 1984 Florida license 727-ARF was registered to a 1978 four-door Ford vehicle, owned by the Mobile Showroom, Inc., 14145 S.W. 142 Avenue, Miami, Florida. A check of the name, FRANK FUSTER, revealed one FRANCISCO FUSTER, with a date of birth of: 10 December 1948, with a misdemeanor traffic past from 04 June 1977, but no MPDD jacket.

On Tuesday, 07 August 1984, at 8:00 a.m., this investigator responded to the MPDD Records Section and requested a victim/subject check be made for the names FRANK and ILEANA FUSTER, from 1980-1984. The check revealed on 15 December 1980 FRANK FUSTER had reported, under MPDD Case Number 416686-A, that persons unknown had broken into his van and removed $3,114.98 worth of property and money. The case is Open-Pending. On 18 December 1980, FRANK FUSTER reported, under MPDD Case Number 419493-A, that he was the victim of an Aggravated Battery. According to the report, written by OFFICER T. McEACHIN, Badge #693, MR. FUSTER opened the door of his office, Tiles and Decorating, at 7890 West Flagler Street, to allow a white male to enter. The subject pointed a gun at MR. FUSTER and ordered him back inside the store. Approximately eight feet inside the store, the subject shot MR. FUSTER one time in the right ear, then fled from the store. The case is Open-Pending, however, there was no Supplementary Report in file.

On 23 September 1981, MR. FUSTER reported, under MPDD Case Number 326752-B, that he was the victim of Criminal Mischief in that someone came to his residence, identified himself

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | | District | Grid | |
|---|---|---|---|---|---|
| DET. D. MERAVIDES (J.) | | | | | |

13

METRO-DADE POLICE DEPT.
DADE CC    V, FLORIDA

| -14- | Type of Report Continued | Offense – Incident | □ Missing Person □ Runaway | ☒ Victim | Case No. |
|---|---|---|---|---|---|
| ( Continued ) | OFFENSE-INCIDENT | SEXUAL BATTERY | | Name ST. LAURENT, Jared | 287537-E |

as a police officer and requested to see him. MR. FUSTER was not at home, and his wife and maid only spoke Spanish and, therefore, were unable to communicate with the subject. The subject then walked to where MR. FUSTER'S van was parked and broke the window. DETECTIVE J. ELEKIS was assigned the follow-up investigation; and when he interviewed MR. FUSTER, he was advised a Metro-Dade Police Officer was possibly the subject. Internal Review was contacted, and on 17 November 1981, photographs of the entire Station Five/ G.I.U. Section was shown but no identification was made. The case is Open-Pending.

On 27 February 1982, MR. FUSTER reported, under MDPD Case Number 72078-C, that he was the victim of a Battery. The Offense-Incident Report indicates MR. FUSTER was jogging when a white female threw several eggs from the vehicle, which struck him. DETECTIVE J. GABLE conducted the follow-up investigation and ascertained that the license tag was stolen. The case is Open-Pending. On 17 December 1982, MR. FUSTER reported, under MDPD Case Number 434889-C, that persons unknown had attempted to burglarize his business, Kendall Decorator Warehouse, located at 14145 S.W. 142 Avenue. The case is Open-Pending. On 20 April 1983, MR. FUSTER, in a Telephone Incident Report, under MDPD Case Number 132983-D, reported someone had removed business papers, a Bressler's, a calculator and a tape recorder from his business, KDW Enterprises, Inc., located at 14145 S.W. 142 Avenue. The case is Open-Pending.

On 23 September 1981, a BONNIE KENDALL reported, under MDPD Case Number 326859-D, that her daughter, RENEE RIVERO, 9, W/F, had been fondled by FRANK FUSTER. The investigation was handled by DETECTIVE B. MARSHALL. DETECTIVE MARSHALL'S report indicates that while the victim was riding in his van, MR. FUSTER fondled her breast and genital areas. DETECTIVE MARSHALL contacted the subject, who identified himself as FRANCISCO FUSTER ESCALONA. MR. FUSTER denied touching the victim. Additional information obtained from the interview is MR. FUSTER stated he had a previous conviction in New York State for Homicide and had served four years before being paroled and has since had his rights restored. MR. FUSTER had psychiatric care in New York. DETECTIVE MARSHALL contacted New York Parole and Probation, DONNA MACKY, who confirmed that a FRANCISCO FUSTER had served time and was paroled for Manslaughter, #1056627P, but no other details were available. According to DETECTIVE MARSHALL's report, MR. FUSTER had an arrest in 1977 for Petit Theft by the City of Miami Police. MR. FUSTER also indicated he had been a suspect in an alleged rape with a girl he had picked up from 37 Avenue and N.W. 7 Street, the Central Shopping Center, and subsequently had intercourse with. MR. FUSTER related

(SEE CONTINUATION)

| Badge No. | District | Grid |
|---|---|---|

Officer's Name (Print)

14

METRO-DADE POLICE DEPT.

DADE COUN.  FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim / ☐ Missing Person / ☐ Runaway<br>Name: ST. LAURENT, Jared | Case No.<br>287537-E |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | | |

**CONTINUATION**

that the matter was unfounded, and he was never arrested. DETECTIVE MARSHALL checked MDPD Records and with City of Miami Homicide SERGEANT MIKE GONZALEZ and found no record of the incident he described. On 29 September 1981, DETECTIVE MARSHALL obtained a warrant, #81-21904, charging the subject with Lewd and Lascivious Assault, F.S.S. 800.04, under the name of FRANCISCO FUSTER ESCALONA. The subject responded to MDPD Station Five the same day and was taken into custody. MR. FUSTER was found guilty after a trial; and the disposition print-out indicates on 29 November 1982, and he was placed, by the Honorable JUDGE JOSEPH P. FARINA, on a two-year reporting probation. The prosecuting attorney was J. AKERS, who is no longer with the State Attorney's Office.

On 16 November 1981, FRANK FUSTER was reported as the subject in a Landlord-Tenant Dispute, under MDPD Case Number 39366-B. According to the report, written by OFFICER T. PESANTE, Badge #2194, MR. FUSTER and his sister-in-law, GUISELLA SOUTHWELL, went to the office of the apartment complex where she lives. Once there, MR. FUSTER and the manager, MR. BISCIEGLIR, became involved in a verbal altercation, and MR. FUSTER verbally threatened MR. BISCIEGLIR. The case was Exceptionally Cleared.

On 12 November 1983, MR. FUSTER was reported as the subject of an Aggravated Assault, reported under MDPD Case Number 395727-D. According to the Offense-Incident Report, written by OFFICER S. JOCELYN, Badge #3669, ISRAEL MENDOSA stated he and MR. FUSTER were involved in a domestic argument when MR. FUSTER pulled out a handgun, pointed it at MR. MENDOSA and threatened to kill him. The case was Exceptionally Cleared when MR. MENDOSA declined to prosecute.

This investigator then responded to the office of Assistant State Attorney CHRISTOPHER RUNDLE and advised him of the above facts. MR. RUNDLE was also advised of the statements made by MRS. ST. LAURENT, MRS. LEININGER, MRS. POPHAM and MR. and MRS. PARISER, and the fact that this investigator would attempt to locate other people who had used the Country Walk Babysitting Service. MR. RUNDLE advised he would contact Parole and Probation and ascertain the conditions of MR. FUSTER'S probation and advise them of the fact that he or his wife was operating a business which would put him into contact with young children.

Upon returning to the Sexual Battery Office, this investigator contacted Juvenile Assistant State Attorney JIM SMART and requested he locate the case file for the U.R.S. investigation from the first part of June when JOANNE MENOUER made the anonymous report.

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|
| | | | |

15

METRO-DADE POLICE DEPT.

CONTINUATION

| DATE CI  Y, FLORIDA | | | | Case No. |
|---|---|---|---|---|
| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | 287537-E |
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | |

Continued:

At 12:30 p.m., on Tuesday, 07 August 1984, VINCE and ANDREA LANDIS responded to the Sexual Battery Office and advised that they had used the Country Walk Babysitting Service. MRS. LANDIS stated she took her three-year-old daughter, TIFFANY LEIGH, to the FUSTER'S for seven or eight times in May, 1984. The FUSTER'S had been recommended to them by their neighbor, DIANE TOBY, whose daughter, BROOKE TOBY, went there. According to MRS. LANDIS, her daughter became inflamed in the vaginal area just after TIFFANY started going to the FUSTER'S, but she thought it was a heat rash. During the time she was going there, TIFFANY told her mother she was afraid of the "big boy", who had a mask and had scared her. TIFFANY had also told her mother that she slept in the "big boy's room. MRS. LANDIS advised she learned one day when she was at the FUSTER'S that FRANK FUSTER was the "big boy" when her daughter pointed to him and referred to him as the "big boy". Prior to that, MRS. LANDIS had thought "big boy" referred to MR. FUSTER'S son, who is a few years older than TIFFANY.

MRS. LANDIS went on to say that MRS. FUSTER knew what time she would be coming to pick TIFFANY up; however, it would take her approximately ten minutes to answer the door. Additionally, when she was at the FUSTER'S, MRS. LANDIS advised MR. FUSTER was always there. MRS. LANDIS advised DIANE TOBY'S daughter, BROOKE, was sometimes taken to the beach, alone, with MR. FUSTER. When asked if she knew of anyone else who used the service besides MRS. TOBY, she said COLLEEN POPE took her daughter, SHANA, there. MRS. LANDIS advised her daughter could be interviewed later that evening, and an appointment was made.

This investigator responded to 14601 S.W. 144 Street, the Country Center, and spoke with JOANNE MENOHER. MISS MENOHER provided this investigator with a list of other persons whom she thought had used the service. They are:

(1) Pope -- 14915 S.W. 142 Place, phone: 233-2065.

(2) Kopel -- 14801 S.W. 148 Street Circle, phone: 251-6271.

(3) Avakian -- 14521 S.W. 148 Avenue, phone: 255-5745.

MISS MENOHER advised she had spoken with "REGGIE" LITWIN and had been told she had taken

(SEE CONTINUATION)

| | | | | | |
|---|---|---|---|---|---|
| | | | District | Grid | |

| Officer's Name (Print) | Badge No. |
|---|---|

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway |
|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared |

**Continued:**

her two-year-old son, DAVID, there approximately five times, and her four-year-old daughter, JENNIFER, there once. While going there, DAVID had began to fondle himself. On one occasion, MRS. LITWIN had arrived earlier than expected, stood at the door for 20 minutes, then had been admitted by FRANK FUSTER. She observed DAVID wearing only his diaper and had been told he changed every baby after their naps. Regarding where ILEANA was, MRS. LITWIN was told she was at the bus stop picking up a child. When she took DAVID home, he passed out on the floor and could not be awakened. MRS. LITWIN inquired of her daughter what she did there and was told she and FRANK watched "Conan The Barbarian" all afternoon.

MISS MENOHER advised that she was told by MRS. LANDIS that TIFFANY LANDIS went to the FUSTER'S on Tuesdays and Thursdays for about a two-week-period. When dressing her, her mother observed her vagina was red. On the second visit, the "big boy" scared her by wearing a mask. Her mother thought NOEL was the "big boy" but later learned he was FRANK FUSTER. Additionally, MISS MENOHER was told TIFFANY took her nap every day in the "big boy's bed", and they had secret games that parents aren't to know about. MISS MENOHER provided this investigator with a copy of the contract MR. FUSTER was using. The contract had been given to MRS. LITWIN, who had given it to MISS MENOHER.

This investigator then responded to 14833 S.W. 148 Street Circle and attempted to contact MRS. LITWIN but was advised by the maid she would not return home until 3:30 p.m. This investigator responded to 15045 S.W. 142 Place and attempted to contact MRS. TOBY but met with negative results.

At 4:00 p.m. on Tuesday, 07 August 1984, this investigator responded to 14833 S.W. 148 Street Circle and spoke with RAEGENA and STEVEN LITWIN. MRS. LITWIN stated she took her two-year-old son, DAVID ANDREW, to the Country Walk Babysitting Service approximately three days per month, from the first part of February until the middle of May. She learned of the service by seeing an advertisement in the Country Times or a flyer in her mailbox. MRS. LITWIN advised she telephoned SHIRLEY AVAKIAN and asked about the FUSTER'S babysitting service and was told everything was fine. MRS. LITWIN says she then took her children to the FUSTER'S and spoke with ILEANA about babysitting. At the time, she says FRANK FUSTER was building a play area off the kitchen. She did note there were not alot of toys and games there. When she first started taking DAVID to the FUSTER'S, he would cry, but MRS. FUSTER later told her that

(SEE CONTINUATION)

DADE COUNTY, FLORIDA POLICE DEPT.

| Type of | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| Continued | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

-18-

five minutes after she left, her son would be fine. According to MRS. LITWIN, MRS. FUSTER always made a fuss over the children and seemed to care about each of them. On one occasion at the end of March or the beginning of April, 1984, she went to the FUSTER'S and observed that ILEANA FUSTER was wearing sunglasses. MRS. LITWIN says she asked her why and was told it was an irritation. MRS. LITWIN advised she saw that the eye was red under the bottom lid and thought it did not look like an eye infection to her.

In relating her experiences with the FUSTER'S, MRS. LITWIN advised the blinds of the residence were always closed, making it dark inside; and it always took five-to-ten minutes before someone answered the door. Sometimes, she telephoned the FUSTER residence and got no answer. MRS. FUSTER explained that she did not answer the telephone during the time she was feeding the children. One day, MRS. FUSTER came out of the master bedroom with a child in her arms, which only had a towel wrapped around it. MRS. LITWIN advised MRS. FUSTER said the child had had an accident in its pants. On another day, MRS. FUSTER came out of the master bedroom with a dust cloth in her hand and told MRS. LITWIN she was cleaning. A child suddenly walked out of the same bedroom, and have his clothes on. On two or three other occasions, MRS. LITWIN noticed that the child did have his clothes on. On two or three other occasions, MRS. LITWIN noticed that the child there were children in the master bedroom; and one time, two came out, and she still heard at least one more inside.

One incident MRS. LITWIN recalled was taking DAVID to the FUSTER'S and telling MRS. FUSTER what time she would pick him up. Approximately one hour before doing so, she called and again advised MRS. FUSTER of the time. When she arrived, she waited out- side the door, ringing the doorbell and pounding on the office window for approximately five-to-seven minutes before it was finally opened by MR. FUSTER. When she entered the residence, she observed five or six children about the residence and a baby in a crib. Her son, she says, walked out of a bedroom wearing only his briefs. When she inquired as to the whereabouts of MRS. FUSTER, MR. FUSTER told her his wife had gone to the bus stop to pick up a child and would be right back. MRS. LITWIN says she waited ten-to- fifteen minutes because she was going to pay MRS. FUSTER, but finally told him, "I'll call her when I get home."

MR. FUSTER told her her son had awakened from a nap approximately a half-hour prior, and

(SEE CONTINUATION)

METRO-DAC  OLICE DEPT.
DADE COUNTY, FLORIDA

· CONTINUATION

| Type of Report Continued | Offense — Incident | ☑ Victim ☐ Missing Person ☐ Runaway  Name: ST. LAURENT, Jared | Case No. 287537-E |
|---|---|---|---|
| 9 — OFFENSE-INCIDENT | SEXUAL BATTERY | | |

Continued:

he had removed his diaper and put the briefs on him.  MR. FUSTER also told her, "He may be tired when you get him home because he didn't sleep very well here."  This, MRS. LITWIN says, would    be usual for her son as he loves his naps.  While riding home in the car, MRS. LITWIN advised DAVID fell asleep, sucking his thumb.  Then, after getting home, laid down on the rug and in five minutes was "out", and her attempts to awaken him failed.  MRS. LITWIN stated she usually sends a couple of "sip-ups"; however, they were returned unopened at the end of the day.  When she inquired, MRS. FUSTER told her DAVID would rather drink out of the paper cups like the other children.

MRS. LITWIN advised her son would always be tired when he came home; and between the first of February and the fifteenth, his behavior changed.  Her son became very aggressive and began to pull at his penis like it was a game.  His behavior changed so much that MRS. LITWIN says she brought it to the attention of the speech therapist her son was seeing.  This aggressive behavior and pulling at his penis stopped after DAVID stopped going to the FUSTER'S.

During the time her son was going to the FUSTER'S, MRS. LITWIN advised she would send two pairs of shorts, two pairs of briefs, a diaper, a blanket, his "Ernie" doll and some "sip-ups".  Often, everything would be returned intact and unused except the diaper.

MRS. LITWIN stated her four-year-old daughter, JENNIFER, went to the FUSTER'S on one occasion in April, 1984, for approximately five hours.  MRS. LITWIN had questioned her and says her daughter said she watched "Conan The Barbarian" with FRANK in the den.

This investigator then interviewed JENNIFER LITWIN outside the presence of her mother, in the playroom.  MISS LITWIN stated she went to FRANK and ILEANA FUSTER'S twice.  The first time she played with her brother, DAVID, until he went to take a nap.  She then went into the den, where she sat in a chair and watched television.  MISS LITWIN advised MR. FUSTER was also in the room, but he was sitting behind his desk doing paper work and, at times, watching the movie.  MISS LITWIN stated that at no time did MR. FUSTER touch her.  This investigator asked MISS LITWIN if her school had ever shown any movies or the teachers had told them about "good touching" or "bad touching".  MISS LITWIN advised that they had.  This investigator asked MISS LITWIN if FRANK or ILEANA had ever touched her in a "bad" way or somewhere where they shouldn't have, and she stated, "No."  This investigator asked MISS LITWIN if she had ever taken any of her

(SEE CONTINUATION)

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Victim ☒  Missing Person ☐  Runaway ☐  Name: ST. LAURENT, Jared | 287537-E |

CONTINUATION

Continued:

clothes off while at FRANK and ILEANA'S, and she again stated, "No." MISS LITWIN advised she could not remember what she had done during her second visit to the FUSTER'S but still thought she had been there twice.

This investigator then interviewed DAVID LITWIN. Due to his age and the fact that he has a speech impediment, his mother was present. This investigator attempted to ask DAVID LITWIN questions; however, he ran about the room ignoring them. MRS. LITWIN also attempted to ask her son questions but was ignored. MRS. LITWIN asked her son if FRANK had ever hurt him, and he said, "Yes." When she asked "how", he slapped his nose with his hand, then hit the front lower part of his shorts with his hand; and according to MRS. LITWIN, said, "Hit". MRS. LITWIN asked, "Did Frank hit your pee-pee", and her son said, "Yes." MRS. LITWIN asked her son, "Did Ileana ever hurt you", and DAVID LITWIN took his right hand and hit the right side of his buttocks. According to MRS. LITWIN, he stated, "Toosh". The interview was then concluded.

This investigator then responded to 15045 S.W. 142 Place and spoke with DIANE TOBY. MRS. TOBY stated her four-year-old daughter, BROOKE LEE, began going to the Country Walk Babysitting Service on 16 February 1984. Approximately two months prior, she had seen an advertisement in the flyer for the service. At that time, she went to the FUSTER residence and met FRANK and ILEANA, who were both home. After talking with them, she says she did not feel comfortable, so she did not take BROOKE, but had another sitter come into her residence. During the first week of February, 1984, MRS. TOBY says she had a problem with the sitter and dismissed her. MRS. TOBY then changed jobs and had to immediately find a new babysitter for BROOKE. She remembered the FUSTER'S and began to take her daughter there and says BROOKE seemed to adjust well. According to MRS. TOBY, her daughter went to Country Walk Babysitting Service from 16 February 1984 until Tuesday, 31 July 1984. The hours were usually after school, from 3:30 p.m. until 6:00 p.m.; and on the weekends, all day Saturday. On Thursday, she and her husband, ED, would sometimes go out, and those days, BROOKE would stay from 3:30 p.m. until approximately 10:00 p.m. When BROOKE stayed until 10:00 p.m., MRS. TOBY says her daughter would often times have been sleeping just before being picked up and would fall back asleep in the car during the ride home.

On a Saturday, at either the end of May or the beginning of June, 1984, MRS. TOBY advised that BROOKE went to the beach with FRANK, ILEANA and NOEL. MRS. TOBY says

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

METRO DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of | Continued | Offense – Incident | ☒ Victim | ☐ Missing Person | ☐ Nursery | Case No. |
|---------|-----------|--------------------|----------|--------|--------|----------|
| 1— | OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | | 287537-E |

CONTINUATION

Continued:

she gave permission for BROOKE to go and knows they all went in the van. That evening when she went to the FUSTER residence to pick BROOKE up, MRS. TOBY says she noted that "Frank had been drinking" and was not happy about the fact that BROOKE had been in the van with him. MRS. TOBY advised he did not appear intoxicated. That, to her knowledge, was the only time BROOKE had gone to the beach.

Approximately six weeks after she began going to the FUSTER'S, MRS. TOBY says she picked her daughter up one evening; and on the way home, BROOKE said that NOEL had showed his penis to her. MRS. TOBY says she did not ask any questions of her daughter or pursue it because she thought that ILEANA had probably handled the situation, and it would be better if she just let it drop.

During the time she was going there, MRS. TOBY noted that it always took MRS. FUSTER a long time to answer the door, then her child was "ready to go" and, therefore, she rarely went into the residence. On one occasion when she knocked on the door for several minutes, BROOKE opened the door and let her in. From the door, she observed ILEANA FUSTER laying in bed and thought maybe she was watching television. The other children were heard at the other end of the residence.

After speaking with MRS. LANDIS, MRS. TOBY says she asked BROOKE if anything had happened to her while at the FUSTER'S, and she had been told, "NO." She asked BROOKE if she had ever received a spanking and had been told, "NO." When she asked if anyone there had got a spanking, BROOKE told her "NOEL"; and when she asked, "Where", BROOKE replied, "His face."

This investigator attempted to interview BROOKE TOBY; however, she first hid behind the sofa, then behind her mother. Despite the fact that her mother urged her to sit in the chair, she refused to. BROOKE then ran to the kitchen saying she wanted some ice cream. MRS. TOBY said she would get it and for BROOKE to return to the living room. BROOKE returned with two kittens, which she showed this investigator. When asked if she would talk with this investigator, MISS TOBY picked up the kittens and left. When MISS TOBY returned to the kitchen area where her mother was, this investigator went to that area; however, BROOKE immediately left and went into the living room.

At that time, ANDREA LANDIS arrived at the TOBY residence. MRS. LANDIS stated she had

(SEE CONTINUATION)

| Badge No. | Grid | Officer's Name (Print) | District | District |
|-----------|------|------------------------|----------|----------|

21

METRO-DADE POLICE DEPT.
DADE CO...TY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

CONTINUATION

Continued:

also remembered that while TIFFANY LANDIS had been going to the FUSTER'S, she suddenly developed the habit of "French kissing". MRS. LANDIS decribed that her daughter would place her hands on either side of the person's head, turn the head sideways, then kiss the person with her mouth open and her tongue out. MRS. LANDIS went on to say that when she had also mentioned this to MRS. TOBY earlier in the day, MRS. TOBY told her that BROOKE had also started kissing in the same manner. MRS. TOBY confirmed the fact. MRS. LANDIS went on to say she and her husband, VINCE LANDIS, a Lieutenant with the City of Miami Police Department, had checked on MR. PEDRO FRANCISCO FUSTER, d.o.b.: 29 January 1944." The felony warrants under the name of PEDRO FRANCISCO FUSTER and discovered he had three outstanding warrants, which she had verified as still open with the MDPD Warrants Section, were for Grand Theft, Burglary, and three counts of Probation Violation. The warrant numbers are 80-016984-B; 80-196695; and 82-013072. As MRS. LANDIS stated, she was already aware of the fact that FRANK FUSTER was on probation from a 1982 arrest, this investigator advised her that FRANK FUSTER and PEDRO FUSTER were probably not the same people; however, the information would be checked out.

This investigator then responded to MRS. LANDIS'S residence at 15036 S.W. 142 Court and spoke with TIFFANY LEIGH LANDIS, three-year-old, W/F. At the time of the conversation, MISS LANDIS was in the kitchen sitting at the table. MISS LANDIS advised she remembered going to FRANK and ILEANA'S. When asked if she had ever taken her clothes off there, she stated, "No." MISS LANDIS was asked if FRANK or ILEANA had ever scared her, and she stated, "Yes." When asked, "How", she replied, "Mask". When asked, "What color was the mask", she stated, "White." This investigator asked MISS LANDIS where she learned to kiss and she shrugged her shoulders. When asked, "How do you kiss", she put her lips together and stuck them out. When asked, "Where does Frank kiss you", she placed her finger on her lips. When asked where ILEANA kisses her, she again put her fingers to her lips. This investigator asked MISS LANDIS, "Where do you kiss Frank", and she agal placed her finger on her lips. In response to "Where else", she shook her head, "No. When asked "Where do you kiss Ileana", MISS LANDIS again placed her finger on her lips

Duri g the conversation with MISS LANDIS, MRS. TOBY arrived at the LANDIS residence, acc anied by BROOKE TOBY, who had apparently indicated that as long as TIFFANY was talk g with this investigator, then she, too, would talk. MISS TOBY was also brought to t kitchen and sat at the table. BROOKE TOBY immediately began a conversation with

(SEE CONTINUATION)

| Badge No. | District | Grid |
|---|---|---|

g Officer's Name          Init

22

METRO-DAC POLICE DEPT.
DADE CO. FLORIDA

CONTINUATION

| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287537-E |

3 –
Continued

MISS LANDIS about the Disney World figures on the plates they were eating from. This investigator attempted several times to talk about the FUSTER'S; however, MISS TOBY would ignore the questions. This investigator asked TIFFANY LANDIS to describe the mask; and when she replied "it was white", MISS TOBY stated, "No, it was green." Both TIFFANY and BROOKE then began a conversation as to whether the mask was white or green; then decided there were two masks. Both, when asked, "Who was wearing the mask", agreed on "Frank". During the conversation, this investigator asked MISS TOBY if she knew the difference between telling the truth and telling a lie, and she stated that she did. When asked what happened to you if you told a lie, MISS TOBY replied, "Your mommy sends you to your bedroom and washes your mouth out with soap." After talking about the masks, neither child again spoke about the FUSTER'S. MISS TOBY, when asked about them, merely got up from her chair and walked to another part of the kitchen to examine something. The interview was then concluded.

MRS. LANDIS advised she and MRS. LITWIN were taking TIFFANY LANDIS and DAVID LITWIN to the Jackson Memorial Hospital/Rape Treatment Center the following morning. MRS. TOBY was asked to bring BROOKE to the Sexual Battery Office on Wednesday, 08 August 1984, at 11:30 a.m., and agreed to do so.

On Wednesday, 08 August 1984, at 7:30 a.m., this investigator responded to MDPD Records Section and obtained the MDPD jacket for PEDRO FRANCISCO FUSTER, ID #260463. A photo-graph of PEDRO FUSTER and FRANK FUSTER, ID #281103, was obtained, and it was noted that they are not of similar appearances and have different fingerprint classifications. Additionally, none of the addresses on PEDRO FUSTER'S paper work was similar in that some were in the Northeast and Beach sections of Dade County. PEDRO FUSTER appears to possibly be a Mariel refugee, as his first arrest was 10 September 1980. Additionally, he is 5'09" tall and weighs 150 pounds, while FRANK FUSTER is described as being 6'0" tall and weighing 210 pounds.

This investigator, at 10:00 a.m., responded to the office of Assistant State Attorney C. RUNDLE and advised him of the statements made by the LITWIN'S, the TOBY'S and the LANDIS'S. MR. RUNDLE stated he had contacted MR. FUSTER'S probation officer, BARRY HECHT. MR. HECHT had advised he was aware of the fact that the FUSTER'S were running a babysitting service but added that "his wife" was doing the babysitting while MR. FUSTER worked at his business, a babysitting service. MR. RUNDLE went on to say he had contacted

(SEE CONTINUATION)

Officer's Name (Print) | Badge No. | District | Grid

23

DADE C/ ... ... FLORIDA

| Type of ... | | Offense – Incident | | Case No. |
|---|---|---|---|---|
| | | SEXUAL BATTERY | | 287537-F |
| | | | □ Victim  □ Missing Person  □ Runaway | |
| | | | Name: ST. LAURENT, JARED | |

24—
Continued:

DEFENSE INCIDENT

MRS. AN MONROE, from H.R.S. Licensing, and requested that she check to ascertain if the FUSTER'S had a license from that agency. This investigator advised MR. RUNDLE of the difficulty in interviewing the children due to their ages, and he suggested DR. MIRANDA (phone: 447-2646) or DR. LEFTER (phone: 667-4600) be contacted to ascertain if either might be able to interview BROOKE TOBY. MR. RUNDLE advised he would continue to ascertain if the FUSTER'S were license through H.R.S.

Upon returning to the Sexual Battery Office, this investigator contacted Juvenile Assistant State Attorney JIM SMART and was advised he had been unable to locate the file from the June, 1984 investigation. He went on to say the investigations are filed by name, and without a name, it would not be possible to locate it.

This investigator contacted MRS. SPICER, phone: 754-3670, who works in the Licensing Division of H.R.S. The procedure was reported, according to MRS. SPICER would to stop immediately. The investigator would respond and advised them that they were operating illegally and to stop immediately. The investigator would respond and advised them that they explain the procedure to obtain the necessary license. The normal procedure takes two-to-three ground check, health and fire inspections, etc. The normal procedure includes a back-weeks. If, however, a "physical" problem – the wrong kind of fire extinguisher, etc. – exists, the procedure could take three-to-four months. During this time, no children can be kept, and when MRS. SPICER was asked what would happen if this were ignored, she stated that an injunction against them would have to be obtained from their legal depart-ment.

This investigator was then contacted by MRS. LANDIS, who stated she and MRS. TOBY were finished at the Rape Treatment Center. MRS. LANDIS went on to say TIFFANY had had a counseling session with the Social Worker, DEMONIQUE McGINNIS, during which she demonstrated some explicit sexual acts with the anatomically correct dolls. According to MRS. LANDIS, DAVID LITWIN also demonstrated the same behavior. This investigator requested that MRS. LANDIS and MRS. LITWIN bring the two children to the Sexual Battery Office, and they agreed to do so. This investigator advised MRS. LANDIS that PEDRO FUSTER and FRANK FUSTER were two different people, and that FRANK FUSTER had no out-standing warrants.

This investigator then contacted DR. D. HICKS, M.D., who had physically examined TIFFANY

24

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

CONTINUATION

| Type of Report Continued | Offense – Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| 5- OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

Continued:

LANDIS and DAVID LITWIN on the morning of 08 August 1984. DR. HICKS stated her exam-
ination revealed no physical evidence of any penetration on either child.

At approximately 11:30 a.m., this investigator was contacted by VINCE LANDIS. MR.
LANDIS advised his wife, after leaving the Rape Treatment Center, had stopped by his
office; then she and MRS. LITWIN decided to take the children home to rest due to the
fact that they had been at the Rape Treatment Center the entire morning. MRS. LANDIS
had requested her husband contact this investigator and advise this information. MR.
LANDIS went on to say he was upset due to the fact that his wife stated the doctor had
observed signs of physical trauma on both children in the form of "scar tissue". This
investigator advised MR. LANDIS of the conversation with DR. HICKS and her statements.
When MR. LANDIS again stated his wife had told him the doctor had observed "definite
signs", this investigator advised him DR. HICKS would be recontacted to ascertain if,
in fact, any trauma was found. This investigator advised MR. LANDIS that PEDRO FUSTER
and FRANK FUSTER were two different people, and FRANK FUSTER had no outstanding warrants.

This investigator immediately recontacted DR. HICKS and advised her of MRS. LANDIS'S
statement. DR. HICKS stated she had observed no signs of penetration on either child
and did not know how MRS. LANDIS became confused. This investigator attempted to
recontact MR. LANDIS but was advised he was out of the office. A message was left to
have him contact this investigator. MR. LANDIS did, in fact, call back later that
afternoon and was advised of DR. HICKS'S findings.

At approximately 11:00 a.m., MR. and MRS. TOBY arrived at the Sexual Battery Office,
and this investigator attempted to speak with BROOKE TOBY; however, she was very with-
drawn, and the interview was ended after approximately five minutes. This investigator
contacted Assistant State Attorney C. RUNDLE and advised him of the fact that the LITWIN
and LANDIS children apparently were very demonstrative with the dolls at the Rape Treat-
ment Center. This investigator suggested that BROOKE TOBY might be more communicative
with the social worker. An appointment was made for 1:00 p.m. to have BROOKE TOBY talk
with the social worker. This investigator showed MRS. TOBY a photograph of FRANK FUSTER,
I.D. #28110, and she confirmed that he was the person who, along with his wife, operated
the Country Walk Babysitting Service.

At 1:00 p.m., on Wednesday, 08 August 1984, this investigator, accompanied by Assistant

(SEE CONTINUATION)

| Reporting Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

25

METRO DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287537-E |

Continued:

State Attorney C. RUNDLE, responded to Jackson Memorial Hospital and spoke with CATHLEEN DEMONIQUE MCGINNIS, Nurse/Counselor. MRS. MCGINNIS advised she had had a session with TIFFANY LANDIS that morning, and during the session, she had showed the anatomically correct female doll to TIFFANY, and she had asked what "nipples" were called. After advising TIFFANY "nipples", TIFFANY lifted the skirt, and MISS MCGINNIS says she asked her if she had ever showed anyone else, and TIFFANY stated, "Two people in school." When asked what about FRANK and ILEANA, TIFFANY had said, "yes." MISS MCGINNIS advised she asked TIFFANY what she did at FRANK'S, and she indicated he touched her on the "boob" and "climbed" on top of her and kissed her. At that time, TIFFANY indicated ILEANA was also in the room. According to MISS MCGINNIS, TIFFANY laid the doll, she identified as herself, down and placed the large male doll, she identified as FRANK, on top of her and rubbed the boy doll's penis on the girl doll's vaginal area. At the time TIFFANY did this, both dolls were completely naked.

Regarding DAVID LITWIN, MISS MCGINNIS advised she asked him if he played games with his babysitters, and he said, "yes." This investigator asked MISS MCGINNIS had she understood DAVID LITWIN, and she advised she understood when he answered "yes" or "no", but his mother translated the other statements. MISS MCGINNIS asked him if they played special games, and he replied, "Yes." During the conversation, DAVID LITWIN undressed all of the dolls and laid them down on the floor. When asked about the games, DAVID pulled on the front of his pants; and when asked "who", he said, "Frank". DAVID then took the penis of the small boy doll and pulled on the penis. Using the doll, he designated it was ILEANA. DAVID demonstrated her pulling on the penis of the doll he called "David", then demonstrated ILEANA touching herself in the vaginal area. Additionally, MISS MCGINNIS advised DAVID LITWIN placed the naked "Frank" doll on top of the naked "Ileana" doll.

MISS MCGINNIS then spoke to BROOKE TOBY with this investigator, MR. RUNDLE and her father in the conference room of the Rape Treatment Center. MISS MCGINNIS introduced BROOKE to the dolls with their clothes on, then explained that they were like real girls and boys, and then she removed the clothing.. While doing so, BROOKE watched. MISS MCGINNIS asked if she had a babysitter, and BROOKE stated, "I do", then identified her as ILEANA. She also said ILEANA had a friend named FRANK, but that only ILEANA watched her. While there, she, ILEANA and the other children played games.

(SEE CONTINUATION)

| | District | Grid |
|---|---|---|
| Badge No. | | |

Officer's Name (Print)

26

METRO-DADE POLICE DEPT.
DADE COU  FLORIDA

| Type of Report Continued | Offense — Incident | ☐ Victim  ☑ Missing Person  ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE—INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

7-
Continued:

After undressing the four dolls, MISS McGINNIS encouraged her to play with them, and BROOKE laid them side-by-side, covered them with a cloth and announced they were sleeping. During the session, MISS McGINNIS pointed to the large doll's penis and asked if she had ever seen one before. MISS TOBY replied, "My daddy's", then was asked if she had ever seen FRANK'S. When she answered "yes", was asked which was larger, and she replied, "Frank's". MISS TOBY began to play with her dolls, which she had brought and continued efforts to interest her in the anatomically correct dolls failed. The session ended soon after, and MISS TOBY left the Rape Treatment Center with her parents.

This investigator, accompanied by MR. RUNDLE, returned to the Sexual Battery Office. Shortly after arriving, this investigator was contacted by MARGARET BUTLER, a case worker from H.R.S. It should be noted that MISS BUTLER had been at the Rape Treatment Center when this investigator was there with BROOKE TOBY. MISS BUTLER inquired if this investigator was working on a case with the Country Walk Babysitting Service. When advised "yes", MISS BUTLER stated she had investigated them in May, 1984, after an anonymous complaint was received. According to MISS BUTLER, she had gone to the FUSTER residence and spoken with ILEANA FUSTER. At the time, there were three "toddlers" in the residence. While she was there, ILEANA FUSTER had picked up one of the children, and the child had kissed MRS. FUSTER and had been kissed back. MISS BUTLER advised she was impressed with the concern and attention MRS. FUSTER gave the children. This investigator asked MISS BUTLER if the FUSTER'S were licensed, and she stated she had observed a license hanging on the wall and had, in fact, copied down the number. She went on to say her report was in the closed files under the name "Country Walk Babysitting Service". Due to the fact that the house was neat and clean and everything seemed in order, the complaint had been unfounded.

MISS BUTLER went on to say she had stopped by the Country Center and talked with some of the employees. It was her opinion that some jealousy may have existed between the people at the Country Center and the FUSTER'S due to the fact that the Country Center was running a Summer Camp for the children, and the FUSTER'S were taking away some of the children they would have had.

After speaking with MISS BUTLER, this investigator contacted H.R.S. and requested they check their files for the Country Walk Babysitting Service report. This investigator

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|
| FCPT. D. MEREDITH/Lm | 1620 | 05 | 2052 |

27

| Type of Report Continued | Offense — Incident | ☐ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

DADE COUN. FLORIDA

was advised it was signed out to JEAN IRWIN, a case worker; however, MISS IRWIN had gone for the day. At that time, this investigator advised MR. RUNDLE, and he contacted the H.R.S. attorney, MORTNER LEITNER. MR. LEITNER advised MR. RUNDLE that he was in possession of the report on the investigation done by MISS BUTLER. His office was currently preparing the necessary paper work for an injunction to serve on the FUSTER'S and would do so later in the evening.

While at the Sexual Battery Office, this investigator was contacted by SHARON COUSINO, who stated her two sons had attended the Country Walk Babysitting Service. MRS. COUSINO was advised that this investigator would respond to her residence to interview her sons, and she gave her address as 14809 S.W. 148 Place. This investigator, accompanied by MR. RUNDLE, responded to the Country Walk area, however, no 148 Place could be located in the complex.

This investigator then responded to 14922 S.W. 149 Street and contacted MRS. LEININGER. This investigator then interviewed her daughter, STACY. MISS LEININGER stated she had been at the FUSTER'S approximately three times; and during these times, she helped ILEANA watch the younger children or watched television. MISS LEININGER was asked if she had removed any of her clothes while there, and she replied, "No." When asked if either FRANK or ILEANA had touched her anywhere they should not have, she said, "No." She was asked if anything unusual had occurred while there, and she again said, "No." MISS LEININGER advised while she was in school, her teachers had explained "good touch-ing" and "bad touching", and she was aware of what it was. She stated nothing like that had happened to her nor did she see it happen to anyone else.

This investigator attempted to speak with TODD LEININGER, however, was unable to do so due to his age.

This investigator contacted SHARON COUSINO and was advised that her correct address was 14809 S.W. 140 Place. While enroute to the COUSINO'S, this investigator was advised that Unit #5314, OFFICER C. TERRY, had responded to MR. FUSTER'S residence and arrested a man for Carrying a Concealed Firearm. This investigator responded to the area of 14810 S.W. 144 Terrace; however, there were no uniform units in the area. This investi-gator then responded to the Country Center and contacted OFFICER TERRY at Station Five. OFFICER TERRY advised he had been dispatched to 14810 S.W. 144 Terrace on a "32" — "man

28

METRO-DADE POLICE DEPT.
DADE CO   V, FLORIDA

| Type of Report Continued | Offense — Incident | XX Victim Name: ST. LAURENT, Jared | Missing Person | Runaway | Case No. 287537-F |
|---|---|---|---|---|---|

29- OFFENSE-INCIDENT    SEXUAL BATTERY

Continued:

with a gun" call.  Upon arrival, he had observed a white male, later identified as DENNIS MELLO, in a truck.  Ordering him out of his truck, he had discovered him in possession of two guns; one of which was in the waistband of his pants.  MR. MELLO was arrested, under MDPD Case Number 292638-E, and charged with Carrying a Concealed Firearm.  MR. MELLO is currently on probation for Carrying a Concealed Firearm.

OFFICER TERRY went on to say while he was on the scene, several people came up and stated MR. FUSTER was being investigated for sexual abuse, and MR. FUSTER, who was standing nearby, had probably overheard these statements and now had knowledge of the fact that an investigation was being conducted.

This investigator, accompanied by MR. RUNDLE, responded to 14809 S.W. 140 Place and spoke with SHARON COUSINO.  MRS. COUSINO stated her son, JUSTIN PAUL, five-years-old, and her son, JONATHAN DAVID, two-years-old, had been going to the FUSTER'S since the last part of February, 1984, when she saw the advertisement in the flyer.  Since that time, they attended from 2:00 p.m. until 6:00 p.m. through this day, 08 August 1984. The last two weeks, the hours were 2:00 p.m.-to-5:00 p.m.

On Tuesday, 07 August 1984, MRS. COUSINO advised she saw MR. FUSTER, and he told her he and ILEANA weren't going to babysit any more; but due to the fact that they were friends, they would continue to babysit JUSTIN and JONATHAN.  MRS. COUSINO says her family and the FUSTER'S went boating together on 04 July 1984.  When asked if she had noticed any behavior in her children while they were going to the FUSTER'S, MRS. COUSINO stated JUSTIN had nightmares, but she did not become alarmed.

This investigator then interviewed JUSTIN in his bedroom.  It should be noted that MR. RUNDLE was present during part of the interview.  JUSTIN was asked if he liked going to the FUSTER'S, and he stated he did not.  When asked "why", he stated, because of what "they did".  When asked "what happened", MR. COUSINO did not answer.  This investigator asked if any of the children had their clothes off, and JUSTIN stated, "Yes."  When asked "who", he stated, "My brother."  JUSTIN was asked to describe what happened to his brother, and he replied that JONATHAN would be wearing a shirt and no diaper and be sitting on the floor when ILEANA would put her mouth on JONATHAN'S penis, then grab it.  This investigator asked JUSTIN if FRANK FUSTER was there when this happened, and he said, "No."  He also related that one time when ILEANA put her mouth on JONATHAN'S penis, she called "Frank, come here and look."  When he saw what she was

(SEE CONTINUATION)

| Reporting Officer's Name (Print) | Badge No. | District | Date | 29 |
|---|---|---|---|---|

CONTINUATION

DADE COUNTY   FLORIDA

| Type of Report — Continued | Offense — Incident | ☒ Victim Name: ST. LAURENT, Jared | ☐ Missing Person ☐ Runaway | Case No. 287537-E |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | | | |

Continued:

doing, JUSTIN says they argued about it, and MR. FUSTER stated, "That's real dumb, and the kids know it. It's embarrassing."

This investigator asked JUSTIN if this happened to any of the other children, and he first replied "no", however, when asked a few minutes later, "Who else did this happen to", JUSTIN replied, "David and Todd." JUSTIN advised that alot of times FRANK touched DAVID on the penis with his mouth. When asked if he played any games while there, JUSTIN said he didn't. This investigator asked if FRANK and ILEANA played any games, and he said they played "get me, get me, touch my penis". When asked how they played this, JUSTIN advised they would try to get pee-pee on their faces and put their pee-pee's in their mouths. When asked "Who would play this game", he stated, "Frank, Ileana, David and Michael", who he said was about three-years-old. When asked if they ever told him not to tell anyone, JUSTIN first said "no", then stated, "They said don't tell or the people won't give us money any more."

When asked if FRANK or ILEANA took any pictures of the children, he said, "Yes." When asked if the children's clothing was off or on, he first said, "on", then he said, "off". JUSTIN stated FRANK and ILEANA would take photos of NOEL, DAVID and TODD, first with their clothes on, then with their clothes off. The pictures were kept in their room in a secret hiding place, which he didn't know.

When asked if anyone other than FRANK and ILEANA had been there, JUSTIN stated once a lady with black hair, who lives in California, came over and "showed her boobies" to JUSTIN and NOEL. JUSTIN says FRANK was in the room at the time, and he referred to her as the "booby girl".

At that point, the interview with MR. COUSINO terminated as this investigator was advised that MR. LEITNER was responding to the FUSTER residence. MR. RUNDLE was left at the Country Center, and this investigator responded to 14810 S.W. 144 Terrace and met with ILEANA FUSTER. MRS. FUSTER stated her husband was in the shower and would be right out. Several minutes later, MR. FUSTER appeared, and both he and MRS. FUSTER were advised that an investigation was being conducted due to the fact that some allegations had been made by the parents of the children his wife was babysitting. MR. FUSTER immediately denied that he had done anything to the children. This investigator advised MR. FUSTER that prior to him being asked any

(SEE CONTINUATION)

| Badge No. 1630 | District 05 | Grid 2052 | 30 |
|---|---|---|---|

| Officer's Name (Print) | |
|---|---|
| DET. R. MUZARRTTT/km | |

METRO-DADE POLICE DEPT.
DADE C   TY, FLORIDA

| Type of Report Continued | Offense — Incident | ☐ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| -31- OFFENSE INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

-31- (Continued)

questions, he had to be advised of his rights per Miranda. This investigator presented MR. FUSTER with the Advice of Constitutional Rights Before Interview form. MR. FUSTER glanced at the form and stated he would not sign anything until he spoke with his attorney, whom he identified as JEFF SAMEK. This investigator asked MR. FUSTER if he wished to call MR. SAMEK, and MR. FUSTER stated he would the following day. MR. FUSTER went on to say MR. SAMEK was handling his appeal from when he was found guilty of "touching the other girl". MR. FUSTER was advised that this investigator was aware of the case and the fact that he was on probation. MR. FUSTER stated the other girl had lied, and even the fact the judge had known it because he put him on probation rather than send him to jail and had appointed MR. SAMEK to handle his appeal.

MR. FUSTER then stated that his wife did the babysitting, and he was never at home when the children were there. This investigator again advised MR. FUSTER that before he could be interviewed concerning anything which had happened, he would have to be advised of his rights. MR. FUSTER then stated he would check with his attorney.

This investigator advised MR. FUSTER he could voluntarily take a polygraph examination if he wished to do so. MR. FUSTER stated he would not take a polygraph examination due to the fact that he had taken two during the investigation of the previous case, passed both and had still to go to court. MR. FUSTER advised this investigator that if all the parents were contacted, they would state that his wife cared for the children as if they were their own, and the children loved he and his wife. MR. FUSTER went on to say he would give this investigator the names and addresses of the people who brought their children, then when asked about the list a few minutes later, he stated he would have to check with his attorney before providing the names and addresses. MR. FUSTER went on to say he had been contacted by MR. LEITNER and told he was bring some papers to his residence at 8:00 p.m. for him to sign. At that time he was going to give MR. LEITNER the "license" and displayed what appeared to be an occupational license. At that time, MR. LEITNER arrived, and after MR. FUSTER let him into the residence, this investigator observed MR. FUSTER hand the "license" to him. Then, due to the fact that MR. FUSTER stated he wished to consult with his attorney, left the residence. MR. FUSTER followed this investigator from the residence and stated he would like to explain the situation. However, the last time he had talked with the detectives and ended up under arrest; so this time, he would talk with his attorney first. He stated the only reason he had been arrested the last time was because the "girl" was related to the "Captain" of the

31

METRO-DADE POLICE DEPT.

DADE CO., FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim | ☐ Missing Person | ☐ Runaway | Case No. |
|---|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | | 287537-E |

32—

32 Continued:

Substation on Kendall. MR. FUSTER stated he could not have done anything to any of the children because he was never home, he was working in construction and added that for the past three months, he had been helping a neighbor remodel his house and gestured to the north. This investigator then left the FUSTER residence.

On Thursday, 09 August 1984, at 9:30 a.m., this investigator was contacted by Assistant State Attorney JEANNIE WILLIS at the Cutler Ridge Branch, phone: 232-3803. MISS WILLIS advised on 08 August 1984, FRANK and ILEANA FUSTER had responded to her office to file Trespass charges against HENRY McDOWELL, of 14024 S.W. 149 Lane. According to MR. FUSTER, at approximately 7:30 p.m., on Tuesday, 07 August 1984, she was in the garage area of her residence when MR. McDOWELL approached her and stated he had heard about "the cases", adding that they had 24 hours to leave the area; and if it was true, nothing would save her. MISS WILLIS says that ILEANA was crying and said she had no knowledge of what he was talking about. MR. FUSTER also told MISS WILLIS about the Lewd and Lascivious Assault arrest two years ago and also the fact that the victim was related to the Captain of Station Five.

On the morning of 09 August 1984, MR. FUSTER telephoned MISS WILLIS and advised her of the incident the previous evening with MR. MELLO. MISS WILLIS says MR. FUSTER insisted that everyone was after his wife and not him. MISS WILLIS stated her office was going to do some additional investigation before any charges were filed against MR. McDOWELL.

At 1:00 p.m., Thursday, 09 August 1984, this investigator responded to the office of Assistant State Attorney C. RUNDLE. Also present was DR. JOSEPH BRAGA, Adjunct Professor of Psychology at the University of Miami, and his wife, DR. LAURIE BRAGA. MR. RUNDLE advised that the DR(S). BRAGA would be interviewing the children who attended the Country Walk Babysitting Service due to their expertise in dealing with the children. The sessions, according to MR. RUNDLE, would be video-taped and would be done in MR. LASER'S Office. The following children were then interviewed by the BRAGA'S.

At 2:05 p.m., the DR(S). BRAGA interviewed JUSTIN COUSINO. The video cassette tape was impounded by this investigator. At 3:15 p.m., the DR(S). BRAGA interviewed JUSTIN and JONATHAN COUSINO. The video cassette tape was impounded by this investigator. At

(SEE CONTINUATION)

| g Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

32

METRO-DADE POLICE DEPT.
DADE CO    V. FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim Name: ST. LAURENT, Jared | Case No. 287537-E |
|---|---|---|---|

33-  OFFENSE-INCIDENT         SEXUAL BATTERY

( Continued: )

4:30 p.m., the DR(S). BRAGA interviewed TIFFANY LANDIS. The video cassette tape was impounded by this investigator. At 5:55 p.m., the DR(S). BRAGA interviewed DAVID LITWIN. The video cassette tape was impounded by this investigator. At 7:15 p.m., the DR(S). BRAGA interviewed TODD LEININGER. The video cassette tape was impounded by this investigator.

During the time the interviews were being done, MR. RUNDLE advised that the Probation and Parole Office was preparing the necessary paper work to file an affidavit for Violation of Probation on FRANK FUSTER. The probation would be violated due to the fact that MR. FUSTER: (1) changed his employment without first procuring the consent of his probation supervisor in that he, on or about 28 March 1984, owned and operated Country Walk Babysitting Service; (2) failed to make a full and truthful report to his probation supervisor on the form provided for that purpose, and that he failed to fully and truthfully answer the question of where he is employed by omitting that between 28 March 1984 and 29 June 1984, he owned and operated Country Walk Babysitting Service; (3) by failing to live and remain at liberty without violating any law in that between 28 March 1984 and 29 June 1984, he owned and operated Country Walk Babysitting Service without a state license, which is a violation of Florida State Statute 402.312; and (4) that between 01 January 1984 and 08 August 1984, he did unlawfully commit a Lewd Act in the presence of a minor, JUSTIN COUSINO, Age: five years, in violation of Florida State Statute 800.04.

MR. A. LASER contacted MR. FUSTER'S attorney, J. SAMEK, and was advised that MR. FUSTER would surrender himself at 10:00 a.m. on Friday, 10 August 1984, in the Honorable JUDGE NEWMAN'S court.

On Friday, 10 August 1984, MR. FUSTER appeared before JUDGE NEWMAN and was taken into custody. At that time, MR. RUNDLE and MR. LASER requested MR. FUSTER'S son, NOEL FUSTER, be interviewed by the Child Protection Team and H.R.S. to determine if he had been the victim of any sexual abuse and place him in a temporary shelter if, in fact, anything had occurred. JUDGE NEWMAN ordered that NOEL FUSTER could remain in the custody of his step-mother, ILEANA FUSTER, and a hearing would be held on Monday, 13 August 1984, before the Honorable JUDGE FERGUSON.

On 10 August 1984, at 12:35 p.m., the DR(S). BRAGA interviewed BROOKE TODY. The two

(SEE CONTINUATION)

| Badge No. 1630 | District 05 | Grid 2052 |
|---|---|---|

s Officer's Name (Print)
DET. D. MEZNARICH/km

33

METRO-DADE POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim Name: ST. LAURENT, Jared | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | | | 287537-E |

...tinued)

video cassette tapes of the interview were impounded by this investigator. At 1:10 p.m., the DR(S), the DR(S). BRAGA interviewed JUSTIN COUSINO. The video cassette tape was impounded by this investigator.

On Friday, 10 August 1984, this investigator, MR. LASER and MR. RUNDLE viewed the video cassette tapes of the interview with JUSTIN COUSINO on 09 August 1984 and 10 August 1984. After viewing the tapes, at approximately 3:30 p.m., MR. LASER and MR. RUNDLE advised enough probable cause existed for the issuance of a search warrant for the residence located at 14810 S.W. 144 Terrace to search for photographs, films or video tapes. The search warrant was prepared, and at approximately 6:00 p.m., on Friday, 10 August 1984, this investigator appeared before the Honorable JUDGE DAVID M. GERSTEN. JUDGE GERSTEN then signed the warrant authorizing the search of the residence.

This investigator, accompanied by SERGEANT F. GROSS, then responded to 14810 S.W. 144 Terrace and met with DETECTIVE D. WENDEL. Entry to the residence was gained by a locksmith opening the lock on the door leading from the garage into the resi- dence. It should be noted that upon arrival, this investigator found the double garage door unlocked. Also present at the time entry was made was Unit #5310. SERGEANT T. ADDISON, MAJOR J. FARRELL and Lab Unit #329, LAB TECINICIAN R. TAAFFE, and Lab Unit #312, LAB TECINICIAN D. CURTIS. LAB TECINICIAN TAAFFE took 58 colored photographs of the residence. This investigator impounded the following property from the residence: (1) Ten cans of undeveloped film; (2) Five magazines; (3) One black thumbring; (4) One book; (5) One photo album; (6) Sixteen miscellaneous photographs; (7) Miscellaneous negatives; and (8) One bag of suspect marijuana. Items number 1, 2, 3, 4, 5, 6 and 7 were then given to LAB TECINICIAN TAAFFE for transport. Item number 8 was taken by this investigator and submitted to the MDPD Lab for further analysis. See LAB TECINICIAN TAAFFE'S Crime Scene Report, which has been made a part of this case file for further information.

On Saturday, 11 August 1984, at 1:00 p.m., this investigator responded to 14546 S.W. 142 Street Circle and spoke with LINDA and WILLIAM THOMPSON. MRS. THOMPSON stated her two daughters, ALLISON PAMELA, four-years-old, and BRIDGET LEIGH, seven-years-old, went to the Country Walk Babysitting Service. She advised she saw the advertisement in the Country Times; and in April, 1984, she visited the FUSTER residence to interview MRS.

(SEE CONTINUATION)

| | | | Grid | |
|---|---|---|---|---|
| Officer's Name (Print) | Badge No. | District | | |

34

METRO-DADE POLICE DEPT.

DADE COUN     FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim Name: ST. LAURENT, Jared ☒ Missing Person ☐ Runaway | Case No. 287537-E |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | | |

FUSTER. At that time, she saw four children in MRS. FUSTER'S care. Approximately three weeks later, she says she took ALLISON to the FUSTER'S and left her there for "a few hours". One other time she recalls taking both ALLISON and BRIDGET to the FUSTER'S for approximately three hours. MRS. THOMPSON advised on one of the times during which she took her daughter(s), she remembered seeing MR. FUSTER leaving the residence.

MRS. THOMPSON stated both of her daughters were currently vacationing in the Boston, Massachusettes area and would not be returning to Miami until the last week of August. MRS. THOMPSON was advised to contact this investigator upon their return.

This investigator responded to 14840 S.W. 140 Court and attempted to contact SHARON NELSON but met with negative results.

At 2:00 p.m., on 11 August 1984, this investigator responded to 14917 S.W. 141 Place and contacted SHARON TOPPINO. MRS. TOPPINO was asked if she had used the Country Walk Babysitting Service, and she stated she had not, however, her girlfriend, GILDA CABA, had. MRS. TOPPINO went on to say one day around the first part of June, 1984, while MRS. CABA was visiting her, she took her two children to the babysat. MRS. TOPPINO went with MRS. CABA when the children were dropped off around noon time. MRS. CABA discovered she had forgotten the younger child's bottle, however, ILEANA told her it was all right, they had punch. MRS. TOPPINO and MRS. CABA returned to her residence, and approximately a half-hour later, she took the bottle to the FUSTER'S. At that time, MRS. TOPPINO says FRANK FUSTER appeared to be coming home. She gave the bottle to MRS. FUSTER at the door and was told the baby was asleep. MRS. TOPPINO advised she observed two other children there.

At approximately 5:00 p.m., MRS. TOPPINO advised she and MRS. CABA returned to the FUSTER'S residence to pick up the children. MRS. TOPPINO remembers walking around to the back sliding glass doors, going into the kitchen and picking up the children's things, then leaving through the same sliding glass door. At the time, there were no children other than NOEL FUSTER there, and MRS. TOPPINO thought they were going somewhere after because FRANK FUSTER was standing beside the vehicle.

MRS. TOPPINO advised she would contact MRS. CABA in New York and advise her of the

(SEE CONTINUATION)

| Officer's Name (Print) | | Badge No. | | District | | Grid | |
|---|---|---|---|---|---|---|---|

35

METRO-DADE POLICE DEPT.
DADE COL.   .FLORIDA

| Type of Report Continued | Offense – Incident | ☐ Victim ☑ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| 36— OFFENSE INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 282517-E |

Continued:

investigation and the fact that this investigator would be contacting her at a later date.

This investigator then responded to 14036 S.W. 148 Lane and attempted to contact ANEICE McPHERSON but met with negative results. This investigator responded to 15022 S.W. 141 Court and attempted to contact KELLY ALLENS but met with negative results. This investigator responded to 15045 S.W. 142 Place to contact DIANE TOBY but met with negative results. This investigator responded to 14028 S.W. 148 Lane and attempted to contact DENNIS MELLO but met with negative results.

On Sunday, 12 August 1984, at 9:00 a.m., this investigator responded to MDPD Station Five and obtained a copy of the Offense Incident Report, written on 08 August 1984, by OFFICER TERRY for case number 292638-E. While at Station Five, this investigator telephoned the residence of KELLY ALLENS and spoke with her husband, STEVE ALLENS. MR. ALLENS stated he was leaving for his office in Fort Lauderdale and would not return until 8:00 p.m. This investigator then made an appointment for an interview with MR. ALLENS on Monday, 13 August 1984, at 6:00 a.m.

This investigator then responded to 14860 S.W. 144 Terrace and spoke with SAL WEISMAN. MR. WEISMAN advised he did not use the FUSTER'S babysitting service but knew of two people who had.. MR. WEISMAN then telephoned one of them and asked if they wanted to talk with this investigator. When he hung up the telephone, MR. WEISMAN stated they did not want to become involved; therefore, he could not give their name. MR. WEISMAN then suggested this investigator go to the residence across the street and inquire there.

This investigator responded to 14851 S.W. 144 Terrace and spoke with MRS. USS. MRS. USS advised she had two sons, CHRISTOPHER RICHARD USS, two-years-old, and NELSON AMAURY THEN, nine-years-old. MRS. USS stated her husband was currently on a business trip and would not return for approximately ten days. She stated she had spoken with him the previous evening, and they had decided they did not wish to become involved in the situation. MRS. USS went on to say when her son was going to the FUSTER'S, she had taken one of their forms to the bank where she works and had an attorney there examine it. When MR. FUSTER had been arrested, several people at the bank had recalled the form and questioned her as to her involvement with the FUSTER'S. This had caused her great embarrassment. Additionally, she was now taking her two-year-old son to

Officer's Name (Print)                    Badge No.                    District        Grid

| DADE COUNTY FLORIDA | | | |
|---|---|---|---|
| Type of Report — Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

another babysitter in Country Walk, and Channel 23 television had gone there for a news story and filmed CHRISTOPHER. This had caused her additional embarrassment.

MRS. USS, though somewhat reluctant to talk, stated she had taken her son, CHRISTOPHER, to the FUSTER'S on two occasions. The first time, he returned home with a throat infection, and they had had to take him to a doctor.

Approximately two or three months later, MRS. USS says she took CHRISTOPHER back to the FUSTER'S, and this time, he stayed from Monday through Friday on a 24-hour basis. When she picked him up, she immediately discovered he had a 104-degree temperature. Her son was admitted to the hospital due to the fever. MRS. USS advised that ILEANA FUSTER did not seem to notice that he had the fever. Since those two times, the last possibly the week of 02 July 1984, CHRISTOPHER had not returned to the FUSTER'S to be babysat.

Her other son, NELSON, played with NOEL FUSTER alot, and on at least one occasion, went to the beach with NOEL, FRANK and ILEANA FUSTER. At the end of the 1983-1984 school year, MRS. USS says NELSON went to South America for a vacation, and when he returned, he seemed reluctant to play with NOEL FUSTER. He has since began playing with the six-year-old who lives next-door. MRS. USS advised she has asked him why he no longer plays with NOEL, but he offers no answer. At the conclusion of the interview, MRS. USS again stated she did not wish to become involved.

This investigator then responded to 15105 S.W. 140 Court and spoke with SHARON NELSON. MRS. NELSON stated she had heard about the Country Walk Babysitting Service from a neighbor, who had gotten the information from the bulletin. MRS. NELSON advised she took her three-year-old daughter, LAUREN LEIGH, to the FUSTER'S on one occasion for three hours. When she took her daughter there at approximately 10:00 a.m., she says both FRANK and ILEANA FUSTER were there, along with NOEL. She says she remembers ILEANA telling her they were expecting more children to arrive. When she was in the residence, MRS. NELSON says she saw the living room area, the kitchen and the playroom, and all appeared to be neat and clean. When she picked her daughter up, MRS. NELSON stated she did not remember seeing any other children being there and thinks MR. FUSTER was in his office working.

(SEE CONTINUATION)

| Badge No. | Grid | | |
|---|---|---|---|
| Officer's Name (Print) | | District | |

37

DADE COU .FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim | Cont... |
|---|---|---|---|
| 8— | OFFENSE-INCIDENT | SEXUAL BATTERY | ☒ Victim ☐ Missing Person ☐ Runaway Name: ST. LAURENT, Jared | 287537-E |
| Continued: | | | |

MRS. NELSON says she has seen FRANK and ILEANA at the central pool approximately three times. The friend who gave her the FUSTER'S name and address was MARGO DENNEMAN, phone: 233-9831. Also, she thinks her friend, STEPHANIE, phone: 252-1202, used the service.

The two telephone numbers were cross-referenced, and this investigator responded to 14804 S.W. 139 Court and spoke with STEVEN DENNEMAN.. MR. DENNEMAN stated his wife, MARGO, was currently out-of-state on vacation for two weeks with the children. MR. DENNEMAN went on to say he would check with his wife as to whether they used the Country Walk Babysitting Service and recontact this investigator if they did. MR. DENNEMAN advised he did not think that his children had ever gone to the FUSTER'S.

This investigator then responded to 14917 S.W. 140 Court and spoke with DON WOLGAST. MR. WOLGAST stated that he and his wife had never taken their children to the FUSTER'S to be babysat.

This investigator responded to 14036 S.W. 149 Lane and spoke with the occupant. The white female stated that her name was not ANEICE McPHERSON and added that MRS. McPHERSON had moved away several months prior. The white female stated she had no children, so would certainly not use a babysitting service.

This investigator responded to 15001 S.W. 146 Street and spoke with DAN TSUJIOKA. MR. TSUJIOKA stated he and his wife had never taken their son, TODD, to the FUSTER'S to be babysat.

This investigator then responded to 14807 S.W. 139 Court and spoke with MRS. ALEX GONZALES. MRS. GONZALES stated she had never used the FUSTER'S babysitting service for her children.

This investigator responded to 14028 S.W. 148 Lane and spoke with DENNIS and LINDA MELLO. MRS. MELLO stated she had taken her one-year-old daughter, CARMEN GABRIELLE, to the Country Walk babysitting service from the week of 04 June 1984 through 07 August 1984. During this time, CARMEN would go there at approximately 2:00 p.m. and be picked up between 6:00 p.m. and 7:00 p.m.; sometimes, however, she would stay there until 9:00 p.m. or 10:00 p.m. MRS. MELLO estimated her daughter went there approximately

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid | |
|---|---|---|---|---|

38

METRO-DADE POLICE DEPT.

DADE CO., FLORIDA

CONTINUATION

| Type of Report Continued | Offense – Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287517-E |

39 — Continued:

26 times. She was advised of the service by her friend, SHARON COUSINO.

MRS. MELLO advised it always seemed to take MRS. FUSTER a long time to answer the door; and one time when she questioned her about it, MRS. FUSTER told her she had disconnected the doorbell because it upset the children. When she first started taking her daughter there, MRS. MELLO says FRANK FUSTER would be in his office working, but then she began to see him with the children more and more. On one occasion, he took CARMEN from her arms when she took her there. When she first started there, she noticed there were no covers over the electrical outlets, so she bought some and gave them to MRS. FUSTER. The children she usually saw there were KENNY, whose father is a pilot, SHARON COUSINO'S children, JUSTIN and JONATHAN, BROOKE and an approximately two-year-old black female, MELISSA. NOEL FUSTER would sometimes be arriving home from school while she was there.

When she first started taking CARMEN there, MRS. MELLO advised her daughter would scream and cling to her. Approximately four weeks prior, CARMEN had developed a rash on her vulva. MRS. MELLO says she put cream on it for a couple of days, and it went away. The rash was gone for about one week, then came back and CARMEN had it for approximately a week before she could clear it up. MRS. MELLO learned that KENNY had broken a toe while at the FUSTER'S, and MRS. FUSTER had told his mother he fell. MRS. MELLO advised she was talking with KENNY'S mother and was told that the first story ILEANA FUSTER gave wasn't right, but that was because of ILEANA not speaking good English.

MR. MELLO advised he was the person who usually picked CARMEN up from the FUSTER'S. He stated several times when he arrived, CARMEN would be asleep, then would cling to him and be happy to see him. Several times when he arrived, MR. MELLO says MR. FUSTER would open the door and tell him, "Ileana's got to get dressed. She just took a shower."

Every time, MRS. MELLO says, she would send two full bottles for CARMEN; and often times, there would be a half or a full bottle returned. MR. MELLO stated he noticed that often times the victim would come from the FUSTER'S and be asleep well before her usual 8:00 p.m. bedtime. Once, he says, he told his wife, "Linda, I think they're drugging her."

(SEE CONTINUATION)

| Badge No. | District | Grid |
|---|---|---|

ing Officer's Name (Print)

39

METRO-D. POLICE DEPT.

DADE COUNTY, FLORIDA

| Type of Report Continued | Offense – Incident | | ☑ Victim ☐ Missing Person ☐ Runaway Name: ST. LAURENT, Jared | Case No. 287537-E |
|---|---|---|---|---|
| -40- | OFFENSE–INCIDENT | SEXUAL BATTERY | | |

(is Continued)

After interviewing MR. and MRS. MELLO, due to the fact that it was 7:00 p.m., this investigator contacted STEVE ALLENS to ascertain if he and his wife could be inter- viewed. MR. ALLENS stated he was busy, and the following morning would be fine.

This investigator then responded to the Sexual Battery Office and contacted GILDA CABA, of 212 - 5th Avenue, Greenport, New York, phone: 516-477-1706. MRS. CABA stated her two children, STACY LYNN, 22-months, and TIMOTHY CLAY, six-years-old, had gone to the Country Walk Babysitting Service one time at the beginning of June, 1984. MRS. CABA, after speaking with SHARON TOPPINO, had questioned her children as to what they did while at the FUSTER'S and had been told they had played outside. According to MRS. CABA, her son had told her he didn't like going there but refused to give a reason why. MRS. CABA could advise no further information.

On Monday, 13 August 1984, at 6:00 a.m., this investigator responded to 15022 S.W. 141 Court and spoke with STEVE ALLENS. MR. ALLENS stated his son, KENNY, 1½-years-old, went to the Country Walk Babysitting Service from the middle of June, 1984, through the first part of August, 1984, approximately three days per week, from 8:00 a.m. until 5:00 p.m. or 6:00 p.m. MR. ALLENS stated that his son was often times the first child there in the morning, and alot of times, he woke the FUSTER'S up. Sometimes, he noticed three or four other children there, and one time, ILEANA told him she was going to keep four-to-five children at the most. Sometimes, when he picked his son up, MR. FUSTER was in his office working, and some other times, he was playing with the children.

MR. ALLENS advised that all of the food they sent with KENNY was apparently used, as none was returned. On two occasions, one of which was on a weekend day, KENNY went with MR. and MRS. FUSTER to his mother's, and once they took KENNY out to dinner.

After hearing "rumors" about the FUSTER'S at the pool, MR. ALLENS says he took the child out of the day care center and had him examined by a doctor. According to MR. ALLENS, the examination showed no signs of trauma or abuse, and he and his wife were satisfied that nothing had happened to KENNY. MR. ALLENS could advise no further information. It should be noted that during the interview, MRS. ALLENS was not present nor was KENNY ALLENS.

At 9:00 a.m., on Monday, 13 August 1984, this investigator responded to the Marriage

(SEE CONTINUATION)

40

| DADE | ITY,FLORIDA | | | | | |
|---|---|---|---|---|---|---|
| Type of Report Continued | Offense — Incident | | | ☒ Victim | ☐ Missing Person | ☐ Runaway | Case No. |
| -41-. OFFENSE-INCIDENT | SEXUAL BATTERY | | | Name: ST. LAURENT, Jared | | | 287537-E |

license Bureau, located at 44 West Flagler Street, and obtained a certified copy of FRANK and ILEANA FUSTER'S marriage license. The license shows MRS. FUSTER giving her date of birth, at the time the license was issued on 27 September 1983, as 28 November 1966. This date would make her present age 17 years.

At 11:00 a.m., on Monday, 13 August 1984, this investigator responded to the Office of Assistant State Attorney C. RUNDLE and advised him of the results of the inter-views conducted on 11 August 1984 and 12 August 1984. MR. RUNDLE was also advised of the date of birth on MRS. FUSTER'S marriage license.

At 11:30 a.m., on Monday, 13 August 1984, this investigator was contacted by SHIRLEY AVAKIAN, of 14521 S.W. 148 Avenue, phone: 255-5745. MRS. AVAKIAN advised she and her family were currently vacationing in New Hampshire and would return to the Miami area on 24 August 1984. MRS. AVAKIAN stated she took her three-year-old son, BRADLEY SCOTT ARCHABALD AVAKIAN, to the Country Walk Babysitting Service from 9:00 a.m.-to-12:00 noon during the time she was working part-time. This was, according to MRS. AVAKIAN, either right before or right after Christmas, 1983. She also recalled taking him to the FUSTER'S from 1:00 p.m. until 5:00 p.m. on 07 March 1984 and 09 March 1984. On 08 March 1984, she took him there during the morning hours.

At the time she was taking BRADLEY to the FUSTER'S, she says she saw two-to-three other children in the television room to the right of the kitchen. Once in a while, MR. FUSTER was there; however, the times when she went there around noon, she did not see MR. FUSTER and assumed he was working. When she sent a lunch, none of the food was ever returned.

MRS. AVAKIAN went on to say she never noticed any change in BRADLEY'S behavior; however, he once complained, "I don't want to go." When she asked "why", he repeated the statement but offered no further explanation. MRS. AVAKIAN could advise no further information and stated she would contact either this investigator or MR. RUNDLE upon her return to Miami.

At 12:30 p.m., on Monday, 13 August 1984, this investigator responded to 3300 N.W. 27 Avenue and spoke with Juvenile Assistant State Attorney J. SMART. MR. SMART advised his office had prepared a Dependent Petition in the interests of NOEL FUSTER, declaring

(SEE CONTINUATION)

| ing Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|
| DET. D. MEZNARICH/km | 1630 | 05 | 2052 |

4l

METRO DADE POLICE DEPT.
DADE   JNTY. FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287537-E |

-42-

Also Continued:

him dependent due to the fact that he is abused by the willful acts of his father which result in any physical, sexual or mental injury, which causes or is likely to cause his physical, mental or emotional helath to be significantly impaired. The petition also alleges that during a period from approximately March, 1984 until August, 1984, he had been sexually abused by his father, FRANK FUSTER, who caused him to participate in oral sex with him.

Additionally, the petition alleged that since approximately March, 1984 until August, 1984, he had been living in an environment where he has been continuously exposed to his father and step-mother sexually abusing young children in their care.

Present at the hearing before the Honorable JUDGE FERGUSON was Assistant State Attorney J. SMART, Assistant State Attorney M. TENENBAUM, this investigator, Attorney HARVEY NUSSENBAUM, who was representing NOEL FUSTER'S natural mother, MARTHA FUSTER, and MRS. FUSTER'S sister, GIESELLA GONZALEZ. After hearing the facts of the petition, JUDGE FERGUSON ruled that NOEL FUSTER would be seen by the Child Protection Team and that Team would decide if NOEL FUSTER was to be released to his natural mother or taken into the custody of the State. Another hearing was set for 2:00 p.m., on Wednesday, 15 August 1984.

NOEL FUSTER was then taken, by H.R.S. worker M. BERGER, to Jackson Memorial Hospital/ Rape Treatment Center to be examined by and interviewed by DR. J. LEDERHANDLER.

MR. SMART advised he had been contacted by JOLENE WUEST, of 16401 S.W. 140 Avenue, Lot #434. MRS. WUEST advised her two children, KRISTIE WUEST, four-years-old, and EDWARD WUEST, one-year-old, had been at the Country Walk Babysitting Service. According to the report, MRS. WUEST took her children on 12 January 1984 to the Country Walk Babysitting Service for four hours at night. When the mother returned, EDWARD was very emotionally upset, had nightmares, when picked up. Although her mother had provided food and drink, the children had received nothing. The mother saw only the woman, she did not see a man at all. The four-year-old said the woman took the baby to a back room, and the four-year-old was not allowed to go to the "back room". Something happened to the six-month-old. The four-year-old heard the child crying all the time and said lady was a "bad lady".

(SEE CONTINUATION)

| | Grid | District | Badge No. |
|---|---|---|---|

Filing Officer's Name (Print)

| METRO... DE POLICE DEPT. DADE JUNTY, FLORIDA | | | | Case No. 287537-E |
|---|---|---|---|---|
| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | |
| -43- OFFENSE-INCIDENT | SEXUAL BATTERY | Name ST. LAURENT, Jared | | |

**(Date Continued)**

Upon returning to the Sexual Battery Office at 4:00 p.m., this investigator contacted MRS. WUEST. MRS. WUEST stated she took her two children, KRISTIE and EDWARD, to the Country Walk Babysitting Service one time, on 12 January 1984. MRS. WUEST proceeded to advise this investigator the same information which was contained in the H.R.S. In-Take Report. An appointment was made to have the WUEST children speak with the DR(S). BRAGA on Friday, 17 August 1984.

This investigator responded to the Ninth Floor of the State Attorney's Office, and at 4:30 p.m., impounded the video cassette tapes of the interview earlier that day of JUSTIN COUSINO and of the earlier interview of BROOKE TOBY.

While at the State Attorney's Office, this investigator was contacted by VICKI MESEROLL. MRS. MESEROLL stated she began taking her four-year-old son, DAVID BRUCE, to the Country Walk Babysitting Service from 7:30 a.m. to 4:30 p.m., Monday through Friday, from February, 1984 through the end of April, 1984. During this time, she says ILEANA always seemed nice to the children and would even provide an umbrella for when they were walked to the car if it was raining. Several times when she went to pick DAVID up, she says he would be in the back yard playing with NOEL FUSTER. MRS. MESEROLL advised she did not like the "roped off" room in which the children played.

MRS. MESEROLL stated that at the end of April, 1984, she was changing his clothes; and when he was nude, he stated, "Kiss my body." As her two older children, BROOKE ANN, five-years-old, and CHRYSTEN, seven-years-old, refer to DAVID'S penis and their vaginal areas as their "body", MRS. MESEROLL says when her son made this statement, she thought the girls had been teasing him. When she asked him, "Who said that", he stated, "Ileana kisses my body." She then asked, "Did Ileana do it today", and he replied, "Ileana kisses all of the babies' bodies." MRS. MESEROLL asked her son, "What about Frank", and he replied, "No, Ileana." MRS. MESEROLL then asked him, "David, did Ileana kiss you there", and he replied, "No." MRS. MESEROLL advised she was confused due to the fact that her son had first said it happened, then said it didn't happen.

MRS. MESEROLL stated she stopped taking DAVID to the Country Walk Babysitting Service, and due to the fact that BARBARA LEININGER was a close friend of hers, and she knew TODD LEININGER was going there, she told MRS. LEININGER what her son said. MRS. MESEROLL says she was afraid of slander and told BARBARA LEININGER to make up her own

**(SEE CONTINUATION)**

| | | | | | | 43 |
|---|---|---|---|---|---|---|
| | | Grid 2052 | | | | |
| (Badge No. 1630) | (District 05) | | | | | |

Reporting Officer's Name (Print)

ME.RO..O..TE POLICE DEPT.
DADE C ..TY, FLORIDA

| Type of Report Continued | Offense — Incident | ☐ Victim ☒ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

-44- Is Continued

mind as to whether she wished to keep sending TODD there. MRS. MESEROLL knew nothing further. An appointment was made with MRS. MESEROLL to have DAVID talk with the DR(S). BRAGA the following day.

This investigator was present in the State Attorney's Office when NOEL FUSTER was interviewed by the DR(S). BRAGA, and following the interview, impounded the video cassette tape. At the conclusion of the interview, it was decided that NOEL FUSTER would go to Pompano Beach and spend the night with his aunt, GIESELLA GONZALEZ, at 2547 N.W. 42 Avenue, phone: 755-2583. NOEL FUSTER would be returned to the State Attorney's Office the following day for another interview.

On Tuesday, 14 August 1984, at 9:00 a.m., this investigator responded to the State Attorney's Office. At 9:35 a.m., the DR(S). BRAGA interviewed DAVID MESEROLL. At the conclusion of the interview, this investigator impounded the video cassette tape. At 11:15 a.m., the DR(S). BRAGA interviewed STACY LEININGER. At the conclusion of the interview, this investigator impounded the video cassette tape. At 1:55 p.m., the DR(S). BRAGA interviewed NOEL FUSTER. At the conclusion of the interview, this investigator impounded the two video cassette tapes.

At approximately 1:00 p.m., on Tuesday, 14 August 1984, this investigator was contacted by KAREN MARKS. MRS. MARKS advised she is a neighbor of FRANK and ILEANA FUSTER and had taken her son, SCOTT VICTOR, two-years-old, to the FUSTER's to be babysat, on 11 May 1984. MRS. MARKS advised that prior to that date, she had gone to the FUSTER residence to inquire about the service. At that time, MRS. MARKS says she went inside and sat on the couch. ILEANA FUSTER gave her a business card, and MRS. MARKS asked if she had a license. MRS. FUSTER stated "yes" and added that the written test had been hard, and she had had to study. MRS. MARKS says she saw something on the wall which she thought was a license. MRS. FUSTER stated she charged $2.00 per hour, and during the 20-to-25 minutes MRS. MARKS was there, was very business like. During the time she was speaking with MRS. FUSTER, Mr. FUSTER was in the den talking on the telephone.

On 11 May 1984, MRS. MARKS advised she had to go to a school picnic with her four-year-old, so at approximately 11:30 a.m., she took SCOTT to the FUSTER residence. When she arrived, she observed that FRANK FUSTER was sitting at his desk in the den and that there

(SEE CONTINUATION)

| Badge No. | District | Grid |

444

METRO DADE POLICE DEPT.
DADE C  TY, FLORIDA

| Type of Report Continued | Offense — Incident | | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|---|
| -45- | OFFENSE—INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | 287537-E |

is Continued:

were other children there, ILEANA FUSTER answered the door, and MRS. MARKS says she gave her the food and diaper bag. She told MRS. FUSTER, "Don't put him down for a nap," then, because she was in a hurry. She had no further conversation.

At approximately 4:00 p.m., she returned to the FUSTER residence and rang the doorbell. ILEANA FUSTER answered the door and opened it. MRS. MARKS advised she went into the living room/dining area and observed SCOTT standing in the middle of the area holding a pillow. MRS. MARKS stated she thought it was strange for her son to be standing in that area, but then she thought maybe they were giving him "special attention" due to the fact that she was a neighbor. MRS. MARKS advised she observed FRANK FUSTER standing in the area also, but can't remember if he was standing there when she came in or he came in while she was there. According to MRS. MARKS, her son was wearing the same clothing, however, his diaper had been changed. MRS. MARKS says she said she was going to put him down for a nap, and ILEANA replied, "He is tired." MRS. MARKS stated she had no problems or complaints at the time.

Approximately one week later, MRS. MARKS says FRANK FUSTER came to her residence and asked her husband, JEFFERY MARKS, to bring him some auto parts or something for a car. The following day, she says she took a can of oil to the FUSTER residence and gave it to MRS. FUSTER. At the time, she observed FRANK FUSTER in his office.

According to MRS. MARKS, the only problem she had with the FUSTER'S was approximately two months prior to 11 May 1984. The children from the FUSTER'S were in her rear yard and tore down a small tree. She went out and confronted NOEL FUSTER and another boy, whom she identified as JUSTIN. FRANK FUSTER came out, and she told him about the tree and the apparent lack of supervision. MR. FUSTER'S reply was, "I'm here." MRS. MARKS advised that she was upset over his attitude. Later, the mother of JUSTIN telephoned her and offered to pay for the tree, but MRS. MARKS says she told JUSTIN'S mother that she was not as upset about the tree as she was by the fact that the children were un-supervised.

Following the interview with MRS. MARKS, an appointment was made for Friday, 17 August 1984, to have SCOTT MARKS interviewed by the DR(S). BRAGA.

On 14 August 1984, this investigator was contacted by JOYCE MAIORANA.  MRS. MAIORANA

(SEE CONTINUATION)

| ing Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

45

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

16-.

( Continued )

stated she had talked with her son concerning anything which may have happened to him while at the FUSTER'S and believed that nothing had happened. MRS. MAIORANA stated she wanted no further involvement and refused to allow her son to be interviewed.

At approximately 5:00 p.m., on Tuesday, 14 August 1984, this investigator interviewed MARTHA FUSTER, 27-year-old, W/F, d.o.b.: 26 October 1956, who resides at 1714 Richwood Avenue, Maitland, Florida, phone; 647-2048. MRS. FUSTER stated she was FRANK FUSTER'S second wife. His first wife's name was also MARTHA, and they lived in the Bronx, New York. They had one child, a girl, SUZETTE, who would be approximately 19-years-old now. After MR. FUSTER went to jail in New York, his wife wanted nothing to do with him, refused to bring SUZETTE to the prison to visit and divorced him while he was in prison.

MARTHA FUSTER stated she married FRANK FUSTER on 05 May 1976 and divorced him on 20 March 1980. Their son, NOEL, was born on 19 October 1977. After the divorce, MARTHA FUSTER says she continued to live with FRANK FUSTER due to the fact the he was a father figure, and she was dependent upon him. They continued to live together until June, 1983, when, on 19 June 1983, she went to New York for a month. When she returned, MR. FUSTER informed her he had met and fallen in love with a girl he met at the flea market; that girl was ILEANA.

MARTHA FUSTER says she contacted ILEANA shortly after the marriage, and they had talked mostly about NOEL. She says she did not try to get custody of NOEL because FRANK FUSTER had threatened to kill her if she did so, and she was afraid he would do it. MARTHA FUSTER did have the right to visit and would do so and also would take NOEL to the zoo or to her sister's in Pompano Beach.

According to MARTHA FUSTER, FRANK FUSTER has two brothers, GEORGE FUSTER, 31-32 years old, and SERVANDO CASTILLO, 19-years-old. His mother is ANGELA CASTILLO, who lives in the area of Kendall Drive and S.W. 97 Avenue. A vehicle registration check reveals a 1976 Chevrolet with 1984 Florida QPY-665 registered to ANGELA CASTILLO, d.o.b.: 12 January 1929, 9042 S.W. 97 Avenue, #7.

MARTHA FUSTER stated on Friday, 10 August 1984, at approximately 2:00 p.m., ILEANA telephoned her from the Office of MICHAEL VON ZAMP and told her something horrible had happened to FRANK. After saying it was similar to what had happened the last time,

[SEE CONTINUATION]

| ug Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|
| DET. D. MEZNARICH/kvm | 1630 | 05 | 2050 |

46

METRO-DA POLICE DEPT.

DADE COUNTY, FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| 47– | OFFENSE–INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

**(Continued:)**

ILEANA had begun to cry and some man, who identified himself as MICHAEL VON ZAMPT, came on the line and told her to get on a plane and come to Miami. She was instructed to meet with him at 12:00 noon so NOEL would be given to her and not to H.R.S.

On Monday, 13 August 1984, MARTHA FUSTER says she went to MR. VON ZAMPT'S office with her sister. They were taken to a conference room, where she was told she would have to go to court in front of a judge who would decide custody. According to MARTHA FUSTER, MR. VON ZAMPT was concerned with the child not going to a shelter. They then drove to the "courthouse", where she was introduced to "her attorney". After MRS. FUSTER advised the above information, the interview was concluded due to the fact that MR. RUNDLE advised MARTHA FUSTER and her sister had to leave to return to Pompano Beach.

On Wednesday, 15 August 1984, this investigator responded to the State Attorney's Office. At 9:30 a.m., the DR(S). BRAGA interviewed JARED ST. LAURENT. At the conclusion of the interview, this investigator impounded the video cassette. At 10:40 a.m., the DR(S). BRAGA interviewed CARMEN MELLO. At the conclusion of the interview, this investigator impounded the video cassette. At 11:30 a.m., the DR(S). BRAGA interviewed NOEL FUSTER, and at the conclusion of the interview, impounded the video cassette.

On Thursday, 16 August 1984, at 9:00 a.m., this investigator responded to the State Attorney's Office. At 10:15 a.m., the DR(S). BRAGA interviewed ASHLEY and MACKENZIE PEREZ. At the conclusion of the interview, this investigator impounded the video cassette tape. At 12:15 p.m., the DR(S). BRAGA interviewed JENNIFER LITWIN. At the conclusion of the interview, this investigator impounded the video cassette tape.

During the taping, this investigator interviewed MRS. ALLYSON PEREZ, of 14610 S.W. 142 Place, phone: 253-6245. MRS. PEREZ stated she was made aware of the Country Walk Babysitting Service when it was recommended by a person in "Sales" and a second time by JOANNE from the Recreation Center. She began taking her daughter, ASHLEY OWEN, three-years-old, and her son, MACKENZIE ELLIOTT, two-years-old, in March, 1984. The last time her children were there was in May, 1984. MRS. PEREZ says the children went there about five times from 8:00 a.m. to 6:00 p.m. She says she stopped because the service was too expensive.

(SEE CONTINUATION)

| District | Grid | Badge No. | ing Officer's Name (Print) |

METRO-DADE   POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense - Incident | ☒ Victim ☐ Missing Person ☐ Runaway Name: | Case No. |
|---|---|---|---|
| 18 - OFFENSE-INCIDENT | SEXUAL BATTERY | ST. LAURENT, Jared | 287537-E |

48

CONTINUATION

Prior to taking the children there, MRS. PEREZ says she visited the FUSTER'S and was advised by ILEANA FUSTER that she was 25-years-old and was licensed. MRS. PEREZ advised that ASHLEY didn't want to go because she said the "lady was mean". On 08 August 1984, when she began to question ASHLEY about what she did, she says ASHLEY "claned up" and that night had a nightmare.

MR. PEREZ stated when they first started going to the FUSTER'S, the children were in the side room with the bi-fold doors. A television set was in the room. Approximately one-and-a-half months ago, they closed off the area by the kitchen. When he knocked on the door, MR. PEREZ says it always took three-to-four minutes to answer the door. A few times when he picked up the children, he thought they were sluggish and glassy-eyed. ILEANA explained this by saying they didn't take a nap.

On Thursday, 16 August 1984, this investigator contacted BEVERLY GILCHRIST, of 14624 S.W. 143 Court, phone: 232-0417. MRS. GILCHRIST stated she took her daughter, KIMBERLY JUNE, ten-months, to the Country Walk Babysitting Service in February, 1984, after reading the advertisement in the Country Times. Her daughter went approximately three times a week for eight hours. MRS. GILCHRIST says she stopped taking her daughter on Monday, 06 June 1984. At the time she started taking her daughter there, MRS. GILCHRIST says she was five-months-old. She noticed no physical problems with the child other than she seemed occasionally withdrawn when she picked her up. She did not notice this behavior when she left her daughter with a different babysitter on weekends. When she first started taking her daughter to the FUSTER'S, MRS. GILCHRIST advised she did not see MR. FUSTER and MRS. FUSTER told her he had an office on Brickell Avenue. Approximately three times after that, she observed MR. FUSTER home; and on two or three occasions, she saw him. In his "office" talking with another man. The few weeks prior to her leaving the service, MR. FUSTER told MRS. GILCHRIST he was "building" in the house next door.

During the time she was taking her daughter to the FUSTER'S, MRS. GILCHRIST advised several times she would ring the doorbell for four-to-five minutes before MRS. FUSTER answered it. Approximately two-and-a-half-to-three months prior to August, 1984, MRS. GILCHRIST says a white female, who was identified as a cousin of ILEANA FUSTER, was staying at the residence. After a period of time, she did not see this white female again and asked where she was. MRS. GILCHRIST advised MRS. FUSTER told her that her

(SEE CONTINUATION)

| | | | |
|---|---|---|---|
| Reporting Officer's Name (Print) | Badge No. | District | Grid |

DADE COUNTY, FLORIDA

| Type of Report Continued | Offense – Incident | | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ☒ Victim Name: ST. LAURENT, Jared ☐ Missing Person ☐ Runaway | 287537-E |

mother was ill, and the cousin had had to return to North Miami to care for her. MRS. GILCHRIST could advise no further information.

On Thursday, 16 August 1984, this investigator spoke with MRS. PHYLLIS WILKER. MRS. WILKER stated she had taken her one-year-old daughter, SUSAN JENNIFER, to the FUSTER'S on 07 March 1984, then approximately once a week for a few hours until 03 May 1984. The first time she went to the FUSTER'S, MRS. WILKER says there were three other children there; one sleeping and two awake. MRS. FUSTER showed her the kitchen and the T.V. area. When asked how many children she was caring for, MRS. FUSTER told her "only those two regularly" and others occasionally. The last time she was there, MRS. FUSTER showed her a photograph she had taken of SUSAN and told her she would give her one. In the photograph, her daughter was dressed, in her walker, and smiling. MRS. WILKER stated she thought it was strange of MRS. FUSTER to be taking photographs of her daughter but noticed that she had taken photographs of several of the other children staying there also. MRS. WILKER was told she would be given a photograph of her child, but for some reason, which she cannot recall, she didn't get one.

MRS. WILKER went on to say she stopped taking her daughter to the FUSTER'S after hearing the "rumor" about the boy who came home and asked his mother to kiss "his body", referring to his penis. MRS. WILKER, during the time her daughter was going to the FUSTER'S, advised she did not notice any behavior changes. During the month of April, 1984, she did wake up at night, on several occasions, but her daughter was cutting a tooth around that time, and she attributed her restlessness to that. MRS. WILKER stated that while her daughter was going to the FUSTER'S, she was red in her vaginal area but added that she had also had redness in that area prior to going to the Country Walk Babysitting Service. On one occasion, her daughter returned home with a red spot on her forehead, and MRS. WILKER says she called MRS. FUSTER to find out what had happened. MRS. WILKER was told by MRS. FUSTER that she had no knowledge of how it had happened. The bump appeared to be from possibly falling against a piece of furniture. On another occasion, MRS. WILKER went to pick her daughter up and discovered her wearing only her diaper and a shirt; her overalls had been removed. MRS. FUSTER told her she had taken the overalls off because it had gotten hot. MRS. WILKER says she thought it was strange due to the fact that it was not hot that day.

MRS. WILKER went on to say the people she knew of that used the Country Walk Babysitting

(SEE CONTINUATION)

49

METRO ... E POLICE DEPT.
DADE ... NTY, FLORIDA

| -50- | Type of Report Continued | Offense – Incident | ☒ Victim Name: | ☐ Missing Person | ☐ Runaway | Case No. |
|---|---|---|---|---|---|---|
| | OFFENSE-INCIDENT | SEXUAL BATTERY | ST. LAURENT, Jared | | | 287537-E |

Service were MRS. LEININGER, MRS. MESEROLL, MRS. AVAKIAN, MRS. ST. LAURENT, MRS. PARISER, and MRS. POPHAM. MRS. WILKER could advise no further information.

On Friday, 17 August 1984, this investigator responded to the State Attorney's Office where, at 9:25 a.m., the DR(S). BRAGA interviewed SCOTT MARKS. At the conclusion of the interview, the video cassette tape was impounded by this investigator. At 11:00 a.m., the DR(S). BRAGA interviewed CASEY and LAUREN POPHAM. At the conclusion of the interview, the video cassette tape was impounded by this investigator. At 12:25 p.m., the DR(S). BRAGA interviewed EDWARD and CHRISTIE WEST. At the conclusion of the interview, the video cassette tape was impounded by this investigator.

On Friday, 17 August 1984, at 3:00 p.m., this investigator contacted ANIECE McPHERSON, of 12 Park Place, Richardson, Texas, phone: 214-437-3882. MRS. McPHERSON stated her two sons, BRIAN ANDREW, five-years-old, and JAMES CLAY, two-years-old, had gone to the Country Walk Babysitting Service. MRS. McPHERSON advised she became aware of the service through DIANE TOBY, as she picked her son and BROOKE TOBY up at the end of the school day and dropped BROOKE TOBY off at the FUSTER'S. Her son, BRIAN, went to the FUSTER'S approximately twice but wanted to go more often as his friends, BROOKE TOBY and JUSTIN COUSINO, went there. Her son, JAMES, went to the FUSTER'S approximately five times, mostly in the morning hours; but once in the middle of June, 1984, just before she moved from the Miami area, he spend a Saturday there.

MRS. McPHERSON says MRS. FUSTER appeared to be outgoing and friendly, and the children seemed "attached" to her. At the time she sent her children to the FUSTER'S, the residence was "under construction" as they were building a playroom. Several times when she went to pick up her children, ILEANA appeared to be hurrying, so she did not stay and talk. Other times when BROOKE and BRIAN got out of her car and rang the door-bell, it would take MRS. FUSTER a long time to open the door. At these times, MRS. McPHERSON was told ILEANA was feeding a baby or on the telephone. Other times, she says the door was opened right away.

When asked if her sons had displayed any unusual behavior, MRS. McPHERSON advised her son, BRIAN, began to refuse to allow her to touch his penis to clean it while bathing, and she had, in fact, punished him several times for this behavior. She says she has always stressed the fact that if anyone were to touch him in a sexual nature, that he

(SEE CONTINUATION)

| | Badge No. | | District | Grid |
|---|---|---|---|---|

ing Officer's Name (Print)

50

METRO-DADE POLICE DEPT.

CONTINUATION

| DADE, ITY, FLORIDA | | | | Case No. |
|---|---|---|---|---|
| Type of Report Continued | Offense — Incident | ☐ Missing Person ☐ Runaway | | 287537-E |
| 51 — OFFENSE-INCIDENT | SEXUAL BATTERY | Victim Name: ST. LAURENT, Jared | | |

(Is Continued)

should tell her right away, and she thinks he would. Her son has had nightmares and is afraid of the dark; however, she cannot remember when this behavior started. The nightmares have been worse since they moved. BRIAN, according to his mother, has not mentioned monsters; however, at Halloween time in 1983, she took her two sons and SHARON COUSINO took her two sons to the Haunted House that had been set up at the Country Walk Country Center. MRS. McPHERSON recalls that her older son did not go in. MRS. McPHERSON advised she would be willing to bring her sons back to the Miami area to be interviewed if necessary.

Upon returning to the Sexual Battery Office, at 6:00 p.m., on Friday, 17 August 1984, this investigator was advised to return to the State Attorney's Office and meet with Assistant State Attorneys C RUNDLE and A. LASER and State Attorney J. RENO. Upon arriving at MISS RENO'S office, this investigator was advised that the gonorrhea cultures taken from NOEL FUSTER on Monday, 13 August 1984, by DR. J. LEDERHANDLER, had tested positive for gonorrhea of the throat. MISS RENO went on to say that all of the parents currently known to have used the County Walk Babysitting Service would have to be contacted and advised to take their children to Jackson Memorial Hospital/Rape Treatment Center on Saturday, 18 August 1984, or to their own private physicians. DR. D. HICKS was contacted by MISS RENO and stated she, herself, would be at the Rape Treatment Center the following day to do the cultures. The following people were contacted by this investigator. At 7:50 p.m., MRS. DAVID MESEROLL; at 8:55 p.m., MR. MICK DUCK; at 9:05 p.m., BRIAN PARISER; at 9:14 p.m., BEVERLY GILCHRIST; at 9:18 p.m., PHYLLIS WILKER; at 9:25 p.m., BRENDAN GRUBB; at 11:00 p.m., LINDA THOMPSON; at 11:30 p.m., VALERIE POPHAM; at 11:20 p.m., MARIO MATORANA; and at 11:40 p.m., ALLYSON PEREZ. This investigator also contacted ACTING LIEUTENANT F. GROSS and MAJOR FARRELL and advised them of the above information.

Contacted on Friday, 17 August 1984, by the DR(S). BRAGA were SHARON COUSINO, DIANE TOBY, ANDREA LANDIS, STEVEN LITWIN, BARBARA LEININGER, LOUIS ST. LAURENT, DENNIS MELLO, JEFFERY MARKS, JOLENE WUEST and STEVE ALLENS.

On Saturday, 18 August 1984, this investigator contacted SHARON NELSON and ANIECE McPHERSON and advised them of the information. When MRS. McPHERSON was contacted, she advised she had recalled that one time when she went to pick her son, JAMES, up, she had asked ILEANA FUSTER if her son had eatten, had anything to drink, played or taken a

(SEE CONTINUATION)

| | Badge No. | District | Grid |
|---|---|---|---|
| Reporting Officer's Name (Print) DET. D. MCGRODTICH/bm | 1620 | 05 | 2052 |

51

METRO-DADE  POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| 52—<br>Continued | OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

CONTINUATION

nap while there and had been told, "I don't know. My husband played with him." At
the time she went to the door, her son was brought to the door ready to go by MRS.
FUSTER at the same time she answered it. On another occasion while she was there,
FRANK FUSTER looked at JAMES and asked how old he was. When MRS. McPHERSON told
him "two", he replied, "What a nice big boy he is."

This investigator attempted to contact SHIRLEY AVAKIAN in New Hampshire, however, was
advised she and her family had left the area to continue their vacation and had left
no forwarding address. This investigator attempted to contact GILDA CABA in New York
but met with negative results. This investigator contacted MRS. RICHARD USS and advised
her of the information. An appointment was made to have her son, NELSON, then inter-
viewed by the DR(S). BRAGA on Monday, 20 August 1984.

On Saturday, 18 August 1984, at 6:30 p.m., this investigator was contacted by Unit
#5311, OFFICER G. FUNDORA.  OFFICER FUNDORA advised he was currently at 152 Street
and S.W. 142 Avenue. He had been dispatched to 14810 S.W. 144 Terrace in reference
to a Burglary-in-Progress; and while enroute, told via the radio that the suspects
had left. He observed the suspect vehicles at the above location and stopped them.
The people stopped identified themselves as ILEANA FUSTER, W/F, Age: 23, who stated
she was moving to 2031 N.E. 139 Street, and was taking her property from her former
residence.  Assisting her with the moving was CELENIA GONZALAS, 21, W/F, of 1135 N.W.
174 Street, phone: 769-2021; JESUS DAVID ESCALONA, 52, W/M, of 14801 S.W. 70 Street,
phone: 596-5394; MARITZA GONZALAS, 18, W/F, of 3295 N.W. 98 Street, phone: 691-1730;
ORLANDO GONZALIS, 19, W/M, of 1135 N.W. 124 Street, phone: 769-2921; DIEGO GARCES,
56, W/M, of 2025 E. 94 Street, Hialeah, phone: 888-7920; and ELSA MENDOZA, 46, W/F,
of 2350 N.W. 91 Street, phone: 691-0823. According to OFFICER FUNDORA, MRS. FUSTER
stated she had just left the office of her attorney, MICHAEL VON ZAMP, at 7600 W.
20 Avenue, Suite #223, Hialeah, phone: 558-5300.  MR. VON ZAMP had advised her that
she could remove all of her property from the residence.  OFFICER FUNDORA wrote an
Information Report under MDPD Case Number 306613-E.

On Monday, 20 August 1984, at 11:00 a.m., this investigator responded to the State
Attorney's Office, where, at 11:40 a.m., the DR(S). BRAGA interviewed MICHAEL PARISER.
The video cassette tape of the interview was impounded by this investigator.

(SEE CONTINUATION)

52

METRO-DADE POLICE DEPT.

DADE CO   FLORIDA

| 55– | Type of Report Continued OFFENSE–INCIDENT | Offense – Incident SEXUAL BATTERY | ☒ Victim ☐ Missing Person ☐ Runaway Name: ST. LAURENT, Jared | Case No. 287537-E |

On Friday, 31 August 1984, at 2:50 p.m., DETECTIVE N. SHIPES impounded a video cassette tape of an interview conducted with DAVID MESEROLL by the DR(S). BRAGA on 31 August 1984. The tape was given to SERGEANT F. GROSS, who took it to the office of Assistant State Attorney C. RUNDLE for viewing.

On 05 September 1984, at 1:00 p.m., this investigator responded to the State Attorney's Office due to the fact that FRANK FUSTER was to have a Bond Hearing. At that time, MR. RUNDLE and MR. LASER direct-filed additional charges against FRANK and ILEANA FUSTER.

The charges are:

(Against FRANK FUSTER)

(1) Sexual Battery in that FRANK FUSTER placed his penis into the mouth or in union with the mouth of JUSTIN COUSINO in violation of Florida State Statutes 794.011(2) and 777.011.

(2) Sexual Battery in that FRANK FUSTER placed his penis into the mouth or in union with the mouth of NOEL FUSTER in violation of Florida State Statutes 794.011(2) and 777.011.

(3) Sexual Battery in that FRANK FUSTER placed his penis in union with the vagina of BROOKE TOBY in violation of Florida State Statutes 794.011(2) and 777.011.

(4) Sexual Battery in that FRANK FUSTER placed his mouth in union with the vagina of BROOKE TOBY in violation of Florida State Statutes 794.011(2) and 777.011.

(5) Sexual Battery in that FRANK FUSTER placed his penis into the mouth or in union with the mouth of DAVID MESEROLL in violation of Florida State Statutes 794.011(2) and 777.011.

(6) Sexual Battery in that FRANK FUSTER placed his mouth onto or in union with the penis of DAVID MESEROLL in violation of Florida State Statutes 794.011(2) and 777.011.

(SEE CONTINUATION)

| | Badge No. | District | Grid |
| Officer's Name (Print) | | | |

53

METRO-DADE POLICE DEPT.
DADE COL  , FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim  ☐ Missing Person  ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

56-
Continued:

(7) Sexual Battery in that FRANK FUSTER placed his penis in union with the penis of DAVID MESEROLL in violation of Florida State Statutes 794.011(2) and 777.011.

(8) Lewd and Lascivious Act in the Presence of a Child in that FRANK FUSTER placed his penis into or in union with the mouth and/or buttocks of ILEANA FUSTER in violation of Florida State Statutes 800.04 and 777.011.

(9) Lewd and Lascivious Act in the Presence of a Child in that FRANK FUSTER placed his hand in union with the penis of TODD LEININGER and fondled or manipulated his penis in violation of Florida State Statutes 800.04 and 777.011.

(10) Lewd and Lascivious Act in the Presence of a Child in that FRANK FUSTER placed his hand in union with the vagina of TIFFANY LANDIS.


(Against ILEANA FUSTER)

(1) Sexual Battery in that ILEANA FUSTER placed her vagina in union with the vagina of BROOKE TOBY in violation of Florida State Statutes 794.011(2) and 777.011.

(2) Sexual Battery in that ILEANA FUSTER placed her mouth onto, or in union with the penis of DAVID MESEROLL in violation of Florida State Statutes 794.011(2) and 777.011.

(3) Sexual Battery in that ILEANA FUSTER placed her mouth onto, or in union with the penis of JONATHAN COUSINO in violation of Florida State Statutes 794.011(2) and 777.011.

On Monday, 10 September 1984, this investigator responded to the State Attorney's Office, where, at 11:30 a.m., the DR(S). BRAGA interviewed TIFFANY LANDIS. The video cassette tape was then impounded by this investigator. At 12:45 p.m., the

(SEE CONTINUATION)

54

METRO-DADE POLICE DEPT.
DADE CTY. FLORIDA

| Type of Report Continued | Offense - Incident | Victim Name: | Missing Person ☐ Runaway | Case No. |
|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ☒ ST. LAURENT, Jared | ☐ ☐ | 287537-E |

-57-

(Continued)

DR(S). BRAGA interviewed TODD LEININGER. At the conclusion of the interview, the video cassette tape was impounded by this investigator.

On Monday, 10 September 1984, this investigator contacted CHRISTINE KOPEL, of 14801 S.W. 148 Street Circle, phone: 251-6271. MRS. KOPEL stated she had taken her two children, DAVID EDWARD, six-years-old, and EMMA ETTA, three-years-old, to the Country Walk Babysitting Service after seeing an advertisement at the Country Center. She also was told of it when she met MRS. FUSTER at the bus stop in November, 1983. She often saw MRS. FUSTER at the bus stop due to the fact that her son, DAVID, went to the same school as NOEL FUSTER. MRS. KOPEL says she stopped taking her children to the FUSTER'S in February, 1984, due to the fact that EMMA often returned home with wet diapers, and the yard was not enclosed. At that time, MRS. KOPEL advised MRS. FUSTER was keeping five-to-six other children, ages two-to-approximately four-years. Her son, DAVID, went to the FUSTER'S three-to-four times, and her daughter went approximately ten times in the mornings. While dropping her children off or picking them up, she says she only observed FRANK FUSTER there once or twice. On a few occasions, it took ILEANA FUSTER three-to-four minutes to open the door.

The personal information MRS. KOPEL learned from talking with MRS. FUSTER was that she was 23 or 25-years-old. FRANK FUSTER was divorced, and this was his second marriage. MRS. KOPEL advised she thought the Country Walk Babysitting Service was licensed as MRS. FUSTER had showed her a white card in a frame that looked like a license. MRS. KOPEL advised she had just returned from an extended stay in Aruba and would contact the DR(S). BRAGA at a later date for an appointment to have her children interviewed by them.

SCENE:

The scene is a one-story, single family residence, located at 14810 S.W. 144 Terrace. The residence is painted a white color and has a gray shingle roof. The residence is located on the east side of S.W. 144 Terrace.

The residence has a double car garage and a single garage, the doors of which are painted

(SEE CONTINUATION)

55

DA  POLICE DEPT.

DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☐ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE—INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-1 |

(Continued)

a white color. The single garage is located at the south end of the residence and occupies the southwest corner. The double garage is located adjacent to and north of the single garage. The single garage has a large wooden table in the middle portion, on top of which sits numerous tools and miscellaneous building materials.

The double car garage area contains building materials piled on the cement floor in the middle. Several rolls of carpet padding are lying on top of the building materials, along with several bicycles and a punching bag. Several carpet samples and pieces of carpet are in the garage. A wood door, secured by a two key, dead bolt lock is located in the east wall of the garage, approximately four feet south of the northeast corner. The door, which opens into the garage, leads into the kitchen area of the residence.

The area directly inside the door is carpeted with a tan carpet. A carpeted hallway extends north from the doorway. The kitchen area is located to the east of the door- way, and a formal dining area is located to the south. A wood door lies on its side, leaning against the wall to the north of the garage door.

Adjacent to the west wall of the dining area, approximately two feet south of the garage door, is a water cooler. The south wall of the dining area consists of dry- wall, which is not finished. The drywall partition extends from the east wall to the west wall of the dining area. A doorless opening, with a dome-shaped top, is located at the east end of the partition. An infant's white colored highchair sits against the drywall partition, approximately three feet east of the southwest corner of the dining area. A box, on top of which sits a plastic bag containing miscellaneous cloth- ing, a bag of camping gear and a green rolled up sleeping bag, sits against the drywall partition east of the highchair. The dining area is located adjacent to the south part of the kitchen, with no structural separation. A rectangular wood grain table sits in the middle of the area and extends east-to-west. Sitting on top of the table, along the northwest side, is a miniature picnic table, which holds a yellow mustard bottle, a red ketchup bottle and a salt and pepper shaker. An empty glass sits on the table to the southeast of the picnic table, a plastic white and black game sets; and occupying the southeast corner of the table is a portable radio/television. A tan colored vinyl chair sits at the north, south, east and west sides of the table. Directly over the table is a single lightbulb with a small metal shade extending from the ceiling on a

(SEE CONTINUATION)

56

METRO-DADE POLICE DEPT.

DADE C.   TY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE—INCIDENT. | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

59-

n Continued:

CONTINUATION

metal rod.

Sitting against the east dining room wall to the north of the drywall partition are four stacked tan colored T.V. trays. To the north of the trays is a sliding glass door, which extends north to the kitchen area. The sliding glass doors are covered by tan colored verticals.

The room, created by the drywall partition, occupies the southeast corner of the residence. The room is covered by a tan colored carpet, and the walls and ceiling, with the exception of the drywall which makes up the north wall, are painted white. A color television, on a white pedestal stand, sits just inside the entrance door along the east wall. A window is located in the east wall, approximately one foot north of the southeast corner. The window is covered by tan colored, horizontal mini-blinds, which extend from the top of the window to the bottom. Sitting against the east wall, directly under the window, is a rust colored, cloth covered, padded bench-type piece of furniture. A large three-wheel tricycle is located to the west of the bench, and another smaller plastic tricycle is located south of the large tricycle. A plastic rocking horse sits between the smaller tricycle and the south wall. Adjacent to the west of the rocking horse and sitting against the south wall is a child-size wood picnic table. Wood bench-type seats are located to the east and west of the table.

Sitting in the southwest corner of the room is a plastic playpen, which is filled with numerous miscellaneous toys. Several miscellaneous toys are also laying on the floor, under the playpen, the wood table and around the tricycles. Two wood frame chairs are located along the west wall to the north of the playpen. A pile of red and white blocks lies on the floor to the northwest of the northern-most chair, and several blocks are laying along the north wall. A small tricycle is sitting on the east side of the northern-most chair.

The floor of the kitchen area is covered by a tan colored vinyl and is lit by an over-head drop ceiling with a rattan design. A work island, approximately eight feet in length and four feet wide, extends north-to-south along the west edge of the kitchen area. Five pull-out drawers are located at the top portion of the east side of the island. Under the drawers are five doors, which covers storage space. The island is

(SEE CONTINUATION)

57

DADE COUNTY, FLORIDA

| Type of □ Continued | Offense — Incident | ☒ Victim □ Missing Person □ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

Continued:

covered by a brown woodgrain finish. Sitting on the top of the island at the south end is a potted plant. Sitting approximately two feet north of the plant is a green colored, rod-shaped object with a white end. The rod sits east-to-west across the island. A green glass bowl containing several apples sits to the north of the rod. Sitting at the north end of the island is another potted plant, a flashlight, two magazines and a newspaper.

Sitting along the east wall, adjacent to the north side of the sliding glass door, is a refrigerator. A woodgrain counter extends to the north from the refrigerator. Two cabinets extend approximately four feet north from the refrigerator above the counter. A wall telephone is attached to the woodgrain backsplash, approximately two feet north of the refrigerator. A window is located in the east wall, north of the cabinets, and extends to approximately one-and-a-half feet south of the northeast corner of the kitchen. The window is covered by tan colored, horizontal mini-blinds, which extend from the top of the window to the bottom of the window. A double sink sits in the counter directly below the window. A dishwasher is built into the counter to the south of the sink.

The counter extends to the west from the northeast corner of the kitchen. Located built into the counter approximately four feet west of the northeast corner, is the electric cooking area. A built-in stove is located to the west of the cooking area. It consists of a lower oven and a built-in microwave oven above the stove.

Entrance to the kitchen can be gained through the open area between the stove and the work island or at the south end through the open area between the work island and the refrigerator.

The hallway, to the north of the garage entrance door, extends approximately five feet north and ends at the entrance to the formal dining room and living room area. Un-finished drywall is attached to the sides and ceiling of the north end of the hallway. At the north end of the hallway from the kitchen, another hallway extends to the west. The hallway is covered by a tan colored carpet. Located in the south hallway wall, approximately five feet west of the living room area, is a bathroom which extends to the south. The bathroom floor is covered by tan colored tiles, and the walls are painted a white color. A bathtub is located along the east bathroom wall, extending from the north

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

DADE COUNTY · FLORIDA

| Type of Rep. ☐ Continued | Offense — Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

Continued:

to the south walls. A sink with a tan marble top is located in the northwest corner of the bathroom. A mirrored medicine cabinet is above the sink and cabinet space under. The countertop extends to the south to the south wall. A planter with dried plants, sits on the countertop. A toilet sits in the southwest corner of the bathroom.

The west end of the hallway ends in the entrance to a bedroom. Another short hallway extends approximately three feet to the north and ends in the entrance to a "convertible" room. A tan metal, three drawer file cabinet, containing a safe and two open shelves under the safe sits against the east wall of this hallway and occupies the entire east wall space from the beginning of the hallway to the entrance of the "convertible" room. While facing the safe, the three pull-out drawers are located to the left side, and the right side is covered with a metal door. The door is observed to be off its hinges and is sitting on the floor leaning against the right, front side of the safe. The pull-out drawers are empty, as are the two shelves, except for an alarm box with a key on the top shelf. The safe contains a package of locks. A ceramic statute of two horses sits on top of the filing cabinet.

Located in the west wall of the short hallway, directly across from the filing cabinet, is the entrance to a bedroom which has been converted into an office.

The bedroom, located at the end of the hallway which extends west from the living room/formal dining area, has a door which opens inward. The floor of the room is covered by a tan colored carpet, and the walls are painted a white color. The entrance door is located along the east bedroom wall in the northeast corner. Sitting adjacent to the north bedroom wall, approximately four feet west of the entrance door, is a wood dresser which extends to the west. The bottom portion of the wood dresser contains drawers with miscellaneous clothing sitting on top of the middle portion of the dresser and extending upward is a wood frame extention with two shelves. Sitting on the top of the dresser, the two shelves and the top of the extention are miscellaneous toys and stuffed animals.

Sitting in the west bedroom wall, approximately three feet south of the northwest corner of the room, is a window which is covered by tan colored, horizontal mini-blinds, which extend from the top of the window to the bottom of the window. Sitting on the floor, under the window, is a gray colored sit-up board. Occupying the southwest corner of the

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|

DADE CO___TY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim / ☐ Missing Person / ☐ Runaway | No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

62—

Continued:

bedroom is a child size wood desk and chair. The chair sits along the south wall, and the desk sits to the north of the chair, west-to-east. A typewriter and miscellaneous pencils and papers sit on top of the desk. A lamp, in the shape of a ball, in a basketball hoop, hangs over the chair. A wood frame, single bed is located against the middle portion of the south wall and extends north into the center of the room. The bed is covered by a Mickey Mouse print bedspread. A pillow, with a blue, pink and white striped cover, sits at the head of the bed. A baseball hat lies on top of the pillow, and a blue belt lies on the bed at the northeast corner of the pillow.

A wood nightstand sits against the south wall adjacent to the east edge of the bed. Sitting on top of the nightstand is a framed photograph, a mailbox bank and a red plastic dog wearing a tan hat.

Located in the southeast corner of the bedroom and extending north along the east wall is a closet whose double bi-fold doors are observed to be open. The closet contains a few items of boy's clothing and several miscellaneous toys. To the north of the closet is the entrance door.

Located in the west hallway wall, directly across from the filing cabinet/safe, is the entrance to a bedroom, which apparently has been converted to an office. The floor of the room is covered by a tan carpet, and the walls are painted a white color. The entrance door, which opens inward, is located in the east wall at the southeast corner of the room. Sitting along the east wall is a double wall unit, approximately six feet in height. Between the two units is a space with shelves containing miscellaneous business papers. A wood desk extends west into the middle part of the room from between the two wall units. Sitting on top of the desk in the east corner is a lamp, which is on. Also on top of the desk is a stapler, white telephone, coffee cup, ash-tray and calculator. A large brown cloth covered chair is located on the north side of the desk. A manilla envelope, containing four rolls of film, was discovered by this investigator in the right top drawer of the desk. The film was impounded and submitted to the MDPD Lab for developing.

Located in the north wall and extending from the east to the west side of the room is a closet with two sets of double bi-folding metal doors. The closet has several cloth samples hanging in it and sample hooks and cloth samples on the shelves. Sitting on

(SEE CONTINUATION)

| Officer's Name (Print) | Badge No. | District | Grid |
|---|---|---|---|
| | | | |

60

METRO-DADE POLICE DEPT.

DADE COU~   FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim ☐ Missing Person ☐ Runaway Name: | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | ST. LAURENT, Jared | 287537-E |

Continued:

the floor of the closet are more miscellaneous samples. A metal, four drawer file cabinet sits along the west wall in the northwest corner. A two shelf wood case sits adjacent to the south side of the file cabinet and extends to the south approximately six feet. The two shelves and the top of the case contain samples of wallpaper, cloth carpeting, etc. Located in the west wall, south of the wood case, is a window, which is covered from the top of the window to the bottom by horizontal mini-blinds. Sitting on the floor, directly under the window, are carpet samples. Located against the south wall, to the east of the carpet samples, is a brown cloth covered chair, which faces to the north. Adjacent to the east side of the chair is a wood, two-tier stand; on the top tier of which sits a desk lamp, a tape measure and miscellaneous papers. A Adjacent to the east side of the wood stand is another brown cloth covred chair. A large colored map of Dade County hangs on the south wall in back of the wood stand and the eastern-most chair.

Located at the north end of the short hallway is the entrance to the "convertible" room. The floor of the room is covered by a tan carpet, and the walls are painted a white color. The entrance door from the hallway is located in the south wall, in the southwest corner, and opens inward. Sitting against the west wall, approximately four feet north of the southwest corner, is a wood frame baby crib. Sitting on the floor to the north of the crib is a carboard box containing miscellaneous clothing items. Another cardboard box containing miscellaneous clothing items sits on the floor to the north of the first and occupies the northwest corner of the room. A window, covered by white horizontal mini-blinds, which extend from the top of the window to the bottom, sits in the north wall of the room, approximately four feet east of the northwest corner. A wood framed mirror hangs on the north wall, approximately two feet east of the window. A tan colored telephone sits on the floor between the window and the mirror and is plugged into a wall outlet under the mirror. Located in the east wall, extending south from the northeast corner are two bi-folding louvered doors, which are painted a white color. These bi-folding louvered doors close off the "convertible" room from the living room area to the east of it. A baby's playpen sits inside the "convertible" room in front of the south bi-folding door. A white and orange comforter lies on the floor, spread between the playpen and the baby crib.

Sitting against the east wall, to the south of the bi-folding door, is a wood hutch, which has three open shelves on the top and two drawers below the shelves. The top

(SEE CONTINUATION)

| Badge No. | District | Grid |
|---|---|---|
|  |  |  |

Officer's Name (Print)

METRO-DADE COUNTY ... FLORIDA

| Type of Report Continued | Offense – Incident | ☒ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

shelf is empty, the middle shelf contains a cordless telephone, a doll, a container of Ammens and a box of diapers. The bottom shelf contains a stuffed dog, two diapers and a tube of baby ointment. The drawers contain several items of miscellaneous baby clothing. Sitting on the floor, adjacent to the south side of the hutch, is a large cardboard box, which contains miscellaneous kitchen items. Another larger cardboard box, also containing kitchen items, sits on the floor to the west of the first box.

Sitting in the southeast corner of the room and extending west along the south wall is a woodgrain counter, which has a sink built into the east end. The counter is approximately seven feet in length and has storage space under it. The storage space contains a large box of diapers. A mirror covers the wall area behind the counter, and an arrangement of dried flowers sits at the west end of the counter. Several small carpet samples are attached to the west wall above the counter. The counter is recessed into the south wall, and the wall area to the west of the counter is approximately three feet in length and contains the entrance door in the southwest corner of the room to the west of it.

Returning to the north end of the hallway, which leads from the kitchen, is the formal dining area, extending to the east and the living room to the north of the dining area. The floor of the living room/formal dining room is covered by a tan carpet, and the walls are painted a white color. The south dining room wall extends east from the hallway, approximately ten feet, then north. A wicker box sits in the southeast corner of the dining room, and the east wall, which has a sliding glass door in it, is covered by tan colored verticals, which extend from the top of the window to the floor. A large, rectangular-shaped wood table sits north-to-south in the dining area. Sitting on top of the table is a large glass bowl and two newspapers in their plastic bags. Two wood frame, cane back chairs sit on both the east and west sides of the table. One wood frame, cane back chair sits at the south side of the table. An upright vacuum cleaner sits to the west side of the table.

A white wall is to the west of the dining area and extends north from the hallway, which extends to the west to the entrance to the "convertible" room. Sitting against this, on the west side of the dining area, is a wood china cabinet, which contains some miscellaneous china pieces. A small tree, in a pot, sits adjacent to the south end of the china

(SEE CONTINUATION)

DADE CO. /Y, FLORIDA

| Type of Report Continued | Offense – Incident | ☑ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

55-

cabinet.

To the north of the dining area is the living room, which extends to the north and east. The east wall is a sliding glass door, which is covered from the top of the window to the floor by tan colored verticals. Two other windows, both located in the east living room wall, one at the north end and one at the south end, are also covered by tan colored verticals, which extend from the top of the window to the floor. A palm plant, in a wicker basket, sits in the southeast corner of the room. A white rattan chair sits along the east wall, approximately seven feet from the southeast corner of the room. Another potted plant sits in the northeast corner of the room. A ceramic tiger sits to the west of the potted plant, and a second white rattan chair, matching the first, sits approximately two feet south of the tiger. Sitting against the east living room wall, between the two windows, is a square-shaped, plastic, tan colored table on which sits a stereo system. A speaker sits on the floor, on the north and south sides of the table. A wood frame, cane back chair, matching those at the dining room table, sits approximately one foot southwest of the tan table.

Sitting along the north living room wall and paralleling it is a three section chrome and smoked glass wall unit. The east section contains three open shelves, on which sit several knickknacks, a glass covered shelf and two doors at the bottom which open outward and contain miscellaneous papers. The middle section contains two open and two glass shelves with knickknacks and three drawers containing miscellaneous photos and negatives. The west section contains three open shelves, the top two of which hold knickknacks, a glassed shelf with the same and an open shelf on which sits a yellow and black microphone. The bottom shelf contains books. Several of the photo- graphs, negatives, a book and a photo album were impounded from here. Sitting adjacent to the west side of the wall unit is a potted tree in a wicker basket.

Approximately five feet directly south of the potted plant is a white vinyl, rattan convertible sofa. A chrome and glass sofa table sits at the back of the couch. A pot of dried plants sits on top of the sofa table. A large bunch of red and tan dried fronds sits in a wicker basket at the south end of the sofa. A white, rattan serving cart sits at the south end of the table and east of the dried fronds. The top and bottom shelves of the cart contain miscellaneous papers and magazines.

(SEE CONTINUATION)

63

| Type of Report Continued | Offense – Incident | ☐ D/S/D/C/C  V. FLORIDA<br>☒ Victim  ☐ Missing Person  ☐ Runaway | Case No. |
|---|---|---|---|
| OFFENSE-INCIDENT | "SEXUAL BATTERY" | Name: ST. LAURENT, Jared | 287537-E |

66-  (Continued)

Located to the west of the sofa area is the front entrance of the residence, which consists of a double door secured by a dead bolt lock. The entrance doors are painted a white color, and the window in each is covered by a white print curtain, which extends from the top of the window to the bottom of the window.

Adjacent to the north side of the entrance doors is a short hallway, which extends north-to-south and is approximately five feet in length. The west hallway wall consists of two metal bi-fold doors, which covers a closet. Contained in the closet are several boxes of Christmas ornaments, miscellaneous papers, toys and a vacuum. Located on the east side of the hallway is the entrance to the master bedroom and bath, which occupy the north end of the residence.

The entrance door is located in the west bedroom wall, in the southwest corner of the room and opens inward. The floor is covered by a tan colored carpet, and the walls are painted a white color. Sitting on a white wood stand with wheels, approximately six feet from the entrance door and along the south bedroom wall, is a color tele-vision. Sitting on top of the television are several books, several stuffed animals and a wood box, which contains four canisters of film, a flashlight battery and a photograph. The rolls of film were impounded by this investigator and submitted to the MDPD Lab for developing. Sitting in the southeast corner of the room and extending west along the south wall is a three drawer wood dresser. The dresser contains several items of miscellaneous clothing. Sitting on top of the dresser is a radio/cassette tape player and some dried flowers.

Located in the east bedroom wall, approximately three feet north of the southeast corner is a sliding glass door, which is covered from the top to the floor by white verticals. Hanging from the ceiling, in the northeast corner of the room, is a white macrame hanger, which has two glass shelves. A photograph sits on the top shelf, and a glass and glass container on the lower shelf. Sitting on the floor, under the macrame hanger, is a copper magazine holder containing several magazines. Several more magazines are lying on the floor to the south of the holder. The Playboy and Forum magazines were impounded by this investigator.

Sitting against the north bedroom wall, approximately four feet west of the northeast corner of the room, is a queen size brass frame bed, which extends south to the center

(SEE CONTINUATION)

| Badge No. | District | Grid |
|---|---|---|

MERIDIAN POLICE DEPT.
DADE COUNTY, FLORIDA

| Type of Report Continued | Offense — Incident | ☒ Victim | ☐ Missing Person | ☐ Runaway | Case No. |
|---|---|---|---|---|---|
| OFFENSE-INCIDENT | SEXUAL BATTERY | Name: ST. LAURENT, Jared | | | 287517-E |

7- Continued:

of the room. A wood cross is located between the mattress and box springs. A light blue, fitted sheet covers the mattress, and two pillows with light blue and dark blue striped covers lay across the head of the bed. A light blue and dark blue striped sheet lies at the southeast corner of the bed. A round table, covered with a white cloth covering it, is located adjacent to the west side of the bed. Sitting on top of the table is a white lamp, a white telephone, a clock, a remove control, a photograph, a doll, a letter and a cigarette lighter. A white framed mirror hangs on the wall in back of the table.

Sitting adjacent to the west bedroom wall, approximately four feet north of the entrance door, is a red and tan cloth covered love sofa. A pillow, with a light blue, dark blue and red striped cover lies on the couch. A pair of men's blue jeans are lying across the north arm of the chair. A colored photograph of Christ hangs on the west wall above and to the north of the sofa.

Located through a doorless entrance, at the northwest corner of the bedroom, is the master bathroom, which extends to the east and west. Leaving the bedroom, one immediately enters the carpeted dressing area. The north wall of the dressing area contains a black marble vanity, which extends east-to-west. Located in the east end of the vanity is a sink. A black wood and cane seat chair sits at the west end of the dressing area. Under the cane seat is an area which contains several pieces of miscellaneous jewelry. Located in the west wall, above the vanity, is a mirrored door medicine cabinet. A mirror extends the length of the vanity, attached to the north wall behind it. Several bottles of perfume and cologne are sitting on top of the vanity along with a ceramic statute. A white waste basket sits on the floor under the west side of the vanity. Four pull-out drawers are located along the length of the vanity. The second drawer, from the west, contained a black "thumbcuff", along with a box of shotgun shells and revolver shells. The drawer on the extreme west side contained three vibrators, and the storage below the vanity contained a bag of suspect marijuana. The suspect marijuana and "thumbcuff" were impounded by this investigator.

Located to the east of the dressing area is an area covered by white tile. A toilet and a bidet are located against the north wall, and the entire east end of the room is a black marble sunken bathtub. A tan colored scale sits on the floor in the south-east corner by the tub.

(SEE CONTINUATION)

DADE COUN . . FLORIDA

| Type of Report Continued | Offense — Incident | ☐ Victim ☐ Missing Person ☐ Runaway | Case No. |
|---|---|---|---|
| B— OFFENSE INCIDENT Continued: | SEXUAL BATTERY | Name: ST. LAURENT, Jared | 287537-E |

The west end of the dressing area leads to a toilet partitioned from the dressing area and a tiled shower to the west of the toilet.

Located in the southwest corner of the dressing area is a large walk-in closet. The closet contains several men's and women's items of clothing. Found in a blue vinyl travel bag, in the closet, are two cans of film. The film was impounded by this investigator.

Lab Unit #329, LAB TECHNICIAN R. TAFFEE, and Lab Unit #312, LAB TECHNICIAN D. CURTIS, responded and processed the scene by taking 50 color photographs.

CROSS REFERENCE CASE NUMBERS:

312746-E    JUSTIN COUSINO

312745-E    JONATHAN COUSINO

312747-E    TIFFANY LANDIS

312748-E    TODD LEININGER

312749-E    DAVID LITNIN

312750-E    SCOTT MARKS

312751-E    CARMEN MELLO

312752-E    DAVID MESEROLL

312753-E    MICHAEL PARISER

312754-E    LAUREN POPHAM

312755-E    BROOKE TOBY

312756-E    EDWARD WUEST

METRO-DADE POLICE DEPT
DADE COUNTY, FLORIDA
Type of Report Continued

-69-
(Continued)

OFFENSE INCIDENT

Offense — Incident: SEXUAL BATTERY

☐ Victim  ☐ Missing Person  ☐ Runaway
Name: ST. LAURENT, Jared

No. 287537-E

312757-E       CHRISTIE WUEST

312758-E       SUSAN WILKER

312759-E       NOEL FUSTER

312760-E       ASHLEY PEREZ

312761-E       MacKENSEY PEREZ

312762-E       MARIO MAIORANA

CASE DISPOSITION: OPEN PENDING.

67

parents, the children's answers were consistent with the interviewers' biases. Goodman &

Clarke-Stewart, 1991. Suggestibility in children's testimony: Implications for child sexual

abuse investigations. In J.L. Doris (Eds.), *The suggestibility of children's recollections*

(pp. 92-105). Washington, D.C. American Psychological Association.

      This study and others like it provide important evidence that interviewers' beliefs

about an event can influence the accuracy of children's answers. See, e.g., Ceci & Bruck,

1995, The effects of interviewer bias on the accuracy of children's reports. In *Jeopardy*

*in the Courtroom: A Scientific Analysis of Children's Testimony* (pp. 89-91)Washington,

D.C., American Psychological Association. The data highlight the dangers of having only

one hypothesis about an event, particularly an event that is ambiguous in nature.

      Interviewer bias can influence the entire architecture of an interview. Typically, in

addition to the general slant of the interview towards one hypothesis, the biased

interviewer will employ any tactics (repeated questions, leading questions, threats and

bribes, setting an emotional tone to the interview) necessary in the mind of the interviewer

to elicit a report consistent with that interviewer's bias. The interviews conducted by Drs.

Joseph and Laurie Braga during the investigations of Mr. Fuster present classic examples

of such biased interviewing.

      b. *Examples of Interviewer Bias in Mr. Fuster's Case.*[21]

---

[21]   The state has argued in its Response Brief that, in his Rule 3.850
petition, Mr. Fuster cited only three examples of problematic interviews
from the roughly two thousand pages that transcribe the interviews
conducted by the Bragas. The state contends, first, that this Court
should not find reversible error where so few instances of improper
questioning can be shown over the course of such a large record. The
state also contend that to introduce more of these examples would
involve a lack of exhaustion.

    As to the latter issue, exhaustion does not require that a
litigant state every fact in his petition upon which s/he relies for

During the Bragas first interview with JPC, the doctors talk to JPC's parents.. They have just met the child.  Nonetheless, Laurie Braga tells the parents, "J's responsiveness to me is a definite indication of deep seated (inaudible).  You find that children have trauma;  in other words, stuff that is inside affects their head.." (9/12/85, 22)  Joseph Braga follows this up by saying,  "He's savory and extremely bright and *he knows something went on.*"  Id.

In their first interview with BT, the Bragas repeatedly question the child about a secret game she played with the Fusters, a game BT has never mentioned.  When the Bragas ask BT to tell them what the secret game is, BT answers, "I think we played grocery store." (9/13/85, 54)  Joseph Braga, evidencing clear bias, responds,  "Grocery store.  That is not the secret game. . ." (Id. 54-55)  The Bragas continue to ask BT what the secret game is, using anatomical dolls and pretending to be Mr. Fuster asking the question.  Then, getting no response from BT that fits their preconceived belief of what happened at the Fuster house, Joseph Braga introduces an idea never mentioned

---

support.  It is enough for the litigant to describe the claim and direct the court to the record, which the Rule 3.850 court was obligated under the Florida Rules of Court to examine and consider fully.  Moreover, Mr. Fuster requested an evidentiary hearing at which to present the testimony of experts who would have detailed for that court the hundreds of examples that can be found throughout the transcripts of improper interviewing.

The dilemma faced by anyone preparing this argument for the court is that one can turn to almost any page in the 2000 pages of interview transcripts and find examples -- frequently outrageous examples -- of improper suggestive interviewing.  Thus, the task becomes finding ones to provide the court that are representative and give the court the flavor of the whole.

Accordingly, and to keep the examples as relevant as possible, Mr. Fuster draws his examples from the interviews of the children who either testified at trial or whose hearsay remarks were introduced at trial. Mr. Fuster also confines his examples, for the most part, to the early interviews with the children.

previously by BT. "Do you remember, though, do you remember the baby-sitter sometimes would play games without clothes on? Would she take her clothes off and play some of the games we play without clothes?" (Id. 55) Despite BT's continued insistence that she knows of no secret game, this theme of questioning was continued through the course of the interview, with both the Bragas and BT's father alternately insisting that secret games were played and that BT is not being cooperative; suggesting that BT knows about a secret game called the "pee pee" game; and that BT is withholding information because, perhaps like the other children, she is afraid to tell because Frank and Iliana had told the children not to tell. See, e.g. 9/13/85, 62, 63, 66, 68, 73, 74-75, 78, 99 (L. Braga by this time, tells BT that she does not have to talk about what happened to her; she can just tell about what happened to the other children. Again, the implicit bias that something happened to the other children. Id, 99) BT never makes any allegation of abuse during this interview. Laurie Braga concludes the interview, telling BT's parents that BT is in denial, (Id., 110), another clear showing of bias.

When questioning AP, Laurie Braga again repeatedly asks her about games she played at the Fuster house. Braga asks if they played a game where they all fell down. AP answers that she didn't play that. Laurie Braga, evidencing her belief that AP did and is withholding information, responds with disbelief. "You don't play that? Did somebody tell you not to tell? Somebody say, [AP], don't tell anybody?" (9/19/85, 112) Then later, Laurie Braga asks, "Do you know why I keep asking questions about the games? . . . Would you like to know why? Because I wonder if maybe you played some games and maybe Iliana said, don't tell anybody about these games. It's our secret." (Id., 125) Yet

later, AP mentions that Iliana played with the girls on the bed. Though this could have a perfectly innocent explanation since these young children were being left for full days in Iliana's care, Braga refuses to accept one. AP tells Braga, for example, that Iliana was reading books with these girls on the bed. (id., 144) Braga responds, "Is that what hurt the babies, playing with, reading books?" When AP responds that she doesn't know, Braga answers, "I think you do know. You can tell me. It's okay. I won't be upset. I won't be made with you." (Id., 145) Moments later, Braga asks AP, "When you were there, did you see anybody take their clothes off? [AP] responds and Laurie asks, "Never? Are you telling me the truth?" (Id., 146) AP says she wants to get out of there and return to her mother. (Id.) AP's mother enters the room and tells AP she has a surprise for her in the car if only she will tell. [This is a good example of bribery. See infra] AP indicates interest in the surprise and her mother, also evidencing clear bias, again asks, "What did she do to the children?" (Id., 151)

An interesting result of bias is seen in the interview with JPC. Laurie Braga asks if BT would kiss Frank's penis. JPC answers, "No, they would bite each others penis." Neither Braga challenges him in any fashion about this answer. (9/12/85, 47) An unbiased interviewer, however, would be somewhat skeptical about this conduct, as it would involve a fair likelihood of pain and physical injury, were it true. Thus, the lack of challenge is noteworthy. The lack of challenge is also noteworthy because BT is a girl and JPC has just indicated that Frank and BT bite "each other's" penises. Again, an unbiased interviewer would follow this statement up with some sort of gentle challenge, such as,

"Are you sure they were biting each other?" "Did you see Frank bite BT's penis?" Or even, "Are you sure BT had a penis?"

In her interview with JL, Laurie Braga tells the four-year-old that. "Some of the children said that [the Fusters] were acting like monsters and they wore these masks and they scared them." JL asks if this is true and Braga responds, "I am not sure but some of the children said so and I believe the children because I don't think children make up stories like that." (9/19/85, 62) Note that this is also a classic example of the use of peer pressure. See infra.

In TL's first interview, Laurie Braga tells the child, "I think that Iliana and Frank did some things that some of the children didn't like. . .." (9/12/85, 177)

Of course, the clearest evidence of bias relates to the interviews by the Bragas and Dr. Simon Miranda of NG. Laurie Braga testified at trial, for example, that prosecutors came to her and her husband with the information that NG had tested positive for gonorrhea and told them to be as leading as necessary to get NG to acknowledge that Mr. Fuster had abused him. (9/27/85, 71) As a result of being biased to believe that NG must be lying, the Bragas applied highly coercive techniques to get NG to disclose. Joseph Braga, for example, tells this six-year-old child, ". . .I know you are not telling me the truth because you said no one put their penis in your mouth but yet you had the test, the test said you had gonorrhea. If you have gonorrhea, someone put their penis ..." NG interrupts to say he does not remember this happening. Joseph Braga continues, "You said you don't remember anybody putting their penis in your mouth: Do you think is was your father?" NG continues to be confused, saying he does not remember this happening.

Laurie Braga then tells him to "suppose it did, okay?  Because the doctor said it did, even though you don't remember who did you think might have done that to you.  Do you have any idea, even if you don't remember?" (9/20/85, 450-452)  The interview proceeds apace in this same manner with the Bragas continuing to confuse NG and to ask him what he thinks would have happened when Mr. Fuster put his penis in NG's mouth.  (Id., 452 et seq.)

Bias is evident throughout the Bragas' interviews with the children.  Mr. Fuster invites the Court to read through any one of the interview transcripts and note the tone of certainty with which the Bragas pursue reports of abuse from the children.

2.  Use of specific, forced choice, and leading questions

a. *Research Findings.*

Interviewers (particularly those with a bias) may not ask children "open-ended" questions such as "What happened?" but may resort instead to very specific or leading questions.  However, important and accurate details are most likely to be provided in free recall.  Errors increase dramatically when children are asked more specific questions.  For example, children were interviewed a few days after, and then again six months after, they had visited a hospital emergency room to be treated for traumatic injury.  The children were first asked free recall questions.  ("Tell me what happened.")  Then the children were asked more specific questions (e.g., "Where did you hurt yourself?" "Did you hurt your knee?")  As had been found in previous studies, important details were most likely to be provided in free recall and these were accurately reported.  Errors increased dramatically, however, at both the interviews, when children were asked more specific questions.

## 2. Examples from the Braga Interviews

The following exchange provides an example of how repeated questions were used by the Bragas to confuse the children. This interview with JL came after approximately 40 transcript pages during which JL had never made any allegations of abuse or other untoward behavior. Laurie Braga had first spent a good deal of time engaging in stereotype induction with JL and talking about good touch/bad touch.

JL  . . . I wonder if they played ring around the rosy with no clothes on.

Braga: Do you think they did? . . .Do you think maybe so.

JL: (Nodding in the affirmative.)

Braga: You know ring around the rosy and they go all fall down? Do you know what they would do then?

JL: They would just fall down.

Braga: And anything else?

JL: I wonder if they played or (inaudible) no clothes on.

Braga: I don't know. I wonder. . . .I wonder if they did play duck, duck, goose with no clothes on. I wonder what they would do, you know, like if you go duck, duck, goose and you would tag somebody, is that what you call it? You touch somebody?

JL: No.

. . .

Braga: I wonder if they did, if they would like touch each other in their private parts. Do you think?

JL: (Nodding in the negative.)

Braga: No? You don't think so? If they did, you think that they probably played it with their clothes off?

Fuster's home; (9/4/85, 143) SM had 12 therapy sessions with Dr. Jerome Poliacoff. (9/5/85, 129) BT had 10 sessions with Dr. Doris Stiles (9/10/85, 10) and met weekly for therapy and court preparation with Linda Cooper, a counselor employed by the state, once a week from March, 1985 through August 1985. (9/9/85, 83)

JL:  Off?

Braga:  Off.  What do you think they would do with their clothes off?

JL:  Play games.

(9/19/85, 66-68)[23]

    d.  The Emotional Tone of the Interview

       1. *Research Findings*

Research shows that children are quick to pick up on the emotional tone of an interview.  In one study, children played with an unfamiliar research assistant for five minutes while seated across a table from him.  Four years later, researchers asked these children to recall the original experience.  The researchers created an "atmosphere of accusation," telling the children that they were to be questioned about an important event and saying things like, "Are you afraid to tell?  You'll feel better once you've told."  Although few if any of the children had any memory of the original event, five of the fifteen incorrectly agreed with the interviewer's suggestive question that they had been hugged or kissed by the confederate, two of the fifteen agreed that they had had their picture taken in the bathroom, and one child agreed that he had been given a bath.  Goodman,G.S., Wilson, M.E., Hazan, C., & Reed, R.S. (1989).  Children's Testimony Nearly Four years After an Event.  Paper presented at *Annual Meeting of the Eastern Psychological Association*, Boston, MA.  Reported in Ceci & Bruck (1995), supra at 140-141.

---

[23]  Mr. Fuster urges the Court to watch the videotape of this child, to see her obvious confusion when these questions are posed to her in this fashion.

There are many other studies that show that reinforcing children for certain behaviors also increases the frequency of that behavior. If a child is told, "You are a really good boy" after he gives certain types of responses, he is likely to increase that type of response, often at the expense of other responses for which he receives no reinforcement. See, e.g., Ceci and Bruck (1995), supra at 143-144.

Likewise, using bribes, threats, or "merely" telling a child that the interview will not, or cannot, end until the child provides information desired by the investigator is a highly successful way of eliciting such information, whether or not it is true. The Bragas often elicited information in such a way and then used that information in subsequent interviews with the same child or with others, telling them that this is what had been said previously, and now they wanted it confirmed. ) Ceci & Bruck (1995), supra at 145-146.

2. *Examples from the Bragas' Interviews*

The examples of to be found in the Braga interviews of setting the emotional tone are legion. They continually repeated to the children that it was okay to tell; suggested to the children that the Fusters had threatened them "not to tell" or told them to keep their activities a "secret"; said that the children would feel better if they told; talked about how proud the children's parents would be if the child "told what happened;." and suggested to the children that the Bragas had scared them.

Typical is Laurie Bragas exchange with three-year-old SM. SM had made no disclosures of abuse. Braga first tells SM that grown-ups aren't supposed to touch children in private places. (1/15/85, 187) Shortly thereafter, she asks, "Did somebody tell you not to tell? Mommy and Daddy won't be mad. You won't get in trouble." (Id.,

189) and, "Mommy and Daddy will be proud of you." (Id., 190) SM mentions monsters

and Braga asks, "Did monsters say something bad would happen if you tell?" (Id., 192)

Then, "[i]t would be so good if you could tell. If you keep it secret, it could give you

tummy ache. Other kids come and tell [use of peer pressure, see infra]. You'll feel

better." (Id., 193) Braga later asks SM if SM saw Mr. Fuster put his penis in someone's

mouth. SM answers, "Whose mouth?" Braga responds, "You don't know or you're

scared to tell?" (Id., 206)

     See, also, for example, Laurie Braga's second interview with SM. SM has made

reported no occurrences of abuse when Braga launches into this line of remarks:

> Did somebody tell you not to tell? Who told you not to tell? . . .Yes, you can tell.
> Do you know what? You are not going to get into any trouble and Mommy is not
> going to be mad at you and Daddy is not going to be mad. If somebody said,
> "Don't tell the secret because you will get in trouble," they weren't telling you the
> truth because you are not going to get into any trouble. . . .You know Mommy
> won't be mad and Daddy won't be mad. They will be so proud of you, if they
> know what happened . . .

(9/21/85, 188-189)

     In an interview with TL, Laurie Braga asks the child to tell her "more stuff about

what happened at Frank and Iliana's." (9/12/85, 187) When TL responds no, Braga asks

if it makes TL "sad to talk about it," asks if it "scares" her, and then asks, "Did somebody

tell you not to talk ... Did they maybe tell you that you might get into trouble if you told?

Yes, I know it's kind of hard but I will tell you what, I will talk, okay? You don't have to

talk. I just want to tell you no matter what anybody said, you are not going to get into

trouble for telling, okay? You did a real good (inaudible) nobody is going to do anything

to you. You are not going to get into any trouble. Nobody is going to hurt you. You didn't do anything bad." (Id., 187-188)

During the interview with AP, with AP having given no accounts of abuse, Laurie Braga tells the child, "I know that maybe Iliana told you that, don't tell anybody because if you tell, you will be in a lot of trouble and somebody will hurt you. Okay? . . . Yes, and I just want you to know that nobody is going to hurt you and if you tell, mommie and daddy will be so proud because sometimes, if children keep secrets way inside here, it hurts because then they can't tell anybody and it makes them feel bad." This soliloquy continues for another page and a half on the same theme. (9/19/85, 137)

The Bragas used comments like these in every interview.

E.  Stereotype Induction

1.  *Research Findings*

Stereotype induction refers to a process by which interviewers (or others) suggest to a subject that someone has certain personality characteristics. In the control condition of a classic study conducted in early 1990's, a stranger named Sam Stone paid a two-minute visit to preschoolers (age 3 to 6) in their daycare center. Following Sam's visit, the children were asked non-suggestively for details of the visit on 4 different occasions over a 10 week period. One month after the fourth interview, the children were questioned by an interviewer who asked if Sam did something to a teddy bear and a book. In reality, Sam never touched either one. Of these children, 10% initially claimed that Sam had done something to the book or the teddy bear and when gently challenged, only 2.5% of the younger children still insisted on the reality of the fictional event. None of the older

to do his job.  Lepore, S.J. & Sesco, B. (1994).  Distorting children's reports and interpretations of events through suggestion.  *Applied Psychology*, 79, 108-120.

Thus, stereotype induction can have a powerful effect on a child's memory of past events.  It can cause children to view a person in a negative light and can induce memories of bad acts that never occurred.[24]

### 2. *Examples from the Fuster Interview*

It is clear from the interviews of JL that her parents set up a strong negative stereotype induction before she even got to the Bragas.  This is played up by Laurie Braga:

> JL:  They are strangers.
>
> Braga:  Who?
>
> JL:  Iliana and Frank.
>
> Braga:  They are strangers?
>
> JL:  And they went in jail.
>
> Braga:  Yes I don't think Iliana went in jail.  Frank went in jail.
>
> JL:  Why?
>
> Braga:  Because some people felt that maybe he hurt some children and that's why we are talking to the children, to see if may any of the children could tell us some of the things that might have happened, so we could understand.

(9/19/85, 29)  Note that JL then picks up on the fact that Iliana is not in jail and points out to Braga,  "She gave me a doughnut without any poison on it."  (Id., 29-30)

---

[24]  Consider the effect that negative stereotyping such as took place here would have had in combination with the positive reinforcement child complainants were given for being brave for "telling."

43

Note that this type of stereotype induction is a constant in most of the interviews. SM, for example, makes a reference during his second interview to monsters, a reference that is not connected to Braga's monologue about the Fusters. Braga, however, immediately assumes that SM is talking about the Fusters when he refers to monsters and incorporates this theme into the interview. (9/21/85, 191)[25]

    F. Use of Anatomically Detailed Dolls.

       1. *Research Findings.*

Anatomically detailed dolls were used over and over again with the child complainants in this case -- by staff members at the Rape Treatment Center, by the Bragas, by the children's therapists. The rationale given by the experts at trial for the use of these dolls was that they allowed the children to re-enact events of abuse without having to talk about the abuse, thereby overcoming both embarrassment and language barriers for children too young to verbalize what had happened. The prosecution experts also testified that an abused child will play with anatomically detailed dolls differently from the way a non-abused child will or that a child will exhibit "avoidance" behaviors in the presence of such dolls because they remind the child of the abuse. The state's experts testified more specifically that the child complainants they met with exhibited behaviors

---

[25]    The Court should note, too, that Braga starts questioning SM about ways in which the monsters may have hurt him.  SM says they hurt his foot.  Then she asks if they put something in his mouth.  SM answers, "Bubblegum in my mouth."  Braga responds with incredulity and then asks, "Was it really bubblegum or something else they called bubblegum?"  SM answers is was green.  Braga will not accept that SM is really talking about bubblegum and begins referring to the gum as "green stuff" and asking if the green stuff in SM's mouth made him feel funny.  She then asks,  "What happened after they put the green stuff in your mouth?" and seems frustrated by his reply that he took it out and threw it in the garbage.  She asks over and over again what the Fusters put in his mouth.  (9/21/85, 194-197)

in substantiating abuse: A pilot study. *Journal of the American Academy of Child and Adolescent Psychiatry, 29,* 743-746. Realmuto, G., and Wescoe, S. (1992). Agreement among professionals about a child's sexual abuse status: Interviews with sexually anatomically correct dolls as indicators of abuse. *Child Abuse & Neglect, 16,* 719-725.

Yet one prosecution expert after another testified confidently that the play engaged in by the children who had attended the Fuster baby-sitting service was clearly indicative of the children having been sexually abused. (9/4/85, 280; 9/4/85, 257-58; 144-45, 152, 168..

### 2. *Examples from the Fuster Interviews*

Again, the interviews have one example of the dolls being introduced after another. A particularly interesting episode occurs during the first interview with SM and only can be seen by watching the tape, since it is not reflected in the written transcript. Laurie Braga shows SM the anatomically detailed dolls and asks him which one is Iliana. What the transcript does not reveal is that Braga puts the dolls on the floor in front of SM, and pulls their dresses up over the dolls' faces so that he is staring at the dolls' genitalia. It is in this context that Braga asks SM to look at the dolls and decide which one is Iliana. (9/21/85, 187) Braga then begins "educating" SM with the dolls, telling him what constitutes a private part, teaching him the word vagina and penis. (Id., 187-88)

Braga reintroduces the dolls to SM, with SM having given no impetus for her to do so. Virtually out of the blue, Braga pulls them out and asks SM, "Did Frank put his penis here or here or here on you?" (Note this is also a good example of a forced choice question.) After asking the question several times, Braga narrows the question and asks,

"Did he put it there in your bottom?" showing SM the dolls. (This is a leading question.) SM nods yes. Braga asks if SM's clothes were on or off, a forced choice question. SM says they were on. At this point, Braga says, demonstrating with the dolls, "Okay, your clothes were on but you said he put his penis here. How could he do that if your clothes were on? [This is a reasonable question for an unbiased interviewer to have asked, gently challenging a statement that seems to be inconsistent. However, Braga continues without waiting for SM's reply and still demonstrating with the dolls] Maybe he pulled your pants down a little?" Three-year-old SM assents. (9/21/85, 198)

The dolls were an integral factor in all of the Braga interviews and with most of the therapists the children saw. All of them used the dolls. The Bragas routinely named the dolls, undressed them, pointed out their body parts, and engaged in fantasy play with them.

H. Use of Peer Pressure

1. *Research Findings*

Research on the effects of peer pressure indicate that children will provide inaccurate responses to questions if they believe that their peers have provided the same, or similar, information. For example, in a study conducted in a school in which a classroom of children witnessed someone knock a cake off a piano, the entire class was later questioned about the event, including seven members of the class who had not been present when the event occurred. Six of these seven children nevertheless indicated that they had been present and provided "information" about the event. Pettit, F., Fegan, M..

& Howie, P. (1990, September). *Interviewer's effects on children's testimony.* Paper

presented at the International Congress on Child Abuse and Neglect, Hamburg, Germany.

Likewise, 113 children were interviewed 6 to 16 weeks following a sniper attack at

an elementary school during which scores of children were pinned underneath gunfire on

the playground. Some of these children were not present at the school when the sniper

attack occurred, yet gave "eyewitness" accounts nevertheless. Pynoos, R.S. & Nader, K.

(1989) Children's memory and proximity to violence. *Journal of the American Academy*

*of Child and Adolescent Psychiatry, 28,* 236-241.

Thus, the pressure to go along with what one believes one's peers has experienced

can sometimes promote false reports. It is not known whether the children making these

false reports are conscious or them being fabrications or if, after hearing about an incident

over time, the children come to believe they have participated in the event themselves.

### 2. *Examples from the Fuster Interviews*

Perhaps the most striking use of peer pressure in the Braga interviews was the

following that took place with JL:

> Braga: Some of the children don't understand. They are afraid. Some children
> said that they were acting like monsters and they wore these masks and they scared
> them.
>
> JL: Is that true?
>
> Braga: I am not sure but some of the children said so and I believe the children
> because I don't think children make up stories like that. Do you?
>
> JL: Which children?
>
> Braga: Well, D. and some of the other children.
>
> JL: They were bigger than me.

Braga: Well, most, some of them were bigger than you and some of them were littler than you.

JL: But some of them are bigger than me and did they tell that they were naked or anything like that?

Braga: Yes.

JL: What did they say?

Braga: They said that they played games with Frank and Iliana and some of the littler children and everybody took off their clothes and they played games and people touched each other's private parts.

JL: That's true.

Braga: Is it true?

JL: Yes but D. (inaudible) the other children said it, so D. might be right.

Braga: You think D. might be right?

JL: Right. Right because the bigger children said that.

Braga: You thought maybe if D. said it, maybe it wasn't right?

JL: But now I found out that it was true because other children said it.

Another rather shocking instance of peer pressure occurred when the Bragas decided it might be useful to bring JPC, who had been questioned previously and had made disclosures, into their first interview with BT. As BT denied any knowledge of wrongdoing, JPC called BT a liar and insisted that she was failing to tell the Bragas what had gone on in the Fuster house. (9/18/85, 5 et seq.)

I. Inducing Children to Pretend or Fantasize

1. *Research Findings*

### 2. *Examples from the Fuster Interviews*

The children being interviewed by the Bragas were told over and over again to fantasize and pretend, often in conjunction with the anatomically detailed dolls. The dolls were introduced to JDC and he was told, "Show me with the dolls, pretend. No, pretend this is Jonathan. Show me what Iliana did?" (9/12/85, 33). JPC, his older brother, is given the dolls and suggests pretending with them and the Bragas readily assent. (Id., 41)

During TL's interview, Laurie Braga suggests that they pretend again. Using the anatomical dolls, Braga names one Frank and asks what Frank would do. TL indicates she does not want to. Braga says, "You don't want to do it anymore? Okay you don't have to. How about if we pretend. Let's forget about [TL]. Let's pretend this is Iliana and this is Frank. Show me what Iliana and Frank would do." (9/12/85, 178)

Likewise, with AP, Laurie Braga sets up a "game" for the child. "Want to play a game with the dolls? This is a doll. This a lady doll. Let's pretend this is Iliana, okay? This is a man doll. We will pretend his name is Frank. So this is Frank and this is Iliana. This is a little girl doll. We will pretend her name is [AP] and this is a little boy doll and his name is [MP], okay? So we can pretend and let's play a game. What game should we play? What game would you like to play with the dolls?" (9/19/85, 101) A short while thereafter, Joseph Braga picks up the dolls and starts playing ring-around-the-rosy with them (the game he thinks the Fusters had played in the nude with the children.) (Id., 105) When AP expresses no interest in the game or the dolls, the two Bragas begin playing ring-around-the-rosy with the dolls and then the two begin undressing the dolls. (Id, 106)

These fantasy/pretend games were played with each of the children.  It was an integral part of the Bragas interviewing technique.

3.  Newly Discovered Evidence Also Shows that, Contrary to the Assertions Made by Prosecution Experts That They Could Tell When Children Were Providing False or True Reports, Even Highly Trained Professionals Are Generally Unable to Do So When Children's Memories Have been Tainted By Suggestive Questioning Because the Children Are Not Consciously Lying Or Reciting Information By Rote.

Prosecution experts at trial had a field day testifying that they could unquestionably distinguish between falsity and true reports of abuse.  These experts listed the factors they would consider;  among them, rigid consistency of the reports, the child's affect when making the report, the nature of the report in combination with the child's use of anatomically detailed dolls, the lack of detail in the reports.

Studies have been conducted, however, to test the credibility (as opposed to reliability) of children who are giving false reports as a result of memory taint.  In one such large scale study, approximately 1,500 judges, researchers and mental health professionals who work with children viewed videotapes of children making reports about events, both real and imagined, from the Sam Stone study described above.  The professionals then rated the accuracy and credibility of each child. The professionals scored very poorly on these tests, tending to find the most credible those very children who had given the most inaccurate or false reports.  This test was repeated, with psychologists who specialize in interviewing children being shown videotapes of the children in the Mousetrap study, described above.  The test yielded the same results.  See, Ceci and Bruck, Jeopardy in the Courtroom:  A Scientific Analysis of Children's Testimony, American Psychological Association, Washington, D.C., 1996, at 281-282.   See also, Horner, T.M., Guyer, M.J.,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRANCISCO FUSTER-ESCALONA)
)
     Petitioner,      )
)     Case No. 97-1369-CIV-LENARD
-vs-              )     MAGISTRATE JUDGE SORRENTINO
)
HARRY K. SINGLETARY,  )
)
     Respondent.     )
)
_____   _)

# EXHIBITS TO MOTION FOR AN EVIDENTIARY HEARING

Volume II

<u>List of Attachments and Exhibits</u>

**Certification of Amy Gershenfeld Donnella**

Exhibit 1 to Donnella Certification – Letter dated December 10, 1998 from Assistant State Attorney Abraham Laeser

**Certification of W.L.H. Whittington**

Exhibit 1 to Whittington Certification – Curriculum Vita

Exhibit 2 to Whittington Certification – Memorandum from assistant state attorney Dan Casey to assistant state attorney Richard Shiffrin, dated February 19, 1985

Exhibit 3 to Whittington Certification – Trial testimony of Dr. Judith Lederhandler

Exhibit 4 to Whittington Certification – Deposition testimony of Joseph Kyle, Laboratory Technician

Exhibit 5 to Whittington Certification – Deposition testimony of Freda Burstyn, Laboratory Technician

Exhibit 6 to Whittington Certification – Records from Jackson Memorial Hospital

Exhibit 7 to Whittington Certification – Pediatric Infectious Diseases, vol. 7, 1988, "Incorrect identification of *Neisseria gonorhoeae* from infants and children." And "Misidentification of sexually transmitted organisms in chidren: medicolegal implications."

**Certification of Richard Ofshe, Ph.D.**

Exhibit 1 to Ofshe Certification – Curriculum Vita

Exhibit 2 to Ofshe Certification – Sworn Statement of Ileana Flores

Exhibit 3 to Ofshe Certification – Psychological Evaluation of Ileana Fuster, dated July 30, 1985 by Norman Reichenberg, Ph.D.

Exhibit 4 to Ofshe Certification – Psychological Report re: Ileana Fuster, dated August 3, 1985, by Psychological Associates of Miami (Leonard Haber, Ph.D.)

Exhibit 5 to Ofshe Certification – Letter dated July 31, 1985, re: Ileana Fuster from Sanford Jacobson, M.D.

Exhibit 6 to Ofshe Certification – Invoices of charges to Michael von Zamft from Behavior Changers, Inc., dated August 26, 1985 and September 23, 1985

Exhibit 7 to Ofshe Certification – Affidavit of Herb Smith filed July 29, 1985

Exhibit 8 to Ofshe Certification – Memorandum to file from assistant state attorney Dan Casey, dated August 5, 1985

**Certification of Maggie Bruck, Ph.D.**

Exhibit 1 to Bruck Certification – Curriculum Vita

Exhibit 2 to Bruck Certification – Police Investigative Reports

Exhibit 3 to Bruck Certification – Excerpts from Mr. Fuster's Corrected Amended Petition

Exhibit 4 to Bruck Certification – Deposition of Steven Paul Allen

Exhibit 5 to Bruck Certification – Deposition of Mary Lerow

Exhibit 6 to Bruck Certification – Transcriptions of Braga interviews from trial Transcripts dated 9/12/85, 9/13/85, 9/18/85 and a portion of 9/19/85



IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO. 84-19728

STATE OF FLORIDA,                    :
                                     :
                Plaintiff,           :
                                     :
        v.                           :
                                     :
FRANCISCO FUSTER ESCALONA,           :
                                     :
                Defendant.           :
                                     :
- - - - - - - - - - - - - - x


                            1351 Northwest 12th Street
                            Miami, Florida
                            Tuesday, July 9, 1985
                            10:25 a.m. - 10:50 a.m.


### DEPOSITION OF STEVEN PAUL ALLEN

        Taken before Mark J. Silverman, Notary

Public for the State of Florida at Large, pursuant to

Notice of Taking Deposition filed in the above cause.


- - - - -



— BRuck Exhibit # 4          —

BRICKELL REPORTING SERVICE, INC.
COURT AND DEPOSITION REPORTERS
444 BRICKELL AVENUE, SUITE 650
MIAMI, FLORIDA 33131
(305) 756-2322

**APPEARANCES**

DANIEL CASEY, Assistant State
Attorney, on behalf of the
State of Florida.

JEFFREY SAMEK, ESQ., of the
firm of SAMEK & BESSER, on
behalf of the Defendant.


- - - - -


_____


**I N D E X**

| Witness | Direct |
|---|---|
| Steven Paul Allen | 3 |


- - - - -

1          (Whereupon, the following proceedings were

2    had:)

3    Thereupon--

4                    STEVEN PAUL ALLEN,

5    was called as a witness by the Defendant and, having

6    been first duly sworn, was examined and testified on

7    his oath as follows:

8                    DIRECT EXAMINATION

9    BY MR. SAMEK:

10         Q    State your name and your occupation, please?

11         A    Steven Paul Allen, Pilot 4, Shore

12   International Airlines.

13         Q    Are you married, Mr. Allen?

14         A    Yes.

15         Q    Your wife's name?

16         A    Kelani Ann Allen.

17         Q    Do you have any children?

18         A    Two, Kenny Sheppard Allen and I don't

19   remember her name in here--Christie Lee Allen.

20         Q    How old is Kenny?

21         A    Kenny is now two and a half.

22              Christie is two weeks.

23              MR. SAMEK:   Congratulations.

24   BY MR. SAMEK:

25         Q    Do you know Frank or Ileana Fuster?

1    A.   Yes.

2    Q.   Have you ever met them?

3    A.   Yes.

4    Q.   Both of them?

5    A.   Yes.

6    Q.   Together or separate when you met them?

7    A.   Both.

8    Q.   You met them both at the same time?

9    A.   Yes.

10   Q.   When was that?

11   A.   The exact date I don't know.

12        I imagine around March of '84, or something

13   like that, April.

14   Q.   What were the circumstances under which you

15   met them?

16   A.   I was looking for a babysitter.

17        I found their babysitting services in the

18   Country Walk Flier, so I called Ileana up, talked to

19   her and went by.

20   Q.   You keep saying "I."  Was it you that did

21   it yourself or--

22   A.   Yes.

23   Q.   --or you and your wife?

24   A.   No.  I did it myself.

25   Q.   In the depositions of all the other parents

1    the trend has usually been that the wives are

2    handling that; is there any particular reason why in

3    your family you did it?

4        A.    I took Kenny to the babysitting services

5    because my wife was flying out of town.  She's with

6    Pan Am.  So, I usually took Kenny to and from the

7    Fusters.

8        Q    Your schedule is more local more often?

9        A.    Yes.

10       Q    Did you go to visit Ileana before you

11   brought him in?

12       A.    Yes.  Once.

13       Q    When was that?

14       A.    Again, March or April, whenever we started

15   this.

16       Q    What did you observe when you went to visit

17   them?

18       A.    They were very nice.

19       Q    They were both there when you went there?

20       A.    I think so, yes.

21            I believe they were both there, yes.

22            I looked at their house.  Just talked to

23   them about babysitting for Kenny.

24            She showed me around the house.

25            I told her basically "I'd be bringing Kenny

1    by two or three days a week."

2              I think she showed me a license, an

3    occupational license, or something.

4              She gave me a couple of people to call for

5    references.

6         Q    Do you remember who that was?

7         A    I don't remember their names, and I think

8    at that time, I think my wife just called them, just

9    asked if they had kids at Ileana and they said "Yeah,

10   they are very good.  No problem."

11        Q    Do you know any of the people she mentioned

12   as references?

13        A    No.

14        Q    What did you observe at their house when you

15   were there that day?

16        A    They got a nice estate home.  Nicely

17   furnished.  Set up for four or five kids, whatever

18   they handle.  It's clean.  It's nice.

19        Q    Did you talk with Frank Fuster, at all, on

20   that occasion?

21        A    Yeah, a little bit.

22              He said he had a self-employed--works out

23   of the house in some carpet business, or something.

24        Q    Did he explain to you or did she explain to

25   you that he might on occasion be present when the

1   children were in the house?

2       A     Yes.

3       Q     You found nothing wrong with that?

4       A     No.

5       Q     Have you ever been arrested?

6       A     No.

7       Q     Have you ever been in the military?

8       A     No.

9       Q     Have you or your wife or your--I'll say

10  children now--to your knowledge ever been treated for

11  any sexually transmitted diseases?

12      A     Treated for them?

13      Q     Treated for them, yes.

14      A     No.

15      Q     Have you and your wife or your children

16  ever been tested for them?

17      A     Kenny was tested.

18      Q     As a result of--

19      A     As a result of this.

20      Q     --what allegedly occurred in this?

21            You began bringing Kenny shortly after the

22  time you went to meet Ileana, or did you leave him

23  there that day?

24      A     No.  It was three or four days, maybe a week

25  after.

1    Q    How often did you bring him there?

2    A    About three days a week, give or take.

3    Q    What were the hours; from when to when?

4    A    I'd drop him off about 7:00 or 8:00 and

5    pick him up about 5:00 or 6:00.

6    Q    So, while you were working and your wife

7    might be out of town working Ileana was watching Kenny?

8    A    Yes.

9    Q    She always knew approximately when you

10   were coming to pick him up?

11   A    No, I fly.

12        Some days I'd come home early.  Some days

13   I'd pick him up a little later.

14   Q    So, she really didn't know, with any

15   regularity, when you would be coming to pick him up?

16   A    No, not really.

17        The majority of the time I'd pick him up

18   5:00 or 6:00, but on occasion I'd pick him up later.

19   Q    Did you ever notice anything unusual at

20   any of the times you picked him up?

21   A    No.

22   Q    Not a thing?

23   A    No.

24   Q    Would it be fair to say that the first

25   inkling that you got that anything might be amiss at

1  the house was when the police told you there were

2  arrests being made?

3       A     No.

4       My wife was at the pool, and I think a

5  couple of girls or wives may have come up to her and

6  just asked her if she noticed anything at Country

7  Walk, at the Fusters.  And she said "No.  Why?"

8       I think she said "Well, something might be

9  going on," or something like that.

10      She came and told me about it.

11      About this time--we had been on a waiting

12 list to get Kenny on--or in a South Miami Church

13 Day Care Center, so it just happened that they had

14 called and said that Kenny can now get in, there is

15 a slot open for him.  So, we took Kenny out and put

16 him in.

17      You know, that was about it.

18      Q     South Miami Church was your first choice

19 in the first place?

20      A     Yeah.  We've been waiting to get in there.

21      It's a years waiting list.

22      Q     Was it coincidental that the slot came open

23 at the time that you pulled him out and put him in

24 South Miami, about the same time you heard rumors or--

25      A     It was about the same time.

1    She came home and said "There is some rumors

2    about Ileana and Frank."

3    It didn't really bother me, because they

4    just seemed like such nice people.  But, again, at

5    that time we had him in South Miami.

6    Q    You would have done that regardless?

7    A    We would have done that regardless, yes.

8    We said, "Let's bring him out.  Rumor has

9    it--"  We brought him out and put him in South Miami.

10   It worked good for us.  That was the first

11   indication, about a week later, or two weeks later

12   I heard it through, I guess the paper or something.

13   Q    You mean the Herald, the News?

14   A    Yes.

15   Q    Do you know what the allegations specifically

16   are that the State says happened to Kenny?

17   A    No.

18   Q    "No" you do not not?

19   A    No.

20   Q    In caring for your son, you've had the

21   opportunity, that may not be a good word, you've had

22   occasion to bathe him and change his diaper?

23   A    Yes.

24   Q    Do you ever let him parade around the house,

25   or walk around the house, with no clothes on?

11

1    A    Not a lot, no.

2    Q    My question was:  Do you ever?

3    A    Yes.

4    Q    You don't have an absolute prohibition

5  against that in your home?

6    A    Well, when he does I put a diaper on him,

7  he'll take it off and run around, so, you know.

8    Q    When you change him do you caress him, hug

9  him, give him a kiss?

10    A    I guess.

11    Q    Please don't guess.

12    A    Yes.

13    Q    Did you ever touch his buttocks?

14    A    Yes.

15    Q    Did you ever touch his penis?

16    A    Yes.

17    Q    Other than to clean?

18    A    No.

19    Q    You've never given him a little pat while

20  he's laying there on the changing table?

21    A    Oh yes, oh yeah.

22    Q    Do you ever kiss him?

23    A    Yes.

24    Q    Has he ever seen you or your wife in the

25  nude?

1      A.    Yes.

2      Q.    Do you know if he's ever inadvertently

3 seen you and your wife engaging in any sexual

4 relations of any kind?

5      A.    No, he hasn't.

6      Q.    You don't know or you are sure he has not?

7      A.    I'm sure he has not.

8      Q.    He has his own bedroom?

9      A.    Yes.

10     Q.    Could you describe the bedroom?

11     A.    Regular kid's bedroom.

12          It has a crib, queen size bed.

13     Q.    A crib and a queen size bed?

14     A.    Yes.

15     Q.    In the same bedroom?

16     A.    Yes.

17          Shelves with a bunch of toys on it.

18     Q.    Could you tell us what the toys are?

19     A.    Cars, trucks, stuffed animals, AVC games.

20          I don't know.

21     Q.    What color is the carpet?

22     A.    What color is the carpet?

23     Q.    Yes.

24     A.    Brown.

25     Q.    Any wallpaper?

13

1   A.   No.

2   Q.   What color are the walls painted?

3   A.   In his room?

4   Q.   Yes.

5   A.   Sort of a peach color.

6   Q.   What color is the crib?

7   A.   Brown, dark brown.

8   Q.   Does he have any mobiles or toys hanging

9   from the crib?

10   A.   No.

11   Q.   Are the shelves you spoke about a wall unit

12   of some kind, or are they shelves on a bracket?

13   A.   It's a one piece shelf, wood shelf.

14   Q.   And to how high?

15   A.   Five and a half feet, I guess.

16   Q.   What color is that?

17   A.   White.

18   Q.   How about the dresser?

19   A.   White.

20   Q.   Have you ever discussed with your son--I

21   know he's not exactly what we would call elderly,

22   but have you ever discussed with him what it is that

23   he saw or was done with him--

24   A.   No.

25   Q.   --or you to him?

1    A.    No.

2    Q     Never?

3    A.    No.

4    Q     Has he ever said anything to you?

5    A.    No.

6    Q     Do you know if he ever said anything to your

7    wife?

8    A.    No.

9    Q     How do you know anything happened to him?

10   A.    Well, he didn't talk back then.  He was too

11   young.

12         He didn't have a lot to say.

13   Q     How do you know anything happened to him?

14   A.    I don't.

15   Q     When you brought your son to Ileana's,

16   did you bring a change of clothing, food?

17   A.    I brought a little bag, it usually had a

18   change of clothes, diapers, lunch.

19   Q     When you picked him up, would everything

20   be accounted for?

21   A.    Yes.

22   Q     Either used or returned?

23   A.    Yes.

24   Q     Was the food all apparently used or did he

25   or did Ileana usually return what wasn't eaten?

1    A    What they didn't eat she usually returned.

2    Q    If he ate half his sandwich she'd send you

3  back the other half?

4    A    Yes.

5    Q    Just so you knew what he was eating?

6    A    Yes.

7    Q    Did he ever go on any outings or excursions

8  with the Fusters?

9    A    Yes.  One night I asked them to keep him.

10  I was going to come around 8:00 or 9:00 and they said

11  they were going to take him to his parents for dinner.

12    Q    To Mr. Fuster's parents?

13    A    One of them, I believe.  I don't know which.

14    Q    You said "his," that's why I suggested

15  Mr. Fuster.

16        I don't mean to put words in your mouth.

17        THE WITNESS:  I don't know which parent.

18  I don't have any problem with that.

19        He went to dinner with them.

20        The only other time was--I guess that was it.

21  BY MR. SAMEK:

22    Q    Did you ever have your son checked for any

23  signs of abuse after you heard these rumors?

24    A    Yes.

25    Q    Who did you take him to?

1    A.    I believe Dr. Simovich.

2    Q.    That's his pediatrician?

3    A.    Yes.

4    Q.    Do you know where Dr. Simovich's offices

5    are located?

6    A.    I don't know the address.  They are off

7    Sunset and Galloway.

8    Q.    Do you know if he's ever otherwise been

9    tested for the same or similar physical evidence?

10   A.    What do you mean?  Another doctor?

11   Q.    Yes, doctor, counselor, psychologist,

12   psychiatrist, nurse?

13   A.    I think when we saw Dr. Simovich we had him

14   taken to Baptist for further testing.  That's I guess

15   under his supervision.

16   Q.    So, he went there twice?

17   A.    No.  I think I--let me see--I think we went

18   to Dr. Simovich's office.  He saw Kenny and had us

19   go to Baptist Hospital to run the tests.

20   Q.    Do you know when that was?

21         Let me see if I can make that question

22   easier.

23         Do you recall taking Kenny when you heard

24   the rumors or when the arrests were made?

25   A.    Taking him to Simovich?

1    Q    Yes.

2    A    I guess after the arrests were made.

3         It was after the arrests were made, yeah.

4    Q    And the tests reflected what?

5    A    Well, for gonorrhea and syphilis they were

6    negative.

7    Q    How about signs of physical abuse?

8    A    Nothing.

9    Q    What do you think happened to him?

10   A    To Kenny himself?

11   Q    Yes.

12   A    I don't think anything happened.

13        After this became public, I tried to recall

14   right then as I picked him up and so forth.  I don't

15   think anything happened to him.

16        MR. SAMEK:  Thanks very much.

17        You have the right to read this deposition

18   when it's been transcribed or you can waive the

19   right to read it.

20        Let me just briefly explain what it is so

21   you can understand what to do.

22        If you read it you are reading it not to

23   make, not to correct your answers, but rather

24   to not corrections in what you believe are

25   errors in transcription.  If you do want to read

it, or even if you think you might want to read

it, you have to tell him now that you do want

to so he knows to call you or contact you

somehow before he puts it in the court file.

If you say you want to and you change your

mind, then you can just tell him that you changed

your mind.

If you waive reading you are waiving reading

and it will be just placed in the court file

without your having read it.

That doesn't mean you never get a chance to

read it, or you can't ever call attention to the

fact that you think a mistake was made, but it

will be transcribed and placed in the court file

without that notation being made.

Most people say they are going to read it

and then subsequently don't, just so they keep

the option open.

THE WITNESS:   I will read it.

(Reading and signing not waived.)

(Thereupon, the taking of the deposition

was concluded.)

1

2

3
                                        _____

4
        Sworn to and subscribed before me this

5
_____ day of _____, 1985.

6

7
                                     _____

8
My commission expires 12-12-85.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<center>CERTIFICATE OF NOTARY</center>

STATE OF FLORIDA )
                 ) SS.
COUNTY  OF  DADE )

I, MARK J. SILVERMAN, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that I reported the deposition of Steven Paul Allen, a witness called by the Defendant in the above-styled cause; that said witness was duly sworn by me; and that the foregoing pages, numbered from 1 to and including 19, are a true and correct record of the deposition given by said witness.

I further certify that I am not an attorney or counsel of any of the parties; nor a relative or employee of any attorney or counsel connected with this action; nor financially interested in said cause.

WITNESS my hand and official seal at Miami, Dade County, Florida, on this ____19th____ day of _____,
1985.

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP. JULY
BONDED THRU GENERAL

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

BROOKE TOBY, et al.,                )

            Plaintiffs,       )

vs.                                 )       No. 85-16206 CA 31

ARVIDA CORPORATION, etc.,           )
et al.,
                            )

            Defendants.       )
_____

JEFFREY I. MARKS and KAREN          )
MARKS, et al.,
                            )

            Plaintiffs,       )

vs.                                 ) No. 84-42560 CA 31

FRANCISCO FUSTER ESCALONA,          )
et al.,
                            )

            Defendants.       )
_____

STEVEN LITWIN and RAEGENA           )
LITWIN, et al.,
                            )

            Plaintiffs,       )

vs.                                 ) No. 84-32600 CA 31

FRANCISCO FUSTER ESCALONA,          )
et al.,
                            )

             Defendants.       )
_____

STEVEN LITWIN and RAEGENA           )
LITWIN, et al.,
                            )

            Plaintiffs,       )

vs.                                 ) No. 85-17564

FRANCISCO FUSTER ESCALONA,          )
et al.,
                            )

            Defendants.       )
_____

— BRUCK Exhibit #5 —

2

```
ASHLEY PEREZ and MACKENSIE    )
PEREZ, et al.,
                              )
               Plaintiffs,
vs.                           )    No. 84-35314 CA 31

FRANCISCO FUSTER ESCALONA,    )
et al.,
                              )
               Defendants.
──────────────────────────────

JONATHAN COUSINO and JUSTIN   )
COUSINO, et al.,
                              )
               Plaintiffs,
vs.                           )    No. 84-3368 CA 31

FRANCISCO FUSTER ESCALONA,    )
et al.,
                              )
               Defendants.
──────────────────────────────

TIFFANY LEIGH LANDIS, etc.,   )
et al.,
                              )
               Plaintiffs,
vs.                           )    No. 84-32827 CA 31

FRANCISCO FUSTER ESCALONA,    )
et al.,
                              )
               Defendants.
──────────────────────────────

TODD LEININGER, et al.,       )

               Plaintiffs,    )
vs.                           )    No. 86-19449 CA 31

FRANCISCO FUSTER ESCALONA,    )
et al.,
                              )
               Defendants.    )
──────────────────────────────
```

                781 City National Bank Building,
                25 West Flagler Street,
                Miami, Florida,
                Thursday, 9:10 a.m.,
                July 3, 1986.

APPEARANCES:

    KUBICKI, BRADLEY, DRAPER,
     GALLAGHER & McGRANE,
    BY:  GAIL L. KNISKERN, ESQ.,
    On behalf of Defendants/Arvida and
     Arvida Management Co., and
     David B. Meseroll, Jr.

    LAW OFFICES OF EDWARD SOTO,
    BY:  EDWARD SOTO, ESQ.,
    On behalf of Defendants/Arvida and
     Arvida Management Co.

    ADAMS, HUNTER, ANGONES & ADAMS,
    BY:  FRANK ANGONES, ESQ.,
    On behalf of Plaintiffs/ Landis and Perez.

    WALTON, LANTAFF, SCHROEDER & CARSON,
    BY:  KATHLEEN SINGER, ESQ.,
    On behalf of Homeowners Association.

    KWITNEY, KROOP & SCHEINBERG, P.A.,
    BY:  RICHARD I. KROOP, ESQ.,
    On behalf of Plaintiff/Raegena.


    BY:  PATRICK MURPHY, ESQ.,
    On behalf of Defendant/I. Fuster.

    SPENCER & TAYLOR,
    BY:  MARY VALENTINE, Law Clerk,
    On behalf of Defendant/F. Fuster.




DEPOSITION OF

MARY LEROW

4

The deposition of MARY LEROW, a witness

of lawful age, taken for the purpose of discovery

and for use as evidence in the above-entitled cause,

pending in the Circuit Court of the 11th Judicial

Circuit in and for Dade County, Florida, pursuant

to Re-Notice, before STERLIE J. THUMANN, Shorthand

Reporter and Notary Public in and for the State of

Florida at Large, at the time and place aforesaid.

- - - - -

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mary Lerow | | | | |
| (By Ms. Kniskern) | 5 | | | |
| (By Mr. Soto) | 31 | | | |
| (By Mr. Murphy) | | 38 | | |
| (By Mr. Soto) | | | 47 | |
| (By Mr. Kroop) | | | | 49 |
| (By Ms. Kniskern) | | | 53 | |
| (By Mr. Soto) | | | 54 | |

5

Thereupon:

                    MARY LEROW

was called as a witness by the Defendants and, having

been first duly sworn, was examined and testified

upon her oath as follows:

                    DIRECT EXAMINATION

BY MS. KNISKERN:

        Q       Would you please state your name and

address for the record.

        A       Mary Lerow.  409 Northwest 2nd Avenue,

Miami.

        Q       How long have you been employed by the

Miami Police Department?

        A       Since July of 1980.

        Q       Do you by any chance live in the

community in South Dade known as Country Walk?

        A       No, I don't.

        Q       Have you ever given your deposition

before?

        A       On this particular case, no.

        Q       Ever?

        A       Oh, yes, several times.

        Q       So you know the basic ground rules for

a deposition.

6

A        I do.

Q        We will ask you questions.  The court
reporter will take them down verbatim.  If you have
any problem understanding any of our questions,
please let us know and we will try to rephrase
them and work with you.  If not, we will assume
you understood the question.  Is that all right?

A        Fine.

Q        Do you know Andrea Landis?

A        Yes.

Q        How long have you known Andrea Landis?

A        Since I came on to the Miami Police
Department.

Q        That was in 1980?

A        Yes, ma'am.

Q        Do you know her husband, Vincent Landis?

A        Yes, I do.

Q        How long have you known Vincent?

A        Same amount of time.

Q        Did you work with Andrea or Vincent?

A        No.  I have not worked under either one
of them.

Q        How did you come to know Andrea Landis?

A        Well, female officers more or less get

7

to know one another in the department and she and
I had a conversation when I first came on to the
department.  And then after that, we started going
out for coffee.  And at one point I was on the
midnight shift, when I worked on the Sexual Battery
Unit, and she was on patrol, and a lot of times
I would ride along with her.  She was a sergeant
on patrol, however, I was not working for her.

     Q     Did Andrea Landis ever work on
sexual battery cases, to your knowledge?

     A     Not to my knowledge.

     Q     Do you know if Vincent Landis ever worked
on sexual battery cases?

     A     I have no idea.

     Q     Do you know the Landis' daughter,
Tiffany?

     A     Yes.

     Q     How long have you known Tiffany?

     A     Since she was two years old, one-and-a-
half or two years old.  I don't remember.

     Q     Have you ever been to the Landis' home
in Country Walk?

     A     Several times.

     Q     Did you have occasion to go to the

8

Landis' home between May and August of 1984?

    A.    I am sure I did.  There was a period of time when I was staying with them for about three weeks.

    Q.    When was that?

    A.    It was during the summer, but I don't recall the dates.

    Q.    During the summer of 1984?

    A.    Yes, ma'am.

    Q.    Between May of '84 and August of 1984, did you ever see Tiffany display any atypical behavior in the Landis' home?

    A.    Yes.

    Q.    What was that?

    A.    She was very moody, irritable, spoiled. I slept in the same room with her, so she had a lot of difficulty sleeping.  A lot of times she was a very well-behaved child.

    Q.    During that same period of time, and this is prior to August of 1984, did you ever see Tiffany display any atypical sexual behavior or behavior that would indicate a knowledge beyond her years?

    MR. ANGONES:  Objection to the form.

9

A       Yes.

Q       What is that?

A       A couple of things happened that I
thought were strange.   I  would say come over
here and give me a kiss and she would stick out
her tongue and I would be kind of taken back at
that.

Another time I asked her to come over
and give me a hug and she asked me if that would
be with or without her clothes on.  I was fairly
upset by her questions and I didn't know where she
was getting it from.

Q       Okay.  Do you recall when the French
kissing incident took place?

A       I am sorry, I don't recall.

Q       Do you recall if it was before or after
Frank Fuster's arrest?

A       I could not even tell you that.  I have
tried to think about that, and I just don't remember
because I spent so much time there.  I just don't
remember.

Q       Do you recall who may have been present
when Tiffany kissed you?

A       There was a maid in the house, but she

10

didn't speak any English, so I am not sure if she

understood what was going on or not.

Q       And this took place in the Landis' home?

A       Yes  it did.

Q       Did you tell Andrea about Tiffany's

behavior when she tried to kiss you?

A       Yes, I did.  I am trying to think now

when it was.  I did tell her about it.  And then

one night Andrea and I--going back to behavior--but

this was after the case broke--Andrea and I were

sitting in the living room and Tiffany was laying

on the couch and she was masturbating.  And we both

talked to her a little bit.

Q       This was after Frank Fuster's arrest?

A       Yes.  That one, I do remember.

Q       What did you and Andrea talk to Tiffany

about when she was on the couch?

A       We sat her up and we asked her what

she was doing.  And I don't remember the exact words,

but we explained to her the body parts; this is

called your vagina.  And her mother explained it

to her and she asked her to talk about anything

that was bothering her.

Q       What did Tiffany say?

11

A.      She just would repeat a lot of the body

parts her mother said to her.  She would ask

several questions, like, what is it called again,

that type of thing.

        The child is bilingual, so a lot of

times they would explain it to her in English and

then in Spanish, so she would have the meaning of

both.

        Q       Was anyone present when Tiffany asked you

whether the hug was to be with or without her

clothes?

        A       I don't believe so.  I believe that

was in the bedroom and we were upstairs and I

was getting ready to go to sleep.

        Q       Did you talk to Andrea about that

statement?

        A       Yes.

        Q       What did Andrea say?

        A       She was surprised and upset.

        Q       To what did she attribute the statement,

if anything?

        A       I don't think she could attribute it

to anything because she--the first thing I asked

her was, does she have the HBO X-rated T.V. or

12

anything like that, and they said no.  And I asked,

do they have that where she goes to spend time

during the day in the nursery, and she said she was

not aware of it, and she was going to look into it,

but that was the end of that.

        Q     Do you recall whether this was during

the time that Tiffany was being baby-sat by

Illeana Fuster and Frank Fuster?

        A     Well it was during--I know that she

started being baby-sat by the Fusters when the maid,

Isabel, left and, that was in the summertime.  So,

I have to assume it was during that time, because

that is a lot of time--that was when I was spending

a lot of time there.

        Q     Do you know if Tiffany ever went to

any other baby-sitter or nursery when Isabel came

back?

        A     No, I don't.  I don't believe so.  That

was the whole purpose of having Isabel there.

        Q     So, it is to the best of your knowledge

that that statement would have taken place while

she was being baby-sat by the Fusters because

Andrea said she was going to check into it?

        A     To the best of my knowledge.

13

Q        Do you know if Andrea ever did check into it?

A        To my knowledge, she did.

Q        And do you know whether she got a response?

A        I don't recall what the answer was.

There are things that I remember about her, that after I knew about the case, we started going back over.

For example, after picking her up, after her mother got off work, the kid would come out of the house and fall asleep in the back seat of the car, very drowsey. Her lunch was not always eaten. In fact, we talked about that. I remember specifically at one point there were a couple of those fruit juice packs in her lunchbox and Andrea remarked to me why, she don't know why  they don't give her fruit juice. And I remember that specifically. And we thought about it afterwards and we started realizing the reason probably.

Q        Would any of the behavior that you described, moodiness, irritability, difficulty sleeping and the behavior that you have just described, did you attribute or did Andrea attribute

14

those behaviors to anything during that time?

    A.    I think the thing that we decided during that time was that she missed Isabel.

    Q    Could you describe for me briefly your training as a police officer or what training you would have gotten?

    A.    I was a court reporter from 1981 until-- excuse me, 1971 to 1981. I worked for the State Attorney's Office for several years. I worked for a court reporter firm for two years and I went to the City of Miami in 1980 as a civilian, and I worked in their Homicide Unit as a court reporter. I went over there to get my foot in the door, to become a police officer.

        I worked in Patrol for three-and-a-half months, which is a very short time for most patrol officers. And I was taken then, because of my court reporting skills, they took me to Internal Security and worked on a special investigation with the investigators up there on a Latin demonstration that took place sometime in January of '82, I believe it was.

        And then as soon as I was finished with that assignment, I was taken to Sexual Battery.

15

There I worked for--let me see.  I was there for, I
believe, two-and-a-half years.

     Q    And what two-and-a-half years would
that be that you worked in Sexual Battery?

     A    I remember it was May of '82, I believe,
until October of '85.

     And then from October of '85, the
chief requested that I come to a new unit that
was organized, PRIDE, which is an avenue for
Sexual Review and Investigative Detail.

     Q    You were working in the Sexual Battery
in May of '84?

     A    Yes, I was.  That was the main reason
why Andrea called me at work one day and asked me,
you know, some advice on it.

     Q    When did Andrea call you at work?

     A    It was sometime late in the summer, and
I don't recall the date.  I can tell you the time,
but not the date.  It was the date that Mr. Fuster
was knocking on everybody's door to try to get the
parents to talk to him.

     Q    What was the substance of your
conversation with Andrea that day?

     A    She was extremely upset, to the point that

16

1
2   I could not talk to her on the phone.  I had to
3   leave work and go to her house.
4           By the time I got there, they were all
5   going over to another parent's house and, I have
6   met so many parents, I can't even tell you.  I
7   want to say it's Regie, and the last name is
8   Litwin.
9           I think we went to their house.  I
10  can't recall for sure.  And there were several
11  parents there and they were all talking at the
12  same time.  It appeared to me that something had
13  happened--I didn't know their name at the time--with
14  the Fuster family.
15      Q      Prior to May of '84, how many sexual
16  battery cases had you been on, ball park figure?
17      A      Over one hundred.  I can't think of it--
18  a lot.
19      Q      Had you worked on any cases involving
20  child sexual abuse?
21      A      About 90 percent of my cases were
22  child abuse cases.
23      Q      Were you involved in doing criminal
24  background checks?
25      A      Yes.

Q       Who can generally run a background
check on an individual?

A       Police officers.  I don't know other
than that.

Q       And under what circumstances can a
police officer run a background check?

A       Doing a history on the background on
a person.  The first thing I can do, and I can
only give you my example, when I worked in Sexual
Battery, I would normally run the suspect and the
victim.

Q       In May of '84, what would Andrea Landis
have had to do to run a background check?

A       Walk to the 5th Floor, fill out a piece
of paper, request the information and hand it to the
people at the desk.

Q       What information was being requested?

A       Person's name, date of birth and usually
their residence.

Q       Does she have to explain why she wanted
the background check?

A       No.

Q       In May of '84, did Andrea talk to you
about her decision to send her child, Tiffany, to

18

Frank and Illeana Fuster?

     A.    She told me that she was placing her daughter in a day care that was conveniently located in the Country Walk area because Isabel wasn't there.

     Q.    Did she tell you how she came to find out about the Fusters baby-sitting?

     A.    Either through a friend or a flier that had the name of it.

     Q.    Do you recall which?

     A.    No, I don't, because I have seen both. I have seen the flier with the name on it and I have also heard people talking about it.  So, I don't remember.

     Q.    This flier that you saw, could you describe that to me.

     A.    It's Homeowners Bulletin, is the best way I can describe it.  I can't recall anything other than that.  It had the updates of the activities.

     Q.    Do you recall what issue you saw?

     A.    I sure don't, no.

     Q.    Could you describe for me what exactly you saw in the flier?

19

A.      No.

Q.      Was it an advertisement, like, woman baby-sits in my home, or something like that?

A.      I just don't recall.  I had no reason at that time to think anything about it.

Q.      During the time that Andrea was using Illeana Fuster as a baby-sitter, did she refer to her as Illeana or as the Country Walk Baby-sitting Service?

A.      Both.  I think she said:  I have to pick her up.  And I said:  Where are you picking her up at?  And she said:  The Country Walk Baby-sitting Service.

        I was under the impression it was in the clubhouse for a long time or one of the recreational areas.  And then one afternoon, when I first started staying there, I went with Andrea to pick her up.  And I said:  Oh, she is at a house. I thought she was at the recreational facility. She said:  Oh, no.

        She went to the door and the lady came to the door, and I know it was a woman, because I saw the long dark hair.  And Andrea stood there and knocked, and the door opened, I would say,

about that wide (indicating).--

           MR. ANGONES:  How wide?

           MS. KNISKERN:  Let the record reflect

that she is indicating about a foot.

     A    (Continuing)  --and the door then shut.

And then, the door opened again and Tiffany walked

out and the lady handed Andrea her lunchbox.  And

Andrea stood there for a second and smiled, and

said good-bye, and got in the car, and that was it.

     Q    During the summer of 1984, did Andrea

ever tell you why she stopped using Illeana as a

baby-sitter?

     A    I don't remember whether it was because

the maid came back or whether  this broke.  I really

don't remember which one it was.

     Q    Did Andrea ever tell you about any

funny feelings she had about the Fusters?

           MR. ANGONES:  Objection to the form.

     A    No.

     Q    Did she ever tell you she had heard

any rumors about the Fusters?

           MR. ANGONES:  Objection to the form.

     A    I don't recall that, no.  I don't recall

whether our whole conversations took place after

21

this or during.  I just don't recall.

Q       Had you ever seen Frank Fuster prior
to August of '84?

A       No.

Q       Did Andrea ever tell you that she thought
Frank looked like a pervert?

A       You have to know Andrea.  I don't
recall if she said that before or after, either.

Q       Have you talked to any attorneys
representing Andrea Landis or any of the other
families about this lawsuit?

A       All attorneys--

Q       Any attorneys.

A       No.

Q       Have you talked to Andrea Landis about
this lawsuit that you're here on today?

A       Yes.

Q       What did Andrea tell you?

A       She just told me that--what I could
expect.  She said there would be a room full of
attorneys.

Q       My question is:  Has she talked to you
about the lawsuit, the civil action?

A       I can guarantee you, that I don't even

22

know how much she is suing for.  I don't know

anything.  She told me that she engaged Steve Hunter's

law firm,  and her brother, Stewart, works there,

and I know her brother, and that they were suing

Arvida.  And she told me the reasons why she was

suing Arvida, but that is going back, because I

was involved somewhat in that, in talking to a

friend of an employee of Arvida.

I knew back then--in fact, I think

I was the first person that said somebody better

get a hold of the people of Arvida and find out about

this guy.

If my supervisors had allowed it, I

would have gone to them myself, but it was out

of my hands.  I was only a City of Miami perimeter

detective and I was a City of Miami--as a matter

of fact, I called the County detective to find out

what she was doing about it.

MS. KNISKERN:  Could you read back

the last answer.

(Thereupon, the answer referred to was

read back by the reporter as above-recorded.)

Q     Okay.  Let's take this part here.

Have you ever spoken to  anyone who

23

you thought to be employed by Arvida, Arvida
Management, David Meseroll, or the Homeowners
Association?

    A    There was a woman at the time that I
thought worked for David Meseroll, but I found out
it was a neighbor or friend.  I think the name is
Barbara Leninger.

    Q    Barbara Leninger?

    A    Yes.

    Q    When did you speak to Barbara Leninger?

    A    Again, it was around the same time.
I can't be more specific than that.  I just recall
going to her house and talking to her on one
occasion, at least.

    Q    Would this have been about the time that
the Metro-Dade investigation of the Pusters cranked
up?

    A    Yes.

    Q    What did Barbara Leninger tell you?

    A    Actually, it was Andrea that told me
the story first, and that is why I wanted to go to
speak with Barbara.

    Q    What story did she tell you?

    A    Mr. Meseroll had a child in the

24

Country Walk Day Care Center.  And that his child came home and, apparently, when his mother was going to bathe him or change his clothes or something, he said something to her about, would you suck my penis, or are you going to suck my penis, or would you do something, to some part of his body.  I don't remember the exact words.  And the mother started questioning him about it, and the child said something about, Illeana does it all the time.

So, Mr. Meseroll was made aware that Illeana was doing it, and he took his child out.  But, he never warned any of the other parents.  He didn't say:  Listen, I think something is going on there.

Q      Is that what Andrea told you?

A      That is what she told me.

And then, I went over to talk to Barbara about it because I felt like it was something extreme.  It infuriated me.  I couldn't believe it.  I went over personally to speak with Barbara because I wanted specifically to ask her certain questions.

And she did tell me that that is what

25

happened.  And I found out she was not an employee,
she was a friend.

Q      What did you tell Barbara after she told
you the story?

A      I told her I can't believe that these
people think more of their blank money than they do
of the welfare of a bunch of kids.  And I asked
her how long she had known this man and what type
of a person would do something like that.

I was full of all kinds of statements,
and I immediately got on the phone and tried to call
the County detective.  I had spoken to her one
time prior to this, and that was the night that
Mr. Fuster was running around banging on doors.
It's my experience, when somebody does that, he
is desperate to talk to somebody, that he really
wants to talk.

And I told her that she should get
over here to talk to him and see what she could
learn, and she didn't want to bother.

MR. SOTO:  What was the lady's name
that you spoke with?

THE WITNESS:  I would know it if I
heard it.

Q      Was it Donna Meznarich?

A      That's it.

I was astounded at her attitude, as a detective.

MR. SOTO:  Donna Meznarich?

THE WITNESS:  Right.

Q      The conversation that you had with Donna Meznarich, did she ever tell you that Barbara Leninger said that David Meseroll said that she take her son out of there?

A      Yes.  He suggested that she take her son out of there, but not to pass it around, because they didn't want to wind up with a lot of lawsuits and problems.

Q      Did she say that he told her that or his wife?

A      He told her that.

Q      Did you ever speak to anyone at the Country Center?

A      I don't know.  I didn't go specifically to the Country Center.  It could have been somebody in one of the rooms.

Q      During the times that you have been out to the Country Walk Center--have you ever been

27

to the Country Walk Center?

A.     Yes.

Q.     Do you know Jan Menoher?

A.     No.

Q.     M-e-n-o-h-e-r.  And Beth Fraser,
F-r-a-s-e-r?

A.     No, I don't.

Q.     Do you have any specific recollection
of speaking to any employee at the Country Center
during the summer of '84?

A.     No.

Q.     Have you ever had any conversations
with David Messeroll?

A.     I asked to, and that is when my
supervisor told me to back off.  I was going to go
over to his house, as a matter of fact.

Q.     Did Andrea ever tell you about any of
the specifics of her allegations against Arvida
or Arvida Management or David Messeroll other
than what we have already discussed.

A.     No.

Q.     Have you spoken to the Perez family?

A.     I spoke to a lot of families and they
had a lot of meetings.  I don't recall specifically

the name.

      Q     Did you go to any of the meetings of the Organization For Justice For Sexually Abused Children?

      A     Yes, I did.  If I had the time, I would have joined.

      Q     Do you know how many meetings you went to?

      A     Several.

      Q     Did you ever go to any meetings where the parents were together and they talked about their lawsuits against Arvida?

      A     They didn't spend so much time talking about the lawsuits as they did for J.S.A.E.

      Q     Did they talk about the lawsuits?

      A     No, ma'am.  Not that I recall.  They were too overwhelmed and distraught with the present situation.  I don't think anybody was thinking lawsuit.  At the time, they were just thinking of their kids.

      Q     Did you talk to a Cousino family?

      A     Several times.

      Q     Did you talk to the Cousinos about how they came to use the Fusters?

PENGAD/INDY.  MUNCIE  IN  47302

SF-740

A    My recollection is for the same reason. Word of mouth or the same being presented in the bulletin.

Q    But you don't recall which one?

A    No, I don't.

Q    Did you ever speak to the Litwin family?

A    Several times.

Q    Did you ever speak to the Litwin family about how they came to use the Fusters?

A    I don't recall.

Q    Did you ever talk to the Litwin family why they stopped using the Fusters?

A    Yes.

Q    Why?

A    The same reason.  I was under the impression that everyone found out about the same time.  It could be my assumption, but that is what I recall.

Q    Did you ever talk to the Marks family?

A    Several times.

Q    Did they ever tell you--

A    I don't know.  There are some that I know better than others.

Q    Did you ever talk to Diane Toby?

A.      Yes.

Q.      Did you know Diane Toby during the
time that you were staying with the Landises?

A.      I have known Diane off and on, just
to say hello, the whole time I lived with Andrea.

Q.      I think she lived behind Andrea.  Their
daughters played together.

Q.      Prior to August of '84, did you ever
talk to Diane Toby about the Fusters baby-sitting
or Illeana baby-sitting?

A.      I think on one occasion.  Both the
children were there at the same time, and we went
over to pick them up at the same time.  I don't
recall for sure when it was, not really.

Q.      Did you ever talk to Diane Toby
about how she came to use the Fusters?

A.      No, not that I recall.

Q.      Other than the conversations you have
already talked about, do you have any other
conversations with Barbara Leininger?

A.      I went to her house two or three more
times during all this and we just re-discussed
the same situation over and over and over.  It
seemed like it was, you know--

31

Q       Did you ever talk to Ms. Leininger about how she came to use the Fusters?

A       I don't recall.

Q       Did Andrea Landis ever speak to you about any investigation that she had done on the Fusters, prior to sending her daughter there?

A       No.

MS. KNISKERN:   Nothing further.

EXAMINATION

BY MR. SOTO:

Q       Just very quickly.

You mentioned during the course of the deposition something about the time of the hugging incident and not being able to put it in a time frame.

Does the French kissing incident help you to put a time frame on the hugging incident?

A       No.

Q       Did the French kissing incident happen more than one time?  Did that happen more than one time, if you recall?

A       I don't believe it did.  I remember it happened the first time and I immediately talked to Andrea about it.

32

Q       To the best of your recollection would
it have happened about the time that you stayed there?

A       I really don't recall.   I was there so
much.

Q       You stayed there for three weeks.   Why
was that?

A       I had a break-up with a fiance.

Q       And the three-week period, just for my
recollection, was during the same time that Isabel
was gone for that period?

A       It took me a long time.   We broke up
early in the year.

Q       Is there anything else that you can
recall speaking with Detective Meznarich about,
anything you talked about?   Did you talk to her
about any leads or speak to her about any names?

A       I tried to, but her attitude didn't
warrant saying anything else.   I considered  my
lieutenant, and asked her to contact her lieutenant.

Q       What was your lieutenant's name?

A       My lieutenant was William Berger, and
hers was Linda Blue.

Q       Are you familiar with Linda Blue?

A       Yes.

33

Q        Again, I ask you to be as specific as
you can about what you can remember about the
very words that Barbara Leininger used to you.

Were her words:  That David Meseroll
suggested that I take my child out?

A        He didn't--he said he wanted her--

Q        Try to remember what her words were,
and if you can state those to the best of your
recollection.

A        You better get your kid out of there
because--I don't recall the exact words.

I took her and I had a conversation--I
went right up to her and I said:  Sit down.  Tell
me everything that, you know, that he said to her,
because I thought this was important for the
purpose--that this man knew about it, and no one
was doing anything.  I thought it was more critical
than anything.

Q        I guess you felt the same thing
towards Barbara Leininger, because she didn't do
anything about it?

A        Yes.  I was furious with her.

Q        Did you tell her about it?

A        Yes.

14

Q     Did you frighten her in any way?

A     She was very upset.  She wanted to

immediately, but she didn't know what to do because

this man was a friend.

Q     So, to the best of your recollection,

what were her words?

A     I can't be more specific than I have

already been.

Q     You can't recall her words?

A     No.  I didn't take any notes.

Q     That's fine.

You mentioned that you had gone to

Frank Fuster's house on at least one occasion.  Was

it more than one occasion?

A     Yes, but I never went inside.

Q     Never went inside?

A     No.

Q     Did you ever see anything on the outside

that made you believe that there  was a business

being run in there?

A     Mothers driving up and pulling away.

Q     How many mothers did you run into there?

A     Always one or two.

Q     Anything else?

35

A       There was no big sign up.

Q       Any sign, small or big?

A       No.

Q       Was there anything indicating there was
a baby-sitting service being run inside, like
Mickey Mouse pictures or anything like that?

A       No, not that I recall.

Q       Just looked like a normal home?

A       Yes.

Q       Can you recall the names of any of the
mothers that you might have met when going to
or from the Fusters?

A       The Tobys and Litwins.  Another lady,
I don't remember her name.  One day, I believe,
Sharon Cousino picked Tiffany up for Andrea, stuff
like that.  And mothers dropped her off at the house.

Q       This was during the period of time
that Tiffany was going there?

A       Yes.

Q       Now, you mentioned that 90 percent of
your cases had been child abuse cases.

A       Yes.  I was one of the more sensitive
detectives.  I ended up dealing with them.

Q       Of those cases, how many were child

36

sexual abuse?

      A.    Children that young and that age level?

      Q.    Children of the age level of Tiffany and, say, about the little Toby girl, there abouts? What percentage of your case load dealt with children that young, children sexually abused?

      A.    Fifty percent or more.

      Q.    Has it been your experience, then, that it's a difficult thing to detect, when a child that young has been sexually abused?

      MR. ANGONES:  Objection to the form.

      A.    Yes, very difficult.

      Q.    Why is that?

      A.    For various reasons.  I can only give you the reasons I have run across.

      They're too young to talk about it. They're so afraid to talk about it because they feel like they have done something wrong or they have been warned not to talk about it.  It happens at such a young age and keeps going to such an age that they think it's normal, but in another way, they don't think it's normal.  They think it's normal to accept it, but not normal to talk about it. It usually manifests itself in some way.

37

I have had parents under suspicion because the child would act a certain way or acted in a certain way. And they said, I just want to be sure, and went to a rape treatment center, and the rape treatment center would contact the detective and say, hey, we have a child here with gonorrhea or something like this, with tears. I have had children as young as six weeks old with their vaginas torn open.

Q       Not only is it difficult to detect, but is it particularly difficult for a parent to detect?

A       It is very difficult for a parent to detect it. And, it is very difficult for a parent to accept it. They want to—"It can't be happening"—

Q       A general response is to rationalize it or think it's something else?

MR. ANGONES:  Objection to the form.

A       Hope it's something else. A lot of times it turns out to be a relative or a husband, around those areas. So, the mother wants to deny that it's true. I have had them deny it.

Q       As a part of your job, do you, in fact, interview parents?

A       Yes.

38

Q    Do you have to interview children as well?

A    Yes.

MR. SOTO:   Thank you very much.

Let me ask one question.

BY MR. SOTO:

Q    Did you ever speak with anyone that you thought to be in any way connected with the Homeowners Association?

A    I don't know.  I will tell you flat out.

In the beginning of this thing, I didn't care who the hell anybody was.  I just wanted to know who the damned people were and I wasn't thinking of anything, but the crime at the time.  And that was it.

Q    Other than the parents that you met with and spoke with  and the things you have already mentioned, did you ever speak with someone in the community who was not an affected parent or in one of the meetings that you referred to?

A    I don't think so.  I can't be more specific.  I don't know.

CROSS-EXAMINATION

BY MR. MURPHY:

Q    I get the impression you are personal

39

friends with the Landises?

     A.    Yes.

     Q.    You work with Andrea?

     A.    Yes.

     Q.    In the same department?

     A.    Yes.

     Q.    In your dealings with Tiffany, did she ever say to you anything that Illeana personally did to her?

     A.    Yes.

     Q.    Can you tell me what that was?

     A.    Scared her with masks, and that came up one night when I was spending the night there. I spent a three-week period there, but I also spent other nights there. One night or two nights, I would go over for dinner and wind up staying because I lived in the north and they live in the south, and I would just stay over.

     And a lot of times she would wake up crying, especially afterwards, when I realized something had happened. I would sit up and wake up with her and she would go into it and say: Illeana would scare her with masks and kill birds.

     Q.    When was this?

40

A       That was after I knew what had taken

place.  I don't recall.  I would say sometime in

September or October.

        Q       Besides scaring her with masks, and

Illeana also killing birds, did she ever say

that Illeana physically touched her?

        A       She would say she would put her

finger in her vagina and suck penises.

                And, I can't remember the Cousinos'

child's name, but he was one of the most brought

up names that I heard.

        Q       By Tiffany?

        A       Right.

        Q       Were you at the Landis home when this

conversation took place?

        A       Yes.  It was in the middle of the

night.

        Q       Who else was present?

        A       Just Tiffany and myself.  And, first

thing in the morning, I told Andrea about it.

        Q       How old was Tiffany at the time?

        A       She is five now, so--let me think.  I

guess she was between three and four.

                That is what made it so difficult, the

41

age.

Q    Can you recall anything else that she said Illeana may have done to her?

A    Putting something in her vagina, but I don't remember what the object was.  Her finger, I know, but there was, apparently, some apparatus, but I don't remember what it was.

Q    Do you recall Tiffany ever saying particular things that Frank Fuster may have done to her?

A    They would put them in showers, that I heard a lot.  They would put the children in showers together.  He would urinate on them.  They would kill animals in front of the children and tell them that is what would Happen to their parents if they told.  That is what would happen to them if they told.

Q    Let me interject.

This time frame, was this after the arrest or before the trial or after the trial?

A    I don't even know if he was arrested at that point.  I know there was a delay in his arrest.  I don't remember if this was during the time he was in jail or before he was in jail or

42

after, because I couldn't understand why it was

taking so long for anybody to do anything.

     Q     Can you recall anything else that Tiffany

may have said?

     A     They gave them some type of punch with

a drug in it.

     Q     They, being Frank and Illeana?

     A     Yes.  They would fix them lunch.  And

I was thinking that is why she would come home with

her sandwich and High-C, or whatever it was.

     One thing I found out is that children

that age don't know how to make stuff like that up.

So I paid a lot of attention to what she said.

     We would be walking down the mall and

all of a sudden she would be saying something about

Illeana or Frank.  And one time, I can't remember--it

had to be around Halloween, she saw a mask and went

crazy, I mean, hysterical.

     Q     Did you ever have occasion to talk to

any other children that were plaintiffs in this case?

     A     Yes, the Cousino child and the Toby child.

     Q     Both children?

     A     The Litwins' child.

     Q     On a professional basis or personal basis?

43

A.      Kind of both because I--

Q.      Were you acting in a professional capacity?

A.      Not really.  I wasn't assigned the case, but it was something I felt so strongly about.  I particularly wanted to handle children's sexual battery when I first went to Sexual Battery.  It took one kid to tell me a story and it got to a point that I wanted to get involved in it.

Q.      When did you become involved with Justin?

A.      I went over to the Cousinos', and this was after, you know, everything had happened and it was known what had happened.

Q.      Had they requested you to come over and speak with the children?

A.      No.  I went over to Andrea's house and she was just getting ready to go over to her because, apparently, she was having a very difficult time, emotionally, Sharon, and I remember her husband was extremely upset about it.  And I told her I would go with them and maybe talk with them a little bit.  And Justin  had drawn all kinds of pictures and he was one--if I can use plain English--

44

one messed up kid I have ever come into contact with.

     Q    Again, that was after the arrest and before the trial?

     A    Yes.

     Q    Can you recall what Justin told you that Illeana did to him?

     A    Sucked his penis.  Stuck her finger in his rectum.  Put objects into his rectum.  Killed birds, the masks, the showers.

     Q    Can you recall during this time when he was telling you this story of what happened to him, did he ever relay that she was by herself when she did these things to him or was Frank always present?

     A    I can't remember that.

     Q    Was Jonathan verbal at that time?  Did he relate stories or was he still too young?

     A    Jonathan was the Litwins'--

     Q    Jonathan is the Cousino--

     A    Justin--

     Q    Justin is the older one and Jonathan is the baby.

     A    I don't think I could talk to him.  There

45

are so many babies.  I remember him being pretty
small.  I don't think I ever talked to him.  He
was really small, as a matter of fact.

I remember talking to the Litwins' son,
and he didn't even talk.

Q       You spoke with David Litwin, the baby?

A       Yes, he couldn't even talk.  He was old
enough to know how to talk, but he had a bad
stuttering or speech impediment, if I recall.

Q       He didn't say anything that Illeana may
have done to him?

A       No.

Q       How about Jennifer Litwin?

A       Yes.  She was more ashamed.  She would not
open up.  This was in the beginning.  I got to the
point where I thought I should back off, because I
believe Dr.--the lady at the rape treatment center--

MR. SOTO:  Dr. Hicks.

A       Hicks.

I discussed it with her.  I found that
one thing that kids will do is repeat.  And I don't
like to drill a kid by putting too many words in
their mouth.  I like them to tell me.  I don't tell
them, they tell me.

46

Q     Can you recall anything that Jennifer may have told you that Illeana did to her specifically?

A     The punch, the masks, the birds, the showers.  I don't remember anything more specific than that.  I think that she watched a lot of things happen to her brother and I think she saw a lot of things happen to the other children.

Q     Did you speak with any of the other children involved in this case?   Todd Leininger?

A     No.

Q     Brooke Toby?

A     I spoke with Brooke a lot because she was always over there talking to Tiffany.  And when I would ask her questions about--do you want to tell me what happened, she would not want to talk about it.  So, I didn't push her.

Q     She never told you anything?

A     No, not that I recall.

Q     How about Scott Marks?

A     I don't recall.

Q     After these conversations, did you make any type of a report to your supervisors or your department; or what did you do with the information

47

that you obtained?

A       I tried to pass it on to the County.
I talked to Linda Blue about it.  And my own
lieutenant told me not to get involved with it.
So, I didn't report to him anymore.

No matter who I found out was doing
something like that, I would work on it.

Q       One last question.

You said you were working on a unit
called PRIDE.

A       Yes.  Professional Review and
Investigative Detail.  We handle police corruption.
It keeps me very busy.

MR. MURPHY:  I have no further questions.

MS. SINGER:  Do you still consider

yourself as a friend of the Landises?

THE WITNESS:  Yes.

REDIRECT EXAMINATION

BY MR. SOTO:

Q       The time of these conversations with the
children, I didn't get that.  The time of these
conversations with the children, would that have
been before or after they had spoken with
Dorothy Hicks or before they had gone to the

48

rape treatment center?

     A.    Before, I believe.  They went a couple of times, if I remember.

     Q.    It was before the kids had gone to the rape treatment center?

     A.    Yes.

     Q.    Was it before or after they had their initial conversations with Doctors Braga?

     A.    Before.

     Q.    That would have been, I think, the initial conversations with Dr. Braga would have been August 9th.  That is pretty early.

     A.    Very early.

     When the Bragas got involved, I backed off, because I know their reputation and I have dealt with them occasionally.  I know I have a lot of faith in what they can do with children.  So, I just stayed out of it.  I just don't want too many people questioning.

     Q.    Did you pass the information that you had gotten from the children on to either of the Doctors Braga?

     A.    Andrea told them.  I believe I wrote a lot of it down and gave it to her, so they could work

49

with the kids based on that.

Q       Those notes, did you ever see them
again after you handed them to Andrea?

A       No, I never even thought about them
again.

RECROSS-EXAMINATION

BY MR. KROOP:

Q       When you spoke with Barbara Leininger
about the conversation she had with David Meseroll,
did she tell you that David Meseroll had requested
her not to say anything?

A       Yes.

Q       Swore her to secrecy?

A       Yes.

Q       Relay for me the sum and substance of
that conversation.

A       She was in the kitchen, and she has a
bar between the kitchen and dining room.  I was
sitting on one of the stools and she was in the
kitchen and she was talking about the children.

We were all discussing the things
that they were starting to notice.  And I always
told them to think about them and write them down,
whatever, on that type of conversation.

50

I was more appalled at them than anybody.
To this day I still feel the same way.  I can't
believe somebody would do that.

MR. SOTO:  If they did it.

MR. ANGONES:  That's right.

THE WITNESS:  If Theodore Bundy did what
he did.  If Charles Manson did what he did.
Somebody has to be doing these things.

MR. SOTO:  And Barbara did what she did.

THE WITNESS:  I understand Barbara's
position because I have mothers come to me
every day afraid, the fear of getting
involved, the fear of, "Am I doing the right
thing.  Am I doing the wrong thing."

I am the type of person--immediately
I would go to somebody.  I don't care who they
are.  She is not the same personality.

BY MR. KROOP:

Q    Did Barbara tell you that she had gone
to the rec center and reported this to Joann Menoher?

MR. SOTO:  Objection to the form.

A    I don't recall.  I believe she went to
somebody and I don't recall who.  It was an--I know
she went to Andrea.  I know there was somebody

51

in between, but I don't know whether it was in the time frame.

Q       Did she discuss with you any conversations that she had with Todd?

A       All the parents were discussing all their conversations, but I can't be more specific. I didn't know her as well as I knew the Litwins or the Cousinos.

Q       Did you testify at the criminal trial?

A       No, I did not.

Q       Were you interviewed by anybody from the State Attorney's Office?

A       Not in the formal sense, no.

I knew Randal (phonetic) in the beginning. I called him and I told him what was going on in the beginning of the case.  I told him what was going on and that is how they got a hold of his name.

Q       Did you ever see any of the State Attorney's files?

A       No, I don't believe I did.

Q       Other than your conversations with the parents, did you participate in any investigative way?

52

A.      When Andrea ran the record check on
Frank and he came back with a past--

        MR. SOTO:  Andrea ran a record check
on Frank?

        THE WITNESS:  Yes.  I remember her doing
that.

Q       When was this?

A.      This was after they found out about what
had happened.  I believe it was the same day as
I called Donna Meznarich.  And I told her this guy
has a past, has anybody found it.  And again, her
lack of interest was one of--I said, I'm just staying
out, and that was when my lieutenant ordered me to
stay out of it.

Q       Did you ever see a copy of that?

A.      Yes.

Q       It came out on your printout?

A.      Yes.

Q       What did it indicate?

A.      They had a past for Fuster and some other
things, but I don't really recall what they are now.

Q       Was one of the things you recall child
abuse?

A.      I don't recall.  It may have been.  I

53

want to say yes, but I am not sure if I am not thinking about this.

Q       Did it show whether or not he was on probation?

A       I believe he was.

Q       Do you recall what for?

A       No.

Q       Did you ever speak to Noel Fuster?

A       Their child?

Q       Yes.

A       No.  I saw him one night--this was after things took place--because we were going over to the house and I would drive by the house.  And I saw them throwing a bunch of things into the van. That is another reason I called Mesnarich, I thought they were taking things out of the house that may be evidence.  And, again, no response.

MR. KROOP:  Thank you.

REDIRECT EXAMINATION

BY MS. KNISKERN:

Q       Did you ever talk to a lady named Chris Galloway at the Country Walk Center?

A       The name is familiar, but I don't know in what way.

54

Q      Did you ever speak to a woman by the name of Cathy Pariser?  Do you know her?

A      I don't know.

BY MR. SOTO:

Q      You mentioned Andrea Landis ran a record check on Frank Fuster.

A      Yes.

Q      She did that on her own or through your aid?

A      She told me she was going to do it and I believe I went with her to the desk.

Q      And she did it the way you described earlier?

A      Yes.

Q      Barbara Leininger spoke to Andrea Landis?

A      Yes, several times.

Q      That is obvious.  Let me rephrase the question.

I got the impression from your testimony that it was somehow contemporaneous with the time she spoke with David Meseroll.  Was that accurate?

MR. ANGONES:  Objection to the form.

A      I was under the impression that Barbara spoke with Andrea about the situation some time after

55

the situation.  I think she had taken her child

out several months--sometime in March, April.

       Q    So, it was some time after she had taken

her child out, some time after Barbara had taken her

child out but before the Fuster investigation began,

that Barbara spoke with Andrea?

       MR. ANGONES:  Objection to the form.

       A    The way you just phrased that, no.  She

didn't talk to her about the situation until after

it broke.

       Q    That is my question.  When did she speak

with Andrea Landis then, if you recall?

       MR. ANGONES:  After it broke.

       MR. SOTO:  I don't know what that means.

BY MR. SOTO:

       Q    Can you clarify that for me?

       A    After it broke.  I don't know how to

be more specific.  After everybody became aware

of what was going on.

       Q    That would be sometime, to the best of

your recollection, sometime in August?

       A    Beginning of August.

       Q    '84?

       A    '84.

56

Q     That was the first time that Andrea Landis
spoke with Barbara Leininger?

A     No.

Q     They knew each other before then?

A     From my knowledge, they knew each other
from the area.  Other than that, I don't know how
close they were.

Q     Did Andrea ever tell you how many
parents were using the Fusters as baby-sitters?

A     No.

Q     What was your impression?

A     That she knew other people that took
their children there.  In fact, when I asked her
about, it's a shame we didn't run a check on him
before--and then you start thinking why don't you
run checks on boyfriends you're going out with,
and next door neighbors before you buy a house.
Next thing you know, you're checking the shoe store
salesmen and car dealers.

Q     It's possible to do that?

A     Very possible.

Q     The information you received regarding
David Meseroll, that you feel so strongly about,
that information came from Barbara Leininger?

57

A       Yes.

Q       Nobody else?

A       Barbara and Andrea.

Q       You never had a conversation with David Meseroll?

A       I attempted to or he was not in town or my lieutenant told me to stay out of it.  I called Donna immediately to tell her about it.

Q       You have no firsthand knowledge other than what you received from Andrea and Barbara?

A       No, sir.

MR. SOTO:  Thanks.

MS. KNISKERN:  Read or waive?

THE WITNESS:  I will read it.

(Thereupon, the taking of the deposition was concluded at 10:15 a.m.)

- - - - - - - - - - -

_____
                        DEPONENT

SWORN TO AND SUBSCRIBED before me this _____ day of _____, 1986.

_____
                        NOTARY PUBLIC

My Commission Expires:

_____

58

## CERTIFICATE OF NOTARY

STATE OF FLORIDA )
                       SS:
COUNTY  OF  DADE )

I, STERLIE J. THUMANN, Shorthand Reporter

and Notary Public in and for the State of Florida

at Large, do hereby certify that I reported the

deposition of MARY LEROW,  a witness called by the

Defendants in the above-styled cause; that said

witness was duly sworn by me; that the reading

and signing and notice of filing were not duly waived;

and that the foregoing pages, numbered from 1 to 57,

inclusive, constitute a true and correct record of

the deposition by said witness.

I further certify that I am not an

attorney or counsel to any of the parties to the

cause, nor am I a relative nor an employee of anyone

connected with said action, nor am I financially

interested in said action.

WITNESS my official  hand and seal in

the City of Miami, County of Dade, State of Florida,

this ___15___ day of July, 1986.

My Commission Expires:
August 11, 1989

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR DADE COUNTY

CRIMINAL DIVISION

CASE NO.  84-19728


THE STATE OF FLORIDA,          :
                               :
          Plaintiff,           :
                               :
vs.                            :
                               :
FRANCISCO FUSTER ESCALONA,     :
a/k/a FRANK FUSTER,            :
                               :
          Defendant.           :
_____:


                              Metropolitan Justice Building
                              1351 Northwest 12th Street,
                              Miami, Florida.
                              Thursday, September 12, 1985.


          TRANSCRIPT OF PROCEEDINGS had before the HON.

ROBERT NEWMAN, Circuit Court Judge, at the Metropolitan

Justice Building, Miami, Florida, on Thursday, the 12th

day of September, 1985, pursuant to notice.

                    *      *      *

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1       APPEARANCES:

2                   OFFICE OF THE STATE ATTORNEY
                    Metropolitan Justice Building
3                   Miami, Florida,
                    By:  DANIEL A. CASEY,
4                   Assistant State Attorney,
                            and
5                       JOHN HOGAN, Assistant State Attorney,
                            and
6                       RICHARD SHIFFRIN, Assistant State
                    Attorney,
7                   on behalf of the State.

8                   SAMEK & BESSER,
                    1925 Brickell Avenue, Suite D207,
9                   Miami, Florida  33129,
                    By:  JEFFREY SAMEK, ESQ.,
10                  on behalf of Frank Fuster.

11                              ----------

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                  OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                   44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1  be no capture on television of the children

2  testifying on the tapes because the children are

3  not blocked out in any way, shape or form, so

4  there will be no direct TV of the children

5  testifying.

6      If there is anything you can't hear because

7  each tape was taken at a different time, raise

8  your hand or let me know so Craig or one of his

9  associates can adjust it accordingly.  Okay?

10      Whenever you are ready, Craig.

11      (Thereupon, the videotape of JUSTIN COUSINO,

12  10/05 was played.)

13      MR. SAMEK:  Judge, just so the record is

14  clear, it appeared from where I was sitting, we

15  could see where we were sitting the jurors and the

16  first witness I noticed anyway was Mrs. Rose

17  motioning to me that she couldn't hear which is

18  what I came to tell you.

19      THE JUROR:  Distorted in my ears.

20      MR. SAMEK:  I am repeating --

21      THE COURT:  Difficulty was in actual taping,

22  not the equipment we have here.  You noticed Craig

23  came in to try to adjust the best he could.

24      MR. CASEY:  I think the set-up we had for the

25  little TV, that seemed to be better for me.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

17

1        THE COURT:  I noticed.  Mr. Samek, this is

2    the first time.

3        MR. SAMEK:  Perhaps we could take a short

4    recess.

5        THE COURT:  All right.  Short recess.

6        (Thereupon, there was a break in the

7    proceedings, after which the following proceedings

8    were had:

9        (Thereupon, the jurors are returned to the

10   courtroom.)

11       THE COURT:  Both sides can see the presence

12   of the jury?

13       MR. HOGAN:  Yes.

14       MR. SAMEK:  Yes.

15       THE COURT:  Please be seated.  The court

16   reporter you notice  is missing.  She went into

17   another room where she thought she might be able

18   to take it down better and hear.  I apologize

19   about the sound.  There is nothing we could do

20   with the other tape.  The sound was in taking the

21   tape, not in the showing of the tape, I

22   understand.

23       We will do the best that we can do, okay?

24       MR. SAMEK:  Defense asks Exhibit B be

25   accepted into evidence, Jonathan and Justin.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        THE COURT:   We can't turn off some of the

2    lights back here because of the TV equipment.   We

3    thought we could do it but that's why we can't do

4    it, okay?

5        (Thereupon, the video of   JONATHAN AND JUSTIN COUSINO were

6    played and recorded by the court reporter as

7    follows:)

8        L. BRAGA:   Hi, Laurie, look who I am?   This

9    is Jonathan?   Hi, how are you?   Do you want to put

10   him on your hand?

11       Boy you have pretty eyes, blue.   We have a

12   little girl.   Her name is Joanne (phonetic), she's

13   just as big as you.   Here comes Mommie.   Do you

14   know who is here?   Mommie is here.

15       J. BRAGA:   Mommie.

16       L. BRAGA:   You have got a mouthful of teeth,

17   huh?

18       It's kind of cold in here, huh?   Good thing

19   you brought your -- let's see who I've got here

20   you might like.

21       Do you like Donald Duck?   Our little Joanne,

22   she loves Donald a lot.   She calls him Ducky.

23   Let's see, I've got a duck puppet.

24       Can you make a Donald Duck sound?   Here we

25   have Minnie Mouse.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        Have you ever gone to Disney World?

2        JONATHAN:   (No response.)

3        L. BRAGA:   There, Minnie Mouse.   Do you know

4    Minnie Mouse and Donald Duck?   Are they friends?

5    Kiss.

6        Boy you have pretty eyes.   You have long

7    eyelashes.   Ask Joe if he can make a Donald Duck

8    sound.

9        J. BRAGA:   Donald Duck sound?   It's been a

10   long time.

11       L. BRAGA:   I can't make a Donald Duck sound,

12   all I can do is pretend to be Donald.

13       Hi, Jonathan, how are you?   Let's see what

14   have we got here.   Do you like blocks?   Let's see.

15       You know, when Justin was in here, he played

16   with these blocks.   He liked them a lot.   Do you

17   and Justin play together?

18       You are kind of scared, huh?   This is hard.

19       Let's see what we have.   Do you want to play

20   with this?   Do you want to play with me?

21       Can I hold you?

22       J. BRAGA:   There you go.   Hi.

23       L. BRAGA:   Want to sit down?

24       J. BRAGA:   You understand these feelings but

25   there's a question.   So what do you think?   Do you

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                           44 W. FLAGLER ST.
                                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   like the rabbit?  He's all right.

2       L. BRAGA:  He's all right.  I haven't made a

3   hit yet.

4       Has he got any favorite toys that he likes

5   a lot?  Let's see, we've got a bunny.  We have a

6   Mickey and Donald and Minnie.  Who cares?

7       J. BRAGA:  I can make you smile.  Can you

8   play dump and fill?

9       Can you play dump and fill?  I can remember

10  all the times I kept wishing my granddaughter

11  would do certain things and then I realize when

12  they did she could do other things.

13      You take the top off and when you go -- you

14  go dump.  Want to try?  Not yet, huh?

15      Tell you one thing the child can --

16      JONATHAN:  (Inaudible.)

17      J. BRAGA:  Do you want to try?  I will move

18  it closer?  You got it.  Yes, do you see what

19  Jonathan did?

20      L. BRAGA:  Yes, very good.

21      J. BRAGA:  Very good.  Do you want to try

22  this one?  Keep trying.  That's okay, keep trying.

23  Yes, very good.  Sweet hair.

24      How about another?  Which hole is that going

25  to?  That's good, how about another?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1              L. BRAGA:  Oh, yes.

2              J. BRAGA:  Will it go in?  Yes, it went in.

3      One more time.  Yes, yes.

4              This is a round one.  Now we have to figure

5      this one out.  Very good.

6              L. BRAGA:  Very good.

7              J. BRAGA:  Square one.  Try again.  Just keep

8      trying.  Maybe it goes in.  The other one.  Very

9      good.  (Inaudible.)

10             Do you want -- shall we dump them out and try

11     again?  Do you want to try?  Oh, there's another

12     one there.  Will you get it or do you want me to

13     get it?

14             Do you want me to get it?  Yes.  Laurie will

15     get that one for us.

16             L. BRAGA:  Sure.

17             J. BRAGA:  Thank you.  There we go, Jonathan,

18     you smarty.  You figured out the round one won't

19     go into the hole.  Do you want to dump them for

20     me?

21             Oh boy.  You are good at that.  Shall we put

22     the top on?  Here's the top and now let's try it.

23             L. BRAGA:  Hurray.

24             J. BRAGA:  Good solving ability.  You are

25     good at that.  Whoops.  Yes, how about this one?

1        Yes, yes, yes.  Yes.  That's it.  Get a better --

2        sit.  Are you comfortable?  That's it, sit.

3              No, that is really it in terms -- the first

4        thing you asked me, what about the long term?  You

5        may not have used those terms but that's what you

6        are asking?  Jonathan's responsiveness to me is

7        definite indication deep seated (inaudible).

8              You find that children have trauma; in other

9        words, stuff that is inside affects their head.

10             L. BRAGA:  He's okay.

11             J. BRAGA:  The response, he's one it's taking

12       a little time.  Now he's reaching out himself and

13       I know that that is not a great comfort but it

14       should be because it means that you don't have to

15       worry about any long term problems.  This child

16       is -- do you want to dump them this time?

17             Do you want to dump them on the floor and we

18       will start all over again?  All right.

19             L. BRAGA:  Good for you.

20             J. BRAGA:  Do you want to put the top on?

21       You can do it with the top.  I have no doubt about

22       it.  I won't just say that to make you feel

23       better.

24             He's savory  and extremely bright and he

25       knows something went on.  Remember in usual

23

1   situations --

2       JONATHAN:   (Inaudible.)

3       L. BRAGA:   You got your hand stuck, huh?

4       J. BRAGA:   He can control people throughout

5   the subject matter.   We did some things much like

6   we are doing here, he knew where we are going.

7   Don't get me wrong in the use -- the word

8   manipulation.

9       In the world we live in we have to try to

10  observe in the world.   I don't do anything --

11      JONATHAN:   (Inaudible.)

12      J. BRAGA:   That's a person that --

13      L. BRAGA:   Look at you, you are so smart.

14      J. BRAGA:   The word manipulation is not a

15  negative, it's in the circumstances he's going to

16  (inaudible) --

17      L. BRAGA:   You put the top on, huh?

18      J. BRAGA:   It makes it very difficult to

19  elicit information.   You are at his mercy because

20  one, you will in no way want to give him what you

21  want.   You want him to give the information and --

22      L. BRAGA:   Yes.   Hurray.

23      JONATHAN:   (Inaudible.)

24      J. BRAGA:   He's comfortable enough.   Why

25  don't you talk to Justin?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7288

1          L. BRAGA:  Hurray.

2          JONATHAN:  (Inaudible.)

3          L. BRAGA:  You are so smart.  It won't go in

4    there, huh?  Yes.

5          JONATHAN:  It won't go in.

6          L. BRAGA:  It won't go in?  We will try it in

7    another one.  It won't go in.

8          JONATHAN:  Pour it out.

9          L. BRAGA:  Pour it out, yes.  Get it checked

10   out, just to give you the reassurance.  Nobody

11   likes it.

12         JONATHAN:  (Inaudible.)

13         L. BRAGA:  They all fell out.

14         JONATHAN:  Goes.

15         L. BRAGA:  Yes, goes in.  Is it going to eat

16   the block?

17         JONATHAN:  (Inaudible.)

18         L. BRAGA:  It went in, didn't it?  You

19   dumped them all out?  Yes, yes.

20         JONATHAN:  Dad's going to come?

21         L. BRAGA:  Dad's going to come in in awhile.

22   He's fine really.

23         J. BRAGA:  (Inaudible.)

24         L. BRAGA:  Thanks.  Are they yours?  Do they

25   belong to you Jonathan?  Mine, yours.  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE            OFFICIAL COURT REPORTER         MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    J. BRAGA:  Hi, what, a smile?  That's great.

2  Good player.  Notice something, look what's left

3  behind?  This is very comforting.  Very good.

4    L. BRAGA:  Want mommie to come over here too?

5  Want mommie to come over here and sit down?

6    J. BRAGA:  Who's the Cat In The Hat?  Do you

7  like him?

8    You like him?  Thank you.  Peek-a-boo.  Peek-

9  a-boo.  Who's that silly man with the silver hair?

10    Who is he?  Why don't you stay here for a

11  minute.  Yes, why don't you stay here for a

12  minute?  We have made the transition from me being

13  here to Laurie.

14    L. BRAGA:  Want to see this doll?  Oh, you

15  found that, huh?

16    JONATHAN:  Look.

17    L. BRAGA:  Look.  It's a puppet.  Do you want

18  me to show you how?  Do you know how?  That's an

19  (inaudible).  Put it on your hand.  There's

20  another one over there.  Give me mine and you have

21  yours.  You've got the right idea.  That's right

22  on your hand.  That's it.  Good.

23    JONATHAN:  Puppet.

24    L. BRAGA:  Puppet, that's right it's a

25  puppet.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                   OFFICIAL COURT REPORTER                   MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

26

1          Jonathan, come here.  Look, that's a tiger

2     puppet.

3          JONATHAN:  Tiger.

4          L. BRAGA:  Yes, that's a tiger.  Oh no, the

5     tiger bit me.  Look at that one.

6          Put your hand inside, yes.  Did he bite me

7     to?  Oh, he bit me.

8          JONATHAN:  Puppet.

9          L. BRAGA:  Puppet, yes.

10          JONATHAN:  Dad comes.

11          L. BRAGA:  Daddy is going to come in awhile.

12     Maybe you will go out and see daddy after awhile,

13     okay?  Oh, the tiger bit me.

14          Can you make, can you make the puppet talk to

15     this little boy?  Make him talk.  Come here.

16     Let's see if the puppet will talk to this boy.

17     This puppet has something to tell this boy.  Let's

18     see if he's going to talk.  He says, oh little boy

19     let's pretend this is Jonathan.  Hi Jonathan?  How

20     are you?  Is this -- make Cat In The Hat talk to

21     Jonathan.

22          JONATHAN:  Look.  Look.

23          MRS. COUSINO:  Is he going to talk to the

24     baby?

25          JONATHAN:  Puppet.

1    L. BRAGA:   Puppet.

2    JONATHAN:   (Inaudible.)

3    L. BRAGA:   Let's see, what do we have?   We've

4    got a mommie doll, look at mommie doll.   Do you

5    know what this doll's name is?

6    This doll's name is Iliana?

7    JONATHAN:   Iliana.

8    L. BRAGA:   Iliana, yes.   Do you know somebody

9    named Iliana?

10    (The child is going to the mother.)

11    L. BRAGA:   This -- this is -- this little

12    boy -- this little boy is Jonathan.   Does Iliana

13    like Jonathan?

14    JONATHAN:   (No response.)

15    L. BRAGA:   Do you want to play with these

16    puppets, these dolls?   They are not puppets, they

17    are dolls.   Here this is Jonathan.   What happens?

18    Does Jonathan wear a diaper?

19    JONATHAN:   (No response.)

20    L. BRAGA:   Yes, diapers.

21    JONATHAN:   (The child is indicating,

22    inaudible.)

23    L. BRAGA:   Diapers, yes.   Does Iliana change

24    Jonathan's diapers?

25    JONATHAN:   (Inaudible.)

1      L. BRAGA:  Jammies on?

2      JONATHAN:  Jammies on.

3      L. BRAGA:  What did Iliana do to Jonathan?

4      Can you show me?

5      JONATHAN:  Lay down.

6      L. BRAGA:  Lay down and then what?

7      JONATHAN:  Lay down.  (Inaudible.)

8      L. BRAGA:  Take off her clothes?

9      JONATHAN:  Dress (inaudible.)

10     L. BRAGA:  Iliana takes off her dress?

11     JONATHAN:  Yes, dress.

12     L. BRAGA:  Uh-huh?

13     JONATHAN:  Go to the bathroom.

14     L. BRAGA:  Go to the bathroom?

15     JONATHAN:  Lay down.

16     L. BRAGA:  Lay down?  Then what did she do?

17     JONATHAN:  (Inaudible.)

18     L. BRAGA:  What did Iliana do with her mouth?

19     JONATHAN:  (Inaudible.)

20     L. BRAGA:  Show me with Jonathan.

21     JONATHAN:  Bathroom (inaudible).

22     L. BRAGA:  Take off the diaper?

23     JONATHAN:  Pull off.

24     L. BRAGA:  Pull it off?  Show me what Iliana

25     would do?  Show me what Iliana would do?  Show me

29

1      what Iliana would do.  Lay down with Jonathan?

2             JONATHAN:  (Demonstrating.)

3             L. BRAGA:  Would she lie on her stomach like

4      that?  She'd jump in the air?  Show me?

5             JONATHAN:  (Demonstrating.)

6             L. BRAGA:  This is Jonathan, right?  This is

7      a doll and this is Iliana.  Show me what they

8      would do?  You don't want to, huh?

9             Justin said you are very smart and you can

10     talk a lot.  He said if I ask you what Iliana

11     would do, you would show me?  Would you show me?

12            JONATHAN:  (No response.)

13            L. BRAGA:  Where is Jonathan?  Where is

14     Jonathan?  Where is Jonathan?

15            There he is.  Where is Jonathan?  There he

16     is.  Where is Jonathan?  I see you.  I see you.  I

17     see you.

18            You are throwing him around, huh?

19            JONATHAN:  (No response.)

20            L. BRAGA:  Let's see what else have we got?

21     Do you know who this is?  This doll's name is

22     Frank.  This is Frank.

23            JONATHAN:  Hair.

24            L. BRAGA:  Yes he has hair on his chest.

25     He's a grown-up man.  He's not a little boy.  What

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                            44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        would Frank do?

         JONATHAN:  (No response.)

3        L. BRAGA:  Show me what Frank did?  Can you

4        show me?

5        JONATHAN:  Shoes.

6        L. BRAGA:  Shoes, yes.  You were going to

7        take off your shoes?

8        JONATHAN:  (Demonstrating.)

9        L. BRAGA:  You are going to take off your

10       shoes, huh?

11       JONATHAN:  Shoes on.

12       L. BRAGA:  Shoes on, yes.  Oh, you are so

         smart.

14       Jonathan, does Jonathan like Iliana?

15       JONATHAN:  (Inaudible.)

16       L. BRAGA:  Iliana?

17       JONATHAN:  Iliana.

18       L. BRAGA:  Frank and this is Jonathan, right?

19       JONATHAN:  (No response.)

20       L. BRAGA:  Show me what Frank would do?

21       JONATHAN:  (Inaudible.)

22       MRS. COUSINO:  Can you see this doll here?

23       JONATHAN:  Yes.

2'       MRS. COUSINO:  Do you know what that doll's

25       name is?  What's the doll's name?

1        JONATHAN:  Frank.

2        L. BRAGA:  Frank.

3        MRS. COUSINO:  What is this doll's name,

4    Jonathan?

5        JONATHAN:  (Inaudible.)

6        MRS. COUSINO:  No this doll's name is Iliana.

7    Iliana.  Do you see Iliana?

8        L. BRAGA:  Show me what Iliana and Frank

9    would do?

10        MRS. COUSINO:  What would Iliana and Frank

11    do, Jonathan?  Jump in the air, huh?

12        Iliana, she has a boo boo now.

13        L. BRAGA:  Did she hurt herself?

14        MRS. COUSINO:  Let's pretend.  Here is

15    Iliana.  She's sitting down by Frank.  Here comes

16    Jonathan.  What does Iliana --

17        JONATHAN:  Sit here.

18        MRS. COUSINO:  What does Iliana do with

19    Jonathan, huh?

20        JONATHAN:  Sits here.

21        MRS. COUSINO:  Jonathan sits by Iliana, huh?

22        JONATHAN:  Yes.

23        MRS. COUSINO:  Yes?  Okay.

24        JONATHAN:  That's here.

25        L. BRAGA:  Now what?  Now what?  Show me what

1        Iliana would do?

2                JONATHAN:  Sit here.

3                L. BRAGA:  Sit here?

4                JONATHAN:  Here.

5                L. BRAGA:  Sit here and Frank?

6                JONATHAN:  Lays down.

7                L. BRAGA:  Lies down?

8                JONATHAN:  Lies down too.

9                L. BRAGA:  Lies down too, okay.

10               MRS. COUSINO:  What does Jonathan do?  Here's

11       Jonathan.  Where is Jonathan?

12               JONATHAN:  Lay down.

13               L. BRAGA:  Does Jonathan have his clothes on?

14               JONATHAN:  (No response.)

15               L. BRAGA:  Where is Jonathan?  There you are.

16       I see you.  I see you.

17               Did Iliana take Jonathan's clothes off?

18               JONATHAN:  (No response.)

19               L. BRAGA:  Can you show me?  Can you show me

20       how?  Come here.

21               JONATHAN:  (No response.)

22               L. BRAGA:  Let me see.

23               JONATHAN:  Clothes off.

24               L. BRAGA:  Clothes off?  Do you want to show

25       me?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7288

33

JONATHAN:   (No response.)

L. BRAGA:   Whoops, you fell down.  Do you want to show me what happened?

MRS. COUSINO:   Does Jonathan have a diaper on?  Look at Jonathan.  Does Jonathan have a diaper on?  (Inaudible.)  You are a big boy.

L. BRAGA:   You are a big boy.  Justin said Jonathan doesn't talk to me much and he wanted us to talk to Jonathan.

Justin said Jonathan can talk a lot.  All you have to do is ask Jonathan what happened.  What did Iliana and Frank do to Jonathan?

Justin said, just ask Jonathan and he will tell me.  Will you tell me?  Would you tell me?

JONATHAN:   Shoe off.

L. BRAGA:   Shoe off?

JONATHAN:   Sock off.

L. BRAGA:   Sock off?  What else off?

JONATHAN:   Shoe off.

L. BRAGA:   Shoe off?  Show me with the dolls, pretend.  No, pretend this is Jonathan.  Show me what Iliana did?

JONATHAN:   Shoe off.

L. BRAGA:   Shoe off?  When Iliana change Jonathan's diaper, what did she do?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      JONATHAN:  Shoe off.

2      L. BRAGA:  Shoe off.  Do you want to take

3  your shoe all the way off, Jonathan?

4      JONATHAN:  (No response.)

5      L. BRAGA:  You are getting shy, huh?  Where

6  is Jonathan?  There you are.  Where is Jonathan?

7  There you are.  There you are.

8      Boy you got a lot of teeth in your mouth.

9  You have a whole mouthful of teeth.

10     Where is Jonathan?  Where is Jonathan?  There

11 he is.

12     I don't think I have anything --

13     MRS. COUSINO:  Uh-uh.

14     L. BRAGA:  I think we have probably gotten as

15 much as we are going to get.  Would you like to go

16 see if Justin is out there now?

17     J. BRAGA:  Is Justin there?

18     I do want you to talk to Justin.

19     L. BRAGA:  Can I have a hug too?  No?  That's

20 okay.  You don't have to, if you don't want to.

21     J. BRAGA:  Don't forget, isn't this yours?

22 He's not yours?

23     (Justin has come into the videotape.)

24     J. BRAGA:  It would be helpful, can you tell

25 us anything about the masks or anything you played

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1       with?

2           JUSTIN:  Yes, ring around the cosy and pee

3       pee game and masks and Jason and luckle-day

4       (phonetic), gremlin and werewolf.

5           J. BRAGA:  What was -- how did they play

6       werewolf?

7           JUSTIN:  No, those were all masks.

8           J. BRAGA:  They were all put-on masks?

9           JUSTIN:  Yes -- no they put them on and

10      scared us.

11          J. BRAGA:  Now, what did they say to you when

12      they scared you?  Did they say boo?

13          JUSTIN:  No they were growling and talking

14      like (inaudible) and like that and they were

15      scaring us.

16          J. BRAGA:  Why do you think they were scaring

17      you?

18          JUSTIN:  I don't know.

19          J. BRAGA:  Did they tell you any time that

20      anything would happen to you if you would tell the

21      secrets about what was going on?

22          JUSTIN:  (Pause.)

23          J. BRAGA:  See, if you tell us then it will

24      go away and you won't have to be scared any more.

25          JUSTIN:  I know.  They --

1      J. BRAGA:  So we can make it go away, if you

2  tell us anything that they told you scared us.  If

3  you tell us there would never be anything to worry

4  about any more.

5      JUSTIN:  They would let me think they were

6  playing ring around the rosy.

7      J. BRAGA:  How did they play ring around the

8  rosy?

9      JUSTIN:  They play it.  They -- they dress up

10  naked and play it.

11      J. BRAGA:  What?

12      JUSTIN:  They take all their clothes off and

13  play it.

14      J. BRAGA:  Who would take off their clothes?

15      JUSTIN:  All the girls and boys.

16      J. BRAGA:  What about Frank?

17      JUSTIN:  Frank and Iliana, yes, they would

18  undress.

19      J. BRAGA:  They would undress?

20      JUSTIN:  Yes.

21      J. BRAGA:  What would they then do?  What

22  would happen then?

23      JUSTIN:  Then they would play ring around the

24  rosy.

25      J. BRAGA:  Can you show me with the dolls,

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0800                                                              MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   ring around the rosy because I don't know how to

2   play ring around the rosy?

3        JUSTIN:  Okay.

4        J. BRAGA:  Will four be enough?

5        JUSTIN:  No, there was just two.

6        J. BRAGA:  Just two?

7        JUSTIN:  Yes.

8        J. BRAGA:  Who would the two be?

9        JUSTIN:  David was playing and -- and let me

10   think, Brooke was playing.

11        J. BRAGA:  Brooke too?

12        JUSTIN:  Yes.

13        J. BRAGA:  So David and Brooke and who else

14   would play with them?

15        JUSTIN:  No one else, Iliana.  Iliana would

16   just undress.

17        J. BRAGA:  She would take --

18        JUSTIN:  On the couch.

19        J. BRAGA:  She would -- show me.

20        JUSTIN:  Okay, she would --

21        J. BRAGA:  Let's say this, this -- give me

22   that.  Let's make this Iliana.

23        JUSTIN:  Okay.

24        J. BRAGA:  Let's make this Iliana and you

25   show me what happened?

1      JUSTIN:  Okay where's the little -- okay.

2   (Indicating).

3      J. BRAGA:  Would she take off all her

4   clothes?  Did she have underpants too?

5      JUSTIN:  No she took off all her clothes and

6   everybody else took them off.  Frank was in the

7   game too.

8      J. BRAGA:  Frank was in the game?

9      JUSTIN:  Yes.

10      J. BRAGA:  So we will make that Frank and

11   this is Iliana, okay?

12      JUSTIN:  Yes.

13      J. BRAGA:  You said David so we will make

14   this David.  Did David have clothes on?

15      JUSTIN:  No, off.

16      J. BRAGA:  Can I take his clothes off?

17      JUSTIN:  Yes.

18      J. BRAGA:  And this would be David, okay.

19   All right, let's do that.  Here's David.  That's

20   Frank.  That's Iliana.  Tell us what happened?

21      JUSTIN:  And this is Brooke.

22      J. BRAGA:  Okay, this will be Brooke.

23      JUSTIN:  Okay.

24      J. BRAGA:  Okay.

25      JUSTIN:  She had clothes off too, see?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

39

1        J. BRAGA:  She did?

2        JUSTIN:  Yes.  Okay, now --

3        J. BRAGA:  All right, now let's see what

4  happened?

5        JUSTIN:  Let's see what I need.

6        J. BRAGA:  You notice on this doll, this doll

7  has like fur here?

8        JUSTIN:  Yes.

9        J. BRAGA:  Or would -- which would -- this

10  looks like Iliana or that?  Which one would look

11  more like Iliana?

12        JUSTIN:  Um --

13        J. BRAGA:  How come?

14        JUSTIN:  Because I mean this one, I don't --

15  I mean this really would because her hair is

16  always back like this.

17        J. BRAGA:  I see how -- what about the rest

18  of her body when she had her clothes off, which

19  one would look more like Iliana?

20        JUSTIN:  This one.  She has hair there.

21  (Indicating)

22        J. BRAGA:  She has hair there?

23        JUSTIN:  Yes.

24        J. BRAGA:  She has hair between her legs?

25        JUSTIN:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          J. BRAGA:  How could you see that because she

2     had no clothes on?

3          JUSTIN:  No clothes on.

4          J. BRAGA:  What about Frank, which of these

5     two dolls look more like Frank, this one or this

6     one?

7          JUSTIN:  This one.

8          J. BRAGA:  How come?

9          JUSTIN:  Because Frank had hair right here.

10     (Indicating)

11          J. BRAGA:  He's bigger too.  He's much bigger

12     than the dolls?  This is Iliana.  This is Frank.

13     This is Brooke?

14          JUSTIN:  That's David.

15          J. BRAGA:  That's David and that's Brooke.

16     Will you show us what happened?

17          JUSTIN:  Okay.  Okay, this -- how about you

18     making this, this is David.

19          J. BRAGA:  Okay.

20          JUSTIN:  And this is Frank.

21          J. BRAGA:  Okay.

22          JUSTIN:  Okay, now --

23          J. BRAGA:  How come David doesn't have hair

24     there?  Does he?  Does David have hair there too?

25          JUSTIN:  No but we could --

1    J. BRAGA:  Pretend?

2    JUSTIN:  Pretend, yes.

3    J. BRAGA:  Okay.

4    JUSTIN:  What do I need?

5    J. BRAGA:  I --

6    JUSTIN:  Iliana joined in too, so you will

7    have to do that and you will have to do that.

8    L. BRAGA:  Okay.

9    JUSTIN:  They were holding hands.

10    J. BRAGA:  Okay, good.

11    L. BRAGA:  Everybody?

12    JUSTIN:  Yes, everybody.

13    J. BRAGA:  Okay, let's do it this way.  I

14    will hold this hand and this hand and this hand

15    and this hand, okay?

16    JUSTIN:  Okay.

17    J. BRAGA:  Nobody had any clothes on?

18    JUSTIN:  No.

19    J. BRAGA:  Nothing?

20    JUSTIN:  They just were going around

21    (inaudible), yes, then they would go, they would

22    fall down.

23    J. BRAGA:  Everybody would fall down?

24    JUSTIN:  Yes, then they would get up and try

25    to get each other.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1          J. BRAGA:  How would they get each other?

2          JUSTIN:  They would just go demonstrating and

3     fight.

4          J. BRAGA:  They would fight?

5          JUSTIN:  Yes.

6          J. BRAGA:  They would hurt each other or play

7     fight?

8          JUSTIN:  Just play fight.

9          J. BRAGA:  Would they touch each other?

10         JUSTIN:  Oh yes.

11         J. BRAGA:  Tell me how they would touch each

12     other?

13         JUSTIN:  They would go like this and then

14     that was -- they would just tackle each other.

15         J. BRAGA:  Would they touch anybody any time

16     when they would --

17         JUSTIN:  Yes they would touch her and --

18         J. BRAGA:  How would they touch her?  They

19     would go --

20         JUSTIN:  (Demonstrating.)  Like that, okay?

21     They would touch each other here.

22         J. BRAGA:  Yes?

23         JUSTIN:  Yes.

24         J. BRAGA:  At their bottom.  Tell me about

25     that?

1      JUSTIN:   They would do this (indicating).

2      J. BRAGA:   With their hands?

3      JUSTIN:   Yes.

4      J. BRAGA:   What?

5      JUSTIN:   They would stick it inside.

6      J. BRAGA:   What would they stick where?

7      JUSTIN:   They would stick their finger inside

8    their butt.

9      J. BRAGA:   Who would do it, Frank would do it

10   to himself?

11     JUSTIN:   No, Frank would do it to them.

12     J. BRAGA:   Now who is this?   This is David?

13     JUSTIN:   David.

14     J. BRAGA:   Wouldn't it hurt David?

15     JUSTIN:   No this is David.

16     J. BRAGA:   Okay, this is Frank.

17     JUSTIN:   Right.

18     J. BRAGA:   So what would Frank do?

19     JUSTIN:   He would go --

20     J. BRAGA:   Didn't it hurt David?

21     JUSTIN:   No it wouldn't.

22     J. BRAGA:   How come?

23     JUSTIN:   Because I don't know why but it

24   wouldn't hurt David.

25     J. BRAGA:   David, oh did David mind?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

44

1        JUSTIN:  No he didn't mind.

2        J. BRAGA:  He didn't mind?

3        JUSTIN:  He minded but not that.

4        J. BRAGA:  How come?

5        JUSTIN:  They were going like this.

6    (Indicating)

7        J. BRAGA:  Like that?

8        JUSTIN:  Yes.

9        J. BRAGA:  Okay, did Frank ever like kiss

10   David's eyes or kiss David's hands or kiss David

11   anywhere?

12       JUSTIN:  He would do this.  He would go -- he

13   wants to kiss his penis.

14       J. BRAGA:  Who kissed whose penis?

15       JUSTIN:  Frank kissed David's penis.

16       J. BRAGA:  Did David mind?

17       JUSTIN:  Yes.

18       J. BRAGA:  Did Frank ever -- what did David

19   say?  Do you remember?

20       JUSTIN:  No he didn't say anything.

21       J. BRAGA:  He didn't say anything?  Did

22   Frank ever ask anybody to kiss his penis?

23       JUSTIN:  No.

24       J. BRAGA:  How about Iliana?  Did Iliana ever

25   kiss David or anybody's penis?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 447-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

45

1            JUSTIN:  He would do this.  (Indicating)

2            J. BRAGA:  To who?

3            JUSTIN:  To David.

4            J. BRAGA:  To David?  How about to Frank?

5            JUSTIN:  No.

6            J. BRAGA:  Okay.

7            JUSTIN:  Just to David.

8            J. BRAGA:  How about the get me game.  You

9     said ring around the rosy?

10           L. BRAGA:  But this game -- what would

11    happen?

12           JUSTIN:  (Inaudible.)  Here's how you do it.

13    Then they would (inaudible) the penis.

14           J. BRAGA:  Who would do it to who?

15           JUSTIN:  Frank would do it to David.

16           L. BRAGA:  What about -- what would happen to

17    Brooke?

18           JUSTIN:  Brooke?  Which one is this?

19           L. BRAGA:  This --

20           JUSTIN:  Oh right here.  They would do this.

21    Oh which one -- yes.  Yes they would do it right

22    there.  (Indicating)

23           J. BRAGA:  Uh-huh?

24           JUSTIN:  And right here.

25           J. BRAGA:  With his hands?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                  44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          JUSTIN:  Yes with his hands.

2          J. BRAGA:  Oh I see and Iliana would do this?

3          L. BRAGA:  To --

4          JUSTIN:  To David, let me see.

5          J. BRAGA:  Let me see.

6          JUSTIN:  Like that.

7          J. BRAGA:  Now did this happen only one time?

8          JUSTIN:  Yes once.

9          J. BRAGA:  One time or one day or --

10         JUSTIN:  Just one time.

11         J. BRAGA:  What other games did they play

12     like that?

13         JUSTIN:  Just -- they played other games,

14     okay?  It's kind of a ring around the rosy game

15     but first we have to hold each others hands again.

16         J. BRAGA:  Okay.

17         L. BRAGA:  Okay.

18         J. BRAGA:  All right.  Now --

19         JUSTIN:  Here's Brooke.

20         L. BRAGA:  Would Brooke stand next to Iliana

21     or next to David or who?

22         JUSTIN:  Next to Frank.

23         L. BRAGA:  Next to Frank, okay.

24         JUSTIN:  That makes her here.

25         L. BRAGA:  Okay.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                            44 W. FLAGLER ST.
                                                         (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      JUSTIN:   That --

2      J. BRAGA:   This was another time they played

3  this game?

4      JUSTIN:   Yes and then they will go here.   How

5  they would do it --

6      L. BRAGA:   Uh-huh?

7      J. BRAGA:   Uh-huh?

8      JUSTIN:   Then they were letting -- then they

9  would do this.   What do they call this game?   Do

10  you remember?   Do they call it anything.   No, just

11  do it, do this.

12      L. BRAGA:   This is Iliana and David?

13      JUSTIN:   Yes he would stick his penis inside

14  his mouth, okay?

15      L. BRAGA:   That's Brooke?

16      JUSTIN:   Brooke would do this, same thing.

17  Same thing this way.

18      L. BRAGA:   Brooke would kiss Frank's penis?

19      JUSTIN:   No they would bite each others

20  penis.

21      L. BRAGA:   They would bite each others penis?

22      J. BRAGA:   Let me ask you a question.   At any

23  time in any of the games --

24      JUSTIN:   Yes?

25      J. BRAGA:   -- did Frank ever take his penis

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        and put it into anybody's bottom or try to --

2              JUSTIN:  Now pretend this is Frank.

3        J. BRAGA:  This is Frank.

4        JUSTIN:  Yes.

5        J. BRAGA:  This is Iliana.

6        JUSTIN:  Yes.

7        J. BRAGA: Okay.  Can you show me exactly the

8   way they were?

9        JUSTIN:  They --

10       J. BRAGA:  If Frank was like this, he would

11  have been hurting because he can't stand like

12  that, so pretend -- just exactly how they actually

13  were, what do you remember seeing?

14       JUSTIN:  They would do this and they would

15  take it like this and stick it in here and then

16  they would do this.  (Indicating)

17       J. BRAGA:  Now --

18       JUSTIN:  They would do this, stick it on her

19  boobies (phonetic).

20       J. BRAGA:  Would she be standing up, lying

21  down, kneeling?

22       JUSTIN:  Like this.  Then he would do like

23  this and like this and like this.

24       J. BRAGA:  Now where were the children when

25  they were doing this?

1          JUSTIN:  They were still naked.

2          J. BRAGA:  Uh-huh?

3          JUSTIN:  They were -- then they were like

4     this and then -- now pretend this is David -- I

5     mean Noel.

6          J. BRAGA:  Noel?

7          JUSTIN:  Yes, okay?  Noel would do this.

8     (Indicating)

9          J. BRAGA:  To who?

0          JUSTIN:  To David -- to Frank -- to, I mean

1     David.

2          L. BRAGA:  They had the children doing this

(     together?

4          JUSTIN:  Yes they had the children do it

5     together.

6          J. BRAGA:  What about the boys and girls

7     together?

8          JUSTIN:  Girls, they would do this.  See the

9     boys were -- the boys were right over here, see --

)     let me see, where is the -- where is the --

          L. BRAGA:  The clothes?

          JUSTIN:  Yes, I just need these.

          L. BRAGA:  Okay.

          JUSTIN:  Okay, let's see.  I need men.  I

     don't need this.  I need the men's clothes.

L. BRAGA:  The men's clothes, I think what we have here is a pair of underwear for David and a pair of underpants.

JUSTIN:  No, Frank didn't dress.

L. BRAGA:  Frank didn't dress?

JUSTIN:  Right.  That's Noel.  That is -- Noel dressed, see Frank wasn't in that.

J. BRAGA:  He wasn't there at the time?

JUSTIN:  Yes.

J. BRAGA:  This was another day?

JUSTIN:  Yes.

J. BRAGA:  So only Iliana was there?

JUSTIN:  Right.

J. BRAGA:  Any other adults that came over?

JUSTIN:  A baby girl.

J. BRAGA:  A baby girl, who is that?

JUSTIN:  She showed her boobies and --

J. BRAGA:  Why did she do that?

JUSTIN:  I don't know.

J. BRAGA:  Did she take off all her clothes?

JUSTIN:  No, she just showed off her boobies.

J. BRAGA:  Didn't everybody think she was silly?

JUSTIN:  Yes.

J. BRAGA:  Let me ask you, you know what a

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

camera is?

JUSTIN:  Yes.

J. BRAGA:  Did anybody take pictures?

JUSTIN:  Yes.

J. BRAGA:  Who took pictures?

JUSTIN:  Frank.

J. BRAGA:  Did he -- did he have a camera?

JUSTIN:  Yes.

J. BRAGA:  How big?

JUSTIN:  About as big as that, that one over --

J. BRAGA:  Was it a camera like this?

JUSTIN:  A camera like that.

L. BRAGA:  Like a movie camera?

JUSTIN:  Yes a movie camera.  When those things like -- let me think, like artists do sometimes they have the big cameras and they take pictures of sculptures and stuff.  That's the ones I mean.

L. BRAGA:  Did you ever see any of the pictures?

JUSTIN:  Yes I saw some but I -- there was -- Brooke was doing this.  (Indicating)  Iliana was doing this.  (Indicating)  I mean David was doing this and this.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

52

1          L. BRAGA:  Iliana?

2          JUSTIN:  Yes and this and this and this.

3          L. BRAGA:  They took pictures of that?

4          JUSTIN:  Yes and then the boys ran on into

5     the bathrooms and began to dress, while the girls

6     were still naked.

7          See the girls didn't know he was dressing.

8     He was dressing.  Just one boy was dressing, just

9     Noel.

10         L. BRAGA:  But the girls didn't have any

11    clothes on?

12         JUSTIN:  No.

           J. BRAGA:  Did they ever hurt any of the

14    girls they didn't mean to maybe but did anyone

15    ever feel hurt?

16         JUSTIN:  No.

17         J. BRAGA:  No one said ouch, that hurts, stop

18    or --

19         JUSTIN:  No.

20         L. BRAGA:  How do you think the other kids

1     felt about it?

2          JUSTIN:  I don't know.

3          J. BRAGA:  You never talked to them about it?

4          JUSTIN:  No.

5          J. BRAGA:  Did they ever talk to you about

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     it?

2         JUSTIN:  Yes.

3         J. BRAGA:  What did they say?

4         JUSTIN:  They said it's not feeling very good

5     and I didn't like it because it's not very good

6     when you touch private parts of your body.

7         J. BRAGA:  Where did you hear that?  Who told

8     you that?

9         JUSTIN:  Noel.

10         J. BRAGA:  Who do you think told him that?

11         JUSTIN:  Who do you think told him what?

12         J. BRAGA:  It's not good for somebody to feel

13     your private parts?

14         JUSTIN:  Noel was in the game too.  Noel was

15     in the game and then he --

16         J. BRAGA:  Didn't you ever feel left out that

17     he didn't want to include you in the games, no?

18         JUSTIN:  No because I didn't want to be in

19     the games.

20         J. BRAGA:  But they let you watch?

21         JUSTIN:  No I didn't watch.  I was watching

22     TV because it was gross.  I knew that the game

23     would be sickening.

24         J. BRAGA:  Sickening?

25         JUSTIN:  Because it's not very nice when you

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE         OFFICIAL COURT REPORTER         MIAMI
(305) 467-0600                                    44 W. FLAGLER ST.
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.     (305) 373-7295

54

1   do that kind of stuff.

2       J. BRAGA:  So -- but you were in the same

3   room?

4       JUSTIN:  No I was in the TV room.  They were

5   outside.

6       J. BRAGA:  How could you see it if you were

7   in the other room?

8       JUSTIN:  No I didn't see.  I watch TV.

9   That -- I didn't see it.  I watched TV instead of

10  seeing it.

11      L. BRAGA:  How do you know about it?  Did

12  someone tell you?

13      J. BRAGA:  Did you --

14      JUSTIN:  I -- I -- I saw what they were doing

15  but I didn't watch the whole game.

16      J. BRAGA:  I see now, what about the pee pee

17  game?  What was that?

18      JUSTIN:  They was throwing pee pee at each

19  other.  They would try to get it in their nose.

20      J. BRAGA:  Who would do that, Frank would do

21  it?

22      JUSTIN:  Yes.

23      J. BRAGA:  Frank would do it?

24      JUSTIN:  Yes.

25      J. BRAGA:  So were you ever -- when --

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

55

besides the guys was there ever a time when you

were alone with Frank?

JUSTIN:  No.

J. BRAGA:  Were there ever times when Iliana

left and left the children with Frank to take care

of everybody for awhile?

JUSTIN:  No.

J. BRAGA:  She never went shopping and had

Frank take care of things while she was gone?

JUSTIN:  Yes once but Frank never did

anything.

J. BRAGA:  No?  Were there times when Frank

would take care of you like baby-sit you all while

Iliana was there?

JUSTIN:  No.

J. BRAGA:  Not games but times when he would

just baby-sit you or watch movies?

JUSTIN:  No he would always play games and

stuff.  He always played games like pee pee games

and ka ka games and butt games.  That's what

they --

J. BRAGA:  What is the ka ka game?

JUSTIN:  It's a game where they throw poop at

each other.  Yes.

J. BRAGA:  You are kidding me?

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                                    MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT  DADE COUNTY  FLA

1          JUSTIN:   No.

2          J. BRAGA:   What?

3          L. BRAGA:   Can you tell us more about that?

4          J. BRAGA:   Can you tell us more about that?

5          JUSTIN:   They first went to the bathroom and

6      then they started -- they took it out of the

7      toilet with some toilet paper and threw it at each

8      other.

9          J. BRAGA:   Who would do that?

10          JUSTIN:   Noel.

11          J. BRAGA:   Oh, Noel did that?

12          JUSTIN:   Yes.

13          J. BRAGA:   Oh, well he's just a baby, isn't

14     he though?

15          JUSTIN:   No.

16          J. BRAGA:   How old is Noel?

17          JUSTIN:   Six.

18          J. BRAGA:   Was he just fooling around when he

19     did that?

20          JUSTIN:   Yes.

21          J. BRAGA:   Didn't Iliana get mad and say

22     that's going to mess up the house?

23          JUSTIN:   No.

24          L. BRAGA:   Did she like it?  Did she want him

25     to play that game?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          JUSTIN:  Yes.

2          J. BRAGA:  Did they take movies while they

3     did that?  Was the camera around while they were

4     doing that?

5          JUSTIN:  Yes.

6          J. BRAGA:  Was the camera around when they

7     played the pee pee game?

8          JUSTIN:  Yes.

9          J. BRAGA:  Who was running the camera?

10         JUSTIN:  See it doesn't -- it does (phonetic,

11    inaudible) it does it alone.

12         L. BRAGA:  Automatically?

13         J. BRAGA:  It would be going by itself?

14         JUSTIN:  Yes.

15         L. BRAGA:  Something like that?  It would

16    just sit there?

17         JUSTIN:  Yes.

18         J. BRAGA:  It's like a tripod?  Is that what

19    you meant when you said an artist thing?

20         JUSTIN:  Yes.

21         J. BRAGA:  Let me ask you another question,

22    you see this?

23         JUSTIN:  Yes.

24         J. BRAGA:  This is what we call a video

25    cassette.  Maybe sometimes Frank showed you

1    movies?  Did Frank show you movies on the

2    recorder?

3         JUSTIN:  Yes.

4         J. BRAGA:  Did they have something like that?

5         JUSTIN:  Yes.

6         J. BRAGA:  Is that how you saw movies?

7         JUSTIN:  Yes.

8         J. BRAGA:  What kind of movies did you see?

9         JUSTIN:  Pee pee movies.  See here's how they

10   undressed.  They always took their hand -- here's

11   how -- here's how.  Pretend this is my brother,

12   Jonathan.

13        J. BRAGA:  Okay.

14        JUSTIN:  Here is what Iliana did once.  I

15   will show you.  Let me take this off.

16        J. BRAGA:  When they made the video movies,

17   is that what they did?  They made movies like

18   this?

19        JUSTIN:  Yes.

20        J. BRAGA:  It would go on something like

21   this?

22        JUSTIN:  What does this do?

23        J. BRAGA:  This you put in the machine.

24        JUSTIN:  Show me.

25        J. BRAGA:  All right, come over here.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      JUSTIN:  Show me a little movie.

2      J. BRAGA:  See it's like this.  This is a

3   place where it goes in.  I can't do it.  It comes

4   up and you put it in and then you can see the

5   movie on the TV.

6      L. BRAGA:  I think there is one over there

7   you can show him.

8      J. BRAGA:  Yes, come over here.  See, this is

9   how that works.  Then he puts it in, pushes the

10   bottom and the TV comes on.

11      JUSTIN:  Yes he showed me one of those

12   movies.

13      J. BRAGA:  He did?  What did he show you?  Do

14   you remember?

15      JUSTIN:  Okay, turn that on a little bit.

16      J. BRAGA:  I don't think there is anything on

17   this but if there were a movie this is what he

18   would have done.  He would have shown Conad or

19   something like that.

20      JUSTIN:  No he would show -- he would

21   undress, pretend this is --

22      J. BRAGA:  Is this -- like did he have like

23   a --

24      L. BRAGA:  A machine like this?

25      J. BRAGA:  A machine like this?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0800
MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        JUSTIN:  Yes.

2        L. BRAGA:  You said pretend that's your

3    brother?

4        JUSTIN:  Yes pretend this is my brother and

5    this is Iliana.

6        L. BRAGA:  Uh-huh?

7        JUSTIN:  Here's what Iliana did.  He put his

8    penis in her mouth and my brother peed in it, so

9    she washed it out with water and that's what the

10   end of the game was.

11       J. BRAGA:  Now --

12       JUSTIN:  The pee pee game.

13       J. BRAGA:  That was the pee pee game?  Was

14   the camera going while this was happening?

15       JUSTIN:  Yes.

16       J. BRAGA:  Did they ever show you?

17       JUSTIN:  Yes.

18       J. BRAGA:  They showed you some of the games

19   and said let's play this game and let's show it to

20   you on the TV?

21       JUSTIN:  No, I didn't want to play the game.

22       J. BRAGA:  I don't mean you but did they ever

23   show it on TV?

24       JUSTIN:  Yes.

25       J. BRAGA:  For you all to see?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER
(305) 467-0600                                                    MIAMI
                                                          44 W. FLAGLER ST.
                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          JUSTIN:  Yes but --

2          J. BRAGA:  What would they say?

3          JUSTIN:  They would say let's play

4     (inaudible) then they would do more games.

5          J. BRAGA:  They would take the camera?

6          L. BRAGA:  Did they show pictures?  The

7     pictures they showed, were they the children at

8     their house, your friends?

9          JUSTIN:  (Nodding in the affirmative.)

10         J. BRAGA:  How do you feel about that?

11         JUSTIN:  Bad.

12         J. BRAGA:  You think they shouldn't have done

13    it to you?

14         JUSTIN:  Yes I thought they shouldn't have

15    done it.  I don't like when they do things like

16    that.

17         J. BRAGA:  Justin, let me ask you just a

18    couple more questions.  You have really helped us

19    a lot.  I want to know you better.

20         JUSTIN:  Here's a kind of one that he took.

21         J. BRAGA:  How do you know?  What's it like?

22    How do you know?

23         JUSTIN:  Because he showed me it.  Those are

24    the kind.  Then he recorded it with pee pee.

25         J. BRAGA:  And it had like numbers on it,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

62

1        like that?

2              JUSTIN:  Yes.

3              J. BRAGA:  Was it the same numbers 2120?

4              JUSTIN:  Yes same numbers.

5              J. BRAGA:  What were the numbers?

6              JUSTIN:  TM120.

7              J. BRAGA:  I see.  The last questions, you

8        said that they talked about masks?

9              JUSTIN:  Right.

10             J. BRAGA:  Okay did they ever try and scare

11       you?

12             JUSTIN:  (Nodding in the affirmative.)

13             J. BRAGA:  They did try to scare you?

14             JUSTIN:  (Nodding in the affirmative.)

15             J. BRAGA:  Why do you think they tried to

16       scare you?

17             JUSTIN:  I don't know.

18             L. BRAGA:  Do you think they didn't want you

19       to tell?

20             JUSTIN:  Yes.

21             L. BRAGA:  That's why?

22             JUSTIN:  I told my mom and then they scared

23       me.

24             J. BRAGA:  Justin, thank you very much.  I

25       want to tell you something very important and I

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       want you to listen to me just for a minute, okay?

2           JUSTIN:  Okay.

3           J. BRAGA:  If they told you anything bad was

4       ever going to happen to you if you told or they

5       said anything would be awful if you told, it's not

6       going to happen.

7           JUSTIN:  Yes, I know.

8           J. BRAGA:  They weren't telling the truth.

9           L. BRAGA:  You know something else?  Maybe if

10      you talk to some of your friends and you can tell

11      them if any of these things happened to any of

12      your friends, they shouldn't feel bad because they

13      didn't do any wrong.

14          JUSTIN:  I know.

15          L. BRAGA:  Okay?

16          J. BRAGA:  Nothing is wrong and nothing is

17      ever going to happen.

18          L. BRAGA:  Most grown-ups aren't like Iliana

19      and Frank, okay?  Iliana and Frank shouldn't have

20      done what they did, what you said is they were

21      nice in some ways but in this way they have a

22      problem.

23          They made a mistake.  They shouldn't have

24      done it but the children didn't do anything wrong

25      and they shouldn't feel bad.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        J. BRAGA:  I am glad you told us and I really

2    mean it.

3        L. BRAGA:  You are very brave.

4        J. BRAGA:  You are a very brave young man and

5    you don't have anything to worry about.

6        JUSTIN:  Okay.

7        J. BRAGA:  It's true.  Shall we go back to

8    your mom and dad?

9        JUSTIN:  (Inaudible.)

10       J. BRAGA:  Can I ask you an important

11   question?

12       JUSTIN:  Yes.

13       J. BRAGA:  When was the last time you saw the

14   video movies they made of your games?  How many

15   days ago was it, yesterday?

16       JUSTIN:  Yes, yesterday.

17       J. BRAGA:  Were you at the Center yesterday

18   with Frank and Iliana?  Now today is Wednesday --

19   Thursday, were you there yesterday or is it before

20   yesterday?

21       JUSTIN:  It was before yesterday.

22       J. BRAGA:  Do you remember -- now this is --

23   this is Thursday.

24       JONATHAN:  Hi.

25       J. BRAGA:  Before Thursday comes Wednesday

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    and Tuesday and then Monday and Saturday and soon

2    the weekend.

3         JUSTIN:  Yes.

4         J. BRAGA:  Was it before the weekend?  Was it

5    like last week?

6         JUSTIN:  Yes.

7         J. BRAGA:  Do you remember this, this is a

8    very important question?  Was it this week or last

9    week or was it before either last week?

10        JUSTIN:  It was Christmas.

11        J. BRAGA:  Christmas, you remember Christmas

12   is a long time ago?

13        JUSTIN:  It was a real long time ago.

14        J. BRAGA:  The scene was in the TV room?

15        JUSTIN:  Yes.

16        J. BRAGA:  And cassettes kept underneath the

17   couch?

18        JUSTIN:  Right.

19        J. BRAGA:  Do you remember when you told your

20   mommie about this?

21        JUSTIN:  Yes.

22        J. BRAGA:  Would they still have cassettes

23   then?

24        JUSTIN:  Yes.

25        J. BRAGA:  When you told your mommie about

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                44 W. FLAGLER ST.
                                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    this and daddy, they still had the cassettes about

2    the same time you told your mommie about it?

3        Did they show you any of the cassettes after

4    that?

5        JUSTIN:  Yes.

6        J. BRAGA:  They didn't know you told your

7    mommie?  Did they show you any cassettes after you

8    told your mommie?

9        JUSTIN:  No, they only told -- they only

10   showed us at Christmas.

11       J. BRAGA:  What movies did they show you at

12   Christmas?  What videotapes did they show you at

13   Christmas?

14       JONATHAN:  Stripe.

15       J. BRAGA:  Yes that's neat, a Care Bear.  You

16   like him?  He's a gremlin.  He's cute.

17       JUSTIN:  That's his now because I am going to

18   get one.

19       L. BRAGA:  Are you really, oh.

20       J. BRAGA:  Can you ask Jonathan to show us

21   any games that they played?

22       JUSTIN:  Jonathan, what games did they play?

23   Jonathan, what games did they play?

24       He played kind of a Donald game.

25       J. BRAGA:  Donald?

1          JUSTIN:  McDonald.

2          J. BRAGA:  McDonald?

3          JUSTIN:  No, Old McDonalds.  They undressed

4     themselves and made noise like a chicken or a cow

5     and all that.  That's what they did.

6          J. BRAGA:  What would the cow do?

7          JUSTIN:  The cow?

8          J. BRAGA:  Let Jonathan tell me.

9          JUSTIN:  Jonathan, what did the cow do?  What

10    did the cow do?

11         What did the cow do?  What did the cow do?

12         J. BRAGA:  (Inaudible.)

13         JUSTIN:  What did the cow do?

14         J. BRAGA:  I think this is probably enough.

15    Okay, thank you both.  Okay?  That's good enough.

16         JUSTIN:  Jonathan, what did the cow do?

17         J. BRAGA: .He's cute.  You are both cute.

18    That's it.  Okay.

19         THE COURT:  We will break for lunch.  I'd

20    like them back at 1:30.  The dates of the tapes

21    were August 9th, 1984.  Thank you.  See you about

22    an hour.  We will be in recess until 1:30.

23         (Thereupon, a luncheon recess was had, the

24    following proceedings were resumed at 1:35 o'clock

25    p.m.:)

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                    44 W. FLAGLER ST.
                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

68

1          THE COURT:  Want to bring in the jury please?

2          (Thereupon, the jury is brought in.)

3          THE COURT:  Both sides can see the presence

4     of the jury?

5          MR. CASEY:  Yes, sir we do.

6          THE COURT:  Defense also?

7          MR. SAMEK:  Yes.

8          THE COURT:  Thank you, please be seated.

9     Before we resume with the tapes, ladies and

10    gentlemen, let me ask you a question.  First tell

11    me something, next week is a religious holiday of

12    those of the Jewish faith.  Not knowing and nor do

13    we ask religious preferences of any member of the

14    jury, I don't know which of you, if any, would be

15    observing the holiday known as Rah Shashana

16    (phonetic) and if you do observe it, whether you

17    observe one day or two days.  If you can just tell

18    me and it will help in my scheduling of other

19    matters for you to hear.

20         Mr. Gainey?

21         MR. GAINEY:  No problem.

22         THE COURT:  You see, Mr. Gainey, if I left

23    one of you out, the Judge -- you could say the

24    Judge was in error.  I am asking you, Mr. Harpel?

25         MR. HARPEL:  No.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        THE COURT:  Mr. Padron?

2        MR. PADRON:  No.

3        THE COURT:  Mrs. Rose?

4        MRS. ROSE:  No problem.

5        THE COURT:  Mrs. Buerger?

6        MRS. BUERGER:  No.

7        THE COURT:  Mrs. Ketchum?

8        MRS. KETCHUM:  No.

9        THE COURT:  Mr. Buff?

10       MR. BUFF:  Sorry to say no.

11       THE COURT:  Mrs. Epperson?

12       MRS. EPPERSON:  No.

13       THE COURT:  So there is no scheduling

14  problem, fine.  That will help me in my scheduling

15  for you to hear the balance of the tapes.  Let me

16  tell you, I am going to take Monday off so that

17  you know I will not be here Monday, nor will we

18  work on Monday.  I do and have since I have been a

19  child celebrate or I could say observe is the word

20  because it's not a celebration, observe one day of

21  Rah Shashana.  I will not be available Monday but

22  we are going to meet tomorrow morning if I am not

23  mistaken and discuss the tapes and set up the

24  scheduling for you, the jury, so that you will if

25  necessary have an opportunity perhaps to observe

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1     the tapes over the weekend and/or other days so we

2     will work that out tomorrow morning, okay?

3          At least I know your feelings and now you

4     know mine.   I think with that we can commence with

5     the tapes.   Okay?

6          MR. SAMEK:   Yes, Judge.

7          THE COURT:   Thank you.

8          MR. SAMEK:   The defense would next ask that

9     Defense Exhibit C, August 9 be published.

10         THE COURT:   Here is Craig.   Are you all

11    comfortable?   While you are sitting you can move

12    around if you so choose.   If it's any better to

13    see or you are uncomfortable where you are, since

14    we are looking at the tapes any of these seats

15    certainly are available to you.   The court

16    reporter is going inside.   It's easier for her to

17    take it.

18         (Thereupon, the video of TODD LEININGER was

19    played and recorded as follows:)

20         L. BRAGA:   Dolls, here, do you like dolls?

21         TODD:   Yes.

22         L. BRAGA:   Let's play a game with these

23    dolls.   Let's pretend this one is Todd, okay?

24         TODD:   (Nodding in the affirmative.)

25         L. BRAGA:   That is Todd.   This is a little

1      girl.  Let's pretend -- do you know a little girl

2      named Brooke?

3              TODD:  (Nodding in the affirmative.)

4              L. BRAGA:  Can we pretend this is Brooke?

5              TODD:  Yes.  He's got --

6              L. BRAGA:  He's got a mouth.  You can put

7      your finger in, huh?  And this, this is Iliana.

8      Let's pretend this is Iliana, okay?  This doll we

9      are going to pretend is Frank.  Okay?

10             You can play with the dolls and you show me

11     what Iliana and Todd do, okay?  Just show me.

12             TODD:  (Pause.)

13             L. BRAGA:  Mommie is there.  Would you show

14     me?  Show me what Iliana does, okay?  Show me what

15     Iliana does to Todd?

16             Would you show me?

17             TODD:  (Nodding in the affirmative.)

18             L. BRAGA:  Huh?

19             TODD:  (Demonstrating.)

20             L. BRAGA:  Likes to put your finger in there,

21     huh?  I will tell you what.  Let's see.  Let's

22     pretend, can everybody play a game together?

23             TODD:  (Nodding in the affirmative.)

24             L. BRAGA:  Shall we all play together?  Okay?

25     So we have got Frank and Iliana, okay and Brooke

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    and Todd, okay.  Everybody play a game together,

2    what game shall we play?  You tell me what game

3    shall we play?

4         Show me what game?  Will you show me?  Okay,

5    have you ever played a game called the pee pee

6    game?

7         TODD:  (Nodding in the affirmative.)

8         L. BRAGA:  Yes?  Would you show me how to

9    play it?

10         TODD:  (Nodding in the affirmative.)

11         L. BRAGA:  You show me.  Show me what to do?

12         TODD:  (Inaudible.)

13         L. BRAGA:  Uh-huh?

14         TODD:  Pee pee.

15         L. BRAGA:  Who would do that?  Is that the --

16    is that Todd's penis?

17         TODD:  (Nodding in the affirmative.)

18         L. BRAGA:  Yes?  Would somebody touch Todd's

19    penis?

20         TODD:  No put it back on.

21         L. BRAGA:  Put it back on?

22         TODD:  Yes.

23         L. BRAGA:  Okay.  How about (inaudible) let's

24    pretend -- this isn't Todd, okay?  Let's pretend

25    this is David, okay?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          TODD:   (Nodding in the affirmative.)

2          L. BRAGA:  Can you show me what Iliana would

3      do with David?

4          TODD:   Uh-huh.

5          L. BRAGA:  Would you show me?

6          TODD:   Yes.

7          L. BRAGA:  Would you?

8          TODD:   (Indicating.)

9          L. BRAGA:  Would Iliana play with David and

10      play a game with David?

11          TODD:   Yes.

12          L. BRAGA:  What kind of game would Iliana

13      play with David?

14          TODD:   (Pause.)

15          L. BRAGA:  Would you tell me?  Maybe if

16      there is something that, that you feel a little

17      shy about and maybe if you feel -- maybe if

18      somebody might have said to you, don't tell

19      anybody, would somebody tell you not to tell?

20          TODD:   (Nodding in the affirmative.)

21          L. BRAGA:  Well, you know, what?  They might

22      have scared you and told you not to tell?  Did

23      they do that?

24          TODD:   Yes.

25          L. BRAGA:  Well, it's okay for you to tell.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                     (305) 373-7288
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    TODD:  Mommie.

2    J. BRAGA:  Todd, did Frank and Iliana have a

3  camera like that?

4    TODD:  (Nodding in the affirmative.)

5    L. BRAGA:  They did?  Did they take pictures

6  of you?

7    J. BRAGA:  When you would play games?

8    TODD:  (Nodding in the affirmative.)

9    L. BRAGA:  Can you show us what games you

10  would play and they would take pictures?

11    TODD:  Yes.

12    L. BRAGA:  What games?

13    MRS. LEININGER:  Show them the kind of games

14  you play with Iliana and Frank.  Can you do that?

15  Can you show them the kinds of games you play with

16  Iliana?

17    TODD:  I can't see.

18    L. BRAGA:  You can't see?

19    MRS. LEININGER:  I know, go over there and

20  look at the dolls.  Then you can look at that

21  later.

22    L. BRAGA:  Yes on television.

23    J. BRAGA:  See the dolls?

24    L. BRAGA:  Look.

25    J. BRAGA:  This is Frank and that's Todd.

1          Can you show me Iliana?

2               L. BRAGA:  Let's see, here's a Iliana.  Let's

3          play together.  It's Iliana.

4               J. BRAGA:  Hi, Todd.  Can you show us the

5          games you play?

6               TODD:  (Nodding in the affirmative.)

7               J. BRAGA:  Come and tell us.

8               L. BRAGA:  Let's play together.

9               MRS. LEININGER:  You can tell them.  You can

10         play.  Would you show them?  It's okay.

11              J. BRAGA:  If you want to, you can go over

12         and sit down.  It's fine.

13              MRS. LEININGER:  Okay, you show them the

14         kinds of games.

15              J. BRAGA:  This is Frank and this is Iliana

16         and this is Todd and this is Brooke.  Can you show

17         us how you would play the games?  How they would

18         play?

19              MRS.  LEININGER:  It's okay.  You can show

20         them.

21              TODD:  No.

22              J. BRAGA:  Okay.

23              MRS. LEININGER:  Go show them the games you

24         would play.  Go show them the kinds of games you

25         would play.  Can you show me?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0800                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          Okay, go ahead.  Show mommie the games you

           played.

3          TODD:  That's Frank.

4          J. BRAGA:  That's Frank.

5          MRS. LEININGER:  What kind of games did you

6     play with Frank?

7          J. BRAGA:  Here's you.  This is Todd.

8          TODD:  Yes.

9          J. BRAGA:  Let's make believe this is Todd,

10    okay?  Oh, Todd's pants fell down.  Let's pull

11    Todd's pants back up.  Here Todd.  This is Frank

12    and Frank wants to play some games with Todd.

      Show us what Frank does to Todd.  Okay?

14         TODD:  (Indicating.)

15         J. BRAGA:  Dance?

16         TODD:  Uh-huh.

17         L. BRAGA:  What else do you do more than

18    dance?  Do you play games too?  Okay after you

19    dance what happens?

20         TODD:  (Inaudible.)

21         MRS. LEININGER:  Did he dance with you?

22         TODD:  Yes.

23         J. BRAGA:  Does Brooke dance too?

24         TODD:  Yes.

25         J. BRAGA:  Does Iliana dance too?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7285
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

77

1          TODD:  (Indicating.)

2          J. BRAGA:  Here's Todd.  You want to hold

3     Todd and make Todd dance?  What happens next?

4     What do they do next?

5          TODD:  I don't know.

6          J. BRAGA:  You don't know?  Oh, okay.  This

7     is Frank.  Does Frank play games with Iliana?

8          TODD:  (Inaudible.)  Fall down.

9          J. BRAGA:  Fall down?

10          MRS. LEININGER:  This is Todd?

11          TODD:  Yes.

12          MRS. LEININGER:  What is he going to do now?

13          TODD:  Dance.

14          MRS. LEININGER:  After he dances, what

15     happened?  Then what happened to Todd?

16          TODD:  He falls down.

17          MRS. LEININGER:  Falls down, okay, now what

18     happens?

19          TODD:  He puts his head down.

20          MRS. LEININGER:  He puts his head down?

21          TODD:  Yes.

22          J. BRAGA:  Where does he put his head down?

23          TODD:  Breaks his neck.

24          J. BRAGA:  He broke his neck?  Did someone

25     tell you you would break your neck?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          TODD:  Put his clothes back on.

2          J. BRAGA:  Did someone take his clothes off?

3          TODD:  Yes.

4          J. BRAGA:  Who took your clothes off?

5          TODD:  (No response.)

6          MRS. LEININGER:  Who took them off in the

7     first place?

8          TODD:  (Indicating.)

9          J. BRAGA:  Who is that?

10         TODD:  Frank.

11         J. BRAGA:  Frank took your clothes off?

12    Let's play that.

13         TODD:  Yes.

14         J. BRAGA:  Here is Frank taking clothes --

15    Todd's clothes off.

16         Did he take off your pants?

17         TODD:  (Nodding in the affirmative.)

18         J. BRAGA:  Okay.

19         TODD:  Okay.

20         J. BRAGA:  He took off the pants?  What else?

21         TODD:  That --

22         J. BRAGA:  Show me.  He took off his shirt?

23    He took of his shirt too, huh?

24         TODD:  Yes.

25         J. BRAGA:  Let's take off the shirt.  Then

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          what happened?

2                 TODD:  Pants.

3                 J. BRAGA:  He took off his pants too?  All

4          gone.  Took off your pants (inaudible).  Took off

5          pants, okay.

6                 TODD:  (Inaudible.)

7                 J. BRAGA:  Come take his off too.

8                 TODD:  Yes.

9                 J. BRAGA:  You want to help?

10                TODD:  Yes.

11                J. BRAGA:  Take pants off here.  You pull.

12         There got them.

13                TODD:  Yes.

14                J. BRAGA:  There.  We got them off, what

15         else?  Okay.

16                TODD:  Yes.

17                J. BRAGA:  All down now?

18                TODD:  Take off.

19                J. BRAGA:  Oh, what else?

20                TODD:  That.

21                J. BRAGA:  That comes off too?

22                TODD:  (Nodding in the affirmative.)

23                J. BRAGA:  Okay, whoopsy daisy.

24                TODD:  Take pants off.

25                J. BRAGA:  Did Frank take off his pants too?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                 OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      TODD:  Yes.

2      J. BRAGA:  Did Frank do it?

3      TODD:  Yes.  He took them off his hiney

4   (phonetic).

5      J. BRAGA:  Off his hiney?

6      TODD:  Yes.

7      J. BRAGA:  Did Frank show you his hiney?

8      TODD:  Who's that?

9      J. BRAGA:  This is Brooke.  What happened to

10   Brooke?

11      TODD:  She took clothes off.

12      J. BRAGA:  Who took her clothes off?

13      TODD:  You.

14      J. BRAGA:  Me?  I didn't take off her

15   clothes.  Who took her clothes off?

16      TODD:  We.

17      MRS. LEININGER:  Did she take her own clothes

18   off?

19      TODD:  Yes.

20      J. BRAGA:  Did she take off her clothes or

21   Frank take off her clothes or Iliana?

22      TODD:  (Pause.)

23      MRS. LEININGER:  Which one of these two

24   people took them off?

25      L. BRAGA:  Takes off all her clothes?

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
OFFICIAL  COURT  REPORTER
CIRCUIT  COURT  OF  THE  11TH  JUDICIAL  CIRCUIT,  DADE  COUNTY,  FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    TODD:  Yes.

2    L. BRAGA:  Just that?

3    TODD:  Just that.

4    L. BRAGA:  Who took this off?

5    TODD:  Pants.

6    J. BRAGA:  Who took pants off?

7    TODD:  I take them off.

8    L. BRAGA:  All right, hiney?

9    J. BRAGA:  Yes that's her bottom, her hiney.

10   TODD:  Yes.

11   L. BRAGA:  Okay who is this?  This is Iliana?

12   TODD:  Yes.

13   L. BRAGA:  Did she take off her clothes too?

14   TODD:  Yes.

15   MRS. LEININGER:  We will take her clothes

16   off, okay?  Take these off too.

17   TODD:  Yes and her hiney.

18   L. BRAGA:  Everybody took off all their

19   clothes, right?

20   TODD:  Yes.

21   L. BRAGA:  To play a game?

22   TODD:  Yes.

23   L. BRAGA:  Can you show us what game they

24   played?

25   MRS. LEININGER:  Show us.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                   OFFICIAL COURT REPORTER                   MIAMI
(305) 467-0600                                                            44 W. FLAGLER ST.
                                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        L. BRAGA:  This is Iliana.  This is Todd and

2     this is Frank and this is Brooke, right?

3        TODD:  Yes.

4        L. BRAGA:  Show us what games they play?

5     Show us what they do?

6        TODD:  That.

7        L. BRAGA:  Show me?

8        TODD:  Frank, penis.

9        L. BRAGA:  Yes?

10        TODD:  Penis.

11        L. BRAGA:  She me what Frank did.  You mean

12     this is Frank's penis?

13        TODD:  Uh-huh.

14        L. BRAGA:  She me what Frank did with his

15     penis?

16        TODD:  (Indicating.)

17        L. BRAGA:  He rubbed it?

18        TODD:  Yes.

19        L. BRAGA:  Did he rub it or did you rub it?

20        TODD:  He rubbed it.

21        L. BRAGA:  He rubbed his penis?

22        TODD:  Yes.

23        L. BRAGA:  What else did he do?  Did he do

24     something else?

25        TODD:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER               MIAMI
(305) 467-0600                                                 44 W. FLAGLER ST.
                                                               (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1            L. BRAGA:  What?

2            TODD:  That.

3            J. BRAGA:  Uh-huh?  What else did he do?

4            TODD:  (Indicating.)

5            J. BRAGA:  That's the hair under his arm.

6       That's the hair under his chest.

7            L. BRAGA:  Did he do anything with Iliana?

8            TODD:  (Indicating.)

9            L. BRAGA:  Who was standing up, Frank?

10           TODD:  Yes.

11           L. BRAGA:  What happened then?  Here is Frank

12      standing up?

13           TODD:  He's standing up.

14           L. BRAGA:  Okay.

15           TODD:  Standing up.

16           L. BRAGA:  Now what happened?

17           TODD:  Standing up.

18           L. BRAGA:  Standing up too?

19           J. BRAGA:  Okay.

20           TODD:  (Indicating.)

21           MRS. LEININGER:  Like that?

22           TODD:  Yes.

23           L. BRAGA:  Did everybody?

24           TODD:  Stands up.

25           MRS. LEININGER:  Is this how they were

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                    MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        standing?

2               TODD:  Yes.

3               J. BRAGA:  Then what would they do?

4               TODD:  Hold it.  Hold it.  Hold it.

5               J. BRAGA:  Hold the hands?

6               TODD:  Yes.

7               J. BRAGA:  Everybody hold hands.  You hold

8        Todd and I will hold Brooke.

9               TODD:  You get up.

10              J. BRAGA:  Okay.

11              TODD:  Ring around the rosy.

12              J. BRAGA:  Ring around the rosy.  Ring around

13       the rosy.  Ring around the posies, ashes ashes we

14       all fall down.

15              TODD:  Yes.

16              MRS. LEININGER:  Is that what they do?

17              J. BRAGA:  Okay.

18              TODD:  Ring around the rosies?

19              MRS. LEININGER:  Wait a minute.

20              J. BRAGA:  Without clothes on?

21              TODD:  Yes.

22              MRS. LEININGER:  Okay.

23              L. BRAGA:  Okay ring around the rosy, pocket

24       full of posies, ashes, ashes we all fall down.

25              TODD:  Do it again.

1      J. BRAGA:  All right.

2      L. BRAGA:  Put your foot up, okay?  Ring

3  around the rosy, pocket full of posies, ashes,

4  ashes we all fall down.

5      Okay what happens next?

6      TODD:  Do it again.

7      MRS. LEININGER:  What happened after ring

8  around the rosies?

9      TODD:  We do it again.

10     MRS. LEININGER:  No, let's see.  What

11 happens?

12     J. BRAGA:  We can do it again.  Show us what

13 else happens one more time.  One more time.  Then

14 you show us what all happens, okay?

15     TODD:  (Nodding in the affirmative.)

16     L. BRAGA:  Then we will see how the rest of

17 the game is.  Ring around the rosies, pocket full

18 of posies, ashes, ashes we all fall down.

19     Okay, now what happens next?

20     MRS. LEININGER:  You said if we did it one

21 more time, then we will (inaudible).

22     L. BRAGA:  What happens next?  Show your mom

23 what happens next?

24     TODD:  (Indicating.)

25     L. BRAGA:  No, did anybody show Todd -- no

1       what did they do to Todd?

2               J. BRAGA:  Ouch.

3               MRS. LEININGER:  Todd, sit down and show what

4       happens next.

5               TODD:  Ring around the rosy.

6               MRS. LEININGER:  Did they play other games?

7               TODD:  Ring around the rosy, all fall down.

8               J. BRAGA:  Did they play catch me catch me?

9               TODD:  Ring around the rosy, fall down.

10              L. BRAGA:  Fall down and what happened when

11      you fall down?  Did everybody fall down together

12      or apart?

13              TODD:  Ring around the rosy, pocket full of

14      posies, ashes, ashes all fall down.

15              J. BRAGA:  Todd, if this is Brooke and this

16      is Frank, what did they do?

17              TODD:  All fall down, ashes, ashes all fall

18      down.

19              L. BRAGA:  Did you hurt your knee?

20              TODD:  I got my knee hurt.

21              MRS. LEININGER:  You did?

22              TODD:  Yes.

23              J. BRAGA:  Did Frank ever do anything to hurt

24      you?

25              TODD:  Ashes, all fall down.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE            OFFICIAL COURT REPORTER            MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          MRS. LEININGER:  Did Frank ever hurt you,

2     Todd?

3          TODD:  Ashes, ashes all fall down.  All fall

4     down.

5          MRS. LEININGER:  Okay.

6          TODD:  What do you have on?

7          J. BRAGA:  Here is Iliana and this is Todd.

8          TODD:  (Indicating.)

9          L. BRAGA:  He's got an (inaudible) in his

10    face, isn't that silly?

11         TODD:  Yes.

12         J. BRAGA:  Todd, this is Iliana and this is

13    Todd.

14         TODD:  (Inaudible.)

15         L. BRAGA:  Are you okay?  Do you know what I

16    think?  I think --

17         TODD:  Pocket full of rosies, all fall down.

18         L. BRAGA:  Did you ever see somebody wearing

19    a mask?

20         TODD:  Yes.

21         J. BRAGA:  Who else do you know that would?

22         TODD:  Frank.

23         L. BRAGA:  Did Frank ever put on a mask?

24         TODD:  Yes.

25         J. BRAGA:  What would happen when he put on

1        the mask?

2               TODD:  He would put a mask on him.

3               J. BRAGA:  He would put a mask on him?

4               TODD:  Yes.

5               L. BRAGA:  Then what would he do?

6               TODD:  Growl.

7               J. BRAGA:  Did he growl?  Did he scare you a

8        little bit?

9               TODD:  Put a hat on.

10              MRS. LEININGER:  Pretend like a monster hat?

11       What did you do?  Did he scare you?

12              TODD:  Yes.

13              L. BRAGA:  Did he tell you?

14              TODD:  Which one?

15              J. BRAGA:  This is Frank?

16              TODD:  Pocket full of rosies, all fall down,

17       rosies, rosies.

18              L. BRAGA:  Did Frank have a mask on when you

19       would play ring around the rosy?

20              TODD:  Yes.

21              J. BRAGA:  This is Todd?  Did Frank ever

22       touch your body?

23              TODD:  You play.

24              MRS. LEININGER:  No I am too tired to play

25       ring around the rosy.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                                44 W. FLAGLER ST.
                                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        J. BRAGA:  We will later, if you tell us a

2    story.  Tell us the story about what happened when

3    you played with Iliana and Frank and nobody had

4    any clothes on.

5        TODD:  (No response.)

6        MRS. LEININGER:  Tell us what you are doing

7    here?

8        J. BRAGA:  Todd, would you tell me what would

9    happen when you wouldn't have any clothes on?

10   What would happen?

11       TODD:  Pee pee.

12       J. BRAGA:  Tell me about pee pee, tell me

13   about pee pee?

14       TODD:  Pee pee.

15       J. BRAGA:  Tell me about it?

16       TODD:  I -- I did pee pee.

17       L. BRAGA:  You would pee pee?

18       TODD:  Uh-huh.

19       J. BRAGA:  When you had no clothes on?

20       TODD:  No.

21       J. BRAGA:  No?  When?

22       TODD:  Frank.

23       J. BRAGA:  Can you show me with the dolls?

24       TODD:  I want the big one.

25       MRS. LEININGER:  This is the big one.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                  44 W. FLAGLER ST.
                                                               (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1           J. BRAGA:  This is the big one and this is

2      the little one.  This is Todd and this is Frank.

3      Maybe this is another boy.  This is David.

4           Can you show me what Frank would do with

5      David?

6           TODD:  I will get --

7           J. BRAGA:  I think we are lost.

8           L. BRAGA:  Where is David?

9           MRS. LEININGER:  Is this David here?

10          TODD:  Yes.

11          MRS. LEININGER:  David wants to find out

12     something, come here.  Let's find him.  Todd?

13          TODD:  (Inaudible.)

14          MRS. LEININGER:  Look you can dump it out

15     after you talk to David.  All right?  Come here.

16     Let's talk to David.

17          J. BRAGA:  Then you can play with the truck.

18          MRS. LEININGER:  Come and talk to David

19     first.  Then you can come play with the truck.

20          Hi, Todd, who is this?

21          L. BRAGA:  David.

22          MRS. LEININGER:  Then we will play with the

23     truck later.  Come here.  Come over and sit with

24     David.

25          L. BRAGA:  We will make believe this isn't

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      Todd anymore.  This is David.

2            TODD:  I am going to dump it out.

3            MRS. LEININGER:  Let's put the truck up for

4      just a minute, Todd, here.

5            J. BRAGA:  Why don't we take a short break

6      and let him play with the truck and then we can

7      try again.

8            L. BRAGA:  You can play with the truck.  Go

9      ahead.

10           TODD:  Dump it out.

11           L. BRAGA:  Okay, dump it out.

12           TODD:  Dump it out.

13           L. BRAGA:  You dump it out.  It's kind of

14     hard to talk about this stuff, huh?

15           TODD:  (No response.)

16           L. BRAGA:  Because maybe somebody said

17     something to scare you if you said something.

18           TODD:  (Inaudible.)  Find a man.

19           L. BRAGA:  What man?

20           TODD:  In the truck.

21           L. BRAGA:  Here, let's put Frank on the

22     truck.  Okay?  There we go, Frank is in the truck.

23           TODD:  No I don't want him in the truck.

24           L. BRAGA:  You don't want him in the truck?

25           TODD:  He's too big.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                 44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       L. BRAGA:  How about Todd in the truck?

2       TODD:  Uh-huh.

3       L. BRAGA:  Go ahead.

4       TODD:  He's too big.

5       L. BRAGA:  You want a man, a little man.  I

6   don't think we have any little men here.

7       TODD:  An old man here.

8       MRS. LEININGER:  Did Frank tell you not to

9   talk about what happened at their house?

10      TODD:  I want a man.

11      MRS. LEININGER:  Did Frank tell you you must

12  not tell anybody what happened?

13      TODD:  (Inaudible.)

14      MRS. LEININGER:  Todd, listen to mommie.  Did

15  Frank tell you not to talk about this?  Listen,

16  it's okay to talk about it.  You are not going to

17  get into trouble.

18      Nobody is going to hurt you.  Here.  Come

19  here, Todd.

20      TODD:  What is that?

21      MRS. LEININGER:  Todd, it's okay to talk

22  about this.

23      TODD:  Mommie.

24      MRS. LEININGER:  That's a block.

25      TODD:  Dump it out.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                      MIAMI
(305) 467-0800              OFFICIAL COURT REPORTER           44 W. FLAGLER ST.
                                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        L. BRAGA:  It's very normal for him to react.

2    He hears you, even though he's ignoring you.

3        MRS. LEININGER:  Okay.

4        L. BRAGA:  It took a lot for him to do what

5    he did.  He may not give us any more but his

6    reaction is very clear.

7        TODD:  A little man.

8        MRS. LEININGER:  They don't have a little

9    man, Todd.

10        L. BRAGA:  I wish we brought a little man.

11    These are all the littlest dolls we have.

12        MRS. LEININGER:  That's Brooke.  You can put

13    her -- let's put her in the truck in here.

14        TODD:  Yes.

15        MRS. LEININGER:  I don't know if she will fit

16    in there or not.  Oh, she does.

17        L. BRAGA:  She looks kind of cute.

18        TODD:  She doesn't fit.

19        L. BRAGA:  She's awful big for that, huh?

20        MRS. LEININGER:  Did you ever play with that

21    with Frank and Iliana?  Remember that little

22    motorcycle at their house?

23        TODD:  Yes.

24        MRS. LEININGER:  I wonder if it's still

25    there.  We left it over there.  Did you ever ride

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    it at their house?

2        TODD:  Yes it's too big for me.

3        MRS. LEININGER:  That's a little motorcycle.

4        TODD:  Yes.

5        MRS. LEININGER:  Did Frank play with you when

6    you were on the motorcycle?

7        TODD:  Yes.

8        MRS. LEININGER:  Todd, did Frank tell you you

9    couldn't tell anybody?

10        TODD:  (Inaudible.)

11        MRS. LEININGER:  Todd, you know what?  It's

12    okay to talk about it.  Nobody is going to get

13    angry and nobody is going to get mad.

14        Todd, you are going to feel better if you

15    tell us all about what happened there.

16        TODD:  Okay.

17        L. BRAGA:  I think maybe you are a little

18    scared to talk and that is okay.

19        TODD:  What's that?

20        L. BRAGA:  That's like an extra wheel.  See

21    these wheels here?  Then on the bottom there's an

22    extra wheel there.  I think maybe you are a little

23    scared to talk about it and maybe somebody said

24    they would hurt you if you talked about it but

25    nobody is going to hurt you.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          IF you don't want to talk, that's all right.

2     You don't have to.

3          MRS. LEININGER:  You know the other children

4     told them what happened there?

5          TODD:  Where?

6          MRS. LEININGER:  The other children told

7     them.

8          L. BRAGA:  At Iliana's.  Yes we talked to

9     Justin and Jonathan.

10         TODD:  Oh.

11         MRS. LEININGER:  They told them what Frank

12    and Iliana did at home.  You know that?  They told

13    them all about them.  Can you do that?

14         TODD:  Dump it out, mommie, dump it out.

15         MRS. LEININGER:  Do you remember Jonathan and

16    David?

17         TODD:  Dump it out.

18         MRS. LEININGER:  Do you remember them?  They

19    told them what Iliana and Frank were doing?

20         It doesn't come up.  You have to turn it

21    over.  They talked about Iliana and Frank.  Can

22    you do that?

23         TODD:  Dump it out.

24         L. BRAGA:  I think we should let it go.

25         MRS. LEININGER:  It doesn't -- from what I

1    can tell, Todd, it doesn't come up.  You have to

2    turn it over.

3         TODD:  Have it off.

4         L. BRAGA:  Well you can take it apart, if you

5    want.  Let me show you something.

6         TODD:  Yes.

7         L. BRAGA:  See this, let's see this part

8    right here?

9         TODD:  Uh-huh.

10        L. BRAGA:  Undo this.  I started it.  You can

11   finish it.  That's right.  Now watch.

12        Yes, here you go.

13        TODD:  Put it back on.

14        L. BRAGA:  Put it back on, okay.  There you

15   go.

16        TODD:  Put it back on.

17        L. BRAGA:  There, you want to finish it?

18        TODD:  Yes.

19        L. BRAGA:  Okay, go ahead.  Want to take it

20   off again?

21        TODD:  Take that off.

22        L. BRAGA:  Take that off?

23        TODD:  Yes.

24        L. BRAGA:  Okay, there we go.

25        TODD:  Put that on.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          L. BRAGA:  Put it back on, okay.  There we

2     go.

3          TODD:  Screwdriver.

4          L. BRAGA:  Srewdriver.

5          TODD:  I want a screwdriver.

6          L. BRAGA:  We don't have one but you can use

7     your fingers.  There we go.  Take it off?

8          TODD:  Take that off.

9          L. BRAGA:  Take it off.

10         TODD:  Put it back on.

11         L. BRAGA:  Put it back on?

12         TODD:  (Inaudible.)  Take it off.

13         L. BRAGA:  Screw it in.  Do you want to?

14         TODD:  Take the wheel off.

15         L. BRAGA:  You want to take the wheel off?

16         TODD:  Yes.

17         L. BRAGA:  Go ahead.  You take that off.  You

18    have to undo the white part, the middle part.

19         TODD:  Yes.

20         L. BRAGA:  I will start and then you finish

21    it.  Then you do it.  You got it.

22         TODD:  (Indicating.)

23         L. BRAGA:  There you go.  See you can do it

24    yourself.  Do you want to put it back on?

25         TODD:  Put it back on.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER              MIAMI
(305) 467-0900                                                  44 W. FLAGLER ST.
                                                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    L. BRAGA:  Okay you want some help?

2    TODD:  Put it back on.

3    L. BRAGA:  Okay I will just put it like this

4  and then you screw it in.

5    TODD:  Put that -- close that off.

6    L. BRAGA:  Take that off?

7    TODD:  Yes.

8    L. BRAGA:  Finish this one first.  Then we

9  will take that other one off.  Shall we turn that

10  upside down?  You take this one, the white part is

11  what you have to -- see this won't come off.  It's

12  the white part you have to unscrew.  Turn it the

13  other way, the other part.

14    MRS. LEININGER:  The white part, yes turn it

15  that way.  Keep turning it.  The other way, that's

16  it.

17    L. BRAGA:  I will start it and you finish it,

18  okay?  Now you do it.  There.  You took it off.

19    TODD:  Take that off.

20    L. BRAGA:  Just let it drop.  I think it will

21  drop off, yes.  Okay.

22    TODD:  Take those off.

23    L. BRAGA:  You want to take this one off too?

24    TODD:  Take two off.

25    L. BRAGA:  Take two off, okay.  I will start

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                      44 W. FLAGLER ST.
                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        it and then you can finish it, okay?

2            TODD:  Two off.  Take two off.

3            L. BRAGA:  You want to take more off?

4            TODD:  Yes.  Take two off.

5            L. BRAGA:  Okay you finish it.

6            MRS. LEININGER:  The other way, the white

7        one, the other way.

8            TODD:  Yes.

9            MRS. LEININGER:  The other way, this way.

10       No, the white part, Todd, that's the wrong way.

11       Is that the way you want to do it?  Yes.

12           TODD:  Yes.

13           MRS. LEININGER:  Oh, okay.

14           TODD:  You do this.

15           L. BRAGA:  Let's see.

16           TODD:  Take that part.

17           L. BRAGA:  Okay this is almost down.  You

18       finish it.  The white part.

19           TODD:  (Inaudible.)

20           L. BRAGA:  I think it's all coming apart.

21       You have to take the wheel off first.

22           TODD:  (Inaudible.)

23           L. BRAGA:  Here, you do it.

24           TODD:  No, no, take it off.

25           L. BRAGA:  It doesn't want to come off, huh?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    Let's see, almost.  It's kind of hard.  It's

2    stuck, stuck on there.  There we go.  Now look

3    what happens.

4         TODD:  Take that off.

5         L. BRAGA:  Yes we will take this part off.

6    Look at that.

7         TODD:  Take that off.

8         L. BRAGA:  This too?

9         TODD:  Yes.

10        L. BRAGA:  Wait until you see what happens.

11   It's all apart.  That's it.  That's as much as it

12   comes on.

13        TODD:  Put the seat back on.

14        L. BRAGA:  Okay you put it back on.

15        TODD:  That way?

16        L. BRAGA:  The other way.  Turn it around.

17        MRS. LEININGER:  Turn it around.

18        TODD:  That way?

19        MRS. LEININGER:  Uh-huh.

20        L. BRAGA:  You got it.  Now try from the

21   bottom.  I think like this.

22        MRS. LEININGER:  Let's get the handle out so

23   it doesn't get in your way.  Here.  The handle, I

24   mean the thing doesn't come off here, Todd.

25        L. BRAGA:  Almost got it.  This part goes

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          underneath like this.

           TODD:  Yes.

3          L. BRAGA:  Yes you do it.  That's it.  Good.

4          TODD:  That's it.

5          L. BRAGA:  Yes that's it.  Yes, that's it.

6          TODD:  Put that on.

7          L. BRAGA:  Right.

8          TODD:  (Inaudible.)

9          MRS. LEININGER:  I think if you turn it

10    around the other way.  That's it.  Good.

11         L. BRAGA:  Boy, you are smart.

12         TODD:  Like that?

           MRS. LEININGER:  Uh-huh.  Screw it in, that's

14    good.

15         TODD:  (Inaudible.)  Put that in.

16         MRS. LEININGER:  Right.

17         TODD:  Where does it go?

18         MRS. LEININGER:  You have to put the wheels

19    on now.  First I think you have to put the red

20    part on first.

21         TODD:  Screw that?

22         MRS. LEININGER:  Let's see, is that how it

23    goes?

24         L. BRAGA:  Uh-huh.

25         MRS. LEININGER:  I will hold it and you screw

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                           44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

that in, okay?  Good.

TODD:  Where is (inaudible) put this on.

MRS. LEININGER:  Uh-huh.

TODD:  Where does it go?

MRS. LEININGER:  You have to put another one in here.  I will hold it.  You can screw that in, okay?

The other way, that's right.  Just keep doing it.  It will screw in.  That's all right.  I think you got it.

TODD:  (Inaudible.)  Where does that go? Where does that go, mommie?

MRS. LEININGER:  Next side.  Let me see.

TODD:  Hold it.  You hold it for me.

MRS. LEININGER:  You have to get the red wheel.  Want me to hold it?

TODD:  Yes.

MRS. LEININGER:  Keep doing it.  Keep turning it.

TODD:  Uh-huh.

MRS. LEININGER:  You have to keep turning a whole bunch of times.

TODD:  Where does that go?

MRS. LEININGER:  The bottom, maybe, yes on the bottom.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

TODD:  On that bottom?

MRS. LEININGER:  No the other way.  That's right.  This way.  Go ahead.

TODD:  Do that part.

MRS. LEININGER:  That goes on the bottom.

TODD:  Goes on the bottom?  Where?

MRS. LEININGER:  Boy, you took that whole truck apart and you put it back together.  That's pretty good, huh?  Very good.

TODD:  (Inaudible.)  Joanne.

MRS. LEININGER:  You want to see Joanne?

TODD:  Yes.

MRS. LEININGER:  If Joanne comes in, will you tell the story about Frank and Iliana?

TODD:  (Nodding in the affirmative.)

MRS. LEININGER:  Let me get Joanne, if she comes in will you tell them what happened at Frank and Iliana's house?

TODD:  (Pause.)

MRS. LEININGER:  If I bring her in, will you tell her about what happened at Frank and Iliana's house?

TODD:  Yes.

MRS. LEININGER:  Okay, I will go get her.  Okay now Joanne is in here.  Joanne is here.  Can

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          you tell us about Frank and Iliana?

2                    TODD:  (Inaudible.)

3                    MRS. LEININGER:  Todd?

4                    TODD:  (Inaudible.)

5                    MRS. LEININGER:  Todd, you promised us you

6          would tell us about Frank and Iliana.  Can you do

7          that now, please?

8                    TODD:  I can't.

9                    MRS. LEININGER:  Why not?

10                   TODD:  I can't.

11                   MRS. LEININGER:  Because they told you not to

12         tell?

13                   TODD:  No.

14                   MRS. LEININGER:  It's okay to tell now.  They

15         can't hurt you.

16                   TODD:  Joanne's here?

17                   MRS. LEININGER:  Yes.

18                   TODD:  Is the TV on?

19                   MRS. LEININGER:  Yes.

20                   TODD:  Turn it on.

21                   MRS. LEININGER:  Yes.

22                   L. BRAGA:  Let's pretend this is Iliana,

23         okay?  This is Iliana and let's see, that's

24         Brooke.

25                   TODD:  Where is Todd?

1      L. BRAGA:  Here is Todd.  Can you show me

2    what Iliana and Todd did?

3      TODD:  Yes.

4      L. BRAGA:  Would you?

5      TODD:  Yes.

6      L. BRAGA:  Come on, show me.

7      TODD:  I don't want to.

8      L. BRAGA:  You don't want to show me?

9      TODD:  No.

10     MRS. LEININGER:  As soon as you show them we

11   can go home.

12     L. BRAGA:  Sometimes little children have

13   some type of yucky secrets because they might get

14   into trouble, because they told sometimes they

15   feel a lot better.

16     TODD:  Where is Joanne going?

17     L. BRAGA:  Sometimes grown-ups do things they

18   shouldn't do.

19     MRS. LEININGER:  Joanne is here.  We will go

20   home now if you tell about Frank and Iliana.

21     L. BRAGA:  After you tell, you will feel much

22   better then.  You won't have to talk about it any

23   more.

24     TODD:  All fall down.  Truck.

25     MRS. LEININGER:  Come on Todd, we will go

home when you are finished telling, okay?

    TODD:   (Inaudible.)

    MRS. LEININGER:  You have to finish telling.

    L. BRAGA:  Let's just pretend.  This isn't
real, okay?  This is just pretend.  We are going
to pretend that this is Iliana.  It's just a doll.
It can't hurt you.

    TODD:  I am finished.

    L. BRAGA:  You are finished?

    TODD:  Finish.

    MRS. LEININGER:  Tell her about the games you
played with Iliana.

    L. BRAGA:  Just show me one time what Iliana
would do to Todd?

    TODD:  That -- (inaudible.)

    MRS. LEININGER:  Yes you will go home with us
but first you have to tell us what Frank and
Iliana did with you?

    TODD:  Pee pee.

    MRS. LEININGER:  They played with your pee
pee?

    TODD:  Yes.

    MRS. LEININGER:  Can you tell us how you did
that?

    TODD:  Pee pee in pants.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          MRS. LEININGER:  Pee peed in your pants?

2          TODD:  Girls pee pee in their pants.

3          MRS. LEININGER:  The girls pee peed in their

4    pants?

5          TODD:  Fell.

6          MRS. LEININGER:  Brooke fell down?  What

7    happened to her pee pee?

8          TODD:  Wanted to go pee pee in the potty.

9          MRS. LEININGER:  They wouldn't let you go pee

10    pee in the potty?

11          TODD:  Yes.

12          MRS. LEININGER:  Did she do it?

13          TODD:  Yes.

14          MRS. LEININGER:  She went and pee peed in the

15    potty?

16          TODD:  Yes.

17          MRS. LEININGER:  Then what happened?

18          TODD:  Would fall down.

19          L. BRAGA:  Is that a game you would play?

20          MRS. LEININGER:  Show us what Brooke did

21    after she went pee pee in the potty?

22          TODD:  Pee pee in the potty.

23          L. BRAGA:  Frank, let's pretend this is

24    Brooke and this is Frank.  Let's pretend this is

25    Frank and this is Brooke.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    What would Frank do with Brooke?

2    MRS. LEININGER:  Honey, it's okay.  Nobody is

3    going to hurt you, Todd.  It's okay to talk about

4    this.

5    L. BRAGA:  It's kind of scary, I know.

6    MRS. LEININGER:  Mommie loves you so much,

7    you know?

8    TODD:  You have glasses on.

9    MRS. LEININGER:  You know what?

10   TODD:  What?

11   MRS. LEININGER:  You are such a good boy.  I

12   love you.  Do you want to talk about it, then you

13   are going to feel so much better.

14   TODD:  Pee pee.

15   MRS. LEININGER:  Then what?  Show me?

16   TODD:  Frank.

17   MRS. LEININGER:  Show me what Frank did?

18   TODD:  He scared me.

19   MRS. LEININGER:  He scared you?

20   TODD:  Yes.

21   MRS. LEININGER:  What did he scare you with?

22   TODD:  A hat.

23   MRS. LEININGER:  A hat?

24   TODD:  Yes.

25   MRS. LEININGER:  What else?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                        MIAMI
(305) 467-0600                                                   44 W. FLAGLER ST.
                                                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          TODD:  Penis.

2          MRS. LEININGER:  What else?  He scared you

3     with his penis?

4          TODD:  (Inaudible.)

5          MRS. LEININGER:  He what?

6          TODD:  Rocked it.

7          MRS. LEININGER:  Rocked it?

8          TODD:  Just like that.  (Indicating.)

9          MRS. LEININGER:  Did he rock you?

10         TODD:  No.

11         MRS. LEININGER:  He rocked his penis?

12         TODD:  Yes.

13         MRS. LEININGER:  Show me on Frank how he

14    rocked his penis?

15         TODD:  Rock.

16         MRS. LEININGER:  He rocked back and forth?

17         TODD:  (Indicating.)

18         MRS. LEININGER:  What did he do with his

19    penis, like that?

20         TODD:  Yes.

21         MRS. LEININGER:  What were you doing?  Where

22    was Todd when he did that?

23         TODD:  (Inaudible.)

24         MRS. LEININGER:  You rocked back and forth?

25         TODD:  Yes.

1    MRS. LEININGER:  Where were you sitting?

2    TODD:  (Inaudible.)

3    MRS. LEININGER:  On his lap?

4    TODD:  Yes.

5    MRS. LEININGER:  And --

6    TODD:  Rocking.

7    MRS. LEININGER:  You were sitting on his lap

8    like that?

9    TODD:  Rock rock.

10   MRS. LEININGER:  Where was his penis when you

11   were rocking?

12   TODD:  Rocking.

13   MRS. LEININGER:  Show me where Frank's penis

14   was when you were rocking?

15   TODD:  Here (indicating).  His penis.

16   MRS. LEININGER:  Were you sitting on his lap?

17   TODD:  Yes.

18   MRS. LEININGER:  Where was Frank's penis then?

19   TODD:  Peeing in the pants (inaudible).

20   MRS. LEININGER:  Pretend this is Frank.

21   Where is Todd?

22   TODD:  Right here.

23   MRS. LEININGER:  Was Todd sitting like this?

24   TODD:  Yes rocking.

25   MRS. LEININGER:  He rocked you?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

TODD:  Rocked me.

MRS. LEININGER:  He rocked you like this?

TODD:  (Inaudible.)

MRS. LENINGER:  Yes and what did you do?

TODD:  Rock.

MRS. LEININGER:  Yes?

TODD:  Backwards.

MRS. LEININGER:  You went backwards?

TODD:  Backwards.

L. BRAGA:  Were you scared?

TODD:  No.

L. BRAGA:  Did it hurt?

TODD:  Rock baby.

L. BRAGA:  Rock the baby?

MRS. LEININGER:  Did it hurt you?

TODD:  (No response.)

MRS. LEININGER:  Did it hurt Todd?

TODD:  No (inaudible).

MRS. LEININGER:  You put Todd on your lap, is this Todd?

TODD:  Yes.

MRS. LEININGER:  Then what happened?

TODD:  Rock baby.

MRS. LEININGER:  Rocked you back and forth?

TODD:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    MRS. LEININGER:  Then you got off?

2    TODD:  Yes.

3    MRS. LEININGER:  Then what happened?

4    TODD:  Rock the baby.

5    MRS. LEININGER:  Back and forth while you

6    were sitting on Frank's lap?

7    TODD:  (Indicating.)

8    MRS. LEININGER:  You know what?

9    TODD:  Yes?

10    MRS. LEININGER:  Boy are you tired.

11    TODD:  No.  Backwards.

12    L. BRAGA:  Todd, did Iliana ever touch your

13    penis?

14    MRS. LEININGER:  Now let's finish rocking,

15    okay?

16    TODD:  Uh-huh.

17    L. BRAGA:  Did Iliana ever touch Todd's

18    penis?

19    TODD:  No.

20    L. BRAGA:  Did Iliana ever touch Brooke?

21    TODD:  (No response.)

22    MRS. LEININGER:  After you finish telling

23    your story, then we are going home.

24    TODD:  I want to keep rocking the baby.

25    MRS. LEININGER:  Okay you finished.  Is Frank

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      finished?

2              TODD:  No.

3              MRS. LEININGER:  He rocked you for a long

4      time?

5              TODD:  Yes.

6              MRS. LEININGER:  He rocked a long long time?

7              TODD:  Yes.

8              L. BRAGA:  Then what did he do?

9              TODD:  Rocking his baby.

10             MRS. LEININGER:  He was rocking his baby?  Is

11     that what he said?

12             TODD:  Yes.

13             MRS. LEININGER:  He says I am rocking my

14     baby?  Are you all finished?

15             TODD:  No, rocking (inaudible).

16             MRS. LEININGER:  Okay.

17             TODD:  Rock the baby and sit down.

18             MRS. LEININGER:  Now is he finished?

19             TODD:  No.

20             MRS. LEININGER:  He did that a long long

21     time?  You want to keep rocking?

22             TODD:  Rock rock.

23             MRS. LEININGER:  Where was Iliana while you

24     were rocking on Frank's lap?

25             TODD:  On penis.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          MRS. LEININGER:  You were on his penis?

2          TODD:  Yes rocking the baby, rock his baby,

3     rock his baby.

4          MRS. LEININGER:  Were you sitting on his

5     penis when you were rocking, Todd?

6          TODD:  Rock the baby.  Rock the baby and rock

7     the baby.  That's fun rocking the baby.

8          MRS. LEININGER:  Is it fun to rock the baby?

9     Were you sitting on Frank's penis when you sat on

10    the baby?

11         TODD:  (Inaudible.)

12         MRS. LEININGER:  Did it hurt sometimes?

13         TODD:  Like that and (inaudible).

14         L. BRAGA:  Can you put that back down?

15         MRS. LEININGER:  Let's put this back down.

16         L. BRAGA:  When you were done rocking, what

17    did Frank do?

18         TODD:  Penis.

19         MRS. LEININGER:  What did he do with his

20    penis?

21         TODD:  Rock the baby, rock the baby, rock

22    the baby like that.  Rock the baby, rock the baby,

23    rock the baby, rock the baby.  Rock the baby.

24    Rock the baby and rock the baby, rock the baby,

25    rock the baby.  (Inaudible) Rock the baby.

1      MRS. LEININGER:  Let's finish up with rocking

the baby.

3      L. BRAGA:  That's enough.  You want to put

4  the clothes back on?

5      TODD:  Yes.

6      L. BRAGA:  You want help?

7      TODD:  Yes.

8      L. BRAGA:  You want to go find the clothes

9  over there for me, would you?

10      TODD:  No you go get them.

11      L. BRAGA:  Okay, I will go get them.

12      MRS. LEININGER:  You know what?  I love you.

You are a good boy.  Yes, you are a sweetie.

14      TODD:  (Inaudible.)

15      MRS. LEININGER:  I've got the sniffles.  I

16  think I've got a cold.  Do you want to put the

17  clothes back on?

18      TODD:  No.

19      L. BRAGA:  You want to leave the clothes off?

20      TODD:  Yes.

21      L. BRAGA:  We will leave the clothes off.

22  You think you talked enough?  Do you want to say

23  anything else?  Do you want to tell us anything?

24      MRS. LEININGER:  What happened when you got

2_  off of Frank's lap?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 487-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1       TODD:  (Pause.)

2       L. BRAGA:  You don't have to say anything

3   more if you don't want, but if there's anything

4   else, any other secrets you want to tell, it's

5   okay.

6       TODD:  (Inaudible.)

7       MRS. LEININGER:  You knocked me over.

8       L. BRAGA:  Do you want to go home?

9       TODD:  No.

10      MRS. LEININGER:  Do you want to tell her some

11  more?  What do you want to tell her?

12      TODD:  Pee pee.

13      MRS. LEININGER:  Happens next?

14      TODD:  I don't want to talk more.

15      L. BRAGA:  Okay.

16      MRS. LEININGER:  Are you all finished?

17      L. BRAGA:  If sometime you want to tell more

18  to mommie, nobody is going to get mad at you.  You

19  didn't do anything wrong.  Sometimes if you feel

20  like talking about it, you can talk.  Sometimes if

21  you have a secret about it, you feel better if you

22  talk.

23      If you want to, you can talk to mommie or

24  somebody you love.

25      TODD:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7285

1        MRS. LEININGER:  Where?

2        TODD:  What does she got?

3        MRS. LEININGER:  What?

4        L. BRAGA:  Where?

5        TODD:  Penis.

6        L. BRAGA:  No.

7        TODD:  I don't want to talk.

8        L. BRAGA:  Okay, you don't have to.  Sorry.

9   Thank you for talking to us.

10        TODD:  Okay.  Rock the baby.

11        MRS. LEININGER:  You want to keep rocking the

12   baby, huh?

13        TODD:  I knocked you over.

14        MRS. LEININGER:  I know you knocked me right

15   over.  You know what?  My legs are tired standing

16   up.  Just a minute.  You ready to go home?

17        TODD:  Yes, yes, get up mommie.

18        MRS. LEININGER:  I can't get up with you in

19   my arms Todd.  You are too heavy.

20        TODD:  Mommie, will you hold me?

21        MRS. LEININGER:  Okay, Todd, come here.  Do

22   you want to go home?

23        TODD:  Yes.  (Inaudible.)  At my house.  At

24   your house.

25        MRS. LEININGER:  No, she's going to go to her

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                              MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1 house, honey.

2   (Thereupon, the videotape of TODD LEININGER

3 concluded.)

4   MR. SAMEK:  Judge, the next exhibit is

5 Exhibit D, which I request to publish to the jury.

6 It's August 9th, videotape of David Litwin.

7   MR. HOGAN:  These are all August 9 so far.

8   MR. SAMEK:  Yes I think I said --

9   MR. HOGAN:  All right.

10   (Thereupon, the video of DAVID LITWIN was

11 played at 2:35 o'clock p.m., and was recorded as

12 follows:)

13   L. BRAGA:  Get all the blocks.  Let's put it

14 in.

15   DAVID:  Did this --

16   L. BRAGA:  This goes with the truck.  We took

17 the truck apart.  I think this goes here.

18   DAVID:  Here?

19   L. BRAGA:  Yes and it goes -- I tie it on

20 this.  Shall I fix it?

21   DAVID:  Yes.

22   L. BRAGA:  Okay.  It's hard.

23   DAVID:  It's hard.

24   L. BRAGA:  Yes it's hard to get it through

25 because the end of it.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                MIAMI
(305) 467-0600              44 W. FLAGLER ST.
                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    DAVID:  Here.

2    L. BRAGA:  You want to do it?

3    DAVID:  Yes.

4    L. BRAGA:  Okay you do it.

5    DAVID:  It's hard.

6    L. BRAGA:  Yes it's hard.  See what I mean?

7    DAVID:  That you can do, yes.

8    L. BRAGA:  That's good.

9    DAVID:  Right there.

10   L. BRAGA:  Look at that.  You're right.  It

11   goes right through there.

12   DAVID:  (Inaudible.)

13   L. BRAGA:  Oh.  Let's see.  Hand me that top

14   over there.  See the top right over there?

15   DAVID:  Yes.

16   L. BRAGA:  Put it on here.

17   DAVID:  Now?

18   L. BRAGA:  Now, very good.

19   DAVID:  (Inaudible.)

20   L. BRAGA:  Uh-huh, wonderful.  You are smart.

21   DAVID:  This, here, no.

22   L. BRAGA:  No it doesn't go there.

23   DAVID:  No.  This is --

24   L. BRAGA:  That will go, yes.

25   DAVID:  (Inaudible.)  Here that goes here.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        L. BRAGA:  I don't think that one will go it

2    is well you've got it.  Good.

3        DAVID:  (Inaudible.)

4        L. BRAGA:  Good.  Good for you.

5        DAVID:  All right.  Here (inaudible).  Here.

6        L. BRAGA:  Do you know what this is?

7        DAVID:  Yes.

8        L. BRAGA:  It's a wheel.

9        DAVID:  Wheel?

10        L. BRAGA:  It's a wheel.  It goes on here.

11    Let me show you.

12        DAVID:  Yes.

13        L. BRAGA:  See?  This goes like this and

14    actually I think I have it backwards.  Does it go

15    like --

16        DAVID:  This?

17        L. BRAGA:  No I have it the right way like

18    that and then --

19        DAVID:  Then --

20        L. BRAGA:  Yes you've got it right.  You put

21    this in here.

22        DAVID:  This?

23        L. BRAGA:  Uh-huh.  You put it in, you kind

24    of screw it in.  Shall I help?

25        DAVID:  Do this.

1      L. BRAGA:  You fix it.  Make it tight.  Screw

2  it all the way.

3      DAVID:  Do this one.

4      L. BRAGA:  This one first.

5      DAVID:  (Inaudible.)

6      L. BRAGA:  You want to put that around it?

7      DAVID:  Yes.

8      L. BRAGA:  Oh good.  You know what that is?

9  That's a seat.  That goes -- it goes like this.

10  Let's see how that works.

11      DAVID:  (Inaudible.)

12      L. BRAGA:  Like this or maybe --

13      DAVID:  Yes.

14      L. BRAGA:  I am not sure.  This, I think,

15  goes like this.  That's how it goes.  See?

16      DAVID:  This?

17      L. BRAGA:  What you have to do is find one of

18  the wheels.

19      DAVID:  Wheels?

20      L. BRAGA:  There's a wheel over there.  Do

21  you want to hand it to me?

22      DAVID:  This?

23      L. BRAGA:  Uh-huh, that's the white part.

24      DAVID:  White.

25      L. BRAGA:  Then hand me one of the red ones.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1            That's part of it.

2               DAVID:  This one?

3               L. BRAGA:  Yes, okay, put this like this.

4            Then put this part in.  Do you want to do it?

5               DAVID:  No.

6               L. BRAGA:  No?  Okay you don't have to and

7            turn it over.

8               DAVID:  This (inaudible) here.

9               L. BRAGA:  No, know what that is?  It's a

10          wheel.

11               DAVID:  Wheel?

12               L. BRAGA:  Yes, you know where it goes?

13          Right here.

14               DAVID:  Here.

15               L. BRAGA:  That's right.

16               DAVID:  Here.

17               L. BRAGA:  But you have to screw it on.  You

18          have to use this.

19               DAVID:  Do this.

20               L. BRAGA:  Yes.  See you put it like --

21               DAVID:  This.

22               L. BRAGA:  Then you put this through and --

23               DAVID:  (Inaudible.)

24               L. BRAGA:  There you go like that.

25               DAVID:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          L. BRAGA:  Yes.

2          DAVID:  (Inaudible.)

3          L. BRAGA:  One wheel but you have to put

4     three more wheels on to make it go.  Do you want

5     to find the other wheels?

6          DAVID:  (Inaudible.)

7          L. BRAGA:  See if you can find them.

8          DAVID:  This a wheel?

9          L. BRAGA:  Yes that's right, that is a wheel.

10          DAVID:  Do it.  (Inaudible.)

11          L. BRAGA:  Let's put the wheel on like so and

12     I will take this.  Thank you.

13          DAVID:  (Inaudible.)

14          L. BRAGA:  Okay, do you want to find the

15     other wheels?

16          DAVID:  Yes.  I will do it.

17          L. BRAGA:  You do it.

18          DAVID:  Okay.

19          L. BRAGA:  Okay.  You can do it.

20          DAVID:  Do it.  (Inaudible.)

21          L. BRAGA:  Let's find the other part.  One

22     more.  Look around.  There's one more.  There, see

23     it?

24          DAVID:  Yes.

25          L. BRAGA:  Good, okay.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                                    MIAMI
(305) 467-0600                                                              44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      DAVID:  This?  This?

2      L. BRAGA:  That's one.  Okay put it in.

3      DAVID:  This one in?

4      L. BRAGA:  Yes that one in.  We are going to

5   screw it in.  There we go.  Now --

6      DAVID:  No.

7      L. BRAGA:  Now --

8      DAVID:  (Inaudible.)

9      L. BRAGA:  Now it works like a truck.  You

10  got it.

11     DAVID:  (Inaudible.)

12     (Whereupon, Dr. Joseph Braga has entered the

13  room.)

14     L. BRAGA:  Oh, I got it.  Remember this was

15  so hard but I finally got it.  One more.  Now you

16  can pull it.

17     J. BRAGA:  Oh boy.

18     DAVID:  (Inaudible.)

19     J. BRAGA:  Oh she's going to ride in the

20  truck, take it for a ride.

21     DAVID:  (Inaudible.)

22     L. BRAGA:  Do you want to get Donald?  Let

23  Donald -- let him be the driver.

24     DAVID:  (Inaudible.)

25     L. BRAGA:  There you go.  There you go.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

There you go, he fell out.  Are you going to give the (inaudible) to Donald and all the blocks?

DAVID:  Yes.

J. BRAGA:  Good.

DAVID:  (Inaudible.)

L. BRAGA:  David, could you play a pretend game?

DAVID:  (Inaudible.)

L. BRAGA:  Do you know how to make believe, huh?

DAVID:  Voom (inaudible).

J. BRAGA:  Minnie is going to get a ride now. Can you give Minnie and Donald a ride now?

DAVID:  Okay.

L. BRAGA:  Okay.  Want to bring them over here?  Oh, thank you.

DAVID:  (Inaudible.)

L. BRAGA:  Minnie Mouse is going to get a ride.

J. BRAGA:  Voom voom voom voom voom voom.

L. BRAGA:  Donald is making that squeaking noise.

DAVID:  Whoops.

L. BRAGA:  Will you play your game with me with these dolls?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          DAVID:  No.  Do this.

2          L. BRAGA:  Do this?  Okay we will do that.

3     We'll put the dolls away for a minute.  Will you

4     bring me that other doll that is over there?

5          DAVID:  (Inaudible.)

6          L. BRAGA:  Huh?

7          DAVID:  Not now.

8          L. BRAGA:  Not now, okay.

9          J. BRAGA:  Do you want to do it that way?

10         DAVID:  (Inaudible.)

11         J. BRAGA:  Oh you build real good.

12         DAVID:  (Inaudible.)  Here.  There you go.

13         L. BRAGA:  There you go.

14         J. BRAGA:  Oh oh.

15         DAVID:  (Inaudible.)

16         J. BRAGA:  This is good to get a reading on

17    his language.

18         MRS. LITWIN:  Do you understand?

19         J. BRAGA:  Yes it's an understanding of his

20    language.

21         L. BRAGA:  You don't know the specific things

22    he said but he was talking about building there.

23         MRS. LITWIN:  Home.

24         L. BRAGA:  Their home.

25         DAVID:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        L. BRAGA:  Bye-bye.  Do you know how to make

2    that work?  Bring them over here.  I will show you

3    how it works.  Bring me the other part too.

4        DAVID:  Works?

5        L. BRAGA:  Yes I will show you how it works.

6    Watch this.  His name is Tommy Tippy.

7        J. BRAGA:  Tommy Tippy.

8        DAVID:  Yes.

9        L. BRAGA:  You put him down like this.  He's

10   real old.  He does like this and he does like a

11   somersault and he goes back.

12       J. BRAGA:  He tips over, isn't he cute?  Good

13   receptive language.

14       L. BRAGA:  It's hard because this thing keeps

15   coming together, yes that's right.

16       J. BRAGA:  I will twist it just the right

17   way.  That's it.  Good.

18       L. BRAGA:  He repeats everything, good.

19       MRS. LITWIN:  He can't express himself.  He's

20   very limited in vocabulary on his own.

21       L. BRAGA:  But he tries it.

22       DAVID:  (Inaudible.)

23       L. BRAGA:  Now this goes here.  Want to let

24   her go for a ride?

25       DAVID:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

L. BRAGA:  She's on her head.

J. BRAGA:  Can you give the doll a ride and bring her over here with the other dolls?

DAVID:  Here (inaudible) like this.

J. BRAGA:  David, can you bring her over here with the other dolls?  Bring her to the other dolls.  That's good.  Voom voom voom.

L. BRAGA:  She fell off.

J. BRAGA:  She fell off, everything falls off.  Can you bring that doll here with other dolls for us, David, trucks are more interesting.

L. BRAGA:  Do they use dolls like this?

MRS. LITWIN:  Yes but if you leave everything out, if you take that away (inaudible) then he will be interested in (inaudible).

J. BRAGA:  Out of sight, out of mind.

DAVID:  (Inaudible.)

J. BRAGA:  Oh Laurie, look at this doll.  Isn't that a neat doll?

L. BRAGA:  What's her name?

J. BRAGA:  I think this doll's name is Brooke and this is David.

L. BRAGA:  Is that David?

J. BRAGA:  That's David and this --

L. BRAGA:  He's --

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

129

J. BRAGA:  This is Frank and that's Iliana.
Can we play a game, you and I?

L. BRAGA:  Do you think David would like to
play with us?

J. BRAGA:  I don't know.  David is pretty
busy with what he's doing.  Let's pretend this is
David.  This is Brooke and this is Iliana.  This
is Frank and they are going to play a game.

Hold her hand and I am going to hold a hand
here.  You hold that hand and we are going to play
a game.  If you hold hands over here, see?

L. BRAGA:  Do you want to play too?

J. BRAGA:  Do you want to play too?

DAVID:  Yes.

L. BRAGA:  Hold this man.  This is Frank and
that is Iliana and this is David and this is
Brooke, okay?  All fall down.  You got it.

DAVID:  You do this.

J. BRAGA:  Okay.  You are going to do that
one and that one.  Ready?  Let's do it.

DAVID:  (Indicating.)

J. BRAGA:  Want to do it again?

DAVID:  (Inaudible.)

J. BRAGA:  Okay so I've got Frank and Iliana
and I have Brooke and David.

1       L. BRAGA:  You show us, okay?

2       J. BRAGA:  You show us.  What do they do now?

3       DAVID:  (Inaudible.)

4       J. BRAGA:  What do they do now?

5       DAVID:  They fall down.

6       J. BRAGA:  They fall all down?

7       DAVID:  Yes.

8       J. BRAGA:  What else can we do?  I don't

9   know.

10      L. BRAGA:  Let's pretend.

11      DAVID:  (Inaudible.)

12      L. BRAGA:  Let's pretend this is Iliana and

13   this is Frank and this is Brooke.

14      J. BRAGA:  How did they play?  Show us how

15   they play together.

16      DAVID:  (Inaudible.)  Going night night

17   (inaudible).

18      L. BRAGA:  Going night night.

19      DAVID:  Yes.

20      L. BRAGA:  Show us what they do.

21      DAVID:  (Inaudible.)

22      J. BRAGA:  They're all going night night.

23      L. BRAGA:  Then what do they do?

24      DAVID:  (Inaudible.)  This (inaudible).

25      L. BRAGA:  Okay.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    DAVID:  (Inaudible.)

2    J. BRAGA:  Can you show us more games that

3    they can play?

4    L. BRAGA:  Let's pretend.  David, this is

5    David okay?  This is Iliana.

6    DAVID:  (Inaudible.)

7    L. BRAGA:  Show me what Iliana would do with

8    David?

9    J. BRAGA:  How would they play?  How would

10   David -- show me.

11   Frank and Iliana.

12   L. BRAGA:  Frank and Iliana.  Show me.

13   DAVID:  (Inaudible.)

14   L. BRAGA:  Do they kiss?

15   DAVID:  Eat this.

16   L. BRAGA:  She eats the block?

17   DAVID:  Eat this.

18   L. BRAGA:  What else would Iliana eat?

19   DAVID:  This.

20   J. BRAGA:  Thank you.  No fooling

21   (inaudible).

22   L. BRAGA:  Yum.

23   J. BRAGA:  Yum.  Good-bye.  Good-bye.  Put

24   all the other toys away and just play with the

25   dolls.  Okay, show that to Laurie.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                            44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      DAVID:  (Inaudible.)

2      J. BRAGA:  Show that to Laurie over here.

3      L. BRAGA:  David, you have a puppet.  Do you

4  think that that puppet can tell this doll what

5  happened at Iliana's house?  Do you think the

6  puppet could tell us?

7      DAVID:  Hi.

8      L. BRAGA:  Hi.  The puppet is kissing.

9      DAVID:  (Inaudible.)

10      J. BRAGA:  Thank you, David, want to pick

11  that up for me?

12      L. BRAGA:  Hand that to Joe.

13      J. BRAGA:  Thank you.

14      L. BRAGA:  Thank you.  Let's give this to

15  Joe.

16      J. BRAGA:  Thank you, David, thank you.

17      L. BRAGA:  That's a good boy.  Let's come

18  over here and see what you have here.  Let's

19  pretend.  Do you know how to pretend?  Can I have

20  the puppet?

21      J. BRAGA:  This is David again, David and

22  Brooke are going to play.  Do you like David and

23  Brooke's clothing?

24      DAVID:  Yes.

25      J. BRAGA:  She's got a dress on and he's got

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                            44 W. FLAGLER ST.
                                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          his pants on.

2                    DAVID:  (Inaudible.)

3                    L. BRAGA:  Show us.

4                    DAVID:  (Inaudible.)  Boobies.

5                    MRS. LITWIN:  He said undress.

6                    L. BRAGA:  Undress her.  Iliana takes her

7          clothes off?

8                    DAVID:  Yes.

9                    J. BRAGA:  Shall we take the clothes off?

10         Okay.

11                   DAVID:  (Indicating.)

12                   L. BRAGA:  And Frank takes Frank's clothes

13         off?

14                   DAVID:  He --

15                   J. BRAGA:  Do you want me to help?

16                   DAVID:  (Inaudible.)

17                   J. BRAGA:  He has a boo boo.

18                   DAVID:  Yes.

19                   J. BRAGA:  How come?  What happened?

20                   DAVID:  Go to the doctor.

21                   L. BRAGA:  You are going to the doctor and

22         fix his boo boo?

23                   DAVID:  Okay.

24                   L. BRAGA:  Now show us what Frank and Iliana

25         would do?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

134

1        DAVID:  (Inaudible.)

2        L. BRAGA:  Take the clothes off, okay?

3        DAVID:  (Inaudible.)

4        L. BRAGA:  Take the panties off too?

5        DAVID:  Yes.

6        L. BRAGA:  Okay.

7        DAVID:  (Inaudible.)

8        L. BRAGA:  They do that?

9        DAVID:  Yes.

10       L. BRAGA:  Can you show me with the doll?

11       DAVID:  Yes.

12       L. BRAGA:  Show me.  Let me take these off,

13       then you show me.  Show me what they would do.

14       J. BRAGA:  Over here, David.

15       MRS. LITWIN:  Show her.

16       L. BRAGA:  Let's pretend that this is Brooke.

17       DAVID:  Okay.

18       L. BRAGA:  Okay show us what they would do.

19       DAVID:  (Inaudible.)

20       L. BRAGA:  He makes --

21       J. BRAGA:  Hold it for just a minute.  Show

22       me David.

23       DAVID:  (Inaudible.)  Rub it.

24       MRS. LITWIN:  I don't want to rub it, David.

25       You show that, honey.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600.                                          44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       J. BRAGA:  Show me David.  I want to know.

2   You tell me.

3       DAVID:  Take her clothes off.

4       J. BRAGA:  Take her clothes off.  All the

5   clothes or just --

6       DAVID:  Yes.

7       L. BRAGA:  Take everything off?

8       DAVID:  Take it off.  Take this off.

9       L. BRAGA:  Take this off?

10       DAVID:  Take it off.

11       L. BRAGA:  Take everything off, okay.

12       J. BRAGA:  These too, David?

13       DAVID:  (Inaudible.)

14       J. BRAGA:  All right.

15       L. BRAGA:  Now show us what they -- show us

16   what they would do.

17       MRS. LITWIN:  Direct the names again.

18       L. BRAGA:  This is Iliana and this is David.

19   Show us what Iliana and David would do.

20       DAVID:  (Inaudible.)

21       L. BRAGA:  Come over here and show us.  We

22   can't see over there.  Come on.

23       J. BRAGA:  This is Iliana and that is David.

24       L. BRAGA:  Show us what they would do.  What

25   does Iliana do to David?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
·CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DAVID:  (Inaudible.)

2          J. BRAGA:  Okay and what -- here is Iliana

3     and this is David.  What do they do to play?

4          DAVID:  (Inaudible.)

5          L. BRAGA:  Come back over here.

6          MRS. LITWIN:  No.

7          J. BRAGA:  After we -- show us with the

8     dolls.  Does Frank play with David?

9          DAVID:  Yes.

10          J. BRAGA:  Show me how.  Show me how Frank

11     and David play.

12          DAVID:  (Inaudible.)

13          L. BRAGA:  Night night.  Okay.

14          DAVID:  (Inaudible.)

15          L. BRAGA:  She would like on the couch.

16          DAVID:  Yes (inaudible).

17          L. BRAGA:  They would go night night and then

18     what?

19          J. BRAGA:  What happens when they wake up?

20          DAVID:  I don't know.

21          J. BRAGA:  You do know?

22          DAVID:  She's up.

23          L. BRAGA:  Now she's up and then what

24     happens?

25          DAVID:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        MRS. LITWIN:  Iliana makes night night on the

2   floor.

3        J. BRAGA:  They lie on the floor?

4        L. BRAGA:  On the floor.  Now what happens?

5   Come over here.

6        DAVID:  Box.

7        MRS. LITWIN:  He's trying to look for a box.

8        DAVID:  This box or this box.

9        MRS. LITWIN:  He makes toys.

10        DAVID:  (Inaudible.)

11        L. BRAGA:  I don't know who that is.

12        DAVID:  (Inaudible.)

13        J. BRAGA:  David, David come here for a

14   minute, honey, come here just for a second.

15        DAVID:  That's a cord.

16        L. BRAGA:  That's a cord.  Come over here

17   with us, okay?

18        J. BRAGA:  David, does Frank ever touch your

19   pee pee?  If this is you, this is David and this

20   is Frank --

21        L. BRAGA:  That's Brooke.

22        J. BRAGA:  Is that Brooke?

23        DAVID:  Yes.

24        J. BRAGA:  Does Frank ever give kisses to

25   Brooke?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        DAVID:   No.

2        J. BRAGA:   Does Iliana ever give kisses with

3    Brooke?

4        DAVID:   (Inaudible.)

5        J. BRAGA:   Does Iliana ever give kisses to

6    Brooke?

7        DAVID:   (Inaudible.)

8        J. BRAGA:   That's someone in the next room.

9    Does Frank ever give kisses to David?

10        DAVID:   (Inaudible.)

11        J. BRAGA:   No?

12        DAVID:   (Inaudible.)

13        MRS. LITWIN:   No we are playing with the

14    dolls right now, sweetheart.

15        J. BRAGA:   That's all right.

16        L. BRAGA:   If he doesn't want to, it's fine.

17    That in it self says something really.

18        MRS. LITWIN:   (Inaudible.)  He's afraid but

19    this is one question they directed to him which,

20    if you direct it to him he would probably tell you

21    and he would demonstrate it.

22        DAVID:   (Inaudible.)

23        MRS. LITWIN:   Now you can talk to them.

24        L. BRAGA:   Hi, okay.

25        DAVID:   Hold this.

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
OFFICIAL  COURT  REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.

1          L. BRAGA:  I will hold this.  Let's pretend

2      that this is David.

3          DAVID:  This is me.

4          J. BRAGA:  That's you, okay this is you.

5          L. BRAGA:  This is you and let's pretend that

6      that is Frank.  Show me what Frank does to David?

7          DAVID:  This is (inaudible) this is mine.

8          J. BRAGA:  This is you, okay.  This is David.

9          DAVID:  That's Iliana.

10         MRS. LITWIN:  Iliana.

11         L. BRAGA:  This is Iliana, right because

12     Iliana has boobs.  Right, okay.

13         DAVID:  Doesn't have boobs.

14         L. BRAGA:  No, she doesn't.  She has

15     little --

16         J. BRAGA:  She has little ones.  What did

17     they do with children?

18         DAVID:  (Inaudible.) Boobies.

19         L. BRAGA:  Yes those are boobies, okay.

20     Now --

21         DAVID:  Here (inaudible).

22         L. BRAGA:  Thank you very much.  Thank you

23     very much.

24         J. BRAGA:  Hand me the pants.  Did they ever

25     play the pee pee game?  Do you know how to play

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          the pee pee game?

2                  DAVID:  (Inaudible.)   Those on.

3                  J. BRAGA:  Put the clothes on?

4                  DAVID:  This is (inaudible).

5                  J. BRAGA:  That's right.   That's where they

6          go.   They go --

7                  DAVID:  (Inaudible.)

8                  J. BRAGA:  Did they ever play ring around the

9          rosies?

10                  DAVID:  No.

11                  J. BRAGA:  Did they play the catch me game?

12                  DAVID:  (Inaudible.)   Here.

13                  L. BRAGA:  Leave that off.

14                  MRS. LITWIN:  Okay.   Just wait.   Just wait.

15          Okay, thank you.

16                  J. BRAGA:  I am going to put Frank's shirt on

17          because I think Frank forgot how to play the game.

18                  DAVID:  This is me.

19                  J. BRAGA:  That's you, huh?

20                  DAVID:  Yes.

21                  J. BRAGA:  All right, do you want to show how

22          you played the game with Frank?

23                  DAVID:  Yes.

24                  J. BRAGA:  Show me how you played the game

25          with Frank.   How do you play the games with Frank?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                               44 W. FLAGLER ST.
                                                                            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1       What do you do with Frank?

2           DAVID:  This is me.

3           J. BRAGA:  That's you too, huh?  What does

4       Frank do with you?

5           DAVID:  (Inaudible.)

6           J. BRAGA:  One, two, three.

7           MRS. LITWIN:  I have the other one.

8           J. BRAGA:  Okay.

9           L. BRAGA:  You put the pants on her head.

10          DAVID:  I can't do it.

11          L. BRAGA:  You can't do it?  That's because

12      the pants don't go on her head.  Shall we put the

13      dress on her?

14          DAVID:  (Inaudible.)

15          L. BRAGA:  Let's find the dress.  This

16      goes --

17          DAVID:  This goes here.

18          L. BRAGA:  No, I think those go on the little

19      boy.  Give those to Joe, okay?

20          DAVID:  (Inaudible.)

21          J. BRAGA:  Okay here, that's good.  Put on

22      the pants, one leg at a time.  I get (inaudible).

23          DAVID:  One leg.

24          J. BRAGA:  One leg goes in the pants and

25      another leg goes in the pants.  Right.  Thank you,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

142

1    David.  That's very helpful.  David, can you hand

2    me the pants over there?

3        L. BRAGA:  Come here.  Let me show you right

4    here could we have those?  Thank you.

5        DAVID:  (Inaudible.)

6        MRS. LITWIN:  Yesterday they didn't have any

7    toys.  They just had this and he was really

8    (inaudible) with it but with the toys.

9        L. BRAGA:  Also he's been through it before.

10       MRS. LITWIN:  He didn't want to play with

11   these dolls today and I didn't think he would.  I

12   really didn't.

13       L. BRAGA:  Their dolls are cuter anyway.

14       MRS. LITWIN:  You know what I am saying, I

15   think yesterday he (inaudible) I think.

16       L. BRAGA:  He doesn't want to do any more.

17       MRS. LITWIN:  This morning (inaudible).

18       DAVID:  (Inaudible.)

19       L. BRAGA:  That's why I am saying his

20   behavior is showing something too.

21       MRS. LITWIN:  Everytime he sees a doll, he's

22   afraid of it.  (Inaudible).

23       J. BRAGA:  Thank you, David.  Did he do

24   anything else to your pee pee to (inaudible).

25       DAVID:  No (inaudible).

9/12/85

J. BRAGA:  Okay.

MRS. LITWIN:  Is that enough?

J. BRAGA:  We are not really looking for

anything particular.

(Thereupon, the videotape of DAVID LITWIN

concluded and a recess was taken.)

THE COURT:  Bring the jury in.

(The jury is being brought into the

courtroom.)

THE COURT:  Both sides can see the presence

of the jury?

MR. HOGAN:  Yes.

MR. SAMEK:  Yes.

THE COURT:  Please be seated.

MR. SAMEK:  Defense requests Defendant's

Exhibit E on August 9th, interview of Tiffany

Landis, to be published.

MR. HOGAN:  1984.

THE COURT:  Yes.

MR. SAMEK:  Yes, Judge.

MR. HOGAN:  That's okay.

(Thereupon, the videotape of TIFFANY LANDIS

is being shown and recorded as follows:)

J. BRAGA:  You know the Cat In The Hat?  Have

you ever seen him on TV?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

144

1    L. BRAGA:  Do you have any Dr. Seuss' books

2    at home?

3        TIFFANY:  (Nodding in the negative.)

4    L. BRAGA:  No?  Have you ever seen

5    (inaudible).

6        TIFFANY:  (Inaudible.)  I like Strawberry

7    Shortcake.

8        L. BRAGA:  Do you watch that on TV?

9        TIFFANY:  Huh?

10   L. BRAGA:  Strawberry Shortcake but not the

11   Cat In The Hat?

12       TIFFANY:  (Nodding in the negative.)

13   L. BRAGA:  What else do you watch?

14       TIFFANY:  (Inaudible.)

15   L. BRAGA:  Huh?

16       TIFFANY:  Bugs Bunny.

17   L. BRAGA:  What else?

18       TIFFANY:  Snoopy.

19   L. BRAGA:  What is your favorite Snoopy

20   character?

21       TIFFANY:  Strawberry, Mickey Mouse.

22   L. BRAGA:  Did you ever play with puppets?

23       TIFFANY:  What?

24   L. BRAGA:  Did you ever play with puppets,

25   you know, like these?  Can you play with puppets?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

145

1     TIFFANY:  I don't have some.

2     L. BRAGA:  You don't have any?

3     TIFFANY:  (Nodding in the negative.)

4     L. BRAGA:  Do you want to play with any of

5     these with me?

6     TIFFANY:  (Nodding in the negative.)

7     L. BRAGA:  No?  Okay.  I don't know how to

8     make a Donald Duck sound.  Some people can sound

9     just like Donald.  I couldn't do it.

10    TIFFANY:  You couldn't do it?

11    L. BRAGA:  (Inaudible.)  I could try but I

12    can't.  There's a sound you make like, that kind

13    of -- like Donald.  Did you ever go to Disney

14    World?

15    TIFFANY:  (Nodding in the negative.)

16    L. BRAGA:  No?

17    TIFFANY:  (Nodding in the affirmative.)

18    L. BRAGA:  What did you see at Disney World?

19    TIFFANY:  Nothing.

20    L. BRAGA:  What did you do, walk around with

21    your eyes closed?

22    TIFANNY:  (Nodding in the negative.)

23    L. BRAGA:  No?

24    TIFANNY:  Did you?

25    L. BRAGA:  No I didn't walk.  I saw a lot of

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1       stuff.  I saw the pirate ride.  Did you go on the

2       pirate ride?

3               TIFFANY:  (Nodding in the negative.)

4               L. BRAGA:  What about small small world?

5               TIFFANY:  (Nodding in the negative.)

6               L. BRAGA:  No?  What did you do?

7               TIFFANY:  Nothing.

8               L. BRAGA:  Nothing.  So did you just go up

9       there and sit down all of the time?

10              TIFFANY:  (Inaudible.)  What's this toy?

11              L. BRAGA:  It's another puppet.  It's like a

12      bird.  Do you want to put one on your hand?

13              TIFFANY:  (Inaudible.)

14              L. BRAGA:  My name is Birdie.  Want to do it?

15      I am going to bite your finger.

16              Do you want to put one on your hand?  See,

17      I've got two of them.  They're like twins.

18              TIFFANY:  You put it on?

19              L. BRAGA:  Okay, I'll put it on.  Did you

20      ever know anybody who was a twin?

21              TIFFANY:  (Nodding in the negative.)

22              L. BRAGA:  Do you know what a twin is?

23              TIFFANY:  Ouch.

24              L. BRAGA:  How old are you?

25              TIFFANY:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        L. BRAGA:  Huh?

2        TIFFANY:  Three.

3        L. BRAGA:  When is your birthday?

4        TIFFANY:  Tomorrow I will be four.

5        L. BRAGA:  Four tomorrow?

6        TIFFANY:  Yes.

7        L. BRAGA:  Are you going to have a party?

8        TIFFANY:  Yes.

9        L. BRAGA:  What are you going to have at your

10   party?

11        TIFFANY:  What am I going to have at my

12   party?

13        L. BRAGA:  Yes?

14        TIFFANY:  Birthday cake, what else?

15        L. BRAGA:  Ice cream?

16        TIFFANY:  Cake.

17        L. BRAGA:  Snoopy cake?

18        TIFFANY:  Smurfee cake.

19        L. BRAGA:  Oh, smurfee cake?  Do you watch

20   the Smurfs on television?

21        TIFFANY:  (Pause.)

22        L. BRAGA:  Which one do you like the best?

23        TIFFANY:  Smurf.

24        L. BRAGA:  Scooby Doo, you like cartoons?

25        TIFFANY:  (Inaudible.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        L. BRAGA:  Hi Tiffany, how are you?

2        TIFFANY:  (Inaudible.)

3        L. BRAGA:  Do you think this is alive?

4        TIFFANY:  Huh?

5        L. BRAGA:  Do you think this is alive?

6        TIFFANY:  Yes.

7        L. BRAGA:  Yes?  Is it real?

8        TIFFANY:  Is it real?  No.

9        L. BRAGA:  No.  Hello Tiffany, how are you?

10   My name is Mr. Funny Bird.  Hello Tiffany.  My

11   name is Mr. Funny Bird too.

12        TIFFANY:  What's this inside?

13        L. BRAGA:  You know that truck comes all the

14   way apart, everything comes off, the wheels come

15   off and the --

16        TIFFANY:  Can you take it off?

17        L. BRAGA:  Yes you can undo, you know, what

18   you have to do, see this part here?  You like --

19   put your finger on here.  It's kind of hard a

20   little bit but you have to hold on to one part but

21   if you can unscrew it, then the wheels come apart

22   and everything comes back together again.  Want to

23   try?

24        TIFFANY:  No I can't.

25        L. BRAGA:  You can't?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

TIFFANY:  No, you.

L. BRAGA:  Me?  Okay.  There I started it.
Now you finish it.  Move it this way.  See?  Try
it.

TIFFANY:  It's going to come off.

L. BRAGA:  Oh try.  Move the white part.
Move it around like this, okay?  See?

TIFFANY:  Okay.

L. BRAGA:  See it did come off.  I told you.
Now see if you can do the other one.  It's the
white part you have to move.  It's kind of hard.
Let me start it for you.  Then you can finish it.
There you go.

That's right.

TIFFANY:  (Inaudible.)

L. BRAGA:  They went outside to talk with Joe
for awhile.  Is that okay?  They will be back in
awhile.

TIFFANY:  Did you hear David?

L. BRAGA:  What?

TIFFANY:  Did you hear David?

L. BRAGA:  No.  David, is that a friend of
yours?

TIFFANY:  Yes.

L. BRAGA:  I think he's going to come in

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA

150

later.

TIFFANY:  How did you take this one off?

L. BRAGA:  Same way.  I will start it.  Let's see.  It's hard.  Let me see.  Let me hold it just for a minute.

TIFFANY:  I took mine off.

L. BRAGA:  Yes, yes you did it real well. Boy this one is hard.  Whoever put this one put it on real good.  Okay, try now.  Just move the white part, yes.  All right, very good.

You did it, you did indeed.

TIFFANY:  (Inaudible.)

L. BRAGA:  That one, want me to start it for you?

TIFFANY:  What's your name?

L. BRAGA:  Laurie.

TIFFANY:  Laurie?

L. BRAGA:  Uh-huh.

TIFFANY:  I have two Lauries.

L. BRAGA:  You do?

TIFFANY:  Yes she's my friend, mommie of Joshua.

L. BRAGA:  How old?

TIFFANY:  Huh?

L. BRAGA:  How old is she?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          TIFFANY:  Twenty-six.

2          L. BRAGA:  Twenty-six, oh.

3          TIFFANY:  She asked me, twenty-six.

4          L. BRAGA:  This one is hard.  I don't know

5     who put this on.  This is really hard.

6          TIFFANY:  What's this one?

7          L. BRAGA:  That's like -- you can hold on to

8     this and make it, you know, move along, of course

9     it's only two wheels, so it doesn't move too well.

10         TIFFANY:  (Inaudible.)

11         L. BRAGA:  Let me see.  Let me have this

12    because it's kind of hard.  Let me see if I can

      make it move because somebody put it on so hard.

14    I didn't know -- oh, okay.  There, now you do it.

15    You do it.

16         TIFFANY:  I did it.

17         L. BRAGA:  You do it.

18         TIFFANY:  I did it.

19         L. BRAGA:  There, okay now you do it.  That's

20    right.  All right good for you.  You've almost got

21    the whole thing apart.  Here's this part.

22         TIFFANY:  How did you take this off?

23         L. BRAGA:  Well let's see, turn it.  Turn it

24    over the other way.  I think -- whoops.  There you

25    go, see that came apart now.  If you turn it over.

We have one more to take off.  There you do it.

All right, see?  Now it's all apart.  It's a neat toy, huh?

TIFFANY:  Huh?

L. BRAGA:  It's neat, do you like it?

TIFFANY:  Now can I put this on here?

L. BRAGA:  Sure why not.  Go ahead.

TIFFANY:  Whose that over there?

L. BRAGA:  I don't know.  Ask him what his name is?

TIFFANY:  What's your name?

J. BRAGA:  Leo.

L. BRAGA:  That's your friend?  Well he works here.  I don't know him real well.

TIFFANY:  Huh?

L. BRAGA:  I don't know him real well.  I think he's a nice person though.

TIFFANY:  I think so.

L. BRAGA:  Yes I think so.

TIFFANY:  You have these toys?

L. BRAGA:  Yes.

TIFFANY:  Why?

L. BRAGA:  Well we can play with kids like you.  Did your mom and dad tell you why you were coming here today?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

153

 1          TIFFANY:  See -- see -- she didn't tell me.

 2          L. BRAGA:  No?  She didn't say?

 3          TIFFANY:  No.

 4          L. BRAGA:  Why do you think?

 5          TIFFANY:  See I --

 6          L. BRAGA:  You took it off.  Why do you think

 7    you are here?

 8          TIFFANY:  Long hair.

 9          L. BRAGA:  You want to see some long hair?

10          TIFFANY:  Yes.

11          L. BRAGA:  See, what.  Is that a lot of hair?

12          TIFFANY:  Yes.

13          L. BRAGA:  Long, huh?

14          TIFFANY:  Stand up.

15          L. BRAGA:  Isn't that long?

16          TIFFANY:  Yes.

17          L. BRAGA:  Did you ever see such long hair?

18          TIFFANY:  Yes.  Why did you have it up?

19          L. BRAGA:  It's easy, if I take care of it,

20    if I put it up because, you know, when your mommie

21    in the morning has to comb your hair out, in the

22    morning and it takes a long time, well if I have

23    this much hair it takes this much to comb it.  If

24    I put it up on my head, then I don't have to worry

25    about it so much.

154

1    TIFFANY:  Then you take it down?

2    L. BRAGA:  Yes then I take it down and --

3    TIFFANY:  Can I brush it?

4    L. BRAGA:  Yes.

5    TIFFANY:  Where is your house?

6    L. BRAGA:  Do you know where Coconut Grove

7    is?

8    TIFFANY:  (Nodding in the negative.)

9    L. BRAGA:  Well it's not too far from here.

10   TIFFANY:  Where is it?

11   L. BRAGA:  It takes about ten minutes.

12   TIFFANY:  Ten months?

13   L. BRAGA:  Ten minutes, yes.  Have you seen

14   any movies recently?

15   TIFFANY:  Did you?

16   L. BRAGA:  Yes I saw, what did I see?  You

17   know I wanted to see -- there's a story called, oh

18   I can't remember the name.  Did you see -- did --

19   did you ever go to a movie called E.T.?

20   TIFFANY:  (Nodding in the negative), E.T.

21   what?

22   L. BRAGA:  That was the name of a movie.  Did

23   you ever go to a movie with your mom and dad?

24   TIFFANY:  No.

25   L. BRAGA:  No, not ever?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      TIFFANY:  See I can --

2      L. BRAGA:  Sure, you can put it back on.

3      TIFFANY:  Where's the hair thing?

4      L. BRAGA:  I don't know.  Shall I put my hair

5  back up?

6      TIFFANY:  Sure.

7      L. BRAGA:  Okay.  Do you have any sisters and

8  brothers?

9      TIFFANY:  No.

10     L. BRAGA:  Just you?

11     TIFFANY:  Do you have one?

12     L. BRAGA:  Yes I do.  I have a brother.

       TIFFANY:  Brother, my brother is Grady.

14     L. BRAGA:  How old is he?

15     TIFFANY:  Seven -- eight.

16     L. BRAGA:  Eight.  So he's bigger than you?

17     TIFFANY:  (Inaudible.)

18     L. BRAGA:  He's how --

19     TIFFANY:  A month older, like me.

20     L. BRAGA:  A month older like me?

21     TIFFANY:  I am older.

22     L. BRAGA:  You are older?

23     TIFFANY:  Yes.  Why are you putting it in a

  bun?

25     L. BRAGA:  Well, I put it up, then I am going

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

156

1      to put the hairpins in.  Do you know how many

2      hairpins I have here?

3              TIFFANY:  No.

4              L. BRAGA:  No?  How many is this?

5              TIFFANY:  Two.

6              L. BRAGA:  How many blocks is this?

7              TIFFANY:  Two.

8              L. BRAGA:  How many is this now?

9              TIFFANY:  Three.

10             L. BRAGA:  Yes.  Now how many?

11             TIFFANY:  Four.

12             L. BRAGA:  Yes, you are smart.  Do you know

13     why all the children are here?

14             TIFFANY:  Why?

15             L. BRAGA:  All your friends?

16             TIFFANY:  Yes.

17             L. BRAGA:  Because they came here to talk

18     about the place that you go sometimes, the people

19     who baby-sit, you know, Iliana and Frank --

20             TIFFANY:  (Nodding in the negative.)

21             L. BRAGA:  No?

22             TIFFANY:  No, no Frank.  Frank?

23             L. BRAGA:  Huh?

24             TIFFANY:  There was another Frank at the

25     station.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

157

1           L. BRAGA:   At what station?

2           TIFFANY:   In mommie's station.

3           L. BRAGA:   What about the place near where

4    you live that sometimes mommie would take you and

5    you would go to these people, their name was

6    Iliana and Frank?

7           TIFFANY:   No I don't want to go there today.

8           L. BRAGA:   Did you ever go there before?

9           TIFFANY:   Before, yes.

10          L. BRAGA:   A long time ago?

11          TIFFANY:   A long time ago.

12          L. BRAGA:   Yes, what kind of things did you

13   do there?

14          TIFFANY:   Nothing.

15          L. BRAGA:   Did you ever play any games?

16          TIFFANY:   Nope.  Look at what I made.

17          L. BRAGA:   Yes you put them all together.

18          TIFFANY:   Take this (inaudible).

19          L. BRAGA:   Who else went to that place with

20   you?

21          TIFFANY:   Brooke.

22          L. BRAGA:   Brooke?

23          TIFFANY:   Yes.

24          L. BRAGA:   How old is Brooke?

25          TIFFANY:   Seven months.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                 44 W. FLAGLER ST.
                                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

158

1          L. BRAGA:  Seven months?

2          TIFFANY:  Seven months.

3          L. BRAGA:  Who else went there?

4          TIFFANY:  (Inaudible.)

5          L. BRAGA:  Huh?

6          TIFFANY:  David.

7          L. BRAGA:  David and who else?

8          TIFFANY:  Somebody went.

9          L. BRAGA:  Jonathan?

10         TIFFANY:  Jonathan, no.

11         L. BRAGA:  No, the little boy who you saw

12    before, Justin?

           TIFFANY:  Justin, no.

14         L. BRAGA:  Justin didn't go?

15         TIFFANY:  No.

16         L. BRAGA:  No?

17         TIFFANY:  What's he doing sitting down there?

18         L. BRAGA:  Oh he's reading a book.

19         TIFFANY:  What was he doing when he was

20    standing up?

21         L. BRAGA:  I don't know what he was doing

22    when he was standing up.  I think he was making

23    that machine go.  Do you know what that is?

           TIFFANY:  No.

25         L. BRAGA:  He's taking some pictures.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 487-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    TIFFANY:  For who?

2    L. BRAGA:  Of me so I can look at them later.

3 Some pictures of you and me together.

4    TIFFANY:  Together playing?

5    L. BRAGA:  Playing right.  When you were at

6 Iliana and Frank's place, did they ever take

7 pictures of you playing?

8    TIFFANY:  Me?

9    L. BRAGA:  Yes you and the other children?

10    TIFFANY:  No, they didn't take me, any

11 pictures, only mommie and daddy.

12    L. BRAGA:  Mommie and daddy only took

13 pictures of you?

14    TIFFANY:  I see a man right there.

15    L. BRAGA:  It's a picture of a man, looks

16 kind of funny.  He has an apple in front of his

17 face.

18    TIFFANY:  Who drew that?  Who drew that?

19    L. BRAGA:  His name was McGreet.  That was

20 his name.

21    TIFFANY:  (Inaudible.)

22    L. BRAGA:  No it's not real.  It's just a

23 picture, something that somebody drew like that.

24    TIFFANY:  (Inaudible.)  Who drew that

25 (inaudible)?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

160

1    L. BRAGA:  Oh I don't know.  I don't think

2    anybody did.  I think somebody made it look that

3    way.

4        TIFFANY:  I see a thing in there.  What is

5    that?

6        L. BRAGA:  That looks to me like it's a

7    picture of an ocean and a sky and then there's

8    like this big rock, that's kind of right out there

9    in the middle of nowhere.  It looks silly to me.

10   I don't think such a thing really exists.

11       TIFFANY:  It's funny.

12       L. BRAGA:  It is funny you are looking at

13   him.

14       TIFFANY:  Yes he's looking at me.

15       L. BRAGA:  He's looking at you.

16       TIFFANY:  He's looking at me.  (Inaudible)

17       L. BRAGA:  Did mommie and daddy take pictures

18   of you with a camera?

19       TIFFANY:  They have a movie camera.

20       L. BRAGA:  They do?

21       TIFFANY:  I think so.

22       L. BRAGA:  Did Iliana and Frank have -- take

23   any pictures?

24       TIFFANY:  I think so.

25       L. BRAGA:  Did you like to go there before?

1   TIFFANY:  Where?

L. BRAGA:  To Iliana and Frank's house?

3   TIFFANY:  No, not before.

4   L. BRAGA:  No?

5   TIFFANY:  (Inaudible.)

6   L. BRAGA:  You don't want to go there?

7   TIFFANY:  They're ugly (inaudible).

8   L. BRAGA:  Yucky?

9   TIFFANY:  Mommie says they are ugly.

10   L. BRAGA:  Do you think they are ugly?

11   TIFFANY:  Right now they are ugly.

12   L. BRAGA:  Why?

TIFFANY:  (Inaudible.)

14   L. BRAGA:  Do you understand why?

15   TIFFANY:  I understand now.

16   L. BRAGA:  When you went before, did you like

17   to go there?

18   TIFFANY:  No.

19   L. BRAGA:  Did you like Iliana?

20   TIFFANY:  No.

21   L. BRAGA:  Did she do things you didn't like?

22   TIFFANY:  Nope (inaudible).

23   L. BRAGA:  She didn't do anything?

24   TIFFANY:  No.

25   L. BRAGA:  What about with when Justin went?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                 OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                 44 W. FLAGLER ST.
                                                               (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

162

1        TIFFANY:  Justin (inaudible).

2        L. BRAGA:  Huh?

3        TIFFANY:  Justin (inaudible).

4        L. BRAGA:  What about Brooke?

5        TIFFANY:  Uh-uh, she didn't.

6        L. BRAGA:  She didn't do anything?

7        TIFFANY:  Nope, nope.

8        L. BRAGA:  No?  Well, could we play a little

9   game together?

10        TIFFANY:  What game?

11        L. BRAGA:  Well I will show you.  I have this

12   doll, some dolls here.  This one we are going to

13   pretend that this doll's name is Iliana, okay?

14        TIFFANY:  Okay.

15        L. BRAGA:  And this doll we are going to

16   pretend is Frank, okay?

17        TIFFANY:  No, this doll --

18        L. BRAGA:  This one is Frank, which one would

19   you like to be Frank?  This one we will make

20   Frank.

21        TIFFANY:  Yes.

22        L. BRAGA:  This will be Iliana.

23        TIFFANY:  (Nodding in the affirmative), who

24   will be Tiffany?

25        L. BRAGA:  This will be Tiffany -- no let's

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

make this one, let's see, let's make this Tiffany

2      and this will be Iliana.  Is that okay?

3           TIFFANY:  This will be Iliana.

4           L. BRAGA:  This one will be Iliana because

5      she's a little bigger, okay?

6           TIFFANY:  This one will be Tiffany.

7           L. BRAGA:  Yes.

8           TIFFANY:  Okay.

9           L. BRAGA:  Now --

10          TIFFANY:  This one goes into the (inaudible).

11          L. BRAGA:  What?

12          TIFFANY:  One to go in the brown one

J       (inaudible).

14          L. BRAGA:  This one, this is Frank because

15      he's bigger, right?

16          TIFFANY:  Right.

17          L. BRAGA:  Would you show me what Iliana and

18      this -- who shall this -- little boy David?

19          TIFFANY:  (Nodding in the affirmative.)

20          L. BRAGA:  Will you show me what Iliana would

21      do to David?

22          TIFFANY:  Hit him.

23          L. BRAGA:  Hit him?

24          TIFFANY:  Iliana takes her clothes off.

25          L. BRAGA:  She takes her clothes off?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE                                              MIAMI
(305) 467-0600                                         44 W. FLAGLER ST.
                                                       (305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        TIFFANY:  She takes her clothes off.

2        L. BRAGA:  Then what would she do after she

3    takes her clothes off?

4        TIFFANY:  Takes a bath and then she takes --

5    then she (inaudible).

6        L. BRAGA:  He's all right.  He's not paying

7    attention.  It's okay.

8        TIFFANY:  (Inaudible.)

9        L. BRAGA:  He's just busy reading a book.

10    Did Iliana and Frank -- did they tell you not to

11    tell anybody?

12        TIFFANY:  No.

13        L. BRAGA:  Did they tell you to keep it a

14    secret?

15        TIFFANY:  (Inaudible.)

16        L. BRAGA:  Did they say it was all right for

17    you to tell?

18        TIFFANY:  Yes and she and yes Iliana.

19        L. BRAGA:  That's Iliana?

20        TIFFANY:  She takes her clothes off.

21        L. BRAGA:  Right and then what?

22        TIFFANY:  She takes a bath and then she

23    stands with clothes off.

24        L. BRAGA:  What would she do then, take --

25    take your clothes off like she would do.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE            OFFICIAL COURT REPORTER            MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                           (305) 373-7299
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

165

1        TIFFANY:  It's too hard.

2        L. BRAGA:  Is it hard?

3        TIFFANY:  Yes.

4        L. BRAGA:  Do you want some help?

5        TIFFANY:  I can do it.

6        L. BRAGA:  You can do it yourself, right.  I

7   thought you could.

8        TIFFANY:  It's so hard.

9        L. BRAGA:  It is hard but you are pretty

10   good.  I think you can do it.

11        TIFFANY:  You think so?

12        L. BRAGA:  Yes I think so.

13        TIFFANY:  Oh it's too hard.

14        L. BRAGA:  Okay, good girl.  Does that look

15   kind of like Iliana?

16        TIFFANY:  Yes she has titties.

17        L. BRAGA:  Yes?

18        TIFFANY:  Then she has pee pee.

19        L. BRAGA:  Pee pee and does she have like

20   hair on her pee pee?

21        TIFFANY:  Uh-huh and Tiffany takes her

22   clothes off too.

23        L. BRAGA:  Uh-huh?

24        TIFFANY:  Takes her panties off.  (Inaudible)

25        L. BRAGA:  I don't know where her shoes are.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        TIFFANY:  Where are their shoes?

2        L. BRAGA:  I don't know.  Nobody has any

3   shoes, do they?  That's silly.

4        TIFFANY:  Why?

5        L. BRAGA:  That's silly.  I don't know why

6   nobody gave them shoes.

7        TIFFANY:  Nobody gave them shoes to put on?

8        L. BRAGA:  No they didn't.  So show me what

9   they would do to Tiffany?

10        TIFFANY:  Something, they did --

11        L. BRAGA:  Like that?

12        TIFFANY:  Tickle me.

        L. BRAGA:  Tickle you like that?

14        TIFFANY:  And Frank takes his clothes off.

15        L. BRAGA:  Frank takes his clothes off?  Now

16   this -- this is -- who did we say that was going

17   to be?  What other boys would take their clothes

18   off?

19        TIFFANY:  Yes he -- David (inaudible).  He

20   takes his clothes off.

21        L. BRAGA:  Would David take his own clothes

22   off or somebody would take his clothes off for

23   him?

        TIFFANY:  For him?

25        L. BRAGA:  Would somebody else take his

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.

167

1        clothes off or he would take his clothes off?

2              TIFFANY:  He would.  Why do you have that one

3        on?

4              L. BRAGA:  This or this?  Which one?

5              TIFFANY:  This.

6              L. BRAGA:  This?

7              TIFFANY:  Yes.

8              L. BRAGA:  This is -- so they can hear my

9        voice.

10             TIFFANY:  (Inaudible.)

11             L. BRAGA:  This is a secret microphone.  What

12       it does is it eats yucky secrets, things people

13       don't want to talk about and then talk about it

14       and that's why (inaudible) would you want me to

15       put it --

16             TIFFANY:  No.

17             L. BRAGA:  Then I will wear it and I will

18       tell them.  Is that okay?  Is that all right?

19             TIFFANY:  Yes.

20             L. BRAGA:  Tell me some more, okay?

21             TIFFANY:  I will have to take his off,

22       David's clothes off.

23             L. BRAGA:  Okay.

24             TIFFANY:  Oh it's too hard.

25             L. BRAGA:  But you are so smart you can do

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    it.

2           TIFFANY:  I don't know.

3           L. BRAGA:  Sure you can.

4           TIFFANY:  Panties (inaudible) it's too hard.

5           L. BRAGA:  It's very hard but I know you can

6    do it.

7           TIFFANY:  It's very hard.

8           L. BRAGA:  I know it's very hard but you are

9    very smart.  See?  You did it.

10          TIFFANY:  I did it.

11          L. BRAGA:  You did it.  Very good.

12          TIFFANY:  (Inaudible.)  Socks for you to put

     on.

14          L. BRAGA:  They didn't -- no they didn't give

15   me any socks or shoes for the dolls.  They should

16   have, don't you think?

17          TIFFANY:  I think when I come back home

18   tomorrow they get shoes (inaudible).

19          L. BRAGA:  I think it would be good.

20          TIFFANY:  Then take off shoes to go to bed.

21          L. BRAGA:  Right.

22          TIFFANY:  Where do they go to bed?

23          L. BRAGA:  Not here, home.

     TIFFANY:  Which house?

25          L. BRAGA:  I live a long way away from here,

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    not a real long way, just a little long way.

2         TIFFANY:  Far away?

3         L. BRAGA:  Sort of far away a little bit.

4         TIFFANY:  Oh but why do you have that on?

5         L. BRAGA:  Well so that -- so that I can tell

6    the things that I think I should tell.

7         TIFFANY:  Yucky things?

8         L. BRAGA:  Yes yucky things and then I will

9    feel better and you too, don't you think?

10        TIFFANY:  But when you go over there to your

11   house, you don't go with that?

12        L. BRAGA:  No not all the time, just

13   sometimes.

14        TIFFANY:  Somtimes?

15        L. BRAGA:  Yes, sometimes.

16        TIFFANY:  Now --

17        L. BRAGA:  Now, okay.

18        TIFFANY:  (Inaudible.)

19        L. BRAGA:  Iliana does that?

20        TIFFANY:  Yes.

21        L. BRAGA:  Now this is Frank?

22        TIFFANY:  I can't get it off.

23        L. BRAGA:  Sure you can.

24        TIFFANY:  I could but I can't.

25        L. BRAGA:  Try doing it from the feet.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600              OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       TIFFANY:  Yes you got it.

2       L. BRAGA:  It's hard.

3       TIFFANY:  It's hard.

4       L. BRAGA:  I --

5       TIFFANY:  No, I can't.

6       L. BRAGA:  Oh sure you can.  Look at you.

7       TIFFANY:  (Inaudible) well get on.  He's

8   laughing.

9       L. BRAGA:  Was he laughing when you were

10  doing that?

11      TIFFANY:  Yes.  I can't do it.

12      L. BRAGA:  Do you want me to do it?  Tell you

13  what, I will start it and then you finish it,

14  okay?  Now pull.  There you go.  Now this one.

15  Okay.

16      TIFFANY:  What's this?

17      L. BRAGA:  Well that's supposed to be like

18  hair.  Does Frank have hair in his chest?

19      TIFFANY:  (Nodding in the negative.)  He

20  doesn't have a moustache.

21      L. BRAGA:  He doesn't have a moustache?

22      TIFFANY:  No this must be Frank.  Right.

23      L. BRAGA:  Yes we are going to pretend it's

24  Frank, even though Frank doesn't have a moustache.

25  Okay, now show me what happened.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600 .                                                    44 W. FLAGLER ST.
                                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        TIFFANY:  I can't show you because I am tired

2    from (inaudible).

3        L. BRAGA:  You are tired already?

4        TIFFANY:  Yes.

5        L. BRAGA:  Because it took so much to take

6    the clothes off, huh?

7        TIFFANY:  (Pause.)

8        L. BRAGA:  Sometimes when everybody played a

9    game they take off their clothes and they play a

10   game?

11       TIFFANY:  No.

12       L. BRAGA:  No, not ever?

13       TIFFANY:  Not ever.

14       L. BRAGA:  Could you hand me the Frank doll?

15       TIFFANY:  Which one?

16       L. BRAGA:  That one, yes, uh-huh, okay.

17       TIFFANY:  It has lipstick on.

18       L. BRAGA:  Well not really.  They made it

19   that way but he doesn't really.  Now hand me the

20   Tiffany doll.

21       TIFFANY:  Which one?  This one?

22       L. BRAGA:  No because this one -- this one

23   has a penis, right?

24       TIFFANY:  This one?

25       L. BRAGA:  That one, right.  Okay, now show

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                               44 W. FLAGLER ST.
                                                                            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    me, would Frank do something to Tiffany?

2         TIFFANY:  (Nodding in the affirmative.)

3         L. BRAGA:  Okay, would you show me?

4         TIFFANY:  Oh oh (indicating).

5         L. BRAGA:  The bird is biting his hand, huh

6    is the bird mad at his hand?

7         TIFFANY:  (Indicating.)

8         L. BRAGA:  Bad hand.  What did that hand do?

9    Can you show me?

10        TIFFANY:  Wait a second.  (Inaudible.)

11        L. BRAGA:  Yes?

12        TIFFANY:  Yuck.

13        L. BRAGA:  Show me what the hand would do,

14   okay?

15        TIFFANY:  Okay.

16        L. BRAGA:  So you put -- would he put his

17   fingers inside?

18        TIFFANY:  (Indicating.)

19        L. BRAGA:  What did you think when he did

20   that?

21        TIFFANY:  Look at Tiffany.

22        L. BRAGA:  Look at Tiffany?

23        TIFFANY:  She's bigger.

24        L. BRAGA:  She's big, huh?  When Frank would

25   do that, would that hurt you?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                           44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

173

1          TIFFANY:  No.

2          L. BRAGA:  You didn't mind?

3          TIFFANY:  I didn't mind.

4          L. BRAGA:  No?

5          TIFFANY:  Why does this go like this and like

6     that?  Why?

7          L. BRAGA:  Then what?  Tiffany, can you show

8     me anything else?

9          TIFFANY:  (Pause.)

10          L. BRAGA:  Would Frank touch you here?

11          TIFFANY:  You don't take this one off?

12          L. BRAGA:  No that one doesn't come off.

13     That just stays on.  This is a real old one.

14          TIFFANY:  How do you do it?

15          L. BRAGA:  (Inaudible.)  It doesn't do much.

16     All you do is kind of roll it along the floor,

17     just like that.  That's all it does.  It's no big

18     thing.

19          TIFFANY:  You mean like this?

20          L. BRAGA:  Yes like that.

21          TIFFANY:  Wee.

22          L. BRAGA:  Tiffany --

23          TIFFANY:  Yes?

24          L. BRAGA:  Come here.  I want to ask you

25     another question.  Okay, would Tiffany ever touch

1   Frank some how?  Would you show me what Tiffany

2   would do?

3       TIFFANY:  Leave them like that.

4       L. BRAGA:  Okay.

5       TIFFANY:  So they can sleep.

6       L. BRAGA:  Okay they are sleeping, now show

7   me what Iliana and David would do?

8       TIFFANY:  He's David.

9       L. BRAGA:  That's David and that's Iliana.

10  You show me what?

11      TIFFANY:  This one is Iliana.

12      L. BRAGA:  This is Iliana, no that is Iliana.

13      TIFFANY:  How did you take this off?

14      L. BRAGA:  Well I didn't make them, somebody

15  else did but will you show me what Iliana would do

16  to David, okay?

17      TIFFANY:  Well --

18      L. BRAGA:  What?

19      TIFFANY:  When you take (inaudible) off and

20  you wear it long, do you go to a party long with

21  the long hair?

22      L. BRAGA:  Yes I do.

23      TIFFANY:  To a party with long hair?

24      L. BRAGA:  To a party with my hair long, yes

25  I do.  Boy, you have pretty teeth.  Let me see.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                        44 W. FLAGLER ST.
                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1         Open your mouth.

2             TIFFANY:  Watch my hair.

3             L. BRAGA:  Yes let me see.  Okay, let's not

4         pull it.  Turn around.  Oh you have such pretty

5         hair.

6             It's beautiful.  Okay, wait a minute.  I

7         don't want to pull it.  There you go, oh look,

8         it's so pretty.  Oh my.  You have such pretty

9         hair.  Beautiful.

10            TIFFANY:  (Inaudible.)  Watch watch.

11            L. BRAGA:  You can jump, huh?

12            TIFFANY:  (Inaudible.)

13            L. BRAGA:  Huh?  Come here.

14            TIFFANY:  What is it?

15            L. BRAGA:  What is what?  Oh bring it over

16         here.  I will show you.  It has another part.  See

17         that little boy sitting over there?

18            TIFFANY:  Yes.

19            L. BRAGA:  Okay bring him over and I will

20         show you how it works.  Okay?  Thank you but I am

21         talking about that one over there.  See this

22         little guy?  Okay his name is Tommy Tippy and this

23         is a very old toy.  Put it down here and I will

24         show you what it does.  Do it like this.  It

25         balances and all you do is you turn it around like

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                       44 W. FLAGLER ST.
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.    (305) 373-7295

1    this.  See?

2           He will just keep on going like that and he

3    will go backwards.  Want to see if you can do it?

4           TIFFANY:  (Indicating.)  It doesn't come

5    (inaudible).

6           L. BRAGA:  It doesn't come apart.  No that's

7    all it does.  It's not a real exciting toy.

8           TIFFANY:  It's a toy.

9           L. BRAGA:  It's a toy, yes it's an old toy.

10   It's older than your mommie and daddy.

11          TIFFANY:  This is a toy too.

12          L. BRAGA:  Yes it's all part of the same toy.

13   It goes together.

14          TIFFANY:  Together?

15          L. BRAGA:  Uh-huh it does.  Tiffany?

16          TIFFANY:  What?

17          L. BRAGA:  I know this is kind of hard but I

18   need your help because I need to know what

19   happened, what Iliana and Frank did with the

20   children because, you know, why?

21          TIFFANY:  Why?

22          L. BRAGA:  Because grown-ups sometimes I

23   think Iliana and Frank -- do you like them?

24          TIFFANY:  (Nodding in the negative.)

25          L. BRAGA:  Some of the children like them and

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1   thought they were nice people in some ways they

2   were nice but see I think --

3          TIFFANY:  (Inaudible.)

4          L. BRAGA:  I think that Iliana and Frank did

5   some things that some of the children didn't like

6   and if somebody, a grown-up person tries to do

7   something and touch you in a way that you don't

8   like --

9          TIFFANY:  Yes.

10          L. BRAGA:  -- then it's okay for you to say

11   no, don't do that, see but nobody knew they were

12   going to do it, so nobody told you to say no.

13          So we need to know what they did so we can

14   make sure they don't do it anymore.  He's going to

15   leave, okay?  He's going to go away so --

16          TIFFANY:  He's going away, far away

17   (inaudible).

18          L. BRAGA:  I don't know where he went so

19   (inaudible).

20          TIFFANY:  He went with (inaudible).

21          L. BRAGA:  He will be back later but he went

22   away so you and I can talk privately, just you and

23   me, okay?

24          TIFFANY:  What?

25          L. BRAGA:  So I need for you to help me and

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

tell me what Iliana and Frank and the children

would do, okay?

3        TIFFANY:  Yes.

4        L. BRAGA:  So that they won't do it again to

5  other children.

6        TIFFANY:  Right.

7        L. BRAGA:  Right, okay.  So can we pretend

8  again?

9        TIFFANY:  Yes.

10       L. BRAGA:  That this is Tiffany, okay?

11       TIFFANY:  Yes.

12       L. BRAGA:  And this is Frank and show me what

Frank would do?

14       TIFFANY:  I don't want to.

15       L. BRAGA:  You don't want to do it anymore?

16  Okay you don't have to.  How about if we pretend.

17  Let's forget about Tiffany.  Let's pretend this is

18  Iliana and this is Frank.  Show me what Iliana and

19  Frank would do.

20       TIFFANY:  No.

21       L. BRAGA:  No?

22       TIFFANY:  I don't want to show you.

23       L. BRAGA:  You don't want to show me?

24       TIFFANY:  No, how would you do this?  How

25  would you put it in?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE           OFFICIAL COURT REPORTER        MIAMI
(305) 467-0400                             44 W. FLAGLER ST.
                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          L. BRAGA:  You know you didn't do anything

2     bad.  You didn't do anything wrong.  You shouldn't

3     feel upset.  Mommie and daddy might be a little

4     upset but that's because maybe they hurt you.

5          They are not mad at you because you didn't do

6     anything wrong.  You know that?

7          TIFFANY:  Yes.

8          L. BRAGA:  Good but if there is anything that

9     happened that you didn't like --

10          TIFFANY:  Where does this go?

11          L. BRAGA:  Let's try it.  There.  Let's put

12     this one out and try it right there.  How about

13     this one?

14          TIFFANY:  This one?

15          L. BRAGA:  Uh-huh, okay.  I think some of

16     them go in here.  The bigger one I think it goes

17     in here.

18          TIFFANY:  In there?

19          L. BRAGA:  This one goes in here because it's

20     a different kind.  See?

21          TIFFANY:  How about red?

22          L. BRAGA:  Yes.

23          TIFFANY:  How about this color?  How about

24     this color too?

25          L. BRAGA:  Uh-huh.  Did you ever play a game

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        called the pee pee game?

2              TIFFANY:  What's the pee pee game?

3              L. BRAGA:  I don't know, somebody said that

4        that's the game that they played.  Did you ever

5        play that game?

6              TIFFANY:  (Nodding in the negative.)

7              L. BRAGA:  Did you play any games there?

8              TIFFANY:  (Nodding in the negative.)

9              L. BRAGA:  No, not any?  Well look at you

10       with your hair.  Boy, you got a lot of hair, huh?

11             TIFFANY:  (Inaudible.)

12             L. BRAGA:  You want to see?  Do you want me

13       to do it?

14             TIFFANY:  Yes go like that.  Now stand up.

15             L. BRAGA:  Stand up, okay.

16             TIFFANY:  Stand here (inaudible).

17             L. BRAGA:  Yes it's way past my bottom.  It's

18       all the way down to my legs.

19             TIFFANY:  You know what?

20             L. BRAGA:  What?

21             TIFFANY:  When you go pee pee what do you do

22       with your hair?

23             L. BRAGA:  Well I take my hair and I gather

24       it up like this and I hold it to the side.

25             TIFFANY:  You do?

1        L. BRAGA:  Yes.

2        TIFFANY:  Then when (inaudible) when you go

3    pee pee what do you do?

4        L. BRAGA:  Same thing, I pull it like this

5    over to the side.

6        TIFFANY:  Well --

7        L. BRAGA:  See when I sit down, I just hold

8    it to the side.

9        TIFFANY:  Like that.

10       L. BRAGA:  Yes like that.

11       TIFFANY:  Like that?

12       L. BRAGA:  Yes.  Just like this.

13       TIFFANY:  Do it again.

14       L. BRAGA:  Yes?

15       TIFFANY:  Do it again.  That's what you do?

16       L. BRAGA:  No I pull it to the side like

17    this.  (Indicating.)

18       TIFFANY:  Then how do you do -- how?

19       L. BRAGA:  Sometimes I put it on the top of

20    my head, you know, how it was before and I wrap it

21    all around and I put it on the top of my head.

22    That's what I do a lot of times.

23       TIFFANY:  Pull it down here?

24       L. BRAGA:  Yes sometimes I do that and pull

25    it over to the side.

182

1      TIFFANY:  Why is your hair long?

2      L. BRAGA:  Well because I like it long.  Why

3    is your hair long?

4      TIFFANY:  No it's a little bit long.

5      L. BRAGA:  Yes, well I am bigger than you.  I

6    have had a longer time to let my hair grow.  Maybe

7    when you get bigger your hair will be longer than

8    it is now.

9      TIFFANY:  When I am (inaudible).

10     L. BRAGA:  I am older than you.

11     TIFFANY:  When I am four, what will my hair

12   still be?

13     L. BRAGA:  It will be a little longer unless

14   you get it cut.

15     TIFFANY:  (Inaudible.)

16     L. BRAGA:  Well you are three now, right?

17     TIFFANY:  Right.

18     L. BRAGA:  Well let me see, turn around.

19   Okay, it's down to here.  Now probably when you

20   are four it will be down to here and when you are

21   five, maybe down to here, if you don't cut it but

22   you might cut it.

23     TIFFANY:  (Inaudible.)

24     L. BRAGA:  (Inaudible)  Did you ever see Star

25   Wars?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

TIFFANY:  How do you take his face off?

L. BRAGA:  You want to see?  That's just the way it is.  He wears that mask.  Did you ever wear a mask at Frank and Iliana's house?

TIFFANY:  No.

L. BRAGA:  Did they ever wear masks?  Did they scare you?

TIFFANY:  No that's the way he has his (inaudible).

L. BRAGA:  He's wearing his belt.

TIFFANY:  Why?

L. BRAGA:  Well I think he's carrying some things on his belt.

TIFFANY:  (Inaudible.)

L. BRAGA:  I don't think it comes off.  I think that's -- did you ever see Star Wars?

TIFFANY:  They have (inaudible).

L. BRAGA:  I don't think you take it off.  I think it's the way it looks.  He wears this mask all the time, you know, it's a toy and there's no face underneath the mask.  It's just all mask.  That's the way the toy is made.

TIFFANY:  How?

L. BRAGA:  There is a secret to the toy.  Do you want to see?  Look through here.  You can

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    see.  Can you see it?  Now look.  Look with your

2    eye.  Can you see through that?

3            TIFFANY:  (Inaudible.)

4            L. BRAGA:  Did you see it?

5            TIFFANY:  No.

6            L. BRAGA:  No?  I could see through this

7    hole, right here.  Look through the hole.

8            TIFFANY:  Yes.

9            L. BRAGA:  Move your finger away so you can

10   see.  Look through the hole.  Did you see?

11           TIFFANY:  Yes (inaudible).

12           L. BRAGA:  That's just a place.  There's like

13   a screw in there (inaudible).  That's what keeps

14   it together.  That's all.

15           TIFFANY:  How did you do this?

16           L. BRAGA:  I'm not sure.  I don't know, you

17   know, you just kind of play with it.  It doesn't

18   do a lot of stuff.

19           TIFFANY:  How would you do this?

20           L. BRAGA:  Just like what you're doing.

21   That's it.

22           TIFFANY:  Then how did you do this thing?

23           L. BRAGA:  I don't know.  Let me look and

24   see.  That's all.  It just goes like this up and

25   down.  That's it.  That's all it does.  I don't

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

135

1        know what it's for.

2              TIFFANY:  What is it for?

3              L. BRAGA:  I don't know.

4              TIFFANY:  Well (inaudible).

5              L. BRAGA:  Huh?  I don't know.

6              TIFFANY:  What's your dad's name?

7              L. BRAGA:  My dad's name?

8              TIFFANY:  Yes.

9              L. BRAGA:  Larry.

10             TIFFANY:  Huh?

11             L. BRAGA:  Larry.  What's your dad's name?

12             TIFFANY:  (Inaudible.)

13             L. BRAGA:  Vincent?

14             TIFFANY:  Vincent.

15             L. BRAGA:  What's your mom's name?

16             TIFFANY:  Andrea (inaudible).

17             L. BRAGA:  Do you want me to leave it down?

18             TIFFANY:  Yes.

19             L. BRAGA:  I will leave it down.

20             TIFFANY:  Can you do like that?

21             L. BRAGA:  Huh?

22             TIFFANY:  Like that.

23             L. BRAGA:  You want me to do that?

               TIFFANY:  Yes.

25             L. BRAGA:  Okay, you like that?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                      44 W. FLAGLER ST.
                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

186

TIFFANY:  You have to do like that.

L. BRAGA:  (Indicating.)

TIFFANY:  No, no.  When you do that, you do like that.

L. BRAGA:  Like this?

TIFFANY:  Then you do like that.

L. BRAGA:  Like that?

TIFFANY:  No.

L. BRAGA:  Like that?

TIFFANY:  Watch my hair.

L. BRAGA:  Oh I see what you mean.  Okay.  So I put it over my shoulder and then like that, right?

TIFFANY:  No, I will show you.

L. BRAGA:  You show me.

TIFFANY:  (Indicating.)

L. BRAGA:  Oh I see.  Okay.

TIFFANY:  You can't do that?

L. BRAGA:  I don't know, maybe.  Watch.  See if I am doing it right.  Whoops.  It won't go all the way over, will it?  It's too much hair.

TIFFANY:  Why?

L. BRAGA:  Why?

TIFFANY:  Why?

L. BRAGA:  It's just a lot.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        TIFFANY:  Why is it a lot?

2        L. BRAGA:  Well I like it and you met Joe,

3   right?  That's my husband.  He likes it too.

4        TIFFANY:  He likes it too?

5        L. BRAGA:  Yes he does.  He thinks it's nice.

6        TIFFANY:  He thinks it's nice?

7        L. BRAGA:  Yes.

8        TIFFANY:  Why do you have this on, this thing

9   on?

10        L. BRAGA:  What thing on?

11        TIFFANY:  This thing here.

12        L. BRAGA:  Hi.  Do you want to say hi to it?

13        TIFFANY:  Hi.

14        L. BRAGA:  Do you think you could tell me

15   some more stuff about what happened at Frank and

16   Iliana's?

17        TIFFANY:  No.

18        L. BRAGA:  No?  You don't want to?

19        TIFFANY:  No.

20        L. BRAGA:  Does it make you sad to talk

21   about it?

22        TIFFANY:  I don't know.

23        L. BRAGA:  Does it scare you?

24        TIFFANY:  I don't know.

25        L. BRAGA:  You don't know?  Did somebody tell

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          you not to talk?

2                   TIFFANY:  Some, I don't know.

3                   L. BRAGA:  Did they maybe tell you that you

4          might get into trouble if you told?

5                   TIFFANY:  I don't want to ask -- I don't want

6          to talk.

7                   L. BRAGA:  Yes I know it's kind of hard but I

8          will tell you what, I will talk, okay?  You don't

9          have to talk.  I just want to tell you no matter

10         what anybody said, you are not going to get into

11         trouble for telling, okay?

12                  You did real good (inaudible) nobody is going

13         to do anything to you.  You are not going to get

14         into any trouble.  Nobody is going to hurt you.

15         You didn't do anything bad.

16                  TIFFANY:  Right.

17                  L. BRAGA:  Right.

18                  TIFFANY:  (Inaudible.)

19                  L. BRAGA:  Should we put the clothes back on

20         the dolls then?

21                  TIFFANY:  It's going to fall, maybe it will

22         fall.

23                  L. BRAGA:  It might fall.  You could build a

24         tall tower.

25                  TIFFANY:  Huh?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.

1      L. BRAGA:  Do you want me to put the clothes

2  back on the dolls?

3      TIFFANY:  Huh?

4      L. BRAGA:  Do you want to help?

5      TIFFANY:  Just pretend, right.

6      L. BRAGA:  Yes just pretend.  That's all we

7  are just pretending.  It's not real.  We are just

8  pretending as if this is Iliana.  That's all.

9      TIFFANY:  It's not anymore, no.

10     L. BRAGA:  No it's not really.  We were just

11  pretending.

12     TIFFANY:  Not, no.

13     L. BRAGA:  No.

14     TIFFANY:  I don't want to play anymore.

15     L. BRAGA:  Okay, you don't have to play

16  anymore.

17     TIFFANY:  I want my mom.

18     L. BRAGA:  Shall we go to get your mom?

19     TIFFANY:  Yes.

20     L. BRAGA:  Do you want to help me dress the

21  doll?

22     TIFFANY:  No.

23     L. BRAGA:  Okay I will dress them myself

24  later.  I am glad you came and played with me.  I

25  appreciate it and it was nice seeing you.  Let's

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER                 MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1     go get your mom.

2          TIFFANY:  I am going to show my mom.

3          L. BRAGA:  You are going to show your mom how

4     long my hair is?

5          TIFFANY:  Yes.

6          L. BRAGA:  Let's find your hair things

7     because your mom might be upset.

8          (Thereupon, the video of TIFFANY LANDIS

9     concluded.)

10          (Thereupon, proceedings were had at the

11     bench, between Court and counsel, out of the

12     hearing of the court reporter:)

13          THE COURT:  We have one more?

14          MR. SAMEK:  Defense requests --

15          THE COURT:  I am sorry?

16          MR. SAMEK:  Defense requests Defense Exhibit

17     F, August tape of Justin Cousino be shown.

18          THE COURT:  All right, thank you.

19          (Thereupon, the videotape of JUSTIN COUSINO

20     was played and recorded as follows:)

21          J. BRAGA:  You told me you had seen the video

22     cassettes like this that Frank had when you played

23     games with your clothes off and you were biting

24     each other's penis and kissing each other and

25     Frank Iliana would do things, right?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1  JUSTIN:  Right.

2  J. BRAGA:  What I want to ask you is about

3  the camera and the movies he showed you of

4  yourself playing and the video cassette?

5  JUSTIN:  Yes.

6  J. BRAGA:  Can you tell me when the last time

7  you saw any of the movies of the video cassette

8  like those that we just talked about, can you

9  remember the last time you saw any of them or saw

10  the cassettes like this?  That's what I wanted to

11  ask you about them?

12  JUSTIN:  The last time, last Wednesday.

13  J. BRAGA:  Last --

14  JUSTIN:  I saw them, last Wednesday I saw the

15  movies.

16  J. BRAGA:  They showed the movies on the TV

17  to you?

18  JUSTIN:  Yes.

19  J. BRAGA:  Now you were at the day care

20  center, today is Friday?

21  JUSTIN:  Yes.

22  J. BRAGA:  The day before yesterday was

23  Wednesday.  Is that when you saw them?

24  JUSTIN:  Yes.

25  J. BRAGA:  So the last day you were at school

1       is --

2               JUSTIN:  No last Wednesday, yesterday, was

3       not last Wednesday.

4               J. BRAGA:  You mean a week ago?

5               JUSTIN:  Right.

6               J. BRAGA:  Wednesday?

7               JUSTIN:  (Nodding in the affirmative.)

8               J. BRAGA:  Absolutely sure about that?

9               JUSTIN:  Yes.

10              J. BRAGA:  Where were they when you saw them?

11      Is there anyplace like at Frank's and Iliana's

12      like where they would keep them and hide them?

13              JUSTIN:  They would hide them anywhere.  I

14      don't know.

15              J. BRAGA:  Do you remember anywhere they hid

16      them?

17              JUSTIN:  Under the couch.

18              J. BRAGA:  Under the couch is where they hid

19      them?

20              JUSTIN:  Right.

21              J. BRAGA:  And did they -- I remember when we

22      talked, I asked you about the cassettes and you

23      said that you had seen a Christmas cassette.  Did

24      they show you movies on the video cassette of

25      Christmas, Christmas trees and that's what you

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                             (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

were telling me about?

JUSTIN:  Yes and the games they told me about.

J. BRAGA:  Your father said you were concerned about Noel.  Can you tell me why you were concerned about Noel?

JUSTIN:  Because (pause) because one day I might want to visit him and he might be in a bad place (inaudible).

J. BRAGA:  So you don't want anything to happen to Noel or anything like that?  No, nothing is going to happen to Noel.

L. BRAGA:  Noel didn't do anything wrong, none of the children did anything wrong.

J. BRAGA:  And you didn't do anything wrong.

L. BRAGA:  You were brave to tell.

J. BRAGA:  Justin, I can't tell you how brave you were willing to talk (inaudible) especially about cassettes.  That's really all.  I really appreciate it, you coming in again.

L. BRAGA:  Can I ask you one other question?  Brooke was in here a little while ago and she didn't really want to talk to you.  I think she was afraid to talk to you.  Do you remember -- can you tell us anything that happened with Brooke?

1    JUSTIN:  She doesn't come to Iliana's and I

2    think the reason is -- I think she's a little

3    afraid because she -- she doesn't want to talk

4    about them.

5        L. BRAGA:  Do you have any idea?

6        JUSTIN:  Because she thinks that the children

7    did something wrong.

8        L. BRAGA:  Do you think that's why?

9        JUSTIN:  Yes.

10       L. BRAGA:  Did --

11       J. BRAGA:  Did you tell her that the children

12   didn't do anything?

13       L. BRAGA:  I told her that the children didn't

14   do anything wrong and I thought maybe she was

15   afraid.

16       J. BRAGA:  Maybe she's not as grown-up as you

17   are and probably didn't understand that she's

18   younger than you are.

19       JUSTIN:  She's five.

20       L. BRAGA:  I think she said four, almost

21   five.

22       J. BRAGA:  He's much older.

23       L. BRAGA:  You are four, five-and-a-half?

24       JUSTIN:  No I am going to be five-and-a-half

25   in August.  Let me thing, August the 10th.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  Oh boy, moving right along aren't

2    you?  All right.  I guess that's it, Justin, you

3    have been so helpful to us and so brave.

4    L. BRAGA:  Do you want to ask us anything?

5    JUSTIN:  See, I have seen these video

6    cassettes and it was games of things and they have

7    a player, which they have a place where they keep

8    them, not under the couch.

9    J. BRAGA:  They keep them somewhere else?

10    JUSTIN:  Yes somewhere else, where they could

11    sometimes keep them.  They hide them inside books

12    and all that.

13    J. BRAGA:  I see and where do they put the

14    books like in a book case like that?

15    JUSTIN:  Yes.

16    J. BRAGA:  That's where they put them, inside

17    a closed book?

18    JUSTIN:  (Nodding in the affirmative.) .

19    J. BRAGA:  These tapes you actually -- the

20    last day you were there Wednesday, you saw them

21    with tapes of boys and girls with clothes off and

22    doing all the things they did with the children?

23    JUSTIN:  Right.

24    J. BRAGA:  That's the information, that's

25    what I needed to know.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

196

1    L. BRAGA:  We appreciate you telling us.  Is

2  there anything you -- any nightmares you wanted to

3  talk (inaudible).

4    JUSTIN:  Just the masks are giving me

5  nightmares.

6    J. BRAGA:  They should go away because now

7  you have told the big secrets and we know the

8  masks (inaudible).  Now that you have told about

9  the masks, they can't hurt you, never ever will

10  they be able to hurt you.

11    JUSTIN:  I know.

12    L. BRAGA:  But sometimes when you are asleep,

13  even though you know that, when you are awake,

14  maybe sometimes when you are asleep you know that?

15    JUSTIN:  No but I dream things.

16    L. BRAGA:  What kind of things?

17    JUSTIN:  Like vikings and all that.

18    L. BRAGA:  Does that scare you when you dream

19  about all those things?

20    JUSTIN:  Yes.  It's -- it's not scaring me

21  but I just wake up at night because I could see

22  it.

23    J. BRAGA:  In your dream?

24    JUSTIN:  Right.

25    J. BRAGA:  But isn't it good to wake up and

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    know it was just a dream because in the real world

2    it's nothing like that?

3         L. BRAGA:  Is there anything you would like

4    us to tell your mom and dad that you think might

5    be helpful to you?

6         JUSTIN:  Let me think.  I'd like you to tell

7    them that -- let me think.  The reason I think

8    that Brooke is scared is because she -- she's been

9    talking about this too much and she doesn't know

10   what you are doing.  That's what I think is wrong.

11        L. BRAGA:  Yes?

12        J. BRAGA:  You are probably right.

13        L. BRAGA:  You are probably right and she

14   feels everybody wants her to tell something and

15   it's too (inaudible).

16        J. BRAGA:  She preferred not to talk about

17   it.

18        JUSTIN:  Right.

19        J. BRAGA:  If you don't want to talk about

20   it, you know (inaudible) they care and love you

21   very much.  They are not worried at all.  They

22   feel everything is fine.

23        L. BRAGA:  But if you don't want to talk

24   about it, you just tell them, okay?

25        JUSTIN:  Let me think.  Once we got a ticket

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1       (inaudible).

2           J. BRAGA:  (Inaudible.)

3           JUSTIN:  I had a blood test there.

4           J. BRAGA:  They wanted to make sure you don't

5       have a cold or anything.  Right, you have the

6       sniffles and okay I think we are all done.  I was

7       thinking, do we have anything?

8           L. BRAGA:  In the bag?

9           J. BRAGA:  I was thinking about the whole

10      bag?

11          JUSTIN:  Could I have this?

12          J. BRAGA:  I need that to show the other kids

13      but what I can give you is let me find it here.

14      You hold the bag.  There is a whole bunch of games

15      in there.  Here (inaudible).

16          L. BRAGA:  I think there is a number thing

17      too.

18          J. BRAGA:  I don't think it's in here.

19          L. BRAGA:  Is that all it is?

20          J. BRAGA:  I think the number thing is in

21      there.  Let me see if it's got everything in

22      there.

23          L. BRAGA:  No it's not.

24          J. BRAGA:  It's not.  Here it is.  This goes

25      in there too.  There's a whole bunch of games you

can play.  Let's go find your father, Justin, all

right?

      L. BRAGA:  Thank you for coming.

      (Thereupon, the video of JUSTIN COUSINO

concluded.)

      THE COURT:  9:00 tomorrow morning for the

jury to be back.

      (Thereupon, an adjournment was taken to the

following day, Friday, September 13, 1985.)

      ----------

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
OFFICIAL  COURT  REPORTER
CIRCUIT  COURT  OF  THE  11TH  JUDICIAL  CIRCUIT,  DADE  COUNTY,  FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

## CERTIFICATE

STATE OF FLORIDA     )
                                        SS:
COUNTY OF DADE       )


     I, LYNN G. LENFESTEY, do hereby certify that the

foregoing, pages 1 to and including 199, is a true and

correct transcription of my stenographic notes of

proceedings had and testimony taken before the

Honorable Robert Newman, Presiding Judge, on

September 12, 1985, commencing at or about 9:45 o'clock

a.m., in the City of Miami, County of Dade, State of

Florida.


     IN WITNESS WHEREOF, I have hereunto affixed

my hand this 7th day of January, 1986.



LYNN G. LENFESTEY
Court Reporter


NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-9600

MIAMI
44 W. FLAG
(305) 37

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR DADE COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO:  84-19728 (Newman)

THE STATE OF FLORIDA,       :

     Plaintiff,             :

vs.                           :

FRANCISCO FUSTER ESCALONA:
aka Frank Fuster,
                      :

     Defendant.
                      :
_____

     The above entitled cause continued jury trial

before the HONORABLE ROBERT E. NEWMAN, Judge of the

above-styled Court, at the Metropolitan Justice Building,

Miami, Florida, on Friday, September 13, 1985, commenc-

ing at approximately 9:30 a.m.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

APPEARANCES:

                    DANIEL A. CASEY, ESQUIRE,
                    Assistant State Attorney,
                    JOHN HOGAN, ESQUIRE,
                    Assistant State Attorney, and
                    RICHARD SHIFFRIN, ESQUIRE,
                    Assistant State Attorney,
                    on behalf of the State of Florida.


                    JEFFREY SAMEK, ESQUIRE,
                    SAMEK & BESSER,
                    1925 Brickell Avenue,
                    Suite D207,
                    Miami, Florida  33129,
                    on behalf of the Defendant, Frank Fuster.




                        I N D E X

VIDEO TRANSCRIPT OF BROOKE TOBY (Exhibit H)    14

VIDEO TRANSCRIPT OF NOEL FUSTER (Exhibit I)    111

VIDEO TRANSCRIPT OF JUSTIN COUSINO            182
                                (Exhibit J)

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          the younger children, they are very quick.

2                  MR. SAMEK:  Let's say thirty.

3                  MR. CASEY:  An average tape is an hour

4          and a half.

5                  THE COURT:  This is what's left?

6                  MR. HOGAN:  No, total.

7                  MR. SAMEK:  I think we probably have over

8          forty hours.

9                  THE COURT:  That's what we have to start

10         with.

11                 MR. SAMEK:  Maybe fifty we said.

12                 MR. HOGAN:  Maybe we will cut out more.

13                 MR. SAMEK:  But the chances are I think

14         Mr. Hogan will agree, the ones we are cutting

15         out are the ones that are very, very short

16         and --

17                 THE COURT:  Well, okay, let's bring them

18         in and we will get started.

19                 MR. HOGAN:  We can have the continuing

20         process two hour matters as to the last count

21         of the Information, Count twenty-eight.

22                 THE COURT:  Yes.

23                 MR. HOGAN:  The State would be acquiescing

24         to Mr. Samek's motion concerning the child BA.

25                 THE COURT:  BA, go ahead.

**NATIONAL REPORTING SERVICE**
MARTY LESHAW
FT. LAUDERDALE                                          MIAMI
(305) 467-0400            OFFICIAL COURT REPORTER       44 W. FLAGLER ST.
                                                        (305) 373-7288
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    bailiff, the court reporter and the court

2    personnel would even be on this side of the

3    wall.  I explained, Mr. Hogan agreed.

4         THE COURT:  I don't anticipate anyone

5    being on that side.  The clerk will be where

6    he is and the bailiff and someone from the video

7    department, the county, Mr. Berger, who is in

8    charge of that  will be here and/or someone

9    named Lewis Fera (phonetic) whose name was

10   accepted by both of you yesterday.

11        MR. SAMEK:  Or the day before, yes.

12        THE COURT:  Only for the purpose of chang-

13   ing tapes and it will be put in order the way

14   Mr. Samek would want them presented.

15        MR. SAMEK:  They have been labeled, as

16   long as the outfit is labeled.

17        MR. HOGAN:  That's fine.

18        MR. SAMEK:  Additionally, Mr. Fuster

19   wants to be able to view them.  He acknowledges

20   that he does not need to be here but he wants

21   to have the opportunity to review them.

22        MR. HOGAN:  At one point --

23        MR. SAMEK:  Certainly the video capabilities

24   exist for that being done.

25        MR. BERGER: They're going back to an

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       order ..at was given to our office many

2       months ago.  There was a machine made to Mr.

3       Fuster in the ICDA facility.

4           MR. SAMEK:  No, no he wants to be able

5       to view the proceeding.

6           MR. BURGER:  View the proceeding as

7       we are showing them the tape?

8           MR. SAMEK:  Yes.

9           MR. HOGAN:  That's up to the Department

10      of Corrections; in other words we wanted --

11      someone from the State  wanted to watch them

12      also.

13          THE COURT:  Yes.

14          MR. HOGAN:  My reaction is the same as

15      Mr. Berger.  The tape is a tape.  He can

16      watch it wherever he wants to see it.

17          MR. SAMEK: It's the tape to the jury.  He

18      wants to be able to see.

19          MR. HOGAN:  I am not arguing.  The

20      question is whether the Department of Corrections

21      can work out something with Mr. Berger, whether

22      it would be appropriate security.

23          THE COURT:  I am trying to think out loud.

24      The machine and --

25          MR. BERGER: We could if Mr. Fuster would be

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        in your chambers, Judge, so he would see both

2        the jury and the tape at the same time with

3        a few wiring changes on our part.

4               THE COURT:  Anybody here from Corrections?

5               MR. SAMEK:  With a monitor --

6               MR. BURGER:  They could watch with wire

7        monitoring tapes.

8               THE COURT:  If a Saturday, Sunday and Tues-

9        day, if the Defendant wanted to watch the tape,

10       but not here, would you have any problem

11       with him sitting in my office, in my chambers?

12              MR. SAMEK:  We have no objection to any

13       Corrections personnel that is --

14              THE BAILIFF:  I have to check with the

15       sergeant.

16              THE COURT:  Sometime this morning?

17              THE BAILIFF:  Yes.

18              MR. HOGAN:  May also be this afternoon.

19              THE COURT:  May also be this afternoon?

20              MR. BURGER:  It will take a few minutes

21       to have the wiring changes.

22              THE COURT:  Lunch break?

23              MR. BURGER:  Possibly.

24              THE BAILIFF:  How many hours approximately?

25              THE COURT:  Four, five hours on Saturday

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

and maybe the same amount of Sunday.

THE BAILIFF:  Yes.

THE COURT:  And on Tuesday, a regular day?

THE BAILIFF:  As soon as we get the first --

THE COURT:  I will let you know as soon as I know.

MR. SAMEK:  Fine, only thing is I need to know can I instruct the court how many tapes I want shown so I can anticipate what kind of scheduling I am going to have or what procedures do you want me to follow?

I have other witnesses.  When the tapes are finished, I've got witnesses.  I have to start correlating if I know, for example, that we are going to have tapes to watch on Wednesday, I don't need to tell anybody to be here on Thursday.

If, on the other hand, you're finished Tuesday and I don't want to -- if Wednesday morning we're finished --

THE COURT:  I don't think we'll be able to finish Tuesday or Wednesday morning.

MR. SAMEK:  I don't think so either, Judge.  Perhaps Mr. Hogan and I will be able to agree as to a certain amount of tapes to be shown

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      THE COURT:  Right.

2      MR. FUSTER:  Fine, sir.  I agree.

3      THE COURT:  Okay, fine, thank you.

4      MR. FUSTER:  Thank you.

5      MR. HOGAN:  I think while Mr. Samek was

6      speaking to his client, Mr. Berger also wanted

7      a list to check.

8      MR. BERGER:  If we could get a copy also.

9      THE COURT:  Fine.

10     MR. SAMEK:  Yes.

11     MR. BERGER:  The other thing, as I showed

12     you was that the jurors would have to sit in

13     the jury box with the two alternates in front.

14     THE COURT:  Have to put the two alternates

15     this way.

16     MR. SAMEK:  Fine.

17     THE COURT:  By law we need two cameras,

18     which means another receiving set which makes

19     all kinds of problems.  That will be --

20     MR. SAMEK:  Fine, as long as the chairs

21     aren't broken.

22     THE COURT:  You agree?

23     Any particular wordage?

24     MR. HOGAN:  I would like with each tape

25     they simply be told the name of the child and

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     the date it was made.

2         MR. SAMEK:  To keep in sequence and to make

3     sure, keeping sequence, tell them what exhibit

4     letter and if you see Exhibit L, they may say,

5     "Wait a minute, we didn't have L."

6         THE COURT:  Any particular words you wanted

7     to use to the jury?

8         MR. SAMEK:  Why?  Nobody's here.

9         THE COURT:  Decide between now and when

10    you leave this afternoon.

11        MR. SAMEK:  I think before we try to work

12    it out, before we spend time trying to work it

13    out, make sure the court is agreeing to say

14    something along the lines, "We are not here

15    because you asked us to do things on the case

16    to speed it up."

17        THE COURT:  I understand.  Any particular

18    wording?  Just let me know, okay?

19        MR. HOGAN:  Yes.

20        THE COURT:  Please bring in the jury.

21        (Thereupon the jury is brought in).

22        THE COURT:  Good morning.

23        THE JURY:  Good morning.

24        THE COURT:  Both sides can see the presence

25    of the jury?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    MR. HOGAN:  Yes.

2    MR. SAMEK:  Yes.

3    THE COURT:  Good morning, please be seated.

4    Let me just remind you once again during the

5    course of the trial you're going to see the

6    attorneys either in the elevator, hallway,

7    cafeteria or what-have-you and again, let me

8    advise you they are not to have any communica-

9    tion with you whatsoever and you're not to take

10   that personally.

11   They are not permitted to -- I know I

12   reminded you that at the beginning and I'm

13   reminding you again.  I am sure during the

14   course of the trial, over the past several

15   days, there will be times you will be seeing

16   them here, there, yonder and they will not

17   acknowledge you.

18   Ready to proceed?

19   MR. CASEY:  Yes, Your Honor.

20   MR. SAMEK:  Your Honor, defense asks

21   that Exhibit G on October -- I beg your

22   pardon, August 10th, 1984 the tape of

23   Brooke Toby be published to the jury.

24   (Thereupon at 9:50 a.m. the video of

25   Brooke Toby was shown, Exhibit H.)

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      DR. L. BRAGA:  I started.  Take the

2   white part off.  Turn it around the other way.

3   That's it.  You got it.  Now see if you can

4   do the other.

5        If you need some help, try the white part

6   not the red on the outside but the inside.  You

7   got it.

8        DR. J. BRAGA:  (Inaudible).

9        DR. L. BRAGA:  There you go.

10        DR. J. BRAGA:  I know a five year old

11   boy who couldn't figure that out.

12        DR. L. BRAGA:  Yes.

13        DR. J. BRAGA:  We have a friend who is

14   five years of age and he wouldn't figure out --

15   couldn't figure it out and you're only four

16   (inaudible).

17        DR. L. BRAGA:  What is your birthday?

18        MRS. TOBY:  It's okay, tell them.

19        DR. J. BRAGA:  Are you four now?  Do you

20   know when your birthday is?

21        BROOKE TOBY:  (Inaudible).

22        DR. J. BRAGA:  Next July you will be five

23   years old?  I bet you know what year this

24   is, what year is this?

25        Do you know what year this is?  You will be

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                OFFICIAL COURT REPORTER           44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      five in 1985 if you are in what year?

2          BROOKE TOBY:  1985.

3          DR. J. BRAGA:  You are four in 1985.  You

4      are playing with me.  This year, what is this

5      year?  There's no right answer.  I am just

6      curious if you know what year this is.

7          DR. L. BRAGA:  Last number is the same

8      number as your age.

9          DR. J. BRAGA:  That's a toughie there.

10         DR. L. BRAGA:  Yes.

11         DR. J. BRAGA:  Can I help?

12         DR. L. BRAGA:  Turn it the other way.

13         DR. J. BRAGA:  Sometimes you need a special

14     tool, see if it turns.  That's it, good.

15         DR. L. BRAGA:  You have almost got it

16     completely apart.  I think if you take this

17     one off, too, then the seat comes apart.

18         DR. J. BRAGA:  Comes apart.

19         DR. L. BRAGA:  That's like the spare wheel.

20         DR. J. BRAGA:  You even figured out how

21     to do that, all right, didn't you?

22         You have to kind of turn them a little,

23     put them in like you did.  That's it and now

24     use it to turn.  It might be kind of hard but

25     just give it a try.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7285
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    Can I help?  You hold it.  I ll do it.

2    Oh, it's hard.  It's hard.  There we go, that's

3    it.  Good.  That's for letting me help.  Very

4    good.  Oh, that's really good.  You figured

5    out how to do it so quickly.

6         Maybe you can give it a push.  A push and

7    a pull.  That's a toughie, isn't it?

8         Let's push down.  Let's see if that works.

9    Try one more time.

10        DR. L. BRAGA:  Pull it up from that.

11        DR. J. BRAGA:  Whoops, I think I made it

12   more difficult.  That's it.  All right.  Thanks

13   for letting me help you.

14        Now comes the hard part.  Can we put it

15   back together again?

16        (Inaudible).

17        Yep.  You know what I think?  Let's try

18   one and see if we can figure out what one can

19   do.  We know the tire has to go on here but

20   you know what will hold the tire on, it's like

21   you figured out.  You put it in like that.

22   There's a hole here and this part, if we put

23   that part like that and then turn the white

24   part, that's it.  Good.  I think they all

25   go on that way.  That's it.  Good.  Very good.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1  Yep, that's one.  Remember this part here.

2  Maybe we ought to put that part back in the

3  white part.  That we took out last.

4  DR. L. BRAGA:  (Inaudible).

5  That's okay, you can put the wheel in first.

6  DR. J. BRAGA:  Boy, you really figured out

7  things fast, Brooke, very good.  Very good.  Let's

8  put this part together next.  Remember how that

9  was on there before we had to push so hard.  Maybe

10  it will go from underneath.  I think it might work.

11  Let's try and lift this part up, this part up.

12  That's it.

13  I think that will work.  Pull this out for

14  you.

15  DR. L. BRAGA:  You know that ring at the

16  end, you've got it.

17  DR. J. BRAGA:  Right.  I think I stuck the

18  seat -- there we did it.  Good girl.  Remember

19  this part here.  Remember we had you put that

20  on to hold it first.  Uh-huh, that's it.

21  Is it in the hole, in the bottom?

22  Uh-huh.  Whoops, try again.

23  (Inaudible).

24  Good, see now that is going to hold it

25  in, so now this part that you and I put in

NATIONAL REPORTING SERVICE
FT. LAUDERDALE
(305) 467-0600
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.
MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1   won't fall out.  Good.  That tightens up real

2   good.

3        All right.  All right.   What's next do

4   you think?

5        Yes.

6        BROOKE TOBY:  Another one.

7        DR. J. BRAGA:  Yes, there's another one

8   there, too.  I wonder what we're going to do

9   with that one, too.  Do you mean another one

10  of these?  Remember when we took this part

11  out (inaudible).  Let's put that on the rest

12  of the wheels.

13       Maybe it fits there -- yes, let's try it.

14  Yep.

15       DR. L. BRAGA:  Try turning it around.

16       DR. J. BRAGA:  Good problem solving technique.

17  I think she will realize that she has to turn

18  the truck around.

19       (Inaudible).

20       Good.  Did you ever have a toy like this

21  one ever?

22       BROOKE TOBY:  (Shaking head no).

23       DR. J. BRAGA:  No?  You figured it all

24  out just from now, huh?  When I was little,

25  they didn't have nice toys like these either.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      Very good.  Whoops.  Try again.  I will

2      tell you what, I will hold this part.  You do

3      that part.  That's it.

4           (Inaudible).

5           Good.  What do you think?  You got it all

6      back together again.  Not any left over parts

7      either.

8           Want me to put this on?  Where does that

9      go?  Keep looking maybe.

10          BROOKE TOBY:  (Indicating).

11          DR. J. BRAGA:  You think there -- where

12     else might it go?  Look around, look the whole

13     truck over.  If you're going to pull the truck,

14     where would you pull it from?

15          DR. L. BRAGA:  Would you pull it from the

16     back or the front?

17          BROOKE TOBY:  Back.

18          DR. J. BRAGA:  Back, yes.  Sometimes you

19     pull trucks from the back.  Can I attach it

20     or do you want me to put it there?

21          DR. L. BRAGA:  You've got it.

22          DR. J. BRAGA:  We will put it there and

23     we will be able to pull the truck.

24          (Inaudible).

25          DR. J. BRAGA:  Do you go to school?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7258

1          BROOKE TOBY:  (Shaking head yes).

2          DR. J. BRAGA:  You do?  Joe and my grand-

3     daughter go to school, too.

4          Very good.  You are so smart.

5          (Inaudible).

6          Brooke is having such an easy time over

7     here.  The PHD is having a terrible time.

8          DR. L. BRAGA:  Need some help?

9          DR. J. BRAGA:  I went to school for sixteen

10    years to learn how to thread through a hole

11    and I still can't do it.

12          DR. L. BRAGA:  Well --

13          DR. J. BRAGA:  (Inaudible).

14          When did you go to school last?  When was

15    the last time you went to school?

16          BROOKE TOBY:  (No response).

17          DR. J. BRAGA:  Do you remember?

18          DR. L. BRAGA:  Did you go yesterday?

19          DR. J. BRAGA:  What about the day before

20    yesterday?

21          No?

22          DR. L. BRAGA:  Last week?

23          DR. J. BRAGA:  That's it.  Good.

24          Are there other boys and girls where you

25    go to school?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          Yes?

2          It works.  It works.

3          DR. L. BRAGA:  You did it all yourself.  You

4     are real smart.

5          DR. J. BRAGA:  Can I try it and see if I

6     could figure it out, too?

7          Aren't there some more blocks?

8          DR. L. BRAGA:  I think some of the ones

9     are in there.

10          DR. J. BRAGA:  Is that what happened?

11          DR. L. BRAGA:  The real big ones go in

12     here but the smaller ones, let me show you.  See

13     these?

14          BROOKE TOBY:  (Inaudible).

15          DR. L. BRAGA:  (Inaudible).

16          This blue one and white one.

17          BROOKE TOBY:  These are big.

18          DR. J. BRAGA:  Yes, these are big.  Do

19     you think they will fit in here?

20          DR. L. BRAGA:  The big ones will fit in

21     here.

22          Okay, and the ones --

23          DR. J. BRAGA:  Little ones go in there,

24     yep.  Here's another one.

25          I think if you push it this way (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Uh-huh.

2          DR. L. BRAGA:  The pot is getting awful

3     full, huh?

4          I think maybe some of those might not go

5     in there.  It's getting so full.

6          DR. J. BRAGA:  Good, very good.  Maybe

7     that one came from the bag and doesn't belong.

8          DR. L. BRAGA:  Think so?

9          DR. J. BRAGA:  I think we brought things

10    that belong to other toys.  I think that's

11    what happened except this one.

12         Where do you think that one goes?

13         Right, she is so smart.  Brooke is already

14    figuring out she has some more room but doesn't

15    have any more room there and --

16         (Inaudible).

17         You are so smart.

18         DR. L. BRAGA:  You're right.  That does

19    go in there.  It's just hard to fit in right

20    now.  You know what they did with this one?

21    They made it kind of like a puzzle.  If you

22    take this off, that's another new thing.

23         (Inaudible).

24         DR. L. BRAGA:  If you take those off,

25    how do we get this after you take them out?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Then it's kind of a puzzle to get them all

2      in there.

3          DR. J. BRAGA:  All fall down.  All fall

4      down.  All blocks fell down.  All fall down.  We

5      used to play a game when we were little where

6      everybody would fall down afterwards, little

7      Jack (inaudible).

8          No, that's not it.  I remember it was

9      Ring Around the Rosie. Did you ever play that

10     when you were little?

11         I used to play that.  How does it go?

12     Ring Around the Rosie --

13         DR. L. BRAGA:  Pocket full of posies, upstairs,

14     downstairs, all fall down.

15         DR. J. BRAGA:  I remember that (inaudible).

16         What other games did you play when you were

17     little?

18         DR. L. BRAGA:  Sometimes some children

19     say instead of upstairs, downstairs, ashes,

20     ashes.  I don't know what that means.

21         DR. J. BRAGA:  How would it go?

22         DR. L. BRAGA:  Ring around the rosies,

23     ring around the posies, ashes, ashes, all fall

24     down.

25         DR. J. BRAGA:  We used to go play tag, too,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                 (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        and sometimes go play hide and go seek.

2            DR. L. BRAGA:  There's some other dolls.

3        Do you want to play with them?

4            DR. J. BRAGA:  Bring those down here.

5            (Inaudible).

6            DR. L. BRAGA:  You can undress them and

7        stuff.

8            DR. J. BRAGA:  This one has buttons.  What

9        does that one have?

10           BROOKE TOBY:  That one has --

11           DR. J. BRAGA:  What does this one have?

12       It has a shirt.  Doesn't it work?

13           DR. L. BRAGA:  Do you have shoes that you

14       can put them over (inaudible).

15           A lot of kids have those sneakers that have

16       those --

17           DR. J. BRAGA:  Oh, boy, I wonder which

18       one.  Yes, does that one have stuff like that,

19       that you connect at the top, too?  Yes, but

20       it's a tight fit.

21           DR. L. BRAGA:  Maybe that's really not

22       his shirt.

23           DR. J. BRAGA:  Maybe, sometimes they get

24       their clothes mixed up.

25           BROOKE TOBY:  A girl.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     L   J. BRAGA:  A girl, yes.

2     DR. L. BRAGA:  A girl.  That one is a

3 lady.

4     DR. J. BRAGA:  That's a lady.

5     BROOKE TOBY:  This is a mother.

6     DR. J. BRAGA:  That's a mother and that's

7 a baby.

8     BROOKE TOBY:  Look.

9     DR. J. BRAGA:  Oh, yes.

10    DR. L. BRAGA:  You are right, one of them

11 is bigger than the other one.

12    DR. L. BRAGA:  Do you want to do a make-

13 believe game with them and pretend?  Do you?

14    BROOKE TOBY:  (Inaudible).

15    DR. L. BRAGA:  Do you want to pretend

16 this is Brooke?

17    DR. J. BRAGA:  Do you have any friends at

18 school?

19    We want to name the little boy.

20    DR. L. BRAGA:  Do you know somebody named

21 Jonathan?

22    BROOKE TOBY:  (Shaking head yes).

23    DR. L. BRAGA:  Do you want to pretend

24 that that is Jonathan?

25    BROOKE TOBY:  This could be Justin..

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     DR. L. BRAGA:  This is a grownup man.

2   Do you want to pretend this is Frank?

3     BROOKE TOBY:  That could be Ileana.

4     DR. L. BRAGA:  Okay, let's pretend.

5     This one has to be a woman.  It's a little

6   girl.  Do you want to make it Brooke or somebody

7   else?

8     BROOKE TOBY:  Brooke and this is Jonathan.

9     DR. L. BRAGA:  Jonathan, okay.

10     BROOKE TOBY:  And this one's sitting down

11   right here, like -- this one has to sit down.

12     DR. L. BRAGA:  Okay.

13     BROOKE TOBY:  Down here and Justin has to

14   sit there and (inaudible).

15     DR. J. BRAGA:  Everybody is sitting down.

16   Neat dolls, aren't they?

17     DR. L. BRAGA:  They're cute.  Do you want

18   to see what else is there?

19     Somebody else to play with them.

20     DR. J. BRAGA:  Who's that?

21     BROOKE TOBY:  Donald Duck.

22     DR. J. BRAGA:  Yes, Duckie.

23     DR. L. BRAGA:  Do you want Donald to play

24   with them?

25     DR. J. BRAGA:  Can Donald Duck play games

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          with the dolls?  Have Donald (inaudible) to play

2          the games and tell them what to do.

3                 (Inaudible).

4                 BROOKE TOBY:  Minnie Mouse, Minnie Mouse,

5          Donald Duck.

6                 DR. J. BRAGA:  You like them, huh?

7                 Who is that?  It's a little boy named

8          Pinocchio.

9                 BROOKE TOBY:  Pinocchio fall down.

10                DR. J. BRAGA:  He falls down, yes.

11                DR. L. BRAGA:  Let him play with them,

12         too.

13                BROOKE TOBY:  (Inaudible).

14                They have to be right here (inaudible).

15                DR. L. BRAGA:  Okay.

16                BROOKE TOBY:  Donald Duck and (inaudible).

17                DR. J. BRAGA:  Getting quite a gang, aren't

18         we?

19                BROOKE TOBY:  They can play a game.

20                DR. J. BRAGA:  Okay.

21                DR. L. BRAGA:  Oh, you found the special

22         thing, huh?

23                DR. J. BRAGA:  That's another puppet.  Do

24         you want to put it on your hand?

25                (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          BROOKE TOBY:  Two, two (inaudible).

2     Two fingers.

3          DR. J. BRAGA:  Do you know how to make

4     a puppet make a voice?

5          BROOKE TOBY:  This one has a --

6          DR. L. BRAGA:  Yes, it is like a --

7          DR. J. BRAGA:  Hi, how are you?  What is

8     your name?  How do you do?  How do you do?

9          Hi, what is your name?  My name is Nosey.

10    They call me Nosey because I have a long nose.

11    What is your name?

12         So what do you think?  What's your name?

13    How do you do?  How do you do?

14         Hi, my name is Minnie Mouse.  What's your

15    name?  Who is that?  Do you know who that is?

16    That is Cat in the Hat.

17         BROOKE TOBY:  Cat in the Hat.

18         DR. L. BRAGA:  Ever see him on television?

19         BROOKE TOBY:  (Shaking head yes).

20         DR. J. BRAGA:  Do you like him?

21         Hi, I am Minnie Mouse.  My friend is Mickey

22    Mouse.

23         BROOKE TOBY:  Hi, I am Cat --

24         DR. J. BRAGA:  Hi, Cat in the Hat.  I am

25    Minnie Mouse.  Did you come here to play with us

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          today?

2                    BROOKE TOBY:  No.

3                    DR. J. BRAGA:  Who is this?

4                    It's the reindeer.  The reindeer came.

5                    BROOKE TOBY:  Hello.

6                    DR. J. BRAGA:  Hello, Mr. Reindeer.  This

7          is my friend Donald Duck.  Donald doesn't talk

8          very clearly.  I never know what he's saying.

9                    BROOKE TOBY:  But now --

10                   DR. J. BRAGA:  Oh, it's the Tiger.  Hello

11         Mr. Tiger.  Can you talk to Mr. Tiger?

12                   BROOKE TOBY: (Indicating).

13                   DR. J. BRAGA:  Mr. Tiger goes growl, growl,

14         growl.  Hi, Mr. Tiger.  Oh, you work (inaudible).

15         He's neat, isn't that great?  He's super.  He's

16         got a big mouth.  Uh-uh, time consuming.

17                   What do you think, should we play a game

18         with  Pinocchio?

19                   I don't know if he wants to play.  We could

20         play a game together.

21                   What should we play, Ring Around the Rosie?

22         Ring around the rosie, pocket full of posie,

23         ashes, ashes, all fall down.

24                   DR. L. BRAGA:  Should we let these dolls

25         play, too?

1    BROOKE TOBY:  This one has to play, too.

2    DR. J. BRAGA:  Okay.

3    DR. L. BRAGA:  Okay.

4    BROOKE TOBY:  Ring around the rosie, pocket

5    full of posies, ashes, ashes, all fall down.

6    DR. J. BRAGA:  Should we do it again?

7    BROOKE TOBY:  Ring around the rosies, pocket

8    full of posies, ashes, ashes, all fall down.

9    DR. J. BRAGA:  What do we do next?

10   DR. L. BRAGA:  You going to put Brooke over

11   there?  Did she bite you?

12   DR. J. BRAGA:  You know I think Frank has

13   got Justin's shirt on.

14   DR. L. BRAGA:  Shirt?

15   DR. J. BRAGA:  Do you want to take his

16   shirt and we can trade shirts?  Do you want to

17   do that?

18   BROOKE TOBY:  These are bigger than these.

19   DR. J. BRAGA:  You think so?  Here, here's

20   a shirt for him to put on.  Yes,  put this short

21   back on Frank.  This is Frank's shirt.

22   BROOKE TOBY:  Yes.

23   DR. J. BRAGA:  Okay.

24   BROOKE TOBY:  This is Justin's shirt and

25   they changed in their room.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    DR. J. BRAGA:  Yes.

2    BROOKE TOBY:  (Inaudible).

3    I have to put it on like this.

4    DR. J. BRAGA:  Good.  Now they've got their

5    right shirts on.

6    DR. L. BRAGA:  You know what I think?  I

7    think you've got it upside down.

8    DR. J. BRAGA:  Well they're doing that nowadays.

9    You watch that, it will be the new styles next

10   week, especially if it bothers teachers in schools

11   or parents.  They will start wearing their shirts

12   upside down.

13   Frank's got the right shirt on now, right.

14   That's Brooke.  We said we'd call her Brooke.

15   BROOKE TOBY:  (Inaudible).

16   DR. J. BRAGA:  What did he do?

17   BROOKE TOBY:  They swing.

18   DR. J. BRAGA:  They can swing around, wheee,

19   wheee.

20   Swing, swing, swing.  They play good

21   togehter.  What else?

22   Swing, yes.

23   BROOKE TOBY:  (Inaudible).

24   DR. L. BRAGA:  What other kinds of games?

25   BROOKE TOBY:  She could kill him like this

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          and then watch (inaudible).

2                Then swing, swing.

3                DR. J. BRAGA:  Swing, swing.  That's a

4          good idea.  Yes.

5                BROOKE TOBY:  She could play.  She's not

6          playing though.  She has -- swing, swing.

7                DR. J. BRAGA:  Swing, swing.

8                BROOKE TOBY:  Oh, yes, he can play with

9          her.

10               DR. J. BRAGA:  How did they play together?

11         They could play together, too?  Swing, swing.

12         Swing, swing, swing.

13               Feels nice when you swing like that, doesn't

14         it?

15               BROOKE TOBY:  I have a swinging set.

16               DR. J. BRAGA:  Do you, at home?

17               BROOKE TOBY:  (Shaking head yes).

18               DR. J. BRAGA:  Is it like a swing set

19         and your mommy and daddy push you back and

20         forth?  Who gets tired, you or the swing or

21         your mommy and daddy pushing?

22               BROOKE TOBY:  Ring around the rosie,

23         pocket full of posies, ashes, ashes, all fall

24         down.

25               Look (inaudible).

1      They will be like this.  Ring around the

2  rosies, pocket full of posies, ashes, ashes,

3  all fall down.

4      DR. J. BRAGA:  Boom.

5      BROOKE TOBY:  They're kissing.

6      DR. J. BRAGA:  Are they kissing?

7      BROOKE TOBY:  They kiss -- yes.  This one

8  goes to that one.  Brooke goes to Justin.  Right.

9      DR. J. BRAGA:  Yes?

10      BROOKE TOBY:  Because they're sisters and

11  brothers.

12      DR. J. BRAGA:  Uh-huh.

13      BROOKE TOBY:  Because Jonathan is (inaudible).

14      DR. J. BRAGA:  Jonathan is Justin's brother,

15  right?

16      BROOKE TOBY:  Ring around the rosie, pocket

17  full of posies, ashes, ashes, all fall down.

18      DR. L. BRAGA:  All fall down.

19      BROOKE TOBY:  Swing, swing, swing, swing.

20  Whoa.

21      DR. J. BRAGA:  Voom.

22      BROOKE TOBY:  Swing, swing, swing, swing,

23  swing.

24      DR. J. BRAGA:  Boom, all fall down.

25      BROOKE TOBY:  They can hold on.  This one

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1   could hold on to me like this.

2        DR. J. BRAGA:  Uh-huh.

3        BROOKE TOBY:  To me like this.

4        DR. J. BRAGA:  Uh-huh.

5        BROOKE TOBY:  Watch.  Ring around the rosie,

6   pocket full of posies, ashes, ashes, all fall

7   down.

8        Ouch.

9        DR. J. BRAGA:  Did you hurt yourself?

10       DR. L. BRAGA:  A toe a little bit.

11       DR. J. BRAGA:  I hope you didn't hurt

12  yourself.  Did you hurt yourself at all?

13       What other games can we play with them?

14  What other games would they play?  Let's see.

15  What other games can we figure out?

16       BROOKE TOBY:  Guess what?  She's got

17  panties.

18       DR. J. BRAGA:  Does she?

19       BROOKE TOBY:  She's got panties, hey let

20  me see this.  She's a mother.

21       DR. L. BRAGA:  Yes.

22       BROOKE TOBY:  Because look.

23       DR. J. BRAGA:  She's a mama.  Oh, yes.

24       BROOKE TOBY:  Big boobs.

25

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    DR. J. BRAGA:  Yes.

2    BROOKE TOBY:  See this one?  I forgot.

3  Two little tiny moo moos.  They've got things.

4  They've got something, too.

5    (Indicating).

6    I told you they got some.  They got

7  panties.

8    DR. J. BRAGA:  They all have got panties

9  on and pants and shirts.

10    BROOKE TOBY:  No, look he's got a big

11  (inaudible).  Well, I didn't know that.  Bye, bye.

12  Go inside there.  There, now they've all got

13  one but Pinocchio.  Let's see, Pinocchio, no he

14  does not.

15    DR. L. BRAGA:  No, he doesn't have one.

16  Those are special dolls.

17    BROOKE TOBY:  I want to play this.

18    (Inaudible).

19    Hard to open this.

20    DR. L. BRAGA:  Yes, it's a hard zipper.

21    DR. J. BRAGA:  Want to play some more

22  you and me?  Do you want to hold these two?

23    BROOKE TOBY:  (Inaudible).

24    DR. J. BRAGA:  Oh, boy, what did you find,

25  a little boat?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7288
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       BROOKE TOBY:  A boat.  One boat, two boats,

2  it's a car.

3       DR. L. BRAGA:  Uh-huh.

4       BROOKE TOBY:  And whoever (inaudible).

5       They've got number games.  That's a number

6  game.

7       DR. J. BRAGA:  Oh, yes.

8       BROOKE TOBY:  A lot of stuff.

9       DR. L. BRAGA:  Is that a cold?

10      BROOKE TOBY:  Oh, yes (inaudible).

11 Boats floating around.  Boats floating around.

12 Number game.

13      DR. J. BRAGA:  Uh-huh.

14      BROOKE TOBY:  (Inaudible).

15      DR. J. BRAGA:  Play with the number game?

16      BROOKE TOBY:  One, two -- wait.

17      DR. L. BRAGA:  Yes.

18      BROOKE TOBY:  Seven, whoa.  Hard to do

19 this.  This thing.

20      DR. L. BRAGA:  It is hard.

21      DR. J. BRAGA:  It is hard.

22      DR. L. BRAGA:  Yes.

23      BROOKE TOBY:  (Inaudible).

24      There has to be one more numbere here.

25      DR. J. BRAGA:  The number is missing.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    Maybe __'s broken.  Do you think maybe it's

2    broken?  Yes, it's probably broken.

3         BROOKE TOBY:  It's not here.

4         DR. J. BRAGA:  Yes, it's probably broken.

5    Maybe I lost it when I brought the toys.

6         BROOKE TOBY:  Let me see if I see something.

7    Let me see, oh, look at it.

8         DR. J. BRAGA:  Remember the little one

9    before the little boy that was in the sailor

10   suit?

11        DR. L. BRAGA:  You're making him turn

12   around.

13        DR. J. BRAGA:  That's him.  They call him

14   Tommy Tippy.  Want me to show you how it works?

15   This toy is older than I am.  Just push his head.

16   Yes, just push his head like this.

17        DR. L. BRAGA:  Push it and let it go.

18        BROOKE TOBY:  (Indicating).

19        DR. J. BRAGA:  Want me to show you?

20        BROOKE TOBY:  Yes.

21        DR. J. BRAGA:  Watch.

22        BROOKE TOBY:  Okay, I could do that.

23        DR. J. BRAGA:  Yes, I know you could do it

24   as soon as you figured it out.

25        BROOKE TOBY:  Let's see.  Well, that's hard.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       DR. J. BRAGA:  Yes, it is hard but once

2  it does it, it's fun.  Yes.

3       DR. L. BRAGA:  You got it.

4       DR. J. BRAGA:  Let's see how many times

5  he turns.  Isn't that neat?

6       BROOKE TOBY:  (No response).

7       DR. J. BRAGA:  Did you have a toy like

8  that when you were little?

9       MRS. TOBY:  No.

10       DR. J. BRAGA:  If you had I was going to

11  say you are older than I am.

12       (Inaudible).

13       Because essentially all this is is two

14  pieces of metal and a block and a bunch of

15  -- Tommy Tippy, there he goes.

16       Isn't that neat?

17       DR. L. BRAGA:  You did it good.  You

18  really got him going.

19       DR. J. BRAGA:  Look how many times he

20  is doing it.

21       MRS. TOBY:  Just like the  Olympics.

22       DR. J. BRAGA:  Just like the Olympics.

23       BROOKE TOBY:  (Inaudible).

24       Looks like (inaudible).  He falls down.

25       DR. J. BRAGA:  Whoops, whoops, whoops,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   whoops

2        BROOKE TOBY:  That looks like (inaudible).

3   Stand on his head.

4        DR. J. BRAGA:  Yes.

5        BROOKE TOBY:  Oh, look.  He looks like he's

6   going to sleep.

7        DR. J. BRAGA:  Does he go to sleep?

8        BROOKE TOBY:  Watch.  Ring around, ring

9   around -- wait.  Ring -- peek a boo (inaudible).

10  One, two, thre, four, five, six, seven, eight,

11  nine (inaudible).

12       DR. J. BRAGA:  You really know your numbers,

13  huh?

14       If you could remember at that age (inaudible)

15  you can remember for now but not for long.

16       Good, why don't you put those things away

17  because we're not going to play with those.

18       DR. L. BRAGA:  We can put those away for

19  now.

20       DR. J. BRAGA:  We will play with this.

21       BROOKE TOBY:  (Inaudible).

22       DR. J. BRAGA:  Okay.

23       BROOKE TOBY:  A lot of games.

24       DR. L. BRAGA:  Yes.

25       BROOKE TOBY:  Hard.  We can play with these.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0800

MIAMI
44 W. FLAGLER ST.
(305) 373-7288

1      DR. J. BRAGA:   Okay, let's play with

2   those.  Let's put them away for now.  We can

3   play with the dolls for awhile.

4      DR. L. BRAGA:  Thanks.  Okay.  He doesn't

5   stand up too well, huh?

6      BROOKE TOBY:  That's his (inaudible).

7      DR. L. BRAGA:  I don't know if he has a

8   gun.

9      BROOKE TOBY:  Has --

10      DR. J. BRAGA:  That's his eye piece he looks

11   through.

12      BROOKE TOBY:  (Inaudible).

13      DR. L. BRAGA:  You know what you can do?

14   Let me show you.  See this piece right here.

15   If you look with your eyes you can see through

16   that.  See?

17      BROOKE TOBY:  Oh (inaudible).

18      DR. L. BRAGA:  Did you see?  No?

19      BROOKE TOBY:  Nothing.

20      DR. L. BRAGA:  Let me look.

21      BROOKE TOBY:  I can put his thing up like

22   this and then here, look.  It could stand on

23   its head.

24      DR. L. BRAGA:  Look at that.  Very good.

25      BROOKE TOBY:  Look at that.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7288

1                        D. J. BRAGA:  Oh, you got h.. standing

2      on his head.  Very good.

3                        Brooke did that.

4                        DR. L. BRAGA:  Yes.

5                        DR. J. BRAGA:  All right, I am impressed.

6                        BROOKE   TOBY:  But I can't stand on my

7      head either.

8                        DR. J. BRAGA:  That's not easy to do.

9      That's not easy to do.

10                       BROOKE TOBY:  (Inaudible).

11                       Oh, look at that.

12                       DR. J. BRAGA:  Now, he's doing a pushup, huh?

13                       BROOKE TOBY:  And now look.

14                       DR. L. BRAGA:  Backstand.

15                       DR. J. BRAGA:  Now he's backstands.

16                       BROOKE TOBY:  Exercises.

17                       DR. J. BRAGA:  Is he doing his exercises?

18                       BROOKE TOBY:  One and one and (inaudible).

19                       DR. L. BRAGA:  He's running, huh?

20                       BROOKE TOBY:  Let me see.  Stand on here

21      like this and then one, bend, two, three (inaudible).

22                       DR. J. BRAGA:  No?  Does it work?

23                       BROOKE TOBY:  (Inaudible).

24                       DR. J. BRAGA:  (Inaudible).

25                       BROOKE TOBY:  There, now.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1             DR. J. BRAGA:  Shall we play with dolls

2    now for awhile?

3             BROOKE TOBY:  (No response).

4             DR. J. BRAGA:  Whoops.

5             BROOKE TOBY:  (Inaudible).

6             Now the wheel.

7             DR. J. BRAGA:  Did the wheel come down

8    (inaudible).  Didn't fall down.

9             BROOKE TOBY:  Like that (inaudible).

10            DR. J. BRAGA:  Good.

11            BROOKE TOBY:  Then this one.  This one.

12    This one.

13            DR. J. BRAGA:  Uh-huh.

14            BROOKE TOBY:  Goes like this.

15            DR. J. BRAGA:  Good.

16            BROOKE TOBY:  That's too big.

17            DR. J. BRAGA:  Is it?  Do you think you

18    still might fit the others in?  Try that one

19    here.  Let me try one more.

20            BROOKE TOBY:  Wait a minute.

21            DR. J. BRAGA:  How about that?

22            BROOKE TOBY:  Whoa, kind of like this.

23            DR. J. BRAGA:  Uh-huh.

24            BROOKE TOBY:  Kind of like that (inaudible).

25    What can I do?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1               DR. J. BRAGA:  Good.

2               Uh-huh.  I think they go there.  They

3     will work there.  Yes.

4               They will be this way.  Okay?  Thank you.

5               BROOKE TOBY:  (Inaudible).

6               DR. J. BRAGA:  Good, not quite, huh? Can

7     you try this one?  Hold it.

8               BROOKE TOBY:  Wait a minute (inaudible).

9               Hold it.  I can't do it.

10             (Inaudible).

11             DR. L. BRAGA:  Oh, boy, that's a big jump.

12    You jump over the dolls?

13             BROOKE TOBY:  Ready,set, go.  Ready, get

14    set.  Ready, get set.

15             DR. L. BRAGA:  You've been watching the

16    Olympics.

17             DR. J. BRAGA:  (Inaudible).

18             DR. L. BRAGA:  Brooke, shall we play

19    some more with the dolls?

20             (Inaudible).

21             BROOKE TOBY:  Oh, yes.

22             DR. J. BRAGA:  What are some of the games?

23             DR. L. BRAGA:  When you would go to

24    school at Frank and Ileana's house, what are

25    some of the games you would play?

NATIONAL REPORTING SERVICE

FT. LAUDERDALE          MARTY LESHAW          MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER       44 W. FLAGLER ST.
                                       (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    BROOKE TOBY:  I never go to school.  It's

2  not a school.

3    DR. L. BRAGA:  Oh.

4    DR. J. BRAGA:  The babysitter?

5    BROOKE TOBY:  (Shaking head yes).

6    DR. J. BRAGA:  Oh, it's a babysitter.

7    DR. L. BRAGA:  Who is this?  Who did we

8  decide this was?  Are we going to make pretend

9  this is Justin?

10    BROOKE TOBY:  You could have this and you

11  could have these.  I could have this one.

12    DR. J. BRAGA:  Tell me what to do with them.

13  This is Ileana.

14    BROOKE TOBY:  (Shaking head yes).

15    DR. J. BRAGA:  Okay.

16    BROOKE TOBY:  This is -- that's me.

17    DR. J. BRAGA:  Okay.

18    BROOKE TOBY:  I mean this is me.

19    DR. J. BRAGA:  That's you.

20    BROOKE TOBY:  That's Frank.  That's Justin.

21    DR. L. BRAGA:  Who is that?

22    DR. J. BRAGA:  Tiffany.

23    DR. L. BRAGA:  Okay, that Tiffany.

24    DR. J. BRAGA:  What shall we all play?

25  Let's all play a game.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        BROOKE TOBY:  Okay, wait a minute.

2        (Inaudible).

3        DR. J. BRAGA:  Okay.

4        BROOKE TOBY:  It's hard to play.

5        DR. L. BRAGA:  It's hard to hold them all,

6   huh?

7        DR. J. BRAGA:  But what fun.

8        BROOKE TOBY:  Ring around the rosie, ring

9   around the posie, ashes, ashes, all fall down.

10       DR. L. BRAGA:  Want to bring them all

11  over here?

12       DR. J. BRAGA:  Frank you, I have Ileana

13  back again.  All right.

14       DR. L. BRAGA:  I've got Frank and Tiffany.

15  Right?  Is this Tiffany?

16       BROOKE TOBY:  He's got --

17       DR. J. BRAGA:  Justin.

18       BROOKE TOBY:  Justin.

19       DR. J. BRAGA:  And Ileana.

20       BROOKE TOBY:  Yes.

21       DR. J. BRAGA:  What can Ileana and Justin do

22  together?

23       BROOKE TOBY:  They can play (inaudible).

24  They do (inaudible).  We need one more person

25  here.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    L . J. BRAGA:  Okay.

2    BROOKE TOBY:  One more person.  They have

3    to set up together.  One person sits over here

4    and --

5    DR. J. BRAGA: Uh-huh.

6    BROOKE TOBY:  And they let someone sit --

7    let someone sit in their lap.

8    DR. J. BRAGA:  Okay.

9    BROOKE TOBY:  (Inaudible).

10    Sit in their lap.  Father sits.  Says you

11    have to sait a minute.   (Inaudible).

12    DR. J. BRAGA:  Okay.

13    BROOKE TOBY:  (Inaudible).

14    Swing, swing.  They could sit right here.

15    DR. J. BRAGA:  Okay.

16    BROOKE TOBY:  Sit here.  Now you two be

17    good and Brooke will sit right and right here

18    and in the middle with Ileana and this -- this

19    one could sit here.  Justin and Ileana could

20    sit right here.

21    DR. L. BRAGA:  Now what?

22    DR. J. BRAGA:  Now what shall they do?

23    BROOKE TOBY:  One, two -- can't do it.

24    One, two, three, four, five, six, seven.  That

25    was a good exercise.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        (Inaudible).

2        You have to go right here in space.  I

3   bet Justin can do it.  One, two, three, four,

4   five, six (inaudible).

5        Now, Frank is going -- I bet he could do

6   it.  One, two, three, four, five and I bet Brooke

7   could do it.  One, two, three, four, five, six,

8   seven, eight, nine, ten, eleven, twelve (inaudible).

9   Sit right there.

10       (Inaudible).

11       You sit like that.

12       And now Stephanie has to do it.  I bet

13  Stephanie could do it.  One, two, three -- she's

14  doing it different.  One, two, three, four

15  (inaudible).

16       DR. L. BRAGA:  Is she doing the split?

17       BROOKE TOBY:  Now they all do it.  You

18  are a very good (inaudible).  Walk home.  Walk

19  home, Stephanie.

20       (Inaudible).

21       And there they are in their nice, nice

22  home.

23       DR. J. BRAGA:  Yes.

24       BROOKE TOBY:  I can fall over.

25       DR. J. BRAGA:  Brooke, did you ever see a

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    television camera before?  Did Frank and Ileana

2    have a TV camera like that to make movies?

3            BROOKE TOBY:  (Shaking head no).

4            DR. J. BRAGA:  You never saw one like that

5    before?

6            BROOKE TOBY:  Pinocchio has to be home

7    with them.

8            DR. L. BRAGA:  Take him out and let him

9    sit with them.

10           BROOKE TOBY:  Pinocchio has to sit right

11   here.  He can sit with Brooke and Justin but

12   (inaudible).

13           DR. L. BRAGA:  They've got quite a bunch

14   of people there, huh?

15           BROOKE TOBY:  And they live there.

16           (Inaudible).

17           Ouch.

18           DR. L. BRAGA:  Did you hurt yourself?

19           DR. J. BRAGA:  Let's see what else, what

20   other games we can play.  Want to bring them

21   out over here?

22           BROOKE TOBY:  Not (inaudible).  Pinocchio.

23           DR. L. BRAGA:  Just bring Brooke and Justin

24   and Tiffany, okay?

25           BROOKE TOBY:  They're going to go to sleep.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                          MIAMI
(305) 467-0600                                    44 W. FLAGLER ST.
                                                   (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          DR. L. BRAGA:  They're going to go to sleep,

2     okay.

3          BROOKE TOBY:  I am going to sleep with

4     Stephanie and (inaudible).  Nobody.

5          DR. J. BRAGA:  Uh-huh.

6          BROOKE TOBY:  They're going to sleep

7     (inaudible).

8          DR. L. BRAGA:  Okay.

9          BROOKE TOBY:  They can sleep altogether in

10    a nice, nice bed.

11         DR. L. BRAGA:  Okay.

12         BROOKE TOBY:  Right.

13         DR. L. BRAGA:  Right.

14         BROOKE TOBY:  One, two, three jump.  One,

15    two, three jump.  And I can sit down (inaudible).

16    Sit down like this.  One, two, three.

17         Hey, what is that orange thing?

18         DR. L. BRAGA:  I don't know.

19         BROOKE TOBY:  Let me go to the bathroom.

20         MRS. TOBY:  Where is it?

21         DR. L. BRAGA:  Let's see, go out and to

22    the left.

23         BROOKE TOBY:  (Inaudible).

24         Yes.  (Inaudible).  That's her bed.

25         DR. J. BRAGA: Okay, let's start playing again.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        Let me get these other dolls.

2        BROOKE TOBY:  Wake up, doll.  Aren't you

3  going to sit with us?

4        (Inaudible).

5        Right here and sit right here.  Then

6  they're going to like -- they are scared.  They

7  almost died.

8        DR. J. BRAGA:  I am Frank.  He's going to

9  tell us what else we should do, all right?

10        First of all, he's going to say, "Justin,

11  come here."  So let's bring Justin over.

12        DR. L. BRAGA:  That's Ileana.

13        DR. J. BRAGA:  Here is Frank and Frank wants

14  you to tell him what we should do with Justin.

15        You tell us what should Justin do now.

16        BROOKE TOBY:  (Inaudible).

17        Play and lie down.

18        DR. J. BRAGA:  Let's play some of the

19  games we play at the house.

20        BROOKE TOBY:  How about me?

21        DR. J. BRAGA:  Okay, you can play, too.

22  Let's play some of the games, too.

23        BROOKE TOBY:  How about me?

24        DR. L. BRAGA:  Everybody can play.

25        DR. J. BRAGA:  Everybody can play.  Frank says,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                          MIAMI
(305) 467-0600        OFFICIAL COURT REPORTER        44 W. FLAGLER ST.
                (305) 373-7295
CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1      "Let's play with the games that we want to

2      play, that we don't tell anybody about.  So,

3      first of all, Ileana --"

4           BROOKE TOBY:  What about me?

5           DR. L. BRAGA:  Okay.

6           DR. J. BRAGA:  Ileana, I want you to help

7      us to play a game but we don't tell anybody

8      about it.  So let's play these secret games.

9           BROOKE TOBY:  (Inaudible).

10          DR. J. BRAGA:  Frank is here and Frank

11     says will you play the secret game with us

12     and Frank says let's get Justin to play the

13     secret game with us.

14          Okay, Brooke, what could we do?  What do

15     we usually do when we play our secret games?

16     Frank says -- we have to go to the grocery store.

17          DR. J. BRAGA:  Okay.  Well, let's go to

18     the grocery store.

19          BROOKE TOBY:  (Inaudible).

20          Ileana.

21          DR. J. BRAGA:  Ileana is going to stay

22     here and take care of the other little boys

23     and girls.  Frank is going to the grocery store

24     but somebody has to take care of the children.

25          BROOKE TOBY:  (Inaudible).

1          DR. J. BRAGA:  Do you want to come with

2      me to the grocery store?

3          BROOKE TOBY:  Yes.

4          DR. J. BRAGA:  I'm going to go down and

5      get the ice cream.  You go get me the potato

6      chips, okay?  Okay.

7          BROOKE TOBY:  I got them.

8          DR. J. BRAGA:  Okay, I've got the ice cream.

9      Let's go to the register and pay for them, okay?

10         BROOKE TOBY:  Yes.

11         DR. J. BRAGA:  Here's my money, okay?

12         We've got them.  Did they put them in the

13     bag for us?

14         BROOKE TOBY:  Yes.

15         DR. J. BRAGA: Let's go back to the babysitter's.

16         Hi, Ileana.  We just got back.  Here's the

17     ice cream and now we're back from the grocery

18     store, Ileana.

19         BROOKE TOBY:  I'm going to get some -- some

20     (inaudible).

21         DR. J. BRAGA:  Brooke just went to get

22     some potatoes, Ileana and Justin, and she will

23     be back in just a minute.  Thank you.

24         BROOKE TOBY:  I'm going to buy some apple

25     juice.

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                                44 W. FLAGLER ST.
                     OFFICIAL  COURT  REPORTER                (305) 373-7295
     CIRCUIT  COURT  OF  THE  11TH  JUDICIAL  CIRCUIT.  DADE  COUNTY.  FLA.

1      DR. J. BRAGA:  Where is Brooke now?  She

2  just went to get the apple juice and we will

3  play games when she gets back.  When we play

4  games, we will have apple juice.

5      Frank, can we have apple juice, too?

6      Frank says we can have some apple juice.

7      BROOKE TOBY:  Some cheese.

8      DR. J. BRAGA:  We bought some cheese, too.

9      BROOKE TOBY:  We bought some bread.

10      DR. J. BRAGA:  We bought some butter, too,

11  and --

12      BROOKE TOBY:  That's it.

13      DR. J. BRAGA:  That's it, we didn't buy

14  anymore.  We put it all in the refrigerator.

15  Frank says did you remember the games we play?

16  I bet you can't remember the secret games we

17  play.

18      Justin, you're a bad boy.  You don't

19  remember Tiffany.  Do you remember some of

20  the games we play?

21      Do you think Tiffany remembers?  Tiffany

22  doesn't seem to remember.

23      BROOKE TOBY:  I think we played grocery

24  store.

25      DR. J. BRAGA:  Grocery store.  That is not

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1  secret game, Ileana.  You tell Tiffany what

2  the secret game is.

3        BROOKE TOBY:  (Inaudible).

4        DR. J. BRAGA:  And now Justin, you tell

5  Tiffany and Justin (inaudible).

6        BROOKE TOBY:  I know.

7        DR. J. BRAGA:  Okay, and now. Brooke, you

8  tell me.  Does everybody know what we should

9  do?

10       BROOKE TOBY:  Yes.

11       DR. J. BRAGA:  What should we do now?

12       DR. L. BRAGA:  Can you show us what the

13 secret game is?

14       DR. J. BRAGA:  Because Joe and Laurie don't

15 know what the secret game is.

16       BROOKE TOBY:  I'm going to walk there

17 (inaudible) with Stephanie and Stephanie

18 would know what to do.

19       Here.

20       DR. J. BRAGA:  Do you remember, though,

21 do you remember the babysitter sometimes would

22 play games without clothes on?  Would she take

23 her clothes off and play some of the games

24 we play without clothes?

25       BROOKE TOBY:  I'm going to take their

---

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1           clothes off.

2                DR. J. BRAGA:  We played grocery store.

3           But you wear the clothes when you go to the

4           grocery store, right?

5                BROOKE TOBY:  When she comes home, she

6           takes her clothes off and sits down (inaudible).

7                DR. J. BRAGA:  Okay.  Who takes Justin's

8           clothes off?  Does Justin take his own clothes

9           off or does somebody else take his clothes off?

10               BROOKE TOBY:  I take them off.

11               DR. J. BRAGA:  I don't know.

12               BROOKE TOBY:  I take them off.

13               DR. J. BRAGA:  Okay.

14               BROOKE TOBY:  Then they all would like to

15          sit down and Justin --

16               DR. J. BRAGA:  This is Brooke, right?

17               BROOKE TOBY:  Right.

18               DR. J. BRAGA:  This is Tiffany.

19               BROOKE TOBY:  Yes.

20               DR. J. BRAGA:  That's Justin.  This is

21          Ileana.

22               BROOKE TOBY:  Yes.

23               DR. J. BRAGA:  Does Ileana take her clothes

24          off?

25               BROOKE TOBY:  Yes.  She has all her clothes

1    off.

2        DR. J. BRAGA:  Okay.  Okay.

3        BROOKE TOBY:  (Inaudible).

4        Look at her.

5        DR. J. BRAGA:  Uh-huh.

6        BROOKE TOBY:  Look at this.

7        DR. J. BRAGA:  That's the hair under her

8    arms, oh, yes.

9        BROOKE TOBY:  Look at this, nothing (inaudible).

10       DR. J. BRAGA:  Yes.

11      BROOKE TOBY:  But I am going to take his

12    clothes off because he's (inaudible) take one

13    hand off.  Two hands off.

14       DR. J. BRAGA:  Okay.

15      BROOKE TOBY:  And take his shorts off.

16    He's going to be very funny.

17       DR. J. BRAGA:  Okay.

18      BROOKE TOBY:  Funny, funny, funny.

19       DR. J. BRAGA:  One at a time.

20       DR. L. BRAGA:  There you go.

21      BROOKE TOBY:  Now they have got clothes off.

22       DR. J. BRAGA:  Now what?

23      BROOKE TOBY:  You can see them.

24       DR. J. BRAGA:  Okay.

25      BROOKE TOBY:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    MIAMI
(305) 467-0600        OFFICIAL COURT REPORTER      44 W. FLAGLER ST.
              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Take their things off.

2          DR. L. BRAGA: Uh-huh.

3          BROOKE TOBY: Don't tell anybody.

4          DR. J. BRAGA: We won't tell anybody.

5          BROOKE TOBY: No one can look at it.  Only

6     my mommy and daddy.  See if I can do it.

7          (Inaudible).

8          One, two, three -- one, two, three.  You're

9     hard to take off.

10         DR. L. BRAGA: There you go.

11         BROOKE TOBY: (Inaudible).

12         Right here.

13         DR. J. BRAGA: Okay.

14         BROOKE TOBY: What about mine?

15         Okay.

16         DR. J. BRAGA: I will take it off.  You

17    have to hold his head.  Okay.

18         BROOKE TOBY: One, two, three.  One, two,

19    three.

20         DR. J. BRAGA: Whoops.

21         BROOKE TOBY: And now they all have their

22    clothes off.

23         (Inaudible).

24         DR. J. BRAGA: Okay, we want to play the

25    games just like we play at the babysitters.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                            MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          BROOKE TOBY:  Hey, I didn't know she's

2     got one, too.

3          DR. J. BRAGA:  That's Justin.

4          BROOKE TOBY:  She's got under the arm.  I

5     already looked at it.  She's got one.

6          DR. J. BRAGA:  Okay.

7          BROOKE TOBY:  One, two and three.  One, two

8     and three.

9          DR. L. BRAGA:  It's hard, huh?

10         BROOKE TOBY:  I didn't know he got them, too.

11    Now, they all got their clothes off.  Nobody is

12    allowed to see them.

13         DR. J. BRAGA:  But nobody else is here.

14    So let's play the game we play now.

15         BROOKE TOBY:  Yes.

16         DR. J. BRAGA:  We've all got our clothes

17    off.

18         BROOKE TOBY:  What about me?  I am not

19    naked.

20         DR. L. BRAGA:  You can pretend.

21         MRS. TOBY:  You can pretend you are Tiffany

22    and Tiffany is (inaudible).

23         BROOKE TOBY:  Stephanie has got blonde

24    hair so she can be this one and I can be this

25    one.

1        L... J. BRAGA:  Okay.

2        BROOKE TOBY:  Because Stephanie has a

3   jacket on and she's very cold.  That's why she

4   put it on.  And then she let -- then she put

5   one of her --

6        DR. J. BRAGA:  Now, Brooke, Brooke.

7        BROOKE TOBY:  What?

8        DR. J. BRAGA:  This is Frank here, right?

9        BROOKE TOBY:  Frank doesn't do that.

10        DR. J. BRAGA:  Doesn't do what?

11        BROOKE TOBY:  (Inaudible).

12        DR. J. BRAGA:  Let's play some of the

13   games that Frank plays.

14        BROOKE TOBY:  Ileana, Frank, what are you

15   doing naked?  What are they doing naked?  I

16   don't know (inaudible).

17        DR. J. BRAGA:  What do they do then when

18   they take their clothes off?

19        BROOKE TOBY:  They kiss.

20        DR. J. BRAGA:  They kiss?

21        BROOKE TOBY:  (Inaudible).

22   Kiss.

23        DR. J. BRAGA:  How do they kiss?

24        BROOKE TOBY:  They go like this.  Like this.

25        DR. J. BRAGA:  Uh-huh.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE              OFFICIAL COURT REPORTER           MIAMI
(305) 467-0600                                       44 W. FLAGLER ST.
              CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.   (305) 373-7295

1      BROOKE TOBY:  Like this.

2      DR. J. BRAGA:  They do that with their

3   clothes off, right?

4      BROOKE TOBY:  Right, with the clothes on.

5      DR. J. BRAGA:  I see.

6      BROOKE TOBY:  But I can't put their clothes

7   on but look (inaudible).

8      She's a girl so she's sitting in your lap.

9   You can hold her like that.  You could hold her

10  like that and this is a girl.  So she's (inaudible).

11  Again, these are boys.

12     DR. J. BRAGA:  What did you boys do?

13     BROOKE TOBY:  (Inaudible).

14     Here's their clothes.  I don't know which

15  ones.  Like this.

16     DR. J. BRAGA:  Can you show your mommy and

17  daddy the games you play at Frank and Ileana's

18  when the clothes are off, using the dolls?

19     BROOKE TOBY:  (Inaudible).

20     Put the dress and then they walk, walk, walk

21  (inaudible).

22     MR. TOBY:  Hey, Brooke, now it's time.  Now

23  we've been playing around, I want you to show me

24  the games that you play.  It's okay now.  We all

25  want to know.  You won't get in any trouble.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1         DR. L. BRAGA:  You know, I think some of

2    the other children told us they got kind of scared

3    because Frank and Ileana told them not to tell

4    anybody but the other children talked to us and

5    they felt much better after they talked to us.

6         We thought you would feel better, too, if

7    you told us what happened.

8         BROOKE TOBY:  I'm going to put my things on

9    like this and pretend I am a little girl (inaudible).

10        MR. TOBY:  Brooke, what I want you to do is

11    come down here for a second, okay?

12        MRS. TOBY:  Mommy will hold that.

13        MR. TOBY:  Hey, Brooke, come over here.  I

14    know --

15        BROOKE TOBY:  I'm playing.

16        MR. TOBY:  I know, but I want to play with

17    these dolls.  I want you to show me what exactly

18    happened in the secret game.

19        You remember you were not supposed to keep

20    secrets from Mommy and Daddy.  You know that?

21        MRS. TOBY:  I will hold that.

22        MR. TOBY:  Come down, sit here for a few

23    minutes and I want you to tell me about the

24    secret games.

25        BROOKE TOBY:  I don't want you to know.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      MR. TOBY:  Come on.

2      DR. L. BRAGA:  You won't get into any

3  trouble.  Nobody.  What anybody told you, you

4  won't get into trouble.

5      MR. TOBY:  No, not the grocery store game.

6  Let's try the other game.

7      BROOKE TOBY:  (Inaudible).

8      MR. TOBY:  Aren't there other games that

9  you play over there?

10      DR. J. BRAGA:  Pee pee game.

11      MR. TOBY:  Hey, Brooke --

12      BROOKE TOBY:  (Inaudible).

13      MR. TOBY:  Hey, Brooke.

14      DR. J. BRAGA:  (Inaudible).

15      MR. TOBY:  You know what I want to hear?

16  Brooke, I want to tell you a secret.  Come here.

17  Come here.

18      I want you to tell me about the pee pee game.

19      BROOKE TOBY:  No.

20      MR. TOBY:  Why not?

21      BROOKE TOBY:  There's no pee pee game.

22      MR. TOBY:  No pee pee game?  What do you

23  call it?

24      BROOKE TOBY:  I call it (inaudible) game.

25      MR. TOBY:  Okay, tell me a little bit about

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    it or show me.  I want to see.

2         BROOKE TOBY:  One, two, three.  They stand

3    on their head.  It's hard for them.

4         MR. TOBY:  Let me ask you, hey, Brooke, this

5    game did you play the game with --

6         BROOKE TOBY:  (Inaudible).

7         MR. TOBY:  Did you play the game with

8    other boys and girls or did you just play the

9    game with Brooke?

10        BROOKE TOBY:  Other little boys and this

11   is how we played it.

12        DR. J. BRAGA:  (Inaudible).

13        BROOKE TOBY:  Stand in one place.

14        MRS. TOBY:  Stand in one place?

15        BROOKE TOBY:  I will show you how, Daddy.

16   I will show you how, Daddy.  Watch.  Put it on

17   Mommy's neck and hold on with hands and here.

18        MR. TOBY:  Did you have clothes on?

19        BROOKE TOBY:  No clothes.

20        MRS. TOBY:  No clothes?

21        MR. TOBY:  Who gave you the ride?

22        BROOKE TOBY:  Stephanie.

23        MR. TOBY:  Huh?  Did Frank give you a

24   ride?

25        BROOKE TOBY:  No.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      MR. TOBY:  Did you sit -- tell me more

2   about the game.

3      BROOKE TOBY:  Noel.

4      MRS. TOBY:  Noel would give you a ride?

5      BROOKE TOBY:  Piggyback.

6      MRS. TOBY:  Did Noel have clothes on?

7      BROOKE TOBY:  Piggyback, piggyback ride,

8   piggyback ride.

9      (Inaudible).

10      MRS. TOBY: Would he give you --

11      BROOKE TOBY:  (Inaudible).

12      Stephanie, why did you do that?

13      MRS. TOBY:  Why is she sad?

14      BROOKE TOBY:  Because she must not do it

15   again.  If she wants to be with --

16      MRS. TOBY:  Ileana?

17      BROOKE TOBY:  No, Ileana is right there.

18      MR. TOBY:  You've got Ileana right here.

19      BROOKE TOBY:  She wants to sit here with

20   Ileana.

21      MRS. TOBY:  Where did they get piggyback

22   rides, too?

23      BROOKE TOBY:  See, watch this.  Dad, see?

24   See this?  They can hold on to the shoulder.

25      MR. TOBY:  What was the name of the game, the

**NATIONAL REPORTING SERVICE**
FT. LAUDERDALE
(305) 467-0600
MARTY LESHAW
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   game?

2       MRS. TOBY:  Hot potato?

3       BROOKE TOBY:  I'm going to play hot potato.

4       MR. TOBY:  I want to know more about the

5   secret game, the one you are not supposed to tell

6   us.  See, it's okay to tell us.

7       BROOKE TOBY:  There's no secret game.

8       MR. TOBY:  There's no?

9       BROOKE TOBY:  They did not tell me a secret

10   game.

11       MR. TOBY:  Did they tell you (inaudible).

12       BROOKE TOBY:  A ghost game.

13       MR. TOBY:  Is that the game with the mask?

14       BROOKE TOBY:  (Shaking head yes).

15       MRS. TOBY:  That would be a nice one for

16   you to show us.

17       MR. TOBY:  I would like to know about that.

18   Is that like ghost busters?

19       BROOKE TOBY:  (Inaudible).

20       MR. TOBY:  What's the song with that?  Don't

21   you sing it another way?

22       BROOKE TOBY:  Frank Fusters.

23       MR. TOBY:  Who do you call Frank Fusters?

24       BROOKE TOBY:  Frank Fuster.

25       MR. TOBY:  Do you sing that song during the

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1      game?

2          BROOKE TOBY:  Frank Fuster.

3          MR. TOBY:  Hey, that's pretty good.  Do you

4      sing that game?  Do you sing that song during

5      the game, huh?

6          BROOKE TOBY:  Frank Fusters.

7          MR. TOBY:  Let me ask a little bit more

8      about this.

9          BROOKE TOBY:  I will show you, like this.

10         MR. TOBY:  My hand like this?

11         BROOKE TOBY:  Like that.

12         MR. TOBY:  Yes.

13         BROOKE TOBY:  Hot.  We had a (inaudible).

14      In the pot, very hot and very cold and (inaudible).

15         MRS.TOBY:  Tell us about the ghost game.

16         MR. TOBY:  Yes, I want to hear about the

17      ghost game.  Do you get scared in that game,

18      huh?

19         BROOKE TOBY:  They went woo, woo, woo.

20         MR. TOBY:  Who went like this?

21         BROOKE TOBY:  They got tired.  How come

22      they did this?

23         MR. TOBY:  Come over here.

24         DR. L. BRAGA:  Did you get scared when they

25      did the ghost game?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                  MIAMI
(305) 467-0600     OFFICIAL COURT REPORTER     44 W. FLAGLER ST.
                            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    MRS. TOBY:  Brooke, come over here.

2    MR. TOBY:  Did you get scared when they

3    did the ghost game?

4    BROOKE TOBY:  Yes, yes.

5    MR. TOBY:  Can I ask you a couple of

6    questions?  Did they -- did anybody wear masks

7    in that game?

8    BROOKE TOBY: (Inaudible).

9    MRS. TOBY:  Daddy asked you a question.

10   BROOKE TOBY:  I am not going to tell you.

11   MR. TOBY:  Why not?  Did someone tell you

12   not to tell Daddy?

13   Did somebody tell you not to tell Daddy?

14   Don't I tell you everything?

15   BROOKE TOBY:  A snake.

16   MR. TOBY:  Don't I tell you everything,

17   Sweetheart?

18   DR. L. BRAGA:  You found a snake, huh?

19   MR. TOBY:  That's a nice snake.

20   DR. L. BRAGA:  You know, Brooke -- Brooke,

21   come over here.

22   BROOKE TOBY:  Daddy, try to get me with

23   the snake.

24   MRS. TOBY:  We're not going to play that

25   game.

1      MR. TOBY:  I will play that with you

2   you play the other game.

3      MRS. TOBY:  We want to know abou

4   game.

5      BROOKE TOBY:  (Inaudible).

6      MRS. TOBY:  How did Frank and Ileana play

7   the game?

8      BROOKE TOBY:  Put a mask on.

9      MRS. TOBY:  What kind of mask?

10      BROOKE TOBY:  He played (inaudible).

11      MRS. TOBY:  Tell me more about it.

12   Can you tell me more about Frank and Ileana's

13   mask?

14      Did they put the mask on?

15      BROOKE TOBY:  Yes.

16      MR. TOBY:  What colors were the masks?

17      BROOKE TOBY:  White, green.

18      MR. TOBY:  Whose was green?

19      BROOKE TOBY:  Frank's.

20      MR. TOBY:  Did they have anything else

21   besides the masks?  Did they have clothes on

22   or off?

23      BROOKE TOBY:  On.

24      MR. TOBY:  But they put the masks on?

25      BROOKE TOBY:  Ileana had a white one and

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    Frank had a green one.

2        MR. TOBY:  Did they come in and scare you

3    or what?

4        BROOKE TOBY:  We were trying to watch TV

5    (inaudible).

6        Guess what?  We won (inaudible) Ileana

7    and Frank.

8        MR. TOBY:  They were trying to scare you?

9        MRS. TOBY:  Where did you run to when you

10   were running away from the monsters?

11       BROOKE TOBY:  One, two, three, four, five,

12   six, seven, eight, nine, ten, eleven, twelve,

13   thirteen, fourteen -- fourteen, fifteen, (inaudible).

14       MR. TOBY:  Brooke, can I ask you any other

15   thing?  When they chased you with the mask --

16   are you tired now?  Did they ever ask you --

17       BROOKE TOBY:  Yes.

18       MR. TOBY:  Then what happened?

19       BROOKE TOBY:  Then they went (indicating).

20       MR. TOBY:  What do you mean?

21       BROOKE TOBY:  (Inaudible).

22       Have a nice day (inaudible).

23       MR. TOBY:  Let me ask you another question.

24       BROOKE TOBY:  No (inaudible).

25       No, I hate the question.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                           44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      MR. TOBY:  You hate which question?  If

2  you were bad over there --

3      BROOKE TOBY:  I knew you were going to ask

4  that.

5      MR. TOBY:  You don't want me to ask you?

6  You don't want to tell me, do you?

7      Why don't you want to tell me?

8      BROOKE TOBY:  (Inaudible).

9      MR. TOBY:  You don't really want to tell

10  me?

11      MRS. TOBY:  We know you were never bad.

12      MR. TOBY:  If somebody else was bad over

13  there, I know you weren't bad over there, but

14  if somebody else was bad.

15      Listen, if somebody else is bad over there,

16  what happened to them if they were bad?

17      BROOKE TOBY:  Hold my foots.

18      MRS. TOBY:  Daddy is asking you a question.

19      BROOKE TOBY:  Hold my hand.

20      MR. TOBY:  If somebody else -- if somebody

21  else was bad over --

22      BROOKE TOBY:  Watch this.  You can't do this.

23      (Inaudible).

24      MR. TOBY:  Brooke, if someone was bad over

25  there, what would happen?

1        BROOKE TOBY:  (Inaudible).

2        DR. L. BRAGA:  Don't ask anything

3   a minute.  Just let her do whatever she's

4   to do and we will see.

5        BROOKE TOBY:  Mommy, I am  tired of doing

6   this.

7        DR. L. BRAGA:  I don't blame you for being

8   tired.  You know who was here yesterday?

9        BROOKE TOBY:  No.

10       DR. L. BRAGA:  Justin was here and Jonathan

11  and David and Tiffany.

12       BROOKE TOBY:  No such thing as David.

13       DR. L. BRAGA:  No such thing as David?

14  Yes, you know David?  He has dark hair.  He's

15  little than you.

16       BROOKE TOBY:  I know him.

17       MRS. TOBY:  He's going to be in your mama's

18  (inaudible).

19       BROOKE TOBY:  Mom,Mom --

20       MRS. TOBY:  Can you see me on television?

21       (Inaudible).

22       BROOKE TOBY:  Why?

23       DR. L. BRAGA:  You come over here and Mommy

24  can --

25       MRS. TOBY:  Yes, you go over there.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                              MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

DR. L. BRAGA: Everybody is there, huh?

You know what? The other children came in and

just like you, they didn't want to tell at first

because they were afraid. They thought maybe

they had done something bad because Frank and

Ileana made them feel like if they told, they

would get into trouble and their Mommy and Daddy

would be mad at them but Mommy and Daddy won't

be mad at you.

It's okay if you tell.

MR. TOBY: Brooke, Brooke --

BROOKE TOBY: (Inaudible).

DR. L. BRAGA: It's scarey. I know it's

scarey because you like Frank and Ileana, but

some of the things they did, you didn't know

whether you should be doing it and they told

you not to tell.

BROOKE TOBY: I am watching you on TV.

MR. TOBY: Did Frank say it's okay to tell?

BROOKE TOBY: (Inaudible).

DR. L. BRAGA: You want to watch me

talk on TV? Can you see me talking?

You don't have to tell but would you tell

us something about Justin? Would you tell us

something about Justin? How about Jonathan?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        Would you talk to us about Jonathan?

2            BROOKE TOBY:  Okay.

3            DR. L. BRAGA:  Okay.

4            MR. TOBY:  Come over here.  Come.

5            BROOKE TOBY:  I'm watching (inaudible).

6            MR. TOBY:  Come here.  You have to tell

7        us over here.  I can't hear you.

8            DR. L. BRAGA:  Would you come over here

9        and tell us?

10           BROOKE TOBY:  No.

11           DR. L. BRAGA:  How about Tiffany?

12           BROOKE TOBY:  Yes.

13           DR. L. BRAGA:  Would you tell us about

14       Tiffany?

15           BROOKE TOBY:  Yes.

16           DR. L. BRAGA:  Would you tell us about

17       Tiffany?

18           BROOKE TOBY:  (Inaudible).

19           MR. TOBY:  Come over here.

20           MRS. TOBY:  All right.

21           DR. L. BRAGA:  Sometimes little boys

22       and girls have yucky secrets and they don't

23       want to tell anybody because they are scared

24       but if you tell a yucky secret, if you don't

25       tell, it just stays inside and hurts but if you

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    do tell, it's all gone and you feel better

2    and this never -- and you never have to tell it

3    again.

4         MR. TOBY:  Let's tell that secret, Brooke.

5         BROOKE TOBY:  No TV on.

6         MRS. TOBY:  No, so now we can come bak

7    and play with the doll.

8         DR. L. BRAGA:  Would you tell us about

9    Tiffany?

10        BROOKE TOBY:  I want to play with Tiffany.

11        DR. L. BRAGA:  Tell us about Tiffany.  Okay?

12        BROOKE TOBY:  (No response).

13        DR. L. BRAGA:  Nothing, huh?

14        MR. TOBY:  Brooke, here is Justin.  Look

15   who just came in.  That's not yours, Honey.  Put

16   that down.

17        Brookie, this is Justin.

18        BROOKE TOBY:  Tiffany is going to hit

19   Justin.

20        MR. TOBY:  I want you to tell me.

21        DR. L. BRAGA:  Is Tiffany mad at Justin?

22        BROOKE TOBY:  (Shaking head yes).

23        DR. L. BRAGA:  Justin do something to make

24   Tiffany mad?

25        BROOKE TOBY:  They fight together.

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DR. L. BRAGA:  Fight together?

2          BROOKE TOBY:  And they (indicating).

3  Then Tiffany.

4          DR. L. BRAGA:  Then what happens?

5          MRS. TOBY:  If she gets in trouble for

6  fighting, if she were mad?

7          BROOKE TOBY:  She goes home and stays

8  forever and ever.

9          (Inaudible).

10         MR. TOBY:  She goes into a room or a

11  closet of what?  What did you say?

12         BROOKE TOBY:  (Inaudible).

13  Now you were a bad girl.

14         MR. TOBY:  Did you wash her mouth out with

15  soap?

16         MRS. TOBY:  Who did that, Ileana or Justin

17  or Frank?

18         BROOKE TOBY:  Justin did it.  You're a bad

19  girl (inaudible).

20         MR. TOBY:  Did Ileana hit her?

21         BROOKE TOBY:  Yes.

22         MR. TOBY:  And then what?

23         BROOKE TOBY:  Then Ileana got (inaudible).

24  You are a bad girl.

25         Lay in your bed.  (Inaudible).

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 487-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Now, Justin is going to hit and now he's

in trouble and Tiffany is not in trouble.  Yes,

I am not in trouble.

4          MR. TOBY:  Let me ask you this, Brooke,

5     when Tiffany got into trouble, what happened to

6     Tiffany?  What --

7          BROOKE TOBY:  They did (inaudible).

8          MR. TOBY:  No, they didn't throw it up in

9     the air.  Tell me what they really did?

10         DR. L. BRAGA:  You know what?

11         BROOKE TOBY:  No.

12         DR. L. BRAGA:  I don't think we want to

13    hear about this.  I think we will just stop

asking you any question, okay?

15         BROOKE TOBY:  (No response).

16         Going to play Ring Around the Rosie.

17         DR. L. BRAGA:  Okay.

18         BROOKE TOBY:  (Inaudible).

19         Ring around the rosie, pocket full of posies,

20    ashes, ashes, we all fall down.

21         Now it's your turn, Daddy.

22         MR. TOBY: Did you play that game?

23         BROOKE TOBY:  Ring around the rosie, pocket

24    full of  -- did you see me playing?

25         MR. TOBY:  Not over there.  Did you play

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    it a special way over there?

2         BROOKE TOBY:  (Inaudible).

3         Hold hands like this.  Hold hand like that.

4         MR. TOBY:  Uh-huh.

5         BROOKE TOBY:  I hold it like this and

6    (indicating).  I am going to play (inaudible).

7    We had a nice day (inaudible).

8         MR. TOBY:  You know what we can do?  Let me

9    ask you something, if Mommy and I went outside

10   over there, would you tell her about the secret

11   so we don't have to worry and then we can go home?

12        BROOKE TOBY:  No.

13        MR. TOBY:  Why not?

14        DR. L. BRAGA:  I will tell you what.  You

15   don't have to tell me, okay?  Let Mommy and Daddy

16   go out and you and I can play something else.  You

17   don't have to tell me.

18        BROOKE TOBY:  Okay.

19        MR. TOBY:  We will be right back.

20        BROOKE TOBY:  (Inaudible).

21        DR. L. BRAGA:  We will play with some

22   other things.

23        BROOKE TOBY:  (Inaudible).

24        DR. L. BRAGA:  Where did you go?

25        BROOKE TOBY:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER              MIAMI
(305) 467-0800                                                     44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Are you coming here?  Where is he?

2          DR. L. BRAGA:  I don't know where he is.

3   Want to look and see?  Bring me the bag and let

4   me look.

5          BROOKE TOBY:  There's a wallet.

6          DR. L. BRAGA:  That's a wallet, yes.  There

7   he's -- let's fix that.  Let's see.  It's starting

8   to break.  Let's fix it so it won't break, okay?

9          There we go.  Let's just put it like so.

10          BROOKE TOBY:  Now he puts his foot in it

11   and holds on and I hold on.

12          DR. L. BRAGA:  Wait a minute.

13          BROOKE TOBY:  Cuckoo (inaudible).

14          DR. L. BRAGA:  Why didn't somebody answer

15   the phone?  I don't know.

16          BROOKE TOBY:  No, I mean the one (inaudible).

17          DR. L. BRAGA:  Oh, you mean Joe?  He went

18   out for awhile.  Do you think he should come

19   back?

20          BROOKE TOBY:  (She's shaking her head yes).

21          DR. L. BRAGA:  Yes?

22          BROOKE TOBY:  Cuckoo, cuckoo, cuckoo, cuckoo,

23   cuckoo.  See what you can do?

24          DR. L. BRAGA:  Oh, he fell down.

25          BROOKE TOBY:  You were a bad boy (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                       (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       DR. L. BRAGA:  Uh-huh.

2       BROOKE TOBY:  Take these clothes off and

3 then here's my shoe.  Here's my other shoe and

4 here's (inaudible).  Where's the other dolls?

5       DR. L. BRAGA:  They they are over there.

6       BROOKE TOBY:  Here they are and here

7 (inaudible).  Right.

8       DR. L. BRAGA:  Right.

9       BROOKE TOBY:  Now, we have to play with

10 all these toys.  It's going to be hard.

11       DR. L. BRAGA:  Yes.

12       BROOKE TOBY:  Let me see if I could find

13 a toy for you.

14       DR. L. BRAGA:  Okay.  Pinocchio, okay?

15       BROOKE TOBY:  Pinocchio.

16       DR. L. BRAGA:  Do you know the story of

17 Pinocchio?  Did you ever go to see the story

18 Pinocchio?

19       BROOKE TOBY:  No, only I saw Jungle Book.

20       DR. L. BRAGA:  That's a good one.

21       BROOKE TOBY:  And I looked at the movie of

22 Pinocchio (inaudible).

23       DR. L. BRAGA:  Do you know that if Pinocchio

24 told a lie it would get so long that a bird would

25 make a next on his nose?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1        ısn't that silly?  He kept oɴ tellinɡ these

2        stories and his  nose  would get longer and

3        longer and longer and finally he started telling

4        the truth and finally his nose became normal.

5             BROOKE TOBY:  Like this?

6             DR. L. BRAGA:  Yes, I like your nose.

7             BROOKE TOBY:  I like yours.

8             DR. L. BRAGA:  (Inaudible).

9             BROOKE TOBY:  (Inaudible).

10            It's hard.

11            DR. L. BRAGA:  It's hard to get open, huh?

12       Careful, don't hurt yourself.  It's okay.  Come

13       on.

14            BROOKE TOBY:  I'm not talking.

15            DR. L. BRAGA:  Good.  Okay.  So, anyway,

16       we were saying about Pinocchio when he would

17       tell stories or he wouldn't tell the truth,

18       his nose would get so long and a bird would

19       build a nest on it.  He got into a lot of

20       trouble because he wouldn't tell the truth

21       and then finally he decided he would tell the

22       truth.  Then his nose got little again, like

23       yours.

24            BROOKE TOBY:  (Inaudible).

25            DR. L. BRAGA:  Yes, like mine.  You see me

1          on TV.

2               BROOKE TOBY:  Uh-uh.

3               DR. L. BRAGA:  So what should we play

4     with now?

5               BROOKE TOBY:  (Inaudible).

6               DR. L. BRAGA:  Okay, go ahead.

7     What does  this say, munch, munch?

8               BROOKE TOBY:  (Inaudible).

9               DR. L. BRAGA:  Do you see that man with

10    an apple in his face?  Doesn't he look silly?

11              BROOKE TOBY:  (No response).

12              DR. L. BRAGA:  Did you see a doll?  Did you

13    ever see a doll like that, that had all the

14    parts and everything funny, huh?

15              Most dolls don't have --

16              BROOKE TOBY:  (Inaudible).

17              DR. L. BRAGA:  An open mouth.  See, it's

18    got a mouth that is open.

19              BROOKE TOBY:  (Inaudible).

20              Pacifier and a toy.

21              DR. L. BRAGA:  Yes.

22              BROOKE TOBY:  (Inaudible).

23              THE CAMERAMAN:  Tell me a secret and I

24    will tell you one.  These are good.

25              BROOKE TOBY:  I know.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          (inaudible).

2          I have him one.

3          DR. L. BRAGA:  I can't hear you.

4          BROOKE TOBY:  I am not like  (inaudible).

5          DR. L. BRAGA:  Oh, well, not working?

6          BROOKE TOBY:  (Inaudible).

7          DR. L. BRAGA:  I don't know why either.  You

8     don't want to talk to me, do you?

9          BROOKE TOBY:  (Shaking head no).

10         DR. L. BRAGA:  No?

11         BROOKE TOBY:  Eat my lunch.

12         DR. L. BRAGA:  Okay.  What do you think

13    might happen if you did talk to me, huh?

14         What do you think would happen?

15         BROOKE TOBY:  (Inaudible).

16         DR. L. BRAGA:  Okay.

17         BROOKE TOBY:  Could stand up.

18         DR. L. BRAGA:  Do you think somebody might

19    get mad at you if you talked to me?  Do you

20    think so?

21         BROOKE TOBY:  Nobody.

22         DR. L. BRAGA:  Nobody would get mad at

23    you?

24         BROOKE TOBY:  No.

25         DR. L. BRAGA:  Would you feel bad if you

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    talked to me?

2           BROOKE TOBY:  (Shaking head no).

3           DR. L. BRAGA:  No?

4           You are going to put your foot in the bag?

5    Yuck, yuck.

6           BROOKE TOBY:  (Inaudible).

7           DR. L. BRAGA:  How come you don't want to

8    talk to me?

9           BROOKE TOBY:  Do you want a chip?

10          DR. L. BRAGA:  I am not hungry right now.

11   Thanks.

12          BROOKE TOBY:  I can give you one.

13          DR. L. BRAGA:  I appreciate the offer but

14   I am not hungry right now.

15          BROOKE TOBY:  Do you want some kind of

16   a little one?

17          DR. L. BRAGA:  Thanks (inaudible).

18          BROOKE TOBY:  (Inaudible).

19          DR. L. BRAGA:  You eat it.

20   How come you don't want to talk to me?

21          BROOKE TOBY:  My mom told me and my dad

22   told me not.

23          DR. L. BRAGA:  They did, really?

24          BROOKE TOBY:  (Inaudible).

25          DR. L. BRAGA:  No, she told you to talk to me.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          She did.

2                    BROOKE TOBY:  It's good.

3                    DR. L. BRAGA:  Is it good?

4                    BROOKE TOBY:  It's grape juice.

5                    DR. L. BRAGA:  Grape juice?  That is good.

6                    BROOKE TOBY:  What is that a picture of?

7                    DR. L. BRAGA:  I'm not sure.

8                    BROOKE TOBY:  Did you take a picture of that

9          or something?

10                   DR. L. BRAGA:  No, not me.

11                   BROOKE TOBY:  Did you buy them?

12                   DR. L. BRAGA:  No.

13                   BROOKE TOBY:  Who bought them?

14                   DR. L. BRAGA:  I don't know.  This isn't

15         my office.  This belongs to somebody else.

16                   BROOKE TOBY:  How come (inaudible).

17                   DR. L. BRAGA:  Because I came down here

18         especially to talk to you.

19                   BROOKE TOBY:  You know my name?

20                   DR. L. BRAGA:  I do know your name.  I know

21         your name is Brooke.

22                   BROOKE TOBY:  (Inaudible).

23                   DR. L. BRAGA:  And you know who else?

24                   BROOKE TOBY:  Who?

25                   DR. L. BRAGA:  Because I talked to some of your

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                    OFFICIAL COURT REPORTER                  (305) 373-7295
          CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1          friends.

2                    BROOKE TOBY:  They aren't here.

3                    DR. L. BRAGA:  No, they are not here today.

4          This was yesterday.

5                    BROOKE TOBY:  (Inaudible).

6                    DR. L. BRAGA:  They said I should talk

7          to you and they said that you were really nice

8          and you would want to talk to me.

9                    BROOKE TOBY:  (Inaudible).

10                   DR. L. BRAGA:  Justin talked to me and

11         Jonathan and Tiffany talked to me and they all

12         said that you were really nice and that you --

13                   BROOKE TOBY:  Jonathan can't talk.

14                   DR. L. BRAGA:  He can to talk.  You should

15         hear how much he could talk.  Not like you.

16                   BROOKE TOBY:  He can say bye and hi.

17                   DR. L. BRAGA:  Yes, and some other things.

18                   BROOKE TOBY:  Justin, he could say Brooke.

19                   DR. L. BRAGA:  Uh-huh. yes, and so Justin

20         he said you were really nice and you would want

21         to talk to mee, too.

22                   BROOKE TOBY:  I know.

23                   DR. L. BRAGA:  He said that.  Maybe like he

24         said --

25                   BROOKE TOBY:  I wanted to talk to you, too.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1       DR. L. BRAGA:  Well, they thought that you

2  would because when they talked to me, after they

3  talked to me, they thought you would feel better.

4       BROOKE TOBY:  But you talked to them before

5  then, right?

6       DR. L. BRAGA:  Yes, but they thought that

7  since they talked to you and they told me stuff

8  and it made them feel better, that maybe you

9  would want to talk to me too.

10      They thought maybe -- I mean, you don't

11 have to, if you don't want to.  Nobody is making

12 you.  You don't have to talk to me but they

13 just thought maybe you might want to because

14 maybe you would feel better.

15      BROOKE TOBY:  I don't want to because I

16 am a little sick and I went to the doctor today.

17      DR. L. BRAGA:  You were a little sick and

18 you went to the doctor's today?

19      BROOKE TOBY:  Want to see my lip?

20      DR. L. BRAGA:  Yes.

21      BROOKE TOBY:  I bumped into a thing and --

22      DR. L. BRAGA:  That hurt you?

23      BROOKE TOBY:  Yes, that's why I just wanted

24 to talk a little.

25      DR. L. BRAGA:  Just a little?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE                                    MIAMI
(305) 467-0600                                44 W. FLAGLER ST.
                                              (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1       BROOKE TOBY:  Not a lot.

2       DR. L. BRAGA:  Not a lot?  You don't have

3  have to talk a lot.  You don't even have to

4  talk a little if you don't want to.

5       BROOKE TOBY:  I am big.

6       DR. L. BRAGA:  Yes, you are big.

7       BROOKE TOBY:  You are a little bigger.

8       DR. L. BRAGA:  Well, I am a little bigger

9  but I am not going to make you do anything you

10  don't want to do.

11       BROOKE TOBY:  No (inaudible).

12       DR. L. BRAGA:  Want to see something neat?

13  Want to see something that happens when I take

14  my hair down?

15       BROOKE TOBY:  Yes.

16       DR. L. BRAGA:  Okay, watch.  Isn't that

17  a lot of hair?

18       BROOKE TOBY:  I want to see what is

19  going on.  Look at her hair when she takes it

20  off.

21       MRS. TOBY:  Oh, my goodness.  That's

22  like the kind of hair you would like to have.

23  Wow, that is exciting.

24       DR. L. BRAGA:  Are you going to let your

25  hair grow long, too?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          BROOKE TOBY:  Yours is big.

2          DR. L. BRAGA:  Do you want me to show

3     you when I stand up?

4          BROOKE TOBY:  Yes.

5          DR. L. BRAGA:  Oh, my feet hurt from

6     sitting down on the floor for a long time.

7     Look at this.  See how long?

8          BROOKE TOBY:  (Inaudible).

9          Look at that, when she stands up you have

10    to turn around.

11         DR. L. BRAGA:  Turn around, huh?

12         MRS. TOBY:  Long hair.  I bet it takes a

13    lot of shampoo to wash all that hair.

14         DR. L. BRAGA:  Are you going to let your

15    hair grow long?

16         BROOKE TOBY:  Only to here.

17         DR. L. BRAGA:  Only to here?

18         BROOKE TOBY:  To the hips.  Tippy toe,

19    tippy toe.

20         DR. L. BRAGA:  Should we play some more?

21    Should we sit back down?

22         BROOKE TOBY:  Let me see if I could

23    touch your hair like this.  You would make a

24    big ponytail like this.

25         DR. L. BRAGA:  Yes.  I do.  Sometimes

1    I wear it in a ponytail and sometimes I put it

2    in a long braid.

3         BROOKE TOBY:  That looks -- let me see

4    if I could do a braid.  Here (indicating).

5         (Inaudible).

6         It's all dirty.  It's hard to do this.

7         DR. L. BRAGA:  It's hard.  Yes, it's a lot

8    of hair.  Shall we?

9         BROOKE TOBY:  I can't do it.

10        DR. L. BRAGA:  Should I put it back up

11   or should I put it back down?

12        BROOKE TOBY:  I like it down.

13        When you sit down it's all the way to your

14   feet.  I --

15        DR. L. BRAGA:  I know.  It's a lot of

16   hair, huh?

17        BROOKE TOBY:  Right on the floor.

18        DR. L. BRAGA:  Right on the floor.  Want

19   to sit down with me?

20        BROOKE TOBY:  I didn't know you did.

21        DR. L. BRAGA:  No, I know.  What should

22   we do now?

23        BROOKE TOBY:  (Inaudible).

24        DR. L. BRAGA:  Let me see.

25        BROOKE TOBY:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                              MIAMI
(305) 467-0600                                                         44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        DR. L. BRAGA:  No, what shall we do now?

2        BROOKE TOBY:  (Inaudible).

3        DR. L. BRAGA:  Does Mommy put it in two

4   little things to the side?

5        BROOKE TOBY: Uh-uh.

6        DR. L. BRAGA:  Do you ever wear a ponytail?

7        BROOKE TOBY:  I've just got a little ponytail

8   but now it's a little ponytail.

9        DR. L. BRAGA:  That's nice.

10        BROOKE TOBY:  Here's one.

11        DR. L. BRAGA:  Yes, one on each side.

12        BROOKE TOBY:  That's too big.  That's too

13   big.

14        DR. L. BRAGA:  That's cute, I like that.

15   Where's your thing?

16        BROOKE TOBY:  Here.  I have it in my hand.

17   Let me see if I could make (inaudible).

18        It's hard to make an (inaudible).

19        On the side.  Let me see if I could wear

20   it like this.

21        Let me see if I could (inaudible).

22        It could be over here like this.  That

23   looks funny, like a jacket.  It falls down

24   like this and it's like a jacket.

25        DR. L. BRAGA:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600            OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    BROOKE TOBY:  See if I could do it.  Whoa,

2    it's so big.

3    That's why I stpped on it.  It's so big,

4    I didn't know.

5    DR. L. BRAGA:  Yes, it's long.  I know

6    you didn't.

7    BROOKE TOBY:  It was little.  Let me see

8    if I could put it like this.

9    DR. L. BRAGA:  Now it's around you.  It's

10   cute.  Okay, there you go.

11   BROOKE TOBY:  (Inaudible).

12   That's how you start.

13   DR. L. BRAGA:  Uh-huh.

14   BROOKE TOBY:  Where's you thing?

15   DR. L. BRAGA:  Here.

16   BROOKE TOBY:  Let me see if I can (inaudible).

17   Like this or (inaudible).  I could (inaudible).

18   DR. L. BRAGA:  Yes.

19   BROOKE TOBY:  I need it.  See if I could

20   do it again.

21   Guess what?

22   DR. L. BRAGA:  What?

23   BROOKE TOBY:  (Inaudible).

24   DR. L. BRAGA:  Huh?

25   BROOKE TOBY:  (Inaudible).

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DR. L. BRAGA:   (Inaudible).

2          BROOKE TOBY:   (Inaudible).

3          (Thereupon, there was a break in the

4     proceedings).

5          DR. L. BRAGA:   Did you see the movie?

6          BROOKE TOBY:   Yes.

7          DR. L. BRAGA:   Was it scarey?

8          BROOKE TOBY:   A little.

9          DR. L. BRAGA:   (Inaudible).

10         BROOKE TOBY:   (Inaudible).

11         DR. L. BRAGA:   Where is the other one?

12         BROOKE TOBY:   Guess what?

13         I put it (inaudible).   Where is the other

14    one?

15         DR. L. BRAGA:   I don't know.   I thought

16    you had it.   There it is.   It fell on the floor.

17    Do you see it?

18         BROOKE TOBY:   There (inaudible).

19    Get it out of your eyes and do this.

20         DR. L. BRAGA:   Wrap  it around.

21         BROOKE TOBY:   Like that.

22         DR. L. BRAGA:   That's silly, huh?

23         BROOKE TOBY:   One, two, three.

24         DR. L. BRAGA:   There we go.

25         BROOKE TOBY:   Does that hurt?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                  OFFICIAL COURT REPORTER            MIAMI
(305) 467-0600                                       44 W. FLAGLER ST.
            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DR. L. BRAGA:  No.

2          BROOKE TOBY:  One, two, three, yes

3    (inaudible).

4          DR. L. BRAGA:  What are you doing?

5          BROOKE TOBY:  Making a big, big ponytail.

6    Let me see, give me one pin.

7          DR. L. BRAGA:  Okay.

8          BROOKE TOBY:  I know how to make ponytails.

9    My mom teached me how to make ponytails.

10         DR. L. BRAGA:  Yes?

11         BROOKE TOBY:  That's easy.  Do it like

12   this.  Does that hurt?

13         DR. L. BRAGA:  No.

14         BROOKE TOBY:  Make it long hair, one, two,

15   three.  I could do this.  Put it like that and

16   sit on it, sit on it, slide.  Slide.  Does

17   that hurt?

18         DR. L. BRAGA:  No.

19         BROOKE TOBY:  Slide.

20         (Inaudible).

21         Does that hurt?

22         DR. L. BRAGA:  No.

23         BROOKE TOBY:  (Inaudible).

24         Watch.  Even you can play slip and slide.

25   They would (inaudible) slide them.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    DR. L. BRAGA:  Yes?

2    BROOKE TOBY:  (Inaudible).

3    Like this?

4    DR. L. BRAGA:  You know what?  When I was

5    little like you, I had bangs like you.  I had

6    bangs like this and I didn't have as much hair

7    as you do.

8    BROOKE TOBY:  (Inaudible).

9    DR. L. BRAGA:  I like bangs.

10   BROOKE TOBY:  (Inaudible).

11   DR. L. BRAGA:  He will come and get it

12   later.  Okay, go and give it to him.  Want

13   some more to eat?

14   BROOKE TOBY:  I am tired of it.

15   (Inaudible).

16   DR. L. BRAGA:  We thought we would take

17   some pictures but it isn't working.

18   BROOKE TOBY:  (Inaudible).

19   DR. L. BRAGA:  I don't think so.

20   BROOKE TOBY:  You never been at his house?

21   DR. L. BRAGA:  Whose house?

22   BROOKE TOBY:  No, never have (inaudible).

23   THE COURT:  Stop the video.

24   You have been sitting here for over two

25   hours and, you know, my theory on that is I'd

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      rather do it this way and we will bring some

2      coffee in there to you.

3              (Thereupon there is a break in the proceed-

4      ings).

5              (Thereupon, the following proceedings were

6      had).

7              THE COURT:  Both sides can see the presence

8      of the jury?

9              MR. HOGAN:  Yes.

10             MR. SAMEK:  Yes.  Is the court reporter

11     here?

12             THE COURT:  Yes.  Please be seated.

13             Continuation of the tape.

14             (Thereupon, the video of Brooke Toby was

15     continued).

16             BROOKE TOBY:  Jonathan's house.

17             DR. L. BRAGA:  You are both at Ileana's

18     house, right?

19             BROOKE TOBY:  (No response).

20             DR. L. BRAGA:  Did you like going there?

21             BROOKE TOBY:  Hey.

22             DR. L. BRAGA:  I put that there.  It

23     looks silly, doesn't it?  I needed to put it

24     somewhere so I decided to put it there.

25             BROOKE TOBY:  Where's the other?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600        OFFICIAL COURT REPORTER        44 W. FLAGLER ST.
                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DR. L. BRAGA:  I don't know.  Do you

2      want to find it for me?  I know it's in my hair.

3          BROOKE TOBY:  I will get it.

4          DR. L. BRAGA:  You get it.

5          BROOKE TOBY:  You --

6          DR. L. BRAGA:  You fall down, should I

7      put it there, too.

8          BROOKE TOBY:  I can put it --

9          DR. L. BRAGA:  Okay, you do it.

10          (Thereupon, Brooke Toby is talking with

11      her parents).

12          BROOKE TOBY:  (Inaudible).

13          Get my (inaudible).

14          DR. L. BRAGA:  Listen, I don't know if

15      you're going to talk to me or not but there

16      are some things I want to tell you.

17          BROOKE TOBY:  What?

18          DR. L. BRAGA:  I know from talking to

19      friends that some  things happened that kind

20      of upset you and I want to tell you, even if

21      you don't want to talk about it, that nothing

22      bad will happen to you and you didn't do

23      anything wrong, okay?

24          You shouldn't feel bad.

25          If sometime you did want to talk about it,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          you can talk to Mommy or Daddy.

2                  BROOKE TOBY:  Or me.

3                  DR. L. BRAGA:  Or you.

4                  BROOKE TOBY:  Or Grandma.

5          I have two grandmas.

6                  DR. L. BRAGA:  Do you?

7                  BROOKE TOBY:  I have three grandmas but --

8          but I never seen the other one.  I guess the

9          other one's in Boca Raton (inaudible), not

10         the other one.

11                 DR. L. BRAGA:  But --

12                 BROOKE TOBY:  Unless Mommy is fooling

13         me (inaudible).

14                 DR. L. BRAGA:  Yes?

15         I would like it, Brooke, if you would tell

16         me things today.

17                 BROOKE TOBY:  (Inaudible).

18         I have a hard time talking.

19                 DR. L. BRAGA:  Who would have a hard time

20         talking?

21                 BROOKE TOBY:  (Indicating).

22                 DR. L. BRAGA:  Me and you?

23         How come?  Come here.

24                 BROOKE TOBY:  Uh-uh.

25                 DR. L. BRAGA:  Please.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                    OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          BROOKE TOBY:  (Inaudible).

2          DR. L. BRAGA:  Yes, I do.

3          BROOKE TOBY: I want to put their clothes

4      on.

5          DR. L. BRAGA:  You want to put their clothes

6      on?

7          BROOKE TOBY:  I don't know how.

8          DR. L. BRAGA:  You don't know how?  If

9      you don't want to talk about what happened to you,

10     would you tell me what happened with Jonathan?

11         BROOKE TOBY:  (No response).

12         DR. L. BRAGA:  You pretend that this is

13     Jonathan.

14         BROOKE TOBY:  Yes (inaudible).

15         DR. L. BRAGA:  This is Ileana.  Okay?

16         BROOKE TOBY:  Yes and that is Tiffany and

17     this is Justin.

18         DR. L. BRAGA:  Okay, would you show me

19     what happened there?  You don't have to tell

20     me anything about you, just tell me what

21     happened with the other children.  Okay?

22         BROOKE TOBY:  Who's going to be Noel?

23         DR. L. BRAGA:  Whoever you want.  You

24     can make Donald Duck Noel or you can make ---

25         BROOKE TOBY:  Minnie Mouse.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                               44 W. FLAGLER ST.
                                                                            (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        DR. L. BRAGA:  This can be Noel.

2        BROOKE TOBY:  No.  No, Pinocchio.

3        DR. L. BRAGA:  Okay, Pinocchio will be

4  Noel.  All right.

5        BROOKE TOBY:  This can be Noel.

6        DR. L. BRAGA:  That will be --

7        BROOKE TOBY:  (Inaudible).

8  Jonathan.

9        DR. L. BRAGA:  Who is going to be Frank?

10  Shall we make this Frank since he's bigger?

11        BROOKE TOBY:  That can be Noel.

12        DR. L. BRAGA:  This is Frank and this is

13  who?

14        BROOKE TOBY:  Justin.

15        DR. L. BRAGA:  Justin?

16        BROOKE TOBY:  Justin.

17        DR. L. BRAGA:  Okay.

18        BROOKE TOBY:  This is Noel.  This is Ileana.

19        DR. L. BRAGA:  Uh-huh.

20        BROOKE TOBY:  This is Justin and that is

21  Stephanie.

22        DR. L. BRAGA:  Stephanie, would you show

23  me what happened?

24        BROOKE TOBY:  How come (inaudible).

25        DR. L. BRAGA:  Well, that's so that you can --

**NATIONAL REPORTING SERVICE**
MARTY LESHAW
FT. LAUDERDALE                MIAMI
(305) 467-0600             44 W. FLAGLER ST.
          OFFICIAL COURT REPORTER    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    BROOKE TOBY:  So we could --

2    DR. L. BRAGA:  Yes.

3    BROOKE TOBY:  Do this and put some little

4  tiny toys in.  Let me see if I could do this.

5  Like this?

6    DR. L. BRAGA:  Uh-huh.

7    BROOKE TOBY:  (Inaudible).

8    DR. L. BRAGA:  Does anybody ever put anything

9  else in their mouth?

10    BROOKE TOBY:  Put their fingers.

11    DR. L. BRAGA:  Put their fingers?

12    BROOKE TOBY:  And get the gum out.

13    DR. L. BRAGA:  Anything else?

14    BROOKE TOBY:  Ouch, ouch.

15    DR. L. BRAGA:  Huh?

16    BROOKE TOBY:  What is this?

17    DR. L. BRAGA:  Cigarettes.  Do you want

18  to put them back in there?

19    BROOKE TOBY:  What is this?

20    DR. L. BRAGA:  That's a wallet.

21    BROOKE TOBY:  Is that yours?

22    DR. L. BRAGA:  No, that's Joe's.  Would

23  you put that back?

24    BROOKE TOBY:  Joe is not coming in?

25    DR. L. BRAGA:  Would you like him to come?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    BROOKE TOBY:  Yes.

2    DR. L. BRAGA:  Would you talk to him if he

3 came in?

4    BROOKE TOBY:  Yes.

5    DR. L. BRAGA:  Would you really?

6    BROOKE TOBY:  (Inaudible).

7    DR. L. BRAGA:  I think partly you do want

8 to.  I think partly you you don't.  You are

9 a little scared to but I think partly you

10 do want to, do you think so?

11    BROOKE TOBY:  I'm scared.

12    DR. L. BRAGA:  You're scared?

13    BROOKE TOBY:  No, I am not.  I am not

14 scared.

15    Well --

16    DR. L. BRAGA:  Then why won't you talk

17 to me?

18    BROOKE TOBY:  Because I don't want to.

19 My mom told me not to talk to you.

20    DR. L. BRAGA:  No, she didn't.  She told

21 you to talk to me.

22    BROOKE TOBY:  My mom told me not to

23 talk to you.

24    DR. L. BRAGA:  No, she didn't.  She told

25 you to talk to me.  You can't fool me.  You're

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    not going to talk to me.

2         Would you talk to Joe?

3         BROOKE TOBY:  (No response).

4         DR. L. BRAGA:  If Joe came in, would

5    you talk to him?

6         BROOKE TOBY:  Talk to both of you.

7         DR. L. BRAGA:  Would you talk to both

8    of us?

9         BROOKE TOBY:  I don't know where Joe is.

10        DR. L. BRAGA:  I think he's right out there.

11   Do you want to go see?

12        (Thereupon, this ended the video of Brooke

13   Toby, August 10, 1984).

14        (Thereupon, the following is a video of

15   Brooke Toby, August 10, 1984, Exhibit A-10,

16   Exhibit H):

17        DR. L. BRAGA:  If you talk to both of us,

18   then you can go home, okay?

19        BROOKE TOBY:  (Inaudible).

20        DR. J. BRAGA:  That would be good.

21        DR. L. BRAGA:  That's fair.

22        BROOKE TOBY:  Whoa.

23        DR. J. BRAGA:  Did you see Laurie's long

24   hair?  Isn't it pretty?  You've got pretty hair,

25   too, very nice hair.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                     MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          DR. L. BRAGA:  Shall I put my hair back

2     up or leave it down?

3          BROOKE TOBY:  Put it up.

4          DR. L. BRAGA:  Put it up?

5          Around, around, around it goes and where it

6     disappears everybody knows.  There it goes.

7          BROOKE TOBY:  (Inaudible).

8          Ponytail like that.  Around, around.

9     A little ponytail.

10         DR. L. BRAGA:  Almost gone, almost gone.

11    I will put one hairpin and another hairpin.

12    All gone.

13         Put these away, please.

14         (Inaudible).

15         DR. J. BRAGA:  I think we should play

16    with the dolls when Brooke is telling us what

17    happened.  Then she will be able to go home.

18         BROOKE TOBY:  Toys.  (Inaudible).

19         DR. J. BRAGA:  We will leave shoes over

20    here, okay?  We're just going to put the puppet

21    away.  We're going to leave the dolls up so

22    you can tell us.

23         BROOKE TOBY:  (Indicating).

24         DR. J. BRAGA:  Put the clothes over here.

25         DR. L. BRAGA:  That's a pretty dress.  I'd

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1           like a dress like that.

2                   BROOKE TOBY:  Somebody made it for me.

3                   DR. J. BRAGA:  Somebody made it for you?

4                   BROOKE TOBY:  (Inaudible).

5                   Made it.

6                   DR. J. BRAGA:  Is that a friend of your

7           mom's?

8                   BROOKE TOBY:  (Inaudible).

9                   My friend.

10                  DR. L. BRAGA:  Your friend?

11                  BROOKE TOBY:  (Inaudible).

12                  She's got a little girl.  Her name is

13          Louisa.

14                  DR. L. BRAGA:  Louisa?

15                  That's a very pretty dress.  I'd like

16          to have a dress like that, but big enough for

17          me.

18                  DR. J. BRAGA:  Want me to throw that

19          away for you?  Let me get something to wipe

20          your fingers.

21                  DR. L. BRAGA:  Here, sit over here.

22                  BROOKE TOBY:  Inaudible.

23                  DR. J. BRAGA:  Why don't you sit over here,

24          Brooke.  That's a good spot between us.

25                  DR. L. BRAGA:  You want to sit where you

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                              (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1        are?

2             BROOKE TOBY:  Over here, like this.

3             (Inaudible).

4             Wait a minute.

5             (Inaudible).

6             You can have this one.  We have one.

7             DR. J. BRAGA:  Okay.

8             DR. L. BRAGA:  Okay.

9             BROOKE TOBY:  There's their clothes.  Then

10   you put her clothes on.  Wait a minute.

11            (Inaudible).

12            DR. J. BRAGA:  Can you show me, using this

13   doll and that doll, what Frank and Ileana do

14   when they have their clothes off?

15            BROOKE TOBY:  (Inaudible).

16            DR. J. BRAGA:  But before you put the clothes

17   on, Brooke, could you tell me or show me with

18   the dolls what Frank and Ileana do when they

19   take their clothes off, when they take their

20   clothes off what they did?

21            BROOKE TOBY:  After I put these on, I will

22   talk.

23            DR. J. BRAGA:  Okay.

24            BROOKE TOBY:  It's a little hard.

25            There, what about her head?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    DR. J. BRAGA:  Okay.

2    BROOKE TOBY:  (Inaudible).

3    She's dressed right.

4    DR. J. BRAGA:  Uh-huh.

5    BROOKE TOBY:  But you have to get the father,

6    yes (inaudible).  I can have Justin.

7    DR. J. BRAGA:  Okay, you want me to put

8    Frank's pants on?

9    BROOKE TOBY:  I have them here.

10   DR. J. BRAGA:  Okay.

11   BROOKE TOBY:  (Inaudible).

12   It doesn't matter. These are twins.  Right.

13   Those are twins.  Right.

14   DR. L. BRAGA:  Uh-huh.

15   BROOKE TOBY:  You can put his clothes on.

16   (Inaudible).

17   DR. J. BRAGA:  Justin will be here at

18   three o'clock.

19   DR. L. BRAGA:  It's almost three now.

20   Uh-huh.

21   BROOKE TOBY:  Do you want me to put his

22   pants on, too?

23   Are these his?

24   DR. J. BRAGA:  Panties.  Is that what you

25   call them underwear?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                   44 W. FLAGLER ST.
                                                  (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      BROOKE TOBY:  Underwear.

2      DR. J. BRAGA:  Does Frank take off his

3      underwear when he's with you at the house?

4      BROOKE TOBY:  Yes.

5      DR. J. BRAGA:  He does?  What does he do

6      after he takes off his underwear?  What happens

7      after he takes off his underwear?

8      BROOKE TOBY:  He puts his pajamas on and

9      puts new ones on and that's what I do.  But I

10     have panties and these are panties and these

11     are ballarina (inaudible).

12     DR. J. BRAGA:  Did Frank ever take your

13     panties off?

14     BROOKE TOBY:  No.

15     DR. J. BRAGA:  How about Ileana, did she

16     take your panties off?

17     BROOKE TOBY:  (Inaudible).

18     She's got no panties.

19     DR. L. BRAGA:  Did you ever see Ileana

20     take off other children's clothes?

21     BROOKE TOBY:  (Pause).

22     No.

23     DR. J. BRAGA:  Did Ileana -- did you ever

24     see Ileana take off her clothes?

25     BROOKE TOBY:  Uh-uh.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.
MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      DR. J. BRAGA:  No?

2      BROOKE TOBY:  There.

3      DR. J. BRAGA:  Did you ever see the

4  booby lady?

5      BROOKE TOBY:  How come you have a ponytail

6  when you are a boy?

7      DR. J. BRAGA:  Because she likes me to

8  have one.

9      BROOKE TOBY:  She's already dressed and

10  (inaudible).

11      DR. L. BRAGA:  I think you have decided

12  you're not going to talk to us, huh?

13      BROOKE TOBY:  I am talking to you.

14      DR. J. BRAGA:  Will you tell us what

15  happened at Frank and Ileana's when they played

16  games without their clothes on?

17      BROOKE TOBY:  They did have their clothes

18  on.  They kissed like this.  They laid like

19  this.

20      DR. J. BRAGA:  Uh-huh?

21      BROOKE TOBY:  They lay on each other.

22      DR. J. BRAGA:  They lay on each other?

23      BROOKE TOBY:  Yes.

24      Where are the shoes?

25      DR. J. BRAGA:  Did they have some of the

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          boys and girls lay on each other?

2                  BROOKE TOBY:  No.

3                  DR. J. BRAGA:  No?

4                  BROOKE TOBY:  No.

5                  DR. J. BRAGA:  Did they have any of the

6          boys kiss?

7                  BROOKE TOBY:  You can have those.

8                  (Inaudible).

9                  I am going to get yours, okay?

10                 DR. L. BRAGA:  Okay.

11                 BROOKE TOBY:  I could hear my mom talking.

12         Is this (inaudible).

13                 DR. L. BRAGA:  Uh-huh.  That's it.

14                 BROOKE TOBY:  It's ripped.  It's kind of

15         like ripped.

16                 DR. J. BRAGA:  I think she's denying that

17         things have happened and doesn't want to deal

18         with it and her avoidance is what is happening

19         here and I think her parents ought to have

20         her denial because it makes her comfortable.

21                 That's what she needs now is comfort.

22                 Do you agree?

23                 DR. L. BRAGA:  Yes, I do.

24                 DR. J. BRAGA:  Okay.

25                 DR. L. BRAGA:  Do you want to go home?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          MIAMI
(305) 467-0600          44 W. FLAGLER ST.
                        (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    BROOKE TOBY:  (Inaudible).

2    (Thereupon the above video was finished).

3    THE COURT:  We have time for one more.

4    MR. SAMEK:  Judge, if I could check my

5    notes for one second, I think the next one is

6    one of the longer ones.  Perhaps you might

7    want to consider.

8    THE COURT:  No, we will start hearing it

9    and then we will break sometime between one

10   and one thirty.

11   MR. SAMEK:  Defense Exhibit I moved into

12   evidence, August 13th, 1984, the interview

13   of Noel Fuster.

14   THE COURT:  Okay, be published.

15   (Thereupon, the video tape of Noel Fuster

16   was shown, Exhibit I, August 13, 1984).

17   J. BRAGA:  I am Mr. Braga and this is Mrs.

18   Braga.  Can you tell us what is going on?

19   MR. BERGER:  Where can I start?  I've

20   been with this child all day.  I picked him

21   up initially.  I will tell you from my

22   beginning of the case.

23   I picked the child up here this afternoon,

24   took him to Jackson.

25   L. BRAGA:  From where?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          MR. BERGER:  From Chris Rundle's office.

2     From there we went to juvenile justice center

3     before Judge Ferguson before (inaudible).

4          We had a medical exam which I have here.

5     It showed nothing.  The other stipulation was

6     that he speak to a psychologist before consider-

7     ing him -- releasing him to the maternal aunt.

8          If in the course of this interview with

9     the child, if you feel that returning him would

10    be inappropriate, then I will place him in a

11    foster home.  If you feel it would be safe to

12    release him to the aunt, I could do that and

13    (inaudible).

14          Basically, I got the case this morning

15    (inaudible).

16          All I really know about it is what I've

17    heard, you know, what was done allegedly to

18    the child, which was supposedly -- had oral

19    sex with his father.

20          We have other witnesses stating there

21    are other children who are credible witnesses

22    (inaudible).

23          What we are trying to determine is whether

24    it's safe to release him to an aunt, rather

25    than put him into the foster home from his

**NATIONAL REPORTING SERVICE**

FT. LAUDERDALE              MARTY LESHAW                    MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                        OFFICIAL COURT REPORTER            (305) 373-7295
        CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      (inaudible).   I place a lot of children.

2           I do a little bit different style of work

3      than Jim does.  I am an investigator.  I go to

4      the home and see how they live in everyday life.

5      I feel if it's possible, I think a relative would

6      be better because the alleged abuser, Frank, is

7      in jail under no bond.

8           The mother, stepmother (inaudible).

9           So I guess, assuming that we can believe

10     that these people will not expose himself (in-

11     audible).

12          THE COURT:  Fast forward the tape, please.

13          (Thereupon, the tape was fast forwarded).

14          (Thereupon, the child enters the room).

15          J. BRAGA:  Did you see Starwars and Empires?

16          NOEL FUSTER:  (Inaudible).

17          J. BRAGA:  I liked the Return of the

18     Jedi best.

19          NOEL FUSTER:  I liked that, too (inaudible).

20          J. BRAGA:  That's a funny rabbit.  You

21     can say whatever you want.

22          NOEL FUSTER:  I am having fun in here.

23     Don't worry, they've toys in here.

24          J. BRAGA:  Donald Duck and Minnie Mouse

25     and all sorts of doodads.

**NATIONAL REPORTING SERVICE**
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          NOEL FUSTER:  Cat in the Hat.

2          J. BRAGA:  Ever read any Cat in the Hat books?

3          NOEL FUSTER:  No, I've seen it.  Here's the

4      Cat in the Hat puppet.  Cat in the Hat.

5          J. BRAGA:  You have strong fingers for him,

6      huh?

7          NOEL FUSTER:  And this.

8          J. BRAGA:  Ever been up to Disneyworld?

9          NOEL FUSTER:  Huh?

10          J. BRAGA:  Ever been up to Disneyworld?

11          NOEL FUSTER:  (Shaking head yes).

12          J. BRAGA:  Did you like it?

13          NOEL FUSTER:  (Shaking head yes).

14          J. BRAGA:  What was your favorite part

15      of the --

16          NOEL FUSTER:  The dog (inaudible).

17      Where he took the (inaudible).

18          J. BRAGA:  Did you see that?  Did you go

19      on Space Mountain?

20          NOEL FUSTER:  Space Mountain?

21          J. BRAGA: That's the one you come down in

22      a roller coaster.

23          NOEL FUSTER:  Yes.

24          J. BRAGA:  My favorite part was the Pirates

25      in the Caribbean.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          NOEL FUSTER:  Yes.

2          J. BRAGA:  Wasn't that neat?

3          NOEL FUSTER:  Yes, I like it (inaudible)

4     when they sing.

5          J. BRAGA:  When the singing and guns go off.

6          NOEL FUSTER:  Yes.

7          J. BRAGA:  They looked real.  They were

8     chasing the dog around.  They said it was a real

9     dog (inaudible).

10         They call it audio, audio -- what do they

11     call it when they make -- audio games, electronics

12     is what they call it.

13         I think they're robots, weren't the parents

14     robots?

15         NOEL FUSTER:  Yes, they were robots.

16         J. BRAGA:  You've seen all (inaudible).

17         L. BRAGA:  Did you have a favorite?

18         NOEL FUSTER:  Star Wars.

19         J. BRAGA: You liked the Star Wars, first

20     one?

21         (Inaudible).

22         What did he eat?  Dogs?

23         NOEL FUSTER:  Yes.

24         (Inaudible).

25         J. BRAGA:  I don't remember.  I don't

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER            MIAMI
(305) 467-0600                                                  44 W. FLAGLER ST.
                                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    remember who he was.  He was one of the bad guys

2    though, wasn't he?

3        Wasn't he a friend of Darth Vader's?

4        NOEL FUSTER:  I think so.

5        L. BRAGA:  What's your favorite character?

6        NOEL FUSTER:  Luke.

7        J. BRAGA:  Luke Skywalker?  Who else?  Were

8    you surprised at the scene where Darth Vader

9    said, "Luke, you're my son"?

10       NOEL FUSTER:  Yes.

11       J. BRAGA:  I was surprised.  I talked to

12   some other people, no, no, no, I wasn't surprised.

13   I could see that miles away but I couldn't.  I

14   was really surprised.

15       NOEL FUSTER:  You were?

16       J. BRAGA:  I was surprised to find out

17   that Princess Leah (inaudible) were sisters.

18       NOEL FUSTER:  Yes.

19       J. BRAGA:  (Inaudible).

20       Do you have any sisters?

21       NOEL FUSTER:  No.

22       J. BRAGA:  You don't?

23       NOEL FUSTER:  (Shaking head no).

24       What is this?

25       J. BRAGA:  That is a truck.  The trick

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                                      44 W. FLAGLER ST.
                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       to the truck is taking it apart.   It's supposed

2       to come completely apart.  By the way, if you

3       want to sit down, you can sit down.  Just be

4       comfortable.

5            NOEL FUSTER:  Does it come apart?

6            J. BRAGA:  Yes, every part of it comes

7       apart.  See if you can figure it out.

8            NOEL FUSTER:  (Inaudible).

9            J. BRAGA:  That's for you to figure out.

10      I will help if you want some help.  Let me tell

11      you something, you know what the art of putting

12      together is (inaudible).  If you pay attention

13      how you take it apart, it's going to be easier

14      if you put it back together again.

15           Let me see if I am right.  This has been

16      quite a day for you, it hasn't been an easy

17      day?

18           NOEL FUSTER:  (Inaudible).

19           Who made --

20           J. BRAGA:  The company made it.  The toy

21      company that made it.

22           NOEL FUSTER:  (Inaudible).

23           J. BRAGA:  So kids can take it apart and

24      put it back together.  You can take the truck

25      apart.  Yes, the wheels unscrew.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          NOEL FUSTER:  Oh.

2          L. BRAGA:  The whole thing.

3          J. BRAGA:  Every part of it comes apart.

4          NOEL FUSTER:  Like this?

5          J. BRAGA:  I didn't see anybody outside.

6     Who brought you up here?  Did your mom bring you

7     up?

8          NOEL FUSTER:  You know, the girl up there,

9     the woman, you know, the one who works here.

10         J. BRAGA:  He --

11         NOEL FUSTER:  She.

12         J. BRAGA:  Did you come with anybody?

13         NOEL FUSTER:  Yes.

14         J. BRAGA:  Who?

15         NOEL FUSTER: You know, the one that works

16    here.

17         J. BRAGA:  Yes.

18         NOEL FUSTER:  Who came here.

19         J. BRAGA:  Yes.

20         NOEL FUSTER:  Well, she took me up also

21    (inaudible).  She's from my mom -- she's my

22    aunt.

23         J. BRAGA:  Is this the first time you

24    have seen her?

25         NOEL FUSTER:  No, I have seen her a lot of

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

J. BRAGA:  This is the first time you've

ever seen her?

NOEL FUSTER:  I have been there a lot of

times.

J. BRAGA:  Down here or up in Maitland?

NOEL FUSTER:  You know, sometimes she

goes to my house.

J. BRAGA:  Oh, I see.

NOEL FUSTER:  (Inaudible).

L. BRAGA:  But you haven't been living

with her, right?

NOEL FUSTER:  No.

J. BRAGA:  You have been living with your

dad?

NOEL FUSTER:  Yes.

J. BRAGA:  Did you ever  go up to stay

with your mother up in Maitland?

NOEL FUSTER:  I am going to stay with

her today.

J. BRAGA:  But before today, did you

stay with her up there before?

NOEL FUSTER:  No.

J. BRAGA:  How about with your aunt,

did you stay with her up there?

NOEL FUSTER:  No.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

ST.
1

1       NOEL FUSTER:  Yes.

2       J. BRAGA:  But you realized it wasn't

3   your fault?

4       NOEL FUSTER:  It wasn't my fault.

5       J. BRAGA:  Did anybody ever tell you that

6   sometimes kids worry and think that (inaudible),

7   usually when parents don't stay together?

8       NOEL FUSTER:  (Inaudible).

9       J. BRAGA:  Yes, that way to the left.  I

10  thought -- do you know someone named Suzette?

11      NOEL FUSTER:  Huh?

12      J. BRAGA:  Do you know someone named

13  Suzette?

14      NOEL FUSTER:  No.

15      J. BRAGA:  Does your aunt have any other

16  children?

17      NOEL FUSTER:  No.

18      J. BRAGA:  But she's --

19      NOEL FUSTER:  Just one.

20      J. BRAGA:  One other child?

21      NOEL FUSTER:  Yes.

22      J. BRAGA:  How old?

23      NOEL FUSTER:  Huh?

24      L. BRAGA:  How old is she?

25      NOEL FUSTER:  I don't know.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1         L. BRAGA:  You never met her?

2         NOEL BRAGA:  Huh?

3         L. BRAGA:  You never met your aunt's child?

4         NOEL FUSTER:  (Inaudible).

5         (Thereupon the child leaves the room

6   and subsequently comes back).

7         NOEL FUSTER:  This whole thing comes apart,

8   even this?

9         J. BRAGA:  Yes, even this comes apart.

10        NOEL FUSTER:  I don't think (inaudible).

11        J. BRAGA:  I bet it does.

12        NOEL FUSTER:  Huh?

13        J. BRAGA:  I bet it does come apart.

14  You can use that as a screwdriver.

15        You said you were going to stay with

16  Howard.  Do you know the mother and father's

17  name?

18        NOEL FUSTER:  Who is Howard?

19        J. BRAGA:  I thought you said you were

20  going -- not going to Maitland but to stay --

21        NOEL FUSTER:  With my mom and the girl

22  who is here.  This goes up part two, this

23  wheel?  What do you have a wheel here for?

24        J. BRAGA:  That's like the spare tire.

25        NOEL FUSTER:  Who made it?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          Which way?  This way?

2          J. BRAGA:  Who told you that, your aunt?

3          NOEL FUSTER:  My aunt and then my mother.

4          L. BRAGA:  (Inaudible).

5          Did you ever live with your mom after your

6   parents got divorced?

7          NOEL FUSTER:  (Inaudible).

8          L. BRAGA:  Huh?

9          NOEL FUSTER:  (Inaudible).

10          The whole car.

11          L. BRAGA:  Did anybody tell you why you

12   were coming to talk to us?

13          NOEL FUSTER:  No.

14          L. BRAGA:  Would you like to know why?

15          NOEL FUSTER:  (Shaking head no).

16          L. BRAGA:  Well, we just thought we

17   would like to talk to you and see if there's

18   anything you know about what has been going

19   on and anything that concerns you.

20          NOEL FUSTER:  (Inaudible).

21          L. BRAGA:  Huh?

22          NOEL FUSTER:  Nothing concerns me.

23          L. BRAGA:  Do you know what has been

24   happening?

25          NOEL FUSTER:  Happening?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      L. BRAGA:  Yes, since, you know, where

2  your dad is.

3      NOEL FUSTER:  In jail.

4      L. BRAGA:  Do you know why?

5      NOEL FUSTER:  (Inaudible).

6      L. BRAGA:  Do you know why?

7      NOEL FUSTER:  Somebody put a lie on him.

8      L. BRAGA:  (Inaudible).

9      J. BRAGA:  Who told you that, that somebody

10  put a lie on your dad?

11      NOEL FUSTER:  My mom.  The whole car's

12  apart.

13      J. BRAGA:  Now, the hard part is putting

14  the car back together (inaudible).

15      NOEL FUSTER:  It's easy.  See this?

16      J. BRAGA:  Yes?

17      NOEL FUSTER:  That little hole?

18      J. BRAGA:  Yes?

19      NOEL FUSTER:  This has to go over those

20  two holes, okay, and go inside.  You're right.

21  It's hard.

22      J. BRAGA:  Has your mom ever (inaudible).

23      NOEL FUSTER:  No.

24      J. BRAGA:  Has your dad ever hit you?

25      NOEL FUSTER:  Some days.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE     MIAMI
(305) 467-0600  OFFICIAL COURT REPORTER  44 W. FLAGLER ST.
          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      J. BRAGA:  Because of something you did

2    or something -- or just got mad and did other

3    things and took it out on you?

4         NOEL FUSTER:  Because I did something bad.

5         J. BRAGA:  Do you think it was bad, whatever

6    you did?

7         NOEL FUSTER:  (No response).

8         J. BRAGA:  Or do you think it was maybe

9    a mistake, they didn't understand what was

10   going on?

11       I will tell you why I'm asking.  Sometimes

12   when I used to be your age, my father used to

13   hit me and I would say, "Why did you hit me?"

14   He would give me a good reason.

15        (Inaudible).

16        NOEL FUSTER:  That's why you're asking?

17        J. BRAGA:  Yes.

18        NOEL FUSTER:  Because my mom tells me

19    he gets upset (inaudible).

20        J. BRAGA:  By your mom, do you mean your

21   mom who is outside?

22        NOEL FUSTER:  No, she tells me not to

23   put underwear on.  Wear a long shirt and that's

24   why (inaudible).  I cannot do this.

25        J. BRAGA:  Why don't you try it again?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      NOEL FUSTER:  Again?

2      J. BRAGA:  Try again.

       That sounds to me like a good reason.  Does

4   it seem like a good reason?  You just put on

5   a long shirt with underwear.

6      NOEL FUSTER:  Without underwear.  He doesn't

7   want me to (inaudible).

8      J. BRAGA:  What difference does it mean?

9      NOEL FUSTER:  I don't know.

10      J. BRAGA:  That's what I mean.  I never

11   understood.  Does your aunt ever hit you?

12      NOEL FUSTER:  Huh?

13      J. BRAGA:  Does your aunt ever hit you

    like that for no reason?

15      NOEL FUSTER:  (Inaudible).

16      J. BRAGA:  How about your mother?

17      NOEL FUSTER:  (Inaudible).

18      J. BRAGA:  Did she ever hit you for no

19   reason?

20      Did she ever hit you for a good reason,

21   something you --

22      NOEL FUSTER:  Never hit me for no reason.

23      J. BRAGA:  This will be the first time?

24      NOEL FUSTER:  Huh?

25      J. BRAGA:  This would be the first time?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                    MIAMI
(305) 467-0600                                44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        NOEL FUSTER:  Of what?

2        J. BRAGA:  That you will be with her?

3        NOEL FUSTER:  (No response).

4        J. BRAGA:  She's never hit you?

5        NOEL FUSTER:  In the (inaudible).

6        (Thereupon the child leaves the room).

7        L. BRAGA:  (Inaudible).

8        J. BRAGA:  I don't know.  I think that

9  the circumstances leave me to believe, to wonder

10  if he's always this distracted.  Do you know

11  who that man is that's out there with the mustache?

12        NOEL FUSTER: You say here?  No.

13        J. BRAGA:  You don't know?  Is he with

14  you and your aunt and mother?

15        NOEL FUSTER:  No.

16        L. BRAGA:  Would you like to color something?

17        J. BRAGA:  You can pick those up for me,

18  okay, please, thank you.

19        NOEL FUSTER:  Do you have to put it together?

20        J. BRAGA:  So if some body and girl want to

21  see how to do it, like you did, they can pull

22  it apart.

23        NOEL FUSTER:  Coloring book.

24        L. BRAGA:  Would you draw a picture of your-

25  self?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          J. BRAGA:  Would you draw a picture of

2     yourself?

3          NOEL FUSTER:  I want to draw a space ship.

4          J. BRAGA:  Can you put yourself in the

5     space ship?

6          NOEL FUSTER:  Yes.

7          L. BRAGA:  How do you spell your name?

8     N-O-E-L?

9          NOEL FUSTER:  Noel.

10          L. BRAGA:  I knew how to say it, but I

11     didn't know how to spell it.

12          Do you pronounce it Noel or Noel?

13          NOEL FUSTER:  Noel.

14          L. BRAGA:  Noel, okay.

15          NOEL FUSTER:  Noel.

16          That's not the way.

17          L. BRAGA:  Tell me how.

18          NOEL FUSTER:  Noel.  I don't say EL.  I

19     say L.  That's the L.  Look, this is the EL.  Noel.

20     It's not Noel.  It's Noel.

21          (Inaudible).

22          Noel.

23          L. BRAGA:  Noel, right?

24          NOEL FUSTER:  Now I will draw a picture.

25          L. BRAGA:  Okay.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     NOEL FUSTER:  When I finish with this, I

2     think I need (inaudible).

3          Where is that (inaudible).

4          L. BRAGA:  I think somebody else drew it.

5     Do you mind?  Would you like a blank sheet of

6     paper?

7          NOEL FUSTER:  Blank?

8          J. BRAGA:  Yes, with nothing on it?

9          NOEL FUSTER:  Yes.

10         L. BRAGA:  There you go.  Do you want this

11    to lean on?

12         NOEL FUSTER:  Now, here's the Cat in the

13    Hat and Noel is the hat.  I will put Noel on

14    the hat.

15         L. BRAGA:  All right.

16         NOEL FUSTER:  Noel.

17         L. BRAGA:  You are using another color.

18    I can't see it when it's white.

19         NOEL FUSTER:  (Inaudible).

20         J. BRAGA:  That's when you want to write

21    secret messages, that no one else can understand.

22    You write white on white.  That's how spies do

23    it, white on white.

24         NOEL FUSTER:  White.

25         J. BRAGA:  I beg your pardon?

**NATIONAL REPORTING SERVICE**

**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        NOEL FUSTER:  No.

2        L. BRAGA:  What does it say?

3        J. BRAGA:  Violet.

4        L. BRAGA:  Violet, something violet, purple.

5        NOEL FUSTER:  First (inaudible).

6        Do you know what's on this?

7        L. BRAGA:  What is it?

8        You mean that comes out behind the rocket?

9        NOEL FUSTER:  There's a point, the wing.

10        L. BRAGA:  Yes.

11        NOEL FUSTER:  (Inaudible).

12        This is going to land (inaudible).

13        The rocket (inaudible).

14        Here is one big (inaudible).

15        Here comes a lot (inaudible).

16        They shoot.

17        J. BRAGA:  Fireballs, yes.

18        NOEL FUSTER:  Here comes shooter star.

19        J. BRAGA:  They will protect him.

20        NOEL FUSTER:  There's him on the wheel.

21      There he is, he's going to land.  He's real

22      happy (inaudible).

23        L. BRAGA:  Lots of wheels, huh?  Is

24      that to make sure he lands safely?

25        NOEL FUSTER:  Yes, there's this little

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                  MIAMI
(305) 467-0600      OFFICIAL COURT REPORTER      44 W. FLAGLER ST.
           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

creature (inaudible).

He takes them and there he is ready.

I am going to use another crayon.  I don't have to, but I want to.

J. BRAGA:  Good.

NOEL FUSTER:  What is this color?

J. BRAGA:  Blue/green.

L. BRAGA:  Blue/green.

J. BRAGA:  Do you like the school you go to?

NOEL FUSTER:  Huh?

J. BRAGA:  Do you like the school you go to?

NOEL FUSTER:  (Inaudible).

L. BRAGA:  Tell me.

J. BRAGA:  (Inaudible).

NOEL FUSTER:  Where is black?

L. BRAGA:  I saw a black one before.

J. BRAGA:  I don't remember black.

L. BRAGA:  Do you want to use a black pen?

NOEL FUSTER:  A black pen?

L. BRAGA:  Why don't you use this black pen?

J. BRAGA:  Also, you have another one here,

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          orange and purple (inaudible).

2               NOEL FUSTER:  No black, black pen.  I

3     have to draw the whole thing black.  Everything

4     is black.

5               L. BRAGA:  Every place is black?

6               NOEL FUSTER:  Every space.

7               L. BRAGA:  Oh, every space.  It would

8     be easier if it were crayon, huh?

9               NOEL FUSTER:  (Inaudible).

10              L. BRAGA:  Everybody does -- it's hard

11    to color.

12              NOEL FUSTER:  This looks like --

13              L. BRAGA:  Looks like what?

14              NOEL FUSTER:  Scribble scrabble.

15              L. BRAGA:  What is scribble scrabble?

16              NOEL FUSTER:  (Inaudible).

17              J. BRAGA:  Blowing them up, getting rid

18    of them, huh?

19              NOEL FUSTER:  Huh?

20              J. BRAGA:  Is that why you did this, so

21    they won't color them, that's coming through

22    space?

23              NOEL FUSTER:  They're hiding.  That's

24    (inaudible).

25              From outer space here (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     have to stop.  Wouldn't that be good?

2          I was going to, no, that's my stop sign.

3     You have to stop.  Here's my stop sign.  Wouldn't

4     that be a good idea?

5          NOEL FUSTER:  Yes (inaudible).

6          I put a stick on it and I made a little

7     thing.

8          J. BRAGA:  Uh-huh.

9          NOEL FUSTER:  Over here it says stop again.

10         J. BRAGA:  Two stop signs in case they go

11    through the first one, huh?

12         NOEL FUSTER:  Stop and now I've got another

13    stick.  That's a red light.

14         J. BRAGA:  A red light?

15         L. BRAGA:  Just in case they missed the

16    first message, they get the red light.

17         J. BRAGA:  Want to do another one?

18         NOEL FUSTER:  Yes (inaudible).

19         J. BRAGA:  Another sign?

20         NOEL FUSTER:  No, do nothing.

21         J. BRAGA:  Stop, no.

22         L. BRAGA:  Stop, no, do not go, red light.

23         NOEL FUSTER:  Do nothing.

24         (Inaudible).

25         J. BRAGA:  A help sign, a sign saying help.

NATIONAL REPORTING SERVICE

FT. LAUDERDALE
(305) 467-0600

MARTY LESHAW

OFFICIAL COURT REPORTER

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    NOEL FUSTER:  Good (inaudible).  The teacher

2    says, "Show up a sign" and she says, "No."  She

3    will not listen.

4         So they come to help and here she said (inaudible).

5    Stop.

6         J. BRAGA:  Stop.

7         NOEL FUSTER:  Stop doing that (inaudible).

8         J. BRAGA:  Want another piece of paper?  Let

9    me do this.  This one is all done.  You can see

10   through it.

11        See how you can see through it?

12        L. BRAGA:  That's a good picture.

13        NOEL FUSTER:  Here comes me.

14        J. BRAGA:  Can I have that picture?  I'd

15   really like to have that as a gift.

16        NOEL FUSTER:  You look like a (inaudible).

17        L. BRAGA:  Yes, because I have hair on my

18   legs.

19        NOEL FUSTER:  Your feet look like mens feet.

20        J. BRAGA:  You have got mens feet, huh?

21   They look cute.

22        L. BRAGA:  You like mens feet?

23        J. BRAGA:  I am her husband and that's my

24   wife.  She has her legs (inaudible).

25        NOEL FUSTER:  I am eleven and I am --

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        J. BRAGA:  Okay.

2        NOEL FUSTER:  (Inaudible).

3        I want to fly.

4        J. BRAGA:  So like when you grow up every-

5   thing is going to be fine, right?

6        NOEL FUSTER:  I -- I am going to fly and I

7   think I can.  I am already flying.

8        J. BRAGA:  Now, here I am flying up in the

9   sky.  It's a bird, it's a plane, no it's super

10  Noel.

11       L. BRAGA:  That's a happy picture.

12       NOEL FUSTER:  How do you spell super?

13       J. BRAGA:  S-U-P-E-R, super.

14       NOEL FUSTER:  Super.

15       J. BRAGA:  Yes, it's a bird, it's a plane,

16  no, it's super Noel.  Faster than a speeding

17  bullet (inaudible).

18       It's a bird, it's a plane, no, it's super

19  Noel.

20       NOEL FUSTER:  (Inaudible).

21       J. BRAGA:  Who are they?

22       NOEL FUSTER:  They are the little people

23  looking at me.  Where's the plane?

24       J. BRAGA:  It's super Noel.

25       NOEL FUSTER:  (Inaudible).

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 487-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1           There's a train there and --

2       J. BRAGA:  Uh-huh?

3       NOEL FUSTER:  The train is going to fall

4   off the track and jump (inaudible).

5       J. BRAGA:  They are in danger, is that

6   what you're saying?  Right?

7       NOEL FUSTER:  Yes.

8       J. BRAGA:  Are they in bad danger?

9       NOEL FUSTER:  Yes.  See, I am (inaudible).

10  Coming to get them out.  I grab them and I

11  shoot them and I (inaudible).  Here, I am eleven.

12      J. BRAGA:  Let me ask you to pretend some-

13  thing.  You saw the Superman movie?

14      NOEL FUSTER:  Yes.

15      J. BRAGA:  You know how someone gives him

16  cryptomyte to make him powerless?

17      NOEL FUSTER:  You mean Superman Three, put

18  on the last part?

19      J. BRAGA:  Yes, cryptomyte.  What happened

20  if somebody lets --

21      NOEL FUSTER:  (Inaudible).

22      He was still alive.

23      J. BRAGA:  Oh, he was still alive but someone

24  had to help him out.  Who would help out if

25  someone had cryptomyte?  What would save super

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

OFFICIAL COURT REPORTER

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   Noel?

2       NOEL FUSTER:  God was not (inaudible).

3       J. BRAGA:  Did you see that?

4       NOEL FUSTER:  God could save you.

5       J. BRAGA:  What if God was busy that moment?

6       NOEL FUSTER:  I'd say, "God, please, please

7   God.  Do it.  Please, God, give one more wish.

8   That's all.  No more wishes.  Please.  Please."

9       J. BRAGA:  The answer to the one wish, I

10  won't bother you anymore.  Just a minute, God,

11  one minute please.  I know (inaudible).

12      NOEL FUSTER:  The cryptomyte got me.  I've

13  got a shield around me.  I've got a helmet.

14      J. BRAGA:  So nobody can hurt you?

15      NOEL FUSTER:  A helmet, they could (inaudible).

16  To go back and shoot the (inaudible).

17      J. BRAGA:  Maybe Lori would like this one.

18  Who else is in your family?

19      NOEL FUSTER:  House?

20      L. BRAGA:  Draw a picture of your house.

21      NOEL FUSTER:  (Inaudible).  Sidewalk, garage

22  over here.  The door to the garage over there --

23  I mean this door has to go out.  Here, you've

24  come here to the rocket.

25      J. BRAGA:  Up to the rocket, is there a

1      rocket there?

2            NOEL FUSTER:  Yes.

3            J. BRAGA:  By your house?

4            NOEL FUSTER:  No.

5            L. BRAGA:  Makebelieve?

6            NOEL FUSTER:  No.

7            J. BRAGA:  Let's makebelieve last week and what

8      is happening is there's a rocket going up in your

9      neighborhood? What else is happening?

10           NOEL FUSTER:  (Inaudible).

11           J. BRAGA:  Any people in the house?

12           NOEL FUSTER:  Yes, a lot of them watching.

13     You're out there.  They're down sitting on the

14     ground.

15           J. BRAGA:  Watching the rocket?

16           NOEL FUSTER:  Yes.

17           J. BRAGA:  It's a bird, it's a plane, no,

18     it's a rocket.  Are there any people in the

19     house?

20           NOEL FUSTER:  Yes, one.

21           J. BRAGA:  Who is in the house?

22           NOEL FUSTER:  (Inaudible).

23     My dad, babies and aunt.

24           J. BRAGA:  Your mom lives in the house, too?

25           NOEL FUSTER:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                              MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  This is at your house, at Country

2    Walk?

3    NOEL FUSTER:  Makebelieve house.

4    J. BRAGA:  Where you live, does your aunt

5    live there with you?  Does she ever come to stay

6    at the house?

7    NOEL FUSTER:  Huh?

8    J. BRAGA:  You said your aunt, does your

9    aunt ever come to stay with you there?

10   NOEL FUSTER:  (Inaudible).

11   L. BRAGA:  Who is this?

12   J. BRAGA:  Whos is that?

13   NOEL FUSTER:  That's me.

14   J. BRAGA:  That's you?  He's flying away from

15   the house?

16   NOEL FUSTER:  I am going with the rocket.

17   When I get to the moon, I'm going to eat the whole

18   moon up.

19   J. BRAGA:  It's made of cheese?

20   NOEL FUSTER:  I think so.

21   J. BRAGA:  Yucky cream cheese, yuck.

22   L. BRAGA:  You like cheese?

23   NOEL FUSTER:  I think it's made of rock.

24   In the book it says it's made out of rock.

25   J. BRAGA:  You know in the cartoons, when they

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                    MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER    44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    have Mighty Mouse cartoons, they say the moon

2    is made of cheese (inaudible).

3         NOEL FUSTER:  When I get to the moon, I go

4    back here to the house.  Who would like to have

5    this one?  Another one?

6         L. BRAGA:  Yes.

7         NOEL FUSTER:  (Inaudible).

8         J. BRAGA:  Draw a picture of your father,

9    the way you see him.

10        NOEL FUSTER:  (Inaudible).

11        That's a dummy (inaudible).

12        J. BRAGA:  Uh-huh?

13        NOEL FUSTER:  Hair, this is a good picture.

14        J. BRAGA:  Uh-huh?

15        NOEL FUSTER:  You know what he's doing?

16        J. BRAGA:  What's he doing?

17        NOEL FUSTER:  Playing his jumping rope.  He's

18   got the jumping rope.  Now he's doing the jumping

19   rope.

20        J. BRAGA:  Yes?

21        NOEL FUSTER:  This is how fat he is.

22        J. BRAGA:  He better not -- he won't like

23   hearing us say that, would he?

24        NOEL FUSTER:  (Inaudible).

25        J. BRAGA:  Now, he's all fat.  Then he'll jump

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                    OFFICIAL COURT REPORTER        44 W. FLAGLER ST.
                                                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    rope and he'll get think again?  From all the

2    exercise he will get thin  again?

3          NOEL FUSTER:  (Inaudible).

4          J. BRAGA:  He's nuclear.  He's a strong man.

5          NOEL FUSTER:  He's got one more, one more,

6    one more, and one more and one more.

7          J. BRAGA:  He's really a powerful man?

8          NOEL FUSTER:  I know.  One more, one more,

9    one more.

10          J. BRAGA:  He's got muscles on his stomach?

11          NOEL FUSTER:  You know the muscles on your

12    stomach.  If you (inaudible).

13          L. BRAGA: (Inaudible).

14          NOEL FUSTER:  His face is strong.  His mouth

15    is strong.  His nose, his eyes -- his eyes, every-

16    thing is strong.

17          (Inaudible).

18          J. BRAGA:  Yes, draw a picture of -- what

19    is your husband's -- what is your father's wife's

20    name?

21          NOEL FUSTER:  Ileana.

22          J. BRAGA:  Draw a picture of Ileana.

23          L. BRAGA:  Do you call her Ileana?

24          NOEL FUSTER:  (Inaudible).

25          J. BRAGA:  Ileana, draw a picture of Ileana.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1      She s got big eyes?

2      NOEL FUSTER:  No, she's wearing glasses.

3      J. BRAGA:  That's why she's got little --

4      big eyes?  She's got little eyes but big glasses?

5      NOEL FUSTER:  (Inaudible).

6      J. BRAGA:  (Inaudible).

7      NOEL FUSTER:  Stomach and here's me.

8      (Inaudible).

9      Ghost (inaudible).

10     J. BRAGA:  A little ghost?

11     NOEL FUSTER:  Yes.

12     J. BRAGA:  What is a little ghost?

13     NOEL FUSTER:  I am making believe I have a

14     brother and my brother is making fun of me.

15     J. BRAGA:  How come?  What is he going to

16     do?

17     NOEL FUSTER:  There's my dad watching.  He's

18     up the ladder.

19     J. BRAGA:  What is he doing up the ladder?

20     NOEL FUSTER:  Laughing.

21     J. BRAGA:  What is he doing?

22     NOEL FUSTER:  It's not a ladder.

23     J. BRAGA:  It's not a ladder?

24     NOEL FUSTER:  You know, the thing (inaudible).

25     J. BRAGA:  A fire escape, you mean?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1      NOEL FUSTER:  The thing over here and you look

2  and it doesn't have any windows.  Doesn't have

3  any windows.  It has a gate so you won't get out.

4      J. BRAGA:  In the house or outside of the

5  house?

6      NOEL FUSTER:  Outside the building.  Do

7  you know --

8      J. BRAGA:  Like the fire escape in case

9  of a fire?

10      NOEL FUSTER:  No, you know the gate and

11  you have a window and you look out?

12      J. BRAGA:  You have a gate and you look

13  out.   You mean in the door?

14      NOEL FUSTER:  No, it's like this.  I can

15  draw -- you see it's like that.  And you could

16  look out.  Like that.

17      J. BRAGA:  You mean like on a window or

18  on a gate?

19      NOEL FUSTER:  No, here's the gate and you

20  have the window (inaudible).

21      J. BRAGA:  Pull it out.  It's easier to

22  (inaudible).

23      You drew a ghost.  Where is the ghost going?

24      NOEL FUSTER:  Here's a robot.

25      J. BRAGA:  A robot?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                   44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    NOl  FUSTER:  Yes.

2    J. BRAGA:  I like the robot.  Are you all

3    done with him?

4    NOEL FUSTER:  Yes.

5    L. BRAGA:  Are you all done with this?

6    NOEL FUSTER:  Here's the ghost.

7    J. BRAGA:  This is Ileana and that's your

8    dad and this is you and that's a ghost?

9    NOEL FUSTER:  That's my little brother.

10   J. BRAGA:  He's a makebelieve little brother?

11   L. BRAGA:  He's a makebelieve little brother?

12   J. BRAGA:  Can I have that one?

13   NOEL FUSTER:  Yes.

14   J. BRAGA:  Thanks.

15   THE COURT:  Stop the tape.  I stopped it

16   because of the hour.  I want to be sure you get

17   some lunch and come back here.  It's now ten

18   after one and how about two twenty?  It gives

19   you enough time, I imagine, to have lunch and

20   we will pick up where we left it off at two

21   twenty, okay?

22   Thank you.

23   George, are you taking them down?

24   GEORGE:  Yes.

25   THE COURT:  George will take you down.  Thank you.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1       We will see you later.

2            (Thereupon there was a lunch break at 1:10 p.m.)

3            (Thereupon the court reconvenes and the jury

4       is brought back into the courtroom at 2:20 p.m.)

5            THE COURT:  Both sides can see the presence

6       of the jury?

7            MR. SAMEK:  Yes.

8            MR. HOGAN:  Yes.

9            THE COURT:  Will you please tell Craig.

10           (Thereupon the video was continued of

11      Noel Fuster).

12           L. BRAGA:  Where is it going?

13           NOEL FUSTER:  (Inaudible).

14           J. BRAGA:  A happy rabbit, how come it's

15      so happy?

16           NOEL FUSTER:  It's going to the moon.

17           (Inaudible).

18           L. BRAGA:  Is there anything in the rocket?

19           J. BRAGA:  Draw a story about the rocket.

20           NOEL FUSTER:  The rocket is (inaudible).

21           L. BRAGA:  The rocket is R-O-C --

22           NOEL FUSTER: R-O --

23           L. BRAGA:  R-O --

24           NOEL FUSTER:  R-O- --

25           L. BRAGA:  C-K --

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    NOEL FUSTER:  K --

2    L. BRAGA:  E --

3    NOEL FUSTER:  E-T?

4    Rocket.

5    (Inaudible).

6    The rocket is happy.

7    L. BRAGA:  Tell me some more about the rocket.

8    NOEL FUSTER:  The rocket?

9    L. BRAGA:  You don't have to write it all.

10   NOEL FUSTER:  If you're happy, forget he's

11   going to the moon and he likes to go to outer

12   space, the moon.

13   L. BRAGA:  Yes?

14   What do you want to draw now?

15   NOEL FUSTER:  Now?

16   L. BRAGA:  Yes.

17   NOEL FUSTER:  I am going to draw the whole

18   earth.

19   J. BRAGA:  I will get some more paper because

20   we are running out.

21   L. BRAGA:  What is happening on the whole

22   earth?

23   NOEL FUSTER:  (Inaudible).

24   A lake around the  whole earth.

25   (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1    L. BRAGA:  How comes it's mad sometimes?

2    NOEL FUSTER:  Sometimes people get inside

3 the earth and sometimes it's worried and sometimes

4 it wonders.

5    L. BRAGA:  We?

6    NOEL FUSTER:  (Inaudible).

7 They go all around.

8    L. BRAGA:  All around the earth?

9    NOEL FUSTER:  Here's a house.

10    L. BRAGA:  What is this?

11 What's the green?

12    NOEL FUSTER:  All the houses.

13    L. BRAGA:  Yes?

14    NOEL FUSTER:  You know, the (inaudible).

15    L. BRAGA:  Uh-huh?

16    NOEL FUSTER:  The houses and the pools over

17 here.  That's the pool.

18    L. BRAGA:  Uh-huh?

19    NOEL FUSTER:  Now, this is going to be --

20 this is the --

21    L. BRAGA:  A lot of desert?

22    NOEL FUSTER:  This is the whole thing now.

23    L. BRAGA:  So this is the whole earth and

24 this is water, right?

25    NOEL FUSTER:  Yes, that's the water.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    L. BRAGA:  This part is houses and then

2    there's a little pool here and that's all

3    desert?

4    NOEL FUSTER:  (Inaudible).

5    L. BRAGA:  And to walk a long way to get

6    out of the desert?

7    NOEL FUSTER:  No, you can (inaudible).

8    L. BRAGA:  Well, I can, how about you?

9    NOEL FUSTER:  (Inaudible).

10    L. BRAGA:  Really, that's just a picture.

11    NOEL FUSTER:  If I had a real big one,

12    I could draw a real big one.

13    L. BRAGA:  I do.  This is real big.  You

14    can draw a little bigger picture.

15    NOEL FUSTER:  Little bigger?

16    L. BRAGA:  Yes.

17    NOEL FUSTER:  This is bigger?

18    L. BRAGA:  I am going to write what this

19    is so I'm going to remember.

20    NOEL FUSTER:  Earth.

21    L. BRAGA:  The whole earth.

22    NOEL FUSTER:  What's this?

23    L. BRAGA:  This is the house?

24    NOEL FUSTER:  There's the pool.

25    L. BRAGA:  That's the pool and this is the

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          desert, right?

2              NOEL FUSTER:  Right.

3              L. BRAGA:  Anything else I should put on

4          it?

5              NOEL FUSTER:  Here is the water.

6              L. BRAGA:  This is the water.  That's

7          the pool and that is the desert.

8              NOEL FUSTER:  Right (inaudible).

9              Which one do you want, this one?  Which

10         one do you want?  That one?  This whole building,

11         what about this building?

12             L. BRAGA:  Okay, let's do this building.

13             NOEL FUSTER:  A lot of windows over here.

14         Windows that close?

15             L. BRAGA:  I think the building closes

16         at five.

17             NOEL FUSTER:  A lot of windows here, a big

18         one.

19             (Inaudible).

20             There's a garage and a door (inaudible).

21         Car rocket.

22             L. BRAGA:  Car rocket, huh?

23             NOEL FUSTER:  You put the brakes on.

24             L. BRAGA:  Uh-huh.

25             NOEL FUSTER:  They're going to the hotel now.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                          MIAMI
(305) 467-0600                                                     44 W. FLAGLER ST.
                        OFFICIAL COURT REPORTER                     (305) 373-7295
        CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    He's up here.  He's looking out the window.

2    Looking at a little man flying.

3        L. BRAGA:  Who's that?

4        NOEL FUSTER:  That's me.

5        L. BRAGA:  That's you and who's that?

6        NOEL FUSTER:  That's my little brother.  That's

7    my dad.

8        L. BRAGA:  Where is he in the car rocket?

9        NOEL FUSTER:  Yes.  He's not there.  I mean

10   (inaudible).

11       L. BRAGA:  He does --

12       NOEL FUSTER:  He does.

13       L. BRAGA:  What does he think?

14       NOEL FUSTER:  That (inaudible).

15       L. BRAGA:  That you are flying?

16       (Inaudible).

17   Now what?

18       NOEL FUSTER:  A TV.

19       L. BRAGA:  Where else did you go today?

20       NOEL FUSTER:  (Inaudible).

21       L. BRAGA:  Huh?

22       NOEL FUSTER:  What's in here?

23       L. BRAGA:  I don't know.  Let's see.

24       NOEL FUSTER:  Toys.

25       L. BRAGA:  There's some puppets.  Would you

1          like to play with puppets?

2                NOEL FUSTER:  Yes, it's stuck.

3                L. BRAGA:  It's stuck?

4                NOEL FUSTER:  Toys.

5                (Inaudible).

6                Keys, are those yours?

7                L. BRAGA:  Yes, thanks.

8                NOEL FUSTER:  Card.

9                L. BRAGA:  Yes?

10                NOEL FUSTER:  (Inaudible).

11                L. BRAGA:  Let me see why it's stuck.  Let

12          me see if I can figure -- oh, here, there you

13          go.

14                Okay, I will take this.  I will explain it

15          to you.  Let me fix it.

16                NOEL FUSTER:  Here's a racing car.

17                L. BRAGA:  You like that?

18                NOEL FUSTER:  Voom, voom.

19                L. BRAGA:  Want to come over here?

20                NOEL FUSTER:  Voom.

21                L. BRAGA:  Okay, somewhere --

22                NOEL FUSTER:  (Inaudible).

23                L. BRAGA:  Let me show you.  Let me show

24          you what it's for.  Put it down.  I bet you can

25          do it.  Okay, it's kind of breaking.  I need to

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        NOEL FUSTER: (Inaudible).

2        L. BRAGA: If you get it just right, then

3    you can get it one way and it turns back and

4    goes the other way. Sometimes it get stuck.

5        This is a real old toy. This was made a

6    long time before I was made or Joe was born,

7    probably.

8        Do you have a grandma or grandpa?

9        NOEL FUSTER: Yes.

10        L. BRAGA: Probably even before they were

11    born.

12        NOEL FUSTER: (Inaudible).

13        L. BRAGA: Yes?

14        NOEL FUSTER: Okay.

15        L. BRAGA: Did you watch the Olympics on

16    television at all?

17        NOEL FUSTER: No (inaudible).

18        Here's the finish line. People, we are

19    going to have (inaudible). One, two, three,

20    three four (inaudible). Six and he (inaudible).

21        What is this, a deer?

22        L. BRAGA: It's a reindeer. You know, like

23    Rudolph the Rednosed Reindeer?

24        NOEL FUSTER: Yes.

25        (Inaudible).

**NATIONAL REPORTING SERVICE**
FT. LAUDERDALE        MARTY LESHAW        MIAMI
(305) 467-0600                       44 W. FLAGLER ST.
OFFICIAL COURT REPORTER    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1          L. BRAGA:  Put your hand -- yes, that's right.

2     Watch.

3          NOEL FUSTER:  (Inaudible).

4          L. BRAGA:  Do you know how to make a puppet

5     talk?

6          NOEL FUSTER:  (Indicating).

7          L. BRAGA:  Can the puppet tell me a story?

8          NOEL FUSTER:  Okay.  Once upon a time there

9     were three bears, one mama bear (inaudible).

10         I'm going to see somebody.  I've got to

11    get my mom and show her.

12         (Thereupon Noel Fuster leaves the room and

13    subsequently reenters).

14         NOEL FUSTER:  Ta ta, ta ta, Mommy, look.

15    (Inaudible).  Here they come.

16         L. BRAGA:  Do you know what is a lie?

17         NOEL FUSTER:  He lies (inaudible).

18         L. BRAGA:  Do you remember when his nose

19    got really long and it got so long it grew?

20         NOEL FUSTER:  Yes, I liked that part.

21         L. BRAGA:  Do you remember the blue fairy

22    that came along and he tried to help him save

23    himself?

24         NOEL FUSTER:  The nose gets bigger and

25    bigger and bigger.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    L. BRAGA:  He really meant well.  Remember?

2    He didn't mean to keep getting into trouble,

3    seems like everybody was trying to get him

4    into trouble.

5        NOEL FUSTER:  What is this?

6        L. BRAGA:  A puppet.

7        NOEL FUSTER:  Put finger here?

8        L. BRAGA:  Yes, want to put your finger

9    in (inaudible).  I will be the Cat in the Hat.

10       Your puppet can talk to my puppet.  Come

11   over here.  Come on.

12       NOEL FUSTER:  (Inaudible).

13       J. BRAGA:  I'm going to talk a few minutes.

14       L. BRAGA:  We were playing puppet and Noel

15   was going to talk to my puppet.

16       J. BRAGA:  Okay.  She will be right back

17   in a minute.

18       (Thereupon Dr. L. Braga leaves the room).

19       J. BRAGA:  Do you think you would like

20   to come back and visit us tomorrow?

21       NOEL FUSTER:  Yes.

22       J. BRAGA:  Do you think you would like

23   that?

24       NOEL FUSTER:  Yes.

25       J. BRAGA:  I will see if we can make

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                    MIAMI
(305) 467-0600                            44 W. FLAGLER ST.
                                           (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1      arrangements.

2           NOEL FUSTER:  You look like Washington.

3           J. BRAGA:  Yes, I do.  That's why I like

4      my hair long.  That's why (inaudible).

5           NOEL FUSTER:  (Inaudible).

6           Car.

7           J. BRAGA:  Whoops.  Hand me the crayons, please.

8      Thank you, Noel.  Thank you very much.

9           NOEL FUSTER:  I'm going to be the tiger,

10     a good tiger.

11          J. BRAGA:  A good tiger, like the tiger in

12     Winnie the Pooh, Winnie the Pooh tiger?

13          NOEL FUSTER:   Tiger.

14          J. BRAGA:  Wasn't it a tiger and the kangaroo?

15          NOEL FUSTER:  Yes.

16          (Inaudible).

17          J. BRAGA:  That's a telephone.  Nobody's

18     on there, are they?  Nobody talking?

19          NOEL FUSTER:  How could -- do you call?

20          J. BRAGA:  Know what?  That is -- that's

21     called a dictaphone.

22          NOEL FUSTER:  Dictaphone?

23          J. BRAGA:  Dictaphone.

24          NOEL FUSTER:  What's your friend's phone

25     number, the uncle?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    J. BRAGA:  I don't think that works like

2    a telephone, though.  Yes, they put a tape

3    in there and then they -- do you know what

4    it's like?  It's like I'm the boss, so I write

5    to write a letter but I don't want to type it,

6    I put a letter in my tape to the secretary and

7    send a letter to (inaudible).

8        NOEL FUSTER: . (Inaudible).

9        J. BRAGA:  Yes, make a tape recorder.

10       NOEL FUSTER:  Any tape in here?

11       J. BRAGA:  I don't think so.  The man

12   whose office it is, he doesn't leave anything

13   here.

14       NOEL FUSTER:  (Inaudible).

15       J. BRAGA:  Yes, we brought those toys.

16       NOEL FUSTER:  What is the suitcase?

17       J. BRAGA:  That has all sorts of papers,

18   notebooks and things like that.

19       NOEL FUSTER:  School things.

20       J. BRAGA:  (Inaudible).

21       Let's doublecheck and see what else is

22   in there, if anything.  I don't think there's

23   any toys in there.  No, no.

24       NOEL FUSTER:  (Inaudible).

25       J. BRAGA:  And this, there is already

1    something on there that I can't erase.

2         NOEL FUSTER:  What is it?

3         J. BRAGA:  Yes, there's already something

4    in this, so (inaudible).

5         This is my baby playing with Mickey Mouse

6    and this is my son.  There's the baby.  There's

7    my son and there's his wife.

8         NOEL FUSTER:  (Inaudible).

9         J. BRAGA:  No, that's his wife and they

10   play softball.

11        NOEL FUSTER:  (Inaudible).

12        J. BRAGA:  Do you play softball?

13        No?  They play softball.  Do you know the

14   difference between baseball and softball

15   (inaudible).

16        Softball you have to throw it underhand.

17        NOEL FUSTER:  I have to go to the bathroom.

18        J. BRAGA:  Ask Mr. Berger to walk you to

19   the bathroom.

20        (Noel Fuster leaves the room).

21        J. BRAGA:  This will just take a second.  I

22   want to ask you, have you interviewed the aunt

23   or mother at all, other than walking around

24   with them?

25        MR. BERGER:  No, I haven't.

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      J. BRAGA:  So you don't know if they

2   understand about his current mental state or --

3      THE COURT:  Fast forward the tape.

4      L. BRAGA:  Oh, we have a big mess.  What

5   am I going to do.

6      NOEL FUSTER:  (Inaudible).

7      You have no more mess.

8      L. BRAGA:  No more mess, right.  Then I

9   am happy now.  What should we do?

10      NOEL FUSTER:  Finish our game.

11      L. BRAGA:  Let's play another one.

12      NOEL FUSTER:  Do you have that truck that

13   you could write things and (inaudible).

14      L. BRAGA:  How about if we play another

15   game with the puppet and your puppet will tell

16   my puppet a secret.

17      NOEL FUSTER:  Okay, this is going to be

18   my puppet.  Let's play with the three (inaudible).

19      One goes to the other and (inaudible).

20      L. BRAGA:  Let's play.  I don't know.  You

21   show me how.

22      NOEL FUSTER:  You know the one, the princess

23   he choose (inaudible).

24      L. BRAGA:  Yes -- I don't know, tell me.

25      NOEL FUSTER:  First they are together and

1    they're getting ready to see which one they

2    love.

3         L. BRAGA:  Yes?

4         NOEL FUSTER:  You know, the king and the

5    queen.  The queen gets married with the prince.

6         L. BRAGA:  Yes?

7         NOEL FUSTER:  Well, the princess is there.

8    He wants like one of the same kind of ladies

9    and then two ladies come up and then he doesn't

10   like it.  Then he comes up and, you know, the

11   little -- the girl she -- she makes everything

12   evil to be beautiful.  Now, you know --

13        L. BRAGA:  Yes, sounds like a good story.

14   Tell me some more.  This is going to be who?

15   This is going to be the princess?

16        NOEL FUSTER:  No.

17        L. BRAGA:  No?

18        NOEL FUSTER:  Two bad ladies.

19        L. BRAGA:  Two bad ladies?

20        NOEL FUSTER:  (Inaudible).

21        L. BRAGA:  Let's play family.  There's

22   the mother over there.

23        NOEL FUSTER:  Here's the mother.

24        L. BRAGA:  Yes.

25        NOEL FUSTER:  Why did we wear underwear?

1        L. BRAGA:  Well, everybody wears underwear.

2   Didn't you tell me your dad gets upset if you

3   didn't wear underwear?

4        NOEL FUSTER:  But not the dolls.

5        L. BRAGA:  Dolls are like real people.  We

6   will play family.  You tell me what to do.

7        NOEL FUSTER:  First we talk.  We all go to

8   the movies.

9        L. BRAGA:  We will go to the movies.  What

10  movies shall we go to?

11       NOEL FUSTER:  Come over here.  Come on.  We

12  are going to the movies.

13       L. BRAGA:  Let's go to the movies over here.

14       NOEL FUSTER:  Go to the movies.  Come on.

15       L. BRAGA:  Okay, let's go to the movies.

16  What about the children?

17       NOEL FUSTER:  The children go, too.

18       L. BRAGA:  Let's go to the movies.

19       NOEL FUSTER:  Now, we will make a puppet show

20  and I am Pinocchio and whom are you going to be?

21       L. BRAGA:  I am Silly Bird.

22       NOEL FUSTER:  Then we will make it over

23  here.

24       L. BRAGA:  I am Silly Bird.  I am going to

25  show you a show, too.  What kind of show shall we

**NATIONAL REPORTING SERVICE**
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    show them?

2         NOEL FUSTER:  A good show.  Any kind of show.

3         (Inaudible).

4         Here's my little rocket that I like.  Look

5    at how high.

6         Your turn.

7         L. BRAGA:  Oh, where is Pinocchio.  I wonder

8    where he went.  Did he go over in this rocket

9    again?  What is he doing in that rocket?

10        Pinocchio, where are you going in the rocket?

11        NOEL FUSTER:  I am not (inaudible).  You

12   are the only one that knows (inaudible).

13        L. BRAGA:  Okay, it's later now.  Would

14   you like me to fix your rocket?

15        NOEL FUSTER:  Yes.

16        L. BRAGA:  Okay, get your rocket so I can

17   fix it.  Let's fix it and make it all better.

18   Okay, here it is, here's your rocket.

19        NOEL FUSTER:  Wheeee.  Look at how high I

20   went.

21        (Inaudible).

22        Look how high (inaudible).

23        My own little tricky thing.

24        Once upon a time there were three bears

25   and one girl and the girl was named (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          The big bear said, "Somebody has been eating

2     my porridge and" (inaudible).

3          I'm going to get my rocket (inaudible).

4          L. BRAGA:  Okay, I will fix your rocket.  Let's

5     fix it all up so it's okay.

6          Okay, here's your rocket all fixed.

7          NOEL FUSTER:  (Inaudible).

8          L. BRAGA:  Want to play with the dolls?

9          NOEL FUSTER:  Huh?

10          L. BRAGA: Want to play with the dolls?

11          NOEL FUSTER:  We are.

12          L. BRAGA:  He's going to be -- Pinocchio is

13     going to be Mickey Mouse.

14          NOEL FUSTER:  Yes, he's going to put on

15     a mask, a disguise.

16          L. BRAGA:  You --

17          NOEL FUSTER:  (Inaudible).

18          I am Mickey Mouse.  You play with your doll.

19          L. BRAGA:  Okay.

20          NOEL FUSTER:  You pretend you are a duck.

21          L. BRAGA:  I will pretend I am Donald.  Which

22     one, Donald, you will be Mickey?

23          NOEL FUSTER:  Yes (inaudible).

24          L. BRAGA:  Yes?

25          Hi, my name is --

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    NOEL FUSTER:  How do you make that noise?

2    L. BRAGA:  Yours doesn't have one.  You

3  want to trade?

4    NOEL FUSTER:  Yes.

5    L. BRAGA:  Actually, that's Minnie Mouse.

6    NOEL FUSTER:  Where is it?

7    L. BRAGA:  You put your fingers in there.

8  Can you fell it?

9    NOEL FUSTER:  Okay.

10    L. BRAGA:  Hi, my name is Minnie Mouse.

11    NOEL FUSTER:  (Inaudible).

12    L. BRAGA:  Is there anything you want to

13  tell me?

14    NOEL FUSTER:  (Inaudible).

15    L. BRAGA:  What do you want?

16    NOEL FUSTER:  A cake.

17    L. BRAGA:  What kind of a cake?

18    NOEL FUSTER:  A chocolate cake.

19    L. BRAGA:  How big?

20    NOEL FUSTER:  Real big (inaudible).

21    L. BRAGA:  Bigger than the whole earth?

22    NOEL FUSTER:  Yes.

23    L. BRAGA:  What else?

24    NOEL FUSTER:  Yes, that's all.

25    L. BRAGA:  Is it your birthday?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1    NOEL FUSTER:  Yes, it's my birthday.

2    L. BRAGA:  When?

3    NOEL FUSTER:  Today.  Today is.

4    L. BRAGA:  You want a birthday cake?

5    NOEL FUSTER:  I -- (inaudible).

6    I've got one here.

7    L. BRAGA:  What would you like for a birthday

8    present, Donald?

9    NOEL FUSTER:  I'd like one little tiny, tiny

10   puppet.  I mean, yes, puppet, puppet.

11   L. BRAGA:  You want a puppet?

12   NOEL FUSTER:  Yes.

13   L. BRAGA:  What kind of puppet?

14   NOEL FUSTER:  I want the fox one.

15   The fox, this one.

16   L. BRAGA:  Oh.

17   NOEL FUSTER:  (Inaudible).

18   L. BRAGA:  Yes.

19   NOEL FUSTER:  Here's the fox (inaudible).

20   The fox (inaudible).

21   I could scare the people (inaudible).

22   We finished our show.

23   L. BRAGA:  Okay.

24   NOEL FUSTER:  Mickey Mouse (inaudible).

25   I am Pinocchio.  Now, what should we play?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      L. BRAGA:  Should we play something with

2  these dolls?

3      NOEL FUSTER:  Yes.

4      L. BRAGA:  Have you -- when you were littler,

5  did you ever play Ring Around the Rosie?

6      NOEL FUSTER:  Play?  Still.

7      L. BRAGA:  Show me how.

8      NOEL FUSTER:  Okay.  First you have to

9  (inaudible).  You go in.

10     L. BRAGA:  Take the keys and lock her up?

11     NOEL FUSTER:  Go inside.

12     L. BRAGA:  Oh, you have to go inside?

13     NOEL FUSTER:  (Inaudible).

14  What did we play?

15  (Inaudible).

16  He's got hair.

17     L. BRAGA:  He's got hair on his chest.

18     NOEL FUSTER:  He's got underwear.  Want to

19  see?

20     L. BRAGA:  Yes, he's got real underwear

21  like a real person.

22     NOEL FUSTER:  (Inaudible).

23  She doesn't got no underwear.

24     L. BRAGA:  No, she's got like pants.

25     NOEL FUSTER:  She's -- she's got underwear.

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                            (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    She's ⌐ mother, got some underwear.  Looks like

2    a real person.

3        L. BRAGA:  Yes.

4        NOEL FUSTER:  (Inaudible).

5        Look.

6        L. BRAGA:  Yes, they are like real dolls.

7        NOEL FUSTER:  And the hair is real.

8        L. BRAGA:  Uh-huh.

9        NOEL FUSTER:  (Inaudible).

10       We have to take our clothes off.  Come

11   on into the pool, into the pool.

12       Do you have a little (inaudible).

13       L. BRAGA:  No.  She doesn't have a

14   bathing suit.  She just has her dress.

15       NOEL FUSTER:  That's the way they came?

16       L. BRAGA:  Yes.

17       NOEL FUSTER:  (Inaudible).

18       L. BRAGA:  What happened to the shirt?

19   I guess you took it off?  It's under the --

20       NOEL FUSTER:  Where?  Where?  She's

21   going to have to use this for a bathing

22   suit.

23       (Inaudible).

24       This one goes in here.

25       L. BRAGA:  You can try it.  I think the

**NATIONAL REPORTING SERVICE**
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   other way around.

2       NOEL FUSTER:  This way?

3       L. BRAGA:  Can you do it the other way?

4       NOEL FUSTER:  This way?

5       (Inaudible).

6       L. BRAGA:  That's like the shirt.

7       NOEL FUSTER:  It goes here?

8       L. BRAGA:  Uh-huh.

9       NOEL FUSTER:  Can you do it?

10      L. BRAGA:  Uh-huh.

11      NOEL FUSTER:  She always (inaudible).

12      L. BRAGA:  I guess she doesn't have more

13  than one outfit.

14      NOEL FUSTER:  I'm going to jump in the

15  pool and (inaudible).

16      Now we go into the pool.

17      (Inaudible).

18      I am the father.  I have to take everything

19  off for me if I go into the pool.  I have to

20  take everything off.  I have no bathing suit.

21  I have to take everything off.

22      What is that, a mustache?

23      L. BRAGA:  Yes.

24      NOEL FUSTER:  This is a lady, not a man.

25  They've got a mustache like a (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                          MIAMI
(305) 467-0600              OFFICIAL COURT REPORTER           44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          L. BRAGA:  What is it?

2          NOEL FUSTER:  Huh?

3          L. BRAGA:  What does he have?

4          NOEL FUSTER:  A mustache there.

5          L. BRAGA:  Is that a mustache there?

6          NOEL FUSTER:  Oh, God, they are like real

7  persons.

8          L. BRAGA:  Yes.

9          NOEL FUSTER:  They all went to the pool,

10  then comes the racing man, the man with the

11  racing car and I'm going to the pool, too.

12          Can I watch TV?

13          L. BRAGA:  I don't think it's plugged in.

14  Maybe later you can watch.  I don't think that

15  that one is plugged in.

16          NOEL FUSTER:  Hey, (inaudible).

17          L. BRAGA:  I think we'd better put those

18  away because they don't belong to us.

19          NOEL FUSTER:  Wait, you put the tapes --

20  it opens (inaudible).

21          Is this the way?

22          L. BRAGA:  Yes, but I don't think we should

23  play with it.

24          NOEL FUSTER:  (Inaudible).

25          L. BRAGA:  No, we are not going to listen

**NATIONAL REPORTING SERVICE**
MARTY LESHAW
FT. LAUDERDALE                                       MIAMI
(305) 467-0600                              44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          because it doesn't belong to us.

2                   NOEL FUSTER:   Huh?

3                   L. BRAGA:   Come on.

4                   NOEL FUSTER:   (Inaudible).

5                   So what do we do?

6                   L. BRAGA:   We just put these away.

7                   NOEL FUSTER:   (Inaudible).

8                   L. BRAGA:   This isn't my office.   It

9          belongs to somebody else.

10                  NOEL FUSTER:   Toys (inaudible).

11                  I thought you worked here.

12                  L. BRAGA:   No.

13                  NOEL FUSTER:   If you're working here, you

14         know, how do you do that?

15                  Right.

16                  L. BRAGA:   Uh-huh.

17                  NOEL FUSTER:   (Inaudible).

18                  I want to go to my friend's house.

19                  L. BRAGA:   Which friend?

20                  NOEL FUSTER:   He's got toys, too.

21                  L. BRAGA:   What's his name?

22                  NOEL FUSTER:   Howie.

23                  L. BRAGA:   (Inaudible).

24                  Would you come back tomorrow and talk to

25         us a little more?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE                                                                MIAMI
(305) 487-0600                                                          44 W. FLAGLER ST.
                              OFFICIAL COURT REPORTER                    (305) 373-7295
              CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     NOEL FUSTER:   (Inaudible).

2     L. BRAGA:  You want to take it and bring

3  it back tomorrow?

4     NOEL FUSTER:  Yes.

5     L. BRAGA:  I have to ask Joe because I don't

6  know who it belongs to.

7     NOEL FUSTER:  You got it from other people?

8     L. BRAGA:  I think one of the other children

9  may have left it, so I wouldn't want to lose it.

10     NOEL FUSTER:  (Inaudible).

11     L. BRAGA:  Would you help me get these

12  dolls and put their clothes on and --

13     NOEL FUSTER:  Why, they are like real persons.

14  They got real underwear, real pee pee.

15     L. BRAGA:  You think that's silly?

16     NOEL FUSTER:  Yes, that's silly.

17     L. BRAGA:  You've seen dolls like this?

18     NOEL FUSTER:  And they move real.

19     L. BRAGA:  They don't go in the doll bag.

20  They stay here.

21     We need to put his shirt on him.

22     NOEL FUSTER:  You don't have to.

23     L. BRAGA:  Would you just help me with

24  this and then we will go get your mom?

25     NOEL FUSTER:  I am a policeman, you know,

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                               44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     how --

2          L. BRAGA:  How?

3          NOEL FUSTER:  (Inaudible).

4          L. BRAGA:  Leave it there.

5          NOEL FUSTER:  (Inaudible).

6          L. BRAGA:  Don't touch it.

7          NOEL FUSTER:  (Inaudible).

8          L. BRAGA:  No, don't touch the hat.  It

9     doesn't belong to me.

10         I think the man that owns it would be

11    unhappy.

12         NOEL FUSTER:  Unhappy?  If we leave it alone,

13    he would be unhappy?

14         L. BRAGA:  Not happy.

15         NOEL FUSTER:  (Inaudible).

16         Can I go now?

17         L. BRAGA:  Pretty soon.  Help me with this

18    and then we can go get your mom.

19         NOEL FUSTER:  I'm just going to tell

20    (inaudible).

21         THE COURT:  Fast forward.

22         L. BRAGA:  (Inaudible).

23         UNKNOWN PERSON:  Hi.

24         NOEL FUSTER:  They've got real underwear.

25         UNKNOWN PERSON:  Dress them up.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    NOEL FUSTER:  Look, see?  They look real.

2    (Inaudible).

     Anyway you want.  Where's the picture of

4    me for you?

5    L. BRAGA:  I don't know.  Maybe Joe

6    took them already.  Do you want to draw me some

7    more pictures while your aunt and I talk?

8    NOEL FUSTER:  Okay.

9    L. BRAGA:  Do you know where the crayons

10   are?

11   NOEL FUSTER:  Okay.

12   L. BRAGA:  When you draw, you can tell me

13   what you are drawing, too, okay?

     THE COURT:  Fast forward.

15   (Thereupon the tape is being fast forwarded).

16   (Thereupon the video concluded).

17   MR. SAMEK:  Exhibit J.

18   THE COURT:  What date?

19   MR. SAMEK:  August 13th, 1984.

20   THE COURT:  Of Justin Cousino?

21   All right.  I just repeated that for the

22   court reporter.  The court reporter doesn't

23   have to come through into the courtroom.  She

24   can hear me through the microphone.

     (Thereupon at 3:25 p.m., the video of

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      Justin Cousino was shown, Exhibit J, August 13, 1984).

2          J. BRAGA:  Where were we last?

3          L. BRAGA:  Your mom called because she said

4      there were some other things you were talking

5      about that she thought you might be willing to

6      tell us about.

7          I know you have been doing a lot of talking.

8      If you have any questions about why everybody is

9      asking any of these questions, we will be glad

10     to answer them.

11         She did say there are other things you can

12     remember that went on with Frank and Ileana with

13     the children (inaudible).

14         J. BRAGA:  It's very helpful to us.  We

15     are trying to understand and by sharing with us

16     (inaudible).

17         Nobody is in any way hurt by secrets.

18         I think that as you get more comfortable

19     talking to us, you understand that nothing is

20     really going to happen.  Your mom and dad are

21     glad you talked to us and it's important and

22     if there are any other things and also you can

23     understand (inaudible).

24         You and I kind of get along and you fell

25     comfortable, some of the other children don't

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    MIAMI
(305) 467-0600              44 W. FLAGLER ST.
OFFICIAL COURT REPORTER       (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    get along and obviously Ileana and Frank told

2    them not to talk.  So, they are afraid to talk

3    or they feel uncomfortable.  This gives us a

4    chance to (inaudible).

5        Remember when they brought Jonathan, it

6    gives us a way to kind of approach them.  You

7    are closer to this age.  You can help us think

8    of ways we can ask questions.  You have been

9    really a big help to us.

10       It's a big help in understanding what

11   happened (inaudible).

12       L. BRAGA:  So are there anythings you want

13   to ask us first?

14       JUSTIN COUSINO:  (Inaudible).

15       MRS. COUSINO:  Justin, would you feel better

16   if Daddy and I went outside?

17       JUSTIN COUSINO:  Okay.

18       J. BRAGA:  That's fine.  You are comfortable

19   with that.

20       MR. COUSINO:  Justin, you are a brave guy.

21   I'm proud of you.  We will be right out here.

22   Just holler if you want us.

23       (Thereupon the parents leave the room).

24       J. BRAGA:  I think you are more a man.

25   Do you have things -- anything that's on your

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                              MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    mind?

2          JUSTIN COUSINO:  Ileana said if I told

3    people about what she did, she would hurt me.

4          J. BRAGA:  Huh?

5          JUSTIN COUSINO:  And my mom.

6          J. BRAGA:  Well, let me --

7          L. BRAGA:  I'm sure she said that but she

8    won't.  Nobody will touch her.  Nobody will let

9    her.  Nobody is going to let her hurt you or

10   your mother.

11         J. BRAGA:  He's so smart, what Justin is

12   telling his mom and telling us, but by telling

13   us, you (inaudible).

14         You have protected yourself and your mom

15   from getting hurt.

16         A lot of little children, this happens when

17   somebody is playing games like this with people

18   (inaudible).

19         Somebody warns them if they talk to somebody

20   else, they will be hurt.  They don't tell.  Then

21   nobody can protect them, but by your telling,

22   you made it happen that you are now protected.

23   Your mommy is protected and no one is going to

24   hurt you.

25         You were worried about Noel you said and

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1  no one can hurt Noel anymore and no one can cause

2  problems for anybody.

JUSTIN COUSINO:  They were causing problems

4  on my brother.

5  J. BRAGA:  On Jonathan?

6  JUSTIN COUSINO:  Yes, they did it a lot on

7  my brother.

8  J. BRAGA:  See, he didn't know what was

9  happening, did he?

10  JUSTIN COUSINO:  Right.

11  L. BRAGA:  He's so little.  Is there

12  anything else you want to tell us about what

13  happened with Jonathan that you didn't tell us

   because I don't know.

15  JUSTIN COUSINO:  They just played.  They

16  just played games with them.  When they were

17  changing (inaudible).

18  L. BRAGA:  Some of the games you talked

19  about, like the pee pee game and the other games

20  he was involved?

21  JUSTIN COUSINO:  Right.

22  L. BRAGA:  In those?

23  JUSTIN COUSINO:  He wanted to play because

24  he was undressing.  He undresses by himself.

25  L. BRAGA:  Uh-huh?

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     JUSTIN COUSINO:  A lot.  So he had to join

2     in too and if you undress, that means you have

3     to join in the games.

4     J. BRAGA:  I see.

5     JUSTIN COUSINO:  When they're playing a game

6     --

7     J. BRAGA:  What would happen,  you know,

8     sometimes children only came for one (inaudible)?

9     JUSTIN COUSINO:  Unless you (inaudible),

10     which is one of (inaudible).

11     He lives in a white house and he lives by

12     us and he wanted to go Ileana's but now he's

13     not.  So they tried to get him in Ileana's but

14     he didn't go.

15     J. BRAGA:  Were there any children --

16     do you  know a little boy named Alex?

17     JUSTIN COUSINO:  No.

18     J. BRAGA:  No?

19     He was one boy.  There are a couple of

20     boys and girls.

21     JUSTIN COUSINO:  Yes, I know Alex.

22     J. BRAGA:  Do you know how old he is?

23     JUSTIN COUSINO:  Is he real little?

24     J. BRAGA:  Yes, he's real little, he's

25     eighteen months old.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1      JUSTIN COUSINO:  No, Alex is older.

2          J. BRAGA:  I think he's your age.  There's

3.     another little boy, he's only about eighteen

4      months.  He's not as big as Jonathan.

5          JUSTIN COUSINO:  No, Alex that's two years

6      old, I mean the one that goes there.

7          L. BRAGA:  Uh-huh, no, the baby.

8          J. BRAGA:  He's real little.

9          JUSTIN COUSINO:  Right.

10         L. BRAGA:  There was another baby.

11         JUSTIN COUSINO:  He's Nelson.

12         J. BRAGA:  Nelson?

13         JUSTIN COUSINO:  He's Nelson's brother.

14         J. BRAGA:  Did they play games with him?

15         JUSTIN COUSINO:  Yes.

16         J. BRAGA:  They did?

17         JUSTIN COUSINO:  (Shaking head yes).

18         J. BRAGA:  Do you remember those?

19         JUSTIN COUSINO:  Well, I didn't see

20     any games.

21         J. BRAGA:  With him?

22         When they played the games, did they like

23     playing games every day?

24         JUSTIN COUSINO:  Yes.  They played them

25     every day -- I mean --

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                                                           MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

188

1       J. BRAGA:  Every day?

2       L. BRAGA:  What time would you go there,

3  in the morning?

4       JUSTIN COUSINO:  I don't go in the morning.

5  I go in the afternoon.

6       L. BRAGA:  In the afternoon?

7       JUSTIN COUSINO:  At two.

8       L. BRAGA:  At two?

9       JUSTIN COUSINO:  Yes, at two o'clock.

10      L. BRAGA:  What would be happening when

11  you go at two o'clock?  What would happen from

12  the time you went into the door?

13      JUSTIN COUSINO:  They would scare us when

14  I go to the door.

15      L. BRAGA:  So the first thing is that they

16  would scare you?

17      JUSTIN COUSINO:  Right and then my mom

18  would leave.  My mom would leave and they would

19  scare me.

20      L. BRAGA:  What?

21      JUSTIN COUSINO:  Go in the room and scare

22  me.

23      L. BRAGA:  What would they do when they

24  would scare you?

25      JUSTIN COUSINO:  They would just growl, put

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7298

1     on the masks and growl.

2          L. BRAGA:  When they did that, would they

3     tell you not to tell and that's why the were

4     scaring you?

5          JUSTIN COUSINO:  Right.  Right.

6          L. BRAGA:  Then what would happen?

7          JUSTIN COUSINO:  If I told -- if I told,

8     they would hurt me real bad and that's why they

9     told me not to tell anyone.

10         So now, they -- they tell people I am not --

11     they used to tell people not to tell their mom,

12     something real bad could happen.

13         J. BRAGA:  Like you said, I think you said

14     to me that you and the children weren't bad or

15     didn't do wrong things?  They did wrong things?

16         JUSTIN COUSINO:  Right.

17         J. BRAGA:  Speaking of children that did

18     that, did you ever tell us about things that

19     they did when Brooke was there alone without

20     any other children?

21         JUSTIN COUSINO:  All children were there.

22         L. BRAGA:  Were there any children who

23     were there that they didn't do something to?

24         JUSTIN COUSINO:  No.

25         J. BRAGA:  Did they -- there were some children

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                        MIAMI
(305) 467-0600                 44 W. FLAGLER ST.
          OFFICIAL COURT REPORTER       (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        who were there all the time?

2            JUSTIN COUSINO: Right.

3            J. BRAGA:  They were there everyday just

4        about and some children that came once in awhile

5        and only --

6            JUSTIN COUSINO:  How we (inaudible).

7            L. BRAGA:  What do you mean?

8            JUSTIN COUSINO:  They wouldn't play games

9        with other children (inaudible).

10           J. BRAGA:  Let's say --

11           JUSTIN COUSINO:  But my brother and everybody

12       else, they wouldn't play with other kids.

13           J. BRAGA:  So what would happen if a child,

14       let's say a child came for one day only, a girl

15       or a boy came one day only, they wouldn't play

16       games when the child was around or wouldn't

17       play games when the child was in the room?

18           JUSTIN COUSINO:  They would play games

19       when they were there.

20           J. BRAGA:  Not at all?  Not even in the

21       bedroom or (inaudible).

22           JUSTIN COUSINO:  No, because they -- no,

23       they -- no other kids sometimes peeked.

24           They would -- that's why they don't do it

25       when other kids are there.  That's why.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      J. BRAGA:  Did Noel?

2      JUSTIN COUSINO:  Noel?

3      J. BRAGA:  Noel, I'm sorry, did they do

4   things with Noel?

5      JUSTIN COUSINO:  Yes.

6      J. BRAGA:  Can you tell me about that at

7   all, what you saw?

8      JUSTIN COUSINO:  I didn't see anything but

9   Noel told me that they played.  He just told

10   me they played bad games with him a lot.

11      J. BRAGA:  Can you tell me maybe what kind

12   of games they told you about or show me with

13   the dolls?

14      JUSTIN COUSINO:  He didn't tell me.  He

15   didn't tell me anything and he didn't show me.

16      J. BRAGA:  He didn't show you?  The only

17   reason I'm asking is he said that Daddy put his

18   penis in Noel's mouth.

19      JUSTIN COUSINO:  Right.

20      J. BRAGA:  But you just told me Noel didn't

21   tell you.

22      JUSTIN COUSINO:  Right.

23      J. BRAGA:  So help me understand.  Did

24   Noel tell you once that what you told me before

25   and if you made a mistake, tell me.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                              MIAMI
(305) 467-0600                                       44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        One of the visits you had, you told me

2     that you saw Noel's daddy put his penis in

3     Noel's mouth.

4        JUSTIN COUSINO:  Right.

5        J. BRAGA:  Did you see that?

6        JUSTIN COUSINO:  Right.

7        J. BRAGA:  But you just said you never

8     saw any  the games.

9        JUSTIN COUSINO:  I saw some games.

10       J. BRAGA:  Oh, okay.

11       JUSTIN COUSINO:  The games they played

12    with Noel, I saw.

13       J. BRAGA:  Can you tell me what games with

14    Noel you did see?

15       Can you tell me what they did?  Do you

16    want to show me with the dolls what they did?

17       JUSTIN COUSINO:  I -- I just -- I just

18    watched for a little while and went and I had

19    to leave it.

20       J. BRAGA:  So when you watched for a little

21    while, will you tell me what you saw in that

22    little while?

23       JUSTIN COUSINO:  They were sticking penises

24    in Noel's mouth.

25       L. BRAGA:  Who was?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1      JUSTIN COUSINO: Frank.

2      L. BRAGA:  Frank?

3      JUSTIN COUSINO:  Yes.

4      L. BRAGA:  What was Ileana doing?

5      JUSTIN COUSINO:  She was sending me home.

6   See, my dad picks me up and she gets everything

7   ready to leave.

8      L. BRAGA:  Uh-huh?  So Frank put his penis

9   in Noel's mouth?

10      JUSTIN COUSINO:  Yes.

11      L. BRAGA:  What about Noel?  What did Noel

12   do?

13      JUSTIN COUSINO:  Nothing.  Noel never plays

14   any of those games with other children.

15      L. BRAGA:  Just with Frank?

16      JUSTIN COUSINO:  Right.

17      L. BRAGA:  Did you ever do anything with

18   Ileana?

19      JUSTIN COUSINO:  Frank gave her a black eye.

20      L. BRAGA:  Frank and Ileana?

21      JUSTIN COUSINO:  Yes.

22      L. BRAGA:  Did you ever see anything happen

23   between Noel and Ileana?

24      JUSTIN COUSINO:  No.

25      L. BRAGA:  No?  So --

1     JUSTIN COUSINO:  See Ileana --

2     J. BRAGA:  And Noel is not going to get

3 into trouble.

4     JUSTIN COUSINO:  I know.

5     J. BRAGA:  Noel won't get into any trouble.

6     JUSTIN COUSINO:  I know.

7     L. BRAGA:  (Inaudible).

8     See, we need to know what happened, so we

9 can help the children, including Noel.  That's

10 all.  We just need to know so we can help, because

11 you are such a big boy and so intelligent and

12 able to talk like some of the babies, even some-

13 body like Jonathan, he can talk but he can't talk

14 like you can.

15     JUSTIN COUSINO:  I know.

16     L. BRAGA:  That's why we really appreciate

17 you talking to us and you can help us understand

18 things better.  You are very brave to do it.

19     We know it's not easy, especially when

20 they told you something would happen to you.

21     JUSTIN COUSINO:  Yes.

22     L. BRAGA:  We really appreciate it.

23     J. BRAGA:  Simon says --

24     JUSTIN COUSINO:  Yes.

25     J. BRAGA:  Now, when I say --

NATIONAL REPORTING SERVICE
FT. LAUDERDALE    MARTY LESHAW    MIAMI
(305) 467-0600    OFFICIAL COURT REPORTER    44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    JUSTIN COUSINO:  No, we never did.

2    J. BRAGA:  Did -- if someone were to play

3    Simon Says, can you guess what they would have

4    been doing?  Like Simon Says, take three steps

5    forward.  Simon Says, put on a shirt.  Simon

6    Says, (inaudible).

7    JUSTIN COUSINO:  Yes, here's how their Simon

8    Says is.  They say Simon Says take off your clothes.

9    J. BRAGA:  Uh-huh.

10   JUSTIN COUSINO:  Simon Says do this and

11   that.  That's real bad.

12   J. BRAGA:  Here's where you can really be

13   helpful because I don't know, you know, what

14   you mean when you say this and that.  That is

15   bad but I don't know what that means.

16   So if you tell me then I will be able to

17   understand what this and that is.

18   That's where we really need help.  I have

19   to understand what you mean.

20   L. BRAGA:  Would you rather show us with

21   the dolls?

22   JUSTIN COUSINO:  No, I will tell you.

23   J. BRAGA:  Okay.

24   JUSTIN COUSINO:  They were -- they said

25   Simon Says take off your clothes.  Simon Says

1        bite on the penis.

2            J. BRAGA:  When they say bite on the penis,

3        do they mean the boys and girls do it to each

4        other?

5            JUSTIN COUNSINO:  Right.

6            J. BRAGA:  Girls don't have penises.

7            JUSTIN COUSINO:  Right.

8            J. BRAGA:  What would the girls do to the

9        boys?

10           JUSTIN COUSINO:  Bite their vagina.

11           J. BRAGA:  So they would?

12           JUSTIN COUSINO:  Right.

13           J. BRAGA:  Would Ileana do any of this?

14           JUSTIN COUSINO:  No, Ileana just told us

15       what to do when Frank was at work.

16           J. BRAGA:  So Ileana did  this without

17       Frank being there?

18           JUSTIN COUSINO:  Right.

19           J. BRAGA:  Uh-huh.

20           JUSTIN COUSINO:  And that was all they did.

21       They -- it was over.

22           J. BRAGA:  Did they do that?

23           JUSTIN COUSINO:  They wouldn't dress back

24       up.

25           J. BRAGA:  They wouldn't?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    JUSTIN COUSINO:  When their mom and dad

2    came, they would go in the bathroom and get

3    dressed up.

4         J. BRAGA:  This game, this happened when

5    Ileana was there?  The children were there and

6    other times they played Simon Says, was Frank

7    ever there when they played Simon Says?

8         JUSTIN COUSINO:  No.

9         J. BRAGA:  He didn't use that game?

10        JUSTIN COUSINO.  No.

11        J. BRAGA:  What were the games Frank used

12   (inaudible).

13        JUSTIN COUSINO:  He just told them to do

14   it.  That's all.  He just told them to do it.

15        J. BRAGA:  Did Noel ever get hit by his

16   parents?

17        JUSTIN COUSINO:  Yes.

18        J. BRAGA:  You saw it happen?

19        JUSTIN COUSINO:  In the face.  See, like

20   six year olds are not supposed to get hit in

21   their face.

22        J. BRAGA:  That's right.

23        JUSTIN COUSINO:  Because -- because that's

24   not the way they are (inaudible) smack in the

25   face.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7285
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       J. BRAGA:  Really, tell me about it.  Of

2   course not.  Did they hit him with the hand of --

3       JUSTIN COUSINO:  Belt.

4       J. BRAGA:  Hit with a belt?

5       JUSTIN COUSINO:  (Inaudible).

6       J. BRAGA:  Did they hit your brother?

7       JUSTIN COUSINO:  Yes, they hit my brother.

8       J. BRAGA:  Did he cry?

9       JUSTIN COUSINO:  Yes.

10      J. BRAGA:  Do you remember why they hit him

11  with a belt?

12      JUSTIN COUSINO:  No, I don't know why they

13  did it.

14      J. BRAGA:  Did anybody ever hit them or did

15  they ever ask anybody to hit them?

16      JUSTIN COUSINO:  No.

17      J. BRAGA:  And they hit Jonathan and they

18  hit Noel, too, you said?

19      Did you say that Noel got hit by them?

20      JUSTIN COUSINO:  Yes.

21      J. BRAGA:  They did hit Noel?  Do you think

22  they did it a lot?

23      JUSTIN COUSINO:  Yes, because I saw them

24  do it a lot.

25      J. BRAGA:  Do you think that Noel is afraid

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                      MIAMI
(305) 467-0600       OFFICIAL COURT REPORTER     44 W. FLAGLER ST.
                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          of Frank or Ileana?

2                 JUSTIN COUSINO:  He's afraid of Ileana.

3                 L. BRAGA:  Frank, too?

4                 JUSTIN COUSINO:  No.  Noel is afraid of both.

5          Nobody else.  Everybody is afraid of Frank and

6          Ileana, except me.

7                 J. BRAGA:  Did Frank -- you know what a

8          beard is?

9                 JUSTIN COUSINO:  Yes.

10                J. BRAGA:  Did Frank ever have a mustache

11         or beard ever?

12                JUSTIN COUSINO:  (Inaudible).

13         He was growing a mustache but he doesn't have

14         one.

15                L. BRAGA:  Did you ever see a man there

16         who had a beard or mustache?

17                JUSTIN COUSINO:  That's my dad.

18                L. BRAGA:  No, I know your dad does but

19         at Ileana's house?

20                JUSTIN COUSINO:  No.

21                J. BRAGA:  No one with a beard ever came

22         there?

23                JUSTIN COUSINO:  Oh, I know.

24                J. BRAGA:  And stayed?

25         I don't mean to pick up children, came and

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    stayed for awhile?

2        JUSTIN COUSINO:  No.

3        L. BRAGA:  Do you ever remember a little boy

4    named Jarret?

5        JUSTIN COUSINO:  No, because I went there

6    for a long time.

7        L. BRAGA:  Oh.

8        JUSTIN COUSINO:  I was -- I came there on

9    a month when other kids were there.  See, that

10   was my first day.  I didn't come when it was

11   the first day of Brooke's birthday or that because

12   I didn't come (inaudible).

13       J. BRAGA:  Do you remember, you told us

14   about a woman who did come sometimes when they

15   played games, who you called Miss Boobies?

16       JUSTIN COUSINO:  Yes.

17       J. BRAGA:  Did they come more than once?

18       JUSTIN COUSINO:  No, just once.

19       J. BRAGA:  She just came one time?  Was

20   she a friend of Frank's or a friend of Ileana's?

21       JUSTIN COUSINO:  A friend of Noel's.

22       J. BRAGA:  She was a friend --

23       JUSTIN COUSINO:  Because she was a real --

24   she was ten years old.

25       J. BRAGA:  So she wasn't a grownup?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

## CERTIFICATE OF REPORTER

STATE OF FLORIDA    )

COUNTY OF DADE      )


        I, LYNN LENFESTEY, Court Reporter and Notary

Public, do hereby certify that I reported in shorthand

the foregoing trial in the above-mentioned cause before

the HONORABLE ROBERT E. NEWMAN, Judge of the above-

mentioned Court, at the time and place hereinabove

stated and that the foregoing pages, numbered from 1

through 200, inclusive, constitute a true and correct

record thereof.

        I FURTHER CERTIFY that I am not of counsel; I

am not related to nor employed by any attorney to this

cause; and I am not financially interested in the

outcome thereof.

        WITNESS MY HAND AND OFFICIAL SEAL this ___7___

day of January, 1986, at Miami, Dade County, Florida.


                        _____
                        LYNN LENFESTEY, Court Reporter

                            NOTARY PUBLIC
                            MY COMMISSION
                            BONDED

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FRANCISCO FUSTER-ESCALONA)
                        )
     Petitioner,       )
                        )    Case No. 97-1369-CIV-LENARD
-vs-                 )    MAGISTRATE JUDGE SORRENTINO
                        )
HARRY K. SINGLETARY,   )
                        )
     Respondent.      )
                        )
_____)

# EXHIBITS TO MOTION FOR AN EVIDENTIARY HEARING

Volume III

<u>List of Attachments and Exhibits</u>

**Certification of Amy Gershenfeld Donnella**

Exhibit 1 to Donnella Certification – Letter dated December 10, 1998 from
　　Assistant State Attorney Abraham Laeser

**Certification of W.L.H. Whittington**

Exhibit 1 to Whittington Certification – Curriculum Vita

Exhibit 2 to Whittington Certification – Memorandum from assistant state attorney Dan
　　Casey to assistant state attorney Richard Shiffrin, dated February 19, 1985

Exhibit 3 to Whittington Certification – Trial testimony of Dr. Judith Lederhandler

Exhibit 4 to Whittington Certification – Deposition testimony of Joseph Kyle, Laboratory
　　Technician

Exhibit 5 to Whittington Certification – Deposition testimony of Freda Burstyn,
　　Laboratory Technician

Exhibit 6 to Whittington Certification – Records from Jackson Memorial Hospital

Exhibit 7 to Whittington Certification – Pediatric Infectious Diseases, vol. 7, 1988,
　　"Incorrect identification of *Neisseria gonorhoeae* from infants and children." And
　　"Misidentification of sexually transmitted organisms in chidren: medicolegal
　　implications."

**Certification of Richard Ofshe, Ph.D.**

Exhibit 1 to Ofshe Certification – Curriculum Vita

Exhibit 2 to Ofshe Certification – Sworn Statement of Ileana Flores

Exhibit 3 to Ofshe Certification – Psychological Evaluation of Ileana Fuster, dated July
　　30, 1985 by Norman Reichenberg, Ph.D.

Exhibit 4 to Ofshe Certification – Psychological Report re: Ileana Fuster, dated August
　　3, 1985, by Psychological Associates of Miami (Leonard Haber, Ph.D.)

Exhibit 5 to Ofshe Certification – Letter dated July 31, 1985, re:  Ileana Fuster from
　　Sanford Jacobson, M.D.

Exhibit 6 to Ofshe Certification – Invoices of charges to Michael von Zamft from
　　Behavior Changers, Inc., dated August 26, 1985 and September 23, 1985

Exhibit 7 to Ofshe Certification – Affidavit of Herb Smith filed July 29, 1985

Exhibit 8 to Ofshe Certification – Memorandum to file from assistant state attorney Dan Casey, dated August 5, 1985

**Certification of Maggie Bruck, Ph.D.**

Exhibit 1 to Bruck Certification – Curriculum Vita

Exhibit 2 to Bruck Certification – Police Investigative Reports

Exhibit 3 to Bruck Certification – Excerpts from Mr. Fuster's Corrected Amended Petition

Exhibit 4 to Bruck Certification – Deposition of Steven Paul Allen

Exhibit 5 to Bruck Certification – Deposition of Mary Lerow

Exhibit 6 to Bruck Certification – Transcriptions of Braga interviews from trial Transcripts dated 9/12/85, 9/13/85, 9/18/85 and a portion of 9/19/85

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR DADE COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO:  84-19728 (Newman)

THE STATE OF FLORIDA,          :

   Plaintiff,               :

vs.                            :

FRANCISCO FUSTER ESCALONA:
aka Frank Fuster,
                             :

   Defendant.              :

_____:

          The above entitled cause is the continued jury

trial before the HONORABLE ROBERT E. NEWMAN, Judge of the

above-styled Court, at the Metropolitan Justice Building,

Miami, Florida, on Friday, September 13, 1985, commencing

at approximately 9:30 a.m.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      APPEARANCES:

2
                    DANIEL A. CASEY, ESQUIRE,
3                   Assistant State Attorney,
                    JOHN HOGAN, ESQUIRE,
4                   Assistant State Attorney, and
                    RICHARD SHIFFRIN, ESQUIRE,
5                   Assistant State Attorney,
                    on behalf of the State of Florida.
6
                    JEFFREY SAMEK, ESQUIRE,
7                   SAMEK & BESSER,
                    1925 Brickell Aveue,
8                   Suite D207,
                    Miami, Florida  33129,
9                   on behalf of the Defendant, Frank Fuster.

10

11


12                            I N D E X

13     CONTINUATION OF VIDEO TRANSCRIPT
       OF JUSTIN COUSINO                              204

14

15

16

17

18

19

20

21

22

23

24

25

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      J. BRAGA:  So she wasn't a grownup?

2      L. BRAGA:  Was she a grown woman?

3      JUSTIN COUSINO:  No, she was thirteen.

4      J. BRAGA:  Thirteen?

5      JUSTIN COUSINO:  Yes.

6      J. BRAGA:  And she was a friend of who's?

7      JUSTIN COUSINO:  Frank -- Noel's, because she

8   goes to Noel's school.

9      J. BRAGA:  And you all laughed and called

10   her Miss Boobies?

11      JUSTIN COUSINO:  No, I didn't laugh.

12      L. BRAGA:  But other kids did?

13      JUSTIN COUSINO:  Right.

14      J. BRAGA:  Do  you know what her first name

15   was?

16      JUSTIN COUSINO:  No.

17      J. BRAGA:  You didn't know whether it was

18   Mary and Jan?

19      JUSTIN COUSINO:  No.

20      J. BRAGA:  Would Noel know?

21      JUSTIN COUSINO:  No, because they just met

22   her about sixty days ago.  I mean, when I saw

23   the cassette, she came.

24      J. BRAGA:  When you saw the cassette?

25      L. BRAGA:  Cassette?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  Oh, cassette?

2    JUSTIN COUSINO:  Last Wednesday, like I

3    said.

4    J. BRAGA:  That's the last time?

5    JUSTIN COUSINO:  Yes, yesterday I told you.

6    J. BRAGA:  Let me ask you a couple of

7    questions of the cassette.  You said they were

8    movies?  They showed them to you, movies of the

9    games?

10   Were they games of the children playing

11   the games without clothing and all that or there

12   were other people?

13   JUSTIN COUSINO:  The children -- the children

14   that came and the boobie lady.

15   J. BRAGA:  And the boobie lady, too?

16   L. BRAGA:  What about Noel?  Was he ever in

17   the movies?

18   JUSTIN COUSINO:  No.

19   L. BRAGA:  No?

20   J. BRAGA:  You saw him on TV with the

21   children?  Noel (inaudible).

22   JUSTIN COUSINO:  No, because I had seen

23   other games without Noel in there.

24   J. BRAGA:  Do you know from what Noel told

25   you that he was ever in any of them?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    JUSTIN COUSINO:  No, he never wanted to be

2    in them but he wanted to be in them.

3    J. BRAGA:  He did?  Did he say he had

4    seen them?

5    JUSTIN COUSINO:  Yes.

6    J. BRAGA:  That's how he knew about them?

7    JUSTIN COUSINO:  But he could tell me because

8    he was a little scared.

9    J. BRAGA:  He was afraid that if he told,

10   then he would get in trouble?

11   JUSTIN COUSINO:  Right.  Right.

12   J. BRAGA:  Did he ever say what he thought

13   would happen if he told?

14   JUSTIN COUSINO:  They would hit Noel real

15   hard and punish him.

16   J. BRAGA:  What do you mean punish him?

17   JUSTIN COUSINO:  Stab him.

18   J. BRAGA:  With what?

19   JUSTIN COUSINO: Sword.

20   J. BRAGA:  Of a knife?

21   JUSTIN COUSINO:  No.

22   No, just a sword.

23   J. BRAGA:  Why, was there a sword?

24   JUSTIN COUSINO:  Yes, they once had a sword

25   because Noel told me they once had a sword, when

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    Noel was two.  That's why he never told anybody

2    about that.

3         L. BRAGA:  Was he hurt with the sword when

4    he was little?

5         JUSTIN COUSINO:  No, because he never told

6    them.

7         L. BRAGA:  But they warned him?

8         JUSTIN COUSINO:  When he was four, they

9    warned him.

10         J. BRAGA:  He was scared?

11         JUSTIN COUSINO:  Right.

12         J. BRAGA:  When he was two or four?

13         JUSTIN COUSINO:  Four they warned him.

14         J. BRAGA:  Do you know how old is four?

15         JUSTIN COUSINO:  Yes.

16         J. BRAGA:  How old is four, compared to

17    yourself?  You are five and a half, right?

18         JUSTIN COUSINO:  No, I am going to be

19    five next week.

20         J. BRAGA:  That's right, you told me

21    that you're going to have a birthday, right.

22         JUSTIN COUSINO:  Another birthday.

23         J. BRAGA:  You are looking forward to it,

24    going to have another party?

25         JUSTIN COUSINO:  So Noel, we took him out

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    in the boat, in our boat.

2         J. BRAGA:  Yes, that must have been neat.

3    Did you enjoy it?

4         JUSTIN COUSINO: (No response).

5         But that's how Frank gave Ileana a black eye.

6    He threw a rock inside (inaudible) by her eye.

7         J. BRAGA:  Oh, boy, he was mad.

8         L. BRAGA:  That day?

9         JUSTIN COUSINO:  Uh-huh, that day.

10        J. BRAGA:  Did Frank ever take you to his

11   warehouse?

12        JUSTIN COUSINO:  No.

13        J. BRAGA:  Did you know if --

14        JUSTIN COUSINO:  We took a ride once.

15        J. BRAGA:  In his van or in his stationwagon?

16        JUSTIN COUSINO:  In his stationwagon, to

17   pick up my dad from his -- see, his car broke

18   down, little car, and that's what happened.

19        We have two cars.  We have one van and one

20   Fiat.

21        J. BRAGA:  Oh, so --

22        JUSTIN COUSINO:  One Dodge and one Fiat

23   and they have been in the Dodge.

24        J. BRAGA:  They've been in the Dodge?

25        JUSTIN COUSINO:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  What about their cars.  Did

2  they ever take you in their cars or their van?

3    JUSTIN COUSINO:  No, just the little car.

4    J. BRAGA:  Do you know or did any of the

5  other children ever tell you about trips that

6  they took the children on?

7    JUSTIN COUSINO:  They took Brooke out for

8  a trip with Noel.

9    J. BRAGA:  Do you know anything about what they

10  did or what happened or anything?

11    JUSTIN COUSINO:  No.

12    J. BRAGA:  Not at all?

13    JUSTIN COUSINO:  Because I was -- it was

14  when I was at my Aunt  Marsha's and my mom

15  was up in Ohio.

16    J. BRAGA:  Did Brooke ever say anything

17  about it?

18    JUSTIN COUSINO:  No.  She -- she was afraid

19  to tell me.

20    J. BRAGA:  Really?

21    JUSTIN COUSINO:  Yes.

22    J. BRAGA:  Did she ever tell you about

23  anything that you didn't see?

24    JUSTIN COUSINO:  She told me why she

25  was a little afraid.

NATIONAL REPORTING SERVICE

MARTY LESHAW

FT. LAUDERDALE              MIAMI
(305) 467-0600             44 W. FLAGLER ST.
        OFFICIAL COURT REPORTER    (305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY, FLA.

1         J. BRAGA:  What did she tell you?

2         JUSTIN COUSINO:  Because-- because

3   everybody -- everybody gets mad.  She thinks

4   that you will do it to her.

5         J. BRAGA:  Is that what she thinks?

6         JUSTIN COUSINO:  The same thing.

7         J. BRAGA:  Both of us, you mean?

8         JUSTIN COUSINO:  Right.

9         J. BRAGA:  Because last time she was

10  uncomfortable about talking to us, you think

11  that's why?

12        JUSTIN COUSINO:  No, she told me.

13        J. BRAGA:  Did you tell her that you had

14  talked to us?

15        JUSTIN COUSINO:  Yes.

16        J. BRAGA:  What did she say?

17        JUSTIN COUSINO:  That I am scared because

18  I -- I -- I think that she's going to get hurt.

19  That's why.  That's what she said.

20        J. BPAGA:  Do you think that maybe if

21  Brooke comes to visit us, she would listen to

22  you?

23        JUSTIN COUSINO:  Yes, she's coming today.

24  I don't think I will be here if she's here.

25        J. BRAGA:  But do you think you would

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1   help by giving her the feeling, we don't hurt,

2   do we?

3         JUSTIN COUSINO:  Right.

4         J. BRAGA:  Maybe  you could tell her she

5   will begin because all you have told us and

6   other people have told us, she would feel a lot

7   better if she talked.

8         Don't you feel a lot better if she talked?

9         JUSTIN COUSINO:  Uh-huh.

10        (Inaudible).

11        J. BRAGA:  Don't you feel she would, too?

12        JUSTIN COUSINO:  Uh-huh.

13        J. BRAGA:  She's afraid something will

14   happen?

15        JUSTIN COUSINO:  I know and it's no good

16   because it hurts her feelings.  She told me

17   that it will hurt her feelings if you do it to

18   her but I know you won't do it to her.

19        J. BRAGA:  No, no one is going to do it

20   to her.

21        L. BRAGA:  Ever again.

22        J. BRAGA:  Your body is your private body

23   and no one else should touch it.  I think that's

24   why everybody is trying to understand what

25   happened.

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE                                    MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER      44 W. FLAGLER ST.
                                                  (305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        JUSTIN COUSINO:  The reason Frank was doing

2   that is because he wanted to see my thing and

3   he wanted to see how bodies sometimes change,

4   so that's why they did it.

5        J. BRAGA:  Is that what he said to you?

6        JUSTIN COUSINO: Uh-huh.

7        J. BRAGA:  Do you remember how he said it?

8        JUSTIN COUSINO:  In an angry way.

9        J. BRAGA:  In an angry way?

10       JUSTIN COUSINO:  Because --

11       J. BRAGA:  Why (inaudible).

12       JUSTIN COUSINO:  Because I told you.

13       J. BRAGA:  Oh.  Well, that makes a lot of

14  sense to me.  Doesn't that to you?

15       I can understand that.  Do you remember

16  anymore about what is on the video cassette?

17       JUSTIN COUSINO:  No.

18       J. BRAGA:  Other than what you've told

19  us before?

20       JUSTIN COUSINO:  Right.

21       J. BRAGA:  Noel ever tell you anything

22  about the video cassette?

23       JUSTIN COUSINO:  No, I saw but in the

24  ones that he was (inaudible).

25       J. BRAGA:  But he was in some?  He was in

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    some that you didn't see?

2        JUSTIN COUSINO:  Yes.

3        J. BRAGA:  Who told you that?

4        JUSTIN COUSINO:  Because the reasons they

5    wouldn't show me is because they thought I would

6    be a little angry at them.

7        J. BRAGA:  Because Noel was your friend?

8        JUSTIN COUSINO:  Right.

9        J. BRAGA:  Who told you, Noel?

10       JUSTIN COUSINO:  No, Noel's dad, Frank.

11   That's why I never saw any.

12       J. BRAGA:  Want to tell me that again?  I

13   didn't quite understand it.

14       JUSTIN COUSINO:  See, if I told (inaudible).

15   If I (inaudible),  seen one of the movies, he --

16   Frank would get mad at me.

17       J. BRAGA:  I see.

18       JUSTIN COUSINO:  Because and if I talked

19   about them, Frank would get mad at me.  So that's

20   why I am and they would say that you would --

21   you wouldn't like  it and I'd be angry at them.

22   So that's why.

23       J. BRAGA:  I see, well, I guess he certainly

24   want the policeman to know about you.

25       JUSTIN COUSINO:  Right.

---

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE                                          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                OFFICIAL COURT REPORTER                 (305) 373-7295
        CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       J. BRAGA:  You know I am not a policeman.

2  Lori is not a policeman.  We are doctors (inaudible).

3  If anybody is going to be talking, other than --

4       JUSTIN COUSINO:  The other people are police?

5       J. BRAGA:  The first people, yes, but --

6       L. BRAGA:  Do you know Donna?

7       JUSTIN COUSINO:  Yes.

8       L. BRAGA:  (Inaudible).

9       She's real nice.

10       JUSTIN COUSINO:  She's been to my house.

11       L. BRAGA:  Yes.

12       JUSTIN COUSINO:  With Chris.

13       That's why I know Chris.

14       L. BRAGA:  Did you see Ileana and Frank on

15  the TV, on the news?

16       JUSTIN COUSINO:  No -- oh, yes.

17       L. BRAGA:  Yes?

18       Did they look the same on television as when

19  you saw them?

20       JUSTIN COUSINO:  Yes.

21       L. BRAGA:  Because they --

22       JUSTIN COUSINO:  They tell sometimes lies

23  to me.

24       L. BRAGA:  Like what?

25       J. BRAGA:  What kind of lies?

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE                                       MIAMI
(305) 487-0600         OFFICIAL COURT REPORTER     44 W. FLAGLER ST.
                                                (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    JUSTIN COUSINO:   They said that -- they have

2    said they have been on a airplane and they haven't.

3        J. BRAGA:  Uh-huh.

4    JUSTIN COUSINO:   Because they don't have

5    enough money and that's why they told a lie.

6        J. BRAGA:  Did they tell other lies, too?

7    JUSTIN COUSINO:  No.

8        J. BRAGA:  Just that lie?

9    JUSTIN COUSINO:  Yes.  They told other lies

10   but not to me.

11       J. BRAGA:  Oh.

12   JUSTIN COUSINO:  Other kids, when I went

13   there.

14       L. BRAGA:  Do you know what kind of lies

15   that they told to the other kids?

16   JUSTIN COUSINO:  No.

17       L. BRAGA:  Do you know if they ever gave

18   the children -- some of the children sometimes

19   would come home real sleepy.  Did they give the

20   children something?

21   JUSTIN COUSINO:  They gave the children

22   pills that are this big and they cut them up

23   and in real small pieces then they --

24       J. BRAGA:  Do you know what color they

25   were?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1         JUSTIN COUSINO:  They were darkish brown.

2         J. BRAGA:  Darkish brown?

3         JUSTIN COUSINO:  Yes.

4         J. BRAGA:  When you say this big, is that

5  the bottle they were in?

6         JUSTIN COUSINO:  No, in the capsule.  They

7  were this big in a capsule.

8         J. BRAGA:  They opened the capsule inside?

9         JUSTIN COUSINO:  Yes, then they were chopping

10  them up.  Then they put a kind of a poison on them

11  to get them real sleepy and dopey and --

12         L. BRAGA:  When would they do this?

13         JUSTIN COUSINO:  A real long time ago.  When --

14  when I went there.

15         J. BRAGA:  Then how do you know about it?

16         JUSTIN COUSINO:  Because Noel told me.

17         J. BRAGA:  Can you help us by telling us

18  what Noel told you?

19         JUSTIN COUSINO:  Like I don't understand,

20  like what?  Like --

21         J. BRAGA:  Let me give you something to

22  draw.

23         JUSTIN COUSINO:  Okay.

24         J. BRAGA:  Because I can't see inside of

25  your head, right?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE          OFFICIAL COURT REPORTER      MIAMI
(305) 467-0600                                      44 W. FLAGLER ST.
             CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.     (305) 373-7298

1      JUSTIN COUSINO:  Right.

2      J. BRAGA:  Only you can see what is in there.

3  If you can draw me this, this is like a flat form.

4      JUSTIN COUSINO:  Right.

5      J. BRAGA:  If you can, use whatever colors

6  you need.  Draw what pills you know.  What the

7  things they used to cut up looks like (inaudible).

8      JUSTIN COUSINO:  I will make the pills.

9      J. BRAGA:  What color was the pill now?

10      JUSTIN COUSINO:  Let me do it.

11      J. BRAGA:  All the colors are here?

12      JUSTIN COUSINO:  Okay.

13      J. BRAGA:  You've got brown and blue and green

14  and white.

15      L. BRAGA:  Use the color it was.

16      JUSTIN COUSINO:  Around it, around it it had

17  this color.  It was this big now and this color.

18      J. BRAGA:  There's a number of colors,

19  purple, dark purple and yellow.  Then you put

20  brown.  Was it all of those colors, or one?

21      JUSTIN COUSINO:  It was all of them.

22      J. BRAGA:  I think I understand what you

23  mean.  It was like speckled.

24      JUSTIN COUSINO:  Right.

25      J. BRAGA:  And a lot of different colors?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      JUSTIN COUSINO:  Yes.

2      J. BRAGA:  That's the different --

3      JUSTIN COUSINO:  It was brown, yellow.  It

4    was yellow, a slapstick of --

5      J. BRAGA:  It was yellow.  I thought you

6    said brown.

7      JUSTIN COUSINO:  It was yellow, brown.  It

8    was mixed together.  See the brown was on the

9    medicine that put the dopiness in.

10      J. BRAGA:  Did they ever give Jonathan any?

11      JUSTIN COUSINO:  Yes, my brother took

12   them but I threw mine out.

13      L. BRAGA:  What would they tell you when

14   they gave it to you?

15      JUSTIN COUSINO:  They would tell us -- let

16   me think what it would look like.  They were tell-

17   ing us it was candy because they would put some

18   sugar in it and some good tasting stuff in it

19   and little -- it looked like corn candy because

20   all these different colors were in.  They were

21   on either side of the corn candy.  It was

22   inside the corn candy and that's how the pills

23   looked.

24      I will show you how they cut them up.

25      It's kind of hard to draw.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          J. BRAGA:  That's okay, Justin.

2          JUSTIN COUSINO:  They cut it up in little

3     pieces of those.

4          J. BRAGA:  Like that but they were little?

5          JUSTIN COUSINO:  Yes.

6          J. BRAGA:  About this big, the size of my

7     fingernail?

8          JUSTIN COUSINO:  No.

9          J. BRAGA:  Half a size of the fingernail?

10         JUSTIN COUSINO:  Yes, half.  It was a little

11    bigger.

12         J. BRAGA:  This big?

13         JUSTIN COUSINO:  No, it would be this big.

14         J. BRAGA:  How could somebody swallow a

15    pill that size?

16         JUSTIN COUSINO:  Because they would take

17    little pieces.

18         J. BRAGA:  I see, like that?

19         JUSTIN COUSINO:  Yes, cut them up like

20    that.

21         J. BRAGA:  They --

22         JUSTIN COUSINO:  They would take all

23    the colors, put it in there.  They would take

24    these pills.  This is a mold.  They would put

25    the pills in to get these size pills out and I

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                           MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    will show you how the mold goes.

2         (Thereupon, Justin Cousino draws a picture).

3         JUSTIN COUSINO:  That big the mold was.

4         J. BRAGA:  I see.

5         L. BRAGA:  What you are saying --

6         JUSTIN COUSINO:  And they would make them

7    this big.  Then they would -- then they would

8    take it  out and chop it up.

9         J. BRAGA:  What would they use to chop it

10   up?  Do you remember?

11        JUSTIN COUSINO:  Well --

12        J. BRAGA:  Was it like a machine or --

13        JUSTIN COUSINO:  Knife.

14        J. BRAGA:  Knife?

15        L. BRAGA:  What you are saying is they

16   actually were making the pills with something?

17        They were using something to make these

18   pills?

19        JUSTIN COUSINO:  Right.

20        They would put some liquid here, so it would

21   look like -- it would look like a kind of candy.

22        J. BRAGA:  When they put the liquid on it,

23   it would change color?

24        JUSTIN COUSINO:  Right because  it was kind

25   of a dye.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  Did Noel ever tell you about

2    these other times you didn't know about?

3    JUSTIN COUSINO:  No, because they knew --

4    Noel knew that something was going to happen real

5    bad.

6    J. BRAGA:  Did Noel ever explain this,

7    about what happened or did Noel ever (inaudible).

8    He's coming later today.  That's why what

9    you're telling us makes it easier.

10   JUSTIN COUSINO:  See --

11   J. BRAGA:  We are getting your story.

12   JUSTIN COUSINO:  Right.

13   J. BRAGA:  We aren't going to tell Noel your

14   story because we want to make sure Noel tells

15   his story.

16   JUSTIN COUSINO:  Don't tell Noel anybody

17   else's (inaudible).

18   J. BRAGA:  No.

19   JUSTIN COUSINO:  He will feel bad because

20   he things -- just tell a little bit of my story

21   to him because --

22   J. BRAGA:  We're not going to tell him

23   that you said anything to us.  We don't tell

24   any of the children what another child said.

25   This is -- this is private business between

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    your mother and your father and us all and it's

2    (inaudible).

3         JUSTIN COUSINO:  See -- let me think.  Noel,

4    he feels a little bad because he didn't see me

5    in a real long time and when we knew this, it

6    was like three months ago.  That's how he knew

7    this was happening.

8         J. BRAGA:  Did Noel ever talk to you

9    about pills?

10        JUSTIN COUSINO:  No.

11        J. BRAGA:  But I --

12        JUSTIN COUSINO:  I seen the pills.

13        J. BRAGA:  You saw the pills?

14        JUSTIN COUSINO:  But --

15        J. BRAGA:  Did they ever have bags of pills?

16        JUSTIN COUSINO:  No.

17        J. BRAGA:  They just made them up each

18   time?

19        JUSTIN COUSINO:  Right.

20        J. BRAGA:  Let me tell you again, Justin,

21   we are not going to tell any of the children

22   what you told.  We are not going to tell Noel

23   what you told.  That's our business.

24        You don't have to worry about that.

25        L. BRAGA:  It helps us sometimes if you

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     can tell us (inaudible).

2          J. BRAGA:  It's private business between

3.    us and your parents.  Your parents said we can

4     talk to you and you can talk to us but we won't

5     be talking to anybody else.

6          JUSTIN COUSINO:  Like who?

7          J. BRAGA:  Like Noel.

8          JUSTIN COUSINO:  Brooke and Noel.

9          J. BRAGA:  If you wanted Jonathan to talk

10    to us or you wanted Brooke to tell us?

11         JUSTIN COUSINO:  (Inaudible).

12         J. BRAGA:  Okay.

13         JUSTIN COUSINO:  Maybe now.

14         J. BRAGA:  Is Jonathan here with you today?

15         JUSTIN COUSINO:  Yes.

16         No, I mean.

17         J. BRAGA:  He's not here today?

18         JUSTIN COUSINO:  Maybe sometime now

19    (inaudible).

20         J. BRAGA:  Could you in time -- we were

21    talking before you told us about the other

22    children, I'd like to go through it one more

23    time.

24         Can you tell us -- listen to my question

25    carefully now.  Think about any children that

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

224

1    you ever saw on video, movies that were played

2    back that you know who were in it.

3        JUSTIN COUSINO:  David, Brooke and Jonathan

4    and Noel and I have seen one of them.

5        J. BRAGA:  Uh-huh?

6        JUSTIN COUSINO:  And Frank and Ileana.  They

7    were naked, too.

8        J. BRAGA:  Now, that was in the video movies?

9        JUSTIN COUSINO:  Right.

10       J. BRAGA:  Now, let's talk about times

11   when you were there and you saw them playing

12   the games.

13       JUSTIN COUSINO:  I never seen the games

14   before.

15       J. BRAGA:  But when you saw the games, you

16   said you were peeking and you saw.

17       JUSTIN COUSINO:  No.  I -- I never peeked.

18   I just watched it.

19       J. BRAGA:  I see, okay.  All right.

20       JUSTIN COUSINO:  And --

21       J. BRAGA:  Who were the children then?

22       JUSTIN COUSINO:  Ileana and Noel.

23       J. BRAGA:  Ileana and Noel?

24       JUSTIN COUSTINO:  And my brother.

25       J. BRAGA:  And who else?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    JUSTIN COUSINO:  Nobody else.

2    J. BRAGA:  Not Brooke?

3    JUSTIN COUSINO:  No, Brooke was at home

4 that time.

5    J. BRAGA:  What about other days?

6    JUSTIN COUSINO:  Other days, I never seen

7 them other days.

8    L. BRAGA:  You said this happened all the

9 time, every day?

10    JUSTIN COUSINO:  Right, but I never seen

11 them every day.

12    L. BRAGA:  But you know it happened?

13    JUSTIN COUSINO:  (Inaudible).

14    Right, because Noel told me it happened.

15    J. BRAGA:  Where would you be when it was

16 happening?

17    JUSTIN COUSINO:  At -- like I was a little

18 kid.  I was two when it was starting to happen

19 and Noel told me that it was.

20    J. BRAGA:  You were how old?

21    JUSTIN COUSINO:  I mean four.

22    J. BRAGA:  You are five?

23    JUSTIN COUSINO:  No.  I am five last

24 March.  It was my birthday when I was going there.

25    J. BRAGA:  Your birthday is next week, right?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      JUSTIN COUSINO:  Right.  No, it's not

2 next week.  It's March, my birthday.

3      J. BRAGA:  March is your birthday.  You're

4 going to be five and a half in another week, is

5 that it?

6      JUSTIN COUSINO:  Yes.

7      J. BRAGA:  So --

8      JUSTIN COUSINO:  After that, it's going

9 to be -- when it's March I will be six.  And

10 like I told you, Noel is six.

11      They like beat him up, like you -- like

12 you do sometimes to boxing stuff.

13      J. BRAGA:  This --

14      JUSTIN COUSINO:  They beat him real hard.

15      J. BRAGA:  This is pretty important.  I

16 want you to think before you answer this.  This

17 is very important.

18      When we first started talking today --

19      JUSTIN COUSINO:  Yes?

20      J. BRAGA:  -- and I asked you if the games

21 went on all the time or just once or twice --

22      JUSTIN COUSINO:  Right.

23      J. BRAGA:  -- you told me that and whatever

24 you tell me, it doesn't matter.  I just want to

25 make sure whether you changed the story because

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                          MIAMI
(305) 467-0600                                                     44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                              (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    you know what happened or you're guessing or

2    maybe you are having fun a little bit in kidding

3    me a little bit.

4         JUSTIN COUSINO:  Right.

5         J. BRAGA:  In this case, I really have

6    to know because other people might say, "See,

7    he didn't know it was every day.  He just said

8    that."

9         You said it was every day to me.  Now,

10   I'm hearing you say you saw it only once on

11   the movies and once when you were actually

12   there with your own eyes.

13        JUSTIN COUSINO:  Right.

14        J. BRAGA:  I really need to know if you

15   actually saw it happen every day or not when

16   you were there.

17        No pulling --

18        JUSTIN COUSINO:  Only once I saw the games.

19        J. BRAGA:  You actually saw them?

20        JUSTIN COUSINO:  I saw Simon Says.  That's

21   all.

22        L. BRAGA:  You had said before we talked

23   about some other games like the pee pee game.

24        JUSTIN COUSINO:  Yes.

25        L. BRAGA:  And some other games, so let me

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

-- I don't want to make you feel bad, okay?

JUSTIN COUSINO:  Okay.

L. BRAGA:  But because you are more grown up than the other kids, people are going to  listen to you, including us, more than say two year olds because you can talk.

J. BRAGA:  And you are smart.

L. BRAGA:  And you are smart.  I know sometimes you feel comfortable in talking and sometimes not.  So, sometimes you might say something and you will say I am not sure.

I want to talk about it.  I want to know. It's hard but we need to know the true story, what really happened.  We don't want other children to be hurt.

Again, and you can really help to make sure that other children don't get  hurt and it's a lot  to ask of you because you are just a little boy, but you are very smart and very brave.  We have to just ask you really what happened and not kind of say, "Well, this happened.  No, it didn't happen", okay?

JUSTIN COUSINO:  Okay.

J. BRAGA:  We really don't -- we really don't -- otherwise we have to ask you more

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1   questions.  We have to be able to say this is

2   exactly what Justin meant and if you change your

3   mind, we have to know when you change your mind

4   which way is right, which you really meant and

5   which, when we thought about it, maybe it wasn't.

6   We have to know exactly what you know.  We have

7   to know.

8         JUSTIN COUSINO:  I will tell you.

9         J. BRAGA:  What you know?

10        JUSTIN COUSINO:  They did all that and

11   they played with my brother every day, a lot.

12   They just played games and did it to my brother

13   and took video cassettes.  They never -- they

14   never played it with other kids.  Frank and

15   Ileana played it with Jonathan.

16        J. BRAGA:  Now, you told us one time

17   before that they did it with Brooke, too.

18        JUSTIN COUSINO:  They did and David and

19   Todd.

20        L. BRAGA:  Do you remember ever a game

21   anybody telling you or anything about a game

22   in which --

23        J. BRAGA:  I will be back in a minute.

24        JUSTIN COUSINO:  No.

25        L. BRAGA:  You didn't ever hear me finish

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    the question and you said no.

2         JUSTIN COUSINO:  Like what?

3         L. BRAGA:  Like what?

4         You're fooling me a little now?

5         JUSTIN COUSINO:  No.

6         L. BRAGA:  Are you getting uncomfortable

7    with the questions?

8         JUSTIN COUSINO:  No.  I am not fooling

9    you or doing anything.

10        L. BRAGA:  I mean, I would understand if

11   you're getting a little tired of any of these

12   questions.  Are you?

13        JUSTIN COUSINO:  No because you would know

14   because you would ask other people and they would

15   tell and you would know that I'd be telling a

16   lie.

17        L. BRAGA:  Do you ever remember with the

18   time Todd or any of the other children that

19   Frank would play a game, where you put --

20        JUSTIN COUSINO:  No.

21        L. BRAGA:  You said no before I even

22   finished the question.  Why did you say no?

23        JUSTIN COUSINO:  Because I never seen --

24   I never knew.  I never knew because everybody

25   was -- everybody thought that they would get in

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                    MIAMI
(305) 467-0600              44 W. FLAGLER ST.
                            (305) 373-7298
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   a lot of trouble.  They would hurt us, Frank and

2   Ileana.

3       L. BRAGA:  Are you still a little scared

4   about it?

5       JUSTIN COUSINO:  No.

6       L. BRAGA:  Sometimes I kind of feel you

7   don't want to talk about it.

8       JUSTIN COUSINO:  I do.

9       L. BRAGA:  Are you think you want to tell

10  us about it?

11      JUSTIN COUSINO:  Like what?

12      L. BRAGA:  I don't know.  I am asking

13  you things that you would feel better if you

14  told us.

15      JUSTIN COUSINO:  See, Frank and Ileana,

16  they were -- they once touched me.

17      L. BRAGA:  Uh-huh?  Makes you uncomfortable

18  to think about it?

19      JUSTIN COUSINO:  No.  It makes me

20  uncomfortable for them to do it.

21      L. BRAGA:  To do it, yes.  What did you

22  do when they did that?

23      JUSTIN COUSINO:  I just -- I just -- I

24  told my dad and then he and then -- then my

25  mom never knew because my dad never told my mom.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                      MIAMI
(305) 467-0600          OFFICIAL COURT REPORTER          44 W. FLAGLER ST.
                                                          (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      L. BRAGA:  Did your dad believe you when

2  you told him?

3      JUSTIN COUSINO:  Yes.

4      L. BRAGA:  Did you feel better or did you

5  feel worse when you told him?

6      JUSTIN COUSINO:  I felt better.

7      L. BRAGA:  Better?

8      Do you know anything else that you want to

9  tell us?

10      JUSTIN COUSINO:  That they touched my

11  brother and awful lot when they -- when they

12  changed his diaper.  They do it an awful lot.

13      L. BRAGA:  An awful lot?

14      JUSTIN COUSINO:  Yes.

15      L. BRAGA:  What would your brother do when

16  they would do that?

17      JUSTIN COUSINO:  He would do nothing

18  because he wouldn't know what they were doing.

19      L. BRAGA:  Yes.

20      JUSTIN COUSINO:  They -- he wouldn't do

21  anything.

22      So that's why he wouldn't do anything.

23      L. BRAGA:  Did it make you mad they were

24  doing it?

25      JUSTIN COUSINO:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        L. BRAGA:  Did you ever say anything to

2   them?

3        JUSTIN COUSINO:  No.

4        L. BRAGA:  No?

5        JUSTIN COUSINO:  I just was real angry.

6   They've done it to Brooke, Brooke does

7   it with nobody telling her.

8        L. BRAGA:  Really?

9        JUSTIN COUSINO:  Yes.

10        L. BRAGA:  What would they do?

11        JUSTIN COUSINO:  She would take off her

12   clothes.

13        L. BRAGA:  Then what?

14        JUSTIN COUSINO:  Once she did it a lot.

15        L. BRAGA:  Then what after she would take

16   off her clothes?

17        JUSTIN COUSINO:  She would -- she would --

18   she showed her vagina a lot.

19        L. BRAGA:  Uh-huh?

20        Would she touch anybody else?

21        JUSTIN COUSINO:  No.

22        L. BRAGA:  No?

23        JUSTIN COUSINO:  Just Noel.

24        L. BRAGA:  Just Noel?

25        What did they do to Noel?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    JUSTIN COUSINO:  Rub his penis, like I said,

2    about three minutes.

3    L. BRAGA:  Tell me, again, I'm sorry, I

4    don't -- I don't remember you saying it to me.

5    You said that Brooke would -- Brooke would

6    touch Noel's penis or --

7    JUSTIN COUSINO:  No.  She would bite

8    Noel's penis.

9    L. BRAGA:  I remember now, yes, you said

10    that.  Did anybody -- did either Frank or

11    Ileana touch Brooke?

12    JUSTIN COUSINO:  (Pause).

13    L. BRAGA:  Or --

14    JUSTIN COUSINO:  No.

15    L. BRAGA:  Or did Brooke bite anyone?  Did

16    Brooke bite Frank's penis?

17    JUSTIN COUSINO:  No -- oh, once.

18    L. BRAGA:  Once?

19    JUSTIN COUSINO:  Remember when I was using

20    the dolls yesterday?

21    L. BRAGA:  Yes?

22    JUSTIN COUSINO:  That's what I mean, just

23    once.

24    L. BRAGA:  I see.

25    JUSTIN COUSINO:  And twice.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1      L. BRAGA:  Twice?

2      JUSTIN COUSINO:  The reason she does it

3   twice is because she likes to do it.  She likes

4   to see other people's private parts.

5      L. BRAGA:  She does?

6      JUSTIN COUSINO:  Yes.

7      J. BRAGA:  Do you think she thought it

8   felt nice?

9      JUSTIN COUSINO:  Yes.

10      L. BRAGA:  Do you think she liked it when

11   other people were doing that to her?

12      JUSTIN COUSINO:  Some cousins and (inaudible)

13   they -- Jason, he's one of my cousins and he

14   likes to do it a lot to his sister, which is

15   five, her birthday was weeks ago (inaudible).

16      L. BRAGA:  How old is Jason?

17      JUSTIN COUSINO:  He's six.

18      L. BRAGA:  He likes to touch her private

19   parts?

20      JUSTIN COUSINO:  Right.

21      L. BRAGA:  Does she touch his private

22   parts?

23      JUSTIN COUSINO:  No.

24      L. BRAGA:  Any other things you think

25   you'd like to tell me that would make you feel

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          better?

2              JUSTIN COUSINO:  I would like to tell

3      Doctor (inaudible).

4              L. BRAGA:  Would you like it if I would

5      leave and you could  just talk to him?

6              JUSTIN COUSINO:  Yes.

7              L. BRAGA:  Okay, let me go get him.

8              (Thereupon there is a break in the video).

9              J. BRAGA:  Lori said you want to talk to

10     me.

11             JUSTIN COUSINO:  Yes.

12             J. BRAGA:  Okay.

13             JUSTIN COUSINO:  I have some cousins, Jason

14     and (inaudible).

15             Jason likes to touch her private parts.

16             J. BRAGA:  You mean herself?

17             JUSTIN COUSINO:  No, he tries to touch

18     her.

19             J. BRAGA:  Uh-huh.

20             JUSTIN COUSINO:  And I have tried to do

21     it but not a lot.

22             J. BRAGA:  It's okay.

23             JUSTIN COUSINO:  I have tried but I have

24     never succeeded.

25             J. BRAGA:  How does he try and touch her?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                              MIAMI
(305) 467-0600                                                         44 W. FLAGLER ST.
OFFICIAL COURT REPORTER                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     JUSTIN COUSINO:  I never -- I tried but I

2   never succeeded.

3     J. BRAGA:  No, but you said he tries, right?

4     JUSTIN COUSINO:  No, he -- he succeeds.

5     J. BRAGA:  Does he?

6     JUSTIN COUSINO:  Yes, because we wrestle a lot

7   and we like sometimes beat her up or we push her

8   because she's always in our way.

9     J. BRAGA:  Is she bigger or younger?

10     JUSTIN COUSINO:  She's four.  Jason is six.

11   She gets in our way an awful lot, so we have

12   to push her like away.

13     When we like are fighting, she gets in the

14   way and says like you are going to hurt yourself

15   and we are not because I am used to wrestling.

16     J. BRAGA:  Because you are just wrestling?

17     JUSTIN COUSINO:  No, we are not.  We are

18   really wrestling.  We are knocking each other

19   down on our heads real hard.

20     J. BRAGA:  Because you are wrestling?

21     JUSTIN COUSINO:  Uh-huh.

22     J. BRAGA:  She doesn't understand?

23     JUSTIN COUSINO:  We (inaudible) wrestle

24   an awful lot.

25     J. BRAGA:  What does this have to do?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     JUSTIN COUSINO:  The reason she doesn't

2  want us to do it is because girls don't play

3  like that and she wants us to be like girls.

4     J. BRAGA:  (Shaking head yes).

5     JUSTIN COUSINO:  But we play with her a lot.

6     J. BRAGA:  What was it that he succeeded

7  with that you didn't succeed?  Can you explain

8  what you mean?

9     JUSTIN COUSINO:  See, Jason always succeeds

10  with touching her vagina.

11     J. BRAGA:  I see.

12     JUSTIN COUSINO:  She shows it to us.

13     J. BRAGA:  With his hand or penis?

14     JUSTIN COUSINO:  Yes, with his hand and

15  she always shows it an awful lot.

16     J. BRAGA:  Did they -- did they ever go

17  to Frank and Ileana's.  Were they ever around

18  Frank and Ileana's?

19     JUSTIN COUSINO:  No, because they lived in

20  (inaudible).

21     J. BRAGA:  So this is what you are saying,

22  this is just a little bit of what happened at

23  Frank and Ileana's?

24     JUSTIN COUSINO:  Right.  It's a little bit

25  like it.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1  J. BRAGA:  Is that what you wanted to tell

2  me?

3  JUSTIN COUSINO:  Yes, and I would tell you

4  a little more.

5  J. BRAGA:  Sure.

6  JUSTIN COUSINO:  Because, see he does it.

7  He wrestles an awful lot with (inaudible) people

8  and see I am five foot -- feet and I don't care

9  if you beat me up because it doesn't hurt.

10  J. BRAGA:  No, you are very strong.

11  JUSTIN COUSINO:  I punch him an awful lot.

12  J. BRAGA:  You are very strong.

13  JUSTIN COUSINO:  But we laugh if we hurt

14  and knock each other down or hurt each other

15  because we are having a fun time, even though

16  we are not with the girls. We have a fun time.

17  J. BRAGA:  He's a friend, too.  He's not

18  just your cousin; he's a friend?

19  JUSTIN COUSINO:  No, he's my cousin.

20  J. BRAGA:  But cousins can be friends, too.

21  Can't cousins too?

22  JUSTIN COUSINO:  Yes, he's my cousin.

23  Like my brother was talking about -- he always --

24  Jason, he always tries to be a tough guy.  He

25  likes girls and he tried to punch me real hard.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          Jason, I never tried to punch him.  I just

2     tried --

3          J. BRAGA:  You just wrestle, right?

4          JUSTIN COUSINO:  No, he tries to box on me.

5          J. BRAGA:  Instead of wrestling?

6          JUSTIN COUSINO:  Yes.  He punches me right

7     here an awful lot.

8          J. BRAGA:  It doesn't hurt?

9          JUSTIN COUSINO:  No.  It hurts, yes.

10         J. BRAGA:  You can feel it, you know, he

11    did it?

12         JUSTIN COUSINO:  It hurts a lot but, see,

13    Jason he punches me but it doesn't hurt.  He

14    never tried to kill me.  Like Jason does -- he's

15    only two, three and he hits that hard.  Jason

16    never tries to like puncture me.

17         He has fun a lot.

18         J. BRAGA:  You like him, don't you?  Huh?

19    Isn't he neat?

20         JUSTIN COUSINO:  Yes.

21         J. BRAGA:  This is where it makes the

22    noise.

23         JUSTIN COUSINO:  I have a little one that

24    has a (inaudible).

25         J. BRAGA:  With a rock (inaudible).  Why?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                                      MIAMI
(305) 487-0600                                              44 W. FLAGLER ST.
                                                              (305) 373-7295
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1   JUSTIN COUSINO:  It's this big.  Have you

2   ever been to Toys R Us?  One of those toy stores?

3   J. BRAGA:  Sure.

4   JUSTIN COUSINO:  (Inaudible).

5   J. BRAGA:  You know, I saw it once but

6   then they stopped selling them.

7   JUSTIN COUSINO:  They sell a lot.

8   J. BRAGA: Do they still?

9   JUSTIN COUSINO:  I will have to bring it.

10  J. BRAGA:  Toys R Us or Lionel Playworld?

11  JUSTIN COUSINO:  All of them.  I will have

12  to bring mine here and show you.

13  J. BRAGA:  I'd like to see it.  It looks

14  the same but it's smaller and it's got the rocket

15  on the back?

16  JUSTIN COUSINO:  Yes.

17  J. BRAGA:  Does it have a belt on the back,

18  too?

19  JUSTIN COUSINO:  Yes.

20  J. BRAGA:  The belt will come off.  It's

21  hard to put back on.

22  JUSTIN COUSINO:  I took it off when I first

23  came.  I took it off and it was kind of hard to

24  put back on.

25  J. BRAGA:  Put back on?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      JUSTIN COUSINO:  I know because it's real

2  small.

3      J. BRAGA:  He's got a thin waist.  I like

4  it because all the parts bend.  You can put them

5  in different positions.

6      JUSTIN COUSINO:  I have one like this but

7  his knees don't bend and his waist bends.

8      J. BRAGA:  Does this?  Yes, it does.

9      JUSTIN COUSINO:  No, I mean this part.

10     J. BRAGA:  Right there?

11     JUSTIN COUSINO:  Yes.

12     J. BRAGA:  Let me see the front of it.  Turn

13 around.

14     JUSTIN COUSINO:  It has stickers.  It's not

15 that (inaudible).

16     J. BRAGA:  So parts like this would come

17 off probably, right?

18     JUSTIN COUSINO:  No, it doesn't have stickers.

19 It's painted.  I have a real good one.

20     J. BRAGA:  I remember the movie, he was

21 the one that came into (inaudible).

22     He's a bounty hunter.

23     JUSTIN COUSINO:  Right, he's wearing a

24 Darth Vader suit.  See, in the movie, he -- you

25 remember when he threw up (inaudible).

---

**NATIONAL REPORTING SERVICE**
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0400

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1       J. BRAGA:  Yes, I sure do.

2       JUSTIN COUSINO:  And he wasn't to see what

3  happened?

4       J. BRAGA:  He was supposed to take him to

5  (inaudible).

6       JUSTIN COUSINO:  (Inaudible).

7       J. BRAGA:  Wasn't he gross?

8       JUSTIN COUSINO:  He was eating mice.

9       J. BRAGA:  Yuk, gross.

10       JUSTIN COUSINO:  Eating frogs.

11       J. BRAGA:  Eating frogs, yes, I remember

12  that and (inaudible).  What did they freeze him?

13       JUSTIN COUSINO:  They froze him in kind of

14  a gas.

15       J. BRAGA:  It looks like he was in a block

16  like.

17       THE COURT:  We will have a break, no more

18  than ten minutes.  Thank you.

19       (Thereupon, the court at 4:30 p.m. took

20  a short break and subsequently the video was

21  continued).

22       JUSTIN COUSINO:  It was kind of a gas.  It

23  was kind of slime.

24       J. BRAGA:  (Inaudible).

25       JUSTIN COUSINO:  I have had -- I have one

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1     one of those things that (inaudible).  They grow

2     and turn this big.

3         J. BRAGA:  Expand, yes.

4         JUSTIN COUSINO:  And comes so slimy, I had

5     to throw it out.  I got some (inaudible).

6         J. BRAGA:  Yuk.

7         JUSTIN COUSINO:  I ate real mice.  One of

8     Brian's friends.  That's one of my friends, they

9     ate guts of a fish, eyeballs, seaweed.

10         J. BRAGY:  Yucky, yucky.  Must taste awful.

11         JUSTIN COUSINO:  Tasted good to them.

12         J. BRAGA:  Is that what they said?

13         JUSTIN COUSINO:  Some people can't live

14     with that kind of food.

15         J. BRAGA:  I would rather not, if I had

16     my choice.

17         JUSTIN COUSINO:  See, he's Japanese and

18     lots of Japanese people eat those things and

19     sometimes people can't live with some of these

20     things.

21         J. BRAGA:  That's what they're used to.

22         JUSTIN COUSINO:  Right.

23         J. BRAGA:  If you go to (inaudible).

24     Do you know what (inaudible) is?

25         JUSTIN COUSINO:  Yes.

NATIONAL REPORTING SERVICE
MARTY LESHAW

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    J. BRAGA:  They like raw fish.

2    JUSTIN COUSINO:  Yuck.

3    J. BRAGA:  Do you like it?

4    JUSTIN COUSINO:  Yes.

5    J. BRAGA:  They have a name for it, they

6    call it sushi.  So anytime anybody says, "No,

7    thank you, I know what that is."

8    See, when they're little they grow up and

9    they like it and if you live in a different

10    country and you grow up with different foods,

11    then it seems natural to you to eat those foods.

12    JUSTIN COUSINO:  I have tasted ice cream

13    and I put like -- I would put scallops --

14    J. BRAGA: Do you like scallops?

15    JUSTIN COUSINO:  Yes.

16    J. BRAGA: How do you like your scallops?

17    JUSTIN COUSINO:  I like barbecued scallops.

18    J. BRAGA:  Ever eat claps?

19    JUSTIN COUSINO:  Claps?  I have tasted them

20    but --

21    J. BRAGA:  Have you ever eaten deviled crab?

22    JUSTIN COUSINO:  Yes, once it had like

23    a lot of breadcrumbs on top.  No, for barbecue you

24    have to put meat around it and you have to put

25    a kind of a mixed -- you have to put kind of a

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE
(305) 467-0600
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    (inaudible) on it and you put barbecue sauce on

2    the meat and --

3        J. BRAGA:  On the ice cream?

4        JUSTIN COUSINO:  No, you put it on the

5    scallops and then put it on the ice cream on it

6    and barbecue it.

7        J. BRAGA:  Who does it?

8        JUSTIN COUSINO:  My dad.  He once had it.

9    He once tasted raw octopus and raw squid.

10       J. BRAGA:  Wait a minute.  Now sometimes

11   people will take octopus and squid for fish and

12   they call it (inaudible).

13       JUSTIN COUSINO:  You know how you kill it?

14   You bite it between their eyes and guts.

15       J. BRAGA:  Yuck.  That's gross.

16       JUSTIN COUSINO:  That's how you kill it.

17       J. BRAGA:  I am not going to kill any that

18   way.

19       JUSTIN COUSINO:  Or you could bite him on

20   his -- bite him inside his butt.  That's the

21   only way you kill them.

22       J. BRAGA:  Who showed you that?

23       JUSTIN COUSINO:  I have seen it on a fish

24   show, yes.

25       J. BRAGA:  On TV?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER              MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1          JUSTIN COUSINO:  Yes, Jack Cousteau.

2          J. BRAGA:  Yes, all the men on the ship?

3          JUSTIN COUSINO:  Yes.

4          J. BRAGA:  That's what they're talking about.

5          JUSTIN COUSINO:  Yes.

6          They were biting between the eyes or you could

7    bite them on the stomach or in their head.  That's

8    what kills them.

9          J. BRAGA:  That's squid or octopus?

10         JUSTIN COUSINO:  Octopus, to kill squid you

11   would put them in a refrigerator, a real cold

12   refrigerator.

13         J. BRAGA:  I saw Jack Cousteau but they

14   had dolphins on it.

15         JUSTIN COUSINO:  Yes, I saw that.

16         J. BRAGA:  Wasn't it neat?

17         They jump out of the water and have men

18   hold on to them.

19         JUSTIN COUSINO:  I rode on a shark before.

20         J. BRAGA:  When was that?

21         JUSTIN COUSINO:  I go fishing a lot and I

22   rode on a whale and a shark.

23         J. BRAGA:  Did you go to Seaquarium?

24         JUSTIN COUSINO:  Yes.

25         J. BRAGA:  Did you see the killer whale?

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1         JUSTIN COUSINO:  Yes, I touched it.

2         J. BRAGA:  That must be something.  You

3 weren't afraid?

4         JUSTIN COUSINO:  No.

5         J. BRAGA:  They let you touch the head?

6         JUSTIN COUSINO:  No, they let me touch the

7 nose.

8         J. BRAGA:  Yes?

9         JUSTIN COUSINO:  They let me feed them.

10         J. BRAGA:  They're nice.  They're black and

11 white?

12         JUSTIN COUSINO:  I know.

13         J. BRAGA:  They're nice.  They say they call

14 them killer whales and --

15         JUSTIN COUSINO:  But they don't like whales,

16 other whales.

17         J. BRAGA:  That's why they call them killer

18 whales.

19         JUSTIN COUSINO:  (Inaudible).  Yes.

20         J. BRAGA:  They don't like dolphins, do

21 they?

22         JUSTIN COUSINO:  See the dolphins could

23 kill whales and killer whales --

24         J. BRAGA:  They hit them with their nose,

25 don't they, to protect their young?  When I saw

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    Jack Cousteau, it was really neat.  They got on

2    back of the dolphins and held on to the flipper

3    and they went swimming with them and (inaudible).

4         JUSTIN COUSINO:  They don't go like sharks.

5         J. BRAGA:  No.

6         JUSTIN COUSINO:  I have -- I have fed one

7    of those killer whales at the Miami Seaquarium.

8    I fed him.

9         J. BRAGA:  Did you really?  What did they

10   eat, fish or --

11        JUSTIN COUSINO:  They ate shark.

12        J. BRAGA:  Shark meat?

13        JUSTIN COUSINO:  Yes.

14        J. BRAGA:  I like the Seaquarium.  That

15   was nice.  You could see the fishes behind the

16   glass and all.

17        JUSTIN COUSINO:  You know something, have

18   you seen the movie Jaws?

19        J. BRAGA:  Yes.  I saw Jaws III, I didn't

20   see Jaws I, and I didn't see Jaws I, somebody

21   said (inaudible).

22        JUSTIN COUSINO:  How come Jaws I was good?

23        J. BRAGA:  They said because everything

24   looked real but in Jaws III, everything looked

25   silly and makebelieve and phony to me.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    When they said, "Here's a shark", you could

2    tell they weren't photographing a real shark but

3    in Jaws, the sharks they use machines and they

4    look real.

5         JUSTIN COUSINO:  I seen Jaws II.

6         J. BRAGA:  Did it look real?

7         JUSTIN COUSINO:  It looked real good, you

8    know, how it looked.  See, in the beginning there

9    was lots of people and there's this scientist

10   which made a kind of (inaudible).  And it --

11   (inaudible) turned to a fish and rolled it out

12   in the sea and it got real big and learned by

13   the great, great, great white.

14        J. BRAGA:  Uh-huh?

15        JUSTIN COUSINO:  And it got real strong

16   and then it killed people.

17        J. BRAGA:  Oh, boy, it looked real.  It

18   didn't look like fake.

19        JUSTIN COUSINO:  No, how was the movie Jaws?

20        J. BRAGA:  It looked fake.  Sometimes when

21   they make a movie, you look at it and you know

22   it's a machine or it's fake (inaudible).  Real

23   sharks just don't move.  They go boom, right?

24        JUSTIN COUSINO:  In the movie it wasn't

25   (inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      J. BRAGA:  It looked like a machine doing it,

2  not a real shark.

3      JUSTIN COUSINO:  Here's how Jaws ate.

4      J. BRAGA:  You could see  blood coming out

5  the side and all and it looked real.

6      JUSTIN COUSINO:  Right.

7      J. BRAGA:  Not fake.

8      JUSTIN COUSINO:  Yes, that's what I thought.

9      J. BRAGA:  You mean like Jaws was sucking

10  people down the people down in the water?

11      JUSTIN COUSINO:  Sucking people down in the

12  water.

13      J. BRAGA:  You could tell?

14      JUSTIN COUSINO:  (Inaudible).

15      It was sucking things down in the water, in

16  Jaws III.

17      J. BRAGA:  Sure.

18      JUSTIN COUSINO:  I seen Jaws I.

19      J. BRAGA:  That was -- it didn't look phony,

20  even though it wasn't real?

21      JUSTIN COUSINO:  It was at Noel's house.

22  He was sucking things down.  Jaws really could

23  suck the people down.

24      J. BRAGA:  It made it look real.

25      JUSTIN COUSINO:  Because Jaws is a real killer

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    shark.

2         J. BRAGA:  Well, listen, by the way, did

3    Frank every use that movie to scare anybody?

4         JUSTIN COUSINO:  No.

5         J. BRAGA:  I was just wondering about that

6    and you saw it?

7         JUSTIN COUSINO:  Yes, I seen Jason (inaudible).

8    I seen part two, part three.  I seen part four.

9         J. BRAGA:  Who showed you those?

10        JUSTIN COUSINO:  I was at Frank and Ileana's.

11   They don't scare me.  They just let me watch it

12   because -- because they -- they like to entertain

13   the kids, let them play games like that.

14        J. BRAGA:  So that's where you saw it, there?

15        JUSTIN COUSINO:  Right.

16        J. BRAGA:  And Noel watched it, too?  Right?

17        JUSTIN COUSINO:  Right.

18        See, girls, Brooke she didn't want to watch

19   it.  I seen the (inaudible).  That's a movie.

20        J. BRAGA:  I don't think I saw it.

21        JUSTIN COUSINO:  It's a movie.

22        J. BRAGA:  What's it about?

23        JUSTIN COUSINO:  It's on HBO, that's why

24   you haven't seen it.

25        J. BRAGA:  I don't have HBO.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    JUSTIN COUSINO:  Somebody who made some

2    tar and turned it to a monster and they let it

3    loose and he got real black eyed and he turned

4    into Dracula and black tar and he could turn to

5    tar people.  It was kind of a Dracula.

6        J. BRAGA:  Did it scare the girls?

7        JUSTIN COUSINO:  Oh, yes, when he killed

8    people everybody jumped back but I didn't.

9        J. BRAGA:  What did the mask that Frank and

10   Ileana to scare the people with, look like?

11       JUSTIN COUSINO:  Just get into their,

12   just costumes and they would get in the black

13   tar.

14       J. BRAGA:  So like the movies?

15       JUSTIN COUSINO:  They would like scare me

16   with uniforms of (inaudible).  They would scare

17   me.

18       J. BRAGA:  (Inaudible).

19       Voice like a machine, doesn't he?

20       JUSTIN COUSINO:  He goes --

21       J. BRAGA:  I remember, yes, like a machine.

22       JUSTIN COUSINO:  Did you see Jeteye?

23       J. BRAGA:  Yes.

24       JUSTIN COUSINO:  That was good.

25       J. BRAGA:  That was super.

**NATIONAL REPORTING SERVICE**
**MARTY LESHAW**
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1        JUSTIN COUSINO:  When it was sword fighting?

2        J. BRAGA:  Like --

3        JUSTIN COUSINO:  Yes, I have that book.

4        J. BRAGA:  Do you?

5        JUSTIN COUSINO:  Yes.

6        J. BRAGA:  Were you surprised to find out

7  when Darth Vader said that Luke was his son?

8        JUSTIN COUSINO:  I knew it all the time.

9        J. BRAGA:  Did you?  I didn't.  I was

10  surprised.  You had already figured that out?

11        JUSTIN COUSINO:  Didn't you like it when

12  Luke -- Darth Vader was tumbling down the stairs

13  and being dumped?

14        J. BRAGA:  Yes, he sure was.

15        JUSTIN COUSINO:  Being dumped?

16        J. BRAGA:  Did you see the Return of the

17  Jeteye?  The last one?

18        JUSTIN COUSINO:  Yes.

19        J. BRAGA:  It turned out that Darth Vader

20  didn't want anything to happen to his son.

21        JUSTIN COUSINO:  The empire that was one

22  that was trying to control, see, Luke's father

23  was -- Luke's father was once (inaudible).

24        J. BRAGA:  Are you sure?  I thought he

25  was a Jeteye knight.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                                        MIAMI
(305) 467-0600              OFFICIAL COURT REPORTER         44 W. FLAGLER ST.
                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    JUSTIN COUSINO:  He was a Jeteye knight.

2    See that was (inaudible).  That's who was

3    Darth Vader.

4        J. BRAGA:  No, he knew.

5    JUSTIN COUSINO:  No, that was -- there's

6    two Darth Vaders.  There's one -- one that he

7    killed and fell down the crumbling stairs.

8        J. BRAGA:  Uh-huh?

9    JUSTIN COUSINO:  You know that other pit

10   where the other Darth Vader fell down and thought

11   it was Luke's father?

12       J. BRAGA:  Uh-huh?

13   JUSTIN COUSINO:  But the one that Luke killed,

14   you know, the one that she was falling down the

15   stairs, he was the real bad one.  He was the

16   emperor.

17       J. BRAGA:  Do you know who that is?

18   JUSTIN COUSINO:  Yoda.

19       J. BRAGA:  Didn't you like him?

20   JUSTIN COUSINO:  Do you like -- let me

21   think.  This is a real funny creature.  Let me

22   think.  He's (inaudible).

23       J. BRAGA:  Come in.

24       L. BRAGA:  Hi, it's me.

25       J. BRAGA:  Hi, come in.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE
(305) 467-0600
OFFICIAL COURT REPORTER
MIAMI
44 W. FLAGLER ST.
(305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        Do you remember the guy that was (inaudible).

2    He was the guy that looked like the snake was

3    around his neck.

4        JUSTIN COUSINO:  Yes.

5        J. BRAGA:  I like Yoda best of all.

6        L. BRAGA:  I wanted to know how soon you

7    were going to be talking.

8        J. BRAGA:  We're going to be talking all

9    the time.

10        L. BRAGA:  (Inaudible).

11        We need to talk to Chris first and then later

12    after that we wanted to (inaudible).

13        Would you be willing to do that?  Why don't

14    you and I talk to Chris?

15        J. BRAGA:  Okay.

16        Then you would (inaudible).

17        (Thereupon this is the end of the video

18    of Justin Cousino, August 13, 1984).

19        THE COURT:  Because of the hour of the day,

20    I don't want to start another one. Unfortunately,

21    we don't know how long these tapes go.

22        Rather than start one, stop in the middle

23    which I don't like to do, I'd rather stop then

24    for the weekend and let you go back and have

25    you enjoy the weekend and start next week.  It's

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    a lot better than having you sit here and stop

2    in the middle.

3        Please don't discuss the case amongst yourselves

4    or with anybody else and have a pleasant weekend,

5    as possible.  We will see you all next week, okay?

6    Thank you.

7        (Thereupon, the jury leaves the courtroom).

8        THE COURT:  All right, anything further?

9        MR. SAMEK:  No, Judge, other than there

10    is nothing we can do about it and I don't know

11    that it's so terrible, but I am sure the jury heard,

12    I think it was Bill they weren't coming back until

13    Wednesday.

14        THE COURT:  Anyway, we will see you all

15    Wednesday morning at eight o'clock.

16        MR. HOGAN:  Yes, sure.

17        THE COURT:  We will pick up the next tape.

18    Who is keeping those tapes?  See that you are

19    here a little bit before eight.

20        THE CLERK:  I will tell them they have to

21    be here early.

22        THE COURT:  As long as you make those

23    arrangements, fine.   Thank you all.

24        (Thereupon, the court was adjourned at

25    5:05 p.m.).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1

2

3          <u>CERTIFICATE OF REPORTER</u>

4    STATE OF FLORIDA   )

5    COUNTY OF DADE     )

6

7          I, LYNN LENFESTEY, Court Reporter and Notary

8    Public, do hereby certify that I reported in shorthand

9    the foregoing trial in the above-mentioned cause before

10   the HONORABLE ROBERT E. NEWMAN, Judge of the above-

11   mentioned Court, at the time and place hereinabove

12   stated and that the foregoing pages, numbered from 1

13   through 257, inclusive, constitue a true and correct

14   record thereof.

15         I FURTHER CERTIFY that I am not of counsel, I

16   am not related to nor employed by any attorney to this

17   cause; and I am not financially interested in the

18   outcome thereof.

19         WITNESS MY HAND AND OFFICIAL SEAL this

20   day of January, 1986, at Miami, Dade County, Florida.

21

22                                 LYNN LENFESTEY, Court Reporter

23

24

25   LL:mbj

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1
2
3
4
5

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR DADE COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO.  84-19728

6    STATE OF FLORIDA,

7            Plaintiff(s),

8    vs.

9    FRANCISCO FUSTER ESCALONA,
     A/K/A FRANK FUSTER,
10

11           Defendant(s).
     _____/

12

13

14

15           Transcript of proceedings had before The Honorable

16   Robert Newman, Judge of the above-mentioned Court, Metro

17   Justice Building, Miami, Florida, held on the 18th day of

18   September, 1985, commencing at or about 8:45 a.m., taken

19   before Lynn Lenfestey, Court Reporter and Notary Public in

20   and for the State of Florida at Large.

21

22                          — — —

23

24

25

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

2

APPEARANCES:

     DANIEL A. CASEY, ESQ.
     JOHN HOGAN, ESQ.
     RICHARD SHIFFRIN, ESQ.
     Assistant State Attorneys
     State Attorney's Office
     Miami, Florida
     On behalf of the Plaintiff

     SAMEK & BESSER
     BY:  JEFFREY SAMEK, ESQ.
     1925 Brickell Avenue
     Suite D207
     Miami, Florida  33129
     On behalf of the Defendant

               – – –

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

I N D E X

                                                          Page

Video of Justin Cousino and Brooke Toby              5
        Exhibit K.   8/13/84


Video of Noel Fuster                                 46
        Exhibit L    8/14/84


Video of Noel Fuster                                 125
        Exhibit M    8/14/84


Video of Stacy Leininger                             169
        Exhibit N    8/14/84


Video of David Messeroll                             184
        Exhibit O    8/14/84

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    MR. HOGAN:  My understanding is that this

2    evening after court, we will continue with the

3    deposition of Ileana Fuster.

4    MR. SAMEK:  Yes.

5    MR. HOGAN:  After having talked to both

6    lawyers and doctors, they indicate that it's

7    important that we finish it.

8    MR. SAMEK:  Judge, I think you indicated

9    four o'clock?

10   THE COURT:  I will break at the hour that

11   you all suggest.

12   MR. SAMEK:  Yes.

13   THE COURT:  That's my understanding.

14   MR. SAMEK:  Yes.

15   THE COURT:  Tomorrow we will start early

16   and go to the nighttime, take them out to dinner.

17   I already discussed this with Bill.  Bring them

18   back, give them an hour and a half and go at

19   least to ten o'clock tomorrow night and Friday

20   play it by ear.

21   If necessary the same thing and I would

22   like to finish the tapes by Friday night, if

23   possible, if not, do it Saturday morning.

24   MR. SAMEK:  Fine.

25   THE COURT:  We will finish the tapes this

```
1    week.

2            MR. SAMEK:  Can I act upon that and tell

3    my out of town witnesses they should be here

4    for Monday morning?

5            THE COURT:  Let me wait and see and tell

6    you Sunday.  Let's see where we are, is all I'm

7    saying.

8            MR. HOGAN:  Fine.

9            I hate to go back on my word.

10           Good morning, sir.

11           MR. FUSTER:  Good morning.

12           THE COURT:  Please bring in the jury.

13           (Thereupon, the jury entered the courtroom.)

14           THE COURT:  Good morning.

15           THE JURORS:  Good morning.

16           THE COURT:  Both sides can see the presence

17    of the jury?

18           MR. SAMEK:  Yes.

19           MR. HOGAN:  Yes.

20           THE COURT:  Please be seated, sorry about

21    the delay but outside in that real world, there's

22    accidents all over the place.  Everyone was there.

23           I understand there are some tennis players

24    among you and I challenge you either singles

25    or doubles when this case is over.  With that
```

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1       thought in mind, defense ready to proceed?

2               MR. SAMEK:  Yes, I ask that Defense Exhibit

3       K, August 13th, Justin Cousino.

4               THE COURT:  Please, if you will.

5               (Thereupon, the following is taken from

6       a video.)

7               BROOKE TOBY:  Teach me how to spell these.

8       I am writing pink.

9               L. BRAGA:  That's pretty.  You have pink

10      on your dress.

11              BROOKE TOBY:  Right here, right here.

12      (Inaudible)

13              J. BRAGA:  Hi, Brooke.

14              Justin, can you make (Inaudible).

15              J. BRAGA:  Brooke Toby, that's your name,

16      right?

17              BROOKE TOBY:  Lee Toby.

18              L. BRAGA:  That's a pretty name.

19              J. BRAGA:  Luck, luck, don't let anybody

20      steal your luck.  Is that L-U-X, L-U-K?

21              L. BRAGA:  I think that's supposed to be

22      a K.

23              J. BRAGA:  L-U-K.  I don't know what luk

24      is, maybe we made up a new word, huh?

25              You remember the guy you told me about that

has  a  snake  around  his  head?  Can  you  draw  me
a picture of that?

JUSTIN COUSINO:  Yes.

J. BRAGA:  Maybe we will call him luk.

JUSTIN COUSINO:  I don't know what his name
is but I know that's Luke.

J. BRAGA:  Oh Luke.  L-U-K-E.  That's what
you are spelling.  You need to add an E to it.
That's what it is, Luke.  L-U-K-E.

JUSTIN COUSINO:  L-U --

J. BRAGA:  U.

JUSTIN COUSINO:  K.

J. BRAGA:  K.

JUSTIN COUSINO:  Let me do it.  K and --

J. BRAGA:  Now an E.

JUSTIN COUSINO:  K-E.

J. BRAGA:  Laurie has long hair.  Now she's
got it up on top of her head.

L. BRAGA:  Did your mommy tell you why we
wanted you to come back today?

BROOKE TOBY:  Why?

L. BRAGA:  Why?  Because we thought maybe
you know the questions we were asking you when
you were here before, about what happened when
you went to Frank and Ileana's house and you

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1   were just a little bit uncomfortable talking

2   to us.

3       We thought maybe if Justin talked to us,

4   maybe if Justin talked to us, maybe you would

5   feel better about talking to us and Justin said

6   maybe the reason you were afraid to talk to us

7   is because maybe you thought maybe we were like

8   Frank and Ileana.

9       J. BRAGA:  We won't hurt you.

10      L. BRAGA:  We won't hurt you ((Inaudible).

11      JUSTIN COUSINO:  Brooke, if you don't tell

12  them, other people -- other people will do it

13  to other kids and it won't be fun.

14      J. BRAGA:  Do you think that maybe if you

15  told her how we felt about her, maybe if we leave

16  and maybe if you explain it to Brooke because

17  with us around, it's a little bit difficult.

18      L. BRAGA:  We will be back in a minute.

19      JUSTIN COUSINO:  Okay.  Now Brooke why -- why

20  were you scared?

21      BROOKE TOBY:  I was not.

22      JUSTIN COUSINO:  But --

23      BROOKE TOBY:  But I am not scared of

24  (Inaudible).

25      JUSTIN COUSINO:  How come you were scared

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       to talk to them?

2               BROOKE TOBY:  How come you --

3               JUSTIN COUSINO:  Brooke, they are not going

4       to do anything to you.

5               BROOKE   TOBY:    I   know,   but   how   come

6       (Inaudible).  Stephanie is right behind me.

7               JUSTIN COUSINO:  Let me tell you something,

8       Brooke,  and  don't  talk  to  me.   I  have  to  talk

9       to you.

10              Brooke  now  --  Brooke,  we  are  not  going  to

11      do   anything   bad   to   you.    It's  --  it's   just

12      that  --  why   were   you   scared?   I  --  they   told

13      me that you were scared.  Why were you?

14              BROOKE TOBY:  I (Inaudible).

15              JUSTIN   COUSINO:   Brooke,   you   are   telling

16      me a lie, a lie, a lie.  Okay?

17              BROOKE TOBY:  Okay, but --

18              JUSTIN COUSINO:  Tell me the truth.

19              BROOKE TOBY:  See this.

20              JUSTIN COUSINO:  Tell me the truth.

21              BROOKE   TOBY:   When   my   mom   comes   back,   I

22      have to -- I have to talk to my mommy and I have

23      to tell her what does (Inaudible) say?

24              JUSTIN COUSINO:  Let me go and get Dr. Joe.

25              JUSTIN   COUSINO:   She   doesn't   want   to   talk

about it.

J. BRAGA:  Well, I can understand that.

BROOKE TOBY:  I don't know what the say.

J. BRAGA:  That's his baby and --

BROOKE TOBY:  I can write baby.

J. BRAGA:  Yes, A-E-Z-Y-E.  I don't know what it means but --

JUSTIN COUSINO:  Babies.

J. BRAGA:  Babies?  But they're letters.

L. BRAGA:  Do you know what I was wondering? If maybe you don't feel like talking, maybe you could draw a picture.

BROOKE TOBY:  (Inaudible).

L. BRAGA:  Could you draw a picture for us?

BROOKE TOBY:  I am writing.

L. BRAGA:  Are you writing now?

BROOKE TOBY:  After this I am writing a picture.

L. BRAGA:  Could you draw a picture after you finish writing?

J. BRAGA:  Would you draw your mommy a picture of what happened at Frank's and Ileana's?

BROOKE TOBY:  (Inaudible).

J. BRAGA:  Could you write some words about

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7293

1   what   happened -- letters   about   what   happened

2   at Frank and Ileana's?

3          JUSTIN COUSINO:   Or do you want to -- Brooke,

4   why were you scared?

5          Brooke told me that she wasn't scared and

6   I know she's telling a lie.

7          J. BRAGA:   You   mean   by   not   being   scared

8   you   mean   that   maybe   she's   scared   because   she

9   thinks we might hurt her?

10          JUSTIN COUSINO:   Right.

11          J. BRAGA:   But   you   have   known   us   now   for

12   over   a   week.   We   haven't   hurt   you.   We   wouldn't

13   hurt you, would we?

14          JUSTIN COUSINO:   No.

15          J. BRAGA:   We   won't   hurt   Brooke   either,

16   if she (Inaudible).

17          JUSTIN COUSINO:   Brooke,   if   you   don't   tell

18   them   what   they   did,   what   Frank   and   Ileana   did,

19   it will happen to other children.

20          L. BRAGA:   I   will   tell   you   what,   let's   see.

21   Do you know how to make a puppet work?

22          JUSTIN COUSINO:   I do.

23          L. BRAGA:   Do you?

24          JUSTIN COUSINO:   Where is Dr. Seuss?

25          J. BRAGA:   In this bag.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1              L. BRAGA: Maybe the puppet could tell the

2      story.

3              JUSTIN COUSINO: Oh, yes.

4              L. BRAGA: Sometimes the puppet --

5              J. BRAGA: Why don't you come over here,

6      Justin, so you can help.

7              L. BRAGA: Do you know how the puppet works?

8              BROOKE TOBY: (Inaudible).

9              J. BRAGA: (Inaudible). We are not going

10     to push her.

11            JUSTIN COUSINO: How does this work, Dr.

12     Seuss?

13            J. BRAGA: A finger in here and a finger

14     in here, two fingers up through the middle and

15     put your thumb in one and thumb in the other.

16          We could give Brooke a puppet too, she can

17     take Donald Duck.

18            L. BRAGA: Do you like Donald Duck?

19            BROOKE TOBY: I am writing.

20            JUSTIN COUSINO: What is that?

21            L. BRAGA: This is like a funny looking

22     bird. Do you want to put your hand in there

23     and use him?

24            JUSTIN COUSINO: (Inaudible).

25            L. BRAGA: I think there's another one,

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      just like him, reindeer.

2          J. BRAGA:  He's neat, isn't he?

3          L. BRAGA:  My name is funny bird.

4          JUSTIN COUSINO:  Oh, I have seen those birds.

5          J.  BRAGA:  There's  another  one,  just  like

6      that.

7          JUSTIN  COUSINO:  Brooke,  do  you  want  to

8      use  Mickey  Mouse -- Minnie  Mouse?  Yes,  this

9      is -- yes.

10          BROOKE TOBY:  But (Inaudible).

11          JUSTIN COUSINO:  There's a cat, Garfield.

12          L. BRAGA:  But what --

13          BROOKE  TOBY:  Guess  what  I've  got?  I've

14      already got a  Snow White record.

15          L. BRAGA:  You do?

16          J. BRAGA:  (Inaudible).

17          JUSTIN  COUSINO:  Yes,  I  will  put  both  of

18      them on.

19          BROOKE TOBY:  (Inaudible).

20          L.  BRAGA:  Did  you  ever  spend  the  night

21      at Frank and Ileana's house?

22          BROOKE TOBY:  (Affirmative nod.)

23          L.  BRAGA:  Can  you  tell  us  about  what  you

24      did when you spent the night?

25          BROOKE TOBY:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                         44 W. FLAGLER ST.
                                                       (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    JUSTIN COUSINO:  She went in the pool.

2    L.  BRAGA:  Did  you  go  in  the  pool?   Did

3    they have a pool?

4    BROOKE TOBY:  A  jacuzzi  and  a  little  pool

5    (Inaudible).

6    JUSTIN  COUSINO:   She's  lying.   They  really

7    have a little pool they put hot water in.

8    BROOKE TOBY:  I know, but there's a jacuzzi.

9    J.  BRAGA:  A  jacuzzi  that  makes  water  go

10   around?

11   BROOKE TOBY:  (Inaudible).

12   JUSTIN COUSINO:  Huh-uh.  They are in prison.

13   They are not (Inaudible).

14   BROOKE  TOBY:   I  know,  there's  two  little

15   pools.

16   J. BRAGA:  Two little pools?

17   JUSTIN  COUSINO:   You  mean  the  one  by  my

18   house and the one by your house?

19   BROOKE TOBY:  No because the one at my house,

20   I've  got  a  jacuzzi  and  another  pool  and

21   (Inaudible).

22   J.  BRAGA:  We  don't  know  if  maybe  since

23   Brooke  doesn't  want  to  talk  herself,  maybe  the

24   puppet could talk for her.

25   L.  BRAGA:   Do  you  think  the  puppet  might

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                      44 W. FLAGLER ST.
                                                                    (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    tell us like -- tell us some yucky secrets?

2         J. BRAGA:  Brooke?

3         JUSTIN COUSINO:  I will talk about it.

4         J. BRAGA:  Could we talk after you write?

5         BROOKE TOBY:  (Affirmative nod.)

6         J. BRAGA:  Okay, after you write, you will

7    tell us about what happened at Frank and Ileana's?

8         BROOKE TOBY:  (Inaudible).

9         L. BRAGA:  Yes, okay.  Want the puppet to

10   tell one another?

11        JUSTIN COUSINO:  No.

12        L. BRAGA:  Just all about yourself?

13        J. BRAGA:  Let me finish (Inaudible).  Did

14   you ever play Simon Says over at Frank and

15   Ileana's?  Did you play a game like Simon Says?

16        JUSTIN COUSINO:  Uh-huh, and a naked game

17   while she wasn't there.

18        J. BRAGA:  Did you ever play any naked games?

19        JUSTIN COUSINO:  Yes, when -- she wasn't

20   there.  She just doesn't want to talk about it.

21        J. BRAGA:  Do you think she doesn't want

22   to talk about it because I am around and do you

23   think she would talk about it with Laurie if

24   I wasn't around because Laurie is a girl?

25        JUSTIN COUSINO:  No.  She's afraid.  She

1     thinks everyone would get embarrassed.

2         J. BRAGA:  Is that right?  You are afraid

3     that everybody would get embarrassed?

4         BROOKE TOBY:  No.

5         JUSTIN COUSINO:  Yes, I think so.

6         J. BRAGA:  Then what?

7         BROOKE TOBY:  (Inaudible).

8         J. BRAGA:  You draw and write, then afterwards

9     we will talk.

10         JUSTIN COUSINO:  This cap broke up but I

11     can fix it.

12         L. BRAGA:  Okay, I don't think it will go

13     back.  You can kind of use the top.  You can

14     kind of shade with it, you know, what I mean?

15         JUSTIN COUSINO:  Like this?

16         L. BRAGA:  Yes, right, or even turn it off

17     inside.  That's pretty.

18         BROOKE TOBY:  Guess what?  I am (Inaudible).

19         L. BRAGA:  Let me see.  Can I see?  Oh boy,

20     you know a lot of letters, don't you?

21         JUSTIN COUSINO:  I know how to make masks.

22     I know how to write masks and --

23         L. BRAGA:  Yes?

24         BROOKE TOBY:  (Inaudible).

25         JUSTIN COUSINO:  I can make the (Inaudible).

NATIONAL REPORTING SERVICE
FT. LAUDERDALE         MARTY LESHAW         MIAMI
(305) 467-0600      OFFICIAL COURT REPORTER     44 W. FLAGLER ST.
         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    If I owned another piece of paper.

2         L. BRAGA:  There you go.

3         JUSTIN COUSINO:  (Inaudible).

4         BROOKE TOBY:  My mom gave me this paper.

5         L. BRAGA:  You want a plain piece of paper?

6         JUSTIN COUSINO:  Yes.

7         L. BRAGA:  Okay.

8         JUSTIN COUSINO:  (Inaudible).

9         L. BRAGA:  They all have that.

10        JUSTIN  COUSINO:  But  I  can't  use  that

11   (Inaudible).  Okay, want to put this one back?

12        BROOKE TOBY:  (Inaudible).  That's a squirrel.

13        L. BRAGA:  How did you get to be so smart?

14        JUSTIN COUSINO:  She's been in college for

15   nine weeks.

16        L. BRAGA:  In college, huh?

17        JUSTIN COUSINO:  Yes.

18        L. BRAGA:  What do you call this one?

19        BROOKE TOBY:  (Inaudible).

20        L. BRAGA:  Can you draw a diamond?

21        BROOKE TOBY:  A diamond?

22        L. BRAGA:  Yes.

23        JUSTIN COUSINO:  Oh, I could draw it.

24        BROOKE TOBY:  (Inaudible).

25        JUSTIN COUSINO:  Here, I could draw a diamond.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                    44 W. FLAGLER ST.
                                                                  (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

17

1    Look.

2         L. BRAGA:  Okay.

3         JUSTIN COUSINO:   It's a little hard.   Oh,

4    that's wrong.

5         L. BRAGA:  You've got the right idea.

6         BROOKE TOBY:  Look, I made a snake.

7         L. BRAGA:  Yes, you did.

8         JUSTIN COUSINO:   I could make a real good

9    snake.

10        BROOKE TOBY:   This is his nose.   I need

11   to make his eyes, his nose.  Those are his knees,

12   eyes and nose.

13        JUSTIN COUSINO:   Look, that's a real good

14   snake.

15        L. BRAGA:   It is a good snake.   Have you

16   ever seen a real good snake?

17        JUSTIN COUSINO:  Yes, I have touched it.

18        L. BRAGA:  Where?

19        JUSTIN COUSINO:  Yes, at the Serpentarium.

20        BROOKE TOBY:  Snakes (Inaudible).

21        JUSTIN COUSINO:  I once picked up a porcupine.

22        L. BRAGA:  Was it sharp?

23        JUSTIN COUSINO:  No, babies aren't sharp.

24        BROOKE TOBY:  (Inaudible).

25        JUSTIN COUSINO:  (Inaudible).

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

18

1         L. BRAGA:  Let me see if that's for me.

2         JUSTIN  COUSINO:  Look  at  my  snake.  He  has

3  fangs here.

4         L. BRAGA:  Look, I am making stuff.

5         JUSTIN  COUSINO:  My  snake  has  fangs  here

6  and --

7         L. BRAGA:  Yes.

8         JUSTIN COUSINO:  And moustache (Inaudible).

9         BROOKE  TOBY:  I know  how  to  make  a  little

10  one.

11         L. BRAGA:  Boy, you have a bad cold, huh?

12         JUSTIN  COUSINO:  I  have  a  moustache.  If

13  I could only fit some red eyes.

14         BROOKE TOBY:  See.  See, I made a --

15         JUSTIN COUSINO:  Here -- this is --

16         BROOKE TOBY:  Justin.

17         JUSTIN COUSINO:  This is a real good snake.

18         L. BRAGA:  It is a good snake.

19         BROOKE TOBY:  Guess what?  I made a worm.

20         L. BRAGA:  You did make a real worm.

21         JUSTIN  COUSINO:  I  will  show  you  how  real

22  worms are.

23         BROOKE TOBY:  (Inaudible).

24         JUSTIN COUSINO:  I have picked up a worm.

25         L. BRAGA:  Did it wiggle all over?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE        OFFICIAL COURT REPORTER        MIAMI
(305) 467-0600                       44 W. FLAGLER ST.
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.  (305) 373-7295

1          JUSTIN COUSINO:  Yes.

2          BROOKE  TOBY:  (Inaudible).   I  saw  a  lot

3     of  worms  and  my  mom  saw  a  lot  of  worms  and

4     (Inaudible).

5          JUSTIN  COUSINO:   I  have  seen  a  worm  this

6     long (indicating).

7          L. BRAGA:  Yeah, that's a long worm.

8          JUSTIN COUSINO:  There are worms about --

9          BROOKE TOBY:  I need (Inaudible).

10          L.  BRAGA:  Can  you  draw  me  a  picture  of

11     you?  Yes.

12          JUSTIN  COUSINO:   Look  how  long  worms  could

13     be.

14          L.  BRAGA:   Oh  boy,  can  you  draw  a  picture

15     of you?

16          BROOKE TOBY:  I have (Inaudible).

17          JUSTIN COUSINO:  Yes, I could see it.  Yes,

18     right here, huh?  Right here.

19          She  once  had  real  long  hair  in  the  summer

20     but --

21          L. BRAGA:  Did you have real long hair before?

22          BROOKE TOBY:  (Inaudible).

23          JUSTIN  COUSINO:   Yes,  she  got  so  hot,  she

24     had to --

25          L. BRAGA:  Trim it?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                           44 W. FLAGLER ST.
                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT. DADE COUNTY. FLA.

1    JUSTIN COUSINO:  Trim it, and now she wants

2    to grow it back.

3        BROOKE TOBY:  It's going to get growing.

4    I want it to grow (Inaudible).

5        JUSTIN COUSINO:  I seen a lady that had

6    hair all the way down from here, down to here,

7    all the way from here down to there.  All the

8    way from there (indicating).  From there to all

9    the way.

10       BROOKE TOBY:  (Inaudible).

11       JUSTIN COUSINO:  All the way from here.

12   All the way from here.  All the way from here.

13       L. BRAGA:  Yes?  Want to come over here?

14       JUSTIN COUSINO:  I have seen them.

15       JUSTIN COUSINO:  How come you can't play

16   with them?

17       BROOKE TOBY:  I am writing.

18       L. BRAGA:  I thought you were going to draw

19   a picture of you?

20       BROOKE TOBY:  I know but I don't want to.

21       L. BRAGA:  (Inaudible).

22       BROOKE TOBY:  Yes, finished (Inaudible).

23       L. BRAGA:  Now draw a picture of you.

24       BROOKE TOBY:  (Inaudible).

25       JUSTIN COUSINO:  Brooke, Brooke, do you

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      think you could use a sheet of this paper?

2              L. BRAGA:  I will give you one.  Do you

3      want to draw a picture of yourself?

4              JUSTIN COUSINO:  Yes, but (Inaudible).

5              BROOKE TOBY:  But it has to be better.

6              JUSTIN COUSINO:  I could do it bigger than

7      that.  Do you want to see?

8              L. BRAGA:  Yes.

9              JUSTIN COUSINO:  I don't want to forget

10     my mom's pen.

11             L. BRAGA:  Give me a Kleenex.

12             JUSTIN COUSINO:  Want to see something?

13             BROOKE TOBY:  My mom has Kleenex (Inaudible).

14             L. BRAGA:  Want me to get some?

15             JUSTIN COUSINO:  Look how neat this thing

16     is.

17             L. BRAGA:  Is that you?

18             BROOKE TOBY:  Yes.

19             L. BRAGA:  That's Brooke, huh?

20             BROOKE TOBY:  Yes.

21             L. BRAGA:  (Inaudible).  Smile.

22             BROOKE TOBY:  Yes.

23             L. BRAGA:  Do you know Noel?

24             BROOKE TOBY:  Yes.

25             L. BRAGA:  Could you draw a picture of Noel?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1      BROOKE TOBY:  (Inaudible).

2      JUSTIN  COUSINO:   I  will  write  myself  for

3  you.

4      L. BRAGA:  Okay.

5      BROOKE  TOBY:  You  have  to  watch  me  because

6  I am writing names.

7      L. BRAGA:  What names are you writing?

8      BROOKE TOBY:  (Inaudible).

9      L. BRAGA:  Oh, you forgot the (Inaudible).

10     BROOKE TOBY:  No.

11     L. BRAGA:  Eyelashes.

12     BROOKE TOBY:  (Inaudible).

13     JUSTIN  COUSINO:   Brooke,  ladies  don't  just

14  have  eyelashes.   That's  what  I  thought  when  I

15  was a little kid.

16     L.  BRAGA:   That  lady  has  eyelashes.   You

17  have eyelashes, everybody does.

18     JUSTIN COUSINO:  Yes.

19     BROOKE TOBY:  Baby (Inaudible).

20     L. BRAGA:  Well, you do (Inaudible).

21     JUSTIN COUSINO:  (Inaudible).

22     BROOKE TOBY:  (Inaudible).

23     L. BRAGA:  Yes.

24     BROOKE TOBY:  They are soft, see?

25     JUSTIN  COUSINO:   I've  had  somebody  take

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                           MIAMI
(305) 467-0600                                        44 W. FLAGLER ST.
                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1        one of these sticky moustaches and put them

2        on her, you know, sticky beards.

3        L. BRAGA:  Yes.

4        JUSTIN COUSINO:  That's how I was Halloween.

5        L. BRAGA:  Yes.

6        JUSTIN COUSINO:  Yes.

7        BROOKE TOBY:  Guess what I was when I was

8  little, two years old?

9        L. BRAGA:  What?

10        BROOKE TOBY:  I was a tiger.

11        JUSTIN COUSINO:  You were a tiger?

12        BROOKE TOBY:  I was Linda --

13        L. BRAGA:  Linda Goodwitch?

14        BROOKE TOBY:  When I am five, I am going

15  to be a ballerina.

16        JUSTIN  COUSINO:  When  I  am -- when  I

17  am -- when  it's next  Halloween, I  am going  to

18  be something real scarey.

19        L. BRAGA:  What?

20        JUSTIN COUSINO:  I am going to be striped.

21        L. BRAGA:  That will be scarey.

22        JUSTIN COUSINO:  I am.

23        L. BRAGA:  Are you going to get a costume

24  from the store or make your own?

25        JUSTIN COUSINO:  (Inaudible) your head and

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    have ears.

2          BROOKE TOBY:  (Inaudible).

3          JUSTIN COUSINO:  I know I will look like

4    a real gremlin with those clothes on.

5          Did you see the move Karate Kid?

6          L. BRAGA:  No, I didn't.  Was it good?  I

7    heard it was pretty good.

8          JUSTIN COUSINO:  It is.  I am doing a picture

9    of myself.

10         BROOKE TOBY:  See what I did?

11         JUSTIN COUSINO:  It's real easy to do it.

12         BROOKE TOBY:  See (Inaudible).

13         JUSTIN COUSINO:  A real good picture.  It's

14    real easy.

15         BROOKE TOBY:  This is for you.

16         L. BRAGA:  Thank you, I appreciate it.  I

17    like that.  It looks like E-O-Z-Y-E.

18         JUSTIN COUSINO:  E-O-Z-Y-E, instead of Brooke.

19    E-O-Y-Z-E.  Could you copy this on a different

20    piece of paper for me?

21         BROOKE TOBY:  No.

22         JUSTIN COUSINO:  (Inaudible).

23         BROOKE TOBY:  I have to (Inaudible) for

24    my mom.

25         JUSTIN COUSINO:  I think she would like

1       it if you would write that for her.

2              BROOKE TOBY:  O-X-X-O-O (Inaudible) my mom.

3              JUSTIN  COUSINO:  Your  mom  has  to  let  you

4       write stuff.

5              BROOKE  TOBY:  This  could  be  for  you  but

6       I can't give it to you.

7              JUSTIN COUSINO:  I know.

8              BROOKE TOBY:  What is this?

9              L.  BRAGA:  It's  a  piece  of  coral.  Once

10      upon  a  time  it  was  alive  at  the  bottom  of  the

11      ocean.

12             JUSTIN COUSINO:  Coral is alive?

13             L.  BRAGA:  Yes,  when  it's  at  the  bottom

14      of the ocean it's alive and it moves.

15             JUSTIN  COUSINO:  This  is  a  pretty  piece

16      of coral.

17             BROOKE TOBY:  (Inaudible).

18             JUSTIN  COUSINO:  I  have -- have  you  ever

19      seen a sponge?

20             L. BRAGA:  Yes.

21             JUSTIN  COUSINO:  One  of  the  things  on  the

22      beach?

23             L. BRAGA:  Yes.

24             JUSTIN  COUSINO:  I  have  one  of  those  but

25      it's alive.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1       L. BRAGA:  They smell terrible.

2       JUSTIN COUSINO:  It's alive.

3       L. BRAGA:  Is it in a tank?

4       JUSTIN COUSINO:  Yes, they smell terrible

5 when you take them out of the water.

6       L. BRAGA:  That's what I meant, when you

7 find them on the beach.  Yuch.

8       JUSTIN COUSINO:  When you smell them, it's

9 real gross.

10      L. BRAGA:  Yes, it's gross.

11      JUSTIN COUSINO:  I smelled it's breath because

12 blood is coming out, that clear stuff.  It's

13 blood.

14      L. BRAGA:  Is it blood?

15      JUSTIN COUSINO:  Yes.

16      L. BRAGA:  Really?

17      JUSTIN COUSINO:  Yes.

18      BROOKE TOBY:  Look.

19      L. BRAGA:  Who is that?

20      BROOKE TOBY:  (Inaudible).

21      JUSTIN COUSINO:  Who, Brooke?

22      BROOKE TOBY:  My mom.

23      L. BRAGA:  Your mom, okay.

24      JUSTIN COUSINO:  Because it has to be your

25 mom.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0600                                                       44 W. FLAGLER ST.
                                                                     (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT DADE COUNTY FLA

1        BROOKE TOBY:  Here's a picture of my mom.

2        L. BRAGA:   That kind of looks like your

3   mom.

4        BROOKE TOBY:  (Inaudible).   When she was

5   young, she had straight hair.

6        L. BRAGA:  Like yours?

7        JUSTIN COUSINO:  Or like mine.

8        BROOKE TOBY:  When she was little, she had

9   it.   Now she's little and she's a mom.   When

10   I get bigger, I am a mother and (Inaudible).

11        JUSTIN COUSINO:   You will be real old

12   when -- when Brooke went -- when you are a grown

13   up, you'll be an old lady when she's a grown

14   up Brooke.

15        L. BRAGA:  Uh-huh.  Yup, that's true.

16        BROOKE TOBY:  But this has to be for my

17   mom.

18        L. BRAGA:  That was nice.

19        BROOKE TOBY:  My mom has to guess what it

20   is.

21        JUSTIN COUSINO:  Where is the box of crayons?

22        L. BRAGA:  I know where the box is.  I think

23   most are here.

24        JUSTIN COUSINO:  Oh.

25        BROOKE TOBY:  I want a plain piece of paper.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                OFFICIAL COURT REPORTER                MIAMI
(305) 467-0800                                                    44 W. FLAGLER ST.
                                                                   (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1     L. BRAGA: You want a plain piece of paper?

2  Here.

3     JUSTIN COUSINO: Here, the picture of myself.

4     L. BRAGA: Is that you?

5     JUSTIN COUSINO: Yes.

6     L. BRAGA: That's very good. Can I write

7  your name on it?

8     JUSTIN COUSINO: Let me see if I have room

9  for a hat.

10     L. BRAGA: Okay.

11     JUSTIN COUSINO: Let me think if I could.

12     L. BRAGA: That's a snail?

13     BROOKE TOBY: A snail.

14     JUSTIN COUSINO: That's a real good snail.

15  I will show you something that is really something.

16  Look.

17     BROOKE TOBY: (Inaudible).

18     JUSTIN COUSINO: Let me put a hat on.

19     L. BRAGA: What do you want, another piece

20  of paper? Here.

21     BROOKE TOBY: That's your picture.

22     L. BRAGA: That's mine? Thank you, I

23  appreciate it.

24     JUSTIN COUSINO: If I could, I could make

25  sunglasses but this --

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          L. BRAGA:  That's a hat?

2          JUSTIN  COUSINO:   Yes -- no,  that  is  what

3     we think, it's something -- sunglasses.

4          L. BRAGA:   Like  on  top  of  your  head  which

5     some people --

6          JUSTIN COUSINO:   No.   That  is  a  funny  mask

7     that fell on my head.

8          L. BRAGA:  Okay.

9          BROOKE TOBY:  Here's a snail.

10         L. BRAGA:  That's a good snail, yes.

11         BROOKE TOBY:  That's a little snail.

12         JUSTIN  COUSINO:   Snail?   You  want  to  write

13    snail?

14         BROOKE TOBY:  No.

15         JUSTIN  COUSINO:   You  have  to  make  it  real

16    light brown.

17         BROOKE TOBY:  (Inaudible).

18         JUSTIN COUSINO:  (Inaudible).

19         L.  BRAGA:   This  is  kind  of  orange.   It's

20    kind of yellow/orange.  I don't know.

21         JUSTIN  COUSINO:   I  think  brown  is  on  the

22    floor -- no, it fell on the floor.

23         BROOKE TOBY:  No, I've got brown.

24         JUSTIN COUSINO:  Let me use it.

25         BROOKE  TOBY:   I  need  it  one  more  time  for

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                    MIAMI
(305) 467-0600                                              44 W. FLAGLER ST.
                                                             (305) 373-7295

1       zero and the X.

2              JUSTIN COUSINO:  What does that spell?

3              L. BRAGA:  Eyes, yuch.

4              BROOKE TOBY:  (Inaudible).

5              L. BRAGA:  Okay.

6              BROOKE TOBY:  My mom would have to be real

7       glad (Inaudible).

8              JUSTIN COUSINO:  Let me make a (Inaudible).

9              BROOKE TOBY:  (Inaudible).  Who put all

10      these crayons out?

11             JUSTIN COUSINO:  I am using them.

12             BROOKE TOBY:  All of them?

13             JUSTIN COUSINO:  You could use some, Brooke.

14             BROOKE TOBY:  (Inaudible).

15             JUSTIN COUSINO:  What do you mean?  Yes,

16      Brooke, could I use the black?

17             BROOKE TOBY:  I need it.

18             JUSTIN COUSINO:  I need it.

19             BROOKE TOBY:  (Inaudible).

20             JUSTIN COUSINO:  What are you making?

21             BROOKE TOBY:  That's a (Inaudible).

22             L. BRAGA:  Yes, it is.

23             JUSTIN COUSINO:  Walking into a door.

24             BROOKE TOBY:  Yes.

25             JUSTIN COUSINO:  Walking into a door?  The

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                          44 W. FLAGLER ST.
                                                                         (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA

1      sunglasses that Michael Jackson wears.

2           L. BRAGA:  Oh, yes.

3           JUSTIN COUSINO:  I have some of those glasses

4      in the car.

5           BROOKE TOBY:  Here's my other picture.

6           L. BRAGA:  That's nice.

7           BROOKE TOBY:  I only made three pictures.

8      I need two more.

9           L. BRAGA:  More paper?

10           BROOKE TOBY: My mom (Inaudible).

11           JUSTIN COUSINO:  Oh, I am going to be eating

12      something if I could, let me think.

13           L.  BRAGA:  You  are  making  this  a  pretty

14      complicated picture, huh?

15           JUSTIN COUSINO:  I could do something.  Just

16      a second.

17           BROOKE  TOBY:  A  little  (Inaudible).   A

18      little  (Inaudible)  and  again.   That's  going  to

19      be a balloon.

20           L. BRAGA:  Well, that's nice, a heart balloon,

21      huh?

22           BROOKE  TOBY:   Heart  balloon.  (Inaudible).

23      This and this and this and this.  See?

24           L. BRAGA:  Very nice.

25           BROOKE TOBY:  Balloons.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
FT. LAUDERDALE                                                      MIAMI
(305) 467-0600                                                 44 W. FLAGLER ST.
                                                               (305) 373-7295

1      L. BRAGA:  Can you draw?

2      BROOKE TOBY:  Justin, can you see the balloon?

3      JUSTIN COUSINO:  Oh, neat.

4      L. BRAGA:  Can you draw a picture of Ileana?

5      BROOKE TOBY:  No, I can't.

6      L. BRAGA:  No?  Why?

7      BROOKE TOBY:  Because I can't.  I just can't.

8      L. BRAGA:  You don't remember what she looks

9  like?

10     BROOKE  TOBY:  (Inaudible).  I  am  making

11  balloons.

12     JUSTIN COUSINO:  Here's -- here's my picture.

13     L.  BRAGA:  That's great.  Can I write your

14  name on it?

15     JUSTIN COUSINO:  Let me do it.  I need a

16  purple, red, violet.  I haven't spelled my name

17  in a long time.  J-U-S-T-I-N.

18     L. BRAGA:  Uh-huh.  Excellent.

19     JUSTIN COUSINO:  In --

20     BROOKE TOBY:  Look at this?

21     L. BRAGA:  Those are nice, those balloons.

22     JUSTIN COUSINO:  C-O.

23     L. BRAGA:  You are going to write the last

24  name too?  Huh?

25     JUSTIN COUSINO:  C-O-U-S --

FT. LAUDERDALE
(305) 467-0600

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1       L. BRAGA:  Uh-huh?

2       JUSTIN  COUSINO:   I-N-O.   You  know  what  it

3   is?

4       L. BRAGA:  Uh-huh.

5       JUSTIN COUSINO:  Oh.

6       L. BRAGA:  No, I think (Inaudible).

7       BROOKE TOBY:  See, look?

8       JUSTIN COUSINO:  O-N, O-N.

9       BROOKE TOBY:  Justin.

10      These  are  people  I  am  making  for  my  mom

11   (Inaudible).

12      JUSTIN COUSINO:  Okay.  (Inaudible).

13      L. BRAGA:  Oh, that's nice.

14      JUSTIN  COUSINO:   That's  how  it's  going  to

15   be.

16      L.  BRAGA:  You  must  be  happy,  singing  a

17   song.

18      JUSTIN  COUSINO:   Yes.   That's  as  good  as

19   I can draw a picture.

20      L.  BRAGA:   I  think  that's  very  good.   I

21   like that.

22      JUSTIN COUSINO:  What does that say?

23      L.  BRAGA:   8-13-84.   That's  today's  date,

24   August 13th, 1984.

25      BROOKE TOBY:  1985 is my birthday.

NATIONAL  REPORTING  SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT  COURT  OF  THE  11TH  JUDICIAL  CIRCUIT.  DADE  COUNTY,  FLA.

1     L. BRAGA:  Yes.

2     JUSTIN COUSINO:  How do you write Paul?

3     L. BRAGA:  Paul?

4     JUSTIN COUSINO:  Yes.

5     L. BRAGA:  P-A-U-L.

6     JUSTIN COUSINO:  P --

7     L. BRAGA:  A.

8     JUSTIN COUSINO:  A.

9     L. BRAGA:  U.

10     JUSTIN COUSINO:  U.

11     L. BRAGA:  L.

12     JUSTIN COUSINO:  L.  That's my second name.

13     L. BRAGA:  Oh, yes.

14     JUSTIN COUSINO:  Yes.

15     L. BRAGA:  Is it Justin Paul or Paul Justin?

16     JUSTIN COUSINO:  It's Justin Paul Cousino,

17 but (Inaudible).

18     L. BRAGA:  So you put it at the beginning?

19 (Inaudible).

20     JUSTIN COUSINO:  What should I do now?  Oh,

21 I now what I should do, make a radio, if I could.

22 Oh, yes.

23     BROOKE TOBY:  That's easy to do because

24 (Inaudible).

25     JUSTIN COUSINO:  Oh it's easy, Brooke, it's

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1    real easy.  (Inaudible).  Switch there.

2            Okay,  now  what  should  I  do?  Oh  yes,  one

3    second.

4            BROOKE TOBY:  I am trying to make --

5            L. BRAGA:  Do  you  think  it's  time  yet  that

6    you could talk to us about what happened at Frank

7    and Ileana's house?

8            BROOKE TOBY:  I am coloring.

9            L. BRAGA:  I know.  First  you  were  writing,

10   then you were coloring.

11           When will you have time?

12           BROOKE  TOBY:   I  have  to  make  these  pictures

13   for my mom (Inaudible).  One more picture.

14           L. BRAGA:  Okay, when  you  finish  this  paper,

15   will you talk to me?

16           BROOKE TOBY:  I am making (Inaudible).

17           JUSTIN  COUSINO:   Okay,  here.  Here's  one

18   more thing.

19           L. BRAGA:  Okay.

20           JUSTIN COUSINO:   The  color  of  the  rainbow.

21   Did you ever see the movie Thriller?

22           L. BRAGA:  Yes.

23           JUSTIN COUSINO:  It's not very good.

24           L. BRAGA:  No?

25           JUSTIN COUSINO:  For children.

1    L. BRAGA:  It's scarey.

2    JUSTIN COUSINO:  Yes.

3    BROOKE TOBY:  Oh, yes.

4    JUSTIN COUSINO:  Look.

5    L. BRAGA:  Very nice.  Thank you.  Can I

6    keep that?

7    JUSTIN COUSINO:  Uh-huh, wait a second,

8    I have to make something else.

9    Brooke, could I -- where is the black?  Oh,

10   I found it.

11   BROOKE TOBY:  (Inaudible).

12   L. BRAGA:  (Inaudible).  Can I write your

13   name?

14   JUSTIN COUSINO:  (Inaudible).

15   L. BRAGA:  Oh.

16   JUSTIN COUSINO:  Wait a second.

17   L. BRAGA:  Something else, huh?

18   JUSTIN COUSINO:  Yes.

19   BROOKE TOBY:  (Inaudible).

20   JUSTIN COUSINO:  I am going to make two,

21   three antennas.

22   L. BRAGA:  Okay.

23   JUSTIN COUSINO:  If I have enough room.

24   If I have enough room for four, I will make four.

25   BROOKE TOBY:  See, I made a banana.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1       L. BRAGA:  Yes, you did.

2       JUSTIN COUSINO:  There, I made enough room

3  for four.

4       BROOKE TOBY:  And here is a tomato.

5       L. BRAGA:  A tomato?  Do you like tomatoes?

6  Bananas?

7       JUSTIN COUSINO:  (Inaudible).

8       BROOKE TOBY:  (Inaudible).

9       JUSTIN COUSINO:  I like fruit cocktail.

10  I really like plums.

11       L. BRAGA:  Plums?

12       JUSTIN COUSINO:  That's my favorite fruit

13  and my brother eats too much fruit.

14       BROOKE TOBY:  He eats tomatoes.

15       JUSTIN COUSINO:  I don't like tomatoes.

16       L. BRAGA:  Neither of you like tomatoes.

17       JUSTIN COUSINO:  I don't like tomatoes with

18  cream cheese.

19       L. BRAGA:  Tomatoes with cream cheese?  I

20  never even heard of that.

21       BROOKE TOBY:  (Inaudible).

22       JUSTIN COUSINO:  (Inaudible).

23       BROOKE TOBY:  (Inaudible).

24       JUSTIN COUSINO:  Oh, wait a second.

25       L. BRAGA:  You want to put something else?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE      OFFICIAL COURT REPORTER      MIAMI
(305) 467-0600                                        44 W. FLAGLER ST.
                                                 (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

```
 1          JUSTIN COUSINO:  Yes.  I don't know what

 2     I am doing.

 3          L. BRAGA:  Okay.

 4          BROOKE TOBY:  (Inaudible).

 5          JUSTIN COUSINO:  Do you want to do it here?

 6     You could do it.  There's no problem.

 7          L. BRAGA:  Bless you.

 8          JUSTIN COUSINO:  What do I want?  Ears,

 9     ears, ears.

10          BROOKE TOBY:  I am making -- I am trying

11     to make (Inaudible).  Oh, yes.  These are eyes

12     and then nose and happy face and then make it

13     like --

14          JUSTIN COUSINO:  Where is the -- (Inaudible).

15          BROOKE TOBY:  This is not me?

16          L. BRAGA:  No?  Who?

17          BROOKE TOBY:  It's somebody else.

18          JUSTIN COUSINO:  Oh.

19          BROOKE TOBY:  This is going to be Melissa.

20     Melissa is my friend.

21          JUSTIN COUSINO:  I am going to make a

22     necklace.  That's what I am going to do.

23          BROOKE TOBY:  (Inaudible).

24          JUSTIN COUSINO:  I am getting a Christian

25     necklace.
```

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0800

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1       BROOKE TOBY:  (Inaudible).

2       JUSTIN COUSINO:  (Inaudible).

3       L. BRAGA:  Did you see he did it?

4       BROOKE TOBY:  (Inaudible).

5       JUSTIN COUSINO:  (Inaudible).

6       BROOKE  TOBY:  I  am  getting  AT  vitamins

7   (Inaudible).

8       L. BRAGA:  ET?

9       JUSTIN COUSINO:  AT vitamins?

10       BROOKE TOBY:  AT vitamins.

11       JUSTIN COUSINO:  AT or ET?

12       BROOKE TOBY:  AT.

13       JUSTIN COUSINO:  AT or ET?

14       BROOKE TOBY:  AT.

15       JUSTIN COUSINO:  ET.  Are you going to get

16   ET? Say E--

17       BROOKE  TOBY:  ET  vitamins  and  I  hate -- it

18   has --

19       JUSTIN COUSINO:  Oh, I've tasted the cereal.

20       BROOKE TOBY:  It tasted like disgusting.

21       L. BRAGA:  Tasted disgusting?

22       JUSTIN COUSINO:  Right.

23       BROOKE  TOBY:  It  has  chocolate  and  peanut

24   butter (Inaudible).  Chocolate with peanut butter.

25       JUSTIN COUSINO:  I like it.

1    L. BRAGA:  You like it?  It's good?  It's

2    like eating candy, huh?

3    JUSTIN COUSINO:  Yes, you can only taste

4    the peanut butter, not the --

5    L. BRAGA:  Do you like Reeses pieces?

6    JUSTIN COUSINO:  Well --

7    L. BRAGA:  Who is that?

8    JUSTIN COUSINO:  Yes, but I don't like it

9    that much.

10    L. BRAGA:  When you leave here --

11    JUSTIN COUSINO:  Yes.

12    L. BRAGA:  Brooke, can I ask you a question?

13    BROOKE TOBY:  I have to do this.

14    L. BRAGA:  You always have to do it.  Can

15    I ask you a question?

16    BROOKE TOBY:  Yes.

17    L. BRAGA:  If you think you might want to

18    talk to us about some stuff then that's okay

19    and we'd like to, but if you think you are not

20    going to, then we need to talk to some other

21    children.

22    JUSTIN COUSINO:  You could talk to me.

23    L. BRAGA:  I -- well, I know.  We talked

24    to you a lot.  Do you want to talk some more?

25    JUSTIN COUSINO:  Yes (Inaudible).

1    L. BRAGA:  That's excellent.

2    JUSTIN COUSINO:  I have never made a picture.

3    L. BRAGA:  Well, I think it's pretty neat.

4    I'd like to keep it.  Going to play with the --

5    JUSTIN COUSINO:  Are you going to make more

6    pictures?

7    BROOKE TOBY:  This could be Justin.

8    L. BRAGA:  Okay.

9    JUSTIN COUSINO:  Who will be Justin?

10   L. BRAGA:  That.  Okay.

11   JUSTIN COUSINO:  You know who looks like

12   me?

13   BROOKE TOBY:  This (Inaudible).

14   JUSTIN COUSINO:  This looks like me.

15   BROOKE TOBY:  That's Frank.

16   JUSTIN COUSINO:  This is going to be me.

17   BROOKE TOBY:  That's going to be you and

18   this is going to be Jonathan.

19   JUSTIN COUSINO:  No, that's going to be

20   Frank.  This is going to be Ileana and this is

21   going to be you.

22   BROOKE TOBY:  Wait.

23   JUSTIN COUSINO:  This is going to be you.

24   BROOKE TOBY:  Well, I haven't stopped it.

25   JUSTIN COUSINO:  That's going to be you.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          BROOKE  TOBY:  How  come  you  are  taking  those

2     off?

3          JUSTIN   COUSINO:   Because   they   come   off.

4     They come off.  That's going to be you.

5          BROOKE  TOBY:  I know.

6          JUSTIN  COUSINO:  I  know  because  you  don't

7     have any hair down there, right?

8          BROOKE  TOBY:  Yes, and --

9          JUSTIN  COUSINO:  Look, this is neat.

10         BROOKE  TOBY:  He's got a penis.

11         JUSTIN  COUSINO:  Real neat, aren't they?

12         BROOKE  TOBY:  Yes.

13         JUSTIN  COUSINO:  That's  why  that's  not  you.

14    Here,  let  me  undress  --  Brooke,  you  don't  have

15    to drag it.  She likes to drag things.

16         BROOKE  TOBY:  Look at this.

17         JUSTIN   COUSINO:   Oh   neat.   I've  --  I've

18    seen a lady who --

19         BROOKE  TOBY:  This.

20         JUSTIN  COUSINO:  I've  seen  a  lady  who  always

21    takes her clothes off.

22         L. BRAGA:  Who?

23         JUSTIN  COUSINO:  Some  nine  year  old  up  --  they

24    go to the pool naked.

25         L. BRAGA:  Yes?

1    JUSTIN COUSINO:  Nine year old girl.

2    L. BRAGA:  Where you live?

3    JUSTIN COUSINO:  Yes.  They go into the

4    pool naked.

5    BROOKE TOBY:  And they go out of the pool

6    naked.

7    JUSTIN COUSINO:  Yes (Inaudible).

8    BROOKE TOBY:  I can have the girls.  You

9    can have the boys.

10   JUSTIN COUSINO:  Wait a second.  Here, this

11   is Brooke.  So because (Inaudible).  That's Ileana.

12   L. BRAGA:  Okay.

13   BROOKE TOBY:  She (Inaudible).

14   JUSTIN COUSINO:  This is Frank and --

15   BROOKE TOBY:  Let me get -- let me get

16   (Inaudible).  Here's Stephanie.

17   L. BRAGA:  Okay.

18   JUSTIN COUSINO:  This is Stephanie.  Is

19   there parts like --

20   L. BRAGA:  No.

21   JUSTIN COUSINO:  These people.

22   L. BRAGA:  No, this one is like you.  Learn

23   to put on and zipper things and it doesn't have

24   parts or anything.

25   JUSTIN COUSINO:  Let me see this.

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE          OFFICIAL COURT REPORTER          MIAMI
(305) 467-0600                                          44 W. FLAGLER ST.
                                                        (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    L. BRAGA:  So what games should we play?

2    JUSTIN COUSINO:  Learn to zipper (Inaudible).

3    L.  BRAGA:   Right.   So  what  games  should

4    we play, Brooke?

5    BROOKE TOBY:  Pee-pee game, no way.

6    JUSTIN COUSINO:  No, it's the dolls.

7    BROOKE TOBY:  Pee-pee game.

8    L.  BRAGA:   We  are  just  going  to  pretend

9    with  the  dolls.  Can  you  show  us  how  to  play

10   it?

11   BROOKE TOBY:  I don't know how.

12   JUSTIN  COUSINO:  I  do.   I  will  be  glad  to

13   teach you.

14   BROOKE TOBY:  I don't want to play pee-pee.

15   L. BRAGA:  What game would you like to play?

16   BROOKE TOBY:  Grocery game.

17   JUSTIN  COUSINO:   You  know  something?   Why

18   don't we?

19   L.  BRAGA:   Did  you  ever  play  a  grocery  game

20   at Frank and Ileana's?

21   JUSTIN COUSINO:  Let me tell you something.

22   BROOKE TOBY:  (Inaudible).

23   JUSTIN  COUSINO:   Why  don't  we  play  Simon

24   Says?  I  will  tell  you  what  to  do.  I  will  be

25   up  there  and  --  no,  I  mean  you  are  not  doing

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0800                                                              44 W. FLAGLER ST.
                                                                           (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1    it with dolls.

2        BROOKE TOBY:  (Inaudible).

3        JUSTIN COUSINO:  Be doing it but we won't

4    play the pee-pee game.

5        BROOKE TOBY:  No.

6        L. BRAGA:  No way?

7        JUSTIN COUSINO:  No way.

8        BROOKE TOBY:  No way Jose.

9        JUSTIN COUSINO:  We will have to undress

10   you and me.

11       BROOKE TOBY:  No way.

12       JUSTIN COUSINO:  Don't put this over here.

13   I don't want to forget him.

14       L. BRAGA:  Can you tell me, show me with

15   the dolls or tell me games that you play?

16       BROOKE TOBY:  (Inaudible).

17       JUSTIN COUSINO:  (Inaudible).

18       BROOKE TOBY:  No, he's saying that.

19       L. BRAGA:  He's saying that?

20       JUSTIN COUSINO:  I will teach you how to

21   play it first.

22       BROOKE TOBY:  I want to see my mom.

23       JUSTIN COUSINO:  (Inaudible).  Spin me around.

24       L. BRAGA:  Breakdancing?

25       JUSTIN COUSINO:  You could twist your neck

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          instead of your head.

2          L. BRAGA:  You want to come with me?  I

3     am really thirsty.  I want to get something to

4     drink.

5          JUSTIN COUSINO:  I am going to let you -- let

6     you keep these men.

7          J. BRAGA:  (Inaudible).

8          THE COURT:  Fast foward the tape please.

9          J. BRAGA:  Laurie, do you want to sign this?

10         THE COURT:  Fast forward the tape.

11         (Thereupon, the video tape was concluded.)

12         MR. SAMEK:  Defense Exhibit L, August 14,

13    1984 of Noel Fuster.

14         THE COURT:  All right.

15         (Thereupon, the following is taken from

16    a video.)

17         J. BRAGA:  Noel can come in.  You can come

18    in.  I don't mean to hold you up.  I am going

19    to make a phone call.

20         NOEL FUSTER:  There's a family.

21         L. BRAGA:  Yes, and I got you some more

22    paper in case you wanted to draw some more pictures

23    because I really liked your pictures.

24         J. BRAGA:  Look who left their toys outside?

25         L. BRAGA:  Did you see that toy?

NATIONAL REPORTING SERVICE
MARTY LESHAW
FT. LAUDERDALE                    OFFICIAL COURT REPORTER                    MIAMI
(305) 467-0600                                                        44 W. FLAGLER ST.
                                                                      (305) 373-7295
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

1                    <u>CERTIFICATE</u>

2

    STATE OF FLORIDA:
3                              SS
    COUNTY OF DADE  :

4

5        I, LYNN G. LENFESTEY, COURT REPORTER, HEREBY CERTIFY

   THE THE FOREGOING TRANSCRIPT, NUMBERED FROM PAGE 1 TO AND
6
   INCLUDING 46, IS A TRUE AND CORRECT TRANSCRIPTION OF MY
7
   STENOGRAPHIC NOTES OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED
8
   CAUSE, TIME AND PLACE AFORESAID.

9

10       DATED AT MIAMI, DADE COUNTY, FLORIDA, THIS 16TH  DAY

11  OF JANUARY, 1986.

12

13

14                              Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1        J. BRAGA:  (Inaudible).

2        NOEL FUSTER:  Are you going to take these

3    (Inaudible).

4        L. BRAGA:  You are pretty good at that.

5        NOEL FUSTER:  Yes.

6        L. BRAGA:  Want to draw some pictures?

7        NOEL FUSTER:  Yes.

8        L.  BRAGA:  Why don't you bring the papers

9    and crayons down here.

10        NOEL FUSTER:  Black (Inaudible).

11        L.  BRAGA:  (Inaudible).  Are you going to

12    take both of them, then you have a lot of choices?

13        NOEL FUSTER:  (Inaudible).

14        L. BRAGA:  See if this one has it.

15        NOEL FUSTER:  A lot of crayons.

16        L.  BRAGA:  What are you looking for, something

17    to lean on?

18        J.  BRAGA:  Something to lean on.  Let me

19    see what I can find to use as a desk.  Right.

20    Would that be good?  Is that big enough?

21        NOEL FUSTER:  Yes.

22        L.  BRAGA:  Otherwise if it isn't big enough,

23    there's a pile of paper there and you could put

24    one sheet on top of the other ones.

25        Want to do it this way?

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, DADE COUNTY, FLA.

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

1          J. BRAGA:  Think that's better?

2          NOEL FUSTER:  Red (Inaudible).  Red.

3          L. BRAGA:  Uh-huh, you are a good reader.

4          NOEL FUSTER:  Uh-huh.

5          J. BRAGA:  You like to read?

6          NOEL FUSTER:  (Affirmative nod.)

7          J. BRAGA:  Me too.  We will let you decide

8    what you want to draw.

9          NOEL FUSTER:  (Inaudible).

10         J. BRAGA:  A snowman.  Have you ever seen

11   snow?

12         NOEL FUSTER:  Huh?

13         J. BRAGA:  Have you ever seen snow?

14         NOEL FUSTER:  (Negative nod.)

15         L. BRAGA:  Would you like to some day?

16         NOEL FUSTER:  (Inaudible).

17         J. BRAGA:  They say it's cold to touch.

18         NOEL FUSTER:  (Inaudible).

19         J. BRAGA:  Didn't they say a couple years

20   ago it actually snowed in Miami, just a little

21   bit?  I remember getting up one morning and they

22   said there were a few flurries and I said who

23   saw it?  They said as soon as it got down to

24   the ground, it melted.  Isn't that true?

25         L. BRAGA:  Uh-huh.

NATIONAL REPORTING SERVICE
MARTY LESHAW
OFFICIAL COURT REPORTER

FT. LAUDERDALE
(305) 467-0600

MIAMI
44 W. FLAGLER ST.
(305) 373-7295

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE